**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| ZILLOW GROUP, INC. and ZILLOW, INC., <br><br>     *Plaintiffs*, <br><br> v. <br><br> MIDWEST REAL ESTATE DATA LLC, COMPASS, INC., and COMPASS ILLINOIS, INC., <br><br>     *Defendants*. | Case No. 1:26-cv-5451 <br><br> **JURY TRIAL DEMANDED** |

**<u>COMPLAINT</u>**

**TABLE OF CONTENTS**

I.     INTRODUCTION ............................................................................................1

II.    THE PARTIES ..............................................................................................6

    A.    Plaintiffs...........................................................................................6

    B.    Defendants .......................................................................................7

III.    JURISDICTION AND VENUE ...................................................................9

IV.    TRADE AND COMMERCE.......................................................................10

V.    INDUSTRY BACKGROUND ....................................................................11

    A.    The Multiple Listing Service System ............................................11

    B.    The Rise of Private Listings..........................................................14

VI.    ZILLOW'S COMPETITIVE RESPONSE: LISTING ACCESS
    STANDARDS..............................................................................................19

    A.    The Listing Access Standards .......................................................19

    B.    Compass's Campaign to Suppress the Listing Access Standards ..............23

VII.    MRED AND COMPASS'S ANTICOMPETITIVE AGREEMENT ....................24

    A.    The Conspiracy to Implement MRED's Revised Rules to Protect
    Defendants' Competing PLNs in Chicagoland .........................................25

    B.    The Conspiracy to Deprive Zillow of Sufficient Alternative Direct
    Brokerage Feeds to Avoid Reliance on MRED .........................................28

    C.    The Conspiracy Evolves from Boycotting Zillow's Access to MRED's
    Chicagoland Listings to Protecting Defendants' Competing PLNs
    Nationally...................................................................................................30

    D.    Defendants Poised to Immediately Terminate Zillow's Access to the
    MRED Listing Feed....................................................................................32

VIII.    RELEVANT MARKETS............................................................................35

    A.    Market for Residential Real Estate Listing Creation and Distribution ......35

    B.    Market for Brokerage Services .....................................................38

IX.    MARKET POWER.....................................................................................39

A.      Market for Residential Real Estate Listing Creation and Distribution ......39

B.      Market for Brokerage Services ..................................................................41

X.     ANTICOMPETITIVE EFFECTS AND ANTITRUST INJURY .........................42

XI.    CLAIMS FOR RELIEF .....................................................................................45

XII.   REQUESTED RELIEF........................................................................................49

XIII.  JURY DEMAND .................................................................................................50

Plaintiffs Zillow Group, Inc. and Zillow, Inc. ("Plaintiffs" or "Zillow"), allege the following against Defendants Midwest Real Estate Data LLC ("MRED"), Compass, Inc. (d/b/a Compass International Holdings), and Compass Illinois, Inc. (together "Compass") (all collectively, "Defendants"):

## I.      INTRODUCTION

1.      This action seeks to restore competition and transparency in residential real estate. Since its founding, Zillow has long sought to democratize real estate information and "turn on the lights" for home sellers and buyers by making it easy to find, buy, rent, or sell a home. Critical to that mission—and to an efficient and fair market—is the free flow of information about homes for sale. But in recent years, some powerful players in the real estate industry, such as MRED— Chicagoland's monopolist multiple listing service ("MLS"), and Compass, the country's largest real estate brokerage, have erected barriers to information that harm or threaten harm to sellers, buyers, and competitors by hiding real estate listings behind a velvet rope in a Private Listing Network ("PLN"). When Zillow decided last year to stand up for listings transparency and declined to support PLN listings on its own platforms, MRED entered into a conspiracy with Compass, the operator of a competing PLN in Chicagoland. Defendants conspired to threaten to cut off Zillow's access to *all* of the real estate listings controlled by MRED and Compass in Chicagoland—a critical input for competition in the market—in a naked effort to coerce pro-transparency competitors to abandon their business models. Defendants' conduct violates fundamental antitrust law and must be stopped to protect consumers and restore competition.

2.      It is basic economics that the free flow of information supports an efficient and competitive marketplace. In the world of residential real estate sales, the most important information for all market participants is listings. Listings communicate to potential buyers which properties are for sale, how much a seller wants for the property, and what features and qualities

1

the property has. By making listings broadly available and easily accessible, Zillow's pro-transparency platform reduces barriers to information and enables sellers to attract the widest possible pool of home buyers. Transparent listings likewise benefit buyers by informing them of the widest possible inventory of homes for sale so that they can find their dream home and calibrate their bidding strategy based on market conditions. This brings enormous benefits to both sides of the home sale transaction—one of life's most important financial decisions.

3. Others also benefit from transparent listings. Accessible listings enhance competition among real estate agents because buyers' agents are able to compete on the basis of their quality of service and price (i.e., commission rates), rather than the quantity of hidden listings they are able to show prospective buyers. Other market participants—such as websites that display home sale listings—benefit too. Accessible listings reduce barriers to entry because business is won on the basis of innovation and quality of service, rather than which firm can gatekeep the most listings.

4. Given the profound benefits of transparent listings and harms of PLNs, most MLSs across the country have implemented policies that require sellers' agents to enter listings into the local MLS within 1-2 days after the listing is marketed publicly. This ensures that all market participants can readily learn about homes for sale in a timely manner.

5. In recent years, some MLSs and brokerages have sought to undermine this transparent business model for their own benefit and to the detriment of competition as a whole. Compass, by far the largest brokerage in the country and the dominant brokerage in Chicagoland, is the most prominent example. Rather than share all of its listings transparently—as its competitors do—Compass has sought to anticompetitively benefit from its dominance by hiding listings from anyone who is not working with a Compass agent in a PLN. In Phase 1 of Compass's

2

3-Phase Marketing Strategy ("3PM"), its Private Exclusive Listings are accessible only via Compass agents. This allows Compass to lure prospective home buyers to its brokerage with the promise of access to listings hidden behind a registration wall and engineer deals where its agents represent both sides of the transaction. While Compass can use these listings to attract buyers and recruit agents from competitors by touting private inventory, the vast majority of those listings fail to sell while hidden. Compass benefits while its sellers' listings languish unsold. Compass then later enters them into the MLS where Compass can free-ride on the benefits of transparency and liquidity that flow from Compass's competitors having entered their listings into the MLS from the start.

6.      In April 2025, Zillow took a competitive stand, consistent with its longtime pro-consumer focus, against these harmful schemes. Zillow unilaterally adopted its Listing Access Standards ("Standards"), which stated that Zillow will not display on its own websites listings that had been previously marketed privately to only a select group of buyers and were withheld from all market participants. All other platforms and brokerages, including Compass, remained free to display private listings on their own websites, but simply not on Zillow's.

7.      Zillow's Standards are an important dimension of differentiation and a driver of increased competition. By reinforcing Zillow's brand promise to consumers, it is a key business tactic by which Zillow competes against MRED's and Compass's PLNs and to obtain and display new-to-market listings, which are among the most valuable listings. Zillow's Standards enhance competition and choice because they force MRED and Compass to convince sellers that their PLN offers superior value and results. And indeed, since Zillow has introduced the Standards, Compass has invested in promoting its view that private listings are beneficial, while Zillow has vigorously promoted a competing business model in which both buyers and sellers benefit from wider

3

exposure and greater market transparency and liquidity. Without Zillow's Standards, MRED and Compass would have less need to invest in marketing their private listings, as they could count on later free-riding on Zillow's platform.

8. Last year, Compass tried—but failed—to enjoin Zillow's Standards with a preliminary injunction ("PI"), and Compass voluntarily dismissed its lawsuit shortly after its PI motion was denied.

9. But Compass had a backup plan in motion even before it lost its doomed lawsuit. Compass conspired with MRED to use MRED's monopoly power in Chicagoland Residential Real Estate Listing Creation and Distribution to protect their competing PLNs from competition and compel Zillow and other recipients of MRED's listing feed to display Defendants' stale PLN listings. To do this, MRED and Compass hatched a plan to threaten loss of access to all of MRED's listings if a competitor did not display one of MRED's or Compass's competing PLN listings. The scheme worked: because Zillow could not afford to lose access to all Chicagoland listings, Zillow was not able to enforce its Standards in Chicagoland.

10. Yet Defendants did not stop there. MRED and Compass have now expanded their conspiracy to a national scale. On April 24, 2026, they jointly announced an alliance under which MRED would allow agents who use Compass's 3PM (and therefore list homes in its PLN) anywhere in the country to enter those listings into MRED, supposedly to help "protect" Compass's private listings from pro-transparency actions by Zillow and others. In turn, MRED would exploit its monopoly power over Chicagoland listings as leverage to force competitors like Zillow to abandon their pro-transparency business models nationwide.

11. MRED recently made good on its agreement with Compass. Just last week, on May 5, 2026, MRED notified Zillow that Compass PLN listings located in Florida, Georgia, and

California—far outside of MRED's historical Chicagoland territory—had been suppressed by Zillow in violation of MRED's revised rules, despite the fact that Zillow had determined those listings were not eligible for display under its Standards well before the MRED-Compass national alliance. The next day, MLS Grid, MRED's listing distribution provider, threatened to terminate Zillow's access to MRED's listing feed if Zillow did not display many of the same Compass listings. Notably, MRED's CEO Rebecca Jensen is also board chairperson of MLS Grid.

12. Defendants' threat to terminate Zillow's access to Chicagoland listings in response to Zillow's pro-transparency initiatives would immediately harm consumers and competition. If Zillow were to "go dark" in Chicagoland—that is, if Defendants terminated Zillow's listing feed—consumer welfare would be harmed because consumers who previously relied on Zillow's transparent platform and innovative technology to find local homes for sale would be blocked from using their preferred platform. And Zillow's competitors would be free to vie for Chicagoland business with private hidden listings, unconstrained by the procompetitive benefits of transparent access initiatives. Likewise, agents—including those who compete with Compass—would be blocked from advertising to prospective home buyers in Chicagoland. And competition itself would be harmed because any platform—not only Zillow—would be prevented from adopting pro-transparency business practices that seek to differentiate their service and enhance their appeal to consumers.

