**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ZILLOW GROUP, INC. and ZILLOW, INC., | Case No. 1:26-cv-5451 |
| *Plaintiffs,* | Judge: Hon. John J. Tharp, Jr. |
| v. | |
| MIDWEST REAL ESTATE DATA LLC, COMPASS, INC. and COMPASS ILLINOIS, INC., | |
| *Defendants.* | |

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ............................................................................................................. 1

FACTUAL BACKGROUND ............................................................................................ 2

      A.     MRED Monopolizes Chicagoland Residential Real Estate Listings ...................... 2

      B.     MRED, Compass, and Others Promote Harmful Private Listing Networks........... 2

      C.     Zillow Responds to the Rise of Private Listings by Developing Its Listing Access Standards and Zillow Preview, Which Promote Access and Transparency .................................................................................................... 3

      D.     MRED and Compass Conspire to Block Zillow's Standards and Zillow Preview by Cutting Off Zillow's Listings Supply .................................................... 3

      E.     Defendants Are Poised to Block Zillow's Competitive Response Nationally ............................................................................................................. 4

      F.     Zillow Will Be Irreparably Harmed Absent an Injunction ................................... 5

ARGUMENT .................................................................................................................... 6

I.     Zillow Has a Strong Likelihood of Success on Its Antitrust Claims. ............................... 6

      A.     Zillow Is Likely to Succeed on Its Section 1 Claim. ............................................ 6

      B.     Zillow Is Likely to Succeed on Its Section 2 Claim. ........................................... 12

II.    Zillow Will Suffer Irreparable Harm if MRED and Compass Are Not Enjoined. ........... 13

III.   The Balance of Hardships and Public Interest Warrant an Injunction............................ 14

CONCLUSION................................................................................................................ 15

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Abbott Labs. v. Mead Johnson & Co.*,
    971 F.2d 6 (7th Cir. 1992) ....................................................................................14

*Austin Bd. of Realtors v. E-Realty, Inc.*,
    2000 WL 34239114 (W.D. Tex. Mar. 30, 2000) ................................................13

*BrightStar Franchising, LLC v. Foreside Mgmt. Co.*,
    808 F. Supp. 3d 870 (N.D. Ill. 2025) .............................................................13, 15

*ChoiceParts, LLC v. Gen. Motors Corp.*,
    203 F. Supp. 2d 905 (N.D. Ill. 2002) ...............................................................15

*Eli Lilly & Co. v. Arla Foods, Inc.*,
    893 F.3d 375 (7th Cir. 2018) ..........................................................................14

*Hackman v. Dickerson Realtors, Inc.*,
    595 F. Supp. 2d 875 (N.D. Ill. 2009) ..................................................................9

*Hess Newmark Owens Wolf, Inc. v. Owens*,
    415 F.3d 630 (7th Cir. 2005) ..........................................................................14

*Ill. Republican Party v. Pritzker*,
    973 F.3d 760 (7th Cir. 2020) ............................................................................6

*In re Credit Default Swap Antitrust Litig.*,
    2014 WL 4379112 (S.D.N.Y. Sept. 4, 2014).......................................................8

*In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*,
    767 F. Supp. 2d 880 (N.D. Ill. 2011) ..................................................................9

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
    680 F. Supp. 3d 919 (N.D. Ill. 2023) .............................................................7, 11

*In re Text Messaging Antitrust Litig.*,
    630 F.3d 622 (7th Cir. 2010) ..........................................................................7, 9

*In re Uranium Antitrust Litig.*,
    617 F.2d 1248 (7th Cir. 1980) ........................................................................15

*Int'l Outsourcing Servs., LLC v. Blistex, Inc.*,
    420 F. Supp. 2d 860 (N.D. Ill. 2006) ...............................................................11

*Kleen Prods. LLC v. Georgia-Pac. LLC*,
    910 F.3d 927 (7th Cir. 2018) ............................................................................9

*Life Spine, Inc. v. Aegis Spine, Inc.*,
8 F.4th 531 (7th Cir. 2021) ..................................................................................6, 13

*Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*,
29 F.4th 337 (7th Cir. 2022) ......................................................................................6

*Mays v. Dart*,
974 F.3d 810 (7th Cir. 2020) .....................................................................................6

*MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*,
708 F.2d 1081 (7th Cir. 1983) .................................................................................12

*Moehrl v. Nat'l Ass'n of Realtors*,
492 F. Supp. 3d 768 (N.D. Ill. 2020) .....................................................................7, 9

*Ohio v. Am. Express Co.*,
585 U.S. 529 (2018)..................................................................................................10

*Ploss v. Kraft Foods Grp., Inc.*,
197 F. Supp. 3d 1037 (N.D. Ill. 2016) ....................................................................12

*PLS.Com, LLC v. Nat'l Ass'n of Realtors*,
32 F.4th 824 (9th Cir. 2022) ....................................................................................11

