**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ZILLOW GROUP, INC. and ZILLOW, INC., | Case No. 1:26-cv-5451 |
| *Plaintiffs*, | Judge: Hon. John J. Tharp, Jr. |
| v. | |
| MIDWEST REAL ESTATE DATA LLC, COMPASS, INC., and COMPASS ILLINOIS, INC., | |
| *Defendants*. | |

**DECLARATION OF ERROL SAMUELSON IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**

I, Errol Samuelson, hereby declare as follows:

1. I am the Chief Industry Development Officer at Zillow Group.

2. I submit this Declaration in support of Plaintiffs Zillow Group, Inc. and Zillow, Inc.'s Motion for a Preliminary Injunction.

3. The matters in this declaration are based on my own personal knowledge. If called as a witness, I could and would testify competently to them.

4. I have spent more than 25 years in the technology and real estate sectors. Before joining Zillow Group in 2014, I held various leadership roles at Move, Inc., including Chief Strategy Officer, Chief Revenue Officer, and Senior Vice President of Move's business-to-business software group. From 2007 to 2014, I was also President of Move's Realtor.com business, which before Zillow's emergence was the top-ranked real estate website in the United States. Prior to these roles, I co-founded the real estate consultancy Pranix and was director of sales and product management in the real estate, mortgage banking, and law enforcement verticals at GTE Enterprise Solutions.

-1-

5.      In my current role, I am responsible for Zillow's real estate industry relations strategy and interface with brokerage, franchise, and Multiple Listing Service executives.

6.      Zillow was founded in Seattle, Washington in 2004. It has earned its reputation as a technology-forward platform that helps connect home buyers, sellers, and renters to real estate services. Zillow's mission is to "make home a reality" for more people by breaking down information barriers in the housing market and helping consumers find the home that meets their unique needs.

7.      The Zillow network, which includes, among other sites, Zillow.com, Trulia.com, StreetEasy.com, and their corresponding mobile apps, reaches hundreds of millions of consumers and professionals in the real estate industry every month through its dynamic database of for-sale and for-rent listings. Consumers trust Zillow to help them find their dream home, or to market their home listing to the widest audience of potential buyers.

**The Multiple Listing System**

8.      Before the Internet, information about residential real estate was not widely available to consumers (home buyers or sellers); it was primarily accessible only to real estate professionals through printed listing books or closed computer systems. Consumers had to go through a real estate agent to find homes available in their market, learn about recent sales, or get a sense of what their home was worth. And typically, consumers only would be aware of what properties their agent selected for them or what they saw in abbreviated newspaper ads or magazines.

9.      To aggregate and share for-sale listings in their area, real estate brokerages formed regional multiple listing services ("MLSs"). MLSs are services through which real estate brokers agree to contribute to a common database of listings within a particular area. They are typically

owned and operated by local real estate associations, trade groups that are made up of agents and brokerages in the area.

10.     MLSs maintain databases of local listings and share them among their members. They also set rules and standards that govern how listings are added to the common database and how they are displayed. The rules can vary between MLSs, resulting in a patchwork of different local rules and regulations governing real estate professionals, sometimes even in geographically proximate areas. MLSs initially made their listings available only to agents of the member brokerages.

11.     Today, MLSs distribute their local listings for public display through Internet Data Exchange ("IDX") or Virtual Office Website ("VOW") feeds. MLSs will not grant access to the feeds until they review how a member is displaying the listings and confirms compliance with their rules.

**MRED Controls Listings in Chicagoland**

12.     Midwest Real Estate Data, LLC ("MRED") is the primary MLS for much of Illinois and some portions of Indiana, Iowa, Wisconsin, Michigan, Kentucky, and Missouri. It is one of the largest MLSs in the country, with over 43,000 members. In 2025, MRED's members marketed over 264,000 listings. Nearly 100% of the residential property listings in Chicagoland (which includes Cook County and surrounding counties in Illinois) are created and distributed on MRED's database.

13.     Like other MLSs, MRED aggregates and distributes local for-sale listings to its members, agents, brokerages, including online platforms like Zillow through IDX and VOW feeds. It also sets rules and standards that govern how listings are added to and displayed on both MRED's common database and on the platforms operated by recipients of those feeds.

