**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ZILLOW GROUP, INC. and ZILLOW, INC., <br><br>     *Plaintiffs*, <br><br> v. <br><br> MIDWEST REAL ESTATE DATA LLC, COMPASS, INC., and COMPASS ILLINOIS, INC. <br><br>     *Defendants*. | Case No.: 1:26-cv-5451 <br><br> Judge: Hon. John J. Tharp Jr. |

# EXPERT DECLARATION OF
# LAWRENCE WU, PH.D.

**May 18, 2026**

# Table of Contents

I.    INTRODUCTION ..................................................................................................................... 1

    A. QUALIFICATIONS AND EXPERIENCE ................................................................................ 1

    B. OVERVIEW OF THE PARTIES .......................................................................................... 2

        1. Zillow ..................................................................................................................... 2

        2. MRED ..................................................................................................................... 2

        3. Compass .................................................................................................................. 3

    C. THE ALLEGATIONS ....................................................................................................... 3

    D. NATURE AND SCOPE OF THE ASSIGNMENT ................................................................... 5

    E. INFORMATION RELIED UPON ......................................................................................... 6

    F. SUMMARY OF OPINIONS ................................................................................................ 6

II.   BACKGROUND ................................................................................................................ 10

    A. THE RELEVANT ECONOMIC PRINCIPLES APPLICABLE TO UNDERSTANDING THE FUNCTIONING OF REAL ESTATE MARKETS ........................................................................ 10

        1. The Benefits of Liquidity and Thicker Markets .................................................. 10

        2. The Flow of Information Through the Marketplace ........................................... 11

        3. Information Asymmetry ........................................................................................ 13

    B. MULTIPLE LISTING SERVICES ...................................................................................... 14

    C. THE RISE OF PRIVATE LISTING NETWORKS ................................................................. 17

    D. ZILLOW'S BUSINESS MODEL AND THE POLICIES THAT PRESERVE ITS ABILITY TO PROVIDE INFORMATION, TRANSPARENCY, AND SERVICES THAT ENHANCE THE REAL ESTATE MARKETPLACE ........................................................................................................ 20

        1. Zillow's Business Model ..................................................................................... 20

        2. Zillow's Listing Access Standards ...................................................................... 22

        3. Zillow Preview and Other Innovations .............................................................. 23

III.  THE ECONOMIC THEORY BEHIND ZILLOW'S ALLEGATIONS OF COMPETITIVE HARM ................... 24

    A. GROUP BOYCOTT BY MRED AND COMPASS ............................................................... 25

    B. MONOPOLY MAINTENANCE BY MRED ........................................................................ 27

IV.  THE MARKET FOR LISTING PLATFORMS IN THE CHICAGOLAND REGION REPRESENTS A RELEVANT ANTITRUST MARKET ................................................................................................ 28

    A. PRODUCT MARKET DEFINITION .................................................................................... 28

    B. GEOGRAPHIC MARKET DEFINITION .............................................................................. 32

V.   CHICAGOLAND BROKERAGE SERVICES REPRESENTS A RELEVANT ANTITRUST MARKET ............. 32

    A. PRODUCT MARKET DEFINITION .................................................................................... 32

    B. GEOGRAPHIC MARKET DEFINITION .............................................................................. 34

VI.  ANALYSIS OF MARKET POWER ..................................................................................... 34

    A. LISTING PLATFORMS IN THE CHICAGOLAND REGION ................................................... 34

1. *MRED Has Control Over Virtually All Listings in the Chicagoland Region* ...............................34

2. *MRED and Compass Have Control Over Virtually 100% of PLN Listings* .................................35

3. *MRED Has the Ability to Exclude the Formation and Entry of Rival Listing Platforms* ..............36

4. *Compass Has the Ability to Diminish the Quality and Competitiveness of Rival Listing Platforms* ...................................................................................................................................................36

5. *MRED and Compass Combined Have the Ability to Diminish the Quality of Zillow's Listing Platform* ..................................................................................................................................................37

6. *Barriers to Entry into Listing Platforms* ..........................................................................................37

B. BROKERAGE SERVICES IN THE CHICAGOLAND REGION ....................................................................38

1. *Market Power Over Listings Gives MRED and Compass Control Over a Critical Input That Brokerages Need in Order to Compete* ............................................................................................38

2. *MRED and Compass Have the Ability to Erect Barriers to Entry into Brokerage Services* .........39

VII. ANTICOMPETITIVE EFFECTS OF THE CHALLENGED CONDUCT.............................................................39

A. ANTICOMPETITIVE EFFECTS FROM BOYCOTTING ACCESS TO MRED'S LISTINGS.............................40

B. ANTICOMPETITIVE EFFECTS FROM FORCING ZILLOW TO SUPPRESS THE STANDARDS ......................43

C. THERE ARE NO PROCOMPETITIVE JUSTIFICATIONS FOR THE CHALLENGED CONDUCT .....................46

D. PLN PROLIFERATION HARMS COMPETITION AND CONSUMER WELFARE ........................................47

VIII. IRREPARABLE HARMS.................................................................................................................................49

# I.     Introduction

## A.  Qualifications and Experience

1.      I am an economist at and President of NERA. NERA is a global firm of experts dedicated to applying economic, finance, and quantitative principles to complex business and legal issues. I received my B.A. from Stanford University and my Ph.D. from the University of Chicago, Graduate School of Business. Prior to joining NERA, I was a Staff Economist in the Bureau of Economics at the Federal Trade Commission ("FTC"). From 2011 to 2015, I was a Visiting Scholar at the Stanford Institute for Economic Policy Research at Stanford University. I am currently a Non-Resident Fellow at the University of Southern California, Master of Science in Innovation, Economics, Law and Regulation program.

2.      My relevant area of expertise is in the economics of antitrust, which is based on my knowledge of and training in economics, including industrial organization, statistics, and econometrics. I also have experience analyzing and calculating damages in connection with alleged anticompetitive conduct. More generally, I have been retained as an economic expert to testify on issues related to antitrust liability, damages, and class certification. I also have testified on issues related to market definition and market power in antitrust litigations, including those involving allegations of monopolization, alleged conspiracies, exclusive contracting, price discrimination, and anticompetitive exclusionary conduct. My expert experience includes matters involving the U.S. real estate industry. I have provided written and oral expert testimony on numerous occasions, including testimony in U.S. district courts and presentations before the FTC and the Antitrust Division of the U.S. Department of Justice ("DOJ"). My research has appeared in *Antitrust*, *The Antitrust Bulletin*, *The Antitrust Chronicle*, *The Antitrust Source*, *Antitrust Report*, *European Competition Law Review*, *Journal of Business Venturing*, and *Medical Care*. I have edited three books that have been published on the economics of antitrust, including a book on the use of econometrics in antitrust analysis. I also am a co-author of a book on antitrust class certification. My publications, prior testimony, and selected consulting assignments are listed in my curriculum vitae, which is appended to this declaration as **Exhibit A**.

1

### B. Overview of the Parties

#### 1. Zillow

3.        Zillow Group, Inc. ("Zillow") is a real estate marketplace company that provides information about homes, property listings, and mortgages through its online portal.[1] Zillow Group includes Zillow, Inc. and other affiliated brands.[2] Zillow's platform connects buyers, sellers, and agents to facilitate the buying and selling of homes. As a licensed brokerage, Zillow has access to data feeds from multiple listing services ("MLSs") and other brokerages that it uses to populate the property listing information on its platform.[3] Home buyers and sellers can access listings and connect with agents on the Zillow platform for free, and Zillow has become the most visited online real estate portal.[4] Zillow primarily generates revenue from agents who pay Zillow fees or shares of commissions earned in real estate transactions in exchange for leads connecting them to prospective buyers.[5]

#### 2. MRED

4.        Midwest Real Estate Data LLC ("MRED") is an MLS serving the Chicago metropolitan area ("Chicagoland").[6] It is one of the largest MLSs in the nation, with over 43,000 participating brokers.[7] Virtually all property listings in Chicagoland (over 98%) are first created

---

[1] Zillow Group, Inc., Form 10-K for the Period Ended December 31, 2025 ("Zillow Group 2025 10-K"), at p. 3, https://s24.q4cdn.com/723050407/files/doc_financials/2025/ar/Form-10-K.pdf (accessed May 14, 2026).

[2] Zillow Group 2025 10-K, at p. 41.

[3] *See,* Zillow Group, "Real Estate Licenses," https://www.zillow.com/c/info/real-estate-licenses/ (accessed May 14, 2026).

[4] Zillow Group 2025 10-K, at p. 5–6.

[5] Zillow Group 2025 10-K, at p. 41–42.

[6] MRED, *2026 Annual Report*, 2026 ("MRED 2026 Annual Report"), at p. 25–26, https://www.mredllc.com/comms/resources/2026-little-book-of-mred.pdf (accessed May 14, 2026); Declaration of Errol Samuelson in Support of Plaintiffs' Motion for Preliminary Injunction, *Zillow Group, Inc., et al. v. Midwest Real Estate Data LLC, et al.*, Case No. 1:26-cv-5451 (N.D. Ill.) ("Samuelson Decl."), ¶ 12. For the purposes of my report "Chicagoland" is defined as a set of ZIP codes in the Chicago metropolitan area in the State of Illinois. *See*, Declaration of Tim Hunt in Support of Plaintiffs' Motion for Preliminary Injunction, *Zillow Group, Inc., et al. v. Midwest Real Estate Data LLC, et al.*, Case No. 1:26-cv-5451 (N.D. Ill.) ("Hunt Decl."), ¶ 7.b.

[7] MRED 2026 Annual Report, at p. 31–32; T3 Sixty Real Estate Almanac, "Mega +," Last modified April 7, 2026, https://www.realestatealmanac.com/multiple-listing-services/mls-tier/mega+ (accessed May 14, 2026).

and distributed on MRED's MLS.[8] Since 2016 MRED has also operated a private listing network ("PLN") in which its participating brokers can attempt to sell properties that are not listed on the MLS. Unusually for an MLS, MRED is owned by brokers and associations. And since Compass, Inc.'s acquisition of Anywhere Real Estate Inc. ("Anywhere"), at least three Compass-affiliated brokers sit on MRED's Board of Managers, which has the final say on all MRED rule changes.[9]

### 3. Compass

5.        Compass, Inc. (together with its local subsidiary Compass Illinois, Inc., "Compass") operates the largest real estate brokerage in Chicagoland.[10] In addition to its own brand, Compass also operates owned and franchise real estate brokerage firms under various other brands, including Better Homes and Gardens Real Estate, CENTURY 21, Coldwell Banker, Corcoran, ERA, and Sotheby's International Realty.[11] Since acquiring Anywhere in January 2026, Compass accounts for more than 35% of property transactions by sales volume on the Chicagoland MLS.[12] Since 2024, Compass has also operated a PLN in which it attempts to sell properties that it does not list on an MLS and/or delays listing on an MLS.[13]

## C.  The Allegations

6.        In April 2025, Zillow announced its Listing Access Standards (the "Standards").[14] Under the Standards, Zillow will not display (on its Zillow or Trulia platforms) for-sale property listings that have been part of a PLN that is publicly marketed to consumers or otherwise selectively marketed without ensuring broad access by all market participants.[15] Zillow implemented the Standards as a competitive response to the recent rise of PLNs.[16] The Standards incentivize market participants to provide broad access to their listings, promoting market liquidity

---

[8] Hunt Decl. ¶ 9.
[9] MRED 2026 Annual Report, at p. 7–10.
[10] Samuelson Decl., ¶ 32.
[11] Compass, Inc., Form 10-K for the Period Ended December 31, 2025 ("Compass 2025 10-K"), at p. 4, https://d18rn0p25nwr6d.cloudfront.net/CIK-0001563190/b37abbd4-b49e-4b2e-a011-5ee9d17f0939.pdf (accessed May 14, 2026).
[12] Hunt Decl., ¶ 14.a.
[13] Samuelson Decl., ¶ 33.
[14] Samuelson Decl., ¶ 37.
[15] Samuelson Decl., ¶¶ 37–38.
[16] Samuelson Decl., ¶¶ 37, 40.

(i.e., the ability to quickly and easily sell property at its market value) and transparency.[17] And the Standards ensure that Zillow's platform will continue to be a trusted source for home buyers about all homes on the market, which also benefits home sellers seeking to maximize exposure of their for-sale properties.[18]

7.      In its Complaint Zillow alleges two primary theories of harm: (1) a group boycott by MRED and Compass, and (2) unlawful monopoly maintenance by MRED. First, Zillow alleges that in response to the Standards, "Compass conspired with MRED to use MRED's monopoly power in Chicagoland Residential Real Estate Listing Creation and Distribution to protect their competing PLNs from competition and compel Zillow and other recipients of MRED's listing feed to display Defendants' stale PLN listings. To do this, MRED and Compass hatched a plan to threaten loss of access to all of MRED's listings if a competitor did not display one of MRED's or Compass's competing PLN listings. The scheme worked: because Zillow could not afford to lose access to all Chicagoland listings, Zillow was not able to enforce its Standards in Chicagoland."[19] The Complaint explains further that through a recent agreement between MRED and Compass, MRED will cut off access to its data feed if Zillow enforces the Standards outside Chicagoland as well.[20]

8.      Zillow alleges that the MRED and Compass conspiracy did not stop at threatening access to MRED's listings. If MRED were to cut its data feed to Zillow, an alternative source of listing information would be direct data feeds from the individual brokerages. Zillow also alleges that as part of the conspiracy, Compass and its subsidiaries (which account for nearly one-third of all for-sale listings in Chicagoland) have terminated their direct data feeds to Zillow, and that MRED and Compass have encouraged other brokerages to either terminate their direct feeds or refuse to provide a direct feed in the first place.[21] Zillow alleges that the agreement between Compass and MRED constitutes a group boycott designed to deprive Zillow of a crucial input (for-

---

[17] Samuelson Decl., ¶¶ 40, 49.
[18] Samuelson Decl., ¶¶ 40–41.
[19] Complaint, *Zillow Group, Inc., et al. v. Midwest Real Estate Data LLC, et al.*, Case No. 1:26-cv-5451 (N.D. Ill., May 12, 2026) ("Complaint"), ¶ 9.
[20] Complaint, ¶¶ 120–126.
[21] Complaint, ¶¶ 110–119.

sale property listings) in an effort to force Zillow to abandon the Standards and accept Compass's and MRED's stale PLN listings.[22]

9.      Second, Zillow alleges that MRED is engaged in unlawful monopoly maintenance by enacting revised rules by making access to the MRED data feed conditional on Zillow not enforcing its Standards. These revised rules prevent Zillow and others from competing with MRED by differentiating themselves through innovative new services that, unlike MRED's, maximize transparency and broad access to real estate information.[23]

10.      Throughout this declaration, I will refer to these claims collectively as the "Challenged Conduct." Zillow alleges that the Challenged Conduct results in harms to competition in the Chicagoland "Residential Real Estate Listing Creation and Distribution" market (referred to as "listing platforms" hereinafter) and the Chicagoland "Brokerage Services" market (referred to as "brokerage services" hereinafter), as well as harms to consumers and Zillow itself.[24]

## D.  Nature and Scope of the Assignment

11.      I was asked by counsel for Zillow to evaluate the competitive consequences of the Challenged Conduct. In particular, I have been asked to address the following questions:

- Under what economic conditions will the Challenged Conduct harm competition and consumers, and are those conditions present?
- What are the relevant markets in which to assess the Challenged Conduct, the presence of market power, and the competitive impact of the Challenged Conduct?
- Do MRED and/or Compass have market power in any relevant market?
- What is the likely competitive impact of the Challenged Conduct?
- Are there any procompetitive justifications for the Challenged Conduct?
- Is it likely that Zillow will be irreparably harmed by the Challenged Conduct?

