**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ZILLOW GROUP, INC. and ZILLOW, INC., <br><br> *Plaintiffs,* <br><br> v. <br><br> MIDWEST REAL ESTATE DATA LLC, COMPASS, INC., and COMPASS ILLINOIS, INC., <br><br> *Defendants.* | Case No. 1:26-cv-05451 <br><br> Judge John J. Tharp, Jr. |

**DEFENDANTS COMPASS, INC. AND COMPASS ILLINOIS, INC.'S OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER**

Zillow's Motion for Temporary Restraining Order (ECF 41) ("MTRO"), and indeed its entire lawsuit, is an unfair and anticompetitive attempt to force homesellers and their agents—by way of injunctive relief from this Court—into marketing their properties on Zillow's platform from the moment they decide to sell. Zillow insists that its intent is to increase transparency and benefit sellers, but Zillow's Listing Access Standards accomplish exactly the opposite. If a homeseller wishes to market her property in a more careful and methodical way, through pre-MLS marketing efforts designed to provide a host of benefits to the seller, rather than widely broadcasting her untested listing from the outset, Zillow will ban that listing from its platform. *See* Compl. ¶ 6. Worse, Zillow affirmatively displays those properties as "off market" or not for sale on its platform, knowingly misrepresenting the property's for-sale status, harming the seller and misleading potential buyers. *See, e.g.*, Decl. of Brian Y. Chang ("B. Chang Decl."), Ex. A. That is the reason Zillow finds itself in the current situation, not because of some "conspiracy to boycott" it conjures for this Court.

This Court should not aid Zillow in perpetuating its own anticompetitive conduct through its requested injunctive relief. In any event, there is no urgency to the present dispute, because the purported harm Zillow claims it is suffering is entirely of its own making. The Court should deny Zillow's MTRO.

## I. ZILLOW'S LISTING ACCESS STANDARDS ARE ANTICOMPETITIVE.

Zillow's MTRO essentially asks the Court to protect it from the consequences of imposing its Listing Access Standards, which are themselves anticompetitive. Those Standards, and this lawsuit, are an anticompetitive attack on the ability of homesellers to market their properties the way they see fit, including by barring any public marketing before those properties are input into the MLS and made available to Zillow. Zillow's business model depends on obtaining the broadest range of properties available to list on its website so it can monetize those listings even though it did nothing to develop them. It is not surprising, then, that Zillow would prefer that sellers launch their properties directly into the MLS and Zillow's website immediately upon deciding to sell. But some property owners prefer the option of taking more strategic approaches to marketing their properties. The Compass defendants developed an innovative way for sellers to accomplish that— via a 3-Phase Marketing Strategy. The first two phases of that strategy permit the seller to test a listing and obtain valuable information before the listing is publicly marketed, if it is not sold in the first two phases. Compl. ¶ 54. It is only in the third phase that the property is entered into the MLS system for broad distribution, which starts the clock on the number of days the property is publicly listed and tracks price changes.

For example, during the first two phases of the 3-Phase Marketing Strategy, a seller can test the listing price to see if it is too high without the negative consequences of accruing days on the market or price drops, which occur only when a property is broadly marketed on the MLS. Or

the seller can obtain valuable feedback on what aspects of the offered property are attractive to buyers and what might be improved to attract increased buyer interest. The seller can then assess that information and use it to optimize the listing, such as making improvements or staging, that may ultimately be entered into the MLS in the third phase. The 3-Phase Marketing Strategy also permits agents to build interest in properties before they hit the public market. *See* B. Chang Decl. Ex. B (market report describing host of procompetitive benefits of private and pre-marketing strategies). Though Zillow dislikes this marketing approach because it does not fit Zillow's own business model (which depends on having the broadest number of listings possible on its website), it acknowledges that "[p]rivate listing strategies are only becoming more prevalent" (Compl. ¶ 56), an indication of their growing popularity with sellers.

Displeased with these innovative strategies that benefit sellers but delay Zillow's access to those listings, Zillow embarked on a campaign to foreclose that strategy to sellers. Zillow is well aware of the power it wields as a "beloved home listing platform" (MTRO at 8), a euphemism for its dominance in the home search market. To be sure, homesellers may ultimately desire the ability to have their properties displayed to "Zillow's millions of users" (*id.*), but they do not always want to begin that way. Capitalizing on its dominance, Zillow embarked on a plan to punish sellers that first wish to pre-market their properties for the myriad reasons a seller may choose to do so. Zillow's ultimatum is this: immediately list your property in MLS as soon as you decide to sell so that it is immediately available to Zillow or Zillow will ban your listing from its website. As if that was not punishment enough, Zillow goes further by misrepresenting the for-sale status of those properties on its website. The property Zillow cites in its MTRO is a perfect example. *See id.* at 3. That property proceeded through Compass's 3-Phase Marketing Strategy before entering the MLS. Far from its professed transparency, Zillow implemented its self-vaunted Listing Access Standards

3

by falsely listing that property as "Off market" on its website. *See* B. Chang Decl. Ex. A. Zillow cannot possibly claim it is acting in sellers' best interests when it punishes them for their chosen marketing strategy nor in buyers' best interests when it falsely informs them that properties are not for sale.

## II.  ZILLOW MANUFACTURED ITS OWN ALLEGED HARM.

Zillow's claim of irreparable harm, if it exists at all, is completely of its own making. Zillow complains it has "been dispossessed of the critical real estate listings input on which its platform and business depend," causing "monumental" harm and an "immense . . . amount of lost business." MTRO at 2, 5. But no rational company would choose to lose an "immense" amount of business simply because it did not wish to list just *nine* current listings on its website, merely because it viewed them as "stale." *Id.* at 1; Compl. ¶ 76. That makes no business sense, unless it is a litigation strategy designed to manufacture "irreparable harm," as is the case here.