13. Defendants' scheme as a whole also threatens consumers and competition by advancing insidious private listings. Consumers are harmed because private listings offered by Compass and other anti-transparency brokerages are "protected" by MRED's monopoly over Chicagoland listings; they need not compete with the pro-transparency models of Zillow and other MLSs and websites. Defendants' conspiracy harms home buyers and sellers by incentivizing

5

brokerages to withhold listings from the market only until the listing fails to sell privately, thus erecting barriers to information, exacerbating the accessibility and affordability crisis, and reducing the pool of buyers and listings that makes the real estate market efficient and competitive. Their conduct also harms brokerages that compete with Compass by allowing Compass to free-ride on the wide availability of listings from other brokerages, including on Compass's own website, without contributing listings of its own on equal terms.

14.     By taking actions to block Zillow's ability to combat MRED's monopoly platform, Defendants have also harmed competition in the Listing Creation and Distribution market. Zillow offers a platform for brokers and agents to create and publish listings in the Chicagoland area. Zillow has also begun sourcing listings directly from MRED's broker participants through direct broker feeds, an effort that would allow Zillow to offer an alternative method by which brokers and agents could distribute their listings to all market participants. By foreclosing Zillow from competing effectively as an alternative listings platform, MRED maintains its monopoly and deprives brokers and agents of an innovative alternative, resulting in harm to competition and consumers.

15.     MRED and Compass—direct competitors in the Chicagoland Residential Real Estate Listing Creation and Distribution market—cannot unlawfully conspire to boycott a competitor's access to Chicagoland listings. And MRED cannot abuse its monopoly power over those listings as a cudgel to prevent a competitor from effectively competing in Chicagoland or beyond. Defendants' violations of the Sherman Act must be enjoined.

## II.     THE PARTIES

### A.     Plaintiffs

16.     Plaintiff Zillow Group, Inc. is a corporation existing under the laws of the State of Washington, with its principal place of business at 1301 Second Avenue, Floor 36, Seattle,

6

Washington. Zillow Group's affiliates, subsidiaries, and brands include Zillow®, Zillow Premier Agent®, Zillow Home Loans®, Zillow Rentals®, Zillow® New Construction, Trulia®, StreetEasy®, Out East®, HotPads®, Follow Up Boss®, ShowingTime®, dotloop® and Zillow® Closing (collectively "Zillow Group").

17. Plaintiff Zillow, Inc. is a corporation existing under the laws of the State of Washington, with its principal place of business at 1301 Second Avenue, Floor 36, Seattle, Washington. Zillow, Inc. is a wholly owned subsidiary of Zillow Group (collectively with Zillow Group, "Zillow") and a licensed real estate brokerage in 50 states and the District of Columbia.

**B. Defendants**

18. Defendant Midwest Real Estate Data, LLC ("MRED") is one of the largest MLSs in the U.S., serving Chicagoland (northern Illinois, southern Wisconsin, northwest Indiana, and a portion of Iowa) with over 43,000 members. MRED is headquartered in Lisle, Illinois, and organized under the laws of Illinois.

19. In 2025, MRED's members had over 264,000 listings and over $43 billion in transaction volume.

20. Among MRED's members, there are over 5,000 brokerages with 1-10 brokers, close to 300 brokerages with 11-50 brokers, and approximately 90 brokerages with 51 or more brokers.

21. Since 2016, MRED has had its own PLN, the connectMLS Private Listing Network, access to which was only available to MRED member brokers operating in Chicagoland until very recently.

22. MRED earns revenue by charging its members fees. As the largest brokerage in MRED's service area, Compass is MRED's largest customer.

7

23. MRED is owned by brokers and associations, a rarity among MLSs. MRED's "Preferred Unit Owners" direct the rules and policies of MRED and gain access to MRED vendor contracts. Compass is one such Preferred Unit Owner, as are several Compass subsidiaries, franchises, or affiliates, including @properties, Century 21, Coldwell Banker, Christie's, and Corcoran Urban Real Estate.

24. Thirteen of MRED's Board of Managers seats are reserved for Preferred Unit Owners. Three Compass-affiliated brokers sit on MRED's Board of Managers, which has the final say on all MRED rules changes.

25. Defendant Compass, Inc. is a Delaware company headquartered in New York, New York. Compass describes itself as a "global real estate services company with a presence in every major U.S. city," including in MRED's coverage area. Compass operates an owned-brokerage business comprising over 37,000 real estate agents and, combined with its franchises and subsidiaries, operates a global network of more than 340,000 real estate agents. Compass earns revenue by collecting a share of the gross sales commissions that these agents earn from home sales. Compass reported closing 250,360 residential real estate transactions for a gross transaction value of $237 billion in 2025; this figure reflects the sum of all closing sale prices for homes transacted by agents on its platform.

26. Defendant Compass Illinois, Inc. is a Delaware company headquartered in Chicago, Illinois, and is a subsidiary of Compass, Inc.

27. Compass is the largest brokerage by far in Chicagoland and in most residential real estate markets in the United States. Compass has more than a dozen offices in this District and transacts business in this District.

8

28. On January 9, 2026, Compass became even more dominant among brokerages by acquiring Anywhere Real Estate Inc. ("Anywhere"). Through Compass's new Anywhere subsidiary, Compass now franchises many real estate brokerage firms under various brands, including Better Homes and Gardens Real Estate, CENTURY 21, Coldwell Banker, Corcoran, ERA, and Sotheby's International Realty.

29. The merger with Anywhere allowed Compass to obtain what the DOJ has called a "presumptively unlawful" market share of at least 30 percent in numerous markets, including the Chicago area. One April 2026 analysis found that the acquisition increased Compass's share of unit sales in Chicago from 10.7% to 35%; the next highest share was 8.1%. On April 15th, Compass further extended its influence in Chicago by acquiring a 51% stake in Peerage USA Holdings, which in turn owns Jameson Sotheby's International Real Estate, a large Chicagoland brokerage.

30. Compass is a leading proponent of the use of private residential real estate listings, including through its 3-Phase Marketing Strategy described below.

## III. JURISDICTION AND VENUE

31. Plaintiff Zillow brings this action seeking injunctive relief, damages, treble damages, cost of suit, and reasonable attorneys' fees, arising from Defendants' violations of Section 1 and Section 2 of the Sherman Act, 15 U.S.C. §§ 1–2.

32. This Court has subject matter jurisdiction over Zillow's federal law claims pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1332 (diversity), and 28 U.S.C. § 1337 (commerce and antitrust regulation).

33. Zillow has standing to bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26.

34. The Court has personal jurisdiction over MRED because it is an Illinois limited liability company with a principal place of business in this District.

35. The Court has personal jurisdiction over Compass Illinois, Inc. because its principal place of business is in this District.

36. This Court has personal jurisdiction over Compass, Inc. because it has engaged in anticompetitive, unfair, and deceptive business practices that were directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District, including Zillow. Compass, Inc. advertises the availability of its Private Exclusives listings in this District and took overt acts in furtherance of the conspiracy within this District, including through its seat on the MRED Board of Managers, which meets and operates in this District.

37. All Defendants have: (1) transacted business in Illinois, including in this District; (2) transacted with Zillow in Illinois, including in this District; (3) had substantial contacts with Illinois, including in this District; and (4) committed substantial acts in furtherance of their unlawful scheme in Illinois, including in this District.

38. Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(b)(2). Each Defendant transacted business, was found, had agents and/or resided in this District; a substantial portion of the events giving rise to Zillow's claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been carried out in this District.

## IV. TRADE AND COMMERCE

39. Defendants' anticompetitive agreement has been implemented and enforced by Defendants nationwide. For example, Defendants' agreement prohibits enforcement of Zillow's Standards across the United States. Defendants' challenged conduct has, among other harms,

suppressed competition for residential real estate listings and brokerage services. Defendants are engaged in substantial interstate commerce: MRED serves brokerages in Illinois, Wisconsin, and Indiana, and Compass employees and agents serve clients across the United States.

## V.    INDUSTRY BACKGROUND

### A.    The Multiple Listing Service System

40.    MRED is one of more than 500 MLSs across the United States. MLSs are services through which real estate brokers agree to contribute to a common database of listings within a particular area. MLSs aggregate local for-sale property listings into a central database and share them among their members, who are real estate agents and brokerages operating in the area.

41.    An on-MLS listing is generated by an MLS member's agent working on behalf of a specific home seller. This agent is often referred to as the "listing agent." Brokerages own the listings their agents secure through their representation of home sellers.

42.    An on-MLS listing for a home contains essential data about the home, such as: the number of bedrooms and bathrooms; square footage; parking options (garage, number of spots); listing price; days on the market; property taxes; photos of the home; and the name of the listing agent. The listing agent can input hundreds of data fields into the MLS for any given listing.

43.    MLSs also set rules and standards that govern how listings are added to the common database, distributed to MLS member brokers, and displayed. In other words, one major function of MLSs is to act as clearinghouses that centralize, standardize, disseminate, and regulate information about for-sale property listings in their local territories.

44.    Today, MLSs primarily distribute their local listings to the industry through Internet Data Exchange ("IDX") or Virtual Office Website ("VOW") feeds. These data feeds provide access to accurate, comprehensive, and up-to-date listings information for homes for sale on the MLS, as well as other information such as historical listing and sales data. These data feeds are available to

11

MLS member brokers who comply with the MLS's access rules. An IDX feed enables MLS participants to distribute listings data for public display to consumers on the Internet. Websites and platforms that display for-sale listings, including Zillow, Redfin, Homes.com, and others, obtain and distribute aggregated listing information through IDX or VOW data feeds.

45. The real estate industry depends on MLSs for distribution of this aggregated for-sale listings data. For brokerages and agents, MLSs are so important to the operation of real estate markets that, as a practical matter, any brokerage who wishes to compete effectively in a market must participate in the local MLS. The same goes for Zillow and other platforms like it that display aggregated listings and seek to connect consumers with agents to facilitate a real estate transaction; access to the local MLS is essential.

46. When operated fairly and with a focus on competition, consumers, and transparency, MLSs can help facilitate the broad availability of listings for the good of consumers, agents, and the real estate industry as a whole. With listings widely available to the public, buyers can make the best purchasing decisions among the most options. Sellers, in turn, benefit from a larger pool of potential buyers, which leads to better offers on their properties and a more efficient market with faster, more suitable matches between buyers and sellers. And broad dissemination of listing information promotes fair competition among agents and brokerages by giving all participants an equal opportunity to share these listings with their clients. In this way, broad access to comprehensive listings allows even smaller brokerages to display and provide clients with the majority of listings in their area received through MLSs.