*Promatek Indus., Ltd. v. Equitrac Corp.*,
300 F.3d 808 (7th Cir. 2002) ...................................................................................15

*Roland Mach. Co. v. Dresser Indus., Inc.*,
749 F.2d 380 (7th Cir. 1984) ...................................................................................14

*Sw. Suburban Bd. of Realtors, Inc. v. Beverly Area Plan. Ass'n*,
830 F.2d 1374 (7th Cir. 1987) .................................................................................11

*Tichy v. Hyatt Hotels Corp.*,
376 F. Supp. 3d 821 (N.D. Ill. 2019) .........................................................................7

*Tiz, Inc. v. S. Glazer's Wine & Spirits, LLC*,
2024 WL 2785142 (N.D. Ill. May 20, 2024) .............................................................7

*Toys "R" Us, Inc. v. FTC*,
221 F.3d 928 (7th Cir. 2000) .............................................................................10, 12

*Tri-Gen Inc. v. Int'l Union of Operating Eng'rs, Loc. 150, AFL-CIO*,
433 F.3d 1024 (7th Cir. 2006) .................................................................................10

*United States v. Grinnell Corp.*,
384 U.S. 563 (1966)..................................................................................................12

*United States v. Nat'l Ass'n of Realtors*,
2006 WL 3434263 (N.D. Ill. Nov. 27, 2006) ..........................................................11

*United States v. Realty Multi-List, Inc.*,
629 F.2d 1351 (5th Cir. 1980) .................................................................................10

*Wilk v. Am. Med. Ass'n,*
    895 F.2d 352 (7th Cir. 1990) ...........................................................................................15

## STATUTES

Sherman Act....................................................................................................................1, 6, 12

## GLOSSARY OF CITATIONS

| Reference | Document |
| --- | --- |
| ES | Declaration of Errol Samuelson ISO Motion for Preliminary Injunction |
| MH | Declaration of Matthew Hendricks ISO Motion for Preliminary Injunction |
| TH | Declaration of Tim Hunt ISO Motion for Preliminary Injunction |
| LW | Declaration of Lawrence Wu ISO Motion for Preliminary Injunction |
| BL | Declaration of Bonnie Lau ISO Motion for Preliminary Injunction |

**INTRODUCTION**

For over a century, the Sherman Act has prohibited direct competitors from colluding to boycott a mutual competitor. But Defendants have done precisely that, in a naked effort to cut off Zillow's critical listings supply and kneecap Zillow's ability to effectively compete with them. Defendants Midwest Real Estate Data LLC ("MRED") and Compass, Inc. and Compass Illinois, Inc. (together, "Compass") (all collectively, "Defendants") control over 99% of the market for Chicagoland real estate listing platforms. MRED and Compass each operate a private listing network and are each other's largest competitor in that market. Zillow competes with Defendants by offering a pro-transparency platform and services, including its new Zillow Preview product. To insulate Defendants from that competitive threat, MRED's CEO Rebecca Jensen and Compass's CEO Robert Reffkin have worked in lockstep—both in secret and in public—to leverage MRED's monopoly power and control over Chicagoland listing feeds to force competitors like Zillow to display unwanted private listings, abandon pro-consumer listings policies, and to block nascent competing offerings that preference access over exclusivity.

Defendants' conduct is a clear-cut violation of the antitrust laws and threatens immediate, irreparable harm to Zillow, competition, and consumers. Zillow readily meets each element for a preliminary injunction. First, Zillow is likely to succeed on its claims that Defendants violated Sections 1 and 2 of the Sherman Act by entering into an illegal conspiracy and wielding MRED's monopoly power to exclude competition. Second, absent an injunction, Zillow will be forced to jettison its pro-transparency practices and aid competitors against its will, or else lose the essential listings necessary to compete, all of which would degrade Zillow's services and irreparably harm Zillow's platform, business, goodwill, and reputation. Third, because the requested injunction would protect transparency, consumers, and competition, with no real burden on Defendants, the

balance of hardships and public interest decidedly favor Zillow. The injunction should issue.

<u>FACTUAL BACKGROUND</u>

**A.      MRED Monopolizes Chicagoland Residential Real Estate Listings**

MRED is the sole multiple listing service ("MLS") in Chicagoland. MRED provides tools for real estate brokers and agents to create listings, and aggregates and distributes those listings through data feeds ("MRED Listing Feeds"). ES ¶¶12-14. Listings are the lifeblood of real estate markets—access to for-sale property information is vital for brokers, agents, buyers, and sellers. ES ¶24. Any brokerage that wishes to compete in Chicagoland must participate in the local MLS to gain access to MRED Listing Feeds. LW ¶122. MRED possesses monopoly power in the market for Chicagoland Residential Real Estate Listing Creation and Distribution: 98% of residential sale listings are first created and distributed via MRED Listing Feeds. LW ¶121.