14. MRED provides its IDX and VOW listing feeds to brokerages via MLS Grid, of which MRED is a founding member and a shareholder. MLS Grid provides the technology necessary for MRED and other MLSs to distribute their listing feeds to MLS participants, such as Zillow.

15. The current President and CEO of MRED is Rebecca Jensen. Ms. Jensen also serves as the Chair of MLS Grid's Board of Managers.

**Zillow Attracts Consumers Through Innovative Platforms and Tools**

16. Over the last 20 years, Zillow and other players focused on democratizing real estate information and transforming the industry through transparency. Zillow (and Zillow-operated websites and apps, including Trulia.com) have succeeded in this space by aggregating accurate, up-to-date real estate listings that consumers can easily search and browse for free. Today, consumers expect that they can access and search for-sale listings this way themselves, through Zillow and other platforms like it.

17. Today, the vast majority of Zillow's home sale listings come from MLSs. We also obtain some listings directly from other sources including individual agents and brokerages, owners, and builders.

18. A key part of Zillow's business is displaying for-sale listings to consumers and connecting them with real estate professionals who can support consumers and their transaction needs.

19. Providing high-quality leads to real estate professionals on its platform requires Zillow to have a strong base of consumers who are interested in buying or selling homes. To attract and retain consumers, Zillow has built an innovative platform that provides consumers with the

information and tools they need and want to navigate the real estate industry. Most of Zillow's services for consumers are offered for free on our platform.

20.     The foundation of Zillow's platform is a database of almost every home in the country. The most important part of that database is the for-sale listings displayed through our websites and apps. This listings database must be accurate and up-to-date for properties in local areas where consumers are searching. Maintaining consumer engagement on Zillow requires consumers to trust that the platform is providing accurate information about as many homes as possible.

21.     Obtaining broad access to shared listings is very important to Zillow's business model and to upholding Zillow's commitment to provide transparency to consumers for real estate transactions, including accurate and up-to-date for-sale listing information.

22.     As discussed above, the for-sale listing information displayed on Zillow primarily originates with the brokerages and agents that submit listings to their local MLS. MLSs then distribute an aggregated set of these listings via the IDX and VOW feeds.

23.     These data feeds are available to all members of the MLS, who must comply with the MLS's access rules. Based on my experience, other websites and platforms that display for-sale listings, including Redfin, Homes.com, and others, obtain the same listing information through the same process.

24.     Listings are the lifeblood of real estate markets and are crucial to Zillow's multifaceted real estate business where it provides different services to buyers, sellers, and agents. Any brokerage or online portal that wishes to effectively compete in a geographic market must participate in the local MLS to gain access to the aggregated listing information available through the MLS's IDX and VOW feeds.

**Hidden Listings Undermine Zillow's Efforts to Promote Real Estate Transparency**

25. Not every player in the real estate industry supports transparency and broad access to for-sale listings. Some large brokerages, most notably Compass, are expanding the use of "private" or "hidden" listings marketed only to an exclusive group of agents and clients. At least initially, these listings are not submitted to an MLS or otherwise available for consumers and agents outside the brokerage's exclusive network to view.

26. The real estate industry uses various terms to describe how and whether listings are shared with the broader industry. "On-MLS" listings have been entered into an MLS, making the listing broadly visible to participating brokers, agents, and platforms like Zillow. "Off-MLS" listings, sometimes called "pocket listings," are marketed outside the MLS system through private networks or broker-to-broker communications, and are hidden from the broader public. In MRED there is a third, albeit uncommon, option called "connectMLS" that sits between the listing being on-MLS and off-MLS. The listing is entered into the MLS and may be viewed by agents and brokers, but may not be displayed to the public on agent and broker websites other than the listing brokerage (and its partners') website. Finally, "premarketing" is the broader practice of promoting or testing interest in a residential property before the property is listed on the MLS.

27. Zillow believes that hidden listings are harmful to consumers, Zillow, and the real estate industry in general. For buyers, an increase in hidden listings forces them to find and visit multiple platforms (some behind registration walls) for the most comprehensive view of the for-sale listings in their area. Worse, some hidden listings cannot be viewed unless the buyer works with the brokerage offering the listing. Buyers who are not able to access these hidden listings are at a significant disadvantage, missing out on potential opportunities simply because they are not aware of the listings or were already working with an agent who also did not have access to these

listings. This can lead to significant issues with equality and fairness in home sales. While there have always been valid reasons for some sellers to prioritize privacy over broad exposure, these circumstances are rare. Most sellers who choose to list their property through a hidden or private listing network can be harmed when the listing gains exposure to fewer buyers, which can result in the seller receiving fewer offers at lower prices and longer selling times than what the seller might obtain from broad exposure and more bidders. Zillow is also harmed because listings are a key input to many of Zillow's core products; hidden listings increase barriers to information that make it more difficult to obtain listings and an accurate view of housing markets.