---

[22] Complaint, ¶¶ 175–186.
[23] Complaint, ¶¶ 187–194.
[24] Complaint, ¶¶ 162–174.

5

### E.  Information Relied Upon

12.     The opinions in this declaration are based on my professional training and experience, as well as on my review of the Complaint, publicly available documents, and documents attached to the other declarations supporting Zillow's motion for a preliminary injunction. A complete list of the materials and information that I relied upon in preparing this declaration is attached as **Exhibit B**.

### F.   Summary of Opinions

13.     Based on the information available to me and my analysis to date, I have reached the following preliminary high-level conclusions:

14.     A group boycott is an agreement among competitors to collectively refuse to do business with a specific company. The basic economic elements to support Zillow's group boycott claim are present in this matter: (1) MRED and Compass are horizontal competitors; (2) the Challenged Conduct aims to restrict Zillow's ability to compete; (3) the Challenged Conduct is likely to do so; (4) MRED and Compass have the market power to carry out the scheme; (5) there is likely harm to competition; and (6) the conduct is only economically justified by its exclusionary impacts.

15.     Monopoly maintenance refers to anticompetitive conduct that is intended to lessen competition and to help the firm that is engaged in that conduct maintain its market power. The basic economic elements for Zillow's monopoly maintenance claim are present: (1) MRED has monopoly power, (2) it used that power to enact rules impacting Zillow, which (3) will likely result in harm to competition and the welfare of consumers and real estate professionals.

16.     There are two relevant markets in which to assess the Challenged Conduct. The first relevant market is the market for the creation and distribution of real estate listings in the Chicagoland region. I will refer to this market as the market for "listing platforms." The participants in this relevant market includes MRED's MLS listing platform and the pre-marketing listing platforms offered by brokerages like Compass and by Zillow (in partnership with other brokers). The second relevant market is the market for brokerage services in the Chicagoland region. This market includes services provided to home buyers and sellers by licensed real estate

brokers to facilitate real estate transactions. The participants in this relevant market include Compass, Zillow, and the real estate brokers who own and control MRED.

17. In the market for listing platforms, MRED and Compass have market power based on their control over listings. MRED has control over 98% of all listings in the Chicagoland area. Because MRED determines who can have access to that information, MRED has the ability to exclude the entry and formation of a rival listing platform that could become a competing source of all (or almost all) listings in the Chicagoland area. A firm that has the power to significantly impair an important competitor and, as a result, competition in the market has market power.

18. Compass also has the ability to diminish the quality and competitiveness of a rival listing platform. Compass accounts for over 35% of all transactions in the Chicagoland area and over 28% of all sell-side transactions in the Chicagoland area. Denying Zillow access to over 28% of all for-sale listings in the market would greatly diminish Zillow's ability to provide the listing services that it offers to brokerages, real estate professionals, and consumers. A firm that has the power to diminish quality in the market also has market power.

19. Together, MRED and Compass have the combined ability to diminish the quality of Zillow's and other competitors' listing platforms. By threatening to cut off Zillow's access to listings data, MRED and Compass can effectively compel Zillow not to enforce the Standards, which are core to Zillow's ability to invest in and offer high quality services to brokers, agents, home sellers, and home buyers. MRED and Compass could leverage the same power against other pro-transparency competitors who would challenge them. The ability to diminish quality in the market also is market power.

20. MRED's market power over all listings and Compass's control over its own listings give them the ability to erect barriers to entry into the market for brokerage services. This is because traditional brokerages need listing data in order to provide brokerage services. Zillow also needs access to listing data in order to operate its listings platform. Without access to MRED's aggregated listings and Compass's individual brokerage listings, Zillow would forgo access to most of the listings in the Chicagoland region.

21. The Challenged Conduct, which includes MRED's and Compass's threat to (a) cut Zillow off from access to 98% of listings in the Chicagoland area, and (b) force Zillow to stop enforcing the Standards, harms both Zillow and the market overall. There are two scenarios to consider. First, if Zillow continues to enforce the Standards and MRED were to terminate Zillow's access to MRED's listing data and successfully prevent Zillow from accessing a significant portion of listings in the Chicagoland area, then the Challenged Conduct would significantly impact Zillow's entire business and platform. Access to the listings in a geographic area is the one input that Zillow must have to offer its services. Second, if Zillow were to agree not to enforce the Standards so that it could continue receiving MRED's listing data, then the Challenged Conduct would diminish the quality of Zillow's platform—especially because Zillow's access to the newest, most valuable for-sale listings will be compromised.

22. In either situation, the Challenged Conduct diminishes the quality of service that Zillow brings to home buyers, home sellers, and the businesses that partner with Zillow and depend on Zillow for connections to consumers. Agents and consumers would no longer have the robust consumer-facing platform that has provided so many positive benefits to the real estate market generally. It has long been recognized that Zillow's platform has played a large role in facilitating efficiency, transparency, and liquidity in the market for real estate by (a) providing home buyers and sellers with comprehensive, accurate, and up-to-date information, (b) giving home sellers broad market exposure for the homes they want to sell, and (c) making it easy for potential home buyers to find their next home. By diminishing these benefits, the Challenged Conduct harms marketwide competition in both the Chicagoland listing platform market and Chicagoland brokerage services market.

23. Competition in the listing platform market would be harmed because Zillow would be severely compromised in the information it could provide to consumers, brokerages, and other market participants, leading to a decline in consumer traffic to Zillow's platform and a reduction in services sold to real estate professionals. This would significantly impact Zillow's ability to rival or compete effectively against MRED's and Compass's listing platforms in Chicagoland through Zillow Preview, Zillow's open and searchable alternative to PLNs for pre-market listings. These same pressures would likely prevent other pro-transparency competitors from gaining the

scale needed to challenge MRED. This results in reduced quality and innovation in listing platforms, which harms brokerages and agents which would benefit from improved platforms.

24. Competition in the brokerage services market would be harmed because the Challenged Conduct (a) prevents Zillow from maintaining the quality of its listing supply and consumer-facing platform, especially as it loses access to more of the newest, most valuable listings; and (b) makes it harder for Zillow to prevent brokerages and others with PLNs from free riding on the substantial investments that Zillow makes to drive consumers to its platform. This degrades the valuable advertising and connections services Zillow provides to brokerages and agents, decreasing the quality and output of brokerage services in Chicagoland. It also limits the growth and expansion of Zillow Preview and the benefits it can provide brokers and agents to more effectively serve their clients.

25. As part of my preliminary economic analysis, I have evaluated whether the Challenged Conduct has any business or procompetitive rationale. I have seen no evidence so far that the Challenged Conduct would produce offsetting procompetitive benefits or has any non-pretextual business justifications.

26. If Zillow's listings feeds are terminated and/or Zillow is unable to enforce the Standards, it will be irreparably harmed. This is because MRED's and Compass's conduct forces Zillow to choose between two outcomes, both of which severely injure its business in ways that are difficult or impossible to quantify. If Zillow is coerced to abandon the Standards nationwide in order to maintain access to MRED's MLS listing data in Chicagoland, Zillow would be prevented from executing its chosen competitive and brand strategy, and Zillow will face increasing losses of some of the most valuable, new-to-market listings from its platform nationwide. If, however, Zillow enforces the Standards nationwide, then it will lose access to MRED's Chicagoland listing data, in which case it appears that Zillow will not have 50% or more of those listings on its platform, and would face significant obstacles competing as a listing platform in Chicagoland. Both outcomes are damaging to Zillow because access to comprehensive, up-to-date listings (especially the newest listings) is the lifeblood of Zillow's business and business model. Because of network effects, degrading Zillow's listings inputs (in Chicagoland or nationwide) threatens Zillow with a downward spiral. If the quality or quantity of listings on a

platform like Zillow decreases, it becomes less useful to users, which reduces traffic and transactions, making it even less attractive to remaining or prospective listers. As more listings leave in response to falling demand and weaker economics, the platform's inventory shrinks further, degrading the user experience, with the danger that the process becomes irreversible.

27.     Of particular importance is the innovation that will disappear. Zillow Preview is a nascent product that provides brokerages an alternative, pro-transparency approach to pre-marketing that can rival private inventory strategies like MRED's and Compass's. However, the market for listing platforms is subject to network effects, and early competition for market share is critical. The Challenged Conduct will prevent or delay Zillow Preview from entering the early stages of competition for market share, thus causing significant and immeasurable harm, not just to Zillow but to its brokerage and agent partners who benefit from Zillow's platform, including in particular Zillow Preview, and the increases in quality and innovation that Zillow Preview spurs.

## II.     Background

### A.  The Relevant Economic Principles Applicable to Understanding the Functioning of Real Estate Markets

#### 1.  *The Benefits of Liquidity and Thicker Markets*

28.     The residential real estate industry in the United States is a complex market environment in which there are participants competing at many levels to achieve a successful outcome—the sale of a home for the homeowner and the purchase of a home for the buyer.  Many market participants play a role in this process, including brokerages and agents who compete to represent buyers and sellers. The ultimate outcome sought is the sale of a home on terms that are mutually acceptable to the buyer and seller.

29.     As with other markets, real estate markets benefit from having a greater number of buyers and sellers, which leads to increased transactions and liquidity.[25] Sellers benefit from increased competition among larger pools of buyers. Similarly, buyers benefit from increased competition among sellers—larger pools of comparable properties on the market. When competing

---

[25] *See, e.g.*, Dennis W. Carlton and Jeffrey M. Perloff, *Modern Industrial Organization* (4th Edition), (Pearson, 2005), 57–58.

buyers offer prices that exceed the asking prices of competing sellers, new buyers are attracted to the market by the relatively low asking prices, and new sellers are drawn in by the high offers. This increased competition from both sides drives the offered and accepted prices closer together until they match.[26] Thus, thicker markets and higher liquidity promote market efficiency, meaning that transaction prices fairly reflect actual supply and demand conditions and that the time taken to close a mutually beneficial transaction is optimal.

30. Real estate markets also benefit when there is a more comprehensive, up-to-date, and accurate flow of information about the homes that are on the market. This is a key market condition that is at issue in this case. Both buyers and sellers need to know what homes are on the market and at what price if they are going to participate in the market effectively. In this way, home buyers and home sellers benefit not just from greater liquidity and more market participants, but also from (a) transparent information about homes on the market and (b) policies that mitigate information asymmetry.

### 2. *The Flow of Information Through the Marketplace*

31. A real estate property listing is the primary tool for communicating the availability of a property to the market along with key information about the property. While it is possible for a seller to directly create a property listing (a "for-sale by owner" or "FSBO" listing), 91% of home sellers in 2025 relied on the assistance of a real estate agent (the "listing agent") in listing their property for sale.[27]

32. State laws require real estate agents to work under the supervision of a licensed real estate broker.[28] Brokerages own the property listings their brokers and/or agents secure by representing home sellers and are legally responsible for any resulting real estate transaction

---

[26] Carlton and Perloff, *Modern Industrial Organization*, 57 ("If there are many similar firms, no one firm can charge a price above the market price . . . Similarly, consumers cannot find a firm willing to sell below the market price . . .").

[27] National Association of Realtors, "First-Time Home Buyer Share Falls to Historic Low of 21%, Median Age Rises to 40," November 4, 2025, https://www.nar.realtor/newsroom/first-time-home-buyer-share-falls-to-historic-low-of-21-median-age-rises-to-40 (accessed May 14, 2026).

[28] U.S. Bureau of Labor Statistics, "Occupational Outlook Handbook: Real Estate Brokers and Sales Agents," Last modified August 28, 2025, https://www.bls.gov/ooh/sales/real-estate-brokers-and-sales-agents.htm#tab-2 (accessed May 14, 2026).

facilitated by their brokers and/or agents.[29] A listing agreement is created between the seller and the broker, which gives the broker the authority to represent the property and act on the seller's behalf for a specified period of time.

33.     Once the listing agreement is in place, the listing agent uses a platform to create and distribute the listing, indicating to buyers and/or buyer agents that the property is for sale.

34.     Most commonly the listing agent will create and distribute the listing through their local MLS, where the listing will be visible to buyer agents. I discuss MLSs and their role in real estate in more detail below. Most MLSs have rules on which information must be included in the listing, but at minimum listings will generally include the property address, the asking price, and key property features. Listings created on the MLS can be further distributed (syndicated) via data feeds to real estate portals such as Zillow, where the listing will be visible to both buyers, buyer agents, and other sellers.[30]

35.     Though this is still how most listings move through their local markets, it is becoming increasingly common for some brokerages, such as Compass, to withhold their listings from the MLS entirely (or at least for some period of time), and instead create and distribute their listings through their own PLN.[31] These listings are not required to follow MLS rules and can contain whatever information the brokerage chooses to disclose. Unlike on-MLS listings, which are distributed to all agent participants in the MLS (and ultimately to all buyers through consumer-facing real estate portals), PLN listings are only distributed to a limited group of agents and buyers, typically those that already have a relationship with the brokerage that controls the listing.[32] The listings locked in PLNs are usually the newest listings, which are the most valuable to prospective buyers looking for a home.[33] By restricting the flow of listing information in the market, PLNs

---

[29] Indeed, "Real Estate Salesperson vs. Broker: What's the Difference?" Last modified December 10, 2025, https://www.indeed.com/career-advice/finding-a-job/real-estate-salesperson-versus-broker (accessed May 14, 2026).
[30] Samuelson Decl., ¶ 8–11, 13.
[31] Samuelson Decl., ¶ 25.
[32] *See, e.g.*, Compass, "Compass Private Exclusives," https://www.compass.com/private-exclusives/ (accessed May 14, 2026) ("Compass Private Exclusives are properties that are accessible to 340,000 agents in Compass' network of brokerages and their serious buyers.").
[33] Samuelson Decl., ¶ 30.