At the outset, pre-marketed properties are not "stale" at all. The number of days on the market does not start to run, nor is price history tracked, on a listing until the property is entered into the MLS system for broad distribution. So a property that is newly listed through MLS is "fresh" from the general public's perspective. Characterizing such listings as "stale" is mere pretext for refusing to display them on Zillow's website. But even if the listings could be characterized as stale, displaying those nine properties poses no harm to Zillow, particularly compared to the tens of thousands of properties that Zillow advertises. In other words, Zillow's desire to punish those nine homesellers for pre-marketing their properties apparently outweighed Zillow's need for "data feeds of over 30,000 residential real estate listings . . . ." MTRO at 1. That choice wholly contradicts Zillow's feigned complaints of harm.

4

### III.    ZILLOW'S REQUESTED INJUNCTIVE RELIEF IS IMPROPER.

The only request for injunctive relief directed specifically at the Compass defendants is to enjoin them "from taking any steps in furtherance of their group boycott . . . ." MTRO at 9. But that is improper for two primary reasons. First, there is no "group boycott" to enjoin. For its part, Compass's response to Zillow's anticompetitive Listing Access Standards, which target Compass's innovative marketing strategy that benefits its clients and their agents, is completely consistent with Compass's unilateral business interest. Compass's decision three months ago to stop directly supplying its listing feeds to Zillow (*see* Compl. ¶ 116), because Zillow was mischaracterizing the properties that proceeded through Compass's 3-Phase Marketing Strategy as "Off market," was completely within its rights. It is not surprising that a company would want to protect itself and its clients against a policy that unfairly punishes them for innovative marketing. It is not anticompetitive for Compass to complain about Zillow's conduct and hope that MRED enforces its neutral and evenly enforced rules to prevent Zillow from harming Compass and its clients. On the other hand, Zillow's requested injunctive relief seeks to permit Zillow to continue imposing its Listing Access Standards, to the detriment of home sellers and their agents, while handcuffing Compass's ability to protect its business interests. The Court should not entertain Zillow's attempt to obtain through judicial intervention what it cannot fairly obtain through its independent business dealings.

Relatedly, Zillow's idea of what constitutes an "act in furtherance" of some "group boycott" is wildly off the mark. It complains about normal business responses to competitive threats, characterizing them as something nefarious. For example, in its MTRO, Zillow cites recent social media postings by Compass CEO Robert Reffkin as "advertis[ing] the competitive advantage [Compass] unfairly secured through the conspiracy." MTRO at 5–6. Zillow goes on to speculate

that without an injunction, "Zillow will be irreparably harmed by Compass's active, ongoing exploitation of the conspiracy . . . ." *Id.* at 6. But Zillow itself has been equally pursuing a public relations campaign against the defendants. Apart from the First Amendment implications of what Zillow seemingly suggests (*see Zauderer v. Off. of Disciplinary Couns. of Supreme Ct. of Ohio*, 471 U.S. 626, 637 (1985) ("There is no longer any room to doubt that . . . 'commercial speech' is entitled to the protection of the First Amendment . . . .")), and the impermissibly vague nature of its requested relief (*see* Fed. R. Civ. P. 65(d)(1)(B) (requiring "every restraining order" to "state its terms specifically")), this is yet another example of Zillow asking this Court to hamstring Compass while leaving Zillow free to take any action it chooses.

Second, in most antitrust cases, the plaintiff asks the court to enjoin the activity that is the subject of the complaint. But that is the ultimate issue in the case and provides no basis for emergency relief. Otherwise, every antitrust case would start with a motion for temporary restraining order, which is not the case. Instead, courts proceed with antitrust cases in the normal course with a full and fair opportunity for the defendants to mount their defenses, including by challenging plaintiffs' pleadings. Here, Zillow manufactured urgency and harm of its own making to sidestep the normal process, avoiding meritorious challenges to its frivolous complaint.

**CONCLUSION**

Zillow's MTRO is facially flawed, factually unsupported, and should be denied outright.


Dated:   May 22, 2026                                   Respectfully submitted,

                                                        /s/ Nathan P. Eimer
                                                        Nathan P. Eimer
                                                        Vanessa G. Jacobsen
                                                        Brian Y. Chang
                                                        EIMER STAHL LLP
                                                        224 S. Michigan Ave., Suite 1100
                                                        Chicago, IL 60604

6

Telephone: (312) 660-7600
Fax: (312) 692-1718
neimer@eimerstahl.com
vjacobsen@eimerstahl.com
bchang@eimerstahl.com

*Counsel for Defendants*
*Compass, Inc. and Compass Illinois, Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that, on May 22, 2026, I electronically filed a copy of the foregoing through

the Court's CM/ECF system, which will send notifications of the filing to all counsel of record.


Dated:    May 22, 2026

*/s/ Nathan P. Eimer*
Nathan P. Eimer
Vanessa G. Jacobsen
Brian Y. Chang
EIMER STAHL LLP
224 S. Michigan Ave., Suite 1100
Chicago, IL 60604
Telephone: (312) 660-7600
Fax: (312) 692-1718
neimer@eimerstahl.com
vjacobsen@eimerstahl.com
bchang@eimerstahl.com

*Counsel for Defendants*
*Compass, Inc. and Compass Illinois, Inc.*