47. Online home search portals like Zillow have further democratized real estate information and worked to introduce greater transparency throughout real estate markets. Prior to the Internet and disseminating real estate information through tools like the IDX and VOW feeds,

information about home sales was not widely available to consumers. Zillow and other players have succeeded in this space by aggregating comprehensive, accurate, and up-to-date real estate listings from MLSs and displaying them on an innovative platform that consumers can easily search and browse for free. Today, consumers expect to be able to access and search for-sale listings this way themselves, through Zillow and other platforms like it.

48. Most MLSs are members of the National Association of REALTORS® ("NAR"). NAR (among other things) develops and issues rules that impact its member real estate professionals and MLSs that choose to affiliate with NAR. These rules have often been aimed at facilitating the flow of information in real estate markets, such as requiring agents to promptly report to the MLS sales of listed properties (including sales prices) and canceled sales, and requiring all on-MLS listings to include a property address or other location information.

49. In 2020, NAR required member MLSs to implement the Clear Cooperation Policy ("CCP"), which requires brokerages generally to submit listings to their local MLS within one day of publicly marketing the listing. CCP did not prohibit "Office Exclusive" listings—where a seller directs their agent to (1) market the listing internally within the agent's brokerage on a one-to-one basis and (2) prohibit the MLS from syndicating the listing for display on other brokerage websites or home search portals, via a signed certification. This exception was meant to allow for the rare circumstance in which a private listing makes sense, such as when a consumer prioritizes privacy considerations over all else, including higher financial returns and fewer days on market.

50. However, not everyone in the real estate industry supported rules that foster greater transparency and fairness. Compass and other anti-transparency brokerages opposed CCP's adoption, and for five years after its passage pushed to have it repealed or weakened.

13

51.     In March 2025, NAR acceded to this pressure and significantly weakened CCP by adopting the Multiple Listing Options for Sellers ("MLOS") policy. The MLOS policy exempts from the CCP "delayed marketing exempt listings" where sellers have instructed the listing agent to enter the listing into the MLS but to withhold the listing from syndication through the IDX feed to other broker participants for a specified period of time, in addition to exempting office exclusives.

### B.      The Rise of Private Listings

52.     MLOS opened the door to a proliferation of PLNs. Private listings are property listings that are not visible to the general public on consumer-facing real estate websites and are often excluded from MLSs. Instead, these for-sale homes are marketed through a listing agent's network of contacts, targeting a limited group of prospective buyers who have usually already agreed to work with that brokerage's agents. Compass, MRED, and others have been prioritizing the growth of their PLNs, making more and more listings across the country inaccessible to most consumers.

53.     Compass is a vocal proponent of PLNs and has created its own "exclusive inventory" that consumers can only access by working with and paying a commission to Compass. Compass operationalizes its PLN-based approach through its 3PM, which it launched in November 2024.

54.     Under 3PM, Compass steers sellers to take listings through the following phases:

a.      **Phase 1** – The listing is a "Compass Private Exclusive" that is shown only within Compass's closed networks, benefiting insiders while often excluding qualified buyers without Compass representation. Listings in Phase 1 make up Compass's PLN.

b.      **Phase 2** – Compass advertises the listing to consumers via Compass's own platform and through partners' websites as a "Compass Coming Soon" listing.

14

       c.      **Phase 3** – The listing for a stale property that has failed to sell is subsequently released to the MLS and online portals such as Zillow. Most homes marketed through 3PM make it to this stage, where Compass reaps the benefits of transparency and broad distribution by free-riding on others' investments in attracting consumers to their sites to view listings.

55.     For its part, MRED has maintained a PLN since 2016 called connectMLS that, until recently, simply served as a separate database for MRED agents and brokerages to submit "mini-drafts" of local property listings to other MRED members before taking the listing fully public. Only brokerage and agent members of MRED can access the PLN. Since at least 2018, MRED has required that participant agents enter listings into its PLN (or its standard MLS database) "within 48 hours of the effective listing date or within 24 hours after the real estate broker advertises the real property to the general public, whichever is earlier."

56.     Private listing strategies are only becoming more prevalent. In 2023, MRED published an analysis finding that private real estate transactions in its territory had grown from 5% of sales in 2018 to 18% of sales in 2024. And in Compass's Q1 2026 earnings call, CEO Robert Reffkin explained that the company has seen an "uptick" in 3PM use.

57.     Increasingly, agents are pitching sellers on listing their property privately. A recent consumer survey found that 63% of home sellers say their agent pitched a private listing. For sellers who sold more than five years ago, only 18% said their agent pitched selling their home as a private listing. And yet, the same survey found that 68% of clients felt their agent didn't adequately explain the difference between listing a home on the MLS and a private listing. Further, 81% of the sellers surveyed believed their home listing should be freely viewable online. This

shows that it is the relentless and deceptive marketing of PLNs by Compass and others driving the rise of private listings, rather than legitimate consumer demand.

58.     Following the launch of Compass's 3PM, competing brokerages like Douglas Elliman launched similar programs. And with Compass's January 9, 2026 acquisition of Anywhere, Compass can now compel some of the most prominent brokerages in the country to prioritize private exclusives, to the detriment of consumers and the real estate industry as a whole.

59.     PLNs harm consumers, agents, and the real estate industry as a whole in multiple ways. The only ones who benefit from PLNs are the brokerages that own them.

60.     For sellers, listing their property as a private listing reduces the exposure their property receives. A listing in a PLN is only seen by a much smaller, selective group of buyers who have already signed up with the brokerage. This can result in suppressed prices and worse contract terms with the buyer.

61.     Research and data from multiple studies demonstrate that showing a listing to fewer buyers (such as gated behind a PLN) results in the home selling for less than it would on the MLS:

      a.     A 2024 study by California Regional Multiple Listing Service ("CRMLS"), the nation's largest MLS covering large portions of California, analyzed about 25,000 listings in its area and found that listings that started as off-MLS listings sold for an average of $27,000 less than listings that started as on-MLS listings.

      b.     A November 2025 analysis from the San Francisco Association of Realtors found that, over a three-year period from 2022 to 2024, homes listed on the MLS sold for roughly $302,000 more than those sold as off-MLS listings.

c.  A January 2026 study from Doorify MLS found that off-MLS listings in North Carolina sold for an average of $51,000 less (an over 13% reduction) than homes marketed through the MLS.

d.  A Zillow Research study found that off-MLS homes sold between 2023 and 2024 typically sold for $4,975 less than those listed on the MLS, and these impacts were worse in many states.

62.  Similarly, research suggests that homes sold off the MLS entirely (such as Compass Phase 1 listings) take significantly longer to sell. The same 2024 CRMLS study found that homes sold off the MLS stayed on the market for 20–22 days longer than those sold on the MLS. Another MLS analysis found that listings that begin as an off-MLS listing take, on average, more than two weeks longer to go under contract. The chief economist of that MLS examined six months of data on over 100,000 home sales spanning six states and Washington, DC, and found no advantages as to price or speed of sale for sellers whose brokers used private listings.

63.  For buyers, having more listings hidden away in PLNs forecloses their ability to see all available inventory, potentially preventing them from finding their dream home. PLNs also distort competition as buyers gain access to homes based on their affiliation with an agent rather than their readiness or willingness to pay. Fewer bids on properties listed in PLNs also harm buyers who would benefit from stronger signals as to a home's true market value. PLNs also encourage or require buyers to sign up with that brokerage's agents for access, restricting buyer choice of agent based on the best terms or skills. PLNs also cause buyers to pay potentially higher commissions to agents with access to hidden listings, particularly when a large brokerage like Compass controls and gatekeeps a significant percentage of regional listings.

64. There are also serious equity concerns. Research has shown that first-time, relocating, elderly, and underrepresented buyers are disproportionately excluded from access to private listings because they are less likely to have, or be able to afford, agents with an inside line to exclusive inventory. They are also more susceptible to strategies that exploit information asymmetries already present in real estate markets. In communities of color—ZIP codes where a majority of household heads are Black, Hispanic, Asian American and Pacific Islander or Native American—homes sold in 2023–24 off the MLS typically sold for $9,850 less than on-MLS listings. This is more than double the loss for homes sold off-MLS in majority white neighborhoods.

65. For agents and brokers, PLNs can prevent them from serving their clients by denying them access to listings or market information. And as PLNs continue to rise, smaller brokerages will find it harder to enter markets and compete since they do not have the scale or listing volume to create a viable PLN of their own.

66. Through 3PM and other PLN-driven strategies, brokerages like Compass are making real estate information less available to consumers, competing brokerages and agents, and other members of the real estate community like Zillow. Compass and others use PLNs to make listings an artificially scarce resource in real estate markets. They use this manufactured scarcity to ensnare buyers and extract rents from them through private real estate transactions.

67. Further, as more and more listings are locked up in PLNs, market liquidity and efficiency will degrade. This can trigger a harmful feedback loop that further shrinks the market and reduces transparency: as liquidity and efficiency decline, more consumers will exit the market entirely, further decreasing liquidity and efficiency, which pushes yet more consumers out of the market, and so on. In this way, PLNs harm consumers, agents, and real estate markets as a whole.

68. PLNs only benefit the organizations who maintain them. One of the objectives of PLN-driven strategies is to increase double-ending, *i.e.*, representing both the buyer and seller in a transaction and collecting commissions for both representations. Compass, the largest and most vocal proponent of PLNs, double-ends a significant number of its transactions. A recent analysis by a consumer watchdog organization looked at 1,000 consecutive, recent home sales in five major U.S. markets: Austin, Boston, Chicago, San Diego, and Washington, DC. Out of the transactions involving Compass agents (not including brands acquired through Anywhere), over 20% were double-ended in each of the markets studied. Compass's internal data also shows that off-MLS sales double-end 72% more frequently than on-market transactions (31% versus 18%).

69. The brokerages and agents who push sellers into PLNs are also disincentivized from negotiating for better terms with their "counterparts" from the same brokerage. Their brokerage benefits from double-ended deals, not from negotiating the inherently competing interests of their actual clients. This includes commission rates, which are generally higher when brokerages double-end real estate transactions.