**B.      MRED, Compass, and Others Promote Harmful Private Listing Networks**

Private listing networks ("PLNs") have proliferated recently in the real estate industry, dramatically reducing the number of listings that are publicly visible. Compl. ¶¶52-69. MRED operates a PLN in Chicagoland, where over 96% of listings are exclusive to it. TH ¶9. Compass is a vocal proponent of PLNs and operates a PLN with "Private Exclusive" hidden listings. ES ¶33. Compass is also the largest brokerage in the country and dominates Chicagoland Brokerage Services (Compl. ¶160) with a 35.75% share by transaction volume. TH ¶13; LW ¶18. Combined, Defendants control 99.98% of PLN inventory in Chicagoland. TH ¶10.b; LW ¶¶107-09.

PLNs harm sellers, buyers, agents, and the overall real estate market. LW ¶¶146-54. Sellers get less exposure for their homes because listings are not widely accessible. ES ¶35. Buyers lose the ability to see all available inventory, potentially never seeing their dream home. *Id*. PLNs degrade market liquidity and efficiency by preventing the free flow of listings. *Id*. Yet brokers like Compass exploit PLNs to their benefit, gatekeeping a large exclusive inventory of listings and

2

"double-ending" transactions, where one brokerage represents and earns commissions from both buyer and seller. *Id.*; *see also* Compl. ¶¶57-69.

**C.     Zillow Responds to the Rise of Private Listings by Developing Its Listing Access Standards and Zillow Preview, Which Promote Access and Transparency**

Zillow views the proliferation of PLNs as detrimental to consumers, the real estate industry, and Zillow itself. To respond to the anticompetitive impact of PLNs, Zillow announced the Listing Access Standards (the "Standards") in April 2025—under which Zillow does not display on its own platforms listings that were once selectively marketed to some but not all buyers—and has been enforcing the Standards in most regions across the nation for nearly a year. ES ¶¶37-38. The Standards differentiate Zillow from others, such as MRED and Compass, by incentivizing sellers, brokers, and agents to provide timely, broad access to their listings. This helps the market and Zillow maintain transparent access to listings—an essential input for Zillow's multifaceted business—and prevents brokerages from free-riding on Zillow's platform investments by only providing stale listings that failed to sell in PLNs. ES ¶40; LW ¶138.

In March 2026, Zillow furthered its pro-transparency model with Zillow Preview, which expands Zillow's offerings in the Listing Creation and Distribution market by allowing partner brokerages to create listings on Zillow's platform and display them on Zillow and partner websites before they are distributed to the full market by the MLS. ES ¶43. Zillow Preview thus directly competes with Defendants' PLNs, offering sellers a transparent way to pre-market their home. LW ¶71. However, to successfully attract home sellers, Zillow must continue to display standard non-Preview listings to attract a sufficient pool of prospective buyers to its platforms who want to view all types of listings. ES ¶83; LW ¶131. Thus, Zillow relies on MRED Listing Feeds as a critical input to its platform, business model, and services. ES ¶24.

**D.     MRED and Compass Conspire to Block Zillow's Standards and Zillow Preview by Cutting Off Zillow's Listings Supply**

Because Zillow's Standards pose a competitive threat to their PLNs, MRED and Compass conspired to constrain the pro-transparency business models of Zillow and other competitors (such as Redfin, which had announced a policy similar to the Standards, BL Ex. A) by boycotting Zillow's access to MRED Listing Feeds. In October 2025, Compass CEO Reffkin contacted multiple MLSs where Compass has a strong presence, urging them to terminate Zillow's listing feeds if Zillow enforced the Standards. ES ¶51. Soon after, Compass increased its representation to three seats on MRED's board by acquiring competing brokers. *Id.* ¶31; BL Ex. D at 7.

Reffkin's petitions found purchase with MRED. Just weeks after Reffkin's email, MRED CEO Jensen threatened to terminate Zillow's access to MRED Listing Feeds. MH ¶9; ES ¶63. MRED also set new rules ("Revised Rules") and claimed they would effectively block pro-transparency policies like Zillow's Standards because the Rules purport to require feed recipients to display formerly privately marketed properties, such as those in Defendants' PLNs. ES ¶¶54-60. Notably, an MRED employee admitted that the Revised Rules took direct aim at Zillow's Standards. ES ¶53, Ex. H. Jensen and other MRED employees repeatedly threatened to cut off Zillow's access to the MRED Listing Feeds if Zillow implemented its Standards in Chicagoland, even before the Revised Rules became effective on October 29, 2025. ES ¶¶76-80; MH ¶¶9-11.