28.     Zillow makes it our business to understand issues in real estate that impact consumers and professionals. This includes the effects of hidden or so-called "private" listings. A Zillow Research study found that off-MLS homes sold between 2023 and 2024 typically sold for $4,975 less than those listed on the MLS, and these impacts were worse in many states. A true and correct copy of this study is attached as Exhibit A.

29.     Increased barriers to access disproportionately impact communities of color, including in Chicagoland. A Zillow Research study found that in ZIP codes where a majority of household heads are Black, Hispanic, Asian American and Pacific Islander, or Native American, homes sold off-MLS in 2023-24 typically sold for $9,850 less than MLS-listed homes. This is more than double the loss for homes sold off-MLS in majority white neighborhoods. A true and correct copy of this study is attached as Exhibit B. A separate Zillow Research study found that homes for sale across Chicago's majority-white neighborhoods are twice as likely to be listed privately as those in majority-non-white neighborhoods. A true and correct copy of this study is attached as Exhibit C.

30.     Hidden listings harm Zillow because the newest for-sale listings are the most valuable to Zillow's audience and the most likely to generate leads. New listings tend to attract consumers who are actively looking for a home and are therefore likely to generate revenue for Zillow's advertising and referral services, such as providing leads to buyer agents. If Zillow displays fewer new listings, its platform will be less valuable to consumers actively looking to buy a home, and its core value proposition of offering transparency and up-to-date, accurate listings will be diminished. In addition, allowing listing agents to withhold new-to-market listings while sending old, previously-marketed listings to Zillow permits those agents to take advantage of Zillow's investments in building a platform that attracts high-intent buyers. Brokerages may prefer to market many of their properties exclusively first, and then if that approach fails, market the listing instead through MLS distribution channels and Zillow's platform. In this situation, the brokerage gains the advantage of Zillow's broad and active audience while degrading the platform with lower quality, stale listings.

31.     This outcome would ultimately undermine Zillow's incentives to invest in innovation. Without access to new listings, fewer consumers would view Zillow as a place to access the most comprehensive, up-to-date, and accurate set of listings. Zillow would then get a lower return on its investments in driving audience growth, discouraging the development of additional features and insights that help consumers buy and sell homes.

32.     Compass is the largest real estate brokerage in many residential estate markets in the United States, including Chicagoland, and following its January 2026 acquisition of Anywhere Real Estate, Compass is the largest real estate brokerage in the country. A true and correct copy of a January 9, 2026 Compass press release announcing the closing of the acquisition is attached as Exhibit D. Compass owns or franchises other prominent brands like @properties and Christie's

International Real Estate. According to an open letter from Compass CEO Robert Reffkin, Compass also now franchises many real estate brokerage firms under the (former Anywhere) brands Better Homes and Gardens Real Estate, CENTURY 21, Coldwell Banker, Corcoran, ERA, and Sotheby's International. A true and correct copy of the letter is attached as Exhibit E.

33. Compass is a vocal proponent of "Private Exclusive" or hidden listings, which it uses as part of its "Three-Phase Marketing Strategy." My understanding is that in Phase 1, Compass Private Exclusives are not made available to the general public on the internet and are typically only available by contacting a Compass agent.

34. MRED has its own private listing network available only to agents called connectMLS. MRED requires its members to submit listings to connectMLS or its main database within 48 hours of the listing agreement or within 24 hours of public advertising.

35. As discussed above, private listing networks like MRED's connectMLS and Compass's Three-Phased Marketing Strategy harm consumers, agents, and real estate markets broadly. Sellers are harmed because private listings are not exposed to the greatest number of potential buyers. Buyers are harmed because they lose the ability to see all available inventory in one portal, increasing their search costs, and potentially never finding their dream home. And by preventing the free flow of listings, private listing networks degrade overall liquidity and efficiency in real estate markets.