(among other effects I discuss below) can exacerbate inherent information asymmetries in real estate.[34]

### 3. *Information Asymmetry*

36.　Real estate markets are characterized by information asymmetry. Information asymmetry is a condition when some market participants have more information about important aspects of the product or the market than others.[35] In real estate markets, sellers generally have better knowledge about the neighborhood, the condition of their property, and its sale history than potential home buyers. Those sellers may try to take advantage of this information asymmetry by concealing the negative facts about their property. However, if potential buyers suspect that some sellers might hide information about important flaws of their property, they tend to lower their offers to compensate for this uncertainty or refuse to buy at all. This lack of trust among buyers leads to generally lower property values and reduced liquidity.

37.　This issue, known as adverse selection,[36] can trigger a harmful feedback loop where (a) home sellers conceal important negative facts about their properties; (b) buyers, suspecting deception, reduce their offers or stop bidding altogether; (c) sellers with high-quality properties and nothing to hide decide to exit the market because of reduced interest from buyers; (d) buyers lower their expectations regarding the quality of the remaining properties and further reduce their offers or also exit the market. In theory, this cycle can cause some markets to completely unravel and collapse.[37]

38.　A similar type of information asymmetry arises when a brokerage withholds property listings from the broader market. When all brokerages contribute their complete set of property listings to the MLS and online real estate portals (including Zillow), more potential buyers will be attracted to the market, which in turn increases the incentive for potential home sellers to

---

[34] Samuelson Decl., ¶ 27.

[35] *See, e.g.*, Hal R. Varian, *Intermediate Microeconomics: A Modern Approach* (8th Edition), (W.W. Norton & Company, 2010), 718–719.

[36] Varian, *Intermediate Microeconomics: A Modern Approach*, 722–724.

[37] Varian, *Intermediate Microeconomics: A Modern Approach*, 722–723 ("[The] adverse selection problem may be so severe that it can completely destroy the market.").

participate in the market. These positive externalities increase the value of the whole network, leading to thicker markets and higher liquidity that benefit both buyers and sellers.

39. If instead a brokerage initially tries to sell its listings through a PLN, and only shares broadly the "stale" listings it was unable to sell to the limited set of potential buyers with access to the PLN, then this creates an information asymmetry between buyers and sellers similar to that described above. A seller using a PLN would know that a select set of buyers viewed their property, whether an initial list price was attractive to those buyers or not, and how much interest there was in the property (e.g., days on market). But potential home buyers viewing the "stale" listing once it arrives on the MLS or a portal like Zillow would remain in the dark. This can lead to the adverse selection problems described above.

## B. Multiple Listing Services

40. Because access to information is critical to an efficient real estate market, many institutions, rules, and policies have arisen to address information asymmetries and maximize the flow of information between market participants. Those institutions, rules, and policies are especially important because the largest financial transactions most consumers will ever undertake occur in the real estate market. Some of the most important institutions that serve this purpose are the MLSs that operate in local geographic regions throughout the United States.

41. An MLS provides a database of homes listed for sale in a particular region that is accessible to participating real estate professionals doing business in that region.[38] The MLS facilitates information flow by providing brokers and agents information about prior transactions and the current supply of homes on the market.[39] Through their agents, both buyers and sellers benefit from this free-flowing information—buyers can access most for-sale homes in the area, and sellers gain exposure to potential buyers. Sellers also benefit by using MLS information about comparable homes to determine their own listing price (and whether to sell at all).[40]

---

[38] Real Estate Standards Organization,"What is an MLS and How Many MLSs Are There? Multiple Listing Service FAQ," https://www.reso.org/mls-faq/ (accessed May 13, 2026); Samuelson Decl., ¶ 9.
[39] Real Estate Standards Organization,"What is an MLS and How Many MLSs Are There? Multiple Listing Service FAQ"; Samuelson Decl., ¶¶ 8–10.
[40] *See,* Zillow, "Off-MLS Home Sellers Left More Than $1 Billion on the Table the Past Two Years," February 14, 2025, https://www.zillow.com/research/mls-pln-sale-price-34846/ (accessed May 14, 2026);

42.     As of May 2026, there are nearly 500 MLS systems in the United States.[41] Most MLSs are owned and operated by local real estate professional associations, and most of these associations belong to the National Association of Realtors ("NAR").[42] MLSs are not just databases but organizations that create and enforce rules and standards for broker participants regarding listing sharing.[43] Each MLS can set its own rules, but MLSs that are owned by or associated with local and state associations of NAR abide by the rules and policies of NAR.[44]

43.     The real estate industry depends on MLSs for local aggregated listings data,[45] and MLSs in turn depend upon their broker participants to provide that data. A residential for-sale listing in the MLS is generated by an agent or broker working on behalf of a seller.[46] The MLS aggregates the listings data populated by individual agents and brokers and distributes those aggregated listings data back to all of its broker participants. In so doing, the MLS ensures that all of its broker participants have access to all property listings in the MLS—not just the ones they entered—which promotes maximum liquidity in an efficient real estate marketplace that benefits all market participants.

44.     Today, MLSs share aggregated listings with their members through Internet Data Exchange ("IDX") feeds.[47] This technology enables MLS broker participants to access accurate, comprehensive, and up-to-date listings information for homes listed on the MLS and to distribute

---

*See also,* Bright MLS, *On-MLS Study: Measuring the Benefits of an Open and Transparent Housing Marketplace*, August 2023, https://image.m.brightmls.com/lib/fe2b11747364047b741278/m/1/6534ddd0-6f2e-42dc-b05b-634e7b1ad23a.pdf, at p. 6 (accessed May 14, 2026).

[41] Real Estate Standards Organization,"What is an MLS and How Many MLSs Are There? Multiple Listing Service FAQ."

[42] *See,* Real Estate Standards Organization,"What is an MLS and How Many MLSs Are There? Multiple Listing Service FAQ"; *See also,* Samuelson Decl., ¶ 9.

[43] Real Estate Standards Organization,"What is an MLS and How Many MLSs Are There? Multiple Listing Service FAQ"; Samuelson Decl., ¶ 10.

[44] Real Estate Standards Organization,"What is an MLS and How Many MLSs Are There? Multiple Listing Service FAQ."

[45] *See,* Federal Trade Commission and U.S. Department of Justice, *Competition in the Real Estate Brokerage Industry,* 2007, at p. 12, https://www.ftc.gov/sites/default/files/documents/reports/competition-real-estate-brokerage-industry-report-federal-trade-commission-and-u.s.department-justice/v050015.pdf (accessed May 9, 2026) ("As the primary source of information about homes currently for sale and the prices at which other, comparable homes have been sold, the MLS is an extraordinarily important resource for sellers, buyers and brokers.").

[46] Real Estate Standards Organization, "What is an MLS and How Many MLS Are There?"

[47] Samuelson Decl., ¶ 11.

those listings data for public display to consumers on the Internet (e.g., on the brokerage's own website or app).[48] A similar technology called Virtual Office Website ("VOW") provides detailed data not only for the existing listings, but also for historical listings, sales history, and other information not available through IDX.[49] MLSs have policies related to the IDX and VOW feeds that standardize how participants access and display listings.

45.     The dissemination of listings data via IDX feeds has promoted effective competition among brokerages.[50] Broker participants receive MLS listings data through IDX feeds and compete to attract consumers to their websites to view real estate listings using various strategies such as website design, search engine optimization, email marketing, and social media.

46.     MLSs offer numerous benefits to their participants such as thicker markets (more buyers and sellers), faster matching, better price discovery and higher realized prices, and reduced information asymmetries that lower search costs and improve liquidity.[51] These benefits are

---

[48] National Association of Realtors, "Internet Data Exchange (IDX) Background and FAQ," https://www.nar.realtor/about-nar/policies/internet-data-exchange-idx/internet-data-exchange-idx-background-and-faq (accessed May 14, 2026).

[49] National Association of Realtors, "Handbook on Multiple Listing Policy, Virtual Office Websites Policy: Governing Use of MLS Data in Connection with Internet Brokerage," https://www.nar.realtor/handbook-on-multiple-listing-policy/virtual-office-websites-policy-governing-use-of-mls-data-in-connection-with-internet-brokerage (accessed May 14, 2026); Monmouth Ocean Regional Realtors, "IDX vs. VOW," https://monmouthoceanrealtors.com/idx-vs-vow/ (accessed May 14, 2026).

[50] *See*, for example, Amended Complaint, *United States of America v. National Association of Realtors*, No. 1:05-cv-05140, Northern District of Illinois, October 5, 2005, ¶¶ 1–2 ("Internet sites that enable the brokers' customers to search for and receive real estate listings over the Internet . . . replace or augment the traditional practice by which the broker conducts a search of properties for sale. . . . Since these websites were first developed, . . . brokers' use of the Internet in connection with their delivery of brokerage services has become an important competitive alternative to traditional 'brick-and-mortar' business models.").

[51] *See,* Federal Trade Commission and U.S. Department of Justice, *Competition in the Real Estate Brokerage Industry,* at p. 13 ("The efficiencies associated with use of an MLS in the real estate industry are well documented in the real estate, legal, and economic literature and in court decisions."). In particular, there is an extensive literature in economics describing the efficiencies that can arise from platforms in two-sided markets. *See, e.g.*, Mark Armstrong, "Competition in Two-Sided Markets," *RAND Journal of Economics* 37, no. 3 (2006): 668–691; David S. Evans, "The Antitrust Economics of Multi-Sided Platform Markets," *Yale Journal on Regulation* 20, no. 2 (2003): 324–381; Dennis W. Carlton, and Alan S. Frankel, "Transaction Costs, Externalities, and 'Two-Sided' Payment Markets," *Columbia Business Law Review* 2005, no. 3 (2005): 617–642.

especially apparent when comparing the U.S. real estate market with those overseas that do not have an equivalent system in place.[52]

47.     The geographic scope of a particular MLS varies. Some MLSs service multiple states, while others service only a subset of counties within a single state. MRED serves the Chicagoland area, which for this matter is defined to include ZIP codes within the Chicago metropolitan statistical area that are located within the State of Illinois.[53]

## C.  The Rise of Private Listing Networks

48.     Private listings, or "pocket listings," have existed for decades. A private listing is a for-sale property that is not listed on the MLS.[54] Instead, the agent markets the property through private channels such as a PLN.

49.     The popularity of PLNs among some sizable brokerages is growing.[55] MRED's own analyses show that private real estate transactions in its territory had grown from 5% of sales in 2018 to 18% of sales in 2024.[56]

50.     In November 2024, Compass announced a new private listing strategy termed the "3-Phased Marketing Strategy," or "3PM."[57]

---

[52] *See, e.g.,* Brooklee Han, "International Markets Embrace the U.S. MLS Model," *HousingWire*, October 2, 2025, https://www.housingwire.com/articles/international-markets-embrace-the-u-s-mls-model/ (accessed May 14, 2026); Damian Eales, "If You Want to Catch a Big Fish, Avoid Small Ponds," Realtor.com, June 16, 2025, https://www.realtor.com/homemade/if-you-want-to-catch-a-big-fish/ (accessed May 14, 2026) (". . . the U.S. real estate market is unusual in that U.S. sellers do not pay for their home to be seen by buyers, and as a result buyers get fair access to all properties – not because of who they are or who they know, but because they have access to the internet.").

[53] Samuelson Decl., ¶ 12 ("Midwest Real Estate Data, LLC ('MRED') is the primary MLS for much of Illinois and some portions of Indiana, Iowa, Wisconsin, Michigan, Kentucky, and Missouri."); Hunt Decl., ¶ 7.b.

[54] Samuelson Decl., ¶¶ 25–26.

[55] Samuelson Decl., ¶ 25.

[56] *Compare,* MRED, *Private, Not A Secret: An inside look at off-MLS listing solutions*, 2019, at p. 19, https://cdn.carrot.com/uploads/sites/35494/2022/03/Private-Not-a-Secret-Off-market-PLN-homes.pdf (accessed May 14, 2026) *with* MRED, *Private, Not A Secret: An inside look at off-MLS listing solutions*, 2025, at p. 16, https://infogram.com/2025-updates-private-not-a-secret-1hnq41oxl8vqk23 (accessed May 13, 2026).

[57] Compass, "Compass 3-Phased Marketing Strategy," https://www.compass-homeowners.com/ (accessed May 14, 2026); Jim Dalrymple, "Compass leans into private listings with new marketing push," *Inman,*

17

51.     "Phase 1" of the 3PM listing strategy is to list the home as a "Compass Private Exclusive" on Compass's PLN.[58] Buyers and brokers searching on Compass's website are told how many properties match their criteria, but must contact a Compass agent to learn more. In "Phase 2" of the 3PM listing strategy, homes that do not sell as Private Exclusives may be marketed as "Compass Coming Soon" listings on Compass's own platform and its partner websites.[59] Finally, in "Phase 3," homes that fail to sell during the first or second phase may be listed on the MLS, and syndicated for display on broker participants' online real estate platforms.[60]

52.     Other brokerages have also recently launched or expanded their PLNs, including Douglas Elliman, Sotheby's International Realty, Corcoran, Long and Foster, Keller Williams, Edina Realty (a wholly-owned subsidiary of HomeServices of America), The Real Brokerage, and Coldwell Banker.[61] Some of these brokerages have since been acquired by Compass.[62]

---

November 4, 2024, https://www.inman.com/2024/11/04/compass-leans-into-private-listings-with-new-marketing-push/ (accessed May 14, 2026).

[58] Compass, "Compass 3-Phased Marketing Strategy."

[59] Compass, "Compass 3-Phased Marketing Strategy."

[60] Compass, "Compass 3-Phased Marketing Strategy."