## VI. ZILLOW'S COMPETITIVE RESPONSE: LISTING ACCESS STANDARDS

### A. The Listing Access Standards

70. Zillow became concerned about the proliferation of PLNs. It understood that the growth of PLNs would harm consumers, agents, the real estate industry, and Zillow itself by limiting listings transparency and fragmenting real estate markets.

71. As a core competitive response, Zillow unilaterally developed its Standards and announced them in April 2025. The Standards reflect Zillow's long-standing philosophy that publicly marketed listings should be broadly and timely accessible to all buyers. The Standards incentivize sellers (and their brokers and agents) to provide broad access to their listings,

encourage informed seller choice, and maintain Zillow's brand promise to consumers of offering comprehensive, trusted, accessible, and transparent real estate services.

72. Under the Standards, listings that have been part of a private listing network and selectively marketed will not be displayed on Zillow's platforms unless the listing was broadly accessible to all market participants. This includes listings that are only accessible behind a registration wall or that require consumers to agree to work with a specific brokerage. For listings that do not comply, Zillow will not display the violative listing on its own platforms so long as it is with the same listing agent or brokerage.

73. For sellers who need a truly private listing, that listing can still comply with the Standards, as long as: (1) the seller instructs their agent in writing not to disseminate the listing through the relevant MLS; (2) the agent shares the listing only within their brokerage and with clients through one-to-one communication; and (3) the seller signs a waiver that directs the agent not to publicly market the listing and explains the potential drawbacks of limiting public exposure. These steps help ensure that sellers make informed choices about the marketing of their property.

74. The Standards are a competitive response to the problems created by PLNs for Zillow's multifaceted real estate business, which provides various services to sellers, buyers, and agents.

75. First, the Standards help maintain Zillow's access to an essential input it needs to compete in multiple real estate markets: its supply of for-sale residential listings information. Zillow's success in multiple markets is in part due to the way it combines accurate and up-to-date listings with innovative technology and critical insights that empower consumers. Without a reliable supply of listings information, Zillow could lose its reputation as a trusted source for

comprehensive, up-to-date, and accurate information on local property listings. This loss of reputation would in turn lead to a loss of consumer and agent trust.

76. Second, the Standards help maintain the quality of Zillow's listing supply and platform. Without the Standards, the stale listings that brokerages like Compass failed to sell in their gated PLNs would later be dumped onto Zillow. This would compromise Zillow's value proposition and brand promise to maintain a supply of high-quality listings for consumers to search—and the more recent and timely listings are those consumers value most. Buyers want to see the most up-to-date inventory and be able to act on any homes relevant to their search as soon as possible. The Standards prevent this degradation by refusing to display stale listings once marketed in PLNs.

77. Losing access to listings and having lower-quality listings would risk triggering a harmful feedback loop that would degrade Zillow's platform further: fewer buyers would likely visit Zillow's degraded platform, decreasing Zillow's value for sellers and agents, in turn further reducing the value to buyers, and so on.

78. Lastly, the Standards prevent PLNs from free-riding on Zillow's substantial investments that built an online platform consumers and agents love. Brokerages could withhold their new, most valuable listings for PLNs, but still benefit from Zillow's platform and audience when they dump stale, unsold listings on Zillow's platform.

79. Beyond addressing the impacts of PLNs on Zillow itself, the Standards allow Zillow to unilaterally promote a business model based on transparency, access, liquidity, and trust that competes on the merits with the exclusionary PLN model endorsed by Compass, MRED, and others. Zillow's Standards sharpen the competition to obtain and display new-to-market listings,

21

requiring PLNs to prove their value to sellers to list new-to-market properties privately rather than pursuing broad marketing to the maximum number of buyers.

80.     This is especially true given the recent release of Zillow Preview in April 2026. Zillow Preview enables agents at participating brokerages to market "Coming Soon" listings widely and publicly on Zillow's platforms and partner websites. These properties are not yet available to tour or listed on the relevant MLS but will soon be.

81.     Zillow Preview publicly surfaces information about "Coming Soon" listings that consumers previously could not access in many markets because the listing brokerages and agents were restricting access only to their clients or select groups of buyers. Instead of limiting access to closed PLNs, Zillow Preview provides broad, public access to "Coming Soon" listings. This gives buyers access to more homes sooner and delivers early and broad exposure to sellers' properties. It also ensures all buyers and agents can access and show Zillow Preview homes to clients.

82.     Zillow Preview empowers Zillow's partner brokerages with a new way to serve their clients and compete directly with pre-MLS products offered by Compass and other anti-transparency brokerages. And starting this summer, Zillow Preview listings will also be available on Realtor.com—providing even broader exposure for these pre-MLS listings.

83.     Zillow Preview includes tools for brokers and agents to directly enter listing information for display. In this way, Zillow competes in Residential Real Estate Listing Creation and Distribution with Compass, MRED, and others.

84.     Zillow Preview also constitutes an extension of the brokerage services Zillow already offers. Zillow does not operate as a traditional brokerage, nor does it typically represent consumers in real estate transactions. However, by virtue of the fees Zillow receives from its agent partners who use Zillow's advertising services, Zillow participates in the brokerage services

22

market. Zillow also now participates in the brokerage services market by partnering with other brokerages to market properties through Zillow Preview.

**B.      Compass's Campaign to Suppress the Listing Access Standards**

85.      Compass recognized that the Standards were a competitive threat to its PLN model and began waging a war to prevent Zillow from enforcing the Standards.

86.      In June 2025, Compass sued Zillow and moved for a preliminary injunction to prevent Zillow from implementing the Standards nationwide during the litigation.

87.      This attempt to eliminate the Standards as a competitive threat failed. On February 6, 2026, following expedited discovery and an evidentiary hearing, Judge Jeannette A. Vargas of the U.S. District Court for the Southern District of New York denied Compass's preliminary injunction motion, ruling that Compass had failed to show a likelihood of success on any of its antitrust claims. Following this defeat, Compass voluntarily dismissed the lawsuit in its entirety.

88.      Even before admitting defeat, Compass began pursuing other means to undermine Zillow's Standards. These efforts led to the conspiracy at the heart of this case.

89.      Compass began leveraging its power over various real estate institutions to interfere with Zillow's ability to enforce the Standards and to proliferate anti-consumer private listings. Compass's dominance as a brokerage in markets across the United States translates into outsized influence with MLSs that control the input and access to listings information in regional markets. This includes MRED—which Compass influences through its dominant share of Chicagoland listings and multiple seats on MRED's leadership board.

90.      Compass is by far the largest member of MRED and largest brokerage in Chicagoland, representing over 27% of listings and 35% of residential real estate transaction volume. This means that MRED is dependent on a significant portion of its revenue and supply of for-sale property listings from Compass and its agents.

91.     MRED's Board for 2025–2026 is made up of representatives from 13 brokerages and two real estate associations. As of October 6, 2025, three of those Board members are employed by or affiliated with Compass: Fran Broude, Compass's regional vice president for Illinois, Minnesota, Indiana, and Wisconsin, who has served for 14 of the last 16 years; an agent from Coldwell Banker, a brokerage acquired by Compass in its merger with Anywhere; and an agent from Corcoran, another Compass brokerage brand.

92.     Beginning in at least the fall of 2025, MRED and Compass agreed to and engaged in a conspiracy against Zillow as detailed below.

## VII.     MRED AND COMPASS'S ANTICOMPETITIVE AGREEMENT

93.     MRED and Compass conspired to implement a boycott of the residential for-sale listings supply to Zillow and any other competitor who dared challenge the rise of private listings. Defendants implemented this conspiracy to coerce Zillow to abandon its competitive response to private listings, to weaken Zillow's pro-consumer and pro-transparency business model, and to protect Compass's and MRED's own private listings from legitimate competition from Zillow and others. MRED and Compass forced Zillow to allow their listings to free-ride on Zillow's platform under the threat of cutting off Zillow's access to *all* of MRED's listings in Chicagoland.

94.     MRED and Compass have had multiple opportunities to collude and act in furtherance of the conspiracy. Compass's Regional Vice President Fran Broude, who sits on MRED's Board of Managers, has had extensive opportunities to collude and agree with MRED on the conspiracy's shared objective and actively participate in creating the rule changes that MRED uses to prevent enforcement of the Standards.

95.     MRED and Compass executives are close and have also attended the same industry events. For example, MRED CEO Ms. Jensen and Compass CEO Mr. Reffkin hosted a "Private

Listing Networks Fireside Chat" at the ARELLO Mid-Year meeting on April 16, 2025, a conference for real estate industry regulators and participants.

96. During the Fireside Chat, they discussed what would later become the conspiracy: Mr. Reffkin told Ms. Jensen that Zillow's Standards made MRED's PLN "impossible" and Ms. Jensen responded with a discussion of listing feed rules and surmised that "Zillow is going to be making decisions based on brokerage." Ms. Jensen closely mirrored the talking points that Mr. Reffkin would later make to MLSs around the country mere months later and hinted at the rule change that MRED would adopt in October 2025 for the express purpose of coercing Zillow not to implement its Standards.

### A. The Conspiracy to Implement MRED's Revised Rules to Protect Defendants' Competing PLNs in Chicagoland

97. In or around October 2025, Compass CEO Mr. Reffkin sent messages to multiple MLSs around the country urging them to terminate Zillow's data feeds because of Zillow's enforcement of the Standards. Mr. Reffkin wrote that each "MLS must discipline Zillow for its new rules and if Zillow's rules are not immediately repealed, you must block Zillow from IDX and VOW feeds." According to Mr. Reffkin, Zillow was violating what are commonly known as MLS "objective criteria" rules by "discriminating" against brokerages who chose to offer private listings, which Zillow disputes.

98. Mr. Reffkin's message was sent to at least eight MLSs, all in local markets in which Compass has a substantial market share in brokerage services, including, on information and belief, MRED in the Chicagoland area. In the last 12 months, over 35% of residential real estate transactions (by sales volume) were represented by a Compass-affiliated agent.

99. MRED's existing objective criteria rule for its IDX and VOW listing data feeds at the time of Mr. Reffkin's October message did not prohibit Zillow from enforcing the Standards.

Indeed, the rules expressly permitted Zillow and other feed recipients to filter listings based on "objective criteria, including but not limited to factors such as … type of listing." Historically, MRED had allowed feed recipients to filter listings, such as displaying only lakefront houses. Likewise, most other MLSs that implement the same rule have not objected to Zillow's implementation of the Standards.