Faced with the dire threat of losing access to MRED Listing Feeds, Zillow attempted to obtain individual listing feeds directly from brokers as a backup listings supply. ES ¶61. But Defendants took coordinated steps to foreclose Zillow, thus ensuring it was reliant on MRED for listing data. MRED warned brokers about providing direct feeds to Zillow. ES ¶68. Then, Compass and its affiliates—over a third of Chicagoland home sale volume—each terminated preexisting agreements with Zillow to provide direct listing feeds. ES ¶¶69-73; TH ¶14.a.

**E.      Defendants Are Poised to Block Zillow's Competitive Response Nationally**

Defendants recently escalated the conspiracy from Chicagoland to a national scale. On

April 24, 2026, Defendants announced an alliance allowing Compass to enter all of its PLN listings anywhere in the country into MRED. ES ¶74, Ex. V. The alliance allows Defendants to leverage MRED's Revised Rules to "protect" Compass's PLN listings by forcing Zillow to display them nationwide, effectively neutering Zillow's ability to enforce the Standards anywhere in the U.S. As a Compass executive explained, the alliance goal is to "prevent the rise of off-MLS databases," such as pro-transparency competition from Zillow Preview. *Id.* ¶79, Ex. Y.

Defendants immediately capitalized on their national alliance to try to force Zillow's hand: either Zillow must display all of Defendants' stale PLN listings nationwide, or Zillow will suffer the imminent consequence of losing MRED Listing Feeds. On May 5–7, 2026, MRED and its partner MLS Grid (whose board is chaired by Jensen) notified Zillow that it was in violation of the Revised Rules by failing to display Compass listings in California, Florida, and Georgia. ES ¶¶76-78. Zillow had declined to display these listings per its Standards that had been implemented outside of Chicagoland for nearly a year before these listings were entered into MRED. ES ¶78. And MLS Grid threatened to cut off Zillow's access to MRED Listing Feeds for Chicagoland if Zillow did not display these coast-to-coast Compass listings. ES ¶77. Subsequently, Compass VP and MRED board member Fran Broude stated to a Compass broker that MRED "is going to be banning Zillow from getting any listing feeds." ES ¶80, Ex. Z.

**F.      Zillow Will Be Irreparably Harmed Absent an Injunction**

If Zillow now enforces the Standards and suppresses any of Defendants' PLN listings anywhere in the country, then Zillow's access to MRED Listing Feeds will be terminated immediately, harming Zillow and Zillow Preview's ability to compete. ES ¶83. Defendants' boycott thus leverages MRED's monopoly power in Chicagoland as a cudgel to coerce national compliance by Zillow and other pro-transparency platforms, and compels them to degrade their platforms by displaying stale PLN listings. Defendants' conduct irreparably harms Zillow,

competition, and consumers by cutting off Zillow Preview's ability to compete as a new entrant; reducing output by limiting distribution of even Defendants' non-PLN listings; and distorting competition by insulating Defendants' PLN listings from the competitive pro-transparency pressures of the Standards and Zillow Preview. ES ¶¶81-87; LW ¶¶155-65.

## ARGUMENT

To obtain a preliminary injunction, Zillow "must show that it is likely to succeed on the merits, and that traditional legal remedies would be inadequate, such that it would suffer irreparable harm without the injunction." *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 539 (7th Cir. 2021). The Court then weighs the harm of denying the injunction against any harm to the Defendants of granting it, using a sliding scale, and also considers the public interest. *Id.*

### I. Zillow Has a Strong Likelihood of Success on Its Antitrust Claims.

Zillow is likely to succeed on its Sherman Act claims. Zillow "need not show that it definitely will win the case," nor does it need to offer "proof by a preponderance … [which] would spill too far into the ultimate merits …." *Ill. Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020). Rather, Zillow need only "demonstrat[e] how [it] proposes to prove the key elements of its case." *Id.* This is a sliding scale approach; the greater the harm to Zillow from denial of the preliminary injunction, the lower the burden to show likelihood of success on the merits. *See Mays v. Dart*, 974 F.3d 810, 821 (7th Cir. 2020). Zillow meets this standard.

### A. Zillow Is Likely to Succeed on Its Section 1 Claim.

To prevail on its Section 1 claim, Zillow must show "that the defendant (1) entered into an agreement that (2) unreasonably restrains trade in the relevant market and (3) caused the plaintiff an antitrust injury." *Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*, 29 F.4th 337, 349 (7th Cir. 2022). "[T]he ultimate question is whether the evidence considered as a whole and in combination with the economic evidence is sufficient" to find an unlawful agreement was made.

6

*In re Dealer Mgmt. Sys. Antitrust Litig.*, 680 F. Supp. 3d 919, 963 (N.D. Ill. 2023) (quotation omitted). Zillow need only show *either* direct or circumstantial evidence of an agreement, but shows both in spades. *See In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 629 (7th Cir. 2010).