36. In my experience, private listing networks predominantly benefit the large brokers that offer private listings. These brokerages benefit from: (1) walling off the listings in their large networks from outside competitors or preventing competitors from publicly displaying those listings; (2) using their large networks to lure buyers and sellers, capturing so-called network effects; (3) "double ending" the transaction, i.e., capturing fees by representing both buyer and

seller; (4) recruiting agents from other brokerages who want to gain access to private listings; and (5) free-riding on the investments made by online platforms such as Zillow who attract a large audience of likely home buyers while the brokerage withholds listings only until they fail to sell elsewhere.

**Zillow Adopts the Listing Access Standards to Advance its Commitment to Democratizing Real Estate Information**

37. Zillow announced its Listing Access Standards (the "Standards") on April 10, 2025 to help mitigate the damaging effects of private listings. The Standards support Zillow's belief that (1) consumers and agents deserve fair, transparent access to all real estate information, and (2) sellers should make an informed choice about how their listings will be marketed. On June 30, 2025, Zillow started implementing the Standards by region throughout the country, with narrow exceptions including the Chicagoland region. A true and correct copy of the current Zillow Standards is attached as Exhibit F.

38. Under the Standards, Zillow does not display listings that brokerages or their licensed agents marketed to a subset of potential buyers but did not make broadly accessible to the general public in a manner that provides open access, which may include displaying it on a public-facing website, mobile app, or internet real estate portal, or placing it in a MLS for distribution and display on MLS participants' sites. Agents are free to offer any mix of compliant and non-compliant listings, and Zillow only removes non-compliant listings after the agent has received at least two prior warnings.

39. The Standards apply to all brokerages' for-sale listings regardless of source; the policy is not specific to brokerage or entity. Zillow and its Standards do not control what listings are displayed elsewhere, including on MLSs or brokerage websites or other home search platforms.

Those platforms can accept listings that would not be displayed on Zillow's platform; the Standards do not limit others' ability to display or not display any listing.

40. The Standards are a core competitive differentiator for Zillow's positioning in the real estate industry and demonstrate to agents, brokerages, and MLSs alike that we support a transparent, competitive real estate market. The Standards also enhance our product offerings and reflect our pro-transparency mission. The Standards improve the quality of for-sale listings displayed on our platform by reducing the incentives for brokers and agents to take advantage of Zillow's platform investments by submitting old listings only after they failed to sell elsewhere, while still benefitting from our audience of buyers. The Standards also convey a core brand message that Zillow has promoted since its founding, that real estate information should be easily accessible to all.

41. Zillow wants the Standards to represent an alternative to the fragmented, low-transparency, and anti-consumer market that will result from an increase in private listings. As Compass and other large brokerages increase their use of private listings out of self-interest, announcing the Standards helped Zillow challenge the narrative that brokerages must submit to a world of private listings, and further demonstrate our sincere belief in the power of transparency and broad access for consumers and real estate professionals alike. In short, we tried to communicate our belief that transparency is the better way for the industry and consumers.

42. Since Zillow announced the Standards, some notable consumer advocates have praised the policy. This includes the Consumer Policy Center, which called the Standards a "consumer-first" step that promotes fairness in real estate; the Consumer Advocates in American Real Estate, which issued a white paper on the topic; and the National Association of Hispanic

Real Estate Professionals, which highlighted the fair housing concerns private listing networks present.

**Zillow Preview Brings Market-Wide Visibility to "Coming Soon" Listings**

43.     On March 17, 2026, Zillow announced Zillow Preview. Zillow Preview allows partner brokerages to market "coming soon" listings (that are not yet available to tour) on Zillow, Trulia, and the broker's website. We also announced earlier this month that, starting in summer 2026, Zillow Preview listings will be displayed on Realtor.com as well. Zillow Preview brings pre-market listings to the broader real estate market by making them publicly visible, rather than limited to closed systems or hidden in private networks. Zillow Preview also supports Zillow's broader objective to attract a large pool of prospective buyers to Zillow's platforms by providing comprehensive real estate information. This in turn increases the value that we are able to provide through our services for home sellers and real estate agents, whose success depends on reaching high-intent home buyers.

44.     Unlike private listing networks such as Compass's Three-Phased Marketing Strategy and MRED's connectMLS, Zillow Preview provides market-wide exposure to "coming soon" listings, giving all buyers access to more homes and offering sellers early and broad visibility to their properties. Zillow Preview also ensures agents can access and show "coming soon" listings to their clients.