[61] Douglas Elliman, "Douglas Elliman Launches Elliman Private Listings," https://www.elliman.com/insider/douglas-elliman-launches-elliman-private-listings (accessed May 11, 2026); Sotheby's, "Private Exclusive Listings," https://www.sothebysrealty.com/eng/private-exclusive-listings (accessed May 11, 2026); Corcoran, "Corcoran Reserve," https://www.corcoran.com/reserve (accessed May 11, 2026); Long & Foster, "Private Real Estate Listings," https://www.longandfoster.com/pages/private-real-estate-listings (accessed May 11, 2026); Keller Williams, "Create an Internal Listing in Command (Keller Exclusives)," https://answers.kw.com/hc/en-us/articles/4436304396947-Create-an-Internal-Listing-in-Command-Keller-Exclusives (accessed May 11, 2026) (explaining how Keller Williams agents can create a private exclusive listing that only other Keller Williams agents can see); *see also,* KW Coastal Resources, "Keller Williams Personal Exclusives," https://www.kwcoastalhub.com/kw-exclusives/personal-exclusives (accessed May 11, 2026) (southern California franchisee of Keller Williams explaining how Personal Exclusives "offer a unique opportunity to quietly introduce your property to a trusted network of top-producing Keller Williams agents and their highly motivated buyers—without going live on the public market."); Edina Realty, "Edina Realty Fact Sheet," Last modified February 18, 2026, https://www.edinarealty.com/news/fact-sheet (accessed May 11, 2026) (identifying its product "NetworkONE" as "[a]n online, seller-driven pre-market listings network to give clients a premarket advantage and network properties not yet on the market; exclusive to Edina Realty agents."); The Real Brokerage, "How to Enter a listing in reZEN," https://support.therealbrokerage.com/hc/en-us/articles/9324314169623-How-to-Enter-a-listing-in-reZEN (accessed May 11, 2026) (explaining how to enter a listing in The Real Brokerage's agent dashboard, including "exclusive listing[s]"); Jake Indursky, "Coldwell Banker leans into the private listing fray," *The Real Deal*, August 28, 2025, https://therealdeal.com/national/2025/08/28/coldwell-banker-expands-exclusive-look-program/ (accessed May 11, 2026).

[62] Samuelson Decl., Exs. D, E.

53.     Finally, MRED has maintained a PLN since 2016, which was initially used to create "mini-drafts" of listings to share with other MRED brokers before making the listing public.[63] In April 2026, MRED and Compass entered into an alliance to greatly expand MRED's PLN, with Compass placing all of its private listings on MRED's PLN and subsidizing MRED membership for 100,000 Compass agents.[64] This means that Compass agents across the country can enter their Private Exclusive listings (whether they are listings in the Chicagoland area or not) into MRED's database.[65] It also means that MRED may choose to apply the rules governing its MLS at a national scale, as opposed to just in its historical territory.[66] Indeed, this seems to be exactly what MRED will do: Zillow recently received communications from MRED indicating that Zillow is in violation of its rules governing the IDX feed by failing to display several of MRED's PLN listings for Compass properties in Florida, Georgia, and California.[67]

54.     As early as 2013, NAR expressed concerns related to the proliferation of "pocket listings" and "coming soon" marketing techniques, highlighting that these practices can result in "less complete and consequently less useful property data" and "increasingly fractionalized and less efficient residential real estate markets."[68]

55.     In 2020 NAR implemented the Clear Cooperation Policy ("CCP"), a mandatory NAR rule requiring listing agents who belong to NAR-affiliated realtor associations to list their clients' homes on the MLS within one business day of marketing the home to the public. NAR created an "Office Exclusive" exemption to the rule to address privacy concerns expressed by a minority of sellers.[69] The exemption enables an agent to market a listing only within their

---

[63] NSBAR, "Private Listing Network," https://www.nsbar.org/support/MRED/PLN (accessed May 11, 2026); MRED, *Private, Not A Secret: An inside look at off-MLS listing solutions*, 2019, at p. 4, 16.

[64] Lillian Dickerson and Amie Fisher, "MRED opens access to all agents — with Compass the first to join," *Real Estate News*, April 24, 2026, https://www.realestatenews.com/2026/04/24/mred-opens-access-to-all-agents-with-compass-the-first-to-join (accessed May 11, 2026); Samuelson Decl., ¶ 74, Ex. V.

[65] Samuelson Decl., ¶ 75.

[66] Samuelson Decl., ¶ 75.

[67] Samuelson Decl., ¶¶ 76–80.

[68] National Association of Realtors, "Report & Conclusions of the Joint Work Group on Cooperation Issues (2013)," https://www.nar.realtor/about-nar/policies/report-conclusions-of-the-joint-work-group-on-cooperation-issues-2013 (accessed May 14, 2026).

[69] National Association of Realtors, "MLS Clear Cooperation Policy," https://www.nar.realtor/about-nar/policies/mls-clear-cooperation-policy (accessed May 14, 2026); National Association of Realtors, "Summary of 2020 MLS Changes," https://www.nar.realtor/about-nar/policies/summary-of-2020-mls-changes (accessed May 14, 2026).

brokerage and withhold MLS syndication, enabling brokerages to keep pocket listings off the MLS.

56.     NAR widened this exemption in March 2025 with a new discretionary policy called the Multiple Listing Options for Sellers ("MLOS") policy.[70] The MLOS policy exempts from the CCP (in addition to Office Exclusive listings) "delayed marketing exempt listings" where sellers have instructed their agent to enter the listing into the MLS but to withhold it from syndication through the IDX feed to other broker participants for a specified period of time, as permitted by local MLS rules.[71]

57.      Many brokerages continue to develop PLNs following the 2025 NAR policy changes, which weakened the CCP. In a July 2025 letter Compass announced that it "does not consider the [CCP] or any national NAR MLS rule impacting clients as binding," and that it "has not and will not adhere to CCP or any national NAR MLS rule."[72] And in April 2026 Compass and MRED announced they would collaborate on a national private listings alliance.[73]

### D. Zillow's Business Model and the Policies That Preserve Its Ability to Provide Information, Transparency, and Services That Enhance the Real Estate Marketplace

#### 1. *Zillow's Business Model*

58.     Zillow has and continues to make substantial investments to create a platform that connects real estate buyers, sellers, and agents with each other (and that provides innovative tools to agents).[74] Zillow's returns comprise revenue generated via the leads that are created from home buyer traffic, as well as revenue from ancillary services Zillow has developed to aid consumers in completing a real estate transaction (such as mortgage, title, and escrow services) and to improve agent productivity.

---

[70] National Association of Realtors, "Multiple Listing Options for Sellers," https://www.nar.realtor/about-nar/policies/multiple-listing-options-for-sellers (accessed May 14, 2026).

[71] National Association of Realtors, "Multiple Listing Options for Sellers."

[72] Brooklee Han, "Compass will no longer adhere to Clear Cooperation, other NAR MLS policies," *HousingWire,* July 2, 2025, https://www.housingwire.com/articles/compass-will-no-longer-adhere-to-clear-cooperation-other-nar-mls-policies/ (accessed May 9, 2026).

[73] Samuelson Decl., ¶ 74.

[74] Zillow Group 2025 10-K, at p. 6.

59.     Zillow's value proposition to consumers is, among other things, to provide a high-quality source of listings that home buyers and sellers can utilize for up-to-date, accurate information about the market.[75] The high volume of high-quality listings and information attracts many buyers, who value Zillow as a comprehensive, current, and trustworthy source of listing information.[76] A major source of Zillow's revenue comes from referring these potential buyers to agents, who, in turn, pay Zillow for the referrals. Indeed, Zillow's largest source of revenue (65%) comes from its online residential real estate search portal and associated products.[77] Zillow's financial success depends on attracting as many buyers as possible to its platform.

60.     Buyers in particular rate Zillow highly for providing comprehensive, up-to-date, and trustworthy market information.[78] These buyers find new property listings on Zillow to be especially valuable, as they want to see the most up-to-date inventory and act on any homes relevant to their search as soon as possible.[79] The increased interest and engagement with newer listings makes them more likely to generate connections for agents and brokerages and thus are more valuable for Zillow's platform.[80] If Zillow were to accept stale and misleading listings, such as those that were initially privately marketed by brokerages, the result would be lower buyer trust in the platform, which would undermine Zillow's value proposition to users.[81] And if substantially fewer buyers were to use Zillow, buyer agents would find it a less important source of leads (and other agent tools that facilitate transactions) and search for business elsewhere, directly harming Zillow's revenues. It would also allow Zillow's competitors to outcompete Zillow on the quality of their platforms.[82]

61.     In addition to services such as advertising and lead generation, Zillow also provides agents and other real estate professionals with tools that improve their ability to help consumers buy or sell a home. For instance, Zillow's tour scheduling (ShowingTime+) and CRM (Follow Up Boss) tools increase agent efficiency, productivity, and customer service levels; Zillow's 3D tours

---

[75] Samuelson Decl., ¶ 16.
[76] Samuelson Decl., ¶¶ 16, 20.
[77] Zillow Group 2025 10-K, at p. 41–42. Zillow Group generated $2.6 billion in revenue in 2025, $1.7 billion of which (65%) was revenue from its for sale residential business.
[78] Samuelson Decl., ¶ 20.
[79] Samuelson Decl., ¶¶ 30–31.
[80] Samuelson Decl., ¶ 30.
[81] Samuelson Decl., ¶¶ 30–31.
[82] Samuelson Decl., ¶ 87.

and virtual floor plans improve the experience for buyers and allow listing agents to better showcase listings. Importantly, these Zillow services generate revenue regardless of the source of the lead for the agent using the Zillow product. But the uptake of these products by Zillow's agent customers would drop if Zillow becomes a less desirable real estate platform.[83]

### 2. *Zillow's Listing Access Standards*

#### a. The Listing Access Standards

62.     Zillow developed and announced the Listing Access Standards (the "Standards") on April 10, 2025.[84] Under the Standards, listings that have not been made broadly accessible to all market participants through selective marketing to certain buyers through a PLN that is publicly marketed to some but not all buyers or otherwise will not be displayed on Zillow's platforms.[85] This includes listings that are only accessible behind a registration wall or when consumers must agree to work with a specific brokerage.[86] For listings that do not comply with the Standards, Zillow will not display that listing on its own platforms so long as it is with the same listing agent or brokerage.[87] For sellers who need a truly private listing, those can still comply with the Standards, as long as: (1) the seller instructs their agent in writing not to disseminate the listing through the relevant MLS; (2) the agent shares the listing only within their brokerage and with clients through one-to-one communication; and (3) the seller signs a waiver that directs the agent not to publicly market the listing and explains the potential drawbacks of limiting public exposure.[88]

---

[83] Samuelson Decl., ¶¶ 85–86.

[84] Zillow, "Zillow and eXp announce consumer-first commitment to real estate transparency," April 10, 2025, https://zillow.mediaroom.com/2025-04-10-Zillow-and-eXp-announce-consumer-first-commitment-to-real-estate-transparency (accessed May 14, 2026); Samuelson Decl., ¶ 37.

[85] Zillow, "Zillow's Listing Access Standards: What Agents Need to Know," September 24, 2025, https://www.zillow.com/agents/agents-know-listing-access-standards/ (accessed May 14, 2026); Samuelson Decl., ¶ 38.

[86] Zillow, "Zillow's Listing Access Standards: What Agents Need to Know."

[87] Zillow, "Zillow's Listing Access Standards: What Agents Need to Know."

[88] Zillow, "Zillow's Listing Access Standards: What Agents Need to Know."

### 3. Zillow Preview and Other Innovations

#### a. Zillow Preview Is an Innovative Offering

63.     One of the purported benefits of PLNs is that they allow sellers to "pre-market" their home before they are ready to list the property as "active" in the MLS. PLN operators tout that sellers can engage in "price discovery" before deciding the appropriate price at which to list their home—though any "price discovery" that is conducted through a PLN will necessarily be incomplete due to the closed, broker-specific buyer pool.

64.     In March 2026, Zillow announced a new product called Zillow Preview, expanding Zillow's offerings in the listing platforms market by allowing partner brokerages to create and display pre-market listings on Zillow's platform and other websites before they are listed in the MLS.[89]

65.     Zillow Preview is an alternative listing platform to PLNs.[90] Unlike PLNs, which restrict pre-market listings to a closed, brokerage-specific buyer pool, Zillow Preview makes pre-market listings broadly visible on Zillow, partner brokerage/agent sites, and soon, Realtor.com[91]—before they appear on the MLS.[92] This openness allows any buyer or agent to view these pre-market listings regardless of brokerage affiliations,[93] and sellers gain significantly wider exposure on Preview than on private networks because Preview listings are freely accessible on Zillow's, its broker partners', and Realtor's online platforms to anyone with an internet connection. Sellers

---

[89] Zillow, "Zillow launches Zillow Preview to bring pre-market home listings into the open," March 17, 2026, https://investors.zillowgroup.com/investors/news-and-events/news/news-details/2026/Zillow-launches-Zillow-Preview-to-bring-pre-market-home-listings-into-the-open/default.aspx (accessed May 14, 2026); Samuelson Decl., ¶ 43. Zillow Preview is also an extension of the brokerage services Zillow already offers. While Zillow is not a traditional brokerage, Zillow participates in the brokerage services market through the fees it receives from agent partners who use Zillow's advertising services. Now, Zillow also participants in brokerage services through Zillow Preview.

[90] Samuelson Decl., ¶¶ 44–45.

[91] Zillow, "Zillow and Realtor.com® set a new standard for pre-market transparency, extending Preview℠ listings to buyers across both platforms," May 5, 2026, https://www.zillow.com/news/zillow-realtor-com-preview-listings-pre-market-transparency/ (accessed May 12, 2026).

[92] Zillow, "Zillow continues turning on the lights: Introducing Zillow Preview," March 17, 2026, https://www.zillow.com/news/introducing-zillow-preview/ (accessed May 14, 2026); Zillow, "Zillow and Realtor.com® set a new standard for pre-market transparency, extending Preview℠ listings to buyers across both platforms"; Samuelson Decl., ¶¶ 43–44.