100. Mere weeks after Mr. Reffkin's message was sent to MLSs around the country, on or around October 15, 2025, MRED CEO Ms. Jensen informed Zillow during a call that MRED would terminate Zillow's access to MRED's listing feed ("Listing Feed") if Zillow took steps to enforce the Standards against private listings, such as those in MRED's or Compass's PLNs.

101. Later the same day, MRED sent Zillow new rules (the "Revised Rules") that purported to block Zillow from implementing the Standards in Chicagoland by inserting an MRED-specific provision into the objective criteria rule: "Exclusion criteria may not include, directly or indirectly, the identity of any Participant, brokerage firm, subscriber, licensee, or representative."

102. The Revised Rules are designed to provide MRED with a pretextual basis for retaliating against Zillow's implementation of its Standards by terminating Zillow's access to MRED's Listing Feed. An MRED employee directly linked the Revised Rules to Zillow's enforcement of the Standards, warning that "[a] policy or display approach that limits or suppresses listings from certain brokerages would be inconsistent with the revised MRED rules with MLS Grid. We wanted to flag this for you to ensure your Zillow Listing Transparency Policy (if implemented in our markets) is compliant."

103. MRED's Revised Rules became effective on or around October 29, 2025.

104. As of April 29, 2026, the complete, revised IDX rule is as follows:

26

9. **Criteria for IDX Display**
Member Participants may select the listings they choose to display through IDX based solely on objective criteria, including but not limited to factors such as geography or location, list price, type of property, or type of listing. Selection of listings displayed through IDX must be independently made by each Member Participant. If the Member Participant chooses to limit the display of any listings based on objective criteria, the Member Participant's IDX site must include a disclosure to consumers that clearly states "Some IDX listings have been excluded from this website."

For MRED Participants only: Exclusion criteria may not include, directly or indirectly, the identity of any Participant, brokerage firm, subscriber, licensee, or representative. If the Member Participant chooses to limit the display of any listings based on objective criteria, the Member Participant's IDX site must include a disclosure to consumers that clearly states "Some listings have been excluded from this website." The IDX site may also identify the specific criteria used for exclusion (e.g., price range, property type, or location).

For Heartland MLS Participants only: On Coming Soon listings, the display of the provided Activate Date field must be next to the display of the Coming Soon status in public displays. The Activate Date value should be displayed in a manner consistent with the following examples:

Coming Soon  Show From 'Activate Date Value'
Coming Soon  On 'Activate Date Value'
Coming Soon  On Market Date 'Activate Date Value'

For Realtracs Participants only: All listings in the MLS Grid Data that match a consumer's search criteria must be returned by Vendor's consumer search results, unless the seller, at their sole direction, has elected not to include their property listing or property address in public display.

105.    As of April 29, 2026, the complete, revised VOW rule is as follows:

13. **Exclusion of Listings**
A Participant's VOW may exclude listings from display based only on objective criteria, including, but not limited to, factors such as geography, list price, and type of property.

For MRED Participants only: Member Participants may select the listings they choose to display through VOW based solely on objective criteria, including but not limited to factors such as geography or location, list price, type of property, or type of listing. Exclusion criteria may not include, directly or indirectly, the identity of any Participant, brokerage firm, subscriber, licensee, or representative.  Selection of listings displayed through VOW must be independently made by each Member Participant. If the Member Participant chooses to limit the display of any listings based on objective criteria, the Member Participant's VOW must include a disclosure to consumers that clearly states: "Some listings have been excluded from this website." The VOW may also identify the specific criteria used for exclusion (e.g., price range, property type, or location).

For Realtracs Participants only: All listings in the MLS Grid Data that match a consumer's search criteria must be returned by Vendor's consumer search results, unless the seller, at their sole direction, has elected not to include their property listing or property address in public display.

106.    The implementation of the Revised Rules is one effect of the anticompetitive conspiracy between MRED and Compass to target Zillow.

107.    MRED's Revised Rules and sudden threat to terminate Zillow's Listing Feed cannot be explained as an independent response to Zillow's Standards because Zillow had announced and begun enforcing the Standards in other markets several months prior, and had not changed its Standards or enforcement practices in Chicagoland around the time of MRED's threats.

108.    In the following months, MRED made repeated and persistent threats to cut off Zillow's access to MRED's Listing Feed. Ms. Jensen also personally confirmed the seriousness of

27

MRED's threats. Following a meeting for the Real Estate Standards Organization on or about January 23, 2026, Ms. Jensen said to a Zillow representative that she was not backing down when it came to cutting off Zillow's Listing Feed; the representative knew her well enough to know she was not bluffing; and she was the "referee" and would continue to revise MRED's Rules "as needed" to prevent Zillow from enforcing its Standards.

109.    MRED has acted against its own interests by prioritizing Compass's private listings business model over MRED's fundamental purpose of facilitating transparent listings in real estate. A self-interested MLS would promote broad distribution of its publicly available listings and would not threaten to withhold those listings from feed recipients such as Zillow—which distributes them for free to tens of millions of consumers—in service of protecting a small percentage of listings that are privately marketed on MRED's and Compass's competing PLNs.

**B.      The Conspiracy to Deprive Zillow of Sufficient Alternative Direct Brokerage Feeds to Avoid Reliance on MRED**

110.    Defendants also conspired to deprive Zillow of the opportunity to obtain sufficient direct feeds from brokerages, to create a backup feed if MRED were to cut off its Listing Feed, and to challenge MRED's monopolistic imposition of the Revised Rules.

111.    On or around November 3, 2025, MRED sent an email to all of its participating managing brokers that specifically referenced Zillow's Standards, stating that "MRED has made it clear to Zillow that selectively excluding certain listings may violate MRED's rules, as well as the terms of Zillow's license agreement with MRED." MRED directed these managing brokers to "notify MRED immediately" if they received communications from Zillow regarding enforcement of its Standards. The clear import of the email was that MRED was watching closely to detect if Zillow took steps to enforce the Standards and, if so, would immediately terminate Zillow's Listing Feed.

28

112. Indeed, MRED's General Counsel linked that email to Zillow's enforcement of the Standards, telling a Zillow executive that MRED CEO Ms. Jensen had directed that the email be sent if there was any chance that Zillow would enforce the Standards in MRED's region.

113. Public reporting indicates that on or around December 13, 2025, MRED emailed its participating agents to inform them that Zillow had been attempting to obtain direct back-up feeds from brokerages of their respective listings, and falsely implied that MRED did "not understand why [Zillow] claim[s] service will be interrupted in January," knowing full well that MRED had previously threatened to terminate Zillow's Listing Feed.

114. Six weeks later, on or around January 26, 2026, the President and CEO of Coldwell Banker—a real estate brokerage brand that Compass had acquired less than three weeks prior—terminated over twenty direct listing feed agreements with Zillow for Compass-owned Coldwell Banker brokerages across the country, including for a Coldwell Banker office in Chicagoland.

115. On or around February 12, 2026, MRED posted a message to its internal member portal stating that Zillow was "anticipating disruptions to listings flowing to Zillow via MRED and that they are urgently working with brokerages to set up direct listing feeds," and repeating the falsehood that MRED "do[es] not understand why they claim service will be interrupted."

116. Approximately five days later, on February 17, 2026, Compass, acting through Fran Broude, its regional vice president and representative on MRED's Board of Managers, terminated Compass's pre-existing agreements to provide direct listing feeds to Zillow in Chicagoland, thus causing Zillow to lose the option of displaying Compass listings in the event that MRED were to terminate Zillow's Listing Feed.

117. On or around May 6, 2026, Jameson Sotheby's Internal Realty—a Chicago-based franchisee of Compass subsidiary Sotheby's International Real Estate—likewise terminated its authorization for Zillow to access any and all feeds of the franchisee's listings nationwide.

118. On May 8, 2026, Compass terminated—on behalf of itself and "every" Compass "brokerage entity or subsidiary"—all direct listing feeds with Zillow nationwide. Compass has thus terminated Zillow's direct feed access to more than 25% of the current listings in Chicagoland, and ratcheted up its conduct from Chicagoland to nationally.

119. The termination notices from Compass, Coldwell Banker, and the Sotheby franchisee are a significant departure from established practices, as Compass and its affiliates had regularly provided these direct feeds for years in the past.

### C. The Conspiracy Evolves from Boycotting Zillow's Access to MRED's Chicagoland Listings to Protecting Defendants' Competing PLNs Nationally

120. While the conspiracy originally focused on protecting MRED's and Compass's competing PLNs in Chicagoland, it has quickly evolved to a national scale.

121. MRED and Compass also recently collaborated on a national private listings partnership. On April 24, 2026, MRED and Compass announced an effort to expand and multiply the force of MRED's threats against Zillow by subsidizing entry into MRED's PLN. The announcement explained that MRED has "commit[ed] to protect and safeguard agents who participate in its PLN from being banned or penalized by third party portals and IDX feed recipients," such as Zillow, and to expand access to its PLN nationwide so that Zillow is impeded from enforcing LAS on a much larger scale. In return, Compass committed "to providing its nationwide inventory of listings, including Private Exclusive and Coming Soon Listings, to MRED's PLN participants," thus bolstering the effects of MRED's threats against Zillow to the benefit of its private listings competitor, Compass.

122. In effect, Compass seeks to achieve by conspiring with MRED what it could not achieve in federal court, leveraging MRED's local monopoly and nationwide scale to stop Zillow from enforcing its Standards.

123. Under the national partnership, Compass further agreed to subsidize the cost of MRED access for the first 100,000 Compass agents to join MRED as full members, potentially tripling the size of MRED and its resulting power to impose MRED's Revised Rules on the residential real estate industry.

124. Similar conduct has proliferated among other market participants partnering with Compass. On April 30, 2026, Compass and Realtracs, a dominant provider of listing feed technology services for Tennessee-area MLSs, announced that Realtracs would expand to provide national listing feeds, including for Compass listings. Around the same time, Realtracs announced a new rule for listing feed recipients—such as Zillow and other competitors of MRED and Compass—that would forbid recipients from declining to display *any* listing in Realtracs listing feeds for any reason unless permitted by the home seller. The IDX rule, shown below, went into effect on April 29, 2026:

> For Realtracs Participants only: All listings in the MLS Grid Data that match a consumer's search criteria must be returned by Vendor's consumer search results, unless the seller, at their sole direction, has elected not to include their property listing or property address in public display.