***Direct Evidence of Conspiracy:*** Defendants' April 2026 alliance is direct evidence of an agreement to use MRED's monopoly power over listings to protect their PLN listings from Zillow's competitive threat. ES ¶¶74-75, Exs. X, Y. MRED admits its role in the alliance is to "protect" private listings "from being banned or penalized by third party portals and IDX feed recipients," a clear reference to Zillow's Standards. *Id.* Indeed, Compass employees praised the alliance, noting that MRED would use its control over Chicagoland listing data to coerce Zillow to abandon its Standards, confirming the objective of the conspiracy. BL Ex. C.

***Circumstantial Evidence of Conspiracy:*** Circumstantial evidence requires "(1) parallel conduct and (2) additional factual circumstances, or 'plus factors,' indicating an agreement." *Tichy v. Hyatt Hotels Corp.*, 376 F. Supp. 3d 821, 834 (N.D. Ill. 2019). "Relevant plus factors … include whether the parallel acts were against the economic self-interest of the parties, the market structure of the relevant markets, and … opportunities to collude." *Tiz, Inc. v. S. Glazer's Wine & Spirits, LLC*, 2024 WL 2785142, at *17 (N.D. Ill. May 20, 2024). All are present here.

Parallel conduct. Zillow can show at least two distinct strands of parallel conduct. *First*, in October 2025, Reffkin messaged multiple MLSs urging them to terminate Zillow's listing feeds in retaliation for Zillow's Standards. ES ¶51. Weeks later, Jensen made the same threat to Zillow and MRED created Revised Rules, closely mirroring the rules urged by Reffkin. ES ¶¶54-60, 63. Likewise, less than a week after MRED threatened (again) to terminate Zillow's access, a Compass executive suggested another MLS do the same to help "prevent the rise of off-MLS databases." ES ¶79, Ex. Y. *See Moehrl v. Nat'l Ass'n of Realtors*, 492 F. Supp. 3d 768, 778 (N.D. Ill. 2020)

7

(parallel conduct and written MLS rules are sufficient to show agreement).

*Second*, Defendants worked in lockstep to engineer a boycott of Zillow's access to backup direct listing feeds (an alternative to MRED Listing Feeds). MRED twice misleadingly cautioned members about sending Zillow direct feeds, falsely claiming it did not know why Zillow was concerned about a possible disruption to its MRED Listing Feeds access. ES ¶¶68, 70. In January 2026, days after Compass acquired it, Coldwell Banker terminated Zillow's direct feed access. ES ¶69. Weeks later, Compass terminated Zillow's direct feed access in Chicagoland. *Id.* ¶71. On May 5–6, 2026, MRED and MLS Grid threatened to revoke Zillow's access to MRED Listing Feeds if Zillow did not display certain Compass listings nationwide. *Id.* ¶¶78-80. Days later, Compass and all of its subsidiaries terminated Zillow's direct feed access nationwide. *Id.* ¶73. On May 11, a Compass broker reported to Zillow that the president of Compass Illinois had informed him that MRED "is going to be banning Zillow from getting any listing feeds." *Id.* ¶80, Ex. Z.

Actions against economic self-interest. Defendants' actions are economically irrational without their conspiratorial motive to suppress competition. Compass's terminations of direct listing feeds only serve to punish Zillow because *all* Compass listings—including those that do not violate Zillow's Standards—now stand to lose exposure to Zillow's large audience of potential home buyers. LW ¶¶75-76. MRED's Revised Rules and termination threats also make no economic sense because each jeopardizes the free public distribution of tens of thousands of listings across the thousands of brokerages that MRED serves in order to protect the small percentage of PLN listings that Zillow chooses not to display. *Id*. Collectively depriving a competitor of "necessary information"—despite standing to benefit from providing it—is among the recognized "plus factors" that evinces "an advance understanding." *In re Credit Default Swap Antitrust Litig.*, 2014 WL 4379112, at *4, *10 (S.D.N.Y. Sept. 4, 2014).

High collective market share. The structure of the relevant markets, including a high collective market share, also facilitates collusion. *See In re Text Messaging Antitrust Litig.*, 630 F.3d at 627-28 (90% market share indicated it "would not be difficult for such a small group to agree"). Here, Chicagoland Residential Real Estate Listing Creation and Distribution is a relevant market because it includes interchangeable products and services. *See In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 767 F. Supp. 2d 880, 901 (N.D. Ill. 2011); LW ¶85. MRED and Compass compete and collectively hold over 99% share of that market. LW ¶¶107-09.