45.     Agents and brokerages who participate in Zillow Preview create home sale listings directly on Zillow's platform for display on Zillow and soon on brokerage and other partner websites. Zillow Preview allows agents to use Zillow's platform to create pre-market listings with photos, 3D tours, and listing descriptions to help build demand for the listing by broadly distributing the listing directly to consumers, buyer agents, and to other websites.

46.     Zillow Preview's features are an expansion of Zillow's listing creation tools, which have historically been focused on For Sale by Owner (FSBO) and New Construction listings. Zillow allows FSBO listings to be posted for free with unlimited photos, allowing the owner to decide the price, listing details, marketing strategy, and showing schedule. Zillow also offers tools to allow for creation and distribution of New Construction listings; Zillow lets these users show home and community images, available floor plans, exterior design options, lot maps with ability to show inventory status and plan pricing details, community details and amenities on a dedicated Community Page, as well as 3D tours, among other features.

47.     Zillow's listing creation capability competes with MRED's private listing network ("PLN") and Compass's Private Exclusives by vying to be the first platform on which a brokerage enters a listing, giving that platform a competitive advantage in having the newest, freshest listings to offer to prospective buyers.

48.     Other unique and innovative features of Zillow Preview include the benefits to sellers and agents (including financial incentives for listing agents) of putting pre-market inventory on open and accessible platforms, rather than in closed networks such as MRED's PLN and broker-specific PLNs. Unlike MRED, there is no fee to the brokerage, agent or consumer to list a home in Preview. On the contrary, the value flows the other way. Zillow Preview listings get boosted placement on Zillow and listing agents receive elevated search placement on Zillow (and soon on Realtor.com), as well as free "contact agent" listing leads, and the listing brokerage's branding appears on the listing. In addition to the benefit of this marketing, Zillow also offers to share some of its own revenue with the listing agent and brokerage if a buyer who first connects through a Zillow Preview listing ultimately buys a home with the assistance of a Zillow partner agent. This

financial incentive comes at no additional cost to the consumer or agent, as Zillow is paying out its own revenue.

49. Zillow Preview works in tandem with the Standards to incentivize broader listing exposure to the benefit of consumers and the market alike. Zillow Preview offers enhanced visibility, free consumer connections, and financial incentives for listings that are made openly available to all buyers. The Standards deny Zillow distribution to listings that are marketed only within PLNs. Together, Zillow Preview and the Standards promote transparency, wider dissemination of listing information, and more robust buyer participation.

50. Zillow also recently announced an agreement on May 5, 2026, to syndicate Zillow Preview listings to Realtor.com starting this summer, thus expanding Zillow's distribution efforts for Zillow Preview listings beyond Zillow-owned platforms and further enhancing transparency and access.

**MRED's Revised Rules and Threats to Terminate Zillow's Access to the MRED Listing Feeds**

51. On or around October 2, 2025, Compass's CEO Robert Reffkin sent email messages to MLSs in multiple market areas, urging them to terminate Zillow's listing data feeds if it enforced the Standards. A true and correct screenshot of this message, as shared with a member of my team, is attached as Exhibit G.

52. I and members of my team spoke with, collectively, representatives of several MLSs, including OneKey MLS, California Regional MLS, Contra Costa Association of REALTORS, Bay East Associations of REALTORS, BridgeMLS, MLSListings, BeachesMLS, and NTREIS MLS, who each confirmed that they received a message from Mr. Reffkin advocating for their MLS to terminate Zillow's access to IDX and VOW feeds. These are all MLSs that serve

areas in which Compass has a high share of the local residential brokerage market. Based on this pattern, I believe that Mr. Reffkin also sent the same or a similar message to MRED.

53.     At the time of Mr. Reffkin's email, I believed that Zillow would have been free to implement the Standards in MRED's region because the Standards filter listings based on "objective criteria, including but not limited to…" the "type of listing" (e.g., privately or publicly marketed). Indeed, the vast majority of other MLSs that use the same rule have not objected to Zillow's implementation of the Standards in their regions.

54.     On October 15, 2025, an MRED employee sent an email to Zillow attaching revisions to MRED's rules for IDX and VOW feed recipients, including Zillow. The MRED employee stated that the revised rules would become effective on October 29, 2025 and that "[w]e wanted to flag this for you to ensure your Zillow Listing Transparency Policy (if implemented in our markets) is compliant." I interpreted this to mean that MRED viewed Zillow's Standards as a violation of the revised rules. A true and correct copy of the October 15, 2025 email is attached as Exhibit H.