[93] Zillow, "Zillow continues turning on the lights: Introducing Zillow Preview."

also benefit from innovations like boosted placement on Zillow, further enhancing visibility of their Preview listing.[94] Buyers also benefit. They can search, save, and share Preview homes, and pre-schedule tours so that they are first in line to visit once the listing goes active—without needing access to invite-only systems or prior agent relationships.[95]

66.     Zillow Preview also offers listing agents advantages over PLNs: direct, free connections via the "contact listing agent" button during the preview phase, plus financial incentives unavailable on PLNs.[96] Specifically, at no cost to the consumer, Zillow offers to share a portion of the revenue it earns on transactions where an eligible buyer first connects with a Zillow partner agent through a Zillow Preview listing and then purchases any home using that Zillow partner agent.[97]

67.     Overall, Zillow Preview's open and searchable platform fosters greater competition, more potential bidders, and better price discovery than PLNs such as MRED's or Compass's. These features promote efficient, competitive real estate transactions by increasing transparency and market participation.[98]

## III.     The Economic Theory Behind Zillow's Allegations of Competitive Harm

68.     As described above, Zillow alleges two main theories of harm: a group boycott by MRED and Compass, and monopoly maintenance by MRED. In this section I consider the economic theory behind these allegations and summarize the evidence. I explain the evidence in greater detail in the following sections.

---

[94] *Id.*; Samuelson Decl., ¶ 48.

[95] Zillow, "Zillow continues turning on the lights: Introducing Zillow Preview."

[96] Samuelson Decl., ¶ 48; Zillow, "Zillow and Realtor.com set a new standard for pre-market transparency."

[97] Zillow, "Zillow continues turning on the lights: Introducing Zillow Preview"; Samuelson Decl., ¶ 48.

[98] Samuelson Decl., ¶ 49.

## A. Group Boycott by MRED and Compass

69. A group boycott is an agreement among competitors to collectively refuse to do business with a specific company to limit competition or exclude a competitor. There are six economic elements that are often part of a potential horizontal group boycott.

70. One economic element is whether the conduct involves horizontal competitors. This is the case here. MRED and Compass are horizontal competitors because both have listing platforms.[99] MRED operates both an MLS platform and a PLN platform, while Compass operates a PLN. Compass has also indicated to other MLSs that it has the capability to create and distribute listings like an MLS.[100]

71. A second economic element is whether the boycott is aimed at excluding a competitor. Again I find that that is the case here. Zillow competes with MRED and Compass in the listing platform market through Zillow Preview, which like MRED's MLS and PLN and Compass's PLN, provides the platform on which brokers can create and distribute new for-sale property listings.[101] Further, Compass has contacted various MLSs to express its concern that Zillow has the capability to create and distribute listings through its platform and could thus compete directly with local MLSs.[102]

72. A third economic element is whether the Challenged Conduct is likely to harm a competitor's ability to compete and grow. This is also the case here. Revoking Zillow's access to MRED's data feed has a high potential to harm Zillow's ability to compete and grow, as Zillow estimates that it will lose 50% or more of the listings in the Chicagoland area.[103] Zillow does have the option to seek out direct data feeds from brokerages, but as part of the group boycott Compass has already revoked Zillow's access to its data feed and MRED has cautioned brokerages about providing direct data feeds to Zillow.[104] Since Compass and its subsidiaries control more than one-quarter of listings in the Chicagoland area, even if Zillow were able to obtain data feeds from all

---

[99] Samuelson Decl., ¶¶ 33–34.
[100] Samuelson Decl., ¶ 79, Ex. Y (Email from Compass to Hive MLS, May 11, 2026 explaining that Compass has the ability to "add" and "edit" listings outside the MLS).
[101] Samuelson Decl., ¶¶ 43–44.
[102] Samuelson Decl., ¶ 79, Ex. Y (Email from Compass to Hive MLS, May 11, 2026).
[103] Samuelson Decl., ¶ 81.
[104] Samuelson Decl., ¶¶ 61–73.

other brokerages, it would still be significantly harmed.[105] If Zillow stops enforcing its Standards to maintain access to MRED's data feed, it will still be harmed in its ability to compete.

73.     A fourth economic element is whether the party who is engaging in the boycott has the market power to make good on the boycott. This is also true, as MRED has monopoly power over listings in the Chicagoland area.

74.     A fifth economic element has to do with harm to competition. If the boycott is implemented, is it likely to result in harm to competition? The answer to this question is yes. Compass and its subsidiaries have already terminated their data feeds to Zillow, blocking Zillow's ability to obtain comprehensive listing data from non-MRED sources.[106] Because MRED's threat to withhold its data feed from Zillow is credible, Zillow must either (a) enforce the Standards and forfeit access to an estimated 50% or more of the listings in the Chicagoland area, thus suppressing competition in the marketplace, or (b) comply with MRED's and Compass's demand that Zillow stop enforcing the Standards, including outside of Chicagoland, which compromises both the quality of Zillow's listing platform, and Zillow's ability to win, expand, and enhance its partnerships with other brokerages through Zillow Preview.

75.     A sixth economic element is whether the horizontal conspirators are acting in their economic self-interest or acting in a way that only makes sense if the outcome is the elimination or lessening of competition. In this case, the economic evidence indicates that MRED's and Compass's actions only make sense if their goal was to eliminate or suppress Zillow as a competitor. The reality is that Zillow is the most visited real estate portal on the internet.[107] Yet MRED's and Compass's actions are aimed at withholding their listings from appearing on Zillow.

76.     Threatening to withhold listing data from Zillow does not make economic sense because (a) MRED and MLSs generally benefit from Zillow's platform and (b) brokerages (including Compass) benefit from the wide market exposure that Zillow gives their home seller clients. However, if MRED and Compass both were to withhold their listing data from Zillow (as alleged by Zillow), that would only make sense if somehow (a) MRED believed that such a

---

[105] Hunt Decl., ¶ 14.d.
[106] Samuelson Decl., ¶¶ 61–73.
[107] Zillow Group 2025 10-K, at p. 5–6.

strategy would or could prevent Zillow from becoming a rival platform and source of almost all of the listings in Chicagoland, and (b) Compass believed that such a strategy would or could prevent Zillow from developing a strong listing platform that could compete strongly against its PLN.

77.     In sum, my preliminary analysis suggests that the key economic elements of a successful group boycott are present.

## B.  Monopoly Maintenance by MRED

78.     Monopoly maintenance refers to anticompetitive conduct by a firm intended to lessen competition and maintain its market power. There are three economic elements that are often part of an economic strategy to maintain a monopoly.

79.     One economic element has to do with market power. Does the firm that is engaged in the Challenged Conduct have market power? The answer here is yes. As I describe below, MRED has monopoly power in the listing platforms market in the Chicagoland area, and it also has control over a key input in the provision of brokerage services in the Chicagoland area, which is local residential real estate listings.

80.     A second economic element is whether the Challenged Conduct is likely to harm a competitor's ability to compete and grow. This is also likely to be true. MRED enacted revised rules under which Zillow will lose access to the MRED data feed if it enforces the Standards.[108] These revised rules prevent Zillow and others from competing with MRED by differentiating themselves through services that, unlike MRED's, maximize transparency and broad access to real estate information.

81.     A third economic element has to do with anticompetitive foreclosure. If the Challenged Conduct is successful in preventing a rival from competing and growing, will the firm with market power be able to continue exercising market power? The answer to this question is yes. If Zillow were allowed to continue to grow and differentiate its listing platform it could in

---

[108] Samuelson Decl., ¶¶ 53–60.

27

time become a substitute platform for MRED. MRED's conduct prevents Zillow from enforcing the Standards and differentiating itself from MRED, helping to maintain MRED's market power.

82.     In sum, my preliminary analysis suggests that the key economic elements of a monopoly maintenance claim are present.

## IV.     The Market for Listing Platforms in the Chicagoland Region Represents a Relevant Antitrust Market

83.     Economists and antitrust agencies define a relevant antitrust market as "an area of effective competition, comprising both product (or service) and geographic elements."[109] The relevant product market comprises the set of products or services that are regarded as substitutes by consumers,[110] while the scope of the relevant geographic market "depends on the limits that distance puts on some customers' willingness or ability to substitute to some products, or some suppliers' willingness or ability to serve some customers."[111] Ultimately, in an antitrust matter such as this, market definition serves to illuminate the competitive impact of the conduct at issue.

84.     In this matter, based on the analysis outlined below and the available evidence, my preliminary conclusion is that the market for listing platforms, i.e., platforms engaged in the creation of residential real estate listings and distribution of those listings to buyers and agents in the Chicagoland region, represents a relevant antitrust market.

### A.  Product Market Definition

85.     My preliminary view is that residential real estate listing platforms represent a relevant product market for assessing the competitive impact of the allegations regarding MRED's and Compass's conduct in this matter. This market includes platforms that can be used by listing agents to create for-sale residential real estate listings and distribute them to buyers and their agents in a local area. This market is primarily made up of listings created for broad public distribution

---

[109] U.S. Department of Justice and The Federal Trade Commission, *Merger Guidelines,* December 18, 2023, https://www.ftc.gov/system/files/ftc_gov/pdf/2023_merger_guidelines_final_12.18.2023.pdf ("Merger Guidelines"), at p. 40.

[110] *Merger Guidelines*, at p. 40 ("The outer boundaries of a relevant product market are determined by the 'reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it,'" (quoting *Brown Shoe Co., Inc. v. United States*, 370 U.S. 294, 325 (1962))).

[111] *Merger Guidelines*, at p. 45.

through the MLS ecosystem. It also includes off-MLS listings that are created for properties that a seller (or the broker representing them) chooses not to distribute to the general public but makes available only to a select audience (e.g., MRED's PLN, Compass's Private Exclusives). Finally, it also includes listings that are not yet for sale, or listed on the relevant MLS, but are available for access by the public by being featured on online home search portals like Zillow Preview.

86.     As noted earlier, the core principle underlying product market definition is that of substitutability, with the dimensions of the relevant product market delineated by reasonable interchangeability between the product and substitutes for it.[112] An assessment of interchangeability could be supported by evidence deriving from an implementation of the Hypothetical Monopolist Test ("HMT") or through evaluation of "practical indicia" supporting market definition as outlined by the U.S. Supreme Court in *Brown Shoe Co., Inc. v. United States*.[113]

87.     The intuition underlying the HMT is as follows. If the hypothetical monopolist of a group of products in the candidate market were to increase price (or worsen terms) by a small but significant and non-transitory amount for at least one product in the candidate market, and if buyers of those services would switch to products, services, or sellers outside of the candidate market in sufficient amounts to render the original price increase (or worsening of terms) unprofitable for the hypothetical monopolist, then the candidate market is too narrowly defined to be considered a relevant antitrust market. In other words, the key issue in defining a relevant antitrust market is whether the goods or services sold in a candidate market are sufficiently close substitutes for purchasers that the market is sufficiently self-contained, i.e., a sufficient number of purchasers would continue to purchase a relevant product in the candidate market when faced with a price increase or worsening of terms, to the degree that a hypothetical monopolist of all products or services in the candidate market would find it profitable.[114]

88.     In the case of listing platforms (the candidate market being considered), the relevant buyers of these services are listing agents who are working on behalf of home sellers, buyer agents

---

[112] *Merger Guidelines*, at p. 40.
[113] *Brown Shoe Co., Inc. v. United States,* 370 U.S. 294 (1962).
[114] When applicable, the HMT can take the two-sided nature of a market into account, although these considerations would not change the result of the HMT I describe below.

working on behalf of home buyers, and online home search portals displaying distributed listings like Zillow.com, Redfin.com, and Homes.com. The HMT considers whether in the event of a small but significant increase in the price or worsening of terms (a "SSNIPT") by a hypothetical listing platform monopolist, the number of brokers and agents who would switch to alternate means of creating and distributing residential home listings for home sellers or obtaining direct sources of newly listed homes for home buyers would be sufficient to make such a price increase or worsening of terms unprofitable.

89.     I begin by considering listings on the MLS. If listings on the MLS underwent a SSNIPT, many buyers of such listings would likely switch to PLNs or pre-marketing alternative platforms for the creation and distribution of listings, as PLNs offer the same ability to create and distribute listings online (although listings on a PLN are not distributed as widely as listings on the MLS). Some brokerages, including Compass, offer listing on a PLN as a substitute for listing on the MLS, and will attempt to transition listings that fail to sell on a PLN to the MLS. Zillow's Standards also recognize that pre-marketed listings can potentially be converted to MLS listings. Thus, the relevant antitrust market must include both the MLS, PLNs such as Compass's 3PM, MRED's PLN, and Zillow Preview.

90.     Other methods of advertising properties for sale do not offer the same ability to create and distribute property information as an MLS, PLN, or pre-marketing platform. For example, a listing agent facing a SSNIPT from a hypothetical monopolist of listing services could consider promoting their homes through other means, such as advertising using non-digital platforms like print media, mailing postcards or displaying yard signs. But none of these alternatives would provide nearly the same reach or effectiveness of targeting as would be provided by listing platforms, and therefore the extent of any such substitution is likely to be very small (and not nearly enough to negate the profitability of the price increase imposed by the hypothetical monopolist). Similarly, for an agent representing a home buyer, alternatives like yard signs and print media are unlikely to present viable alternatives for finding a home when compared to having access to a centralized database of real estate listings.

91.     Other digital alternatives like online home search portals or public websites of individual brokerages are also not sufficiently close alternatives to listing platforms for listing

agents for the purpose of promoting homes for sale due to the lack of adequate functionality for creating for-sale listings (e.g., not all online home search portals might offer tools for creation of listings). Such platforms do not allow brokerages and agents to create a listing—a compilation of attributes for a unique property used for marketing that property to potential buyers.

92.     For specific types of listings, such as listings that are created for properties that a listing agent chooses not to initially distribute to the broader public, products offered by online home search platforms (e.g., Zillow Preview) or individual brokerages (Compass Private Exclusives) are viable alternatives for listing agents for promoting a property. Specifically, Zillow Preview allows agents to use Zillow's platform to create and broadly distribute pre-marketed listings directly to consumers and to other websites, such as the listing agent and broker site, and soon to Realtor.com.[115] Similarly, Compass, through 3PM, is already engaged in the creation and distribution of pre-marketed listings to consumers and to certain other websites, such as Redfin.[116] As such, the market for listings creation and distribution in the Chicagoland area includes as relevant market participants MRED, Zillow (through its Zillow Preview product) and Compass (through its Private Exclusives program).

93.     The available evidence indicates that the creation and distribution of residential real estate listings is recognized by the industry as a distinct market. A recent blog post from Baird & Warner, a Chicagoland brokerage, explains while "the MLS has traditionally been the central hub for listing distribution," Zillow's "pre-market listing feature" and Compass's "coming-soon and exclusive listings" are new options for sellers and that, now, "distribution . . . is being shared between MLS organizations, large brokerages, and the major portals."[117]

---

[115] Samuelson Decl., ¶¶ 43–44.