125. In effect, the rule change requires Zillow to display, notwithstanding its Standards, all Compass listings or risk termination of all Realtracs feeds across all brokerages. In other words, Realtracs (like MRED) had agreed to use its control over other brokerages' listings to protect Compass's PLN.

126. Likewise, on May 6, 2026, Compass and California-based MLS "The MLS/CLAW" ("CLAW") announced a partnership whereby Compass would provide its listing data to CLAW and subsidize switching costs for up to 100,000 Compass agents. At the same time, CLAW

announced changes to its own "objective criteria" feed rules that closely mirror MRED's Revised Rules and the talking points that Mr. Reffkin sent to MLSs in October 2025; CLAW now prohibits recipients from excluding listings based on "the identity of any Participant, brokerage firm, subscriber, licensee, or representative." A CLAW spokesperson described the changes as part of an effort to "protect[] our members from third-party platforms that may restrict listing visibility," again parroting the publicly stated objectives of the MRED-Compass announcement to protect MLS participants from policies such as Zillow's Standards.

**D.** **Defendants Poised to Immediately Terminate Zillow's Access to the MRED Listing Feed**

127. With multiple MLSs around the country having now enacted Compass's desired revised rules, Defendants moved to implement the next phase of the conspiracy by threatening to terminate Zillow's access to MRED's Listing Feed if Zillow continued to enforce its Standards as to multiple Compass listings located far outside of MRED's Chicagoland territory.

128. On May 5 and 6, 2026, Zillow received email communications from both MRED and its technology provider, MLS Grid. Both emails identified multiple Compass listings that are purportedly in MRED's Listing Feed but were not displayed on Zillow.

129. MRED's email stated that MRED had "received a report from one of our members" regarding six Compass listings located in Florida, Georgia, and California. On information and belief, the report was made by Compass in furtherance of its conspiracy with MRED to boycott Zillow's access to MRED's Listing Feed. MRED demanded an explanation as to why Zillow did not display the Compass listings on Zillow's platforms.

130. Similarly, MLS Grid's email referred to nine Compass listings, including the same six Compass listings referenced in MRED's email. MLS Grid threatened that if the Compass listings were not restored to Zillow's platform, MLS Grid would "notify MRED of the continued

non-compliance, and any other applicable MLS, as this may result in possible fines or suspension of your access to MLS data through MLS Grid." (For example, MLS Grid is also the technology provider for Realtracs.) MLS Grid also referred to and attached a copy of MRED's Revised Rules. Importantly, all of the referenced listings are outside of MRED's primary territory of Chicagoland.

131.    MRED CEO Ms. Jensen also serves as the Chair of MLS Grid's Board of Managers.

132.    The clear import of the coordinated May 5 and 6 communications from MRED and MLS Grid is that Zillow would lose access to *all* MRED listings if Zillow does not fall in line and unwillingly display—anywhere in the country—Compass listings that violate Zillow's Standards.

133.    In fact, the listings outside of Chicagoland referenced by MRED and MLS Grid had not been displayed on Zillow because each listing violated Zillow's Standards that had been implemented in other regions. The relevant listing agents had received two prior warnings from Zillow that clearly advised the agents that Zillow would not display the third or further noncompliant listings.

134.    Compass then took the conspiracy even further and laid bare its objectives in a May 11, 2026, email to the CEO of Hive MLS (in North Carolina). In the email, Compass executive Caitlin McCrory, Head of Industry Relations, referred to Zillow's recent partnership to syndicate Zillow Preview listings to Realtor.com, stating:

> Zillow & Realtor.com partnership seeks to create "closed-loop" ecosystems, where listings exist exclusively via add/edit tools on Zillow that bypass the local MLS and are distributed to Realtor.com outside of the MLS. Zillow is now directly seeking to disintermediate the MLS, and tighten its control of residential real estate in the US as Zillow has add/edit like an MLS and syndicates to Realtor.com like an MLS. Compass International Holdings is committed to the continued use and support of the MLS as a broker-to-broker cooperative. Which is why we are asking the MLS to rigorously enforce existing policies that prevent the rise of off-MLS databases.

135.    Thus, Compass acknowledges the competitive threat that Zillow Preview poses to Defendants' competing services, and invites Hive MLS to—as Compass has with MRED—

33

"enforce existing policies that **prevent the rise of off-MLS databases**" (emphasis added). Compass then told Hive MLS that if it "<u>successfully</u>" enforced MLS policies by May 20, 2026—a none too subtle reference to terminating Zillow's access to Hive MLS's listing feeds—Compass would commit to the following:

> 1.  For your MLS territory we will NOT have listings add/edit into any third party websites other than the MLS (as a large number of brokerages have signed up to do with Zillow add/edit outside the MLS)
> 2.  For your MLS territory we will NOT send any consumer facing listings from Compass International Holdings to any third-party consumer website without them also being submitted to your MLS, compliant with rules, as a listing not syndicated outside of the MLS (unlike Zillow which is giving listings to Realtor that aren't in the MLS)

136.    In sum, Compass's email acknowledges that Zillow Preview poses a competitive threat to Defendants' competing products and boldly requests the collaboration of Hive MLS to kneecap Zillow's ability to grow Zillow Preview into a viable competitor.

137.    Notably, Compass was not copied on the May 5–6, 2026 communications from MRED and MLS Grid to Zillow regarding Compass listings, which requested a response by May 19, 2026. Thus, Compass's reference to a May 20, 2026 deadline for Hive MLS to commit to "enforce" its policy is highly suggestive of further communications between Defendants regarding the purpose and implementation of their conspiracy.

138.    The implication of the MRED, MLS Grid, and Compass emails—combined with Compass's national "partnerships" with MRED, Realtracs, and CLAW—is clear: if Zillow or any other competitor in Residential Real Estate Listing Creation and Distribution does not heed Defendants' demands to withdraw their pro-transparency, pro-consumer listing policies nationwide, Defendants will exploit MRED's monopoly power over Chicagoland listings to coerce compliance.

34

139. Both Defendants' participation in the conspiracy is essential to its success. Without MRED's threats to cut off Zillow's access to the MRED Listing Feed, Zillow would be able to enforce its Standards in Chicagoland as it has throughout the rest of the country. If Compass and its affiliated brokerages had not cut off Zillow from their back-up direct feeds, Zillow might have been able to assemble enough listings directly to neutralize MRED's threats.

140. Indeed, one Compass agent, Eric Johnson, summarized the effects of the conspiracy as follows: "MRED controls the data pipeline in Chicago. **If Zillow bans those listings**, they don't punish agents, **they lose the market**. So they don't. … Not just access. Protection." (Emphases added.) In other words, MRED has agreed to protect Compass's listings from the competitive pressures they would otherwise face from Zillow absent the conspiracy because Zillow cannot afford to "lose the market." Compass CEO Mr. Reffkin agreed, responding to Mr. Johnson: "Thank you MRED." Another Compass employee, Helene Weissberg, added on, following a comment from Ms. Jensen: "Thank you to [MRED] and Rebecca Jensen . . . for your commitment to supporting and protecting real estate professionals who participate in the Private Listing Network (PLN) from retaliation, including bans from third-party portals"—i.e., using MRED's monopoly power to ensure Zillow cannot enforce the Standards.

## VIII. RELEVANT MARKETS

### A. Market for Residential Real Estate Listing Creation and Distribution

141. The market for Residential Real Estate Listing Creation and Distribution is a relevant product market by which to assess the impact of Defendants' conduct. This market comprises the platforms that listing agents, acting on behalf of sellers, use to create for-sale residential real estate listings and distribute them to buyers and their agents in a local area. This market includes MRED's connectMLS Standard Listing Network (SLN) and Private Listing Network (PLN), Compass Private Exclusives, Compass Coming Soons, and Zillow Preview

listings. In the event of a small but significant increase in the price for residential for-sale real estate listings platforms, the number of brokers and agents who would switch to promoting or finding homes without such platforms would not be sufficient to make such a price increase unprofitable.

142. While this market includes pre-market listings that are created for properties that a broker chooses not to immediately distribute to the broader public and listings created for broad public distribution through the MLS ecosystem, most listings are still created, marketed, found, and sold on the MLS. Providers of online home search portals must have access to timely, complete, and accurate aggregated listings data from the MLS to effectively attract home buyers and home sellers to their websites. Today, these providers have only one real source for access to such data for a given region: the MLS IDX/VOW feeds.

143. Zillow is a competitor in this market through Zillow Preview. Zillow Preview allows property listings to be created and marketed on Zillow, brokerage websites, and soon also on other sites such as Realtor.com, as pre-market listings before they are entered into the MLS as for-sale listings.

144. Zillow is also a potential competitor in this market more broadly. Zillow has attempted to use its scale and relationships to assemble sufficient direct brokerage feeds in Chicagoland to compete with MRED in listings aggregation and distribution. Zillow actively sought to obtain direct broker listing feeds and had initial success. But MRED and Compass's conspiracy thwarted Zillow's efforts to obtain enough listings to replicate MRED's listings coverage, most consequentially by Compass and its affiliates cutting off Zillow's direct feeds and MRED's spurious warnings to brokerages about supposed risks of providing feeds directly to Zillow.

145. Zillow's platform is capable of serving the function of a Residential Real Estate Listing Creation and Distribution platform in Chicagoland. Zillow already maintains tools that facilitate the creation and distribution of residential real estate listings on its platform. For example, Zillow commonly lists and distributes For Sale By Owner listings. Zillow allows these listings to be posted for free with video and unlimited photos, allowing the owner to decide the price, listing details, marketing strategy, and showing schedule. Zillow also offers tools to allow for creation and distribution of New Construction listings. Zillow lets these users show home and community images, available floor plans, exterior design options, lot maps with ability to show inventory status and plan pricing details, community details and amenities on a dedicated Community Page, as well as 3D tours, among other features. And as mentioned above, Zillow Preview now allows agents to use Zillow's platform to create and broadly distribute pre-market listings directly to consumers and to other websites. Zillow has the resources to apply this technology to listing and distributing the residential real estate listings that are currently placed on MRED.