Opportunities to collude. Defendants also had many opportunities to collude. Defendants frequently met through MRED's board, where Compass and its affiliates have three seats. BL Ex. D at 7; *see Moehrl*, 492 F. Supp. 3d at 778 (involvement in governance meetings demonstrated conspiracy). Reffkin and Jensen served on a panel during which they proposed MLS rules similar to the Revised Rules. MH ¶8; *see Hackman v. Dickerson Realtors, Inc.*, 595 F. Supp. 2d 875, 878-89 (N.D. Ill. 2009) (conversations with co-defendants showed "conscious commitment to a common scheme"). Defendants' April 2026 alliance—which covers the same goals of the conspiracy—provided further opportunities to collude. ES ¶75. Compass was even bold enough to report to its own agents that MRED has already decided to terminate Zillow's access to MRED Listing Feeds. ES ¶80, Ex. Z.

While each of these plus factors strongly indicates that Defendants reached an agreement, "the whole may be greater than the sum of its parts" in "exclud[ing] the possibility of conscious parallelism." *See Kleen Prods. LLC v. Georgia-Pac. LLC*, 910 F.3d 927, 934 (7th Cir. 2018).

***Unreasonable Restraint:*** Zillow is likely to succeed in establishing an unreasonable restraint of trade, regardless of whether the Court applies the *per se* or rule of reason framework.

Per Se. "Horizontal agreements among competitors, including group boycotts, [are] illegal

9

*per se*." *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 936 (7th Cir. 2000). A group boycott is *per se* unlawful if "(1) the boycotting firm has cut off access to a supply, facility[,] or market necessary for the boycotted firm … to compete; (2) the boycotting firm possesses a 'dominant' position in the market … and (3) the boycott . . . cannot be justified by plausible arguments that it was designed to enhance overall efficiency." *Id*. Plaintiffs do not have to prove a *per se* violation caused injury to competition—the injury is presumed. *Tri-Gen Inc. v. Int'l Union of Operating Eng'rs, Loc. 150, AFL-CIO*, 433 F.3d 1024, 1032 (7th Cir. 2006). Here, Defendants maintain a stranglehold over the relevant market and have conspired to cut off Zillow's access to listing feeds, which Zillow needs to compete. ES ¶¶74-80; LW ¶114. No benefit accrues to Defendants in depriving Zillow of listing feeds access; indeed, it is economically irrational to do so for the vast majority of listings—PLN or not—that Zillow would otherwise be displaying to its millions of users for free. LW ¶¶144-45. The *per se* standard applies and dictates that Defendants' agreement is unlawful.

<u>Rule of Reason.</u> Even if the rule of reason applies, Zillow is nevertheless likely to succeed in establishing an unreasonable restraint of trade. "Under this framework, the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market. … [T]hen the burden shifts to the defendant to show a procompetitive rationale for the restraint. … [T]hen the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Ohio v. Am. Express Co.*, 585 U.S. 529, 541-42 (2018) (citations omitted).

The boycott has a substantial anticompetitive effect. LW ¶¶129-34. Courts have widely recognized "significant competitive harms" when "a trade group like a multiple listing service … assumes the power to exclude other competitors from access to its pooled resources." *United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1370 (5th Cir. 1980). MRED is such an MLS with a 98%

10

market share of Listing Creation and Distribution. LW ¶121. The conspiracy compels one of two outcomes: either Zillow is forced to protect listings in Defendants' PLNs from competition by Zillow Preview and compliance with Zillow's Standards, or Zillow loses access to MRED Listing Feeds. *United States v. Nat'l Ass'n of Realtors*, 2006 WL 3434263, at *14 (N.D. Ill. Nov. 27, 2006). Either way, competition, transparency, and Zillow Preview are harmed. LW ¶¶125-43.

Defendants have no cognizable procompetitive justification for cutting off broad public distribution of tens of thousands of listings that Zillow displays at no cost to Defendants. A procompetitive justification must "enhance[] competition"; "sparing consumers the need to patronize competing firms is not a procompetitive justification." *PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 836 (9th Cir. 2022). Because Defendants cannot meet their burden on the second step, the burden does not shift back to Zillow and the boycott is an unreasonable restraint.

***Antitrust Injury:*** Defendants' conduct has caused antitrust injury to Zillow, competing platforms, and the market broadly: "a plaintiff must allege an anticompetitive injury that flows from defendant's actions and that the antitrust laws were intended to prevent." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 680 F. Supp. 3d at 972; *Int'l Outsourcing Servs., LLC v. Blistex, Inc.*, 420 F. Supp. 2d 860, 865 (N.D. Ill. 2006) (threatened injury sufficient for injunction). Defendants' group boycott threatens Zillow's listing access and blocks Zillow's efforts to compete. But for the conspiracy, Zillow could expand Zillow Preview as a pro-transparency competitor to Defendants' PLNs and would no longer be forced to display unwanted private listings or allow Defendants' PLNs to free-ride on Zillow's platform. ES ¶¶47-48; LW ¶¶131-42. Zillow also would likely have obtained direct broker feeds from enough brokers to serve as a reasonable alternate to MRED. ES ¶¶61-73; LW ¶130. A group boycott that impairs the plaintiff's ability to compete is sufficient to establish antitrust injury. *Sw. Suburban Bd. of Realtors, Inc. v. Beverly Area Plan. Ass'n*, 830 F.2d

11

1374, 1382 (7th Cir. 1987). At bottom, Defendants' conduct threatens every pro-transparency platform as well as every buyer, seller, and agent who depends on a transparent housing market.