55.     After the Revised Rules went into effect on October 29, 2025, MLS Grid (a vendor for MRED that provides the technical infrastructure for Zillow to access the MRED feeds) formally published the modified IDX and VOW rules for MRED. A true and correct copy of MLS Grid's notice of the new MRED-specific rules is attached as Exhibit I.

56.     A true and correct copy of the IDX rules applicable to MRED as of April 29, 2026 is attached as Exhibit J.

57.     A true and correct copy of the VOW rules applicable to MRED as of April 29, 2026 is attached as Exhibit K.

-15-

58. A true and correct copy of the applicable IDX rules in effect as of June 11, 2025 is attached as Exhibit L.

59. A true and correct copy of the applicable VOW rules in effect as of September 16, 2024 is attached as Exhibit M.

60. MRED has taken the position that the Standards are inconsistent with the revised rules because listings that violate the Standards are not displayed on Zillow for as long as the listing remains within the same brokerage.

**MRED's and Compass's Actions to Impede Zillow's Efforts to Obtain Direct Listing Feeds**

61. In light of the Revised Rules and MRED's position that enforcing the Standards in MRED's territory would constitute a violation of those rules, I understood that there was a risk that MRED would revoke Zillow's access to MRED's IDX and VOW feeds, which would be very harmful to Zillow's business in Chicagoland due to Zillow's reliance on listing data across many of our lines of business. To mitigate that risk, I directed my staff to attempt to obtain individual listing data feeds directly from brokerages, such that Zillow would not be dependent on MRED's feed of aggregated listings in the event of a termination.

62. Soon after Zillow began attempting to negotiate direct feeds with brokerages, MRED complained about Zillow's efforts.

63. On October 18, 2025, I spoke with Ms. Jensen about whether Zillow and MRED could find a middle ground where Zillow would be able to enforce the Standards in MRED's territory without the threat of MRED listing feed termination. We were unable to come to a resolution.

64. On October 31, 2025, I spoke with MRED's General Counsel Charles El-Moussa to discuss Zillow's efforts to obtain listing data feeds directly from brokerages in Chicagoland. Mr. El-Moussa explained that later that day MRED would send a communication to their participating managing brokers acknowledging that MRED and Zillow are in a dispute.

65. The next day, I spoke again with Mr. El-Moussa and requested that MRED not send a message to brokers. Mr. El-Moussa stated that Ms. Jensen would not back down if Zillow did not agree to cease implementation of the Standards in MRED's territory.

66. Around this time, I had several discussions with MRED about whether Zillow would cease contacting brokers regarding direct listing feeds, and I asked if MRED would be willing to pause its threats of termination while the parties negotiated. We were unable to reach an agreement.

67. On or around November 3, 2025, MRED sent an email to the MRED Managing Brokers representing that Zillow's Standards "may violate MRED's rules, as well as the terms of Zillow's license agreement with MRED which requires Zillow to access and display all licensed listings without bias or restriction." A true and correct copy of this email is attached as Exhibit N.

68. On December 13, 2025, MRED sent an email to its subscribing agents stating that Zillow had been contacting brokers regarding direct listing feeds and MRED discouraged its subscribing agents from agreeing to provide direct listings to Zillow. A true and correct copy of the email, as provided to me by a Zillow employee, is attached as Exhibit O.

69. On January 26, 2026, 17 days after Compass closed on its acquisition of Anywhere (which included Coldwell Banker Realty), Coldwell Banker sent a notice terminating multiple of its offices' direct listing feeds with Zillow, including for a Coldwell Banker office in Chicago. A true and correct copy of this notice is attached as Exhibit P. Coldwell Banker then re-sent the letter

on February 17, 2026, this time including attachments, a true and correct copy of which is attached as Exhibit Q.

70.     On February 12, 2026, MRED posted an alert on its internal system with the subject line, "Zillow Communications to MRED Subscribers," that notified MRED's members that Zillow has been working with brokerages to set up direct listing feeds. The alert further stated "MRED does not understand the basis for this, as MRED has not provided Zillow with any notices of violations as of this date that would require a disconnection of the listing data feed. Unless Zillow anticipates violating MRED policy, we do not understand why they claim service will be interrupted." A true and correct copy of this alert, as provided by a Zillow employee, is attached as Exhibit R.