[116] Rocket Companies, "Compass and Rocket Form Historic Alliance to Dramatically Increase Home Listing Inventory on Redfin," February 26, 2026, https://www.rocketcompanies.com/press-release/compass-and-rocket-form-historic-alliance-to-dramatically-increase-home-listing-inventory-on-redfin/ (accessed May 14, 2026).

[117] Baird & Warner, "The Private Listing Wars Just Went Public — And Chicago Is Right in the Middle of It," https://ottenheimergroup.com/blog/the-private-listing-wars-just-went-public-and-chicago-is-right-in-the-middle-of-it (accessed May 14, 2026).

## B. Geographic Market Definition

94.    My preliminary opinion is that the listing platforms market is local in nature. MLSs tend to operate in defined local regions. There is no other MLS for the Chicagoland region besides MRED. Zillow data shows that 73% of buyers searching for homes in Chicago, IL were searching from Chicago, IL.[118] NAR's 2025 Profile of Home Buyers and Sellers found that the median distance moved by sellers was 30 miles.[119]

# V.    Chicagoland Brokerage Services Represents a Relevant Antitrust Market

95.    In this matter, based on the analysis outlined below and the available evidence, my preliminary conclusion is that the market for Chicagoland brokerage services is also a relevant market.

## A. Product Market Definition

96.    My preliminary view is that the provision of real estate brokerage services to buyers and sellers of residential real property is a relevant product market for assessing the competitive impact of the allegations regarding MRED's and Compass's conduct in this matter. This market includes the services provided to home buyers and sellers by residential real estate brokers with access to the MRED MLS, including those offered by Compass, Zillow, and the real estate brokers who own and control MRED.

97.    For the vast majority of home sellers and buyers, there are no reasonable substitutes to real estate brokerage services. For example, for the home seller, the primary alternative to selling a home using a real estate broker is to sell the home on their own, which is typically referred to as For Sale By Owner (FSBO). Zillow's listing database shows that in Chicagoland, just 280 listings were FSBO on May 7, 2026, making up less than 1% of total listings.[120] According to NAR's 2025 Profile of Homebuyers and Sellers, from July 2024 through June 2025, 88% of buyers used agents

---

[118] Zillow, "Search Trends," https://www.zillow.com/research/home-shopping-search-trends-34988/ (accessed May 14, 2026). Select "Chicago, IL" in the dropdown under the header "Where Zillow Shoppers Are Searching."
[119] National Association of Realtors, "First-Time Home Buyer Share Falls to Historic Low of 21%, Median Age Rises to 40."
[120] Hunt Decl., ¶ 9.

to purchase a home and 91% of sellers used agents to sell a home.[121] A hypothetical monopolist of real estate brokerage services would be able to profitably increase commissions significantly above competitive levels. Thus, applying the standard market definition framework discussed above, residential real estate brokerage services represent a relevant product market.

98. Real estate brokers compete to obtain listings (to represent home sellers) and to represent home buyers. When a home sale is closed, a commission is typically paid to both the seller's agent and to the buyer's agent as a percentage of the home sale price. A broker who represents a home buyer may have been connected to a buyer through another cooperating brokerage, and in that instance, the buyer's agent may share some of their portion of the commission with the cooperating brokerage.

99. Based on the available evidence, I preliminarily find that Zillow is a participant in the residential real estate brokerage services market. Zillow, Inc. is a licensed real estate broker and offers agents the opportunity to purchase leads to potential home buyers and home sellers through its Preferred program.[122] When a Zillow Preferred agent closes a residential real estate transaction from a Zillow Preferred connection, the agent and their broker are required to pay what Zillow calls a Success Fee to Zillow that is calculated as a percentage of the commission the buyer or seller agent receives.[123] Zillow also offers many of the services typically offered by brokerages, such as by offering a service to stage homes with 3D home tours.[124] As a participant in this market, Zillow's share of the brokerage services market could be calculated using the percentage of commissions it obtains through the Zillow Preferred Program.

100. The available evidence indicates that MRED is an association of competing real estate brokerages all of whom are participants in the Brokerage Services market. MRED states that

---

[121] National Association of Realtors, "First-Time Home Buyer Share Falls to Historic Low of 21%, Median Age Rises to 40."

[122] Zillow, "Do I owe a Zillow Preferred Success Fee on a transaction?" https://zillow.zendesk.com/hc/en-us/articles/33295568333843-Do-I-owe-a-Zillow-Preferred-Success-Fee-on-a-transaction (accessed May 14, 2026); Zillow, "Real Estate Agents in Chicago, IL," https://www.zillow.com/professionals/real-estate-agent-reviews/chicago-il/ (accessed May 14, 2026).

[123] Zillow, "Do I owe a Zillow Preferred Success Fee on a transaction?"; Zillow, "How to Calculate Success Fees," https://zillow.zendesk.com/hc/en-us/articles/33295951686803-How-to-Calculate-Success-Fees (accessed May 14, 2026).

[124] Zillow, "3D Home," https://www.zillow.com/3d-home/ (accessed May 14, 2026).

it is governed by its Board of Managers and that this Board is primarily composed of local brokerages who pay to become Preferred Unit Owners.[125]

## B. Geographic Market Definition

101.  My preliminary opinion is that the market for Brokerage Services is local in nature. Brokers are licensed state-by-state and develop localized knowledge of the home inventory in their local area.[126] Zillow data shows that 73% of buyers searching for homes in Chicago, IL were searching from Chicago, IL.[127] NAR's 2025 Profile of Home Buyers and Sellers found that the median distance moved by sellers was 30 miles.[128]

# VI.    Analysis of Market Power

102.  Market power is the ability to charge prices above competitive levels, reduce quality below competitive levels, and reduce output or innovation below competitive levels for a sustained period of time. I evaluate these issues with respect to the two relevant markets below.

## A. Listing Platforms in the Chicagoland Region

103.  MRED individually or in combination with Compass has market power in the market for listing platforms.

### 1. *MRED Has Control Over Virtually All Listings in the Chicagoland Region*

104.  Virtually all listings in the relevant geographic market for listing platforms were first created and distributed through MRED's MLS platform. This means that MRED has almost

---

[125] MRED 2026 Annual Report, at p. 7–10; MRED, "Preferred Unit Ownership," https://www.mredllc.com/comms/resources/MRED-PUO-Benefit-Package.pdf (accessed May 15, 2026).
[126] *See,* Federal Trade Commission and U.S. Department of Justice, *Competition in the Real Estate Brokerage Industry,* at p. 5.
[127] Zillow, "Search Trends." Select "Chicago, IL" in the dropdown under the header "Where Zillow Shoppers Are Searching."
[128] National Association of Realtors, "First-Time Home Buyer Share Falls to Historic Low of 21%, Median Age Rises to 40."

complete control over a critically important input (residential property listings) for any broker operating in the Chicagoland area. This confers significant market power to MRED.[129]

105.    For example, according to statistics gathered by Zillow, on May 7, 2026 there were 34,657 unique property listings on the market in the Chicagoland area.[130] Of these properties, 98.2% appeared only on MRED's platform (either the MLS or MRED's PLN).[131]

106.    This market share indicates that MRED has monopoly power over MLS listings created and distributed in the relevant geographic market.

### 2.    *MRED and Compass Have Control Over Virtually 100% of PLN Listings*

107.    In combination, MRED and Compass control virtually all of the private listings in the relevant geographic market for listing platforms.

108.    For example, according to statistics gathered by Zillow, on May 7, 2026, of the 34,657 unique property listings on the market in the Chicagoland area, 4,984 were on a PLN or Zillow Preview.[132] Of these, 4,983 were either on MRED's PLN, a Compass Coming Soon listing, a Compass Private Exclusive listing, or on both a Compass PLN and MRED's PLN.[133]

109.    This means that in combination MRED and Compass control 99.98 % of the private listings in the Chicagoland area.[134]

---

[129] Federal Trade Commission and U.S. Department of Justice, *Competition in the Real Estate Brokerage Industry*, at p. 12 ("As the primary source of information about homes currently for sale and the prices at which other, comparable homes have been sold, the MLS is an extraordinarily important resource for sellers, buyers and brokers. . . . MLSs are so important to the operation of real estate markets that, as a practical matter, any broker who wishes to compete effectively in a market must participate in the local MLS.").

[130] Hunt Decl., ¶ 9.

[131] Hunt Decl., ¶ 9.

[132] Hunt Decl., ¶ 10.

[133] Hunt Decl., ¶ 10.b.

[134] Hunt Decl., ¶ 10.b.

### 3. MRED Has the Ability to Exclude the Formation and Entry of Rival Listing Platforms

110. MRED has the ability to exclude others from the listing platforms market by regulating access to the MRED listing feed. MRED sets the rules that govern access to its data feed, and can terminate this feed for any market participant that does not comply with these rules.[135] The critical importance of the listing feed to other market participants gives MRED significant market power, as evidenced by its ability to coerce Zillow into not enforcing the Standards in the Chicagoland area.

111. If Zillow does not have access to MRED's listing feed at all, then Zillow anticipates that it would lose access to 50% or more of Chicagoland listings and would be forced to expend significant resources maintaining fragmented listing information directly from the brokerages.[136] Losing such access would significantly impair Zillow's ability to operate as a rival listing platform and as a potential alternative to MRED.[137] Having control over the listings that would prevent a firm (e.g., Zillow) from developing a competing platform gives MRED the ability to erect a barrier to entry.

### 4. Compass Has the Ability to Diminish the Quality and Competitiveness of Rival Listing Platforms

112. If MRED were to deny access to its data feed to a rival listing platform, that rival platform (such as Zillow) could potentially continue to operate as a listing platform if it could obtain listings data feeds directly from brokerages.[138]

113. Obtaining feeds directly from brokerages would help that rival platform overcome the barrier to entry, but several brokerages (Compass and its subsidiaries) have already terminated their listing data feeds to Zillow nationwide. Over the previous 12 months Compass and its subsidiaries accounted for over 35% of transaction volume (based on sale price) and 28% of sell-side transactions in the Chicagoland area.[139] If Zillow were forced to rely on direct data feeds from

---

[135] Samuelson Decl., ¶¶ 13, 54–60.
[136] Samuelson Decl., ¶¶ 81–82.
[137] Samuelson Decl., ¶ 84.
[138] Samuelson Decl., ¶¶ 61, 82.
[139] Hunt Decl., ¶¶ 14.a, 14.d.

the brokerages then Zillow would not have access to, at least, 28% of all Chicagoland listings.[140] This would represent a substantial diminution in the quality of the services that Zillow offers to real estate professionals, vendors, and consumers. Forcing Zillow to reduce the quality of its product would be an exercise of market power.

### 5. *MRED and Compass Combined Have the Ability to Diminish the Quality of Zillow's Listing Platform*

114. Together, MRED and Compass have the additional ability to force Zillow to stop enforcing the Standards. Because MRED controls access to 98% of the listings in Chicagoland, and because Compass controls 28% of listings, Zillow must contract with MRED and/or Compass if it is to continue operating as a listing platform. By virtue of their ability to eliminate or substantially reduce the listings that can be shown on Zillow, MRED and Compass (combined) have the ability to force Zillow to stop enforcing the Standards in order to maintain access to their listing data.

115. If Zillow cannot enforce the Standards, the result will be a serious diminution to the quality of listings on the Zillow platform and, as a consequence, a reduction in the quality of service that Zillow can offer to its partner brokerages, to real estate professionals who do business on the Zillow platform, and consumers.[141] Forcing Zillow to reduce the quality of its product would be an exercise of market power.

116. Thus MRED, in combination with Compass, has the ability to reduce Zillow's ability to compete as a listing platform.

### 6. *Barriers to Entry into Listing Platforms*

117. Any company seeking to participate in the listing platforms market in the Chicagoland area without the cooperation of MRED faces significant barriers to entry. MLSs such as MRED have significant indirect network effects: sellers and brokers list their properties on the MLS because that is where the buyers are, and buyers and buyer agents use the MLS because that

---

[140] Hunt Decl., ¶ 14.d.
[141] Samuelson Decl., ¶¶ 85–87.

is where the listings are. Replicating these network effects from scratch would be an exceedingly difficult task.

118. Without MRED's threat of foreclosure, a potential entrant in the listing platform market could use MRED's listing feed to obtain listings, and then compete to attract buyers and buyer agents to the platform. This is the strategy pursued by Zillow. But without the MRED listing feed, a potential entrant would need to create a new source of listings that is as comprehensive, timely, and accurate as MRED's listing feed. Replicating an MLS would require assembling direct feeds from nearly all of the thousands of brokerages in the Chicagoland area, a difficult and burdensome task that constitutes a significant barrier to entry.

119. In response to MRED's threat to revoke access to its data feed, Zillow did in fact begin to assemble data feeds from individual brokerages in the Chicagoland area.[142] However, Compass and all of its subsidiaries revoked access to their data feeds, removing 28% of Chicagoland listings from Zillow's potential alternate data feed.[143] Compass's actions mean that the alternative source of listing information that Zillow is seeking to obtain in order to create a platform that is comparable to MRED's would no longer be comprehensive, thus increasing barriers to entry and reinforcing MRED's ability to exclude others from the market.

## B. Brokerage Services in the Chicagoland Region

120. MRED individually or in combination with Compass has the ability to set up barriers to entry in the Brokerage Services Market in the Chicagoland region.

### 1. Market Power Over Listings Gives MRED and Compass Control Over a Critical Input That Brokerages Need in Order to Compete

121. As described above, MRED has control over MLS listings created and distributed in the relevant geographic market. Over 98% of unique properties on the market in the Chicagoland area appear only on MRED's MLS or PLN.[144]

---

[142] Samuelson Decl., ¶ 61.
[143] Hunt Decl., ¶ 14.d.; Samuelson Decl., ¶¶ 61–73.
[144] Hunt Decl., ¶ 9.

122.    Brokerages cannot do business without access to listings. In 2007, the DOJ noted "MLSs are so important to the operation of real estate markets that, as a practical matter, any broker who wishes to compete effectively in a market must participate in the local MLS,"[145] and that observation remains true today. Thus, any broker (including Zillow) seeking to do business in the Chicagoland area must abide by MRED's rules or risk losing access to this critical input.

### 2. MRED and Compass Have the Ability to Erect Barriers to Entry into Brokerage Services

123.    Because MRED has the ability to control access to virtually all listings in Chicagoland, it has the ability to erect barriers to entry. Again, listings are a critical input for a brokerage, and thus any broker and brokerage seeking to enter the Brokerage Services market in the Chicagoland area must have access to MRED's listing feed.[146] For example, MRED could raise a significant barrier to entry for a brokerage by denying access to virtually all listings in the relevant geographic market by terminating its listing feed.