146. The geographic market for the market for Residential Real Estate Listing Creation and Distribution is the Chicago metropolitan area, or Chicagoland, which is currently a primary region in which both MRED and Compass operate. The Chicagoland geographic area is defined to include the ZIP codes within the Chicago metropolitan statistical area that are located within the State of Illinois.

147. The market for Residential Real Estate Listing Creation and Distribution is local in nature. Home buyers and home sellers buy and sell homes within limited geographic areas. Buyers typically know in advance where they wish to live, and home sellers, through their agents and brokers, typically market their homes to potential buyers within a reasonable driving distance from the home being listed for sale. This local dynamic is equally applicable to listings in the pre-MLS

phase and the on-MLS phase and the associated services for those listings. For example, a home buyer seeking to buy a home in the Chicago metro area would not consider a listing located in Washington, D.C. as a reasonable substitute for a listing located in Chicago. Similarly, a home seller seeking to sell a home in Washington, D.C. would not consider a Chicago-based pre-MLS or on-MLS listings network as a reasonable substitute for one focused on the Washington, D.C. area. Indeed, Zillow's data shows that 73% of home buyers searching for homes in Chicago, IL are searching from Chicago, IL.

### B. Market for Brokerage Services

148. Another relevant market is the provision of real estate brokerage services to buyers and sellers of residential real property. In Chicagoland, this Brokerage Services market comprises the services provided to home buyers and sellers by residential real estate brokers with access to the MRED MLS, including those offered by Compass, Zillow, and the real estate brokers who own and control MRED. In the event of a small but significant increase in the price of brokerage services offered to sellers of residential real property, the number of home sellers who would switch from a real estate broker to for-sale-by-owner would not be sufficient to make such a price increase unprofitable. In the event of a small but significant increase in the price of brokerage services to buyers of residential real property, the number of home buyers who would switch from a real estate broker to self-service would not be sufficient to make such a price increase unprofitable.

149. Zillow is a competitor in the Brokerage Services market. Zillow, Inc. is a licensed real estate brokerage and maintains a real estate brokerage license in Illinois, License No. 478012434. Through its Preferred agent programs, Zillow shares in compensation from other cooperating licensed real estate brokers pursuant to a brokerage-to-brokerage agreement. Zillow

operates differently from a traditional brokerage in some ways, but offers many of the services provided by brokerages, such as connecting potential home buyers with agents and sellers.

150. The geographic market for the market for Brokerage Services is the Chicago metropolitan area, or Chicagoland, which is a primary region in which both MRED and Compass operate. The Chicagoland geographic area is defined to include the ZIP codes within the Chicago Metropolitan Statistical Area that are located within the State of Illinois.

151. The market for residential real estate Brokerage Services is local in nature. Home buyers and home sellers prefer to work with agents who are knowledgeable about local market conditions and who are located within a reasonable driving distance of the geographic area where they are shopping for or selling a home. For example, a home buyer seeking to buy a home in the Chicago metro area would not view an agent located in Washington, D.C. as a reasonable substitute for an agent located in Chicago. Similarly, a home seller seeking to sell a home in Washington, D.C. would not view an agent located in Chicago as a reasonable substitute for an agent located in Washington, D.C. Indeed, Zillow's data shows that 73% of home buyers searching for homes in Chicago, IL are searching from Chicago, IL.

152. This market is closely related to the market for Residential Real Estate Listing Creation and Distribution. Some sellers, through their brokerages and agents, choose to market their for-sale properties as pre-MLS listings as part of an overall marketing strategy to help sell their homes. In other words, marketing a seller's home as a pre-MLS listing is another service that certain brokerages and agents provide in their suite of brokerage services offerings.

## IX. MARKET POWER

### A. Market for Residential Real Estate Listing Creation and Distribution

153. MRED has monopoly power in the Chicagoland Residential Real Estate Listing Creation and Distribution market. Because pre-MLS marketing is still comparatively small, over

98% of residential real estate listings in Chicagoland are first created and distributed on MRED's MLS, and MRED thus has an equivalent market share of 98% in this market.

154. In a 2007 report, the DOJ explained that by virtue of industry-wide participation and control over a critically important input, the MLS (a joint venture of competing real estate brokers) has market power in almost every relevant market. Almost twenty years later, the same is true today. As the only source for active, aggregated, and timely for-sale listings data in a given region, each regional MLS possesses monopoly power. Providers of online home search portals, for example, cannot supply a viable offering to consumers in the relevant geographic market without access to active, aggregated, and up-to-the-minute brokerage for-sale listings. In Chicago, there is only one source for such data: MRED.

155. MRED's control over the MRED Listing Feed and the Chicagoland Residential Real Estate Listing Creation and Distribution market give it substantial market power, including the power to coerce compliance with its rules within its coverage area. Indeed, Zillow has not enforced its Standards in MRED's region due to MRED's repeated threats to terminate Zillow's access to the MRED Listing Feed.

156. MRED, Compass, and now Zillow operate platforms for creating and distributing pre-MLS listings in the Chicagoland region. MRED, both alone and in combination with Compass, has monopoly power over the listings created and distributed in the pre-MLS phase. As of May 7, 2026, among competing PLNs in Chicagoland, MRED held a 96.4% market share and Compass held a 3.5% market share. And across all listing types, MRED holds a 98.2% market share in Chicagoland Residential Real Estate Listing Creation and Distribution as of the same date.

157. The barriers to entry and expansion in the Chicagoland Residential Real Estate Listing Creation and Distribution market are high. The market is subject to network effects because

40

brokers and portals will only use a distribution platform with sufficient listings; but to attract home sellers to create their listings on the platform, there must be sufficient users of the distribution platform. Therefore, for a competitor in the market to compete effectively, it must have both a substantial supply of listings and a substantial number of users of the platform.

158. Indeed, MLSs like MRED have had durable market power for many decades. To effectively compete with MRED's full set of listings creation and distribution offerings in Chicagoland, a potential entrant would need to assemble a feed of home listings that is as comprehensive, timely, and accurate as MRED's Listing Feed. To do so would require assembling direct feeds from nearly all brokerages in the Chicagoland area. While Zillow has the scale and relationships to potentially do so in Chicagoland, Defendants' conspiracy has blocked Zillow's efforts, foreclosing this form of competition from threatening MRED's position.

**B. Market for Brokerage Services**

159. MRED and Compass have market power collectively and independently in the market for Chicagoland Brokerage Services. MRED is owned, controlled by, and constitutes a combination or conspiracy among competing real estate brokers in Chicagoland. MRED has over 43,000 members that collectively have monopoly power over Chicagoland Brokerage Services. Over 98% of residential real estate listings in Chicagoland flow through MRED.

160. Compass is the most dominant brokerage by far in Chicagoland. Compass thus has market power on both the buy-side and sell-side of Chicagoland Brokerage Services. In the last 12 months, Compass and its subsidiaries held a 36% market share based on transaction volume (i.e., sale price). During the same period, Compass and its subsidiaries represented 27% of buy-side and 28% of sell-side transactions. By comparison, its next largest competitor represents 6% and 7% of buy-side and sell-side transactions, respectively.

161.    MRED's control over the MRED Listing Feed gives it substantial market power to coerce brokerages to comply with its rules within its coverage area. Indeed, because of the threat of termination, Zillow has not enforced its Standards in MRED's region. Knowing this, MRED and Compass have conspired to expand MRED's coercive influence nationwide.

## X.    ANTICOMPETITIVE EFFECTS AND ANTITRUST INJURY

162.    Defendants' conduct has caused substantial anticompetitive effects and harm to consumers.

163.    One of the primary goals and effects of Defendants' conspiracy is to coerce Zillow to abandon a core competitive strategy—its Standards—and to degrade Zillow's pro-transparency business model. Zillow's Standards promote greater transparency in the real estate market, greater liquidity for home buyers and home sellers, and increased efficiency in real estate transactions generally. The Standards also promote the quality of Zillow's platform and enhance its consumer appeal by ensuring that listings on Zillow are accurate, current, and accessible to all. The Standards also mitigate free-riding by brokerages on Zillow's substantial investments in its platform, services, and consumer reputation.

164.    The conspiracy ultimately forces Zillow to choose between two outcomes, both of which eliminate a form of competition in the Chicagoland Residential Real Estate Listing Creation and Distribution market: (1) losing access to MRED's Listing Feed, which cuts off traffic to Zillow and thereby Zillow Preview in Chicagoland and prevents brokers from selecting anyone but the conspirators for their pre-MLS listings, or (2) abandoning the Standards, which allows MRED and Compass to freely shield their pre-MLS listings from competition in the private stages while forcing Zillow to promote them in the next.

165.    Defendants' efforts to coerce Zillow and other competitors not to implement pro-transparency policies like the Standards harm competition and consumers in the market for

Residential Real Estate Listing Creation and Distribution by removing a core competitive strategy and key differentiator among competing platforms. Without such pro-consumer policies, Zillow and other competitors cannot attract users or listings on the basis of transparency and must instead accede to Defendants' demands to promote their non-transparent private listings under threat of termination.

166. The anticompetitive effects of Defendants' conspiracy are turbocharged by Defendants' steps to deny Zillow access to sufficient direct listing feeds from brokerages that could reduce or replace Zillow's reliance on MRED. This denies consumers, agents, and brokers the choice to use a competing platform to promote or find a home that offers a differentiated selection of listings and on different dimensions from Defendants' PLN-oriented platforms.

167. If MRED and Compass wish to pursue a private listings strategy, they are free to do so, but they do not have a right to use MRED's monopoly power and Compass's dominance of the Brokerage Services market to coerce Zillow to promote those listings—to which Zillow objects—on Zillow.com.

168. Indeed, Compass has recently signed a deal with Redfin whereby Redfin committed to promote Compass's private listings. Compass and Redfin are free to take a risk that consumers will prefer this privatized strategy, while Zillow and pro-transparency brokerages make a bet that public listings will win out in the competitive struggle.

169. Defendants' conduct—aimed at preventing Zillow from implementing its Standards and thus incentivizing additional listing selection on its platforms—also harms Zillow Preview as a nascent competitor in the market for Residential Real Estate Listing Creation and Distribution. Without the ability to attract listings to Zillow, Zillow will experience a reduction in leads and/or traffic, which in turn reduces the audience of buyers for Zillow Preview listings. Thus, Zillow

43

Preview is denied the scale necessary to build a platform that can attract a sufficient number of both buyers and sellers to be successful and to challenge Defendants' competing platforms. While Zillow Preview is stunted, Defendants' platforms are shielded from effective competition from a viable new competitor.