### B. Zillow Is Likely to Succeed on Its Section 2 Claim.

A Section 2 claim has "two elements: (1) possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power." *Ploss v. Kraft Foods Grp., Inc.*, 197 F. Supp. 3d 1037, 1069 (N.D. Ill. 2016) (quotation omitted). Zillow establishes both. Zillow is also likely to succeed in establishing antitrust injury. *See supra*, Part I.A.

*Monopoly Power:* Monopoly power is "the power to exclude competition or to control price" in a relevant market. *Id.* A plaintiff may "prov[e] market power … by proving relevant … markets and by showing that the defendant's share exceeds whatever threshold is important for the practice in the case." *Toys "R" Us*, 221 F.3d at 937. MRED's market share in Chicagoland Listing Creation and Distribution, *supra* I.A, exceeds 98%, well over the threshold. TH ¶9; LW ¶121. *See United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966) ("87% of the [relevant market] leaves no doubt" as to monopoly power); *MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1107 (7th Cir. 1983) (shares over 70-80% sufficient for monopoly power).

*Anticompetitive Effects:* "[I]f a firm has been attempting to exclude rivals on some basis other than efficiency, it is fair to characterize its behavior as predatory [or exclusionary]." *Ploss*, 197 F. Supp. 3d at 1073 (quotations omitted). Here, the Revised Rules have the anticompetitive effects of excluding Zillow Preview as a viable, pro-transparency competitor to Defendants' PLNs, thus entrenching its monopoly and reducing its incentives to compete with higher quality and lower prices for members. LW ¶¶127-42. Nor do the Revised Rules promote any non-pretextual efficiency objective as MRED has long permitted its feed recipients to "objectively" filter listings. ES ¶53. Only after Zillow announced it would no longer display listings like those in Defendants' PLNs did MRED change its rules to block Zillow's Standards, thus jeopardizing the thousands

more listings that Zillow would otherwise display at no cost to MRED. ES ¶54; LW ¶143.

## II.  Zillow Will Suffer Irreparable Harm if MRED and Compass Are Not Enjoined.

"Harm is irreparable if legal remedies are inadequate to cure it," meaning "the remedy must be seriously deficient as compared to the harm suffered." *Life Spine*, 8 F.4th at 545 (quotation omitted). "[T]here must be more than a mere possibility that the harm will come to pass," but "[t]he alleged harm need not be occurring or be certain to occur before a court may grant relief." *BrightStar Franchising, LLC v. Foreside Mgmt. Co*., 808 F. Supp. 3d 870, 888 (N.D. Ill. 2025). Here, Defendants' conduct harms Zillow by forcing an impossible decision: (1) accede to Defendants' scheme and abandon the Standards nationwide, thus allowing Defendants' competing PLNs to avoid competition and free-ride on Zillow's platform; or (2) maintain the Standards and lose access to MRED Listing Feeds. Either choice causes imminent and irreparable harm to Zillow.

*First*, if Zillow refuses to yield to Defendants' scheme, Zillow faces the imminent risk that MRED will retaliate by severing Zillow's access. This is not mere speculation; MRED has repeatedly threatened to cut off access if Zillow does not accede to the Revised Rules, and recently accelerated those threats. MH ¶¶9-11; ES ¶80. Termination of MRED Listing Feeds would immediately decrease the quality and quantity of listings on Zillow's website. This would reduce viewership and impair products that depend on broad sharing of listings, eroding consumer trust in Zillow's platform and causing an immense but indeterminate amount of lost business. ES ¶¶85-87. Courts have found irreparable harm in these circumstances. *See Austin Bd. of Realtors v. E-Realty, Inc.*, 2000 WL 34239114, at *5 (W.D. Tex. Mar. 30, 2000) ("it would be extraordinarily difficult to place a monetary value" on lost sales and customers due to loss of MLS access).

*Second,* Zillow would suffer irreparable harm from losing access to MRED Listing Feeds because it would shut down Zillow Preview in its infancy. Zillow Preview is a nascent product competing in the Chicagoland Listing Creation and Distribution market, and thus the customers

13

and business lost due to Defendants' conduct are incalculable. *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984) (irreparable harm where business losses are "very difficult to calculate"); *Hess Newmark Owens Wolf, Inc. v. Owens*, 415 F.3d 630, 632-33 (7th Cir. 2005) (noting "[c]ompetition changes probabilities" and plaintiff suffers irreparable harm when it "will not be able to identify which [customers] slipped from its grasp"). Without access to MRED Listing Feeds, Zillow Preview is likely to lose customers and its growth will be stifled or snuffed out in Chicagoland. ES ¶84. This harm cannot be remedied at the end of trial.