71.     On February 17, 2026, Compass Vice President and MRED Board Member Fran Broude sent a notice terminating "any and all Broker Feed Authorization Agreements" with Zillow for any Compass brokerage in Chicago, Illinois. A true and correct copy of this notice is attached as Exhibit S.

72.     On May 6, 2026, Jameson Real Estate Brokerage, LLC (d/b/a Jameson Sotheby's International Realty), whose parent company Compass had purchased a controlling stake in only two weeks prior, sent a notice terminating "any and all Broker Feed Authorization Agreements" with Zillow nationwide. A true and correct copy of this notice is attached as Exhibit T.

73.     On May 8, 2026, Compass, Inc. (d/b/a Compass International Holdings) sent a notice terminating "any and all Broker Feed Authorization Agreements … nationwide between every Compass, Inc. … brokerage entity or subsidiary" and Zillow. A true and correct copy of this notice is attached as Exhibit U.

**MRED and Compass's National Partnership Leads to More Threats to Terminate Zillow's Access to the MRED Listing Feeds**

74.     In April 2026, MRED and Compass announced an alliance that would expand MRED's reach nationwide. A true and correct copy of the MRED press release is attached as Exhibit V.

75.     Based on my review of public reporting and MRED's and Compass's subsequent actions, the MRED-Compass alliance appears to have been designed to prevent Zillow from implementing the Standards, a key competitive differentiator for Zillow, on a nationwide basis. The alliance appears to allow Compass to enter its Private Exclusive listings anywhere in the country into MRED and then allow MRED to claim that Zillow has violated the Revised Rules when Compass's listings are not displayed on Zillow's platforms because of the Standards.

76.     Consistent with my understanding of the alliance, on May 5, 2026, MRED notified Zillow that it was in violation of the Revised Rules by failing to display six Compass listings syndicated to MRED's PLN located far outside Chicagoland: in California, Florida, and Georgia. On May 7, 2026, MRED notified Zillow that one more listing, in Florida, was in violation of the Revised Rules.  This is the first time I can recall MRED ever claiming that it maintained listings outside of its historical Chicagoland and Midwest service area. A true and correct copy of MRED's email is attached as Exhibit W.

77.     On May 6, 2026, MLS Grid notified Zillow that it was in violation of MRED's Revised Rules by failing to display nine Compass listings syndicated to MRED's PLN located in the same three states outside of Chicagoland. Six of those Compass listings overlapped with those identified in MRED's email. MLS Grid threatened that if the Compass listings were not restored to Zillow's platform by May 19, 2026, MLS Grid would "notify MRED of the continued non-compliance, and any other applicable MLS, as this may result in possible fines or suspension of

your access to MLS data through MLS Grid." A true and correct copy of MLS Grid's email is attached as Exhibit X.

78.     The nine listings in California, Florida, and Georgia referenced in the May 5–7 emails from MRED and MLS Grid were not displayed on Zillow because each listing violated Zillow's Standards, which have been implemented in regions outside Chicagoland for nearly a year.  In particular, Zillow had originally decided not to display the listings referenced by MRED and MLS Grid when the listings were entered into other MLSs where Zillow has been implementing its Standards. The listings then appeared in MRED's feeds between April 30 and May 4, 2026, following the MRED-Compass alliance and national expansion of its PLN. In the nearly one year that Zillow has been implementing its Standards, this is the first time I am aware of MRED seeking to challenge Zillow's implementation of the Standards outside MRED's territory. It has only been since the MRED-Compass alliance that MRED has claimed Zillow's failure to display these non-Chicagoland listings ostensibly violated MRED's Revised Rules.

79.     On May 11, 2026, the CEO of Hive MLS in North Carolina forwarded to Zillow an email he received from Compass's Head of Investor Relations, Caitlin McCrory. A true and correct copy of the email is attached as Exhibit Y.

80.     Also on May 11, 2026, a Compass agent sent an email to Zillow explaining that he had received a call from Fran Broude, the president of Compass Illinois and a member of MRED's board, who said that MRED was "going to be banning Zillow from getting any listing feeds, which would of course mean no more leads at all for agents." A true and correct copy of the email is attached as Exhibit Z.