124.    Compass also has the ability to erect barriers to entry into brokerage services by denying rival brokerages access to its listings. Should a brokerage seek to bypass MRED and assemble data feeds from the other brokerages in the Chicagoland area, Compass could raise another significant barrier to entry by denying access to more than one-quarter of listings by terminating its brokerage data feed. This means that collectively MRED and Compass control access to virtually all listings in the Chicagoland area through the MRED listing feed and Compass's brokerage data feed, giving them the ability to raise significant barriers to entry for any rival brokerage.

## VII.    Anticompetitive Effects of the Challenged Conduct

125.    Antitrust is concerned with harm to competition, not merely harm to individual competitors. Conduct harms competition when it results in reduced quality, increased prices, reduced innovation, or reduced sales or total output in the relevant market, relative to a world without the conduct.

---

[145] Federal Trade Commission and U.S. Department of Justice, *Competition in the Real Estate Brokerage Industry*, at p. 12.
[146] *See,* Samuelson Decl., ¶ 24.

126. And though antitrust law protects competition and not competitors, excluding or restricting rivals can be the mechanism for harming competition as a whole. Conduct that constrains necessary inputs, raises rivals' costs, degrades rival quality, or otherwise limits rivals' growth or ability to meet demand can be anticompetitive. This is particularly pertinent when dominant firms restrict a key competitor or competitors—rivals that disrupt the market's status quo and drive innovation. This can lead to marketwide harm when restricting or deterring such competitors significantly weakens constraints on dominant firms, allowing them to restrict output or reduce innovation or the quality of their services without reserve.

127. Based on my preliminary analysis, the Challenged Conduct harms competition in the relevant markets by threatening to exclude and restricting the competitive constraints that Zillow and other pro-transparency platforms and brokerages place on MRED, Compass and other PLNs. By significantly weakening these constraints, MRED and Compass can increasingly restrict access to listings through their PLNs and otherwise neglect quality and innovation.

128. More specifically, I have found that MRED and Compass put Zillow and other pro-transparency platforms between a rock and a hard place: they can either lose access to MRED's listings, a critical input; or forgo enforcement of the Standards and similar policies, leaving them with no choice but to endure displaying stale listings and depart from pro-transparency business practices that give Zillow and other platforms a competitive edge against PLNs. Either way, MRED and Compass have stymied competition marketwide by excluding and restricting rivals in both relevant markets.

## A. Anticompetitive Effects from Boycotting Access to MRED's Listings

129. As part of the Challenged Conduct, MRED and Compass have threatened to cut off Zillow's access to the MRED listing feed entirely. Now that MRED purports to operate nationally through its alliance with Compass, MRED threatens to cut off Zillow's access to its feed even if Zillow continues its existing practice of enforcing the Standards outside of Chicagoland.[147] If MRED and Compass carried out this threat, my initial finding is that it would hobble Zillow's

---

[147] Samuelson Decl., ¶¶ 74–80; Declaration of Bonnie Lau in Support of Plaintiffs' Motion for Preliminary Injunction, *Zillow Group, Inc., et al. v. Midwest Real Estate Data LLC, et al.*, Case No. 1:26-cv-5451 (N.D. Ill.), Ex. E (May 2026 email from MRED's counsel confirming that not displaying listings in Florida, Georgia, and California under the Standards would result in a violation of MRED's rules).

ability to compete in Chicagoland and deter other competitors from a pro-transparency approach for fear of the same reprisal. This would lessen competition in both the listing platform market and the brokerage services market.

130. First, without access to sufficient aggregated, up-to-date, and accurate listings information in the Chicagoland area, Zillow would become markedly less useful and trustworthy to prospective home buyers searching for homes on Zillow's sites.[148] This would set off a harmful feedback loop where reduced buyer traffic would make Zillow less attractive to home sellers and agents, which would make Zillow even less attractive to home buyers, and so on.[149] And since the Challenged Conduct has also prevented Zillow from obtaining sufficient listing feeds directly from brokerages, including Compass, Zillow has no viable alternative to obtaining comprehensive listing coverage, other than relying on the MRED listing feed.[150] Ultimately, cutting off Zillow's listing feed access would likely lead to severely hampering Zillow's operations in Chicagoland. This would result in marketwide harms to competition in the market for listing platforms and the market for brokerage services in that region.

131. Second, in the market for listing platforms, cutting Zillow's listing feed would eliminate effective competition with MRED's and Compass's listing platforms and deter other participants from offering services, like Zillow's, based on increasing transparency and access. With its core platform and audience degraded in Chicagoland, Zillow Preview would not be nearly as useful to brokerages and agents, or to the portal Realtor.com.[151] Zillow Preview and other pro-transparency listing platforms would face serious difficulties in scaling and attracting both buyers and sellers, or in challenging MRED's and Compass's competing listing platforms in Chicagoland.[152]

132. Zillow is a particularly important competitive constraint in this market—it is a new entrant with innovative services and is currently the only viable challenger to MRED and Compass in Chicagoland.[153] My understanding is that Zillow is attempting to offer a different product with

---

[148] Samuelson Decl., ¶ 85.
[149] Samuelson Decl., ¶¶ 83, 85–86.
[150] Samuelson Decl., ¶ 81.
[151] Samuelson Decl., ¶¶ 83–84.
[152] Samuelson Decl., ¶ 84.
[153] Samuelson Decl., ¶¶ 46–48.

Zillow Preview, creating and distributing pre-marketed listings that allow multiple brokerages (not just the owner of the listing) to realize the benefits of broad, public exposure.[154] Zillow Preview also offers improved listings tools and compensation to agents and brokerages, including free connections from Zillow Preview, boosted placement on Zillow, and sharing revenue on transactions originating with a Zillow Preview listing.[155] Cutting Zillow's listing feed would deprive agents and brokerages of much of the value of these benefits. And it would insulate MRED and Compass from effective competition in Chicagoland, both from Zillow and others, reducing MRED's and Compass's incentives to improve their services or reduce members' fees for these services. This harms brokerages and agents in Chicagoland who would otherwise benefit from Zillow Preview's services and improvements in quality and innovation throughout the market.

133. Third, impairing Zillow Preview (and discouraging similar platforms) would also reduce competition in the Chicagoland brokerage services market. With competing platforms like Zillow Preview constrained, brokerages and agents would lose opportunities to obtain new-to-market listings for buyers or offer pre-marketing to sellers.[156] Further, suppression of pro-transparency competitors like Zillow would allow MRED's and Compass's PLN-driven business models to grow unchecked. This would increase the number of listings locked up in PLNs (in particular some of the newest, most in-demand listings), preventing other agents from competing for the opportunity to represent buyers in those transactions. The impacts on smaller, independent brokerages and agents in Chicagoland would be especially significant. In a competitive marketplace, these professionals could outperform MRED and Compass through superior quality services, but they do not have the network size to compete with scaled PLNs.

134. Fourth, and more broadly, forcing Zillow to forgo 50% or more of Chicagoland listings would significantly reduce the benefits to transparency, liquidity, and efficiency that Zillow's core platform provides.[157] This would reduce output (overall number of real estate transactions) and the quality of all brokerage services in Chicagoland.

---

[154] Samuelson Decl., ¶¶ 43–44.
[155] Samuelson Decl., ¶ 48.
[156] Samuelson Decl., ¶¶ 83–84.
[157] *See,* Samuelson Decl., ¶¶ 81–87.

## B. Anticompetitive Effects from Forcing Zillow to Suppress the Standards

135.    My preliminary view is that if Zillow accedes to MRED's and Compass's threat to cut off Zillow's access to the Chicagoland MRED listing feed by forgoing enforcement of the Standards nationwide, MRED's and Compass's suppression of the Standards and similar policies itself results in anticompetitive effects in both relevant markets. Without the Challenged Conduct, the Standards enhance the competitiveness of Zillow's multifaceted real estate business in multiple ways.

136.    First, the Standards are a critical competitive tool to maintain and enhance Zillow's access to the essential input it needs to compete in multiple real estate markets: a supply of high-quality, comprehensive, and up-to-date for-sale residential listings information, and especially the newest, most valuable listings.[158] Zillow's success in multiple markets is in part attributable to the way it combines for-sale listings with innovative technology and critical insights that empower consumers. Without a reliable supply of listings information, Zillow's reputation as a trusted source for comprehensive, up-to-date, and accurate listing information would be severely impaired.[159] This would in turn lead to a loss of consumer and agent trust. This reduction in quality will be felt marketwide because real estate agents and companies that provide real estate services rely on Zillow to provide them with comprehensive, up-to-date, and accurate listing information so that they can compete and offer the services they provide.

137.    Second, the Standards maintain and enhance the quality of Zillow's listing supply and platform.[160] Without the Standards, the stale listings that brokerages like Compass failed to sell in their gated PLNs would be later dumped onto Zillow.[161] This would compromise Zillow's value proposition and brand promise to maintain a supply of the listings consumers value most: those that are timely, accurate, and high-quality. The Standards prevent this degradation of Zillow's platform by not displaying stale listings that were once marketed in PLNs.[162] They also encourage brokerages, agents, and sellers to disseminate their newest listings (which are more

---

[158] Samuelson Decl., ¶ 30.
[159] Samuelson Decl., ¶ 87.
[160] Samuelson Decl., ¶ 40.
[161] Samuelson Decl., ¶¶ 38–40.
[162] Samuelson Decl., ¶¶ 38, 40.

43

valuable to buyers) broadly rather than locking them away in PLNs.[163] Losing access to new-to-market listings and having lower-quality listings would risk triggering a harmful feedback loop that would degrade Zillow's platform further: fewer buyers would likely visit Zillow's degraded platform, decreasing Zillow's value for sellers and agents, in turn further reducing the value to buyers, and so on. This reduction in quality also will be felt marketwide in the market for listing platforms because brokerages with whom Zillow partners in connection with Zillow Preview would find the Zillow partnership and platform to be less valuable and effective.

138.     Third, the Standards prevent brokerages and others with PLNs from free-riding on Zillow's substantial investments.[164] Without the Standards, brokerages could withhold their new, most valuable listings for their PLNs but still benefit from Zillow's platform and audience when they dump stale, unsold listings on Zillow's platform. Such a brokerage free-rides on the benefits of listing on MLS, Zillow, and other real estate portals—which attract potential home buyers who want to see the new and current homes that are on the market—without doing its part to contribute its current and new listings. Free-riding would diminish the value of MLSs and online real estate portals to potential home buyers and the positive externalities generated by MLSs and the portals who contribute their audiences, and the brokerages who contribute their new and current listings. To protect their investment and to maintain the value of the market information, liquidity, and transparency that the portals and other brokerages have sought to create, an online real estate portal may therefore want to adopt mechanisms that deter such free-riding in order to maintain or enhance the value of the platform it has created. Indeed, Zillow has become the most visited online search platform because of the investments it has made in its pro-transparency platform.

139.     Fourth, Zillow's Standards and Zillow Preview work together to incentivize listings creation and distribution on publicly accessible platforms, rather than on closed platforms that restrict access to a limited audience.[165] The Standards incentivize home sellers to choose broad access over PLNs because they deny Zillow's exposure to listings that have been part of a PLN and selectively marketed. Zillow Preview complements this, incentivizing sellers and agents on the listing platform to choose transparency as well by offering enhanced visibility, agent

---

[163] Samuelson Decl., ¶ 30.
[164] Samuelson Decl., ¶ 36.
[165] Samuelson Decl., ¶¶ 43, 49.

compensation, and broader exposure.[166] Thus, the Standards encourage broad dissemination of listings, and Zillow Preview rewards new-to-market listings that buyers choose to broadly disseminate. With Zillow Preview and the Standards, Zillow fosters transparency, wider dissemination of listing information, and more robust buyer participation. In turn, this can improve matching between buyers and sellers as well as price discovery when compared with selective marketing approaches. Because the Standards facilitate greater information flow in the market, which only enhances the efficiency of the real estate marketplace, impairing or blocking the Standards will only lead to a decrease in the efficiency of the real estate marketplace.

140. Without mechanisms like the Standards, all these benefits to Zillow, consumers, professionals, and real estate markets are lost. In this way, MRED and Compass degrade Zillow's platform by reducing its ability to protect listing supply and listing quality. This will in turn reduce the audience of buyers for Zillow Preview listings, which depends on Zillow continuing to attract a sufficient audience of buyers who visit the platform, and weaken Zillow's ability to compete with MRED's and Compass's listing platforms.

141. So by blocking the Standards and other such policies, the Challenged Conduct prevents Zillow and others from competing in the Chicagoland listing platforms market using a pro-transparency business model like the one described above. Nascent services like Zillow Preview are weakened in their ability to successfully attract buyers and sellers (and their agents). With Zillow Preview and Zillow's Standards stymied by the Challenged Conduct, MRED and Compass are relieved of having to compete as intensely to obtain listings on their platforms, and Zillow suffers a loss of listings scale that it would otherwise have. The same dynamics block effective competition from other pro-transparency platforms. This all harms brokerages and agents (and ultimately buyers and sellers) who would benefit from more and better listing platforms in Chicagoland.

142. According to my preliminary analysis, suppressing policies like the Standards also has marketwide impacts in the market for brokerage services in Chicagoland, leading to reduced output, quality, and innovation in this market. Decreasing the quality of Zillow's core platform and audience also decreases the value and connections that agents and brokerages get from

---

[166] Samuelson Decl., ¶ 49.

products like Zillow Preview or Zillow Preferred. Brokerages and agents also lose out by having fewer pre-marketing options, since the competitiveness of Zillow Preview and other pro-transparency platforms is similarly diminished. Lastly, there is a loss in transparency, liquidity, and efficiency in real estate generally without policies like the Standards, which decreases the output and quality of brokerage services broadly.

143.    These effects are likely exacerbated by MRED and Compass's April 2026 alliance. The alliance allows Compass to input its Private Exclusive listings from around the country into MRED—and if Zillow does not display those listings, MRED has threatened to cut off Zillow's listing feed access.[167] In other words, MRED seeks to force Zillow to forgo enforcing its Standards nationally to maintain its access to listings in Chicagoland. If Zillow ceased enforcing the Standards, the same impacts on its business and real estate markets described above would ripple across the country.