170. The ultimate effect of Defendants' conduct on the market for Residential Real Estate Listing Creation and Distribution is reduced competition among competing platforms, reduced scale for would-be challengers, and lower investment and innovation than would exist but for their anticompetitive conduct.

171. Defendants' conduct also harms the closely related market for Brokerage Services. Participants in that market rely heavily on participants in the market for Residential Real Estate Listing Creation and Distribution to aggregate and disseminate listings to market participants and are thus harmed by a reduction in competition in similar ways. Brokerages and agents on the buy side are harmed by an inability to access listings that are hidden away in PLNs until Defendants have tried and failed to sell them elsewhere, depriving agents of the opportunity to compete to represent buyers in those transactions. Brokers and agents on the sell side are harmed by the reduced exposure those private listings receive, on average receiving a lower sales price for the home than they would have by broader exposure. Relatedly, agents who rely on advertising services, such as Zillow Preview or Zillow Preferred, to connect with prospective home buyer clients are harmed by those services' inability to access listings that would attract high-intent buyers. Brokerages and agents could otherwise use competing platforms such as Zillow Preview to obtain new-to-market listings to compete for buyers or to offer pre-marketing options to sellers, in competition with Defendants' services. Consumers are also harmed by reduced competition among brokerages due to an inability to obtain sufficient scale in PLN listings to compete with

44

Defendants, reduced competition on commissions due to PLNs' facilitation of double-ending, and an inability to access differentiated platforms such as Zillow Preview.

172. If the ultimate aim of the conspiracy is achieved and MRED terminates Zillow's Listing Feed access, competition and consumers in both markets will be immensely harmed. The success of Zillow Preview as a viable competitor to Defendants' platforms depends on its ability to attract sufficient prospective buyers, which in turn attracts sufficient listings. A loss in non-Preview listings—which are used to attract high-intent buyers to Zillow Preview—will precipitate a downward spiral in which Zillow and Zillow Preview are unable to attract potential buyers, thus causing a loss of potential sellers, and in turn removing a viable competitor from the Chicagoland market.

173. Zillow has suffered and will suffer antitrust injury because the harms to Zillow are caused by a reduction in competition between Zillow and Zillow Preview, on the one hand, and Defendants' competing platforms, on the other, as set forth above. Zillow is also harmed by the same conduct by Defendants that causes harm to brokers, agents, and consumers in the relevant markets.

174. The writing is on the wall: if Defendants' unlawful conspiracy is not enjoined, Defendants will work to ensure no competing platform, brokerage, or other competitor dares to enact similar policies to ensure transparency in real estate.

## XI. CLAIMS FOR RELIEF

**CLAIM I**
**(Against All Defendants)**
**Section 1 of the Sherman Act, 15 U.S.C. § 1**
**Horizontal Group Boycott to Restrain Trade**

175. Plaintiffs repeat and incorporate by reference each of the foregoing paragraphs of the Complaint.

45

176. Beginning in or around October 2025, Defendants engaged in a group boycott of Zillow to unreasonably restrain interstate trade and commerce in the market for Chicagoland Residential Real Estate Listing Creation and Distribution in violation of Section 1 of the Sherman Act, 15 U.S.C § 1.

177. The contract, combination, or conspiracy alleged herein consists of a continuing agreement among Defendants to deprive Zillow of for-sale residential property listings data in Chicagoland, a key input for competition in Chicagoland Residential Real Estate Listing Creation and Distribution, if it enforces its Standards anywhere Defendants distribute their listings nationwide.

178. Defendants' conspiracy is a per se violation of § 1 of the Sherman Act. The Defendants directly compete in the relevant market for Chicagoland Residential Real Estate Listing Creation and Distribution; the Defendants possess market power in the market; Defendants' agreement operates as a group boycott to deprive Zillow of a crucial input—listings data—for competing in the market by terminating Zillow's access to MRED's Listing Feed and ending direct brokerage feeds with Compass and its subsidiaries. Because Defendants' agreement is *per se* unlawful, Zillow need not show evidence of actual anticompetitive effects; injury to competition is presumed. Regardless, there are no obvious procompetitive justifications or effects from Defendants' conduct.

179. In the alternative, Defendants' conspiracy violates § 1 of the Sherman Act under the Rule of Reason by unreasonably restraining competition in the market for Chicagoland Residential Real Estate Listing Creation and Distribution and/or the related market for Brokerage Services.

46

180.     Defendants possess market power in Chicagoland Residential Real Estate Listing Creation and Distribution as alleged above. In addition, MRED is the only entity that possesses aggregated for-sale listings data and distributes them through IDX and VOW feeds in Chicagoland.

181.     Defendants also jointly possess market power in the Brokerage Services market as evidenced by, among other things, the fact that brokerages cannot compete without access to MRED and its aggregated listings as well as Compass's share of unit sales of residential real property in Chicagoland.

182.     Terminating Zillow's MRED Listing Feed and blocking Zillow's efforts to obtain direct brokerage listing feeds would effectively eliminate Zillow as a competitor, further insulating Defendants' competing services and harming consumers and agents alike.

183.     By coercing Zillow to abandon its Standards and by depriving Zillow and other potential competitors access to listings data, Defendants' conspiracy insulates MRED and Compass from legitimate competition from Zillow and others that utilize a pro-transparency business model to challenge Defendants' dominance.

184.     The result of Defendants' anticompetitive conspiracy is reduced competition in the relevant market, which harms home buyers, sellers, real estate agents, Zillow, and other competitors, and is the type of harm that the antitrust laws were intended to prevent.

185.     There are no procompetitive justifications for Defendants' conduct. Defendants will profit substantially from their anticompetitive scheme to the detriment of competitors in Chicagoland Residential Real Estate Listing Creation and Distribution, competitors in Chicagoland Brokerage Services, as well as home buyers, sellers, and real estate agents.

186. As a direct and proximate result of Defendants' past and continuing violation of § 1 of the Sherman Act, Plaintiffs have been injured in their business and property, are suffering irreparable harm, and are suffering damages in an amount to be proven at trial.

**CLAIM II**
**(Against Defendant MRED)**
**Section 2 of the Sherman Act, 15 U.S.C. § 2**
**Unlawful Monopoly Maintenance in Chicagoland Residential Real Estate Listing Creation and Distribution**

187. Plaintiffs repeat and incorporate by reference each of the foregoing paragraphs of the Complaint.

188. MRED is willfully maintaining and abusing its monopoly power in Chicagoland Residential Real Estate Listing Creation and Distribution through its anticompetitive Revised Rules targeting pro-consumer, pro-transparency platforms like Zillow in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

189. MRED has monopoly power in the Chicagoland Residential Real Estate Listing Creation and Distribution market. Indeed, over 98% of residential real estate listings in Chicagoland are exclusive to the MRED Listing Feed.

190. Starting in or around October 2025, MRED engaged in anticompetitive conduct by enacting its Revised Rules which prevent Zillow from enforcing its Standards. This eliminates competition in Chicagoland Residential Real Estate Listing Creation and Distribution from Zillow and entities like it that would compete with MRED by differentiating themselves through services that, unlike MRED's, maximize transparency and broad access to real estate information.

191. Under MRED's Revised Rules, Zillow will lose access to MRED's Listing Feed if it enforces the Standards—in Chicagoland or against Defendants' listings anywhere in the U.S. Or if Zillow does not enforce the Standards, consumers are deprived of the option of a differentiated, pro-transparency option in the marketplace.

48

192. MRED's predatory and exclusionary conduct has the purpose and the effect, actual or probable, of impeding the competitive process and suppressing competition in the relevant markets, benefitting MRED's Chicagoland Residential Real Estate Listing Creation and Distribution services and harming consumers, agents, Zillow, and other competitors, in the manner that the antitrust laws were intended to prevent.

193. There are no procompetitive justifications for MRED's conduct—its sole purpose is to exclude competition from Zillow and others.

194. As a direct and proximate result of MRED's past and continuing violations of Section 2 of the Sherman Act as alleged herein, consumers have been deprived of the full benefits of competition in the relevant market, and Zillow has been injured in its business and property, is suffering irreparable harm, and is suffering damages in an amount to be proven at trial.

## XII. REQUESTED RELIEF

Zillow requests relief as follows:

A. An injunction prohibiting MRED and Compass from any further acts effectuating their conspiracy;

B. An injunction prohibiting enforcement of MRED's Revised Rules;

C. An injunction prohibiting MRED from terminating Zillow's access to MRED's IDX or VOW feeds on the basis of enforcement of the Standards;

D. An award of treble actual, compensatory, and consequential damages in an amount to be proven at trial in addition to pre- and post-judgment interest as allowed by law;

E. An award of Plaintiffs' attorneys' fees and costs of suit; and

F. Such other relief that the Court deems just and equitable.

49

## XIII.  JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Zillow hereby demands a trial by jury as to all claims so triable.

Dated: May 12, 2026

Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

/s/ *Brian J. Smith*
Brian J. Smith (IL Bar No. 6321543)
1700 K Street NW, Fifth Floor
Washington, DC 20006
Telephone: (202) 973-8800
Facsimile: (866) 974-7329
Email: brian.smith@wsgr.com
*Admitted to practice only in Illinois and Maine*

Beau W. Buffier (*pro hac vice* forthcoming)
31 West 52nd Street, Fifth Floor
New York, New York 10019
Telephone: (212) 999-5800
Facsimile: (866) 974-7329
Email: bbuffier@wsgr.com

Bonnie Lau (*pro hac vice* forthcoming)
One Market Plaza, Spear Tower, Suite 3300
San Francisco, California 94105
Telephone: (415) 947-2000
Facsimile: (866) 974-7329
Email: blau@wsgr.com

Nicholas R. Sidney (*pro hac vice* forthcoming)
701 Fifth Avenue, Suite 5100
Seattle, WA 98104
Telephone: (206) 883-2500
Facsimile: (866) 974-7329
Email: nsidney@wsgr.com

*Attorneys for Plaintiffs Zillow Group, Inc. and Zillow, Inc.*