*Third*, Defendants' conspiracy forces Zillow to abandon its Standards nationwide, a key procompetitive strategy that helps Zillow maintain access to timely and comprehensive listings by incentivizing sellers and listing agents to make new-to-market listings broadly accessible, rather than hidden in PLNs. ES ¶¶72-75; LW ¶164. If deprived of that strategy to maintain the quality and quantity of its listings while this case proceeds, Zillow would face a negative spiral in which the loss of listings leads to lower traffic, making its platform less liquid and attractive overall, thus affecting its entire business in ways that are impossible to quantify. LW ¶¶158-59.

Zillow has no adequate remedy at law because money damages will be "seriously deficient as a remedy for the harm suffered." *Roland Mach. Co.*, 749 F.2d at 386. The conspiracy would damage Zillow's competitive position, platform, goodwill, and reputation, all of which are non-compensable harms, and particularly acute for Zillow Preview. *See Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 16 (7th Cir. 1992) ("[I]t is virtually impossible to ascertain the precise "economic consequences of intangible harms, such as damage to reputation and loss of goodwill").

## III.    The Balance of Hardships and Public Interest Warrant an Injunction.

The preliminary injunction analysis next requires "balanc[ing] the harms to the moving party, other parties, and the public." *Eli Lilly & Co. v. Arla Foods, Inc.*, 893 F.3d 375, 381 (7th Cir. 2018). Here, the balance of hardships weighs sharply in Zillow's favor.

14

If the injunction is granted, Defendants face no risk of harm. While MRED would be restrained from enforcing its Revised Rules, Defendants would remain free to pursue their PLNs in competition with Zillow Preview, and display them on any platform or website but Zillow's. Any supposed harm from Zillow enforcing the Standards (e.g., suppressing private listings) rings hollow because Defendants would face precisely the same harm if they terminate Zillow's access to MRED Listing Feeds, causing tens of thousands of listings to disappear from Zillow. Defendants cannot claim harm they are willing to occasion. *Cf. Brightstar Franchising*, 808 F. Supp. 3d at 889 (granting injunction where defendant's harm was "self-inflicted").

A preliminary injunction would also serve the public interest. Courts widely recognize an overriding public interest in the "effective and meaningful enforcement of the American anti-trust laws," *In re Uranium Antitrust Litig.*, 617 F.2d 1248, 1261 (7th Cir. 1980), and in "promoting competition," *ChoiceParts, LLC v. Gen. Motors Corp.*, 203 F. Supp. 2d 905, 919 (N.D. Ill. 2002). An injunction would further these interests by promoting a transparent and competitive market in which Defendants' PLNs compete with Zillow Preview on the merits. Absent an injunction, consumer harms abound, including "interfer[ence] with consumers' free choice." *Wilk v. Am. Med. Ass'n*, 895 F.2d 352, 371 (7th Cir. 1990). As one example, permitting MRED to cut off Zillow's access to MRED Listing Feeds harms innocent consumers who prefer not to use Defendants' PLNs by depriving them of the choice to transparently market their listings on Zillow. Protecting consumers "weighs strongly in favor of" an injunction. *Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 813-14 (7th Cir. 2002).

## **CONCLUSION**

For the foregoing reasons, the Court should enjoin Defendants from implementing their conspiracy, including taking any steps to terminate Zillow's access to MRED Listing Feeds.

15

Dated: May 18, 2026

Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

/s/ *Bonnie Lau*
Bonnie Lau (admitted *pro hac vice*)
One Market Plaza, Spear Tower, Suite 3300
San Francisco, California 94105
Telephone: (415) 947-2000
Facsimile: (866) 974-7329
Email: blau@wsgr.com

Brian J. Smith (IL Bar No. 6321543)
1700 K Street NW, Fifth Floor
Washington, DC 20006
Telephone: (202) 973-8800
Facsimile: (866) 974-7329
Email: brian.smith@wsgr.com
*Admitted to practice only in Illinois and Maine*

Beau W. Buffier (admitted *pro hac vice*)
31 West 52nd Street, Fifth Floor
New York, New York 10019
Telephone: (212) 999-5800
Facsimile: (866) 974-7329
Email: bbuffier@wsgr.com

Nicholas R. Sidney (admitted *pro hac vice*)
701 Fifth Avenue, Suite 5100
Seattle, WA 98104
Telephone: (206) 883-2500
Facsimile: (866) 974-7329
Email: nsidney@wsgr.com

*Attorneys for Plaintiffs Zillow Group, Inc. and Zillow, Inc.*

16