**Zillow—and Zillow Preview in Particular—Will be Irreparably Harmed by Termination of Listing Access**

81.    If MRED follows through on its threat to terminate Zillow's access to Chicagoland IDX and VOW feeds, Zillow's business will suffer immense harm. Today, nearly all of Zillow's residential for-sale listings in Chicagoland are sourced from MRED's IDX and VOW feeds. If Zillow loses access to MRED's feeds, Zillow will only be able to display listings from a limited set of brokerages and the small portion of listings that are directly created on Zillow's platform (such as Zillow Preview and FSBO listings), which I estimate would cover approximately 40–50% of listings in Chicagoland.

82.    The harm to Zillow of MRED terminating Zillow's access to MRED's Chicagoland IDX and VOW feeds is exacerbated by Compass and its subsidiaries cancelling all of their direct listing feed agreements with Zillow, and MRED's impeding Zillow's attempts to negotiate such agreements. Without backup sources of listing access, Zillow is dependent on MRED's listing feed.

83.    Termination of MRED's feed will be particularly devastating for Zillow Preview's ability to compete with MRED and Compass in Chicagoland. Zillow Preview listings are displayed on Zillow's platforms alongside non-Preview listings, such as the listings that Zillow obtains from MRED. But if Zillow is unable to display those non-Preview listings, home buyers will be discouraged from searching for homes on Zillow at all and thus will have little reason to use Zillow Preview. A reduced audience of prospective buyers will make Zillow Preview a significantly less attractive offering for the agents and brokerages who have signed up to use it and discourage others from doing so, perpetuating a downward cycle of reduced listings and audience. I do not believe it would be possible to identify all such lost customers, nor quantify the harm to Zillow caused by such losses.

84. As Zillow Preview is in its infancy, it is also impossible to calculate the extent to which a loss of buyers will permanently injure Zillow Preview's future viability. Without the ability to attract listings to Zillow, Zillow will experience reduced leads and traffic, which will reduce the audience of buyers for Zillow Preview listings—denying Zillow Preview the scale necessary to build a successful platform. In the meantime, MRED and Compass's competing listing creation and distribution offerings will be free to compete without the competitive pressure of Zillow Preview.

85. For several reasons, the injury extends to other areas of Zillow's business as well, including the brokerage services that we provide to home buyers. First, Zillow Preview directly supports Zillow's advertising and lead generation services by increasing the number of listings for which we can connect prospective buyers to licensed agents, who pay Zillow a fee for this service. With Zillow Preview impaired by the downward cycle described above, Zillow Preview is unlikely to contribute incremental listings for lead generation. Second, as described above, with fewer overall listings (both Preview and non-Preview) due to the loss of access to MRED's listing feeds—and the attendant decline in web traffic from buyers who will turn elsewhere—Zillow's advertising services on non-Preview listings would suffer as well. In particular, Zillow would not be able to attract as many prospective buyers to listings and then connect them with licensed agents, who pay Zillow a fee for this service. Our decreased ability to deliver such connections is likely to cause a loss of clients using these advertising services.

86. Zillow's other businesses, including its mortgage services, New Construction listings, and Zillow Showcase, will also be irreparably injured by the loss of listings. Zillow's mortgage services and New Construction businesses depend on the broad sharing of listings to attract prospective buyers to Zillow. If MRED cuts Zillow's listing feed access, Zillow's audience

-23-

will inevitably drop, causing a loss of clients to these services. Zillow Showcase is a premium listing product designed to help agents enhance their listings through elevated listing design and priority search placement. Showcase is entirely dependent on IDX and VOW feeds as a source of listings. Terminating Zillow's access to MRED's listing feeds will result in the complete collapse of Showcase in Chicagoland.

87.     Finally, the loss of a significant portion of Zillow's listings in Chicagoland will lead consumers to think less of Zillow's quality as its products become degraded. Without a reliable source of listings, Zillow's reputation as a trusted source for comprehensive, up-to-date, and accurate information will suffer, diminishing Zillow's goodwill with customers. Based on my experience in the industry and at Zillow, a loss of customer goodwill is very likely to cause customers to shift their business to Zillow's competitors, and those shifts are often permanent, at least in part, because customers develop new preferences and habits.

//

//

//

//

//

//

//

//

//

//

//

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 16TH day of May, 2026.

Errol Samuelson