## C. There are No Procompetitive Justifications for the Challenged Conduct

144.    In some cases, conduct that allegedly harms competition can also enhance competition. As part of my preliminary economic analysis, I have evaluated whether the Challenged Conduct has any business rationale (other than the advantages of excluding competition) and could result in procompetitive benefits. I have seen no evidence so far that the Challenged Conduct produces offsetting procompetitive benefits or has any non-pretextual business justifications.

145.    Based on my initial evaluation, it makes no economic sense for MRED or Compass to engage in the Challenged Conduct. If MRED and Compass were to completely cut Zillow off from access to MRED's listing feed and independent brokerage feeds, respectively, Zillow's platform would be eroded.[168] As a result, agents and brokerages throughout Chicagoland would lose a valuable source of connections to buyer clients and the broad exposure and audience that Zillow provides sellers. This outcome is not in MRED's unilateral interest, nor is it in the unilateral interest of Compass, or the brokerages and agents affiliated with them. Moreover, abandoning the

---

[167] Samuelson Decl., ¶¶ 74–80.
[168] Samuelson Decl., ¶¶ 81–87.

Standards would reduce transparency, liquidity, and efficiency in real estate generally, which also does not benefit MRED and Compass. The agents and brokerages that MRED and Compass purport to serve compete in the market for brokerage services and benefit from greater information transparency, liquidity, and efficiency in the market for real estate.

### D. PLN Proliferation Harms Competition and Consumer Welfare

146.    MRED and Compass may claim that the proliferation of PLNs will improve consumer welfare. Another result from my initial analysis of the Challenged Conduct is that PLNs in Chicagoland will proliferate. This harms not only buyers and sellers, but also real estate professionals and real estate markets as a whole.

147.    PLNs harm sellers by limiting the number of buyers that can access the sellers' for-sale listings, thereby decreasing demand for their homes. This reduced demand frequently causes homes to sell for less, which several studies support. First, a Zillow Research study analyzing homes sold in 2023 and 2024 found that homes sold off the MLS typically sold for nearly $5,000 less than those listed on the MLS.[169] Second, a 2025 San Francisco Association of Realtors study found that homes sold on the MLS sell for more than $300,000 more than those sold off the MLS.[170] Third, a 2026 study of homes sold in North Carolina from Doorify MLS found that homes sold off the MLS sold for $51,000 less than those sold on the MLS.[171] While these studies covered different markets, they each found one constant: homes sell for less when sold off the MLS.

148.    The reduced exposure for sellers' properties also contradicts the purported benefits of PLNs.[172] Proponents claim that marketing a property through a PLNs allows sellers to test pricing for their property before putting it on the MLS. But trying to validate pricing in limited networks with small pools of buyers will provide misleading information to sellers, relative to the information they could get through broad exposure on the MLS.

---

[169] Zillow, "Off-MLS Home Sellers Left More Than $1 Billion on the Table the Past Two Years."

[170] San Francisco Association of REALTORS®, *Proving MLS Value with RESO Data*, November 2025, https://my.sfrealtors.com/wp-content/uploads/2025/11/SFAR-White-Paper.pdf (accessed May 5, 2026).

[171] Matt Fowler, "Are MLSs Worth It? TLDR, FSBOs Left $406 Million on the Table, So Yes," Doorify MLS, January 26, 2026, https://doorifymls.com/news/are-mlss-worth-it-tldr-fsbos-left-406-million-on-the-table-so-yes/3006 (accessed May 5, 2026).

[172] *See,* Samuelson Decl., ¶¶ 27, 35–36.

149. PLNs further harm sellers by increasing the time it takes to sell their homes. For example, a 2024 study by California Regional Multiple Listing Service (CRMLS) found that homes sold off the MLS took 20–22 days longer to sell than those sold on the MLS.[173]

150. PLNs harm buyers because they reduce access to homes, limit market signals about the actual value of homes, and can lead to buyers paying higher commissions.[174] Specifically, PLNs segment and distort the local housing market because a buyer's knowledge of a home listing can depend on the affiliation of their agent. Further, if there are fewer buyers who have access to a home, there are likely fewer bidders on the home as well. Bids are signals about the value of a home and fewer signals make it more difficult for a buyer to ascertain a home's true value. Finally, by artificially reducing the available inventory, PLNs can pressure buyers to choose their agent based on the agent's access to listings despite higher commissions.

151. PLNs also disadvantage smaller brokerages. Broad listings availability has enabled small brokerages to display and provide their clients with access to the overwhelming majority of listings, and thus compete for buyers despite their brokerage controlling relatively few listings. However, listings in PLNs of large brokerages are hidden from these smaller brokerages. Thus, these smaller brokerages cannot provide buyers with access to the same amount of inventory as larger brokerages, which encourages buyers to choose agents affiliated with larger brokerages. In other words, PLNs encourage or require buyers to sign up with that brokerage's agents for access, restricting buyer choice of agent based on the best terms or skills.

152. PLNs are also detrimental to real estate markets. They create an artificial scarcity of listings in a local market, especially the newest, most valuable listings, providing brokerages opportunities to extract rents (i.e., higher commissions) from buyers who are willing to pay to gain access to hidden listings. This scarcity also reduces the liquidity and size of real estate markets. This degradation of open (i.e., outside of PLNs) real estate markets makes them less efficient and attractive to buyers and sellers. Specifically, it may take longer to buy or sell a home, and the sale price of the home is more likely to diverge from the price that would hold in a more transparent

---

[173] CRMLS, "CRMLS Data That Tells a Story," March 2024, https://go.crmls.org/crmls-data-that-tells-a-story/ (accessed May 14, 2026).
[174] Samuelson Decl., ¶¶ 27, 35–36.

market. This dynamic can trigger a downward spiral that further decreases the liquidity and efficiency of the markets.

153. One of the objectives of PLN-driven strategies is to increase double-ending where the same brokerage represents both the buyer and seller in a transaction.[175] Brokerages benefit from such deals because they receive portions of both the buyer's and seller's commission. However, this weakens incentives for the agents themselves to negotiate on commissions or other key terms of the transaction agreement, to the detriment of buyers and sellers involved.

154. By increasing the use of PLNs in Chicagoland, MRED and Compass advance these anticompetitive harms across the territory, to the detriment of all members of the local real estate industry.

## VIII.  Irreparable Harms

155. Based on my preliminary review of the available evidence, MRED's and Compass's conduct will cause imminent and irreparable harm to Zillow and to competition in the various markets in which Zillow participates.

156. First, if the Challenged Conduct is carried out, the likelihood of competitive harm is high and immediate. For example, MRED is threatening to terminate Zillow's access to MRED's listing feed. If this were to occur, Zillow would face the immediate loss of a large portion of its listings, which would severely restrict Zillow's ability to compete in the Chicagoland area, resulting in substantial disruptions to Zillow's business.

157. In theory, Zillow could mitigate the effects of lost MRED listing feed access by securing direct listing feeds from individual brokerages (of which there are thousands[176]). However, as stated in the Samuelson Declaration, Zillow anticipates that it will lose 50% or more of the listings in the Chicagoland area because it will not be able to obtain a substantial number of the listings it will lose directly from individual brokerages.[177] Compass, the largest brokerage in

---

[175] Samuelson Decl., ¶ 36.
[176] MRED reports that there are over 5,000 brokerages in its coverage area with between 1 and 10 brokers. MRED 2026 Annual Report, at p. 34.
[177] Samuelson Decl., ¶ 81.

the Chicagoland area,[178] has terminated Zillow's feed and instructed its agents not to replace them, such that 28% of current listings could not be recovered through direct feeds.[179] Moreover, negotiating with individual brokerages to obtain direct listings from the ones who *are* willing to give Zillow a feed of their listings will take time. Even if Zillow could obtain direct listing feed agreements with every other brokerage in Chicagoland, it is likely Zillow would have substantially fewer listings than competing online home search platforms that choose to display Compass listings, making Zillow less valuable to customers on its platform.

158.     The magnitude of these harms to Zillow's business and goodwill would be extremely difficult to calculate because Zillow is a multi-sided platform that exhibits multiple direct and indirect network effects. A loss of listings threatens Zillow with a downward spiral that affects virtually all of Zillow's products, services and customer relationships in ways that are extremely difficult to quantify. Moreover, in markets where there are network effects, the passage of time means that such spirals typically do not reverse.

> a. The spiral begins if MRED were to terminate Zillow's access to MRED's listing feed. Without access to over 98% of the listings in the Chicagoland area, the immediate outcome is the reduction in the quality of Zillow's platform and the services that Zillow can offer consumers, brokers, and other participants in the real estate business.[180]

> b. It appears that Zillow will not be able to reverse the effect of such a termination. While Zillow could attempt to obtain direct listing agreements with thousands of brokerages, Zillow expects that it will lose at least 50% of the listings in the Chicagoland area.[181]

> c. With severely diminished listing information, Zillow's platform will become less attractive to customers in impacted regions (e.g., potential home buyers who seek

---

[178] Hunt Decl., ¶¶ 14.a, b, c.
[179] Hunt Decl., ¶ 14.d.
[180] Samuelson Decl., ¶¶ 85–87.
[181] Samuelson Decl., ¶ 81.

information on Zillow), and they will switch to other home search platforms that retain access to MRED's listing feed.

d. As the number of visits to Zillow falls, real estate brokers and home sellers in impacted areas will no longer consider Zillow a valuable partner, and they will switch to other platforms.

e. As brokers and home sellers decrease their participation on Zillow, the result will be an even further decrease in customer demand and user traffic on Zillow in Chicagoland.

159. While the downward spiral affects all of Zillow's products, the imminent effect on Zillow Preview will be particularly pronounced and irreparable because the need to attract sufficient customers in its infancy is critical to its survival and ability to compete in the future.[182] Zillow Preview is a nascent product in a market where there are network effects (i.e., markets where early success can quickly translate to future success due to the benefits of consumer adoption and use, and early failure can lead to the opposite effect). In such markets, a new product that loses its competitive footing at the outset can struggle to succeed in the market in the long term.[183] Thus, in such markets, it is particularly important for there to be vigorous competition for market share earlier, and not later, in the evolution of the market.

160. Second, the harms to Zillow are also irreparable if MRED succeeds in blocking Zillow from continuing its existing practice of enforcing its Standards outside of Chicagoland (i.e., nationwide). This is because, as discussed above, the Standards are a critical competitive strategy utilized by Zillow to maintain and enhance access to listings, especially to the newest, most valuable for-sale listings. If Zillow is blocked from enforcing the Standards nationwide, Zillow thus faces increasing losses of the very listings that are the most critical in driving consumer engagement and traffic to Zillow's platform nationwide. Preventing Zillow from utilizing its Standards to enhance its supply of listings (particularly the newest, most-valuable listings)

---

[182] Samuelson Decl., ¶¶ 83–84.
[183] David B. Yoffie, Annabelle Gawer and Michael A. Cusamano, "A Study of More Than 250 Platforms Reveals Why Most Fail," Harvard Business Review, May 29, 2019, https://hbr.org/2019/05/a-study-of-more-than-250-platforms-reveals-why-most-fail (accessed May 14, 2026).

therefore exposes Zillow to a similar downward spiral to that discussed above, but with nationwide impacts on Zillow and on competition in multiple markets across the country.

161. If the Challenged Conduct is carried out, the likelihood of significant and entrenched harm to Zillow and lessening of competition is high. In the Chicagoland market for listing platforms, this is particularly true because if rival listing platforms see how an MLS like MRED can effectively create a barrier to entry for a well-known firm that already has a strong consumer-facing platform (like Zillow), future entry by another rival platform becomes much less likely. More generally, the prospect for prolonged marketwide harm is high because of the network effects that are inherent in the market for listing platforms and in the market for real estate generally. Network effects can lead to positive spirals or negative spirals, and in this case, the Challenged Conduct will only create negative downward spirals. In addition to network effects, the potential for entrenched harm is exacerbated by the fact that MRED controls virtually all of the listings in the Chicagoland area and Compass controls a significant fraction of those listings. Armed with such control, MRED and Compass also can erect barriers to entry into both markets for listing platforms and for brokerage services in Chicagoland. Barriers to entry that stem from the Challenged Conduct make it even more likely that the downward spiral described above will be permanent and not temporary.

162. Third, if the Challenged Conduct is carried out, it will be difficult to quantify the extent of the competitive and financial harm to Zillow. For example, in the case of Zillow Preview, the opportunity to compete early is critical to future success, which means that any lost or delayed access to the opportunity to compete will likely have significant consequences to the future success (or failure) of Zillow Preview. Because of the network effects, which affects not only Zillow Preview's success but also the potential size and growth of PLNs generally, the impact and loss to Zillow will be difficult to quantify.[184]

163. Consider also the fact that Zillow is a multi-sided platform, which enables Zillow to provide a broad range of services to brokerages and other firms who rely on Zillow for their business. If Zillow no longer had access to MRED's listing data in Chicagoland, or if Zillow's access to listings (especially new-to-market listings) were curtailed because Zillow could no longer

---

[184] Samuelson Decl., ¶¶ 83–84.

implement the Standards nationwide, the network effects described above would also affect Zillow's broader business lines. For example, in addition to the harm to its brokerage services business, Zillow's other businesses in Chicagoland would suffer from the downward spiral. Zillow's mortgage services and new-construction listings businesses depend on Zillow's user traffic to drive customer (agent) engagement.[185] I further understand that Zillow's Showcase product depends entirely on MLS feeds, and does not work for listings available through direct listing feeds.[186] The termination of Zillow's access to MRED's listing feed would result in losses in customers and goodwill related to these services in Chicagoland that are difficult to quantify.[187]

164.    I also understand that the Standards are a key component of Zillow's competitive positioning and branding nationwide. Thus, forcing Zillow to abandon the Standards nationwide would deprive Zillow of its chosen competitive strategy and brand positioning and allow MRED's and Compass's competing PLNs to free-ride on Zillow's platform. If the Challenged Conduct prevents Zillow from enforcing its Standards nationwide, then Zillow will have lost the ability to implement its competitive strategy and an important part of its brand. It is tremendously difficult, as an economic matter, to estimate the damages to a company from being coerced into abandoning its brand positioning.

165.    All these harms to Zillow also inflict incalculable harms on the consumers and real estate professionals that Zillow serves in Chicagoland and nationwide. All would lose access to higher-quality services related to the home buying and selling process that Zillow would provide but for the Challenged Conduct.

---

[185] Samuelson Decl., ¶ 86.
[186] Samuelson Decl., ¶ 86.
[187] Samuelson Decl., ¶ 86–87.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 18th day of May 2026.

Lawrence Wu, Ph.D.

54