# Exhibit A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| ZILLOW GROUP, INC. and ZILLOW, INC., <br><br> Plaintiffs, <br><br> v. <br><br> MIDWEST REAL ESTATE DATA LLC, COMPASS, INC., and COMPASS ILLINOIS, INC., <br><br> Defendants. | Case No. 1:26-cv-05451 <br><br> Hon. John J. Tharp, Jr. |

**BRIEF OF *AMICUS CURIAE* COSTAR GROUP, INC.
IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

**TABLE OF CONTENTS**

**Page**

I.    INTEREST OF THE *AMICUS CURIAE*..............................................................1

II.   SUMMARY OF ARGUMENT ..........................................................................3

III.  ARGUMENT....................................................................................................4

      A.     Zillow Preview Mirrors the Defendants' Conduct of Which Zillow
             Complains. ............................................................................................4

             1.     Zillow Hypocritically Locks in Major Brokerages Through
                     Exclusive Vertical Deals..............................................................5

             2.     Zillow Enters into an Anticompetitive Horizontal Agreement....................8

             3.     Zillow Preview is Based on Anti-Consumer Commission Splits. ...............9

             4.     Zillow Preview Provides an Early Entry Point for Zillow's Broader
                     Anticompetitive and Anti-Consumer Conduct. .........................................10

      B.     Zillow Is Not Entitled to Equitable Relief. .............................................12

             1.     Zillow Will Not Be Irreparably Harmed if Its Motion Is Denied..............12

             2.     Denying Zillow's Request Supports the Public Interest and Does
                     Not Create Substantial Hardship for Zillow. ...........................................13

IV.  CONCLUSION.................................................................................................15

i

## I.   INTEREST OF THE *AMICUS CURIAE*[1]

CoStar Group, Inc. ("CoStar") is an industry leader in real estate listings, information, and analytics.  Founded in 1986, CoStar has worked for decades to offer the real estate industry premium information about, and images of, residential and commercial real estate.  CoStar's mission is to digitize "the world's real estate, empowering all people to discover properties, insights, and connections that improve their business and lives."[2]  CoStar also owns and operates national real estate listing websites for apartments (Apartments.com), commercial real estate (LoopNet.com), and single-family homes (Homes.com).  Homes.com, launched in 2024, is one of the fastest-growing real estate platforms in the United States, serving millions of consumers who rely on the platform to search for homes.  Homes.com uses a "Your Listing, Your Lead" approach that connects buyers directly with listing agents, whether or not that agent pays Homes.com anything.  CoStar competes with Zillow Group, Inc. and Zillow, Inc. (together, "Zillow") in the residential internet listing service ("ILS") market and competes for the same listing inventory, consumer traffic, and brokerage relationships, including the valuable pre-market listings at the center of Zillow's Complaint.  As such, CoStar possesses deep knowledge of the structure, competitive dynamics, and economics of the residential real estate marketplace.

CoStar submits this brief to provide the Court with commercial context and information about Zillow and the competitive landscape not reflected in the parties' submissions.  Zillow's Complaint and its Motion for Preliminary Injunction ("Motion") craft a narrative regarding purported anticompetitive conduct on the part of Defendants Midwest Real Estate Data

---

[1] No party's counsel authored this brief in whole or in part.  No party or party's counsel, and no person other than amicus, its members, or its counsel, contributed money that was intended to fund preparing or submitting this brief.

[2] CoStar Grp., Inc., *Mission and Values*, https://www.costargroup.com/mission-and-values (last visited May 28, 2026).

("MRED"), Compass, Inc. and Compass Illinois, Inc. (together, "Compass"), asking the Court to secure Zillow full access to multiple listing service ("MLS") listings while permitting Zillow to block what it describes as anti-consumer pre-market listings. That narrative, however, elides the fact that Zillow launched its own exclusive pre-market listings, via Zillow Preview "with initial partners . . . including large-scale brokerages and franchisors Keller Williams, REMAX, HomeServices of America, Side and United Real Estate. *These pre-market listings will be exclusively available on Zillow, Trulia and their own listing brokerage and agent sites*."[3] Zillow's exclusive deals are critical context for evaluating this case and Zillow's requested relief.

Zillow claims to dominate the residential real estate market. Zillow reports that "[a]gents who use at least one of [Zillow's] products touch an estimated 80% of residential real estate transactions"[4] and "[70%] of everyone who buys or sells a home in America uses Zillow during the process."[5] Zillow did not get to this position by chance, but rather through a pattern of exclusionary conduct designed to cement its dominance. Indeed, the Federal Trade Commission ("FTC") sued Zillow for attempting to monopolize the rental listing market by paying a rival to cease competing. Zillow also faces class action lawsuits related to its anticompetitive misconduct in the residential listing market. This includes lead diversion, whereby Zillow extracts the lion's

---

[3] *Zillow Launches Zillow Preview to Bring Pre-Market Home Listings into the Open*, Zillow Front Porch (Mar. 17, 2026), https://www.zillow.com/news/zillow-launches-zillow-preview-to-bring-pre-market-home-listings-into-the-open/ (emphasis added).

[4] *Zillow's Q4 Results Reinforce a Consistent Theme: Integration Improves Outcomes*, Zillow Front Porch (Feb. 10, 2026), https://www.zillow.com/news/zillow-q4-results-integration-improves-outcomes/.

[5] Zillow Grp., Inc., *First Quarter 2026 Shareholders Letter*, at 2 (May 6, 2026), https://s24.q4cdn.com/723050407/files/doc_earnings/2026/q1/presentation/Zillow-1Q26-Shareholders-Letter.pdf.

share of buyer-broker commissions in return for diverting consumers to such brokers; and mortgage steering, whereby Zillow pushes consumers to Zillow's far more expensive home loans.[6]

Now Zillow has expanded its anticompetitive conduct to pre-MLS listings through "Zillow Preview," which it created through exclusive vertical agreements with brokerages that guarantee *only* Zillow can access these highly valuable new listings, as well as an exclusive horizontal agreement that guarantees another large competitor in the space, Realtor.com, will not compete for these listings. This point bears repeating: Zillow has exclusive agreements with over sixty of the largest brokerages in the U.S. to display their pre-MLS listings. And only Zillow gets to choose which competitors can access these listings, and at what cost.

A decision granting the Motion risks endorsing Zillow's proposed anti-competitive, asymmetric "heads I win, tails you lose" framework. Zillow has grown so large that it believes that only a listing on Zillow's network is public and pro-consumer. And by that logic, Zillow need not share it further. By contrast, a listing not available to Zillow's network is, by definition, hidden and anti-consumer.[7] Zillow needs a reality check. In the interests of competition and consumers, the Motion should be denied.

## II. <u>SUMMARY OF ARGUMENT</u>

Zillow's Motion paints Zillow as a fledgling, pro-transparency actor victimized by the powerful Defendants because Zillow courageously spoke out against them. That narrative could

---

[6] Ex. 16, Elizabeth Harris, The New York Times, *Real Estate Giants Compass and Zillow Fight Over the Future of the Market* (June 6, 2026) (Zillow's "scale means it can dictate practices that agents say are bad for their businesses and confusing for consumers."), https://www.nytimes.com/2026/06/06/realestate/zillow-compass-real-estate-consolidation.html.

[7] Ex. 15, Greg Hague, *What Zillow's Economist Doesn't Want You To Know* (June 5, 2026), https://www.inman.com/2026/06/05/what-zillows-economist-doesnt-want-you-to-know/ (observing that "[t]he moment we accept that off-Zillow means hidden, we have handed a third-party vendor the power to dictate how every home in America gets marketed and how every homebuyer in America gets monetized").

not be further from the truth. Zillow's Motion is just another tool for Zillow to kneecap competition in an apparent effort to replace the current MLS regime.[8]

Zillow's own efforts to gatekeep pre-market listings belies its proclaimed commitment to transparency and competition. When Zillow launched its pre-MLS listing product, "Zillow Preview," it signed over sixty leading brokerages[9] to exclusive deals under which they provide their newest, most valuable pre-market listings only to Zillow for an indefinite period before offering them on an MLS. That exclusive marketplace for pre-market listings mirrors the exact conduct of which Zillow complains in this case, just on a larger scale. Moreover, Zillow Preview represents Zillow's latest effort to draw consumers into its integrated ecosystem, where Zillow seeks to monetize those consumers by steering them toward various Zillow products and services, regardless of whether those products or services are best for the consumer.

Accordingly, and as discussed further below, Zillow's own conduct undermines every element of its claim for preliminary injunctive relief. The Court should deny Zillow's Motion.

## III.   ARGUMENT

### A.   Zillow Preview Mirrors the Defendants' Conduct of Which Zillow Complains.

Zillow proclaims a commitment to listings transparency, broad consumer access, and fair competition. It also publicly condemns listing exclusivity, where "private listing networks" ("PLNs") keep listings off the market, "limiting visibility, reducing competition, and distorting prices."[10] Indeed, Zillow has preached its "pro-transparency" and "pro-competitive" goals to this

---

[8] *See* Ex. 1, Rob Hahn, *Parsing Zillow's Complaint in Zillow v. MRED* (May 13, 2026), https://www.notoriousrob.com/parsing-zillows-complaint-in-zillow-v-mred/?ref=notorious-rob-newsletter.

[9] Q1 2026 Letter, *supra* note 5 at 5.

[10] *Listing Transparency in Real Estate*, Zillow Front Porch, https://www.zillow.com/news/advocacy/transparency/ (last visited May 27, 2026).

Court.[11]  But these statements are nothing more than lip service to principles Zillow disregards.

### 1. Zillow Hypocritically Locks in Major Brokerages Through Exclusive Vertical Deals.

Under the guise of acting as guardian of the American residential real estate marketplace,[12] Zillow has repeatedly and publicly condemned competitors' practices that restrict access to listings.[13]  But at the same time, Zillow has been laser-focused on capturing for itself exclusive access to "new-to-market listings" that Zillow believes "are among the most valuable listings." Compl. ¶ 7.  Just six weeks after bashing pre-market listings as lacking transparency and defeating Compass's motion for preliminary injunction, on March 17, 2026, Zillow launched its own pre-market listing product.  Zillow trumpeted the very thing it had said was anathema when offered by a rival.[14]  Zillow tries to spin this reality by saying that, through Zillow Preview, brokers are sharing the listing "publicly," as if Zillow were a neutral forum making its listings available, no strings attached, to all-comers.[15]  That's flatly misleading.  On Zillow Preview, participating brokerages submit listings *directly to Zillow* and the listings appear *exclusively* on Zillow's own platform, its sister-site subsidiary, and (now) Realtor.com during the "Preview" period.[16]  Zillow

---

[11] *See* Hr'g Tr. at 25:7–16, May 22, 2026; Dkt. 1 ("Complaint" or "Compl.") ¶¶ 2-4; Dkt. 21 at 1.

[12] *See* Ex. 2, Hal Singer, *Zillow's Latest Scheme Warrants Antitrust Scrutiny*, Nat'l L. J. (Apr. 9, 2026), https://natlawreview.com/article/zillows-latest-scheme-warrants-antitrust-scrutiny.

[13] Without irony, Zillow's Chief Economist averred that "[p]rivate listings . . . strip away the two things that protect buyers and sellers: open competition and price transparency."  *See* Mischa Fisher, *Compass Just Told You Who Benefits from Private Listings (Hint: It's Not the Seller)* (May 27, 2026), https://www.inman.com/2026/05/27/zillow-opinion-compass-private-listings-debate/.

[14] Indeed, Zillow's own Complaint explicitly places Zillow Preview in the same market as Compass's pre-MLS products, acknowledging that "Compass Private Exclusives, Compass Coming Soons, and Zillow Preview listings" are all part of the "market for Residential Real Estate Listing Creation and Distribution."  Compl. ¶ 141.

[15] *Updating Zillow's Listing Access Standards for Today's Market,* Zillow Front Porch (Mar. 17, 2026), https://www.zillow.com/news/updating-zillows-listing-access-standards-for-todays-market/.

[16] *Zillow Preview: Give Pre-Market Listings the Reach They Deserve*, Zillow, https://www.zillow.com/agents/preview/ (last visited May 27, 2026); *Zillow and Realtor.Com*®

thus excludes all competing platforms from accessing any listing on Zillow Preview. Furthermore, because the Preview period has "no fixed default duration," listings can be withheld from competing platforms indefinitely.[17] From a platform competition standpoint, both Zillow Preview and Compass's pre-MLS listings involve the same core dynamic: each company keeps its pre-market inventory exclusive to its own platforms and unavailable to rivals.

Zillow's supposed commitment to openness is also misleading in a second sense, in that as well as locking out competitors it is seeking to lock in consumers. Zillow's own Complaint describes Compass's Phase 2 "Coming Soon" listings as marketed "to consumers via Compass's own platform and through partners' websites." Compl. ¶ 54(b). In other words, Phase 2 listings are publicly viewable on Compass's website and partner sites—just as Zillow Preview listings are publicly viewable on Zillow's website and partner sites. The principal distinction lies in Phase 1, where Compass markets listings only within its network to those who work with Compass Agents. But this distinction is not material, as Zillow would have this Court believe. Zillow Preview listings are available only to those who visit Zillow or its partners—which is not a neutral public venue, but rather the top of the funnel into the Zillow ecosystem. As detailed below, consumers who engage with Zillow Preview are drawn into that ecosystem, where they are subject to lead diversion, mortgage steering, and other practices that benefit Zillow at consumers' expense. Thus, Zillow Preview is not neutral public access; it is access conditioned on exposure to Zillow's integrated monetization apparatus.

---

*Set a New Standard for Pre-Market Transparency, Extending Preview℠ Listings to Buyers Across Both Platforms*, Zillow Front Porch (May 5, 2026), https://www.zillow.com/news/zillow-realtor-com-preview-listings-pre-market-transparency/.

[17] *See Zillow Preview*, *supra* note 16 (*see* Frequently Asked Questions, "How Long Can a Listing be in the 'Preview' Period?").

Unconstrained by consistency, in this litigation Zillow audaciously (and hypocritically) complains about brokerages (1) "walling off the listings in their large networks from outside competitors or preventing competitors from publicly displaying those listings," and (2) "using their large networks to lure buyers and sellers, capturing so-called network effects." Dkt. 23 ("Samuelson Decl.") ¶ 36. But the practices that Zillow vociferously condemns describe precisely *Zillow's* own behavior and objectives with respect to Zillow Preview: Zillow walls off its pre-market listings from competitors like Homes.com through exclusive deals; and seeks to use its large network, which now includes listings not available to rival platforms, to lure customers.

Indeed, Zillow elsewhere underscores how exclusive pre-market listings adversely affect competition and consumers. Zillow has submitted sworn declarations explaining that "[h]idden listings harm Zillow because the newest for-sale listings are the most valuable to Zillow's audience and the most likely to generate leads." *Id.* ¶ 30. Homes.com could of course say the exact same about the new exclusive listings that Zillow hoards, to the detriment of its rivals and their audience. Zillow has also asserted that "the loss of a significant portion of Zillow's listings . . . will lead consumers to think less of Zillow's quality as its products become degraded." *Id.* ¶ 87. While Zillow there was talking about MLS listings, the same logic applies to what Zillow calls "the most valuable" (pre-MLS) listings. By locking up these listings through exclusive brokerage agreements, Zillow ensures that competitors have fewer listings and shields itself from competition. And by requiring consumers to visit Zillow's and its partners' platforms to view these listings—rather than making them available across all platforms, or through a neutral, open channel—Zillow funnels consumers into its ecosystem, where it can monetize them through lead diversion and mortgage steering. Transparency, to Zillow, does not mean available in the public square; it means available only to those willing to enter Zillow's marketplace.

Zillow thus wants to have it both ways. On one hand, Zillow wants immediate access to brokerages' MLS listings so it can profit from those listings as a brokerage competitor and an MLS replacement.[18] On the other, Zillow wants to hoard pre-market listings and market them exclusively through Zillow's own channels, to the detriment of competition and consumers. Perhaps unsurprisingly given its track record, Zillow sees no irony in taking these inherently contradictory positions, so long as they position Zillow to hobble any competitive threat.

### 2. Zillow Enters into an Anticompetitive Horizontal Agreement.

Zillow's hypocrisy is not limited to exclusive vertical arrangements. In addition, on undisclosed terms Zillow has reached a "horizontal" agreement with Realtor.com, which will exclusively syndicate Zillow Preview pre-market listings.[19] According to Zillow, these two marketplaces together reach three quarters of major portal visitors.[20] The exclusive vertical agreements for pre-market listings thus allow Zillow to lock up high-value "coming soon" listings provided by brokerages, while its exclusive horizontal partnership with Realtor.com allows Zillow to capture a dominant marketplace share through elimination of a major competitor and exclusion of all others.[21] Zillow's complaint of a "conspiracy" between Compass and MRED cannot be squared with Zillow's own horizontal conduct.

---

[18] *See* Compl. ¶ 83 ("Zillow competes in Residential Real Estate Listing Creation and Distribution with Compass, MRED, and others."); *id.* ¶ 149 ("Zillow is a competitor in the Brokerage Services market."); *see also* Dkt. 26 ("Wu Decl.") ¶¶ 19, 23, 129, 133.

[19] *Zillow and Realtor.Com® Set a New Standard for Pre-Market Transparency, supra* note 16.

[20] *Id.*

[21] Zillow has previously tried to use exclusive horizontal agreements to capture market share and harm competition. The FTC and five states recently sued Zillow for an anticompetitive deal with Redfin in the rental listing market, which involved a $100M+ payment to Redfin in exchange for Redfin shuttering its rental listing business. *See* Ex. 3, *FTC Sues Zillow and Redfin Over Illegal Agreement to Suppress Rental Advertising Competition*, Fed. Trade Comm'n (Sept. 30, 2025), https://www.ftc.gov/news-events/news/press-releases/2025/09/ftc-sues-zillow-redfin-over-illegal-agreement-suppress-rental-advertising-competition. Here Zillow is similarly incentivizing a rival, in the residential listing space, to cease competing and exclusively display Zillow's listings.

### 3. Zillow Preview is Based on Anti-Consumer Commission Splits.

Zillow Preview is not only an anticompetitive product, but also an anti-consumer one. Zillow uses sellers' listings as bait to divert consumer leads toward Zillow's affiliated buy-side brokers, so that Zillow can obtain a cut of the buy-side commission. Zillow's primary revenue source is based on taking up to 40% of buy-side commissions resulting from such lead diversion. On Zillow Preview, this means that when users click on "Request a Tour," they are connected to random Zillow-affiliated buyer-brokers rather than the listing agents. And Zillow pays kickbacks from the resulting buy-side commissions to induce listing agents to place their listings on Zillow Preview.[22] These kickbacks extend to commissions from other, unrelated sales resulting from the initial lead diversion—transactions that do not benefit the seller whose listing was used as bait. Ultimately, the seller's house may languish on the market while Zillow profits from the consumer traffic that listing generates. Worse, this commission-sharing effectively recreates the anti-competitive economic structure that resulted in the National Association of Realtors agreeing to a $1.8 billion settlement by re-coupling buy-side and sell-side commissions, and fixing those commissions at a rate set unilaterally by a dominant intermediary.[23]

---

[22] *See FirstTeam®, One of the Nation's Largest Independent Brokerages, Brings Pre-Market Listings into the Open with Zillow Preview*, Zillow Front Porch (Apr. 21, 2026), https://www.zillow.com/news/firstteam-zillow-preview-pre-market-listings/ ("[W]hen a buyer who first connects through a Zillow Preview listing ultimately completes a transaction with a Zillow Preferred agent, the listing agent has the opportunity to earn a payment from Zillow equal to 10% of the buyer agent's commission.").

[23] Ex. 2, Singer, *supra* note 12.

### 4. Zillow Preview Provides an Early Entry Point for Zillow's Broader Anticompetitive and Anti-Consumer Conduct.

Offering exclusive pre-market listings via Zillow Preview marks Zillow's latest effort to funnel buyers and sellers into its integrated homebuying ecosystem, wherein it can deceptively extract profits from those consumers and engage in anticompetitive conduct in a variety of ways.

**Lead Diversion.** Zillow dupes consumers by presenting a "Contact Agent" and "Request a Tour" button beside property listings. As described above, Zillow uses these initial points of contact to divert consumer inquiries away from listing agents and toward undisclosed buyer-agents in return for a kickback of up to 40% of that agent's commission.[24] And the vast majority of consumers do not understand this deception, evidenced by a recent study that found 99.7% of respondents incorrectly identified whom they were contacting on the Zillow platform.[25]

This deception benefits Zillow at the expense of consumers *and* buyer-brokers, while driving up home prices. Consumers seeking to connect with listing agents are instead directed toward buyer-brokers who will seek, traditionally, an incremental 3% commission (paid by the buyer out of pocket or indirectly through an increased house price if the seller pays that fee). Buyer-brokers, forced to deal with the dominant platform, do so at the price of up to 40% of their commission. Take away the standard 33% paid to their brokerage firm, and they are left with only 27%. Thus buyer-brokers are gouged by Zillow, eliminating their incentive to negotiate down

---

[24] Ex. 4, Shawn Garrett, *Zillow Faces Class-Action Suit Over Hidden 40% Agent Fees*, KIRO 7 News, (Sept. 20, 2025), https://www.kiro7.com/news/local/zillow-faces-class-action-suit-over-hidden-40-agent-fees/7OJ7RGPHPRADRMOHFGXD5TTSME/; Ex. 5, Preston Mizell, *Penn Professor Says Zillow 'Systematically Deceives Consumers' About Agent Connections*, FOX Business (Mar. 19, 2026), https://www.foxbusiness.com/real-estate/penn-professor-says-zillow-systematically-deceives-consumers-about-agent-connections; Ex. 6, Jared Whitley, *Homes.com, Zillow and the Affordability Stakes of Who Controls the Listing Marketplace*, Housingwire (Mar. 9, 2026), https://www.housingwire.com/articles/homes-com-zillow-affordability-competition/.

[25] Ex. 7, Yoram (Jerry) Wind, *Does Zillow Deceive Homebuyers? Evidence from a Controlled Experiment* (Jan. 27, 2026), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=6140990.

their commission, leaving consumers worse off. Unsurprisingly, Zillow has been sued multiple times for this practice.[26]

However, Zillow remains undeterred. Zillow Preview continues the practice of diverting leads from its "Request a Tour" button to Zillow's fee-paying agent network, rather than to the listing agent who could at some point offer such a tour.[27] Again, Zillow benefits: it earns fees from buyer-agent commissions originating from these connections with confused buyers.

**Mortgage Steering.** Zillow Preview also gives Zillow an earlier opportunity to lock homebuyers—forced to engage with Zillow to access exclusive new listings—into the Zillow ecosystem where they can be steered to more expensive mortgages. As detailed in multiple class actions, Zillow forces buyer-brokers—on pain of losing those "Contact Agent" referrals—to steer their clients to Zillow Home Loans.[28] Those loans are significantly more expensive than the market.[29] They are getting even more expensive each year as Zillow gains market share.[30] And

---

[26] *See, e.g.*, Ex. 8, Complaint, *Taylor v. Zillow, Inc.*, No. 2:25-cv-01818 (W.D. Wash. Sept. 19, 2025) (D.E. 1); Ex. 14, Mike Scarcella, *New Lawsuit Accuses Zillow of Deceiving Home Buyers*, Reuters (Sept. 22, 2025), https://www.reuters.com/legal/government/new-lawsuit-accuses-zillow-deceiving-home-buyers-2025-09-22/.

[27] *See Zillow Preview*, *supra* note 16 ("Choosing 'Request a Tour' routes the inquiry through Zillow's buyer agent network to schedule a tour once the listing is active.").

[28] *See* Ex. 2, Singer, *supra* note 12; Ex. 9, Alexis Weisend, *Zillow Accused of Referral Monopoly, Steering Homebuyers to its Lenders*, Seattle Times (Jan. 21, 2026), https://www.seattletimes.com/business/real-estate/zillow-accused-of-referral-monopoly-steering-homebuyers-to-its-lenders/; Ex. 10, *Trump Thumps Davos' 'You'll Own Nothing' Plan. And Here's Another Target for His Sights*, Nat'l Pulse (Jan. 22, 2026), https://thenationalpulse.com/analysis-post/trump-thumps-davos-youll-own-nothing-plan-and-heres-another-target-for-his-sights/.

[29] *See* Ex. 11, Steven C. Salop, *Empirical Analysis of Zillow Home Loans Pricing* (Draft, Dec. 21, 2025), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=5951355; Ex. 12, Lew Sichelman, *Study: Zillow Loans Found To Be More Expensive*, Nat'l Mort. Pro. (Dec. 29, 2025), https://nationalmortgageprofessional.com/news/study-zillow-loans-found-be-more-expensive.

[30] *Id.*

vulnerable groups, including veterans, low income households, and racial minorities, pay even more.[31] Zillow Preview broadens the funnel of consumers who can be steered to these mortgages.

## B. Zillow Is Not Entitled to Equitable Relief.

Zillow plainly fails to satisfy any element of a claim for a preliminary injunction. First, Zillow cannot show irreparable harm because its harm is self-inflicted and thus remediable by Zillow. The balancing of the harms also does not weigh in Zillow's favor because it is engaged in the same type of platform-exclusive conduct it seeks to enjoin: keeping pre-market listings off rival platforms and conditioning consumer access on entry into Zillow's ecosystem. Because Zillow is "trying to invoke equity, it should come to Court with clean hands." *Bidi Vapor, LLC v. Vaperz LLC*, 543 F. Supp. 3d 619, 635 (N.D. Ill. 2021). Zillow's "failure to do so is yet another equitable factor weighing against [its] proposed injunction." *Id.*; *Boczar v. Kingen*, No. IP 99-0141-C-T/G, 1999 WL 33109074, at *12 (S.D. Ind. July 2, 1999). Finally, the public interest is not served by allowing Zillow to establish market dominance with Zillow Preview.

### 1. Zillow Will Not Be Irreparably Harmed if Its Motion Is Denied.

Zillow cannot meet the standard for irreparable harm because any purported harm flowing to Zillow is both self-inflicted and easily remedied by Zillow. The core of Zillow's irreparable harm argument stems from the prospect of losing MRED's listings, causing Zillow's "platform [to] be less valuable." Mot. at 5–6, 14. That outcome lies entirely within Zillow's control. As the Complaint and Motion recognize, Zillow faces no threat of losing MRED's listings so long as it does not ban Defendants' pre-MLS listings. *See, e.g.*, Compl. ¶¶ 130, 132, 140. If Zillow upholds the principle of transparency it espouses and does not ban certain listings, then it will retain MRED's listings and suffer *no harm at all*. As courts in this Circuit recognize, "self-inflicted

---

[31] *Id.*

12

wounds are not irreparable injury." *Second City Music, Inc. v. City of Chicago*, 333 F.3d 846, 850 (7th Cir. 2003); *accord AbbVie Inc. v. Payer Matrix, LLC*, No. 23 CV 2836, 2025 WL 1101610, at *8 (N.D. Ill. Apr. 14, 2025). What *would* constitute irreparable harm is if Zillow Preview were allowed to expand without competition.

### 2. Denying Zillow's Request Supports the Public Interest and Does Not Create Substantial Hardship for Zillow.

The balancing of hardships and the public interest further weigh in favor of denying Zillow's Motion. Granting Zillow's requested relief would allow Zillow to advance its anti-competitive product to the detriment of the public interest. Moreover, Zillow will not suffer substantial hardship if the Court leaves competitive forces in the MLS market in place.

Zillow asks that the Court reduce (self-inflicted) harm to Zillow while it inflicts the same (or worse) harm on competition and consumers. Zillow is trying to gatekeep pre-MLS listings through exclusive vertical and horizontal agreements, while seeking the right to ban rival pre-MLS listings and maintain broad MLS access. On the equities, Zillow cannot engage in behavior it deems irreparably harmful when undertaken by others. *See Boczar*, 1999 WL 33109074, at *12.

Further, allowing Zillow to preserve its access to MLS listing feeds and ban rival pre-market listings—while foreclosing competing platforms from accessing Zillow's highly valuable pre-market listings—would create a profoundly asymmetric competitive landscape, contrary to the public interest. Zillow's counsel argued to this Court the critical value of new, pre-MLS listings:

> [T]he most important piece of this is how valuable new-to-market listings are. . . . [W]hen we last bought our home, it was an incredibly hot market. Listings were disappearing in hours[.] So in that moment, you really appreciate why the new-to-market listing is the most important because if I didn't know about it within an hour, . . . that listing was gone[.]
>
> And so the other harm that arises from these private listing networks is they withhold the most valuable, critical new-to-market listings until they're stale, until they failed to sell[.]

13

Hr'g Tr. at 22:18–23:6, May 22, 2026.

Zillow then warned the Court about the harm caused when there is information asymmetry and fragmentation as a result of platforms being barred from publishing pre-market listings:

> [Zillow is] thinking about the overall health of the real estate market not just in Chicagoland but all over the country and what we see is private listings are withheld from the market; right[?] . . . And what that does, your Honor, is it creates fragmentation, information asymmetries, and it locks up all of this listing information such that the general public and all of the other brokerages, all of the other platforms like Redfin and Realtor, they don't have any access to it.

*Id.* at 17:10–13; 17:21–18:1. But *Zillow Preview* creates asymmetries and market fragmentation. Its listings, the most "valuable" and "critical," are not displayed on (or available to) leading rivals like Homes.com—just Zillow and its chosen exclusive horizontal partner. And Zillow has rapidly locked up a huge share of supply by signing exclusive agreements with sixty leading brokerages.[32] Moreover, the harm to the public is exacerbated when Zillow is the market fragmenter, because once it draws consumers into its ecosystem, Zillow engages in a suite of anti-consumer and anti-competitive wrongdoing, from lead diversion to mortgage steering.

Zillow's Motion is part of its scheme to expand its ecosystem and replace the non-profit MLS system.[33] It seeks to fragment the market in its favor, locking out rivals like Homes.com, while barring others' pre-market listings and maintaining broad access to MLS feeds, until it no longer needs them. It is telling that Zillow now positions itself as a competitor to the MLS system.[34] Indeed, this suit has been characterized by a leading residential real estate commentator

---

[32] *See* Ex. 13, Brooklee Han, *Zillow Preview Expands as More Brokerages Seek Pre-Market Exposure*, Housingwire (Apr. 10, 2026), https://www.housingwire.com/articles/zillow-preview-adds-28-firms/.

[33] *See* Ex. 1, Hahn, *supra* note 8.

[34] *See* Compl. ¶ 83 ("Zillow competes in Residential Real Estate Listing Creation and Distribution with Compass, MRED, and others."); *id.* ¶ 149; *see also* Dkt. 26 ("Wu Decl.") ¶¶ 19, 23, 129, 133.

14

as sending a message to all MLSs nationwide not to interfere with Zillow's advance into the MLS space.[35] Once Zillow has finished locking out rival platforms, and expanded its vertical brokerage deals, it will no longer need the MLSs and can take them head on. In the interim, it seeks the help of this Court to bring a major MLS (and brokerage) to heel, sending a message to the broader marketplace to get out of Zillow's way. This Court should not oblige.

## IV.     **CONCLUSION**

For these reasons, CoStar respectfully requests that the Court deny Zillow's Motion.

Dated: June 10, 2026                                    Respectfully submitted,

 /s/ *Nicholas J. Boyle*
Nicholas J. Boyle (*pro hac vice* pending)
LATHAM & WATKINS LLP
555 Eleventh Street, NW
Suite 1000
Washington, D.C. 20004
Tel: 202.637.2200
Fax: 202.637.2201
Nicholas.boyle@lw.com

*Attorney for CoStar Group, Inc*

---

[35] *See* Ex. 1, Hahn, *supra* note 8.

15

# Exhibit 1



**MLS & ASSOCIATIONS**

# Parsing Zillow's Complaint in Zillow v. MRED

The battle between Zillow and MRED was inevitable. Well, here we go.

 By Rob Hahn • 13 May 2026



In November of last year, I wrote that the battle between Zillow and MRED must be fought. It's taken a few months, but that battle is now fully joined:

> Zillow filed a federal antitrust lawsuit on May 12 against Midwest Real Estate Data (MRED), a multiple listing service serving the greater Chicago area and parts of three neighboring states, and Compass, the country's largest real estate brokerage.

> MRED and Compass are colluding to hide home listings from buyers — and conspired to punish Zillow for not going along with it.

A lawsuit is but one front in the wider war. I suspect that the bigger battle is happening outside of the courts, but it was widely expected among those in the know that a lawsuit was more likely than not. So here it is.

**Zillow v. MRED Complaint**
Zillow v. MRED Complaint.pdf • 1 MB



The first step in covering a significant lawsuit is reading the actual complaint. It is not enough to read just news coverage. Once we understand what the actual claims are, and how the lawyers have crafted the narrative to support those claims, we might analyze what the key issues may be in the legal fight ahead. Let's go ahead and do that now. As always, I am not your lawyer, none of this is legal advice, and you should consult your own counsel for actual legal advice.

# The Zillow Complaint

It was good of Zillow to include the full filing on its website announcing the news of the lawsuit, so I didn't have to go hunt it down. You can find it in the link above, but I'll embed it here as well for your convenience.

This is a lawsuit alleging violation of the Sherman Antitrust Act. The first claim alleges an illegal horizontal group boycott between MRED and Compass, and the second alleges a Section 2 violation by MRED in unlawfully maintaining its monopoly in Chicagoland "Residential Real Estate Listing Creation and Distribution."

To support those claims, Zillow lays out a fairly comprehensive narrative. It is, of course, entirely biased since lawyers have the job of advocacy, not accuracy. So let's take a look at the narrative.

# The Narrative

Zillow says it "has long sought to democratize real estate information and "turn on the lights" for home sellers and buyers by making it easy to find, buy, rent, or sell a home."

Even more importantly, to have an efficient and competitive marketplace, you need to have free flow of information. And the most important piece of information for "all market participants" is the listing.

So, to democratize real estate and to establish an efficient and competitive marketplace, Zillow needs "free free flow of information about homes for sale." Unfortunately, bad people in Chicago have conspired to deprive Zillow of access to that free flow of information, because Zillow is pro-transparency while MRED and Compass are about hiding listings.

Compass decided to go against transparency and pursue its 3PM program, which hides listings, out of purely selfish reasons.

So, Zillow promulgated ZLAS in April of 2025, which was just Zillow as a company unilaterally deciding not to show listings that were "previously marketed privately." Now, ZLAS is not just a policy, "it is a **key business tactic by which Zillow competes against MRED's** and Compass's PLNs and to obtain and display new-to-market listings, which are among the most valuable listings." [Emphasis added]

Compass sued Zillow, but lost. They had a backup plan, however, which was to conspire with MRED to "use MRED's monopoly power in Chicagoland Residential Real Estate Listing Creation and Distribution to protect their competing PLNs from competition and compel Zillow and other recipients of MRED's listing feed to display Defendants' stale PLN listings."

Not only that, MRED and Compass went national, which lets MRED use its monopoly power in Chicagoland to force "competitors like Zillow" (their own words) to stop ZLAS nationally.

MRED threatens Zillow with termination of its access to Chicagoland listings, which harms consumers and competition. That's because "consumers who previously relied on Zillow's transparent platform and innovative technology to find local homes for sale would be blocked from using their preferred platform."

Wait, there's more! MRED has also illegally interfered with Zillow's ability to compete against MRED:

> By taking actions to block Zillow's ability to combat MRED's monopoly platform, Defendants have also harmed competition in the Listing Creation and Distribution market. **Zillow offers a platform for brokers and agents to create and publish listings in the Chicagoland area.** Zillow has also begun sourcing listings directly from MRED's broker participants through direct broker feeds, an effort that would allow Zillow to offer an alternative method by which brokers and agents could distribute their listings to all market participants. **By foreclosing Zillow from competing effectively as an alternative listings platform, MRED maintains its monopoly and deprives brokers and agents of an innovative alternative, resulting in harm to competition and consumers.** [Emphasis added]

So all of this is illegal and anticompetitive:

> MRED and Compass—direct competitors in the Chicagoland Residential Real Estate Listing Creation and Distribution market—cannot unlawfully conspire to boycott a competitor's access to Chicagoland listings. And **MRED cannot abuse its monopoly power over those listings as a cudgel to prevent a competitor from effectively competing** in Chicagoland or beyond. Defendants' violations of the Sherman Act must be enjoined. [Emphasis added]

I know there are some details worth exploring further, but that's the basic narrative which leads to and supports the two legal claims.

# Things That Make You Go Hmm

There were a number of claims here that made me and should make you go "Hmmm...."

First, it is now beyond debate that Zillow is a *competitor* to both MRED and Compass. The first time I read it, I thought it a drafting error. Nope, Zillow's core legal claim is that it is a competitor to Compass in providing brokerage services, and is a competitor to MRED in providing "Listing Creation and Distribution." Once again, note the quote above where Zillow straight up says they offer a platform for brokers and agents to create and publish listings.

Second, Compass and MRED conspired to block Zillow's access to information. Except that Zillow still has, as of this writing, full access to information. So that's a failed conspiracy. Except that no, the conspiracy is to threaten to block Zillow's access to information unless Zillow drops its competitive differentiator, which is to say, ZLAS.

ZLAS is not Zillow threatening Compass agents with bans unless they comply with Zillow's rules; it is a competitive differentiator. But MRED threatening Zillow with bans unless Zillow complies with MRED's rules is not a competitive differentiator, but an illegal monopoly.

Okay.

Third, (and this comes from the section on Zillow Preview, not from the core narrative) **Zillow offers brokerage services**. Huh? For two decades, Zillow has sworn up and down that it is not a brokerage competing with all those who send

it listing data. It still doesn't have agents driving people around, but Zillow advances a novel theory:

> Zillow does not operate as a traditional brokerage, nor does it typically represent consumers in real estate transactions. However, **by virtue of the fees Zillow receives from its agent partners who use Zillow's advertising services**, Zillow participates in the brokerage services market. Zillow also now participates in the brokerage services market by partnering with other brokerages to market properties through Zillow Preview. [Emphasis added]

So if you charge a fee to advertise an agent's actual brokerage services, then you are offering brokerage services. Under this theory, I suppose Facebook and the local radio station and the billboard company also offer brokerage services.

I suppose once Google and OpenAI get brokerage licenses, they too can force their way into any MLS claiming they too offer brokerage services. Interesting outcome, that.

# The Problem of Zillow Preview

Of course Zillow knows that its own new listing-hiding program Zillow Preview will be a problem at trial. So it tries to anticipate.

> This is especially true given the recent release of Zillow Preview in April 2026. Zillow Preview enables agents at participating brokerages to market "Coming Soon" listings widely and publicly on Zillow's platforms and partner websites. **These properties are not yet available to tour or listed on the relevant MLS but will soon be**.

> Zillow Preview publicly surfaces information about "Coming Soon" listings that consumers previously could not access in many markets because the listing brokerages and agents were restricting access only to their clients or

> select groups of buyers. Instead of limiting access to closed PLNs, Zillow Preview provides **broad**, **public access** to "Coming Soon" listings. This gives buyers access to more homes sooner and delivers early and broad exposure to sellers' properties. It also ensures all buyers and agents can access and **show** Zillow Preview homes to clients. [Emphasis added]

I find it interesting that in back to back paragraphs, Zillow says properties are not yet available to tour, but Zillow Preview ensures that agents can show those homes to clients. How exactly does that work?

But whatever. The idea that Zillow provides "broad, public access" is interesting. I thought Zillow Preview was only available on Zillow and Realtor.com websites. If Preview is broad, public access instead, then maybe Compass could test out that claim by asking Zillow for a feed of the Zillow Preview listings.

We know that won't happen. Given that fact, if exposure only on one or two private corporate websites means "broad public access" then I struggle to understand how that doesn't also apply to every "hidden listing" that Zillow bitches about. Those are also available on one or two private corporate websites.

# The Lynchpin

Let me cut through and highlight what the central issue of the case will be. (Obviously, in my opinion.) When you set aside all of the rhetoric, I think the case turns on how the court interprets what happened here.

Zillow says:

> MRED's existing objective criteria rule for its IDX and VOW listing data feeds at the time of Mr. Reffkin's October message did not prohibit Zillow from enforcing the Standards.

> Indeed, the rules expressly permitted Zillow and other feed recipients to filter listings based on "objective criteria, including but not limited to factors such as … type of listing." Historically, MRED had allowed feed recipients to filter listings, such as displaying only lakefront houses.

Then, in October of 2025, MRED changed the rules. The new rules are actually on [MLS Grid](#):

> Later the same day, MRED sent Zillow new rules (the "Revised Rules") that purported to block Zillow from implementing the Standards in Chicagoland by inserting an MRED-specific provision into the objective criteria rule: "Exclusion criteria may not include, directly or indirectly, the identity of any Participant, brokerage firm, subscriber, licensee, or representative."

How the court sees this is so important because MRED has been operating its PLN for over ten years now. MRED's PLN predates CCP, and certainly predates ZLAS. Zillow joined MRED as a brokerage participant fully aware of this special feature. It didn't care back in 2020 because it wasn't a big deal, and Zillow was focused on lobbying NAR to get and keep CCP going.

It became a big deal post-ZLAS.

Now, from MRED's perspective, I assume they will argue that the "insertion" is merely a clarification. That is, MRED's previous rule was trying to cover normal brokerage use cases, like "I only want to show lakefront condos on my LakefrontCondosChicago.com" or some such. MRED never contemplated that one of its brokerages would *blacklist* one of its other brokerages, or an agent member of MRED. ZLAS does just that.

If the court thinks that what happened in October of 2025 was a rule *change* in order to punish Zillow, or to decrease competition, then yeah, I think at least the

Section 1 claim has merit. If on the other hand, the court thinks that MRED didn't *change* the rule as much as it *clarified* the rule to cover a situation they never saw coming... then there's no case here.

# The Weakness of Zillow's Arguments

Overall, I am left wondering why Zillow filed this case at all. Their other cases and their other court filings have tended to be brilliant works of legal drafting that makes the reader nod along in agreement. This one is not.

I do not suggest that judges will see things as I see them. But it is to suggest that this complaint is just too cute and stretches too far. I think it means Zillow likely knows it isn't going to win, but the lawsuit is worth filing for strategic reasons.

## The Monopoly Claim

Let me start with the second claim, that MRED is illegally maintaining and operating a monopoly. The basis of that claim is that MRED sent some emails to brokers and agents. All of the emails cited has MRED saying, "We don't understand why Zillow claims we'll cut them off."

From the start, MRED's stance was that Zillow had to comply with its idiosyncratic IDX rules, like every other brokerage participant. If Zillow violated those rules, then it could get cut off, like any other participant. Therefore, if Zillow was afraid of getting cut off, it is because Zillow *intended* to violate those rules.

MRED's emails make sense then, unless Zillow had communicated to MRED, "Look here, we intend to violate the rules, okay?" We don't know, but judging by the plain fact that MRED still has not cut off Zillow as of this writing, I'm guessing Zillow did not violate MRED's rules yet.

If MRED, a private organization, had rules that Zillow was planning on violating, then Zillow could have brought a case challenging the rules themselves or

challenging the application of the rules. Compass did that against NWMLS, alleging whack-a-mole rulemaking just to punish Compass. We don't get that here, and given the quality of Zillow's legal counsel, I don't think Zillow fails to make that claim if they have any evidence to support such a claim.

As to other claims Zillow sprinkles in, it should be obvious to everyone that Compass, Coldwell Banker and Sotheby's cutting off their brokerage feeds to Zillow has nothing to do with MRED and everything to do with Compass acquiring Anywhere. I mean, did anybody imagine that Compass was going to keep sending a direct data feed to Zillow?

What MRED has to do with that decision by Compass is left unsaid.

So there goes the second claim of illegal monopoly.

## The Conspiracy for Horizontal Boycott

On the first claim, of an illegal conspiracy to impose a horizontal group boycott, Zillow's focus appears to be trying to establish a "conspiracy" under antitrust law. That's not hard to do. Every single MLS or Association decision likely has coordinated some action. But it is irrelevant.

What is far harder is to show the *group boycott*.

To do so, one would need to ignore the fact that MRED had already been operating a PLN for over ten years. We would need to ignore that Reffkin at Compass was singing MRED's praises before they acquired Anywhere, before they did the national expansion, before any of this. So MRED's PLN and MRED's policies long predate any possible "conspiracy."

Zillow knew about the PLN and MRED's numerous rules, because when Zillow decided to flip to becoming a brokerage to use IDX feeds instead of syndication feeds, it went through an exhaustive analysis of those IDX rules and what they do

and do not allow Zillow to do. It is why Zillow initially went to the "two-tab" approach (remember that?) when it flipped to IDX.

That's why how the court reads the 2025 rule changes is so important. And if MRED's lawyers cannot make a cogent argument that MRED was simply clarifying what "selection" meant in light of unprecedented rule-breaking by one of its participants, then they should be sued for malpractice. I assume they won't be sued for malpractice, hence this point will be made.

If the 2025 rule changes are interpreted as mere clarification instead of a substantive rule change, then Zillow's argument amounts to saying they joined MRED knowing the rules, fully agreed to comply with the rules, but now after Compass and NAR backing off of CCP, they don't like those rules. Presumably, they lobbied MRED to have those rules changed (discovery will tell us how and when). Since they failed that, Zillow now wants the court to force MRED to change the rules or to force them not to enforce the rules.

I mean... I guess? Anything is possible. But look, this is a pretty weak case.

## Is MRED a Monopoly vis-a-vis Zillow?

There is an issue that I think either MRED or Compass's attorneys will bring up. I hope it gets fully litigated so we have some precedent going forward.

That issue is whether an MLS is in fact a monopoly for "Real Estate Listing Creation and Distribution."

Zillow in its complaint defined the relevant market for antitrust as "Residential Real Estate Listing Creation and Distribution." That market is defined thus:

> This market comprises the platforms that listing agents, acting on behalf of sellers, use to create for-sale residential real estate listings and distribute them to buyers and their agents in a local area.

In every other antitrust case involving an MLS, the relevant market is defined differently, because the plaintiffs tend to be brokers and agents suing the MLS for one reason or another. The core idea is that the MLS is a *necessary utility* for brokers and agents wanting to be in the business of real estate brokerage.

So every case I've looked at over the past several years, from Sitzer to REX v. Zillow to FTC v. RealComp to Hardy v. NAR to even the NAR Speech Act cases to whatever antitrust case, the basic claim is that the *MLS is a necessary utility for anyone in the brokerage business*. That's why rules of the MLS are so powerful, and when anticompetitive, need to be struck down.

Here, Zillow is not claiming that it needs MRED to practice real estate. Because it doesn't practice real estate. Here, Zillow is claiming that the "relevant market" is the creation and distribution of listing data, because Zillow needs MRED data to sell advertising to real estate agents.

It is not at all clear that the MLS is a "necessary utility" in *this* market. If I were to vibecode a new Add/Edit module for brokers and agents, do I *need* MRED to approve me? I happen to know that many an agent website vendor has features that allow agents to upload higher quality photos than the MLS allows; they do not need nor ask for permission from the MLS. What if a vendor creates some "syndicate listings to websites in Hong Kong" product? Does he need MRED the same way that an agent needs MRED?

In fact, Zillow already managed to create its own Add/Edit and source its own data feeds from brokers without MRED's permission. There is no claim that Zillow cannot offer an alternative platform without having access to MRED data, and strong evidence to suggest that it can... because it did. So what monopoly power are we talking about here?

The MLS is a local monopoly by virtue of network effect. But it is a local monopoly for MLS services, and maybe for real estate brokerage services

because brokers and agents need full access to the MLS in order to stay in business. It isn't a local monopoly outside of that.

So I'm not even sure that the court would find that MRED is a monopoly in the relevant market. But it would be good for all of us to have some precedent-setting court ruling on this precise topic of the extent to which an MLS is in fact a monopoly.

## Isn't It Ironic? Don't You Think?

The most delicious irony of this case is that MRED can cite chapter and verse from Zillow's arguments in Compass v. Zillow.

In my post analyzing Zillow's letter to the judge in responding to Compass's motion, I wrote:

> We then get the legal argument I fully expected from Zillow, and quite frankly, it's a strong one:

> It is well-settled that the antitrust laws do not impose such a duty to deal. The Supreme Court has repeatedly recognized that "businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009).

> I figured from the moment the Complaint was filed that Zillow would claim no duty to deal in some fashion in its defense.

And in their full written brief, Zillow made strong arguments about no-duty-to-deal as well:

> We get a pretty solid argument that ZLAS is not anticompetitive as Compass remains free to do what it wants, short of forcing Zillow to deal with Compass on Compass's terms (which goes directly to the "no duty to deal" defense above).

Now MRED gets to use the exact same line of arguments against Zillow, especially Pac Bell: "businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing."

If ZLAS is not anticompetitive, then MRED's rules are also not anticompetitive since Zillow remains free to do what it wants, short of forcing MRED to deal with Zillow on Zillow's terms.

Granted, maybe the court distinguishes between Zillow v. MRED and Compass v. Zillow. Who knows? But it is ironic indeed.

# The Reverberations

In a way, while lawsuits are always expensive and painful, I do not think this is where the real action is in the battle between MRED and Zillow, nor in the war between Compass and Zillow.

The real action is in what Zillow wrote about itself and its efforts. Those aren't about winning the legal case. Those are about what Zillow says it actually is when chips are down.

It is impossible to read this complaint without coming to the conclusion that Zillow is now a direct competitor to the local MLS. Zillow's narrative to the industry may be that Zillow loves the MLS and wants to protect the MLS and advance the MLS. Zillow's complaint in a high stakes lawsuit is that Zillow is in fact a competitor who created its own platform, sourced its own direct broker

feeds, and competes against the MLS in the in the Listing Creation and Distribution market.

If it is the case that Zillow is a direct competitor to the MLS, then... this lawsuit doesn't look good for Zillow. Not even antitrust laws demand that companies (even acknowledged monopolies) enable and help their direct competitors. I rather think it requires specific legislation to do *that*, as happened with telecomm. If I'm wrong about that, then Homes.com and Redfin have a claim against Zillow for not sharing Preview data and the proprietary data moat around Zillow AI.

Seems to me that the MLS can cut off not only Zillow's IDX feed, but its participation rights after learning that Zillow is a direct competitor. After all, there is no duty to deal.

For years, Zillow has sworn up and down that it is not a brokerage; it just has a brokerage license to get data access. They don't compete with their brokerage... uh... it's not customer anymore, so I guess partners? Come time to win in the courtroom, however, we learn otherwise.

Brokerages can no longer pretend that Zillow is not a competitor. That's not some Zaterade talking. That's Zillow itself telling the court that Zillow offers brokerage services.

It might be time for the industry to get an update from Gary Keller, Dave Liniger, Alex Perriello, Ron Peltier, and numerous other brokerage leaders who have said over and over again that they accept Zillow as an advertising platform that generates leads. But if Zillow ever crosses the line....

Zillow could win the lawsuit, and lose the war.

# Conclusions

As I have long maintained, you never want to be predicting outcomes of lawsuits. Juries and judges make decisions that often make little sense.

However, what is unique about this lawsuit is just how weak it is. I don't believe I have ever said that about any filing that Zillow's very competent lawyers submit to the courts. This one is.

Which forces me to conclude that the point of the lawsuit might not be to win the legal argument. The point seems to be to punish MRED, impose legal costs on them, and to force them into a lawsuit where process is the punishment.

Which means that the target of this lawsuit might not even be MRED. It might be other MLSs, particularly smaller ones where Compass is not so dominant as it is in Chicago, who are thinking about following suit. Realtracs and CLAW are mentioned in the complaint, but pointedly not co-defendants, for example. The target might not be Compass, with whom Zillow has already tangled. The target might be other brokerages tempted to follow Compass's lead but don't have the legal budget that Compass has.

It's a strategic move, and might very well be effective.

But as in all kinetic actions, which in business means lawsuits, you have to ask whether the belligerent has thought through second and third order consequences. The *reverberations* from this one could end up being far more significant than whether the judge sides with Zillow or with MRED. We shall see.

And we will revisit this, I am certain, when MRED and Compass file their answers and the inevitable motions to dismiss and the like. The battle is now on.

-rsh

# Exhibit 2

Published on *The National Law Review* https://natlawreview.com

---

# Zillow's Latest Scheme Warrants Antitrust Scrutiny

Published: April 9, 2026

---

Article By:
Hal Singer

---

**The commission re-coupling built into Zillow Preview echoes the very conduct that triggered the largest antitrust verdict in residential real estate history.**

Zillow's CEO Jeremy Wacksman has been making the rounds. In both a recent *Yahoo Finance interview* and a *Fortune profile* on the executive, Wacksman lamented how housing supply is the "biggest thing preventing" Americans from buying homes, prices are up 60 to 80 percent from pre-pandemic levels, and the median first-time buyer is now 40 years old. It is a compelling affordability message from the CEO of a company that controls nearly two-thirds of the U.S. real estate audience share.

It is also a breathtaking act of misdirection from a platform that is being sued by the FTC for paying a competitor (Redfin) $100 million to exit the rental advertising market, facing multiple class actions alleging it steers homebuyers into overpriced mortgages, and having just launched a product that may recreate the very commission-sharing structure that cost the National Association of Realtors (NAR) $1.8 billion in a federal jury verdict and triggered settlements exceeding $700 million. For anyone tracking Zillow's pattern of anticompetitive conduct, an affordability message from the CEO is quite rich.

Consider Zillow's most recent move. On March 17, the company announced Zillow Preview, a product allowing participating brokerages to display pre-market listings exclusively on Zillow and Trulia (a subsidiary of Zillow) before they go live in the multiple listing service (MLS).

Buried within Zillow Preview is a commission-sharing arrangement that should make antitrust regulators take notice. Listing agents receive a cut of the buy-side broker commission, a fixed 10 percent set unilaterally by Zillow, if a pre-market listing results in a closed transaction through Zillow's Preferred Agent network. For anyone who followed the NAR litigation, the structure is familiar. For those who study the economics of platform-imposed commission standardization, it is troubling.

## An Anti-Consumer Model That Deserves Scrutiny

Consider how absolute Zillow's rhetoric was during its nine months of litigation with Compass. In November 2024, Compass unveiled its Private Exclusives, a marketing channel of about 7,000 home listings available exclusively to Compass agents and the buyers working with them. In response, Zillow threatened to ban any listing not available for listing on Zillow within 24 hours. Compass sued Zillow in June 2025. Zillow went on offense, portraying itself as the sole guardian of the American homebuyer. After Judge Vargas denied Compass's preliminary injunction in February 2026, Zillow's spokesperson declared: "Zillow believes everyone deserves equal access to the same real estate information at the same time."

Then Zillow launched Preview, and Compass walked away from the lawsuit. Compass CEO Robert Reffkin called it a "major victory" and a reversal of the "Zillow ban." Zillow insisted its standards remain in effect. But read the description of Zillow Preview from Zillow's own press release: "These pre-market listings will be exclusively available on Zillow, Trulia and their own listing brokerage and agent sites." Not on any competing online real estate marketplace. The only difference between the exclusivity that Compass sought and what Zillow is now doing is that Zillow is the one capturing the exclusivity.

**The Economics of Re-Coupling**

The commission-sharing arrangement at the heart of Preview has a striking resemblance to what got the NAR into antitrust trouble.

For decades, NAR's rules required home sellers to make a blanket unilateral offer of compensation to buyer's agents as a condition of listing their property on the MLS. A federal jury found this structure artificially inflated commission rates by eliminating competition. The jury awarded approximately $1.8 billion in damages, potentially exceeding $5 billion after treble damages under the Sherman Act. The resulting settlements required NAR to eliminate rules that tied buyer and seller commissions together and to decouple those commissions from access to listings entirely.

The economic logic of the verdict was straightforward: When a dominant platform standardizes the flow of commissions among brokers, thereby coupling commissions to listings, the result is supra-competitive pricing. Commissions are set by fiat and conditioned on access to listings, rather than by negotiation. Price competition is suppressed. And agents who want to participate in the market have no realistic alternative but to accept the platform's terms.

Consider the structure of Zillow Preview through that same lens. Listing agents are financially incentivized to funnel transactions through Zillow's network to capture a 10 percent commission share. The percentage is not negotiated. It is fixed by Zillow. And Zillow, with its dominant platform, is imposing these terms across its network of participating brokerages, including Keller Williams, HomeServices of America, RE/MAX, Side and United Real Estate, with 24 additional brokerages signing on within the first week.

The irony is hard to miss: Keller Williams and HomeServices were defendants in the NAR litigation, which paid substantial settlements to resolve price-fixing claims. They have now signed on as launch partners for a new fixed commission-sharing arrangement structured by Zillow.

Zillow has found a way to re-couple commissions after the NAR settlement was designed to decouple them. The vehicle has changed, from an MLS rule to a platform product, but the economic effect is the same: commissions flow between brokers at a rate set by a dominant intermediary, not by competition.

**What Antitrust Enforcers Should be Asking**

The DOJ and FTC should take a hard look at Zillow's commission-sharing arrangement. The agencies have already demonstrated their willingness to act. The FTC's September 2025 complaint against Zillow in the rental advertising market was built on an exclusionary theory of harm: a dominant platform cannot pay to exclude rivals and then claim the arrangement is pro-consumer. The fact that Zillow has structured its Preview payment as a "payment from Zillow," rather than a direct transfer between brokers, does not change the economic substance. Antitrust economists have long understood that the competitive effects of an arrangement depend on economic reality, not formal structure. A dominant platform is establishing a fixed, non-negotiated commission-sharing percentage and conditioning access to its exclusive pre-market listings on acceptance of those terms, essentially coupling commissions to listing access, which is the same conduct that cost NAR hundreds of millions of dollars.

Zillow will argue that its program is voluntary. But NAR's rules were also technically voluntary. No one was legally required to list on the MLS. The court found that NAR's dominant position made compliance effectively mandatory for agents who wanted to compete. Zillow's dominance in real estate search creates a similar dependency: Agents who want access to Zillow's nearly two-thirds audience share have powerful incentives to participate and accept Zillow's commission-sharing terms.

Zillow Preview creates an exclusive pre-market window that no competing portal can access, deepening agents' dependence on Zillow's ecosystem. And it introduces a financial incentive, the 10 percent commission share, that rewards agents for routing transactions through Zillow rather than through competing platforms. For brokerages already facing pressure from shareholders aligned with Zillow's interests, Preview adds another reason to consolidate around Zillow; at the same moment activist investors with significant stakes in Zillow's competitor set are pressing some of those rivals to exit or scale back.

The hypocrisy is blatant: Zillow simultaneously tells *Yahoo Finance* that housing affordability is the crisis of our time while building exclusive listing windows and standardizing commission flows that deepen consumer lock-in. That is not consumer advocacy. It is the behavior of a dominant platform that believes that running afoul of antitrust laws should be considered just a cost of doing business. Antitrust enforcers should disabuse Zillow of that assumption.

**Disclaimer**: The opinions and views expressed in this article are those of the author and not necessarily those of *The National Law Review.*

Copyright ©2026 The National Law Forum. LLC

Source URL: https://natlawreview.com/article/zillows-latest-scheme-warrants-antitrust-scrutiny

# Exhibit 3



**FEDERAL TRADE COMMISSION**
PROTECTING AMERICA'S CONSUMERS

For Release

# FTC Sues Zillow and Redfin Over Illegal Agreement to Suppress Rental Advertising Competition

Illegal deal stunts multifamily rental advertising competition, harming American renters and property managers, the FTC alleges

September 30, 2025 |

**Tags:** [Competition](#) | [Bureau of Competition](#) | [Merger](#) | [Real Estate and Mortgages](#)

Today, the Federal Trade Commission sued Zillow and Redfin over an unlawful agreement that eliminates Redfin as a competitor in the market for placing advertising of rental housing on internet listing services (ILSs)—the websites that millions of Americans use to find their next rental home.

Zillow Group, Inc., and Zillow, Inc., (Zillow) and Redfin Corporation operate two of the nation's largest rental ILS networks by traffic and revenue, including sites such as Zillow Rentals, Rent.com, and ApartmentGuide.com. The complaint 🗎 alleges that in February 2025, Zillow and Redfin entered into an illegal agreement to dismantle Redfin as a competitor in the ILS advertising market for multifamily rental properties.

In exchange for a $100 million payment and other compensation from Zillow, the complaint alleges, Redfin agreed:

- To end its contracts with advertising customers and help Zillow take over that business,

- To stop competing in the advertising market for multifamily properties for up to nine years, and

- To serve merely as an exclusive syndicator of Zillow listings, making Redfin sites effectively a copy of the listings that appear on Zillow's sites.

Zillow and Redfin framed their agreement as a "partnership," but in reality the arrangement is an end run around competition that insulates Zillow from competing head-to-head on the merits with Redfin, the complaint states. In connection with the agreement, Redfin fired hundreds of employees, then helped Zillow to hire its pick of those terminated workers.

"Paying off a competitor to stop competing against you is a violation of federal antitrust laws," said Daniel Guarnera, Director of the FTC's Bureau of Competition. "Zillow paid millions of dollars to eliminate Redfin as an independent competitor in an already concentrated advertising market—one that's critical for renters, property managers, and the health of the overall U.S. housing market. The FTC will do our part to ensure that Americans who are looking for safe, affordable rentals receive all the benefits of robust competition between internet listing services like Zillow and Redfin."

The FTC alleges that this agreement destroys competition for multifamily rental properties advertising on ILSs, harming both property managers seeking to advertise properties for rent and renters searching for a home. The agreement also constitutes an unlawful acquisition in violation of Section 7 of the Clayton Act, the complaint alleges.

The FTC alleges that the unlawful agreement will:

- Likely lead to higher prices and worse terms for multifamily unit advertising; and

- Reduce incentives for Zillow and Redfin to compete for renters, including through investment in attracting visitors and innovation to improve user experience when searching on an ILS for a rental property.

The complaint seeks to stop Zillow and Redfin from continuing their unlawful agreement and contemplates a potential divestiture of assets or the reconstruction of businesses to restore competition.

Throughout this investigation, the FTC worked in close collaboration with the offices of several state attorneys general. The Commission looks forward to ongoing cooperation with the states in this matter.

The Commission vote to authorize staff to file a complaint in the U.S. District Court for the Eastern District of Virginia was 3-0.

**NOTE:** The Commission issues a complaint when it has "reason to believe" that the law has been or is being violated, and it appears to the Commission that a proceeding is in the public interest. The case will be decided by the court.

The Federal Trade Commission works to promote competition and to protect and educate consumers. The FTC will never demand money, make threats, tell you to transfer money, or promise you a prize. You can learn more about how competition benefits consumers, file an antitrust complaint, or comment on a proposed merger. For the latest news and resources, follow the FTC on social media, subscribe to press releases and read our blog.

## Contact Information

## Media Contact

Victoria Graham
Office of Public Affairs
415-848-5121

# Exhibit 4

+ Caption

(Zillow)

    

**LOCAL**

# Zillow faces class-action suit over hidden 40% agent fees

    

By **Shawn Garrett, KIRO 7 News**

By **Shawn Garrett, KIRO 7 News**

September 20, 2025 at 7:33 am PDT

September 20, 2025 at 7:33 am PDT

A Portland homebuyer has filed a nationwide class-action lawsuit against Zillow, alleging the Seattle-based real estate giant uses deceptive practices that inflate commissions and home prices.

The lawsuit, filed Friday in U.S. District Court for the Western District of Washington, accuses Zillow of violating consumer protection laws, the federal Real Estate Settlement Procedures Act (RESPA), and unjust enrichment statutes.

Plaintiff Alucard Taylor, who purchased a home in Portland in July 2022, claims he was misled by Zillow's website design.

According to the complaint, when Taylor clicked the "Contact Agent" button while browsing a home listing, he thought he was reaching the seller's agent.

Instead, he was connected to a Zillow-affiliated buyer's agent and asked to sign a "Touring Agreement."

The document said the service was "free," but Taylor later learned the agent received a commission — and if the agent was in Zillow's "Flex" program, up to 40% of that commission went back to Zillow as a hidden fee.

The complaint describes this as "Hidden Zillow Fees" that are never disclosed to buyers or sellers.

Attorneys argue the practice amounts to an illegal kickback under RESPA because the company is paid without performing services connected to the closing of a property.

The lawsuit also takes aim at Zillow's Listing Access Standards, which require sellers' agents to post homes on Zillow within 24 hours of any public marketing — such as yard signs or social media posts — or face penalties.

Critics argue this policy forces agents and sellers to rely on Zillow's platform, increasing the company's dominance in online listings.

According to the filing, Zillow's conduct keeps commissions artificially high, making homes more expensive for buyers.

The plaintiff alleges that if consumers had direct access to listing agents, they could negotiate lower prices and commissions.

Instead, the system encourages Zillow-affiliated agents to prioritize their earnings over clients' interests.

The lawsuit seeks to represent all U.S. consumers who purchased a home listed on Zillow between Sept. 19, 2021, and the present, while being represented by a Zillow agent.

It requests damages, disgorgement of profits, injunctive relief, and attorneys' fees.

Zillow has not yet filed a response in court.

©2025 Cox Media Group

# Exhibit 5

Login   Watch TV

**Recommended Videos**

REAL ESTATE Published March 19, 2026 7:58pm EDT

# Penn professor says Zillow 'systematically deceives consumers' about agent connections

Jerry Wind's study found only 0.3% of users understood they weren't contacting listing agents when using Zillow's contact features

 + **Add Fox Business on Google**

By **Preston Mizell** | **FOXBusiness**

**Expert says real estate still the smartest investment play**

Altman Brothers Real Estate owner Josh Altman joins 'Varney & Co.' to discuss how ChatGPT is influencing real estate negotiations, buyers and sellers receiving conflicting answers from AI.

A University of Pennsylvania Wharton professor published a paper that claims Zillow users don't know who they're being connected with when they select an agent, alleging that Zillow-affiliated agents drive users to Zillow's home mortgages.

Professor Jerry Wind's study showed only 0.3% of users understood they would not be connected with the listing agent when selecting the tabs "Contact an agent" or "Request a tour."

"This study provides empirical evidence that Zillow's interface design systematically deceives consumers about a fundamental aspect of the homebuying process," the conclusion of Wind's paper states.

## TRUMP-BACKED AFFORDABLE HOUSING OVERHAUL CLEARS SENATE, WHILE HOUSE GOP RAISES RED FLAGS

"[Consumers] are not contacting the listing agent. They are being routed to agents who pay Zillow for access to their information, agents who are therefore financially incentivized to steer them toward Zillow's mortgage products."

FOX Business sat down with Wind to discuss his findings and what he believes are the biggest takeaways.

Research by professor Jerry Wind found that almost no Zillow users realize they are not contacting the listing agent, raising concerns about transparency and incentives. (iStock/Getty Images Plus / Getty Images)

---

"My understanding is that the incentive is, one major incentive is that they get the name, and once they get their name and they succeed in selling the house, they have to pay Zillow up to 40% of their commission," the professor told Fox News Digital.

"So, that's what Zillow gets out of this. The agent, obviously, gets a lead.

"And if the agent does not … recommend Zillow's mortgage to the customers, Zillow, I understand, may basically stop giving them leads," Wind continued. "So, there is a real carrot and stick here in terms of encouraging the agents to [encourage] their customers to use Zillow's mortgage."

Zillow maintains that buyers are not steered to its mortgage products and are always free to choose any lender that fits their needs. (Gabby Jones/Bloomberg via Getty Images)

---

Wind joined the Wharton faculty in 1967 and is the Lauder Professor Emeritus and a professor of marketing.

## PAIGE TERRYBERRY: FOREIGNERS ARE SNAPPING UP US HOMES AND STEALING THE AMERICAN DREAM OUT FROM UNDER FAMILIES

"According to recent class action lawsuits filed in federal court, these agents may be required to meet quotas for referring buyers to Zillow Home Loans in order to maintain access to leads," Wind's study says. "Agents who fail to meet these quotas risk losing their primary source of business."

Zillow was quick to deny the professor's claims that such quotas exist in a statement to FOX Business, discrediting the study and the allegations that it forces Zillow-affiliated buyers to recommend Zillow Home Loans (ZHL).

Wind's study claims Zillow's interface confuses users about which agent they're contacting, potentially steering them toward agents tied to Zillow's mortgage business. (Saul Loed/AFP via Getty Images)

---

"This significantly flawed paper does a lot of gymnastics trying to turn Zillow's pro-consumer feature into a buy," a Zillow spokesperson told FOX Business. "When a buyer requests a tour or clicks 'contact agent,' Zillow connects them with a local buyer's agent, someone whose job it is to represent the buyer's interests and drive the best outcomes for them. A listing agent represents the seller."

## EXPERT SAYS REAL ESTATE STILL THE SMARTEST INVESTMENT PLAY

Reports and U.S. national data estimate that total home sales in 2025 were approximately 4.74 million units when combining existing and new home sales.

Zillow's 2025 Consumer Housing Trends Report showed that roughly 68% of homebuyers use Zillow during their search to purchase a home.

Wind alleged that Zillow's popularity has created an antitrust issue, with the platform attempting to create a closed loop between searching, purchasing and selecting a

mortgage provider for payment.

Wind told FOX Business "the situation really requires some type of legal intervention here" or "some regulatory involvement."

Zillow said the claims of a closed loop are false and that it does not steer customers to ZHL.

The company disputes claims of deception, arguing its "Contact Agent" feature is a pro-consumer tool designed to match buyers with qualified agents. (Stefani Reynolds/AFP / Getty Images)

---

"Claims that buyers are steered to Zillow Home Loans or any specific mortgage provider are false," the Zillow spokesperson explained. "We offer choice, not requirements, and buyers are free to work with any lender. Agents are encouraged to help clients evaluate all available financing options.

"We remain confident that our platform delivers transparency, competition and meaningful choice to millions of buyers and sellers."

**CLICK HERE TO DOWNLOAD THE FOX NEWS APP**

As for what Wind hopes to see come out of his study, he told FOX Business he believes consumer awareness and education is important for those looking to make their next home purchase.

"I think the important aspect here is for consumers to try to be more aware and make sure to look for alternative mortgages, not just buy the first one," Wind explained.

"So, consumer education is really key here. Second, I would hope that Zillow will change their incentive systems and business model, basically, and realize they have an amazing platform."

Quotes displayed in real-time or delayed by at least 15 minutes. Market data provided by Factset. Powered and implemented by FactSet Digital Solutions.  Legal Statement.

This material may not be published, broadcast, rewritten, or redistributed. ©2026 FOX News Network, LLC. All rights reserved. FAQ - New Privacy Policy

# Exhibit 6



# Homes.com, Zillow and the affordability stakes of who controls the listing marketplace

Why Homes.com's fight with activists could shape listing competition and affordability

March 9, 2026, 10:01am *by* *Jared Whitley*

News  >  Contributors

## Article Summary

The column frames CoStar's Homes.com investment as a competition play against Zillow's lead and referral monetization model. It argues hedge fund activism could shrink consumer options, while CoStar projects reduced spend and profitability by decade's end.  *AI Summary*

President Trump has made housing affordability the centerpiece of his domestic economic agenda, and for good reason. After four years of Biden-era inflation that priced millions of young families out of the market, the President highlighted declining mortgage costs in his 2026 State of the Union.

He signed an executive order to stop large institutional investors from buying single-family homes that belong in the hands of American families. He directed Fannie Mae and Freddie Mac to purchase $200 billion in mortgage-backed securities to drive down borrowing costs.

The message from this White House is unambiguous: restoring the American Dream of homeownership is a top priority, and Washington is finally doing something about it.

So why are two Wall Street hedge funds trying to shut down a company that is building more competition, more transparency and more options for the very homebuyers the President is fighting for?

CoStar Group, the dominant provider of commercial real estate data, has spent the last several years building Homes.com into a legitimate challenger to Zillow's near-monopoly in residential real estate listings. The business model difference matters directly to housing costs.

Zillow monetizes consumer inquiries by routing them away from listing agents and toward paying "Premier Agents" who bid for lead placement, or by collecting referral fees of up to 40% of the agent's commission when a transaction closes. Those costs do not vanish. They get passed through to buyers and sellers in the form of higher commissions and less flexible pricing, making an already unaffordable market even worse.

Homes.com operates on a fundamentally different model. Its "Your Listing, Your Lead" approach connects buyers directly with the listing agent, whether or not that agent pays Homes.com anything. That creates real downward pressure on agent costs across the market. It is exactly the kind of pro-consumer, pro-competition innovation that free enterprise is supposed to produce.

## The hedge funds in control

Now Third Point and D.E. Shaw, two hedge funds that each hold roughly 2% of CoStar's outstanding shares, have publicly demanded the company abandon Homes.com entirely, replace its founder-CEO, and restructure on their timeline. Strip away the financial jargon and what they want is simple: CoStar should exit residential real estate so these funds can harvest a short-term stock price bump.

The result would be one fewer competitor in a market where the FTC has found that roughly 85% of internet listing revenue is already concentrated among a handful

of players and where the government has sued Zillow for paying a competitor to exit the market. Forcing Homes.com out through shareholder pressure would accomplish the same reduction in competition, just through a different door.

Anyone tempted to trust these firms' judgment should look at their records. At Advance Auto Parts, Third Point secured three board seats in 2024 with no disclosed operational plan, then bailed out six months later after the stock fell nearly 50 percent. At Sony, Third Point demanded a spinoff of the semiconductor division. Management had the backbone to refuse.

That business achieved nearly 12% annual revenue growth, and Sony outperformed the S&P 500 by over 53 percentage points by the time Third Point walked away. D.E. Shaw pushed FIS to spin off its Worldpay payments unit. FIS shares have fallen more than 30% since settlement while the S&P 500 gained over 76%. The pattern is consistent: bold demands, board seats won, value destroyed and a quick exit before the bill comes due.

## Homes.com aligned with affordability agenda

Unfortunately, the policy stakes here go well beyond one company's stock price. The Trump administration has correctly identified housing affordability as a crisis and is pursuing a serious agenda built on expanding supply, cutting red tape, and putting American families ahead of institutional investors. CoStar's Homes.com investment is squarely aligned with that agenda. It introduces competition into a concentrated market. It offers consumers a more transparent experience.

It recently launched Homes AI, a conversational AI tool that helps homebuyers navigate their search using proprietary data no competitor can replicate. The company has committed to cutting Homes.com spending by over $300 million this year and projects the platform will reach profitability by the end of the decade, with company-wide revenue growth of 18% and an 83% increase in adjusted EBITDA in 2026.

The SEC's push to allow semiannual reporting, backed by the President, reflects a growing recognition that the quarterly earnings treadmill empowers exactly this kind of short-horizon activism at the expense of the long-term investment and job creation that actually build a stronger economy.

## Wall Street should not compete with Main Street

President Trump is right that Wall Street should not be allowed to compete with Main Street when it comes to buying homes. The same principle applies to building the platforms that help Americans find and buy those homes.

If Third Point and D.E. Shaw get their way, there will be one fewer competitor in residential real estate, less transparency for homebuyers, and more pricing power for

the incumbent monopoly. That is not a free-market outcome. It is the kind of Wall Street self-dealing that voters sent this President to Washington to stop.

*Jared Whitley is a long-time politico who has worked in the U.S. Congress, White House, and defense industry.*
*This column does not necessarily reflect the opinion of HousingWire's editorial department and its owners. To contact the editor responsible for this piece: zeb@hwmedia.com.*

# Exhibit 7

# Does Zillow Deceive Homebuyers?

## *Evidence from a Controlled Experiment*

### Yoram (Jerry) Wind

## Abstract

This study presents findings from a controlled experiment examining whether consumers understand who they are contacting when they click "Contact Agent" or "Request a Tour" on Zillow's real estate website. Results from 862 respondents—all recent or prospective homebuyers who use online real estate websites—reveal that consumers expect to be connected to the agent associated with the property they are viewing. Incredibly, 99.7% of consumers exposed to Zillow's standard interface were unable to correctly identify who would actually contact them. Even Zillow's additional disclosures failed to meaningfully improve consumer understanding. In contrast, when the interface clearly labeled the contact as the "Listing Agent", 78.9% of respondents answered correctly. These findings were consistent across income levels, indicating that financial sophistication does not protect consumers from this deception.

The results suggest that Zillow's interface systematically deceives consumers about a fundamental aspect of the homebuying process. The implications extend beyond individual transactions: as alleged in recently filed lawsuits, consumers are routed to agents who have paid Zillow for these leads and who are heavily incentivized to direct customers to Zillow Home Loans—a mortgage product that (according to a recent study and the lawsuits) can be significantly more expensive than other available mortgages. Consumers should be informed about the value of seeking multiple mortgage offers, and Zillow must be required to cease its deceptive practices.

## Introduction

Buying a home is the largest financial decision most Americans will ever make. Increasingly, that process begins online—and for millions of consumers, it begins on Zillow. Consumers rely on Zillow to browse listings, schedule tours, and connect with real estate professionals. Zillow has cultivated an image as a helpful, neutral resource—a trusted guide through the complex homebuying process. As the company's corporate website states: "Zillow is synonymous with residential real estate and is the most visited, most trusted name in the industry."[1] As the company describes its value proposition: it "simplifies the real estate journey for millions" through "extensive data and user friendly interfaces."

But do consumers understand what happens when they click "Contact Agent" or "Request a Tour" on a Zillow listing? Do they know who they are contacting? Zillow promotes the importance of real estate agents throughout its platform and advertising, emphasizing that agents are essential guides through the homebuying process. This question of who consumers believe they are contacting has significant implications for consumer welfare, market transparency, and regulatory policy. If consumers believe they are contacting the listing agent when they are not, they may be entering into relationships and transactions based on a fundamental misunderstanding.

This study presents findings from a controlled experiment designed to assess consumer understanding of Zillow's agent contact interface. The results reveal a systematic pattern of consumer confusion—or, more precisely, consumer deception—that raises serious questions about the platform's business practices and the adequacy of current regulatory frameworks. This deception is key to trapping consumers in the Zillow ecosystem and has significant implications for their financial well-being. The findings underscore the urgent need both to reform Zillow's practices and to educate consumers about the risks of placing blind trust in platforms that may not have their best interests at heart.

## The Experiment

**Overview.** To assess whether consumers understand Zillow's agent referral process, we conducted a controlled experiment with 862 respondents. The study targeted the relevant population: U.S. consumers who purchased a home or apartment in the past three years or intend to do so in the next year, and who used or intend to use Zillow and/or other online real estate websites including Homes.com, Realtor.com, Redfin, and Trulia. These are not random respondents— they are precisely the consumers Zillow's platform is designed to serve. This targeted approach ensured that our findings reflect the understanding of actual and prospective Zillow users. The sample was weighted to be representative of U.S.

3

Census demographics with respect to gender, age, ethnicity, geography, and income.

**Experimental Design.** Respondents were randomly assigned to one of five conditions. Four test conditions presented actual Zillow webpage screenshots: two with Zillow's standard disclosure (Test 1 and Test 2—one for "Request a Tour," one for "Contact Agent") and two with Zillow's additional disclosure language that informed consumers they would be connecting "with a local buyer's agent who advertises on Zillow" (Test 3 and Test 4). A control condition presented the Zillow website but with a Zillow listing that actually connects a user to the listing agent, listing her name and phone number (see Appendix).

After viewing the stimulus, respondents were asked both an open-ended question ("Who do you think will contact you if you click this button?") and a closed-ended question with response options including the correct answer. For test conditions, the correct answer was that the respondent would NOT be contacted by the listing agent. For the control condition, the correct answer was that they WOULD be contacted by the listing agent. The response options were randomized and also included "other" and "do not know."

This design allowed us to determine: (a) the percentage of respondents who correctly understand who will contact them, and (b) whether that percentage differs significantly between Zillow's typical interface and a more clearly labeled control condition. The inclusion of both open-ended and closed-ended questions provides a robust test: open-ended responses reveal what consumers spontaneously understand, while closed-ended responses test whether they can identify the correct answer when prompted with options.

## Results

The findings are striking and consistent across multiple measures. The experimental design allowed us to compare consumer understanding under Zillow's typical interface conditions versus a more clearly labeled control condition, providing a direct test of whether Zillow's design produces consumer confusion. Critically, the deception occurs both with Zillow's standard disclosures (Test 1 and Test 2) and with their additional disclosures (Test 3 and Test 4).

Examination of the open-ended responses reveals that only 0.3% of respondents exposed to Zillow's standard disclosure correctly identified that they would not be contacted by the listing agent. Even with Zillow's additional disclosure language, only 2.3% answered correctly. In contrast, 34.5% of respondents in the control condition correctly identified that they would be contacted by the listing agent.

4

**Table 1: Open-Ended Responses**

| Condition | Correct | Incorrect/DK |
|---|---|---|
| Zillow Standard Disclosure (Test 1 & 2) | 0.3% | 99.7% |
| Zillow Additional Disclosure (Test 3 & 4) | 2.3% | 97.8% |
| Control (More Clear Label) | 34.5% | 65.4% |

The closed-ended results were even more striking. When given explicit response options, only 9.5% of respondents in the standard disclosure condition and 13.7% in the additional disclosure condition selected the correct answer. In the control condition, 78.9% answered correctly.

**Table 2: Closed-Ended Responses**

| Condition | Correct | Incorrect |
|---|---|---|
| Zillow Standard Disclosure (Test 1 & 2) | 9.5% | 90.5% |
| Zillow Additional Disclosure (Test 3 & 4) | 13.7% | 86.3% |
| Control (More Clear Label) | 78.9% | 21.1% |

The differences between test and control conditions are statistically significant at the 99% confidence level. For the closed-ended responses, the percent of correct responses in the control group is between 6 and 8 times higher than the percent of correct responses in the test groups; for the open-ended responses, the difference is even more dramatic. While high-income respondents showed slightly higher correct response rates than low-income respondents in the closed-end questions (17% vs. 11.5% for the additional disclosure condition), both groups exhibited very low rates of correct understanding—and both were dramatically lower than the control condition. Financial sophistication provides minimal protection from this deception. This is particularly significant because it suggests the problem lies in the interface design itself, not in the characteristics of the consumers who use it.

**Behavioral Context**

These experimental findings are consistent with established consumer behavior theory and decades of research on consumer decision-making. Several well-documented mechanisms help explain why Zillow's interface design is so effective at misleading consumers—and why this deception has such significant consequences.

First, consumers bring reasonable expectations to the platform. When viewing a specific property listing and clicking a button labeled "Contact Agent," the natural inference is that one will be connected to the agent associated with that property—the listing agent. This expectation is reinforced by decades of real estate practice and by the design conventions of other service platforms. For example, when a customer calls an American Express concierge and asks for an "agent," they know

5

they will reach an American Express agent. When a consumer clicks "contact seller" on a listing page on eBay or Amazon Marketplace, they expect to reach the actual seller of that item. A reasonable consumer would not suspect that "Contact Agent" on a property listing means something other than contacting the agent associated with that listing.

Second, search costs and bounded rationality lead consumers to "satisfy"—to accept options that seem adequate rather than exhaustively evaluating alternatives. The mortgage market exemplifies this pattern. Research consistently shows that most mortgage borrowers obtain only one quote before committing to a loan, despite significant price dispersion in the market. Zillow's own published research (December 2025) confirms that "nearly 7 in 10 mortgage shoppers submit only one application." Zillow knows that consumers do not shop—and the evidence suggests that it exploits this knowledge.

Third, trust and authority heuristics play a significant role in consumer decision-making. Consumers have come to view Zillow as a neutral, helpful platform—a trusted guide through the homebuying process. This trust is evidenced by Zillow's market share and high repeat usage rates. That trust creates a halo effect: recommendations from Zillow are perceived as credible guidance rather than self-interested steering. Balance theory suggests that consumers who trust Zillow will feel psychological pressure to view Zillow's recommendations favorably in order to maintain cognitive consistency. Rejecting a recommendation from a trusted source creates psychological dissonance that most consumers prefer to avoid.

Finally, disclosure is ineffective when it conflicts with strong prior expectations and interface design cues. Our experiment demonstrates this directly: Zillow's additional disclosures produced no meaningful improvement in consumer understanding. The deception is structural, embedded in the interface design itself, and cannot be remedied by fine print. This finding has significant implications for regulatory approaches that rely on disclosure as the primary mechanism for consumer protection.

## Why It Matters

The deception documented in this study appears to be the entry point into a broader ecosystem designed to continuously deceive consumers and take advantage of them at multiple stages of the transaction.

When consumers click "Contact Agent" or "Request a Tour," they are routed not to the listing agent but to a Zillow-affiliated agent who has paid (or will pay, in the form of commission-sharing) for access to these leads. According to recent class action lawsuits filed in federal court, these agents may be required to meet quotas

for referring buyers to Zillow Home Loans in order to maintain access to leads. Agents who fail to meet these quotas risk losing their primary source of business. The lawsuits allege that Zillow uses software to monitor agent communications and identify those who recommend outside lenders.

The financial stakes are substantial and well-documented. A 2024 Federal Reserve Bank of Philadelphia study documented a gap of 54 basis points between the 10th and 90th percentile mortgage rates for identical loans—equivalent to approximately $6,500 in upfront costs. These are not trivial sums; they represent real financial harm to consumers who could have obtained better terms by shopping independently.

The policy implications are significant and timely. The Trump administration is currently drafting an executive order that would allow Americans to tap 401(k) and 529 accounts for home down payments. While this policy aims to expand homeownership, it could funnel millions of first-time buyers—the population most vulnerable to steering—into platforms like Zillow. These buyers are most reliant on guidance, least likely to shop independently, and will be using retirement savings, making any overcharges even more consequential. The combination of deceptive practices and vulnerable consumers accessing retirement funds creates a significant risk of consumer harm.

## Zillow's Consumer Trap

The following diagram illustrates how Zillow's deceptive scheme operates. It begins by offering and promoting the valuable part of Zillow's services—the large listing database and convenient access (Step 1). It continues by promoting the importance of using agents (Step 2), then offering easy "Contact Agent" and "Request a Tour" buttons (Step 3). While consumers expect to be connected to the listing agent (Step 4a), the reality is that they are sent to Zillow's partner agents who pay for referrals and are incentivized to direct consumers to Zillow's mortgages (Step 4b). The end result: buyers are manipulated into purchasing Zillow's mortgage products (Step 5).



## Conclusion

This study provides empirical evidence that Zillow's interface design systematically deceives consumers about a fundamental aspect of the homebuying process. When consumers click "Contact Agent" or "Request a Tour," the vast majority believe they are contacting the listing agent—an expectation reinforced by Zillow's own promotion of the importance of agents throughout its platform and advertising. Yet, they are not contacting the listing agent. They are being routed to agents who pay Zillow for access to their information—agents who are therefore financially incentivized to steer them toward Zillow's mortgage products.

The consistency of these findings across both question types (open-ended and closed-ended) and across income levels underscores that this is not a matter of individual confusion or lack of sophistication. The deception is built into the platform's design. Zillow's additional disclosures—presumably implemented to address concerns about transparency—produced no meaningful improvement in consumer understanding.

Zillow could significantly reduce this deception with clear, prominent disclosure. Our control condition demonstrates that when the interface clearly indicates "Contact Listing Agent" and provides the agent's name and phone number, consumers are far less deceived. While even the control condition did not eliminate all misunderstanding (two out of three respondents were incorrect in open-ended responses, and one in five in closed-ended responses), it represents a substantial improvement in the right direction. The design changes required are straightforward. The question is whether Zillow's business model—which profits from consumer misunderstanding—will permit such honesty.

8

The findings of this study can be summarized simply: Zillow's conduct is highly deceptive. Helping Americans buy homes, as the administration's planned executive order aims to do, is only half the job. Protecting them from being exploited in the process—and educating them to be informed, vigilant consumers—is the other half.

**Yoram (Jerry) Wind** *is the Lauder Professor Emeritus and Professor of Marketing at the Wharton School of the University of Pennsylvania. He has received all major awards in the marketing field and has more than 40 years of experience as a testifying expert in legal cases involving consumer behavior and survey research.*

[1] Zillow Corporate About page, https://www.zillow.com/z/corp/about/ (citing Zillow 2024 State of the Brand Report).

**Appendix: Experimental Stimuli**

The following images show the stimuli presented to respondents in each experimental condition. Test conditions 1 and 2 presented Zillow's standard interface with its existing disclosure language. Test conditions 3 and 4 presented Zillow's interface with additional disclosure language informing consumers they would be connecting with "a local buyer's agent who advertises on Zillow." The control condition presented a Zillow listing where the "Contact Agent" button actually connects users to the listing agent, whose name and contact information are clearly displayed.





**Control**

# Exhibit 8

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| ALUCARD TAYLOR, individually and on behalf of himself and all others similarly situated,<br><br>        Plaintiff,<br><br>   v.<br><br>ZILLOW, INC., ZILLOW GROUP, INC., ZILLOW HOMES, INC., and ZILLOW LISTING SERVICES, INC., Washington Corporations,<br><br>        Defendants. | Case No. _____<br><br><br>**CLASS ACTION COMPLAINT**<br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

CLASS ACTION COMPLAINT
Case No. _____

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

011313-11/3279870 V1

**TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION ..............................................................................................................1

II.  PARTIES ........................................................................................................................3

    A.  Plaintiff .................................................................................................................3

    B.  Defendants ............................................................................................................4

III.  JURISDICTION AND VENUE .....................................................................................4

IV.  FACTUAL ALLEGATIONS .........................................................................................5

    A.  Real Estate Industry Background..........................................................................5

    B.  Zillow's "Flex" Program and "Premier" Program ..............................................7

    C.  Defendants' Fraudulent Conduct ..........................................................................8

    D.  Defendants' Anti-Competitive Conduct ............................................................16

    E.  Zillow's Choice of Law Clause .........................................................................17

V.  CLASS ACTION ALLEGATIONS ..............................................................................17

VI.  TOLLING OF THE STATUES OF LIMITATIONS.....................................................20

VII.  CLAIMS FOR RELIEF ...............................................................................................20

COUNT I VIOLATIONS OF THE WASHINGTON CONSUMER PROTECTION
    ACT (WASH. REV. CODE ANN. § 19.86.010, *ET SEQ*.) (ON BEHALF
    OF A NATIONWIDE CLASS) ..............................................................................20

COUNT II VIOLATION OF THE REAL ESTATE SETTLEMENT
    PROCEDURES ACT, 12 U.S.C. § 2607 (ON BEHALF OF A
    NATIONWIDE CLASS) .........................................................................................22

COUNT III UNJUST ENRICHMENT (ON BEHALF OF A NATIONWIDE
    CLASS).....................................................................................................................25

REQUEST FOR RELIEF .........................................................................................................26

DEMAND FOR JURY TRIAL ................................................................................................26

CLASS ACTION COMPLAINT – i
Case No. _____

- i -


1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

011313-11/3279870 V1

Plaintiff Alucard Taylor brings this action on behalf of himself and on behalf of the plaintiff class (the "Class") consisting of all persons and entities who bought a home using a Zillow agent. Defendants Zillow, Inc., Zillow Group, Inc., Zillow Homes, Inc., and Zillow Listing Services, Inc. (collectively, "Zillow") are Washington State corporations engaged in online real estate transactions. In support of Plaintiff's statutory violations, fraudulent conduct and unjust enrichment claims, Plaintiff states as follows:

## I. INTRODUCTION

1. Zillow is the undisputed market leader in online real estate listings. In investment presentations, it notes that it has 66% of the U.S. real estate audience share – twice as high as its nearest competitors.[1] It also promotes the fact that 80% of consumers come to Zillow directly, and that "Zillow revenue growth has meaningfully outperformed a challenged housing market."[2] According to Zillow, it has a "leading category traffic position" and "market-leading audience," with "4x the daily active app users of nearest competitors."[3]

2. Zillow's ability to monetize this dominance is based on deceptive and illegal conduct. When potential buyers are on Zillow's website, Zillow tricks them into signing up with a Zillow agent. If the agent is part of Zillow's "Flex" program, Zillow gets 40% of the agent's commission – a payment on the back end that is undisclosed to all parties involved.

3. When a house is for sale on Zillow, the Zillow website has a big button in bright blue lettering posted next to the house listing that says "Contact Agent":

$399,987 — 3 beds — 2 baths — 1,515 sqft — Est.: $2,483/mo Get pre-qualified — Request a tour as early as tomorrow at 11:00 am — Contact agent

4. After clicking that button, potential buyers are asked to provide their contact information, which Zillow provides to a Zillow-affiliated agent. Buyers, however, naturally believe

---

[1] Zillow Group, *February 2025 Zillow Investor Presentation*, at 6, efaidnbmnnnibpcajpcglclefindmkaj/https://s24.q4cdn.com/723050407/files/doc_earnings/2024/q4/presentation/Zillow-4Q24-Investor-Presentation.pdf (last visited Aug. 22, 2025).

[2] *Id.* at 9.

[3] *Id.* at 3, 7.

CLASS ACTION COMPLAINT – 1
Case No. _____

- 1 -



1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

011313-11/3279870 V1

they are contacting the *listing* agent. Instead, they are routed to a Zillow-affiliated *buyer*'s agent, who arranges a tour of the home by getting the buyer to sign a "Touring Agreement." (The same process occurs if the potential buyer clicks the blue "Request a Tour" button.). The "Touring Agreement" promises the buyer that the agent's services are "free," but this is deceptive and not true: if the sale goes through, the buyer's agent still receives a commission. In addition, if the Zillow-affiliated agent is a "Flex" agent, he or she has to pay Zillow up to 40% of the agent's commission. This cut of the commission paid to Zillow, for no services rendered related to the real estate sale, is never disclosed to the buyer or the seller (the "Hidden Zillow Fees").

5. Zillow furthers its scheme to defraud buyers by effectively forcing home sellers and their agents to post on Zillow.com immediately after advertising the home for sale. If home sellers do not post on Zillow.com within 24 hours of going public, Zillow sends a violation notice to the seller's agent. If the selling agent violates this Zillow-imposed rule three times, the ad is banned on Zillow, effectively forcing the seller to fire her agent and find someone else who will acquiesce to Zillow's coercive tactics. This policy effectively requires sellers and their agents to forgo using other initial methods to advertise the home sale. The effect of this policy is to inflate the unjustly earned profits Zillow receives from its deceptive conduct, as it continues to increase its dominance of the market.

6. The effect of Zillow's policies and conduct is to increase the purchase price of homes for the buyers. If buyers were directed to *sellers*' agents, they would be better positioned to negotiate a lower purchase price, because the seller would not have to pay commissions to the seller's agent and the buyer's agent. It also incentivizes Zillow Flex agents to prioritize receiving his/her full commission at all costs, even if the buyer loses the bidding process. Since the Flex agents only effectively receive a 1% commission from the purchase of a home (after paying the Hidden Zillow fees and commissions to their firms), they have no practical flexibility in negotiating a lower commission. Sellers are stuck with paying 6% commission (or more) because the buyer Flex agent is receiving such a paltry sum in return, thereby increasing the purchase price of the home for the buyer. Zillow's scheme has the intent and the effect of unlawfully maintaining high and inflexible commissions that drive up the prices that buyers must pay.

CLASS ACTION COMPLAINT – 2
Case No. _____

- 2 -



1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

011313-11/3279870 V1

7.     Zillow's conduct constitutes a violation of Washington State consumer protection laws, which prohibit "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Wash. Rev. Code Ann. § 19.96.010. Zillow designs its website to trick potential buyers into connecting with a Zillow-affiliated agent instead of the seller's agent. Zillow also unfairly and deceptively does not disclose to the buyer or the seller that it is receiving the Hidden Zillow fees from the Flex agents at the tail end of the transaction – facts that both the buyer and the seller would want to know as they negotiate the close of the property.

8.     By requiring Flex agents to pay these hidden fees, Zillow is further violating the Real Estate Settlement Procedures Act ("RESPA") (12 U.S.C. § 2607), because Zillow is receiving a payment that is not in exchange for completing the property transaction. RESPA prohibits receiving payments that are not "in connection with a transaction involving a federally related mortgage loan." 12 U.S.C. § 2607(b). The Zillow Hidden Fees are not in connection with the closing of the property sale, and Plaintiff is entitled to treble damages under the statute. *See* 12 U.S.C. § 2607(d)(2).

9.     Zillow has also unjustly enriched itself as a result of this scheme. It engaged in patently unfair and deceptive behavior, and obtained a windfall of ill-gotten gains as a result. Zillow is liable to Plaintiff and the Class for all profits earned from its deceitful conduct.

10.     Plaintiff on behalf of himself and the Class accordingly brings this lawsuit for Defendants' violations of the Real Estate Settlement Procedures Act (12 U.S.C. § 2607), consumer protection violations under the laws of the State of Washington, and common law unjust enrichment. Plaintiff accordingly seeks treble damages, single damages, injunctive relief, disgorgement, and the costs of this lawsuit, including reasonable attorneys' fees.

## II.     PARTIES

### A.     Plaintiff

11.     Plaintiff Alucard Taylor is a resident of Portland, Oregon. On July 1, 2022, Plaintiff Taylor purchased a home in Portland using a Zillow agent, R.H. prior to his purchase, Plaintiff Taylor was browsing Zillow.com to look for houses, and identified a house that interested him. He clicked on the "Contact Agent" button, believing that he was contacting the listing agent; he did not know

CLASS ACTION COMPLAINT – 3
Case No. _____

- 3 -

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

011313-11/3279870 V1

that he would be routed to a Zillow agent. In his dealings with R.H. prior to and during the purchase of his home, he did not believe he had any other option than to use R.H. to make the purchase.

**B.     Defendants**

12.     Zillow, Inc. is an online real estate marketplace. It is a general corporation organized and existing under the laws of the State of Washington with its principal place of business at 1301 Second Avenue, Floor 31, Seattle, Washington. Zillow maintains real estate brokerage licenses in several states.

13.     Zillow Group, Inc. offers online real estate services and is incorporated in the State of Washington with its principle executive offices located at 1301 Second Avenue, Floor 31, Seattle, Washington. Zillow is the most visited real estate website in the United States and provides its customers an on-demand experience for selling, buying, renting, and financing, "with transparency and nearly seamless end-to-end service."[4]

14.     Zillow Homes, Inc. is organized and existing under the laws of the State of Delaware, with its principal place of business at 1301 Second Avenue, Floor 31, Seattle, Washington.

15.     Zillow Listing Services, Inc. offers a variety of real estate services. It maintains real estate brokerage licenses in several states. It is a general corporation organized and existing under the laws of the State of Washington with its principal place of business at 1301 Second Avenue, Floor 31, Seattle, Washington.

16.     Collectively, the Zillow entities identified above are referred to herein at "Defendants" or "Zillow."

### III.     JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(d)(2), because the Class defined herein contains more than 100 persons, the aggregate amount in controversy exceeds $5,000,000, and at least one member of the Class is a citizen of a State different from Defendants. Subject matter jurisdiction over this action also exists under 28 U.S.C. §§ 1331, 1337.

---

[4] *See What is Zillow?*, ZENDESK.COM, https://zillow.zendesk.com/hc/en-us/articles/202345030-What-is-Zillow (last visited Aug. 22, 2025).

CLASS ACTION COMPLAINT – 4
Case No. _____

- 4 -

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

011313-11/3279870 V1

18.     This Court has personal jurisdiction over Defendants because Defendants have: (1) transacted substantial business in the United States, including in this District; (2) transacted business with members of the Class throughout the United States, including in this District; (3) had substantial contacts with the United States, including in this District; and (4) committed substantial acts in furtherance of their unlawful scheme in the United States, including in this District.

19.     Each Defendant transacts substantial business in this District, as alleged throughout this Complaint. Defendants reside in this District or transact business in this District. Defendants also market and sell products and services in this District, have had continuous and systematic contacts with this District, and engaged in anticompetitive, unfair, and deceptive business practices that were directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

## IV.     FACTUAL ALLEGATIONS

### A.     Real Estate Industry Background

20.     State licensing laws regulate who can represent sellers and buyers in the real estate market. There are two licensee categories: (1) the real estate broker (also known as a "brokerage firm"), and (2) the individual real estate licensee or agent. Brokerage firms license individual real estate realtors or agents and are legally responsible for the actions of their licensed realtors or agents.

21.     Licensed brokers are the only entities permitted by state law to be paid to represent buyers or sellers in a real estate transaction. As a result, a real estate brokerage contracts with sellers and buyers are required to be with brokers, not agents, and all payments to individual realtors or agents pass through brokers.

22.     In typical residential real estate transactions, real estate brokers and agents receive compensation through commissions that are calculated as a percentage of a home's sale price, and the commissions are paid when the home sells.

23.     A seller broker's compensation is set forth in a listing agreement, which is a contract between the seller and the seller broker. The listing agreement specifies the total commission that a home seller will pay to the seller broker and also specifies the amount earmarked to be paid to the buyer broker (in the event the buyer has a broker).

CLASS ACTION COMPLAINT – 5
Case No. _____

- 5 -

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

011313-11/3279870 V1

24. When a buyer retains a broker, the buyer enters into a contract with that broker. The contract typically discloses that the buyer broker will be compensated by receiving a commission from the seller broker.

25. If the buyer has a broker, the seller broker pays the buyer broker a commission out of the total commission paid by the seller.

26. As a result, the buyer brokers and agents – who are supposed to assist their clients in negotiating against the seller – receive their compensation from the total commission paid by the seller, not from the buyer they represent. According to industry insiders, there is "a lot of confusion around how commissions work," where even writers for real estate publications "never get[] a very clear cut answer from the industry or from anyone" on the subject.[5] And other market participants agreed that the practice is "confusing" and that most consumers "just don't understand how commission works."[6]

27. A Multiple Listing Service ("MLS") is a database of properties listed for sale within a certain geographic region. Only registered agents and brokerages that pay for membership can access an MLS database. There are over 500 MLSs in the United States.[7]

28. After a listing is registered with an MLS, companies like Zillow automatically obtain and display these listings through back-end technology feeds called the Internet Data Exchange ("IDX") or the Virtual Office Website ("VOW"). Zillow has obtained and maintained real estate brokerage licenses for sole purpose of collecting listings – upon information and belief, Zillow itself does not provide any brokerage services. Zillow thereby exploits the listings at little cost to squeeze out profits from the listings, without any compensation to the MLSs, agents, or sellers who created the listings.

---

[5] FTC-DOJ Joint Public Workshop, Segment 1 Tr., June 5, 2018, *available at* https://www.ftc.gov/system/files/ documents/videos/whats-new-residential-real-estate-brokerage-competition-part-1/ftc-doj_residential_re_brokerage _competition_workshop_transcript_segment_1.pdf (last visited Aug. 22, 2025).

[6] FTC-DOJ Joint Public Workshop, Segment 2 Tr., June 5, 2018, *available at* https://www.ftc.gov/system/files/ documents/videos/whats-new-residential-real-estate-brokerage-competition-part-2/ftc-doj_residential_re_brokerage _competition_workshop_transcript_segment_2.pdf (last visited Aug. 22, 2025).

[7] *What is an MLS and How Many MLSs Are There? Multiple Listing Service FAQ*, RESO.ORG, https://www.reso .org/mls-faq/ (last visited Aug. 22, 2025).

CLASS ACTION COMPLAINT – 6
Case No. _____

- 6 -

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

011313-11/3279870 V1

**B.      Zillow's "Flex" Program and "Premier" Program**

29.      Behind the scenes, Zillow operates two different programs for prospective buyers' agents:  the "Flex" Program and the "Premier" Program. The Flex Program requires Flex agents to pay Zillow up to 40% of the commissions the agents earn on a sale (the Hidden Zillow Fees). Zillow Flex agents are also required to steer buyers to Zillow Home Loans; if the agents fail to meet certain quotes, they are dropped from the program.[8]

30.      Based on publicly available information, the Zillow agent identified above as "R.H." is a Zillow Flex agent.  R.H.'s "team" (brokerage service), Works Real Estate, advertises itself as "Zillow Flex," which – based on how the real estate industry operates – means that the Zillow agents are Flex agents.  Below is a clip from its Instagram page:



31.      Works Real Estate is also currently advertising for jobs, looking for Zillow Flex Partners:



---

[8] *See Flex Program Standards*, ZILLOW.COM  (https://www.zillow.com/z/flex-performance-terms/performance-standards/ (last visited Sept. 19, 2025).

CLASS ACTION COMPLAINT – 7
Case No. _____

- 7 -

011313-11/3279870 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

## Real Estate Sales Agent - Zillow Flex Partner

Works Real Estate ☑

Portland, OR

$48,226.91 - $196,492.21 a year  - Full-time

You must create an Indeed account before continuing to the company website to apply

Apply on company site ☑   🔖   🔗

32.     The Zillow Premier Program requires agents to pay on a per-lead basis, regardless of whether the lead (the prospective buyer) buys the property.[9]

**C.     Defendants' Fraudulent Conduct**

33.     The overwhelming majority of houses for sale listed in an MLS are displayed on Zillow's home search platform, and most prospective buyers search for homes on Zillow. But buyers and sellers are not aware that Zillow generates the majority of its revenues by engaging in deceptive business practices that inflate the purchase price of the homes. Financial analysts have called Zillow the "clear leader" in the market and have stated that "Zillow's traffic share appears larger than that of its next three competitors combined, and it reports that about 80% of its traffic comes from organic or direct sources. This is a major competitive advantage for Zillow."[10]

34.     When prospective buyers identify homes they are interested in purchasing, Zillow presents them with the option to click a large button with bold type labeled "Request a Tour" or "Contact Agent" in close proximity to the home photos, sale price, and key property details – creating the appearance that the potential buyer can contact the listing agent to ask questions about the property, schedule a tour, or make an offer. Meanwhile, Zillow buries the listing agent in tiny print, barely visible to the average reader.  Below is an example:

---

[9] *See Become a Premier Agent* partner, ZILLOW.COM, https://www.zillow.com/premier-agent/ (last visited Sept. 19, 2025).

[10] *See Zillow Group, Inc.: Initiation of Research Coverage,* WILLIAMBLAIR.COM (April 21, 2025), https://www.williamblair.com/News/Zillow-Group-Inc-Initiation#:~:text=%E2%80%9CImportantly%2C%20Zillow's%.20traffic%20share%20appears,from%20organic%20or%20direct%20sources (last visited Aug. 22, 2025).

CLASS ACTION COMPLAINT – 8
Case No. _____

- 8 -


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX



35.     Prospective buyers who click on the "Request a Tour/Contact Agent" buttons naturally believe they are reaching out to the *listing* agent who was hired by the home seller to "list" the property. This is a ruse. Zillow actually directs the buyer *away* from the listing agent, and redirects the buyer to a buyer agent who is working on a Zillow team, who lacks any specialized knowledge about the subject property. In addition, Zillow Flex agents have agreed to pay the Hidden Zillow fees. The Zillow agent who pays for the lead then attempts to contact the buyer and insert herself into the transaction between the buyer and the listing agent so that she can extract a buyer agent commission – typically around 3% of the purchase price of the property.

36.     On Zillow's website (as shown in the screenshot above), if potential buyers select "Contact Agent" or "Request a Tour," the ultimate outcome is the same:  they are prompted to provide their name, email, and phone number. Zillow then farms out these leads to Zillow-affiliated agents who are part of the Zillow Flex program. The agents contact the buyers, propose a tour, and

CLASS ACTION COMPLAINT – 9
Case No. _____


1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

011313-11/3279870 V1

ask the buyers to sign Zillow's "Touring Agreement."[11] The "Touring Agreement" emphasizes that the services are purportedly "free," as follows:

> **4. No Fee for the Touring Services.**
> (a) Buyer shall not owe or pay Broker any fee for the Touring Services.

37. Although the touring services are technically "free," buyers are being tricked into believing that the agent's services are free. In reality, if the buyer purchases the home, the buyer agent will add a provision to the purchase offer agreement requiring the Seller to pay a commission to the buyer agent (with no disclosure of the Hidden Zillow Fees if a Flex Agent is involved). Listing agents have recently observed that approximately 80% of the prospective buyers they communicate with about their listings have already spoken with a Zillow Agent who was using a Touring Agreement.[12]

38. This is precisely what happened to Plaintiff Taylor. In 2022, when browsing Zillow.com to look for houses of interest to him, he clicked on the "Contact Agent" button, assuming that he would be contacting a *listing* agent. Instead, he was routed to a Zillow agent. During the touring and closing process, Plaintiff Taylor did not believe he had any other option other than to use the Zillow agent. If Plaintiff Taylor was able to contact the listing agent, the seller could have paid less commissions, and the purchase price could have been lower. The Hidden Zillow Fees were not disclosed to Plaintiff Taylor.

39. As Forbes' Magazine described it, this is a classic bait-and-switch scheme by Zillow:

> [The Premier Agent Program], for many years Zillow's primary source of revenue, is based on what appears to me to be a classic bait-and-switch. Each Zillow property page contains, in bold letters at the top, the name of an agent to contact. Ah, thinks the reader, this is the exclusive listing agent who handles the property and is the person most knowledgeable about it. But no, it's not. It's just the name of the agent who has PAID Zillow/StreetEasy for the privilege of being listed there.[13]

---

[11] Touring Agreement Oregon, ZILLOWGROUP.COM, https://delivery.digitallibrary.zillowgroup.com/public/OR-FinalTouringAgreement_pdf_Original.pdf (last visited Sept. 19, 2025).

[12] *See, e.g.,* Jordan Teicher, *What Happens When a Buyer Contacts a Premier Agent Partner?*, ZILLOW.COM (July 19, 2024), https://www.zillow.com/premier-agent/when-buyers-contact-premier-agent/ ("78% of buyers use Zillow has part of their home-buying journey.") (last visited Aug. 22, 2025).

[13] *See* Frederick Peters, *Buyers Beware of this Advertising Tactic by Zillow and StreetEasy*, FORBES (Dec. 9, 2020), *available at* https://www.forbes.com/sites/fredpeters/2020/12/09/buyers-beware-of-this-advertising-tactic-by-zillow-and-streeteasy/ (last visited Sept. 18, 2025).

CLASS ACTION COMPLAINT – 10
Case No. _____

- 10 -



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

011313-11/3279870 V1

40. Zillow acknowledges that the Touring Agreement is designated to "set[] up the expectation of representation."[14] Zillow further explains the Touring Agreement (described as a "buyer agreement" below) as follows (*id.*):

## Why buyer agreements are important

Buyer agreements typically lay out exactly what the agent will do for a client. However, requiring an exclusive commitment upfront before the buyer feels comfortable can negatively impact the consumer experience. To put it simply, most people want to date before becoming exclusive.

At the same time, agents deserve to be compensated for the value they provide to buyers. Since this is an introductory agreement, we still anticipate that buyers and agents will sign a longer-term agreement that outlines compensation terms, if they choose to work together throughout the buying process.

The reference to "compensation terms" relates to commissions, not the Hidden Zillow Fees, which are not disclosed to the buyer or the seller.

41. Zillow describes its Touring Agreement as a "buyer agreement," even though it is not labeled as such. But the "buyer agreement" is "limited," as Zillow acknowledges. Again from Zillow's website (*id.*):

This could be someone's first introduction to buyer agreements, so this approach lets you and the buyer enter the first showing with a signed limited services agreement that satisfies requirements outlined in the NAR settlement.

42. Notwithstanding this "buyer's agreement," Zillow fails to disclose to home buyers that if they work with a Zillow-affiliated Flex agent, Zillow will collect up to 40% of that agent's commission (the Hidden Zillow Fees). Zillow-affiliated Flex agents, who must pay up to half of their commission to Zillow, are driving up the commission amounts to cover their costs. And buyers are forced to pay more for homes based on the rising commission costs. Traditionally, when necessary, in an ordinary situation non-Zillow agents are often willing to make concessions on their commission

---

[14] *See* Zillow Premier Agent, *Zillow's New Touring Agreement Helps Agents Seamlessly Adjust to Industry Changes*, ZILLOW.COM (Aug. 1, 2024), https://www.zillow.com/premier-agent/zillow-touring-agreement-nar-settlement/#state (last visited Aug. 22, 2025).

CLASS ACTION COMPLAINT – 11
Case No. _____



1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

011313-11/3279870 V1

rates to get a deal done. But Zillow-affiliated Flex agents, who operate on far tighter margins, are less willing to reduce their commission amount to satisfy the demands of a home seller.

43. Zillow takes steps to hide the Hidden Zillow Fees from buyers and sellers. Zillow's webpage suggests that the Hidden Zillow Fees are paid out of escrow,[15] but this is not true. The Hidden Zillow Fees are actually paid by the buyer broker directly to Zillow, so that the buyer and seller are never made aware of it during the closing process.

44. Zillow maintains recordings of all introductory calls between buyers and Zillow-affiliated agents who paid for their referrals. Upon information and belief, Zillow-affiliated agents on these calls do not readily disclose that they are not the listing agent.[16]

45. Sales of referrals or "leads" to real estate agents are Zillow's primary source of revenues, which grew to over $2 billion last year. As sellers pay inflated commissions, and traditional real estate brokers experience declining revenues, Zillow revenues continue to grow. Real estate agent and commentator Jon Brooks further describes Zillow's deceptive business practices and referral fees as follows:[17]



---

[15] *See Flex Compliance Policies & The Disengagement Process*, ZILLOW.COM, https://www.zillow.com/z/flex-performance-terms/compliance/#:~:text=Payment%20must%20be%20remitted%20to,.must%20show%.20Gross.%20Commission%20earned (last visited Aug. 22, 2025).

[16] *See* Byron Lazine, *From Lead to Appointment: The Zillow Buyer Script that Works* YOUTUBE.COM (Dec. 23, 2024), available at https://www.youtube..com/watch?v=Hcd2vROkyV0&t=114s (last visited Sept. 18, 2025).

[17] *See* John Brooks, *Zillow's Hidden 40% Agent Fee is Costing You Big*, YOUTUBE.COM (June 4, 205), https://www.youtube.com/watch?v=QnDIi-JT1SA (last visited Aug. 22, 2025).

CLASS ACTION COMPLAINT – 12
Case No. _____

011313-11/3279870 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX



These referral fees are what make it so expensive for agents to operate in the market because there's 204 million unique active users on Zillow.

[]

Zillow continues to gobble up more and more and more of your money that you're paying in commissions, and you didn't even know about it when you clicked the button on Zillow.

[]

This is a ton of money – of your money – that you think is going to the real estate agent that's not going to the real estate agent or the broker; it's going straight to Zillow off the top, and by the way, they have been raising these fees over time, as you can see that the top range actually increased it from 35% to 40%.

[]

Zillow is making just as much money as the agent is making and all Zillow is doing is selling your information to the real estate agent.

[]

Now where can you find the information of the agent who actually has the listing? So they are selling your information to the buyer agent; you're not getting in touch with the listing agent, the one who actually has the listing. The one who actually  -- and this is where they hide it – it is the person right here. You need to call this number right there in order to get in touch with the real estate agent who actually has the listing and knows about the property. And this is one of the problems; it's hidden down a little bit on the page where you can barely find it.

CLASS ACTION COMPLAINT – 13
Case No. _____

- 13 -

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

011313-11/3279870 V1



46.     In truth, contrary to Jon Brooks' statement, the Zillow listings do not routinely even include the seller agent's phone numbers. Many times it simply provides the agent's name, as excerpted below:



47.     Zillow charges Flex Agents up to 40% of their commission in exchange for the leads, and agents who are willing to pay this outsized fee are typically less skilled and experienced with


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

real estate transactions, and less knowledgeable about the local residential real estate market, than agents who are not willing to pay the fee. Buyers are stuck with agents who offer inferior services for an inflated price.

48.     Ironically, Zillow promotes "independent representation" of buyers and sellers, while engineering a relationship such that the agents are entirely dependent on – and compromised by – Zillow. As the website states, "We strongly believe in the value of independent representation: Buyers and sellers deserve to work with an agent who is committed their best interests and only represents them."[18] This is plainly false; the agents effectively represent Zillow.

49.     Through its Hidden Zillow Fees scheme, Zillow is aiding and abetting the breaching of the agents' fiduciary duties to their clients. Under Oregon law, for example, a real estate agent representing a buyer has several duties, including an obligation to "act under a written representation agreement with the buyer. The representation agreement must (a) Be entered into before, or as soon as reasonably practicable after, the licensee has commenced efforts to assist the buyer in purchasing real property or in identifying real property for purchase." O.R.S. § 696.810(1). In addition:

> (5) A buyer's agent owes the buyer, other principals and the principals' agents involved in a real estate transaction the following affirmative duties:
>
> (a) To deal honestly and in good faith;
>
> (b) To present all written offers, written notices and other written communications to and from the parties in a timely manner without regard to whether the property is subject to a contract for sale or the buyer is already a party to a contract to purchase; and
>
> (c) To disclose material facts known by the buyer's agent and not apparent or readily ascertainable to a party.
>
> (6) A buyer's agent owes the buyer involved in a real estate transaction the following affirmative duties:
>
> (a) To exercise reasonable care and diligence;
>
> (b) To account in a timely manner for money and property received from or on behalf of the buyer;
>
> (c) To be loyal to the buyer by not taking action that is adverse or detrimental to the buyer's interest in a transaction;

---

[18] *See* Zillow Premier Agent, *Zillow's New Touring Agreement Helps Agents Seamlessly Adjust to Industry Changes*, ZILLOW.COM (Aug. 1, 2024), https://www.zillow.com/premier-agent/zillow-touring-agreement-nar-settlement/#state (last visited Aug. 22, 2025).

CLASS ACTION COMPLAINT – 15
Case No. _____

- 15 -

011313-11/3279870 V1


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

(d) To disclose in a timely manner to the buyer any conflict of interest, existing or contemplated;

(e) To advise the buyer to seek expert advice on matters related to the transaction that are beyond the agent's expertise;

(f) To maintain confidential information from or about the buyer except under subpoena or court order, even after termination of the agency relationship; and

(g) Unless agreed otherwise in writing, to make a continuous, good faith effort to find property for the buyer, except that a buyer's agent is not required to seek additional properties for the buyer while the buyer is subject to a contract for purchase or to show properties for which there is no written agreement to pay compensation to the buyer's agent. [O.R.S. § 696.810(5) & (6).]

50.     Zillow Flex Agents are violating their fiduciary duties in many respects, including by not disclosing their Hidden Zillow fees, and not exercising reasonable skill and care on behalf of the buyers.

**D.     Defendants' Anti-Competitive Conduct**

51.     The harmful effects of Zillow's fraudulent conduct are exacerbated and amplified by its abuse of its dominant position to monopolize as many listings as possible. On April 10, 2025, Zillow announced that it would be implementing the Zillow Listing Access Standards (the "Zillow LAS"). Under this program, agents must list any properties on MLS (which thereby get routed to Zillow) within 24 hours of any effort by the seller's agent to sell the property. This includes, for example, yard signs, virtual tours, or social media posts.[19]  If the agents do not list their properties within 24 hours, they are sent warnings of non-compliance. According to Zillow, "each non-compliant listing will be logged as a single violation and the listing agent will be notified directly on each violation." *Id.*

---

[19] *See* Zillow Premier Agent, *Zillow's Listing Access Standards:  What Agents Need to Know*, ZILLOW.COM (May 20, 2025), *available at* https://www.zillow.com/premier-agent/agents-know-listing-access-standards/ (last visited Aug. 22, 2025). Zillow defines "public marketing" to mean (i) "promoting, marketing, or advertising a listing in any manner", including without limitation, "flyers, yard signs, social media, public-facing websites or apps, emails, printed mailers, newspapers, open houses, previews, showings, multi-brokerage listing sharing networks, virtual tours, and brokerage private listing networks to the extent such listing network is publicly marketed and/or accessible to consumers, including those accessible only to a brokerage's clients behind a registration wall"; and/or (ii) sending and/or transmitting a Listing, regardless of status, to an MLS, unless seller opts out of the display of the Listing everywhere on the internet due to privacy concerns, and executes a Seller Waiver (as defined below). *Id.*

CLASS ACTION COMPLAINT – 16
Case No. _____

- 16 -

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

011313-11/3279870 V1

52. Critically, *every single post* is a violation, and "an agent's third non-compliant listing – and any subsequent non-compliant listings – will be blocked from Zillow and Trulia for the life of the listing agreement between that listing broker and seller." *Id*. The practical effect of this conduct is that sellers and their agents are forced to list through Zillow via the MLS within 24 hours of putting out any public information about the property for sale. The purpose and effect of this policy is to ensure that all houses, throughout the country, will be listed on Zillow so that Zillow can maintain and grow its monopoly and continue to unjustly earn profits through its fraudulent practices.

53. Zillow's efforts to capture the whole market are made more insidious because Zillow slaps the homes for sale with a "Zestimate" (Zillow's estimate of the sale price of the home), which is often inaccurate and is contrary to the seller's interest. Zillow acknowledges in fine print that "[t]he amount of data we have for your home and homes in your area directly affects the Zestimate's accuracy, including the amount of demand in your area for homes."[20]

54. Without the deceptive practices, more home buyers would connect directly with listing agents and avoid the Hidden Zillow Fees. Due to Zillow's deceptive practices, more buyers use buyer agents than they otherwise would, which results in higher buyer broker commissions and correspondingly higher purchase prices. Neither Zillow nor the participating real estate agents disclose to the buyer that Zillow collects up to 40% of the commissions that the seller pays to the buyer broker.

**E. Zillow's Choice of Law Clause**

55. According to Zillow's "Terms of Use," Washington State law applies to any disputes between Zillow and its users.[21]

**V. CLASS ACTION ALLEGATIONS**

56. Plaintiff brings this action on behalf of himself, and as a class action under Federal Rule of Civil Procedure 23, on behalf of the members of the following Class based on violations of consumer protection laws, RESPA, and unjust enrichment:

---

[20] What is a Zestimate?, ZILLOW.COM, https://www.zillow.com/z/zestimate/ (last visited Aug. 22, 2025).
[21] *See Zillow Terms of Use*, ZILLOW.COM (May 20, 2025), https://www.zillow.com/z/corp/terms/ (last visited Sept. 18, 2025).

CLASS ACTION COMPLAINT – 17
Case No. _____

011313-11/3279870 V1

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

> All persons and entities in the United States who, from September 19, 2021 to the present, purchased a home listed on Zillow.com, and were represented by a Zillow agent.

57. Excluded from the Class are Defendants, their officers, directors and employees; any entity in which Defendants have a controlling interest; and any affiliate, legal representative, heir or assign of any Defendant. Also excluded from the Class are any judicial officers presiding over this action and the members of their immediate family and judicial staff, jurors, and Plaintiff's counsel and employees of their law firms.

58. The Class is readily ascertainable because records of the relevant property transactions should exist and are easily obtainable.

59. The Class members are so numerous that individual joinder of all its members is impracticable. Due to the nature of the trade and commerce involved, Plaintiff believes that the Class has at least tens of thousands of members, the exact number and their identities being known to Defendants.

60. Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff's interests are aligned with, and not antagonistic to, those of the other members of the Class.

61. Common questions of law and fact exist as to all members of the Class and predominate over questions affecting only individual Class members. These common legal and factual questions, each of which also may be certified under Rule 23(c)(4), include but are not limited to the following:

    a. Whether Defendants engaged in the alleged conduct;

    b. Whether the conduct of Defendants caused injury to the business or property of Plaintiff and the other members of the Class;

    c. Whether the effect of Defendants' conduct was to inflate both total commissions and buyer broker commissions that increased the buyer's purchase price;

    d. Whether Plaintiff and the other members of the Class are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such injunctive relief;

CLASS ACTION COMPLAINT – 18
Case No. _____

- 18 -


1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

011313-11/3279870 V1

e.    Whether Defendants' conduct is unlawful; and

f.    The appropriate class-wide measures of damages.

62.    Plaintiff's claims are typical of the claims of the members of the Class because his claims arise from the same course of conduct by Defendants, and the relief sought within the Class is common to each member. There are no defenses available to Defendants that are unique to Plaintiff or to any particular Class members.

63.    Plaintiff will fairly and adequately represent and protect the interests of the Class, has no interest incompatible with the interests of the Class, and has retained counsel competent and experienced in class action, consumer protection, and false advertising litigation.

64.    A class action is the superior method for the efficient adjudication of this litigation because individual litigation of Class members' claims would be impracticable and individual litigation would be unduly burdensome to the courts. Because of the size of the individual Class members' claims, no Class member could afford to seek legal redress for the wrongs identified in this Complaint. Without the class action vehicle, the Class would have no reasonable remedy and would continue to suffer losses, as Defendants continue to engage in the unlawful, unfair, fraudulent, and/or deceptive conduct that is the subject of this Complaint, and Defendants would be permitted to retain the proceeds of their violations of law. Further, individual litigation has the potential to result in inconsistent or contradictory judgments. A class action in this case presents fewer management problems and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

65.    Additionally, the Class may be certified under Rule 23(b)(1) and/or (b)(2) because:

a.    The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants;

b.    The prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the

adjudication, or substantially impair or impede their ability to protect their interests; and/or

    c.    Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class members as a whole.

## VI. TOLLING OF THE STATUES OF LIMITATIONS

66. As of the date of this Complaint, Zillow still does not disclose on its website whether Zillow-affiliated real estate agents are Zillow "Flex" agents. More importantly, Zillow and its affiliated agents at no point disclose the existence of the Hidden Zillow Fees to buyers or sellers during the property transaction. There was no reasonable way for the public, including Plaintiff Taylor, to know that Zillow Flex agents were involved in their transactions, and certainly no reasonable way for the public and Plaintiff Taylor to know about the payment of the Hidden Zillow fees. Indeed, Zillow concealed these facts from buyers and sellers.

67. Plaintiff Taylor and Zillow.com users further had no way of knowing about Zillow deceptive conduct generally, including the deceptive design of Zillow's website. As a result, Plaintiff Taylor and other members of the public did not discover and reasonably could not have discovered Zillow's fraudulent conduct and receipt of hidden fees. Any applicable statues of limitations or repose are accordingly tolled.

## VII. CLAIMS FOR RELIEF

### COUNT I

**VIOLATIONS OF THE WASHINGTON CONSUMER PROTECTION ACT**
**(Wash. Rev. Code Ann. § 19.86.010, *et seq*.)**
**(On Behalf of A Nationwide Class)**

68. Plaintiff (for purposes of all Washington Class Counts) incorporates by reference all paragraphs as though fully set forth herein.

69. Plaintiff bring this Count on behalf of the nationwide class based on violations of Washington's Consumer Protection Act (the "Washington CPA").

70. Defendants, Plaintiff, and each member of the Washington Class are "person[s]" under Wash. Rev. Code Ann. § 19.86.010(1) ("Washington CPA").

CLASS ACTION COMPLAINT – 20
Case No. _____

- 20 -

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

011313-11/3279870 V1

71.     At all relevant times, Defendants were and are engaged in "trade" or "commerce" under Wash. Rev. Code Ann. § 19.86.010(2).

72.     The Washington CPA broadly prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Wash. Rev. Code Ann. § 19.96.010. Defendants' conduct was unfair because it (1) offends public policy as it has been established by statutes, the common law, or otherwise; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to consumers. In short, Defendants' conduct has been deceptive because they have the capacity or tendency to deceive.

73.     In the course of Defendants' business, Defendants crafted their website to deceive buyers into believing that they were contacting the *seller*'s agent, when in fact potential buyers were being routed to a Zillow-affiliated agent. When the agent was a Zillow Flex agent, the Flex agent failed to disclose (and was prohibited from disclosing) the Hidden Zillow Fees to the buyer or seller. The net effect of Defendants' conduct was to drive up the commission paid by sellers, to the detriment of the sellers.

74.     Defendants knew or should have known that their conduct violated the Washington CPA.

75.     Defendants owed Plaintiff and the Class a duty to disclose the truth about the deceptive website and the Hidden Zillow Fees because Defendants:

a.     Possessed exclusive knowledge of the deceptive website and the Hidden Zillow Fees; and

b.     Intentionally concealed the foregoing from Plaintiff and the Class.

76.     Defendants' conduct proximately caused injuries to Plaintiff and the other Class members.

77.     Plaintiff and the other Class members were injured and suffered ascertainable loss, injury in fact, and/or actual damage as a proximate result of Defendants' conduct in that Plaintiff and the other Class members paid inflated commissions related to the sales of their homes. These injuries are the direct and natural consequence of Defendants' misrepresentations, fraud, deceptive practices, and omissions.

78.     Defendants' conduct also aided and abetted the buyer agent's fiduciary duties to Plaintiff Taylor, in that the agent did not disclose the material fact of the Hidden Zillow Fees that the agent had to pay to Zillow.

79.     Defendants' violations present a continuing risk to Plaintiff as well as to the general public. Defendants' unlawful acts and practices complained of herein impact the public interest, in that home sellers are paying inflated commissions as a result of Defendants' conduct.

80.     Defendants are liable to Plaintiff and the Class members for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages up to $25,000, as well as any other remedies the Court may deem appropriate under Wash. Rev. Code. Ann. § 19.86.090.

**COUNT II**

**VIOLATION OF THE REAL ESTATE SETTLEMENT
PROCEDURES ACT, 12 U.S.C. § 2607**
**(On Behalf of A Nationwide Class)**

81.     Plaintiff repeats and incorporates by reference each paragraph above and in any other count of this Complaint.

82.     The Real Estate Settlement Procedures Act ("RESPA") (codified at 12 U.S.C. § 2601, *et seq.*) was enacted in 1974 to provide consumers with greater and timelier disclosure of the nature and costs of the real estate settlement process and to protect them from abusive practices.

83.     RESPA's premise was that complete disclosure of information would preclude illegal kickbacks, fee splits, unearned fees, and compensated referrals, and thereby empower the consumer to get the same or better services at a lower cost.

84.     Section 7 of RESPA (12 U.S.C. § 2607) provides: "No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed." 12 U.S.C. § 2607(b).

85.     RESPA confers on the Secretary of the U.S. Department of Housing and Urban Development ("HUD") authority to prescribe rules and regulations to achieve the purposes of RESPA. The regulation adopted by HUD to fulfill its mandate is known as Regulation X, 24 C.F.R. § 3500, *et seq.*

CLASS ACTION COMPLAINT – 22
Case No. _____

- 22 -



011313-11/3279870 V1

86.     RESPA achieves its goals in a twofold manner: by imposing disclosure requirements in connection with settlement services, and by prohibiting certain practices in connection with settlements.

87.     The term "settlement services" includes any service provided in connection with a real estate settlement, including, but not limited to, providing brokerage services.

88.     HUD has determined in its regulations that kickbacks, fee splits, and referral fees in connection with residential real estate sales are anticompetitive, result in harm to consumers, and thus illegal.

89.     24 C.F.R. § 3500.14 further explains the prohibitions in 12 U.S.C. § 2607 as follows:

(b)     <u>No referral fees</u>. No person shall give and no person shall accept any fee, kickback or other thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or part of a settlement service involving a federally related mortgage loan shall be referred to any person. Any referral of a settlement service is not a compensable service, except as set forth in Sec. 3500.14(g)(1). A business entity (whether or not in an affiliate relationship) may not pay any other business entity or the employees of any other business entity for the referral of settlement service business.

(c)     <u>No split of charges except for actual services performed</u>. No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed. A charge by a person for which no or nominal services are performed or for which duplicative fees are charged is an unearned fee and violates this section. The source of the payment does not determine whether or not a service is compensable. Nor may the prohibitions of this part be avoided by creating an arrangement wherein the purchaser of services splits the fee.

(d)     <u>Thing of value</u>. This term is broadly defined in section 3(2) of RESPA (12 U.S.C. 2602(2)). It includes, without limitation, monies, things, discounts, salaries, commissions, fees, duplicate payments of a charge, stock, dividends, distributions of partnership profits, franchise royalties, credits representing monies that may be paid at a future date, the opportunity to participate in a money-making program, retained or increased earnings, increased equity in a parent or subsidiary entity, special bank deposits or accounts, special or unusual banking terms, services of all types at special or free rates, sales or rentals at special prices or rates, lease or rental payments based in whole or in part on the amount of business referred, trips and payment of another person's expenses, or reduction in credit against an existing obligation. The term "payment" is used throughout Secs. 3500.14 and 3500.15 as synonymous with the giving or receiving any "thing of value" and does not require transfer of money.

CLASS ACTION COMPLAINT – 23
Case No. _____

- 23 -

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

011313-11/3279870 V1

90. The Plaintiff's settlements of residential real estate purchases and sales were financed in whole or in part by federally related mortgage loans. Specifically, Plaintiff Taylor used a lender which is regulated by an agency of the Federal Government.

91. Defendants are real estate settlement services providers that provided real estate settlement services involving federally related mortgage loans within the meaning of 12 U.S.C. § 2602(2) and § 2607(a) for the settlements at issue.

92. In the alternative to the preceding allegation, Defendants are subject to RESPA because it ostensibly "provides business incident to or part of" a real estate settlement service and received settlement fees in connection therewith, within the meaning of 24 C.F.R. §§ 3500.2 and 3500.14, *et seq.*

93. In the alternative to the preceding allegation, each Defendant is also a person who received a split of commissions (other than for services performed) that were paid for the rendering of a settlement service in transactions involving federally related mortgage loans, within the meaning of 12 U.S.C. § 2607(a) and (b).

94. The Hidden Zillow Fees were paid to Zillow by seller brokers as settlement service providers using settlement proceeds within the meaning of 12 U.S.C. §§ 2602(2) and 2607(a) and 24 C.F.R. §§ 3500.2 and 3500.14, *et seq.*

95. The seller brokers paid the Hidden Zillow Fees from settlement proceeds in connection with real estate settlements involving federally related mortgage loans.

96. The Zillow-affiliated agents who received real estate commissions from the subject settlements acquiesced in splitting those commissions with the Defendants by paying the Hidden Zillow Fees in connection with real estate settlements involving federally related mortgage loans.

97. Defendants accepted the Hidden Zillow Fees either as a settlement services provider, a purported provider of services incident to or part of a real estate settlement service, or a person within the meaning of 12 U.S.C. § 2607, *et seq.*

98. Payment and receipt of the Hidden Zillow Fees violated 12 U.S.C. § 2607(b) in that it represents a split of commissions paid without rendering any settlement services in connection with a federally related mortgage loan.

CLASS ACTION COMPLAINT – 24
Case No. _____

011313-11/3279870 V1



1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

99. Defendants collect the unearned Hidden Zillow Fees from settlement proceeds *only* when a listed property sells.

100. The Hidden Zillow Fees are paid from settlement proceeds after all real estate settlement services have been rendered. The Hidden Zillow Fees serve no legitimate purpose, and are an illegal fee for which Defendants perform no services.

101. Each Defendant is jointly and severally liable to the Plaintiff pursuant to 12 U.S.C. § 2607(d)(2) in an amount equal to three times the Hidden Zillow Fees.

## COUNT III

### UNJUST ENRICHMENT
**(On Behalf of A Nationwide Class)**

102. Plaintiff repeats and incorporates by reference each paragraph above and in any other count of this Complaint.

103. As a result of the wrongful and deceptive conduct of Defendants as alleged herein, Defendants knowingly and voluntarily accepted and retained wrongful benefits in the form of Hidden Zillow Fees and referral fee payments by Premium Agents (the "Premium Fees").

104. In so doing, Defendants acted with conscious disregard for the rights of Plaintiff and members of the Class.

105. As a result, each Defendant has been unjustly enriched at the expense of, and to the detriment of, Plaintiff and members of the Class.

106. The unjust enrichment of Defendants is traceable to, and resulted directly and proximately from, the conduct alleged herein.

107. Defendants either knew or should have known that the Hidden Zillow Fees and the Premium Fees were obtained by deception and were unearned. As such, it would be inequitable for Defendants to retain the benefit of the Hidden Zillow Fees and Premium Fees under these circumstances.

108. The financial benefits derived by Defendants from collecting Hidden Zillow Fees and Premium Fees rightfully belong to Plaintiff and Class members.

CLASS ACTION COMPLAINT – 25
Case No. _____

- 25 -



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

011313-11/3279870 V1

109.    Defendants' acceptance and retention of the Hidden Zillow Fees and Premium Fees under the circumstances alleged herein make it inequitable for Defendants to retain the benefits without payment of the value to Plaintiff and Class members.

110.    Plaintiff and Class members are entitled to recover from Defendants all amounts wrongfully collected and improperly retained by Defendants, plus interest thereon.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all Class members, respectfully requests that the Court enter judgment in his favor and against Defendants, as follows:

A.    Determine that this action may be maintained as a class action pursuant to Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure; direct that reasonable notice of this action, as provided by Rule 23(c)(2), be provided to the Class; and declare Plaintiff as the representatives of the Class;

B.    Enter joint and several judgments against the Defendants and in favor of Plaintiff and the Class;

C.    Award the Class damages (i.e., three times the Hidden Zillow Fees and/or the Premium Fees) in an amount to be determined at trial;

D.    Order disgorgement in the amount by which Defendants' ill-gotten gains exceed the treble damages awarded in this case;

E.    Permanently enjoin Defendants' ongoing anticompetitive and deceptive conduct;

F.    Award Plaintiff and the Class their costs of suit, including reasonable attorneys' fees as provided by law; and

G.    Award such further and additional relief as the case may require and the Court may deem just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial for all claims so triable.

CLASS ACTION COMPLAINT – 26
Case No. _____

- 26 -

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE (206) 623-0594 FAX

011313-11/3279870 V1

DATED: September 19, 2025

Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By: /s/ Steve W. Berman
    Steve W. Berman (WSBA No. 12536)
By: /s/ Jerrod C. Patterson
    Jerrod C. Patterson (WSBA No. 43325)
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile:  (206) 623-0594
Email: steve@hbsslaw.com
       jerrodp@hbsslaw.com

Douglas J. McNamara*
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Avenue NW, 8th Floor
Washington, DC 20005
Telephone:  (202) 408-4600
Email: dmcnamara@cohenmilstein.com

Theodore J. Leopold*
COHEN MILSTEIN SELLERS & TOLL PLLC
11780 U.S. Highway One
Suite N500
Palm Beach Gardens, FL 33408
Telephone: (561) 515-1400
Facsimile: (561) 515-1401
Email: tleopold@cohenmilstein.com

*Attorneys for Plaintiff and the Proposed Class*

*Pro hac vice application forthcoming*

CLASS ACTION COMPLAINT – 27
Case No. _____

- 27 -

011313-11/3279870 V1

# Exhibit 9

*The Seattle Times*

*The Seattle Times*

**Real Estate**

# Zillow accused of referral monopoly, steering homebuyers to its lenders

Jan. 21, 2026 at 6:00 am | *Updated Jan. 21, 2026 at 6:00 am*

◀) Listen to article



A laptop displaying the Zillow website. Zillow has been sued by a Kitsap County real estate agency, which claims it was overcharged on commission fees and penalized for refusing to steer clients toward Zillow's home... (Tiffany Hagler-Geard / Bloomberg, 2021) **More** ⌄

By Alexis Weisend

*Seattle Times business reporter*

A new lawsuit alleges Zillow used its monopoly power to charge high referral fees and pressured agents to channel homebuyers into its lending business.

The lawsuit filed Friday in the U.S. District Court for the Western District of Washington comes as Zillow defends itself against other lawsuits filed by homeowners alleging similar practices.

Stephanie Dupuis, owner of the Dupuis team, claims in the lawsuit that Zillow overcharged her Silverdale, Kitsap County, agency on

commission fees and later retaliated after she refused to steer clients toward the home loans program.

The Dupuis Team receives referrals from Zillow through a program called Preferred Agent, which connects potential buyers to agents when they request to tour a property.

Despite the program being an essential source of business for the agency, the team has struggled with "substantial" membership costs and stipulations, according to the lawsuit.

Dupuis' attorney, Ryan McDevitt with the law firm Keller Rohrback, claims in the lawsuit that Zillow flexes its monopoly power to charge excessive commission fees of up to 40% when the industry norm is 25%.

"Agents are effectively forced to do business with Zillow because of its vast market power…" McDevitt wrote.

In a statement Tuesday, a Zillow spokesperson said its referral fees are consistent with industry practices and do not prevent buyers from negotiating fees with their agents.

"This complaint tells a one-sided story that does not reflect how Zillow Preferred partners serve buyers or how we work with real estate agents," the spokesperson said.

Additionally, the lawsuit claims the Dupuis Team saw a drop in referrals after Zillow ramped up pressure on agents to push their clients toward its lending business, Zillow Home Loans.

By integrating its home lending with an agent program, Zillow has seen purchase loan origination volume increase 2.6 times, according to the company's 2024 annual report.

Dupuis claims that she had to sign up for another program that gives lenders access to client information, or be kicked out of the Preferred Agent program.

She worried the program would "compromise her duties to clients by divulging confidential information," according to the lawsuit, but was forced to participate in the program to keep receiving Zillow's connections.

Still, she would not pressure her clients to choose one lender over another, according to the lawsuit.

"Based on Ms. Dupuis's concerns with Zillow's practices and respect for her duties to clients, she and her team refused to steer clients toward (Zillow Home Loans)," McDevitt wrote.

Due to the Dupuis Team's low Zillow Home Loan pre-approvals rates, Zillow capped the number of connections the agency would get per month. Zillow also terminated her access to another product that enhances the visibility of listings, the lawsuit claims.

The lawsuit alleges that Zillow violated state and federal antitrust law and seeks a class action status for all United States residents who were enrolled in Zillow's Premier, Preferred or Flex Agent programs. It requests unspecified financial compensation and for Zillow to give up any profits gained from the practices.

Dupuis and her attorney declined to comment.

The Zillow spokesperson said consumers are always in control of which agent and lender they work with, and that Zillow supports agents who deliver strong outcomes for buyers by sharing clear information and helping them understand what they can afford.

"We will defend ourselves against these claims, while we stay focused on delivering a better real estate experience for buyers, sellers, renters and the professionals who serve them," the spokesperson said.

The complaint is the latest in a flurry of legal challenges that have slammed Zillow within the last year.

In September, a homebuyer who used a Zillow agent filed a lawsuit, claiming the company illegally tricks homebuyers into working with its agents who owe a large chunk of their commission to Zillow — a transaction not disclosed to homebuyers.

In November, another homebuyer sued Zillow for allegedly pressuring her to take out a home loan through Zillow, which her agent led her to believe was her only lending option, the lawsuit claims.

Zillow, which says it accounts for two-thirds of monthly unique visits to real estate websites, has also been accused of anticompetitive actions.

Last fall, the Federal Trade Commission as well as five other states, including Washington, sued Zillow and Redfin for allegedly conspiring to eliminate competition for rental housing listings. The lawsuits came months after the companies had announced a $100 million deal for Zillow to become the exclusive provider of multifamily rental listings on Redfin.

Zillow has denied any wrongdoing.

*Alexis Weisend*: *aweisend@seattletimes.com*.

 View 0 Comments / 0 New

# Exhibit 10

# Trump Thumps Davos' 'You'll Own Nothing' Plan. And Here's Another Target for His Sights.

pulse- thenationalpulse.com/analysis-post/trump-thumps-davos-youll-own-nothing-plan-and-heres-another-target-for-his-sights

The National Pulse                                                          January 22, 2026

Housing affordability is one of the defining issues in American life. President Trump waxed lyrical about it from the stage at Davos this week, decrying major corporations for gobbling up U.S. housing stock.

"Homes are built for people, not for corporations, and America will not become a nation of renters," the President told the World Economic Forum (WEF). "That's why I have signed an executive order banning large institutional investors from buying single-family homes. It's just not fair to the public. They're not able to buy a house."

The numbers are pretty grim. The frustration is palpable and widespread. The sense that the system is now rigged beyond salvation grows stronger year by year.

America's median homebuyer is now 59 years old. That is not a functioning housing market. That is a country where adults are being shut out of homeownership.

Trump's comments, as well as his actions, are a direct negation of the WEF's 2016 slogan: "You'll own nothing, and you'll be happy."

But one executive order and one speech do not a summer make.

If the Trump Administration wants to ratchet up its pursuit of affordability for Americans, it should take a long, hard look at another powerful actor shaping the housing market in ways most do not comprehend. It may be sitting right on your phone as you read this.

**It's Zillow.**

For many, Zillow is just a harmless app where you can scroll through listings and daydream. In practice, the company has become something much bigger. Zillow is no longer just a platform that shows you what is available. It has grown into a vertically integrated housing company with its own internal ecosystem. That ecosystem now includes its own mortgage operation, called *Zillow Home Loans.*

Now, Zillow is not just a participant in the housing market. It has become one of the market's gatekeepers. It can influence what buyers see, who they contact, and how quickly all these pieces can move. When a company has that kind of sway, it can shape consumer behavior without ever having to announce it.

According to a new lawsuit, that power may be getting used in a way that hurts buyers at the worst possible time, when every dollar counts.

Reuters recently reported: "Online real estate platform Zillow is facing a new consumer lawsuit in federal court in Seattle that accuses the company of pressuring homebuyers into using its mortgage lending division. The proposed class action filed on Friday, claims Zillow operates programs in which its affiliated real estate agents receive high-value sales leads only if they meet internal quotas for securing pre-approved mortgages from Zillow Home Loans."

Now factor this into the equation: Zillow Home Loans' mortgages cost $4,600 more than its competitors, on average.

If the allegations in the lawsuit prove accurate, they point to a system designed to steer buyers toward Zillow's more expensive mortgage products through behind-the-scenes incentives. Agents who want access to valuable leads are pressured to meet internal targets. Buyers who think they are simply shopping for a home may be nudged toward a specific lender without realizing how the machinery is working around them.

What may seem like a minor detail is, in practice, a form of gouging American homebuyers at a critical juncture.

Georgetown professor Steven Salop dug into this late last year, analysing nearly 11,000 Zillow Home Loans from 2022 through 2024, and comparing them against other mortgages in the Home Mortgage Disclosure Act (HMDA) database.

He concluded: "This study provides empirical evidence that Zillow Home Loans charged higher prices than other mortgage lenders for conventional 30-year fixed-rate purchase mortgages during the three-year 2022-2024 period, after controlling for a set of borrower, loan, geographic, and temporal characteristics available in the public HMDA data."

Zillow's overcharge was $4,579 on an average loan size of $337,000.

**Table 6. Conventional 30-year loan regression results by year (2022-2024)**

| Dependent Variable: Rate Spread | Zillow Home Loans | | | | | | Adj. R-Sq. | N |
|---|---|---|---|---|---|---|---|---|
| | Coefficient | Standard Error | Avg. Loan Size | Zillow NPV Overcharge Per Loan | Zillow Number of Loans | Zillow NPV Overcharge Total | | |
| Year 2022 | -0.0371% | 0.0002 | $309,294 | ($1,043) | 1,714 | ($1,788,209) | 0.135 | 1.74M |
| Year 2023 | 0.1191%*** | 0.0003 | $296,754 | $3,213 | 3,283 | $10,549,746 | 0.0473 | 1.35M |
| Year 2024 | 0.1494%*** | 0.0004 | $337,075 | $4,579 | 5,972 | $27,343,782 | 0.0974 | 1.38M |

*Notes:* *** p<0.01, **p<0.05, *p<0.10. Each row reports results from a separate regression estimated on the subsample of loans originated in that year. See Table 5 for sources and specification details.

That is *real* money for a working family. It is money that could go toward repairs, moving costs, childcare, savings, or simply staying afloat in an economy that has already punished them with higher prices across the board. It also makes it harder for buyers to compete in the first place, because every extra cost pushes the monthly payment higher and narrows the range of homes they can afford.

The study also found that veterans were hit especially hard.

For VA loans in 2024, the Zillow overcharge was $7,279 on an average loan size of $407,860. At a time when the country talks endlessly about supporting veterans, Zillow is heinously treating them as a premium revenue stream.

This is why Zillow presents such a clear opportunity for the Trump Administration.

With the President returning to his populist economic instincts this year, not only with his proposal on single-family housing but also with ideas like capping punishing credit card interest rates, the public mood is scarcely pro-corporate monopoly. Voters want someone to take on the greedy institutions that have made ordinary life more expensive and more unsettled.

The FTC and the DOJ have the authority to investigate and enforce the rules, and they should do it without hesitation.

Housing is not just another consumer product. It is the foundation of stability for families and communities. When homeownership gets pushed further out of reach, the country becomes less rooted, less secure, and less confident about the future. Americans feel that decline in their own lives, and they are done being lectured by the same people who helped create the mess.

If the goal is to restore the American Dream, then we have to Make America Affordable Again. That starts with breaking the grip of players who treat families as data points and neighborhoods as cash cows. Zillow is towards the very top of that list.

# Exhibit 11

**EMPIRICAL ANALYSIS OF
ZILLOW HOME LOANS PRICING**

Steven C. Salop*

**Draft: Comments Welcomed**

**December 21, 2025**

## Abstract

The recent NAR antitrust settlement provides the opportunity for changes in home buyers' relationships with buyer agents. At the same time, two recent class action cases have alleged that Zillow has engaged in deceptive conduct, including having its affiliated agents steer home buyers to borrow through its Zillow Home Loans (ZHL). The empirical analysis in this report examines whether ZHL loans have higher prices than other lenders, after controlling for borrower demographics, loan characteristics, and geographic and temporal factors. The analysis uses the public Home Mortgage Disclosure Act database for loans originated in the 2022-2024 period. The empirical findings suggest that ZHL borrowers pay significantly higher mortgage costs than they would pay to other lenders, which are referred to as ZHL "overcharges." The estimate of these overcharges on 30-year conventional loans for ZHL borrowers is a higher mortgage APR of approximately 10 basis points for the period 2022-2024, which amounts to a net present value (NPV) overcharge over the 30-year life of the loan of about $2,900 on an average loan size of about $321,000, and a higher mortgage APR of approximately 15 basis points for the year

1

2024, which amounts to a NPV overcharge of about $4,600 on an average loan size of about $337,000, as compared to borrowers with similar characteristics originating similar types of loans at other lenders. The 2024 NPV dollar overcharge is higher than in earlier years both because of an increase in the incremental basis points and because the average loan size is increasing. The estimates for VA and FHA loans also indicate significant NPV overcharges in 2024, though not earlier. Additional analyses of 30-year conventional loans show that the difference between Zillow and other lenders' APRs for a comparable loan is larger in percentage terms for lower-income borrowers for all three loan categories. Analysis of heterogeneity by race and ethnicity shows that the overcharges paid by Black borrowers are substantially larger than the overcharges paid by White non-Hispanic/Latino borrowers. Hispanic/Latino borrowers had an undercharge relative to other lenders in 2022 and 2023, but an overcharge in 2024.

## I.    INTRODUCTION

A home purchase is the most significant financial transaction for most Americans. Competition in the residential real estate brokerage market has been a subject of considerable economic analysis.[1] The role of imperfect information on shopping behavior and market power also has been a longstanding subject of economic research.[2] This research strand has

---

*The author is Professor of Economics and Law Emeritus, Georgetown University. Financial support has been provided by CoStar but was not contingent on the results of the analysis. All analysis, opinions and any errors are my own and are not those of CoStar or any other person at any organization with which I am affiliated.

[1] *See. e.g.,* Panle Jia Barwick and Maisy Wong, *Competition in the Real Estate Brokerage Industry: A Critical Review*, Brookings Institution (2019), *available at* https://www.brookings.edu/wp-content/uploads/2019/12/ES-12.12.19-Barwick-Wong.pdf; Cathy (Cheng) Zhang, *Do US Borrowers Overpay Mortgage Fees?* 71 J. REAL ESTATE FIN. ECON. 1 (2025); Neil Bhutta, and Lauren Lambie-Hanson. *The Rise in Mortgage Fees: Evidence from HMDA Data.* 24-01 FRB of Phila. Consumer Finance Institute Discussion Paper 10 (2024); Stephen J. Popick, *Did Minority Applicants Experience Worse Lending Outcomes in the Mortgage Market? A Study Using 2020 Expanded HMDA Data,* FDIC Center for Financial Research Paper 2022-05 (2022); Ken B. Cyree and Drew B. Winters. *Investigating Bank Lending Discrimination In The US Using CRA-rated Banks HMDA Loan Data*, 197 PUBLIC CHOICE 371 (2023); Neil Bhutta and Aurel Hizmo. *Do Minorities Pay More For Mortgages?,* 34 REV. FIN. STUD. 736 (2021); Jason Allen, Robert Clark, and Jean-François Houde, *The Effect of Mergers in Search Markets: Evidence from the Canadian Mortgage Industry*. 104 AM. ECON. REV. 3365 (2013); Simon Firestone et al., *The Performance of Low-Income and Minority Mortgages*, 35 REAL EST. ECON. 479 (2007).

[2] *See. e.g.,* Peter A. Diamond, *A Model of Price Adjustment*, 3 J. ECON. THEORY 156 (1971); Michael Rothschild, *Models of Market Organization with Imperfect Information: A Survey*, 81 J. POL. ECON. 1283 (1973); Steven C. Salop and Joseph E. Stiglitz, *Bargains and Ripoffs: A Model of Monopolistically Competitive Price Dispersion*, 44 REV. ECON. STUD. 493 (1977); Helmut Bester, *Bargaining, Search Costs and Equilibrium Price Distributions*, 55 REV. ECON. STUD. 201 (1988);

shown that lack of consumer information and effective shopping can lead to higher prices and price dispersion even in unconcentrated markets. Empirical research involving the market for mortgages has shown that borrowers who consider the terms of more than one lender realize substantial savings.[3] Yet many borrowers apparently do not shop.[4] In this regard, both the Federal Trade Commission and FreddieMac have published fact sheets to help home buyers do so.[5]

One way for consumers to gain information is to retain an expert agent that understands the market and can help guide the purchase process. In their recent survey research, Zillow reports that 84% of home buyers use an agent. In fact, engaging an agent is the first step for 52% of home buyers.[6]

If a buyer retains an agent, it is important to choose an agent that will work in the buyer's interest. In this regard, it has long been a concern that buyers' real estate agents have been paid by the seller and that the payment is structured as a share of the listing agent's commission which can lead to steering and other conflicts of interest.[7] Commission sharing

---

Sara Fisher Ellison, *Price Search And Obfuscation: An Overview of the Theory and Empirics*, in Emek Basker (editor), HANDBOOK ON THE ECONOMICS OF RETAILING AND DISTRIBUTION (2016); Jason Allen, Robert Clark, and Jean-François Houde, *Price Dispersion in Mortgage Markets*. 62 J. IND. ECON. 377 (2014).

[3] Cathy (Cheng) Zhang, *Do US Borrowers Overpay Mortgage Fees?* 71 J. REAL ESTATE FIN. ECON. 1 (2025); Alexei Alexandrov and Sergei Koulayev, No Shopping in the U.S. Mortgage Market: Direct and Strategic Effects of Providing Information, CFPB Office of Research Working Paper Series (2018), *available at* https://www.ftc.gov/system/files/documents/public_events/945353/koulayev_no_shopping_in_the_u s_mortgage_market_ftc_2016_0.pdf; Susan E. Woodward and Robert E. Hall, *Diagnosing Consumer Confusion and Sub-Optimal Shopping Effort: Theory and Mortgage Market Evidence*, AM. ECON. REV. 1 (2012); Jinkook Lee and Jeanne M. Hogarth, *Consumer Information Search for Home Mortgages: Who, What, How Much, and What Else*? 9 FIN. SRVC. REV. 277 (2000).

[4] Kara Ng, *Rate Shopping Can Save Buyers Hundreds a Month* (December 11, 2025), *available at* https://www.zillow.com/research/mortgage-rate-shopping-35844/; Kristoffer Jackson and Garrett T. Senney, *Shopping Around: Empirical Analysis of Borrower Comparison Shopping and Mortgage Prices*, 53 REAL ESTATE ECON. 101 (2025); Neil Bhutta et. al. *Paying Too Much? Borrower Sophistication and Overpayment in the U.S.Mortgage Market*, Federal Reserve Bank of Philadelphia Working Paper 24-11 (2024) *available at* https://www.philadelphiafed.org/- /media/frbp/assets/working-papers/2024/wp24-11.pdf.

[5] Federal Trade Commission, *Shopping for a Mortgage FAQs*, *available at* https://consumer.ftc.gov/shopping-mortgage-faqs; My Home (by Freddie Mac), *6 Tips to Consider When Shopping for a Lender*, *available at* https://myhome.freddiemac.com/blog/homebuying/6-tips-consider- when-shopping-lender.

[6] Manny Garcia, *Buyers: Results from the Zillow Consumer Housing Trends Report 2025* (November 6, 2025) available at https://www.zillow.com/research/buyers-housing-trends-report-2025-35688/.

[7] A recent study is Panle J. Barwick et. al., *Conflicts of Interest and Steering in Residential Brokerage*, 9 AM. ECON. J.: APPLIED ECON 191 (2017). But the concerns go back decades. See, e.g., Boris W. Becker, *Economic Aspects of Real Estate Brokerage* (Berkeley, California: Center for Real Estate and Urban

was a key issue in the recent litigation involving the National Association of Realtors (NAR).[8] However, the settlement did not prohibit buyer agency fees structured as a simple percentage of the purchase price.[9] It is not clear that the agent's costs are proportional to the price of the home. A more incentive-compatible contract would pay the agent more for obtaining a lower purchase price, not for obtaining a higher purchase price.[10] Considering the long market experience with broker commissions paid by the seller and split with the buyer's agent, home buyers may lack sufficient information to negotiate. Various disclosures or other policies might be designed to correct this market failure and facilitate the transition to a more efficient market structure.[11]

Zillow is the leading residential real estate portal and its research found that 23% of home buyers in 2024 and 22% of buyers in 2025 found their agent from a real estate website or app (e.g. Zillow, RE/MAX, Realtor.com).[12] Zillow also reported from its research on home buyers that 79% of buyers said that they installed a real estate app during the homebuying process and 68% of those buyers (i.e., 86% of the 79%) did so *before* contacting an agent or pursuing the other possible first steps such as contacting a mortgage lender or attending an open house.[13]

Zillow's business plan connects users to its buyer agents who pay Zillow to be connected to users who are looking at listings. Those Zillow buyer agents in turn connect their clients to Zillow Home Loans (ZHL) for mortgages. Those agents often have agreed to pay Zillow a share of their commissions. Two private antitrust cases have alleged that Zillow engages in deceptive conduct, by steering users to Zillow affiliated buyer agents. The *Taylor* plaintiffs'

---

Economics, University of California, Berkeley, 1972), at 99-107; Bruce M. Owen, *Kickbacks, Price Fixing, and Efficiency in Residential Real Estate Markets*, 29 STANFORD L.R. 931 (1977); William L. Trombetta, *Using Antitrust Law to Control Anticompetitive Real Estate Industry Practices* 14, J. CONSUMER AFFAIRS 142 (1980); Federal Trade Commission, *Residential Real Estate Brokerage Market* (Los Angeles Regional Office Staff Report) (1983)*, available at* https://www.ftc.gov/system/files/ftc_gov/pdf/The-Residential-Real-Estate-Brokerage-Report--Butters-Report.pdf.

[8] *See* Statement of Interest of the United States (dated November 24 2024), Burnett et al. v. National Association of Realtors, 4:19-cv-00332-SRB (W.D. Missouri), available at https://www.justice.gov/atr/media/1386031/dl?inline

[9] *See* NAR Settlement FAQs (Updated October 17, 2025), *available at* https://www.nar.realtor/the-facts/nar-settlement-faqs

[10] Borys Grochulski, and Zhu Wang, *Removing Conflict of Interest for Agents of Homebuyers*, " *Fed. Res. Bank Richmond Econ. Brief*, No. 23-34 (October 2023), *available at* https://www.richmondfed.org/publications/research/economic_brief/2023/eb_23-34.

[11] *See, e.g.,* Howard Beales, Richard Craswell, and Steven C. Salop, *The Efficient Regulation of Consumer Information*, 24 J. LAW ECON. 491 (1981).

[12] Manny Garcia, *Buyers: Results from the Zillow Consumer Housing Trends Report 2025* (November 6, 2025) available at https://www.zillow.com/research/buyers-housing-trends-report-2025-35688/.

[13] *Id.*

complaint alleges that Zillow deceptively induces users to sign up with a Zillow agent and if the agent participates in Zillow's "Flex" program, Zillow receives up to 40% of the agent's commission, a fact which is not disclosed to the buyer. It also alleges that Zillow requires or incentivizes its "Flex" agents to steer users to ZHL, which it alleges are lower quality and higher priced than other loans.[14] *Armstrong*[15] plaintiffs' complaint alleges that Zillow gives "kickbacks" to real estate brokers in the form of access to customer leads explicitly in exchange for sending those customers to ZHL and that this is a conflict of interest not disclosed to the Zillow user.[16]

Concerns about the potential for this deception and conflicts of interest are important because Zillow is the largest online real estate portal. The *Armstrong* complaint also quotes from Zillow's Q3 2022 Shareholder Letter which announced that it would "overhaul [its] current mortgage funnels away from third-party lead generation and toward Zillow Home Loans."[17] Zillow also reported that its recent research showed that almost 70% of buyers submit only one mortgage application rather than shopping around despite the fact that shopping can lead to substantially lower monthly costs.[18]

The allegations in these legal complaints raise the economic question of whether ZHL mortgages are more expensive than the mortgages offered by other lenders. The empirical analysis here uses the public version of the HMDA database. This database is the result of the Home Mortgage Disclosure Act, enacted in 1975. It requires most mortgage lenders to report detailed information about their mortgage lending activity.[19] These data include loan-level information on interest rates, fees, borrower financial characteristics and demographics, loan amounts, and property characteristics. The HMDA data have been widely used in academic research to study mortgage market outcomes, lending discrimination, and the effects of regulatory interventions.[20]

---

[14] *Taylor v Zillow, Inc.* No. 2:25-cv-01818 (Amended November 19, 2025) (W.D. Washington).

[15] *Armstrong v. Zillow Group Inc et al,* No. 2:25-cv-02226 (W.D. Washington)

[16] *Id.* at ¶1.

[17] *Id.* at ¶39, quoting from Zillow Q3 2022 Shareholder Letter at 4, available at https://s24.q4cdn.com/723050407/files/doc_financials/2022/q3/Zillow-3Q22-Shareholders'-Letter.pdf.

[18] Kara Ng, *Rate Shopping Can Save Buyers Hundreds a Month* (December 11, 2025), *available at* https://www.zillow.com/research/mortgage-rate-shopping-35844/. Bhutta et. al, *supra* reports on an earlier survey that half of the borrowers taking out a mortgage in the US seriously considered only one lender, and only 3% of the borrowers considered more than three lenders.

[19] Federal Financial Institutions Examination Council, *Home Mortgage Disclosure Act (HMDA)*, *available at* https://www.ffiec.gov/data/hmda.

[20] See, e.g., Cathy (Cheng) Zhang, *Do US Borrowers Overpay Mortgage Fees?* 71 J. REAL ESTATE FIN. ECON. 1 (2025) Neil Bhutta, and Lauren Lambie-Hanson. *The Rise in Mortgage Fees: Evidence from HMDA Data*. 24-1 FRB of Phila. Payment Cards Center Disc. Paper 10 (2024); Stephen Popick, *Did*

This empirical study examines whether ZHL charges different prices than other mortgage lenders for comparable conventional 30-year fixed-rate purchase mortgages. The study applies econometric regression analysis to compare the costs of ZHL mortgages to those of other lenders, while controlling for a set of borrower, property, and loan characteristics as well as geographic and temporal factors for 2022-2024, which is the most recent 3-year period for which the data is available.[21]

The analysis focuses on the CFPB's "rate spread" variable in the HMDA database, which measures the difference in the annual percentage rate (APR) between a particular mortgage loan and the average prime offer rate of a mortgage loan with the same characteristics issued during the same week (APOR).[22] Thus, the rate spread variable controls for weekly changes in the overall market affected by macroeconomic factors and seasonal variations.[23] The rate spread variable takes into account the difference in discount points and closing costs as well as the interest rate.[24] The rate spread does not account for lender credits. However, lender credits likely lead to only a very small adjustment.

The analysis shows that ZHL mortgages have become more expensive over the course of the 2022-2024 time period, relative to other lenders. While ZHL mortgages were relatively cheaper in 2022, they became relatively more expensive in 2023 and even more expensive in 2024. In 2022, the net present value (NPV) of lifetime incremental cost of a ZHL mortgage held to maturity (and discounted at 6.5% per year approximately equal to the APR) would be $1,043 lower than those of other lenders after controlling for the factors listed above.[25] In

---

*Minority Applicants Experience Worse Lending Outcomes In The Mortgage Market? A Study Using 2020 Expanded HMDA Data*, FDIC Center for Fin. Res. Paper 2022-05 (2022);  Ken B. Cyree and Drew B. Winters. *Investigating Bank Lending Discrimination In The US Using CRA-rated Banks HMDA Loan Data*, 197 PUBLIC CHOICE 371 (2023); Neil Bhutta and Aurel Hizmo. *Do Minorities Pay More For Mortgages?,* 34 REV. FIN. STUD.736 (2021).

[21] During this period, there were 10,969 ZHL loans and over 4.5 million loans from all lenders in the filtered sample. The sample was filtered to include only conventional (non-government-backed) 30-year fixed-rate first-lien purchase mortgages for owner-occupied single-unit properties, with loan amounts between $25,000 and $2,000,000, while excluding loans with non-standard features such as balloon payments, interest-only terms, or negative amortization.

[22] For the rate spread, *see* https://ffiec.cfpb.gov/tools/rate-spread. For the APOR, *see* https://ffiec.cfpb.gov/tools/rate-spread/methodology.

[23]  https://www.fanniemae.com/research-and-insights/publications/housing-insights/rate-30-year-mortgage

[24] https://www.consumerfinance.gov/ask-cfpb/what-is-the-difference-between-a-mortgage-interest-rate-and-an-apr-en-135/; https://ffiec.cfpb.gov/tools/rate-spread/methodology; https://www.investopedia.com/ask/answers/100314/what-difference-between-interest-rate-and-annual-percentage-rate-apr.asp; https://www.bankofamerica.com/mortgage/learn/apr-vs-interest-rate/; https://www.pmrloans.com/breaking-down-what-goes-into-an-apr/

[25] This estimated undercharge was not statistically significant. The overcharges in 2023 and 2024 are statistically significant. The net present value of the incremental rate spread was calculated assuming

2023, they became $3,213 more expensive. And in 2024, they were $4,579 more expensive for an average loan size of about $337,000 if held to maturity.  The number of ZHL 30-year conventional mortgages analyzed here has grown over this 3-year period. There were 1,714 ZHL loans in 2022, which rose to 5,972 loans in 2024. The average ZHL mortgage loan size rose from about $309,000 in 2022 to about $337,000 in 2024.

The $4,579 NPV overcharge in 2024 is equivalent to paying a mortgage APR to ZHL that is 15 basis points greater than to other lenders. For example, if the average mortgage APR at other lenders were 6.0%, it would imply paying a ZHL mortgage APR of 6.15%.  If a $337,000 loan were held to maturity, the borrower would pay about $21 more per month. If the loan were held only for 10 years, the borrower would pay about $13 more per month.

The analysis indicates that ZHL overcharges particularly impact low income buyers.  ZHL conventional loan borrowers tend to have lower income compared to other lenders' borrowers in the sample analyzed.  Over the 3-year period, 37% of ZHL borrowers earn $80,000 or less per year versus 29% for all lenders, and 20% of ZHL borrowers earn $60,000 or less per year versus 15% for all lenders.  For ZHL borrowers earning $60,000 or less, the average loan size was only $159,618 and the overcharge over the 30-year life of the loan was $3,331, equivalent to paying a mortgage APR that is 23 basis points greater than other lenders; for example, if the average mortgage APR at other lenders were 6.0%, it would imply paying a ZHL mortgage APR of 6.23%.

Focusing on 2024, 18% of ZHL borrowers in the sample earn $60,000 or less per year versus 13% for other lenders. For ZHL borrowers earning $60,000 or less per year, the average loan size was $157,118, and the ZHL overcharge over the 30-year life of the loan was $4,457, equivalent to paying a mortgage APR that is 31 basis points greater than other lenders. For example, if the average mortgage APR at other lenders were 6.0%, it would imply paying a ZHL mortgage APR of 6.31%. This NPV overcharge of $4,457 is almost 3% of the size of the loan.

There is significant variation in the overcharges among different races and ethnic groups.  The ZHL overcharge for White non-Hispanic home buyers relative to other lenders was 11 basis points ($3,099 NPV) on an average mortgage loan size of about $321,000.  For Asian borrowers, the ZHL overcharge was 11 basis points ($3,995 NPV) on an average loan size of $413,330. For Black borrowers, the ZHL overcharge was 21 basis points ($5,362 NPV) on an average loan size of $282,832. By contrast, Hispanic borrowers benefited from a small undercharge of 1 basis point ($276 NPV) on an average mortgage loan size of about $320,100.

These overcharges were higher in 2024 than in the 3-year period of 2022-2024. The ZHL overcharge for White non-Hispanic home buyers relative to other lenders was 16 basis points ($4,943 NPV) on an average mortgage loan size of about $337,075. For Asian borrowers, the

---

equal annual principal repayments over 30 years, with interest calculated on the declining balance and discounted at 6.5% per year.

ZHL overcharge was 16 basis points ($6,417 NPV) on an average loan size of $437,574. For Black borrowers, the ZHL overcharge was 32 basis points ($8,225 NPV) on an average loan size of $285,192. For Hispanic borrowers, there was a ZHL overcharge of 3 basis points ($851 NPV) on an average loan size of $330,815.

I also analyzed 30-year fixed-rate purchase mortgages guaranteed by the Department of Veterans Affairs ("VA loans") and 30-year fixed-rate purchase mortgages insured by the Federal Housing Administration ("FHA loans").[26] While Zillow's penetration of VA loans is limited, Zillow levied a significant average overcharge on the 521 ZHL VA loans in the HMDA sample in 2024. While there was a statistically significant undercharge of about 7 basis points (-$2,295 NPV per loan) in 2022 and a statistically insignificant 4 basis point overcharge in 2023, ZHL VA loans exhibited a statistically significant 20 basis point ($7,279 NPV per loan) in 2024 on an average loan size of $407,860. The overcharge is highest for borrowers with incomes at $60,000 or less. For those borrowers, the 2024 overcharge was 25 basis points ($5,118 NPV per loan) on an average loan size of $220,918. For borrowers with incomes below $100,000, the 2024 overcharge was almost 20 basis points ($5,195 NPV per loan) on an average loan size of $291,972.

The number of FHA loans is about 33% of the number of 30-year conventional loans. Across the aggregated 3-year period 2022-2024, the incremental cost of a Zillow loan was negative but statistically insignificant. The results vary significantly over the period: There were statistically significant undercharges in 2022 and 2023 of 22 basis points ($5,450 NPV per loan) and 16 basis points ($4,158 NPV per loan) respectively. By contrast, the ZHL FHA loans exhibited a statistically significant 11 basis point overcharge ($3,233 NPV per loan) in 2024 on an average loan size of $319,153 for the 2,066 borrowers. The 2024 overcharge is highest for borrowers with incomes at $60,000 or less at 27 basis points ($4,203 NPV per loan) on an average loan size of $173,969. The 2024 overcharge for borrowers with incomes at $100,000 was also substantial at 16 basis points ($3,617 NPV per loan) on an average loan size of $249,579.

The remainder of this paper proceeds as follows. Section II describes the HMDA data, the summary statistics, and the sample selection criteria. Section III details the empirical methodology and the basic specification of regression. Section IV presents and interprets the main empirical results for 30-year conventional mortgages. Section V carries out additional analyses for 30-year conventional mortgages subsamples. Section VI carries out similar analyses of loans guaranteed by the Veterans Administration and insured by the Federal Housing Administration. Section VII concludes. The Appendices report the regression results in more detail.

---

[26] The HMDA data reports loans guaranteed by the Rural Housing Service (RHS) or Farm Service Agency (FSA), but there are no RHS or FSA loans from Zillow in the dataset analyzed.

## II.    DATA, SUMMARY STATISTICS AND SAMPLE SELECTION

The Home Mortgage Disclosure Act (HMDA) requires most financial institutions that originate or purchase mortgages to collect and report data about their mortgage lending activity. The HMDA data are collected and published by the Consumer Financial Protection Bureau (CFPB) and represent one of the most comprehensive sources of information on mortgage lending in the United States. The dataset includes loan-level information for tens of millions of mortgage applications and originations each year.

This study is based on HMDA data covering loan originations from 2022 through 2024 from the CFPB's website.[27] The HMDA data include a rich set of variables describing loan characteristics, loan pricing, borrower characteristics, property attributes, and lender identification numbers.[28]

The goal of the sample selection process is to construct a comparison group of mortgages that are as similar as possible to Zillow Home Loans in terms of product features, while spanning the full range of lenders operating in the conventional mortgage market. By restricting attention to loans with identical structural features, the analysis can better isolate pricing differences that arise from lender identity rather than differences in product design or loan characteristics.

Initial analysis database focuses on HMDA data for conventional 30-year fixed-rate first-lien purchase mortgages originated in 2022-2024 with loan amounts between $25,000 and $2,000,000; for site-built, single-unit, non-commercial primary residences; omitting reverse mortgages and mortgages with pre-approval, balloon-payments, interest-only payments, negative amortization, other non-amortizing features, or open-ended lines of credit.[29]

---

[27] https://ffiec.cfpb.gov/data-browser/.

[28] With respect to loan characteristics, the HMDA data includes the loan amount, loan purpose (purchase, refinance, or home improvement), loan type (conventional, FHA-insured, VA-guaranteed, or RHS/FSA-guaranteed), lien status (first lien, subordinate lien), loan term (in months), and combined loan-to-value ratio. The data also indicate whether the loan has non-standard features such as balloon payments, interest-only payments, or negative amortization. With respect to loan pricing, the HMDA data includes the interest rate charged on the loan, origination fees, discount points, lender credits, and the rate spread. With respect to borrower characteristics, the HMDA data includes the borrower's reported income, race, ethnicity, age bracket, sex, and debt-to-income ratio. Credit scores are available in the unredacted HMDA data but not the public version. With respect to property attributes, the HMDA data includes the property value, occupancy type (principal residence, second residence, or investment property), the number of units in the property, whether it is site-built or manufactured housing, and the state and county where the property is located. In the HMDA data, each lending institution is identified by a Legal Entity Identifier (LEI), a unique 20-digit alphanumeric code. The HMDA data was merged with the GlobalLegal Entity Identifier Foundation (GLEIF) database to obtain institution names corresponding to each LEI.

[29] Records for loans originated in New York are excluded because Zillow Home Loans does not operate in that state. See https://www.zillow.com/homeloans/licensing/. Records are also omitted where the state is reported to be a U.S. Territory or is missing, or income is listed as negative, zero, or missing. Records for which information on lender name is not available according to the Global Legal Entity Identifier

Limitations of this kind are commonly employed in academic literature.[30]

This sample has been restricted to mortgages with a 30-year term for home purchase, excluding refinance mortgages and home improvement loans. This is by far the most common mortgage product in the United States, accounting for the vast majority of purchase mortgage originations.[31] This restriction is implemented for several reasons. First, purchase mortgages and refinance mortgages represent fundamentally different transactions.[32] Purchase mortgages involve the acquisition of a new property, while refinance mortgages involve replacing an existing mortgage on an already-owned property. Second, a borrower's willingness to refinance their mortgage at a given interest rate depends on the borrower's existing mortgage terms, which are not observed in the HMDA data, making it difficult to construct appropriate controls. Third, Zillow's business model is centered around assisting consumers with home purchases through its real estate search platform, and the mortgage products Zillow offers are primarily oriented toward purchase transactions.

This initial analysis includes only conventional loans which account for the vast majority of mortgages. Loans guaranteed by the Department of Veterans Affairs (VA Loans) and insured by Federal Housing Administration (FHA Loans) are analyzed in a later section. Loans guaranteed by the Rural Housing Service (RHS) or Farm Service Agency (FSA) are not analyzed because no ZHL loans were identified in those programs.

A limitation of the public HMDA data is that they do not include the actual credit score. Because credit score is an important determinant of mortgage pricing, this represents a potentially significant gap. However, a number of the borrower-specific control variables in the public data set are highly relevant to determining credit worthiness. These include debt-to-income ratio, combined loan-to-value ratio, income, and age control variables in the regressions. Based on the public HMDA data, Zhang (2025) shows that demographic

---

Foundation (GLEIF) are omitted. For lender credits and discount points, missing values are assumed to be zero. This convention is standard and reflects the fact that not all loans involve lender credits or discount points. The HMDA reporting instructions indicate that lenders should report zero when these amounts are not applicable; but some lenders may report missing values instead.

[30] See, for example, Cathy (Cheng) Zhang, *Do US Borrowers Overpay Mortgage Fees?*, 71 J. REAL ESTATE FIN. ECON. *29* (2025); Neil Bhutta, and Lauren Lambie-Hanson. *The Rise in Mortgage Fees: Evidence from HMDA Data,* 24-1 FRB OF PHILA. PAYMENT CARDS CENTER DISC. PAPER 10 (2024).

[31] In the HMDA data analyzed—that is, with all of the limitations except with respect to loan term— 95% of purchase mortgages originated by all lenders have a 30-year term and 97% of purchase mortgages originated by Zillow have a 30-year term. See also https://www.gao.gov/blog/2018/04/24/what-you-need-to-know-about-mortgages-and-equity.

[32] The sample includes only first-lien mortgages, excluding subordinate liens such as second mortgages or home equity loans. First liens have priority in the event of default and foreclosure, giving them lower credit risk than subordinate liens on the same property. Excluding subordinate liens ensures that all loans in the sample have the same priority position and are therefore comparable in terms of this dimension of risk. See also https://www.consumerfinance.gov/ask-cfpb/what-is-a-second-mortgage-loan-or-junior-lien-en-105/.

10

information and other loan characteristics can control for credit scores. Zhang matches HMDA data with Fannie Mae and Freddie Mac data, which contain credit score information.[33] The article finds that including credit scores in the analysis does not significantly change any of the inferences made in the article.

After applying the sample selection criteria, the final sample of 30-year conventional loans contains 10,969 Zillow Home Loans and 4,534,925 loans from all lenders combined (including Zillow). The average loan amount in the full sample is $371,888. Zillow Home Loans have an average loan amount of $320,666, approximately 14% below the overall market average. Zillow's borrowers are purchasing somewhat less expensive properties on average than the typical borrower in the conventional mortgage market. This difference in average loan size is one reason why it is important to control for loan size in the regression analysis and express the results as percentages of the loan amount rather than solely in dollar terms.

The data can be broken down by loan counts, percentages, and average loan amounts by borrower demographic characteristics. These more detailed distribution statistics reveal some substantial differences in the composition of Zillow's borrower base compared to the overall market, differences that underscore the importance of controlling for demographic factors in the empirical analysis.

**Income Level of Borrower**. Table 1 presents the distribution of loans and loan size by borrower income level. Income is reported in the HMDA data in thousands of dollars, and borrowers are grouped into categories for this summary table.

---

[33] See Cathy (Cheng) Zhang, *Do US Borrowers Overpay Mortgage Fees?*. 71 J. REAL ESTATE FIN, ECON. *29* (2025). As explained there, "A potential concern with the findings above is that borrower credit scores are not included in the model. I cannot directly control for them because the HMDA database does not report this variable. To mitigate the concern with this omitted variable, I first merge the HMDA data with Fannie Mae and Freddie Mac loan-level datasets to create a subsample with borrower credit score available. … I find that including FICO has little effect on the coefficient on the interest rate (the coefficient changes from -0.032 to -0.035) and the R2 increased by 0.001."

**Table 1. Distribution of conventional 30-year loans by income level of borrower**

| Income Category | Zillow Home Loans | | | All Lenders | | |
|---|---|---|---|---|---|---|
| | N | % | Avg. Loan | N | % | Avg. Loan |
| Less than or equal to $20,000 | 17 | 0% | $66,765 | 9,755 | 0% | $267,656 |
| $20,000 < income <= $40,000 | 536 | 5% | $119,739 | 162,290 | 4% | $129,292 |
| $40,000 < income <= $60,000 | 1,621 | 15% | $173,779 | 510,004 | 11% | $183,949 |
| $60,000 < income <= $80,000 | 1,919 | 17% | $231,050 | 647,058 | 14% | $243,706 |
| $80,000 < income <= $100,000 | 1,529 | 14% | $281,285 | 609,791 | 13% | $295,374 |
| $100,000 < income <= $120,000 | 1,274 | 12% | $320,659 | 526,307 | 12% | $340,836 |
| Greater than $120,000 | 4,073 | 37% | $463,635 | 2,069,720 | 46% | $508,225 |
| **Total** | **10,969** | **100%** | **$320,666** | **4,534,925** | **100%** | **$371,888** |

*Sources:* Home Mortgage Disclosure Act data, 2022-2024; GLEIF Golden Copy and Delta Files.

The income distribution reveals that Zillow serves a higher proportion of lower- and middle-income borrowers compared to the overall market. While 46% of all borrowers earn $120,000 or more, only 37% of Zillow borrowers fall into this category. Conversely, 20% of Zillow borrowers earn less than $60,000, compared to 15% across all lenders; 32% of Zillow borrowers earn between $40,000 and $80,000, compared to only 26% across all lenders.

Table 1 shows that higher-income borrowers take out larger mortgages. The relationship between income and average loan amount is roughly proportional throughout the income distribution, with borrowers earning $120,000 or more taking Zillow loans averaging approximately $463,000 (and $508,000 across all lenders), while those earning between $40,000 and $80,000 taking Zillow loans averaging approximately $205,000 (and $217,000 across all lenders).[34] This pattern is consistent with standard underwriting guidelines that typically limit borrowers to mortgage payments representing a certain percentage of their income.

**Age of Borrower**. Table 2 presents the distribution of loans by borrower age. HMDA reports the borrower's age in brackets, which are aggregated here into three broad categories: under 35, 35-54, and 55 and over.

---

[34] These values reflect the average of loan amounts for borrowers with income between $40,000 and $80,000.  Bhutta et. al, *supra* note 4 reports on an earlier survey that only Survey data indicate that half of the borrowers taking out a mortgage in the US seriously considered only one lender, and only 3% of the borrowers considered more than three lenders.

**Table 2. Distribution of conventional 30-year loans by age of borrower**

| Age | Zillow Home Loans | | | All Lenders | | |
|---|---|---|---|---|---|---|
| | N | % | Avg. Loan | N | % | Avg. Loan |
| Under 35 | 4,536 | 41% | $310,637 | 1,779,018 | 39% | $346,229 |
| 35–54 | 4,179 | 38% | $353,839 | 1,912,737 | 42% | $418,577 |
| 55 and over | 2,254 | 21% | $279,343 | 843,073 | 19% | $320,104 |
| Missing | | | | 97 | 0% | $402,010 |
| **Total** | **10,969** | **100%** | **$320,666** | **4,534,925** | **100%** | **$371,888** |

*Source:* Home Mortgage Disclosure Act data, 2022-2024; GLEIF Golden Copy and Delta Files.

The age distributions are very similar. Zillow serves a barely higher proportion of younger borrowers (under age 35) compared to the overall market, at 41% versus 39%. Borrowers aged 35-54 represent 38% of Zillow's volume compared to 42% across all lenders, while older borrowers (55 and over) represent 21% of Zillow's volume versus 19% across all lenders.

Average loan amounts vary by age group, with borrowers aged 35-54 having the highest average loan amounts, consistent with this group typically leaving a starter home, achieving higher earning capacity and purchasing more expensive homes. Younger borrowers under 35 and older borrowers 55 and over have lower average loan amounts, which may reflect first-time homebuyer status for younger borrowers and downsizing for older borrowers.

**Race of Borrower.** Table 3 presents the distribution of loans by borrower race. The racial categories reflect a grouping of HMDA definitions, with "Asian" including various Asian and Asian-American subgroups, "Black" referring to Black or African American borrowers, "White" referring to White borrowers, and "Other" including American Indian, Alaska Native, Native Hawaiian and Pacific Islander. The "Missing" category includes borrowers for whom race information was not provided in the HMDA data.

**Table 3. Distribution of conventional 30-year loans by race of borrower**

| Race | Zillow Home Loans | | | All Lenders | | |
|---|---|---|---|---|---|---|
| | N | % | Avg. Loan | N | % | Avg. Loan |
| Asian | 886 | 8% | $413,330 | 433,822 | 10% | $480,310 |
| Black | 572 | 5% | $282,832 | 257,460 | 6% | $337,056 |
| White | 6,106 | 56% | $303,949 | 3,184,433 | 70% | $354,905 |
| Other | 135 | 1% | $305,000 | 41,957 | 1% | $347,705 |
| Missing | 3,270 | 30% | $334,040 | 617,253 | 14% | $399,475 |
| **Total** | **10,969** | **100%** | **$320,666** | **4,534,925** | **100%** | **$371,888** |

*Source:* Home Mortgage Disclosure Act data, 2022-2024; GLEIF Golden Copy and Delta Files.
*Notes:* "Other" includes American Indian, Alaska Native, Native Hawaiian, and other Pacific Islander.

13

Looking only at borrowers for whom information on race is available, the percentage of borrowers who identified themselves as White is similar for Zillow (79%) compared to the overall market (81%).[35] There are similar percentages of other races. Among borrowers for whom race information is available, the average loan amounts follow expected patterns, with Asian borrowers having the highest average loan amounts and Black borrowers having lower average loan amounts. These patterns are consistent with well-documented differences in wealth and income across racial groups in the United States.

**Ethnicity of Borrower.** The database has a separate ethnicity category. Table 4 presents the distribution of loans by borrower ethnicity, specifically focusing on Hispanic/Latino ethnicity as defined in HMDA.[36]

**Table 4. Distribution of conventional 30-year loans by ethnicity of borrower**

| Ethnicity | Zillow Home Loans | | | All Lenders | | |
|---|---|---|---|---|---|---|
| | N | % | Avg. Loan | N | % | Avg. Loan |
| Hispanic/Latino | 1,051 | 10% | $320,100 | 560,159 | 12% | $353,434 |
| Non-Hispanic/Latino | 6,975 | 64% | $314,378 | 3,410,747 | 75% | $370,116 |
| Missing | 2,943 | 27% | $335,771 | 564,019 | 12% | $400,933 |
| **Total** | **10,969** | **100%** | **$320,666** | **4,534,925** | **100%** | **$371,888** |

*Source:* Home Mortgage Disclosure Act data, 2022-2024; GLEIF Golden Copy and Delta Files.

Looking only at borrowers for whom information on ethnicity is available, the percent of borrowers who identified themselves as Hispanic or Latino is similar for Zillow (13%) compared to the overall market (14%).[37] As explained below, race and ethnicity factors are analyzed in combination.

---

[35] Looking only at borrowers for whom information on race is available, the percent of Zillow borrowers who identified themselves as White is (56%)/(8%+5%+56%+1%) = 79%. The comparable statistic for all lenders is (70%)/(10%+6%+70%+1%) = 81%. The high rate of missing race information for Zillow loans (30%) is noteworthy and could be significant. If borrowers who decline to provide race information systematically differ from those who provide it in ways that are also related to mortgage pricing, then the controls for race may not fully capture the relevant demographic variation. This concern is addressed in part by including a dummy variable for missing race in the regression specifications, but I acknowledge that this may not fully resolve the issue.

[36] The HMDA data contains information on Hispanic and Latino borrower ethnicities, which was further grouped as Hispanic/Latino; Non-Hispanic/Latino; and Missing (where information on ethnicity is missing). As with race, Zillow also has a substantially higher rate of missing ethnicity information (27%) compared to the overall market (12%). This concern is addressed in part including a dummy variable for missing ethnicity in the regression specifications.

[37] Looking only at borrowers for whom information on ethnicity is available, the percent of Zillow borrowers who identified themselves as Hispanic or Latino is (10%)/(10%+64%) = 13%. The comparable statistic for all lenders is (12%)/(12%+75%) = 14%.

## III.   EMPIRICAL METHODOLOGY AND ANALYSIS

The empirical analysis employs regression analysis to compare the pricing of Zillow Home Loans to that of other lenders, after controlling for observable borrower and loan characteristics. The dependent variable is the CFPB's "rate spread" variable. As explained above, this rate spread variable in the HMDA database measures the difference in the annual percentage rate (APR) between a particular loan and the average prime offer rate of a mortgage loan with the same characteristics issued on the same day (APOR).[38] This measure takes into account the difference in discount points and closing costs as well as the interest rate.[39] It also controls for factors that affect weekly movements of rates such as the bond rates on which the mortgage rate depends[40] as well as other macroeconomic influences and seasonal factors.

The regression model takes the following form:

$$Y_{ilct} = \beta_1 * Zillow_l + X'_{ilt}\gamma + \alpha_c + \delta_t + \varepsilon_{ilct} \qquad (1)$$

where:

- $Y_{ilct}$ is the rate spread variable for loan $i$ by lender $l$ in county $c$ in year $t$

- $Zillow_l$ is a dummy variable equal to 1 if the lender is Zillow Home Loans, 0 otherwise

- $X_{ilt}$ is a vector of loan and borrower characteristics (as described below)

- $\alpha_c$ represents county fixed effects

- $\delta_t$ represents year fixed effects

- $\varepsilon_{ilct}$ is the error term

The coefficient $\beta_1$ on the Zillow dummy variable is the key parameter of interest. It captures the average difference in pricing between Zillow Home Loans and all other lenders, conditional on the included control variables and fixed effects. A positive value of $\beta_1$ indicates that for borrowers with similar characteristics, Zillow loans tend to be more expensive than loans from other lenders with similar terms. Because the rate spread variable is expressed as a percentage of the loan amount, the coefficient $\beta_1$ is also in percentage terms. To translate the coefficient

---

[38] https://ffiec.cfpb.gov/tools/rate-spread. The value in the denominator of the rate spread is the loan amount.

[39] https://www.consumerfinance.gov/ask-cfpb/what-is-the-difference-between-a-mortgage-interest-rate-and-an-apr-en-135/; https://ffiec.cfpb.gov/tools/rate-spread/methodology; https://www.investopedia.com/ask/answers/100314/what-difference-between-interest-rate-and-annual-percentage-rate-apr.asp; https://www.bankofamerica.com/mortgage/learn/apr-vs-interest-rate/; https://www.pmrloans.com/breaking-down-what-goes-into-an-apr/

[40] https://www.fanniemae.com/research-and-insights/publications/housing-insights/rate-30-year-mortgage

into a dollar amount, its net present value (NPV) is calculated on the basis of the average Zillow loan amount, assuming the loan is paid off in equal increments over 30 years at an annual discount rate of 6.5%.[41] This dollar amount represents the estimated average difference in total mortgage cost between an average Zillow borrower and a similar borrower originating a similar loan at other lenders.

The regression model in equation (1) is estimated via ordinary least squares, with standard errors clustered at the LEI level. The vector $\mathbf{X}_{ilt}$ includes the following control variables: income, loan amount, combined loan-to-value ratio, debt-to-income ratio, age, race, and ethnicity. Income and loan amount enter with both linear and quadratic terms. The combined loan-to-value ratio measures the total amount of all loans on the property relative to the appraised value of the property.[42] The debt-to-income ratio measures the borrower's total monthly debt relative to their total monthly income.[43]

County fixed effects control for all time-invariant characteristics of the county, including local housing market conditions, property values, economic conditions, demographics, state and local regulations, and competitive dynamics among lenders. The rate spread variable implicitly controls for time variation though year fixed effects in the regression analysis also are included for greater robustness.

## IV.     CENTRAL ECONOMETRIC RESULTS FOR 30-YEAR CONVENTIONAL LOANS

This section sets out the econometric results. It also interprets the magnitudes of the Zillow overcharges.

### A.  Econometric Results and Interpretation

Table 5 presents the main regression results using the baseline specification described above in Section III. As noted, the dependent variable represents mortgage costs expressed as a percentage of the loan amount. Specifically, the dependent variable "Rate Spread" is reported in the HMDA data and reflects the difference between the loan's annual percentage rate (APR) and the Average Prime Offer Rate (APOR) for a comparable transaction. Table 5 reports the estimated coefficient  on the Zillow dummy variable, its statistical significance, the Zillow average loan amount, and the incremental borrower cost in dollars. The incremental borrower cost in dollars is calculated as the net present value of the Zillow coefficient assuming a 30-

---

[41] In Section V, the NPV based on the assumption that the 30-year loan is held for only 10 years is also calculated.

[42] https://www.investopedia.com/terms/c/combinedloantovalue.asp

[43] https://www.federalregister.gov/documents/2019/01/31/2018-28404/disclosure-of-loan-level-hmda-data

16

year payoff on the average Zillow loan amount at an annual discount rate of 6.5%.[44] Comprehensive regression results are reported in the Appendix.

**Table 5. Estimation results for conventional 30-year loans (2022-2024)**

| Dependent Variable: Rate Spread | Zillow Home Loans | | | | | | Adj. R-Sq. | N |
|---|---|---|---|---|---|---|---|---|
| | Coefficient | Standard Error | Avg. Loan Size | Zillow NPV Overcharge Per Loan | Zillow Number of Loans | Zillow NPV Overcharge Total | | |
| | 0.0988%*** | 0.0003 | $320,666 | **$2,881** | 10,969 | **$31,596,494** | 0.0753 | 4.46M |

*Source:* Home Mortgage Disclosure Act data, 2022-2024; GLEIF Golden Copy and Delta Files.

*Notes:* *** p<0.01, **p<0.05, *p<0.10.

These results indicate that Zillow Home Loans charges significantly higher prices than other lenders after controlling for observable borrower and loan characteristics. The difference between ZHL and other lenders' APRs for a comparable loan is 10 basis points.[45] This is equivalent to an NPV of $2,881 on a $320,666 loan, or 0.9% of the average Zillow loan amount. The standard error, clustered at the lender level, accounts for potential correlation in unobserved factors within lenders. The result is highly statistically significant (at the 1% level), indicating strong confidence that after controlling for a set of borrower, property, and loan characteristics as well as geographic and temporal factors, Zillow's pricing is different from other lenders.

To place these results in perspective, the NPV of interest on a typical mortgage in this sample, assuming a 6.5% interest rate, is approximately 59% of the loan amount over a 30-year horizon, so an additional 0.9% represents a meaningful increment to total borrowing costs. To further assess the economic significance of Zillow's $2,881 overcharge, it is helpful to express it relative to various measures.

**Overcharge Relative to Origination Fees:** Typical origination fees on a $320,666 loan are in the range of $1,600 to $3,200 (approximately 0.5% to 1.0% of the loan amount).[46] Thus, the $2,881 overcharge is comparable in magnitude to typical origination fees. Borrowers who focus primarily on minimizing upfront fees might miss the larger price difference embedded in the interest rate.

---

[44] As noted above, in this paper Zillow incremental costs above the costs of other lenders are referred to as ZHL "overcharges."

[45] The basis points are equal to the 10,000 times the coefficient. That is, the coefficient 0.0988% is 9.88 basis points.

[46] https://www.rocketmortgage.com/learn/mortgage-origination-fee; https://www.investopedia.com/terms/o/origination-fee.asp

17

**Aggregate Impact of Overcharges:** Zillow originated 10,969 loans in the sample of 30-year conventional loans in 2022–2024. If each of these loans carries an overcharge of approximately $2,881, the total incremental cost to borrowers is approximately $31.6 million in present-value terms. This represents the aggregate incremental cost to consumers from Zillow's pricing during this period.

The full regression outputs are reported in Appendix 2. The results confirm that the control variables enter with the correct signs, consistent magnitudes, and stable interpretation across specifications, reinforcing that the estimated Zillow pricing differential is not an artifact of anomalous control-variable behavior.

The full regression outputs indicate that the key underwriting variables—Debt-to-Income ratio (DTI) and Combined Loan-to-Value ratio (CLTV) have a positive sign consistent with standard mortgage-pricing relationships. Appendix Table 2-2 shows that borrowers in higher DTI brackets face higher rate spreads, and these differences are statistically significant across the pooled 2022–2024 sample.[47] CLTV behaves similarly. Higher CLTV ratios are associated with statistically significant higher rate spreads reflecting the higher credit risk associated with lower borrower equity.

The quadratic income and loan-amount variables also follow economically plausible patterns. Appendix Table 2-2 shows that the linear income coefficient is small in magnitude and not uniformly negative across specifications. In conjunction with the squared-income term it implies only modest variation in predicted rate spreads across the income distribution. The implied marginal effects are economically small—typically well below one basis point when moving across income ranges—indicating that income primarily serves as a control for borrower capacity rather than a major driver of pricing differences.

Loan amount is specified with a non-linear relationship. The linear term is negative and statistically significant, while the quadratic term is positive and small, as reported in Appendix Table 2-2. This structure implies that rate spreads decline as loan size increases from lower levels, with diminishing marginal effects at higher balances. The magnitudes are economically limited; shifts produce only a few basis points of predicted spread change.

### B. Lender Credits

As noted in the Introduction, the HMDA rate spread variable takes account of origination fees and discount points, but not lender credits. Before controlling for all the explanatory variables, Zillow's average lender credits in the 2022-2024 sample period were $749 versus $465 for other lenders. This difference is equivalent to less than 1 basis point of APR relative to the average Zillow loan amount, suggesting that the omission of lender credits from the rate spread likely does not have a material impact on these findings.

---

[47] In the next section, similar analyses are conducted by year and the same pattern is found. See Appendix Table 2-2. DTI remains a stable and economically meaningful predictor of pricing variation.

## V.    ADDITIONAL ANALYSES OF 30-YEAR CONVENTIONAL LOANS

This section reports additional results for various sub-samples. First, the Zillow overcharge has increased over time. While ZHL loans had a $1,043 *undercharge* in 2022, it has an overcharge of $4,579 in 2024.  Projecting this overcharge based on recent ZHL business growth, the total overcharge for Zillow's projected number of 30-year conventional loans in 2025-2027 is about $186 million.[48] Second, the Zillow overcharge is larger in percentage terms for lower-income borrowers. For borrowers earning $60,000 or less, the difference between Zillow's and other lenders' mortgage APRs for a comparable loan was 23 basis points, compared to 10 basis points for the full sample. For borrowers earning $100,000 or less, the difference between Zillow's and other lenders' APRs for a comparable loan was 14 basis points. Third, while the Zillow overcharge is present for shorter mortgage holding periods (e.g., 10 years versus 30 years), the magnitude of the overcharge increases with longer holding periods as expected. Fourth, there is substantial heterogeneity in the Zillow overcharge by race and ethnicity, with Hispanic/Latino borrowers benefitting from a very small undercharge in the 3-year period, while White Non-Hispanic/Latino, Asian and Black borrowers face even higher overcharges. Fifth, these latter overcharges are higher for 2024.

These additional results also show that the result that Zillow charges higher prices than other lenders after controlling for observables is not an artifact of a particular specification or subsample. The finding is robust across multiple dimensions, and there are also important variations in magnitude over time and across demographic groups.

### A.  Results by Year

Table 6 presents regression results estimated separately for each year in the sample: 2022, 2023, and 2024. This allows us to examine how Zillow's pricing has evolved over time.

---

[48] Zillow's Form 10-Q reports a year-over-year change in purchase loan origination dollar volume of 47% between the nine months ending September 30, 2024 and the nine months ending September 30, 2025. (Zillow Form 10Q for Q3 2025, available at https://d18rn0p25nwr6d.cloudfront.net/CIK-0001617640/b7fb3b16-0f0b-46f6-a4ea-79a58a0d97da.pdf, p. 27) If ZHL loans grow by this annual rate in 2025-2027, this will amount to 40,654 ZHL mortgages over this 3-year period. Applying the 2024 NPV overcharge of $4,579 per loan, this implies a total borrower overcharge of about $186 million.

**Table 6. Conventional 30-year loan regression results by year (2022-2024)**

| Dependent Variable: Rate Spread | Zillow Home Loans | | | | | | Adj. R-Sq. | N |
| | Coefficient | Standard Error | Avg. Loan Size | Zillow NPV Overcharge Per Loan | Zillow Number of Loans | Zillow NPV Overcharge Total | | |
|---|---|---|---|---|---|---|---|---|
| **Year 2022** | -0.0371% | 0.0002 | $309,294 | **($1,043)** | 1,714 | **($1,788,209)** | 0.135 | 1.74M |
| **Year 2023** | 0.1191%*** | 0.0003 | $296,754 | **$3,213** | 3,283 | **$10,549,746** | 0.0473 | 1.35M |
| **Year 2024** | 0.1494%*** | 0.0004 | $337,075 | **$4,579** | 5,972 | **$27,343,782** | 0.0974 | 1.38M |

*Notes:* *** p<0.01, **p<0.05, *p<0.10.  Each row reports results from a separate regression estimated on the subsample of loans originated in that year. See Table 5 for sources and specification details.

The temporal pattern is striking.  The incremental cost of a Zillow loan has been increasing over time. While the incremental cost of Zillow in 2022 was not statistically significant from zero, it was negative. That is, a Zillow loan was less costly on average than other lenders' loans, after controlling for borrower demographics, loan characteristics, and geographic and temporal factors. By contrast, the incremental cost of a Zillow loan was positive in 2023, with a 12 basis point difference between Zillow's and other lenders' APRs for a comparable loan, which is equivalent in NPV to $3,213 per loan in 2023. The difference between Zillow's and other lenders' APRs for a comparable loan increased to 15 basis points in 2024, equivalent in NPV to $4,579.

### B.  Income Levels

Table 7 presents results for two subsamples: borrowers with incomes of $60,000 or less (approximately the 15th percentile of the distribution) and borrowers with incomes of $100,000 or less (approximately the 43rd percentile).  Comparing these results to the full sample (Table 5) allows us to assess whether and how the pricing differences vary by borrower income.

**Table 7. Conventional 30-year loan regression results by borrower income level (2022-2024)**

| Dependent Variable: Rate Spread | Zillow Home Loans | | | | | | Adj. R-Sq. | N |
|---|---|---|---|---|---|---|---|---|
| | Coefficient | Standard Error | Avg. Loan Size | Zillow NPV Overcharge Per Loan | Zillow Number of Loans | Zillow NPV Overcharge Total | | |
| All Income Levels | 0.0988%*** | 0.0003 | $320,666 | $2,881 | 10,969 | $31,596,494 | 0.0753 | 4.46M |
| Income ≤ $60k | 0.2295%*** | 0.0002 | $159,618 | $3,331 | 2,174 | $7,240,803 | 0.174 | 0.67M |
| Income ≤ $100k | 0.1428%*** | 0.0003 | $217,090 | $2,819 | 5,622 | $15,846,046 | 0.124 | 1.91M |

*Notes:* \*\*\* p<0.01, \*\*p<0.05, \*p<0.10. Each row reports results from a separate regression estimated on the indicated income subsample. See Table 5 for sources and specification details.

These results reveal that the overcharge is larger in percentage terms for lower-income borrowers. For borrowers earning $60,000 or less, the difference between Zillow's and other lenders' mortgage APRs for a comparable loan was 23 basis points, compared to 10 basis points for the full sample. For borrowers earning $100,000 or less, the difference between Zillow's and other lenders' APRs for a comparable loan was 14 basis points. This pattern suggests that lower-income borrowers may be paying disproportionately higher relative prices.

Even in terms of net present value, the overcharges are somewhat larger for the lowest income group, that is, $3,331 for incomes less than or equal to $60,000 versus $2,819 for incomes less than or equal to $100,000, and $2,881 for the full sample.

Table 8 reports the results of the same analysis solely for loans originated in 2024. The overcharge remains larger in percentage terms for lower-income borrowers. For borrowers earning $60,000 or less, the difference between Zillow's and other lenders' mortgage APRs for a comparable loan is 31 basis points, compared to 15 basis points in the full sample, among loans originated in 2024. For borrowers earning $100,000 or less, the difference between Zillow's and other lenders' APRs for a comparable loan is 21 basis points for loans originated in 2024. In terms of net present value, the overcharges are similar for the lowest income group, that is, $4,457 for income less than or equal to $60,000 in 2024 versus $4,579 for the full sample of loans originated in 2024.

**Table 8. Conventional 30-year loan regression results by borrower income level (2024 only)**

| Dependent Variable: Rate Spread | Zillow Home Loans | | | | | | | Adj. R-Sq. | N |
|---|---|---|---|---|---|---|---|---|---|
| | Coefficient | Standard Error | Avg. Loan Size | Zillow NPV Overcharge Per Loan | Zillow Number of Loans | Zillow NPV Overcharge Total | | | |
| **All Income Levels** | 0.1494%*** | 0.0004 | $337,075 | **$4,579** | 5,972 | **$27,343,782** | 0 | 0.0974 | 1.38M |
| **Income ≤ $60k** | 0.3120%*** | 0.0003 | $157,118 | **$4,457** | 1,100 | **$4,902,705** | | 0.187 | 0.18M |
| **Income ≤ $100k** | 0.2072%*** | 0.0003 | $219,440 | **$4,134** | 2,937 | **$12,141,472** | | 0.182 | 0.54M |

*Notes:* *** $p<0.01$, **$p<0.05$, *$p<0.10$. Each row reports results from a separate regression estimated on the indicated income subsample. See Table 5 for sources and specification details.

The finding that lower-income borrowers face relatively higher prices in percentage terms raises distributional concerns. If these borrowers have less access to information, less ability to shop around, or weaker bargaining power, they may be particularly vulnerable to paying elevated prices. However, as noted earlier, the publicly available HMDA data does not include data on credit scores so it is theoretically possible that these disproportionate effects are at least partially the result of unmeasured risk factors among Zillow borrowers versus lower-income borrowers at other lenders.

## C. Alternative Loan Holding Periods

The baseline results assume a 30-year holding period for the mortgages. However, many borrowers refinance or sell their homes before the full 30-year term. Table 9 reports results for the alternative assumption of a 10-year payoff horizon.

**Table 9. Conventional 30-year loan regression results for alternative NPV horizons (2022-2024)**

| Dependent Variable: Rate Spread | Zillow Home Loans | | | | | | Adj. R-Sq. | N |
|---|---|---|---|---|---|---|---|---|
| | Coefficient | Standard Error | Avg. Loan Size | Zillow NPV Overcharge Per Loan | Zillow Number of Loans | Zillow NPV Overcharge Total | | |
| **30-Year NPV** | 0.0988%*** | 0.0003 | $320,666 | **$2,881** | 10,969 | **$31,596,494** | 0.0753 | 4.46M |
| **10-Year NPV** | 0.0988%*** | 0.0003 | $320,666 | **$1,352** | 10,969 | **$14,828,899** | 0.0753 | 4.46M |

*Notes:* *** $p<0.01$, **$p<0.05$, *$p<0.10$. This table reports results using a 30-year and 10-year NPV horizon for interest rate calculations. See Table 5 for sources and specification details.

22

As expected, the estimated dollar amount of overcharge increases with a longer holding period. For a 10-year horizon, the Zillow overcharge is $1,352 (0.4% of loan amount). For a 30-year horizon, it is $2,881 (0.9%). This pattern makes sense because the cumulative effect of a higher interest rate grows with the length of exposure to that rate.[49]

### D. Race and Ethnicity Interactions

To examine whether the pricing differences vary by Zillow borrower race and ethnicity, the econometric specification includes interaction terms between the Zillow dummy variable and the race and ethnicity categories. This specification provides an estimate of how the Zillow overcharge differs for non-Hispanic/Latino White, Black, Asian, and Hispanic/Latino borrowers, among others.

This analysis is applied in two steps. The first step is the estimated overcharge to White Non-Hispanic/Latino ZHL borrowers relative to other lenders. This baseline effect reflects the combined race and ethnicity categories. Total effects for other groups are then obtained with a second step that adds interaction terms showing the additional increment (or decrement) for each group relative to the White Non-Hispanic/Latino baseline group.

For example, the regression analysis for the pooled 3-year period indicates an 11 basis point ZHL overcharge for White Non-Hispanic/Latino ZHL borrowers. To illustrate the incremental effects for other groups, the coefficient on the interaction term between the Zillow dummy variable and, for example, the Black race indicator, captures the difference between White, Non-Hispanic/Latino ZHL borrowers and Black, Non-Hispanic/Latino ZHL borrowers. That coefficient shows that the rate spread for Black, Non-Hispanic/Latino ZHL borrowers is an additional 10 basis points higher than the rate spread for White, Non-Hispanic/Latino ZHL borrowers, resulting in a total overcharge of 21 basis points (i.e., 10 + 11 = 21) on a ZHL loan relative to other lender's loans for Black, Non-Hispanic/Latino ZHL borrowers. The econometric specification and additional results are set out in Appendix 1.

The results reported in Table 10 reveal substantial heterogeneity across racial and ethnic groups. For White, Non-Hispanic/Latino borrowers, the net present value of the 11 basis point Zillow overcharge on the average loan amount of $320,666 is $3,099. For Black, Non-Hispanic/Latino borrowers, the incremental rate spread of a Zillow loan is 21 basis points higher than other lenders' loans. The net present value of this 21 basis point Zillow overcharge on the average loan amount of $282,832 is $5,362. As indicated in Table 11, their basis point increase is also substantially higher than for White non-Hispanic borrowers. For Asian borrowers, the incremental rate spread of a Zillow loan is the same as for White, Non-Hispanic/Latino borrowers at 11 basis points.[50] The net present value of this basis point Zillow

---

[49] The coefficient on the Zillow dummy variable and its statistical significance is not affected by the payoff horizon; the payoff horizon only affects the calculation of the dollar amount of the estimated overcharge.

[50] The coefficient on the interaction between the Zillow dummy variable and the Asian race indicator,

overcharge on their higher average loan amount of $413,330 is $3,995. By contrast, White, Hispanic/Latino Zillow borrowers experience a slight *undercharge* of less than 1 basis point relative to other lenders. The net present value of this Zillow undercharge on the average loan amount of $320,100 is $276.

**Table 10. Regression results with race and ethnicity interactions (2022-2024)**

| | Zillow Home Loans | | | | | |
|---|---|---|---|---|---|---|
| | Coefficient | | Rate Differential | | Avg. Loan Size | Zillow NPV Overcharge Per Loan |
| **Incremental rate spread for a Zillow borrower where borrower race/ethnicity is:** | | | | | | |
| **White, non-Hispanic/Latino** | 0.1063%*** | (a) | 0.1063% | (a) | $320,666 | **$3,099** |
| **Asian** | 0.0312% | (b) | 0.1063% | (a) | $413,330 | **$3,995** |
| **Black** | 0.1022%*** | (c) | 0.2085% | (a) + (c) | $282,832 | **$5,362** |
| **Race other** | 0.0179% | (d) | 0.1063% | (a) | $305,000 | **$2,948** |
| **Race missing** | 0.0438%*** | (e) | 0.1501% | (a) + (e) | $334,040 | **$4,559** |
| **Hispanic/Latino** | -0.1158%** | (f) | -0.0095% | (a) + (f) | $320,100 | **($276)** |
| **Ethnicity missing** | -0.0656%*** | (g) | 0.0407% | (a) + (g) | $335,771 | **$1,243** |

*Notes:* *** p<0.01, **p<0.05, *p<0.10. See Table 5 and Appendix 1 for sources and other specification details.

These overcharges were larger for 2024. As reported in Table 11, the NPV dollar overcharges were $4,943 for White, non-Hispanic/Latino borrowers, $6,417 for Asian borrowers, $8,225 for Black borrowers and now an $851 overcharge for Hispanic/Latino borrowers.

---

which would flag a difference between White, Non-Hispanic/Latino Zillow borrowers and Asian, Non-Hispanic/Latino Zillow borrowers, is statistically insignificant. Therefore, the additional basis points were not added to the overall Asian borrower rate differential in Tables 10 and 11. This was also the case for the Race Other borrowers for the 3-year 2022-2024 period. But the coefficient is significant for 2024, as shown in Table 11.

24

**Table 11. Regression results with race and ethnicity interactions (2024 only)**

| | Zillow Home Loans | | | | |
| | Coefficient | | Rate Differential | | Avg. Loan Size | Zillow NPV Overcharge Per Loan |
|---|---|---|---|---|---|---|
| **Incremental rate spread for a Zillow borrower where borrower race/ethnicity is:** | | | | | | |
| **White, non-Hispanic/Latino** | 0.1613%*** | (a) | 0.1613% | (a) | $337,075 | **$4,943** |
| | | | | | | |
| **Asian** | -0.0279% | (b) | 0.1613% | (a) | $437,574 | **$6,417** |
| **Black** | 0.1559%*** | (c) | 0.3172% | (a) + (c) | $285,192 | **$8,225** |
| **Race other** | 0.0958%*** | (d) | 0.2571% | (a) + (d) | $309,250 | **$7,229** |
| **Race missing** | 0.0708%*** | (e) | 0.2321% | (a) + (e) | $353,815 | **$7,466** |
| | | | | | | |
| **Hispanic/Latino** | -0.1330%*** | (f) | 0.0283% | (a) + (f) | $330,815 | **$851** |
| **Ethnicity missing** | -0.0977%*** | (g) | 0.0636% | (a) + (g) | $356,557 | **$2,062** |

*Notes:* *** p<0.01, **p<0.05, *p<0.10. See Table 5 and Appendix 1 for sources and other specification details.

# VI. ANALYSES OF VA AND FHA GUARANTEED LOANS

This section reports the econometric analyses of loans guaranteed by the Department of Veterans Affairs[51] ("VA Loans") and the Federal Housing Authority[52] ("FHA Loans"). These categories have fewer loans than the 30-year conventional mortgage category. The results for ZHL pricing are more mixed over the pooled 3-year period and for 2022 and 2023. However, ZHL loans in both programs involve statistically significant overcharges in 2024.

## A. VA Loans

While Zillow's penetration of VA loans is very small, Zillow levied a significant average overcharge on the 812 ZHL VA loans in the sample. Table 12 shows that the difference between ZHL and other lenders' APRs for a comparable VA loan is 11 basis points. This is

---

[51] VA loans are provided by private lenders like banks and mortgage companies; the Department of Veterans Affairs guarantees a portion of the loan, allowing lenders to provide borrowers with more favorable terms. Veterans, servicemembers, and eligible surviving spouses are eligible for VA loans. https://www.benefits.va.gov/homeloans/

[52] https://www.consumerfinance.gov/ask-cfpb/what-is-an-fha-loan-en-112/ ("The Federal Housing Administration (FHA) administers a program of loan insurance to expand homeownership opportunities. FHA provides mortgage insurance to FHA-approved lenders to protect these lenders against losses if the homeowner defaults on the loan. The cost of the mortgage insurance is passed along to the homeowner. The standards for qualifying for these loans are generally more flexible than for conventional loans.")

25

equivalent to an NPV of $4,140 on a $397,352 loan, or 1.0% of the average Zillow loan amount.

**Table 12. VA loan estimation results (2022-2024)**

| Dependent Variable: Rate Spread | Zillow Home Loans | | | | | | Adj. R-Sq. | N |
|---|---|---|---|---|---|---|---|---|
| | Coefficient | Standard Error | Avg. Loan Size | Zillow NPV Overcharge Per Loan | Zillow Number of Loans | Zillow NPV Overcharge Total | | |
| | 0.1146%** | 0.0006 | $397,352 | **$4,140** | 812 | **$3,361,850** | 0.144 | 0.7M |

*Note:* *** p<0.01, **p<0.05, *p<0.10.  See Table 5 for sources and specification details.

Table 13 reports this information by year. While there was a statistically significant undercharge of about 7 basis points (-$2,295 NPV per loan) in 2022 and a statistically insignificant 4 basis point overcharge in 2023, ZHL VA loans exhibited a statistically significant 20 basis point overcharge ($7,279 NPV per loan) in 2024 on an average loan size of $407,860.

**Table 13. VA loan regression results by year (2022-2024)**

| Dependent Variable: Rate Spread | Zillow Home Loans | | | | | | Adj. R-Sq. | N |
|---|---|---|---|---|---|---|---|---|
| | Coefficient | Standard Error | Avg. Loan Size | Zillow NPV Overcharge Per Loan | Zillow Number of Loans | Zillow NPV Overcharge Total | | |
| **Year 2022** | -0.0696%* | 0.0004 | $362,719 | **($2,295)** | 114 | **($261,666)** | 0.0797 | 0.26M |
| **Year 2023** | 0.0389% | 0.0005 | $388,729 | **$1,375** | 177 | **$243,350** | 0.133 | 0.22M |
| **Year 2024** | 0.1963%*** | 0.0007 | $407,860 | **$7,279** | 521 | **$3,792,548** | 0.155 | 0.22M |

*Note:* *** p<0.01, **p<0.05, *p<0.10.  See Table 5 for sources and specification details.

Tables 14 and 15 report that the overcharge is higher for borrowers with incomes at $100,000 or less. As reported in Table 14, the ZHL overcharge for borrowers with incomes of $60,000 or less was 20 basis points ($4,067 NPV per loan) in the pooled 3-year period on an average loan size of $223,636.  In 2024, the ZHL overcharge for borrowers with incomes of $60,000 or less was 25 basis points ($5,118 NPV per loan) on an average loan size of $220,918.

The overcharge for borrowers with incomes at $100,000 or less was also statistically significant.  As reported in Table 14, the overcharge over the pooled 3-year period was 12.6 basis points ($3,367 NPV per loan) on an average loan size of $292,967.  As reported in Table

15, the overcharge in 2024 was almost 20 basis points ($5,195 NPV per loan) on an average loan size of $291,972.

**Table 14. VA loan regression results by borrower income level (2022-2024)**

| Dependent Variable: Rate Spread | Zillow Home Loans | | | | | | | Adj. R-Sq. | N |
|---|---|---|---|---|---|---|---|---|---|
| | Coefficient | Standard Error | Avg. Loan Size | Zillow NPV Overcharge Per Loan | Zillow Number of Loans | Zillow NPV Overcharge Total | | | |
| All Income Levels | 0.1146%** | 0.0006 | $397,352 | **$4,140** | 812 | **$3,361,850** | | 0.144 | 0.7M |
| Income ≤ $60k | 0.2000%*** | 0.0006 | $223,636 | **$4,067** | 88 | **$357,863** | | 0.217 | 0.07M |
| Income ≤ $100k | 0.1264%** | 0.0006 | $292,967 | **$3,367** | 364 | **$1,225,545** | | 0.171 | 0.33M |

*Note:* *** p<0.01, **p<0.05, *p<0.10.  See Table 5 for sources and specification details.

**Table 15. VA loan regression results by borrower income level for loans (2024 only)**

| Dependent Variable: Rate Spread | Zillow Home Loans | | | | | | | | Adj. R-Sq. | N |
|---|---|---|---|---|---|---|---|---|---|---|
| | Coefficient | Standard Error | Avg. Loan Size | Zillow NPV Overcharge Per Loan | Zillow Number of Loans | Zillow NPV Overcharge Total | | | | |
| All Income Levels | 0.1963%*** | 0.0007 | $407,860 | **$7,279** | 521 | **$3,792,548** | 0 | | 0.155 | 0.22M |
| Income ≤ $60k | 0.2548%*** | 0.0007 | $220,918 | **$5,118** | 49 | **$250,778** | | | 0.316 | 0.02M |
| Income ≤ $100k | 0.1957%*** | 0.0006 | $291,972 | **$5,195** | 218 | **$1,132,534** | | | 0.238 | 0.09M |

*Note:* *** p<0.01, **p<0.05, *p<0.10.  See Table 5 for sources and specification details.

## B. FHA Loans

The number of FHA loans represents about 33% of the number of 30-year conventional loans. As reported in Table 16, for the pooled 2022-2024 3-year period, the incremental cost of a Zillow loan was negative but statistically insignificant.  But the results vary by year.  There were statistically significant undercharges in 2022 and 2023 of 22 and 16 basis points respectively ($5,450 and $4,158 NPV per loan, respectively).  By contrast, in 2024, ZHL loans exhibited a statistically significant 11 basis point overcharge ($3,233 NPV per loan) on an average loan size of $319,153, as shown in Table 17.

27

**Table 16. FHA loan estimation results (2022-2024)**

| Dependent Variable: Rate Spread | Zillow Home Loans | | | | | | Adj. R-Sq. | N |
|---|---|---|---|---|---|---|---|---|
| | Coefficient | Standard Error | Avg. Loan Size | Zillow NPV Overcharge Per Loan | Zillow Number of Loans | Zillow NPV Overcharge Total | | |
| | -0.0191% | 0.0005 | $303,338 | ($527) | 3,911 | ($2,060,203) | 0.273 | 1.5M |

*Note:* *** p<0.01, **p<0.05, *p<0.10. See Table 5 for sources and specification details.

**Table 17. FHA loan regression results by year (2022-2024)**

| Dependent Variable: Rate Spread | Zillow Home Loans | | | | | | Adj. R-Sq. | N |
|---|---|---|---|---|---|---|---|---|
| | Coefficient | Standard Error | Avg. Loan Size | Zillow NPV Overcharge Per Loan | Zillow Number of Loans | Zillow NPV Overcharge Total | | |
| Year 2022 | -0.2233%*** | 0.0004 | $268,415 | ($5,450) | 533 | ($2,904,589) | 0.0802 | 0.5M |
| Year 2023 | -0.1563%*** | 0.0004 | $292,622 | ($4,158) | 1,312 | ($5,455,843) | 0.167 | 0.5M |
| Year 2024 | 0.1114%* | 0.0006 | $319,153 | $3,233 | 2,066 | $6,678,462 | 0.22 | 0.5M |

*Note:* *** p<0.01, **p<0.05, *p<0.10. See Table 5 for sources and specification details.

Tables 18 and 19 show that the ZHL overcharge was highest for borrowers with incomes at $60,000 or less. As reported in Table 18, over the 3-year period, there was a statistically significant overcharge for such borrowers of 13 basis points ($1,999 NPV per loan) on an average loan size of $175,461. Table 19 shows that the overcharge for those borrowers in 2024 was 27 basis points ($4,203 NPV per loan) on an average loan size of $173,969.

As reported in Table 19, there was a significant overcharge of 16 basis points ($3,617 NPV per loan) on an average loan size of $249,579 for ZHL borrowers with incomes of $100,000 or less in 2024. However, Table 18 reports that the overcharge was small and insignificant over the pooled 2022-2024 period.

28

**Table 18. FHA loan regression results by borrower income level (2022-2024)**

| Dependent Variable: Rate Spread | Zillow Home Loans | | | | | | | |
| | Coefficient | Standard Error | Avg. Loan Size | Zillow NPV Overcharge Per Loan | Zillow Number of Loans | Zillow NPV Overcharge Total | Adj. R-Sq. | N |
|---|---|---|---|---|---|---|---|---|
| All Income Levels | -0.0191% | 0.0005 | $303,338 | ($527) | 3,911 | ($2,060,203) | 0.273 | 1.5M |
| Income ≤ $60k | 0.1253%*** | 0.0003 | $175,461 | $1,999 | 651 | $1,301,292 | 0.332 | 0.3M |
| Income ≤ $100k | 0.0207% | 0.0005 | $243,719 | $459 | 2,280 | $1,045,819 | 0.32 | 0.9M |

*Note:* *** p<0.01, **p<0.05, *p<0.10.  See Table 5 for sources and specification details.

**Table 19. FHA loan regression results by borrower income level for loans (2024 only)**

| Dependent Variable: Rate Spread | Zillow Home Loans | | | | | | | |
| | Coefficient | Standard Error | Avg. Loan Size | Zillow NPV Overcharge Per Loan | Zillow Number of Loans | Zillow NPV Overcharge Total | Adj. R-Sq. | N |
|---|---|---|---|---|---|---|---|---|
| All Income Levels | 0.1114%* | 0.0006 | $319,153 | $3,233 | 2,066 | $6,678,462 | 0.22 | 0.5M |
| Income ≤ $60k | 0.2657%*** | 0.0003 | $173,969 | $4,203 | 291 | $1,222,977 | 0.37 | 0.07M |
| Income ≤ $100k | 0.1594%*** | 0.0005 | $249,579 | $3,617 | 1,105 | $3,996,876 | 0.302 | 0.3M |

*Note:* See Table 5 for sources and specification details.

## VII. CONCLUSIONS

This study provides empirical evidence that Zillow Home Loans charged higher prices than other mortgage lenders for conventional 30-year fixed-rate purchase mortgages during the three-year 2022-2024 period, after controlling for a set of borrower, loan, geographic, and temporal characteristics available in the public HMDA data. The estimated overcharge was even higher in 2024. The results also show important heterogeneity among Zillow borrowers, with lower income borrowers paying a higher percentage premium. The analysis of VA and FHA loans shows evidence of an undercharge for VA loans in 2022 and an undercharge in FHA loans in 2022 and 2023. But there are significant overcharges for 2024, particularly for borrowers with incomes of $60,000 or less.  These differences provide some support for the concerns that Zillow has begun to steer its users to high-cost loans.  Zillow's loan business has been growing rapidly in the past year, which may substantially increase the total overcharges paid by all ZHL borrowers.

While the public HMDA data lacks credit score information, the analysis included control variables that likely affect credit worthiness; and Zhang's article combining the HMDA data

with Fannie Mae and Freddie Mac data that includes the credit score finds that including the credit score would be unlikely to significantly change her results.

As possible extensions, it will be useful to analyze the 2025 data once it is published by HMDA to see how the market has further developed. If loans made by Zillow's lending partners can be identified, analyzing the rates of those loans would also be a useful extension. Another possible extension would be to explore factors that may explain the elevated Zillow overcharges for Hispanic and Black, Non-Hispanic Zillow borrowers relative to White non-Hispanic Zillow borrowers. For example, following the approach outlined by Zhang, it might be useful to consider whether the likelihood of shopping among brokers—which has been shown to lead to more favorable loan terms—varies by race and ethnicity among Zillow borrowers.

30

## Appendix 1:
## Regression results including interaction terms for
## Zillow borrower race and ethnicity

To examine whether the pricing differences vary by Zillow borrower race and ethnicity, the econometric specification includes interaction terms between the Zillow dummy variable and race and ethnicity categories. This specification provides an estimate of how the Zillow overcharge differs for non-Hispanic/Latino White, Black, Asian, and Hispanic/Latino borrowers, among others.

This analysis is based in two parts. The first part is the estimated overcharge to White Non-Hispanic/Latino ZHL borrowers relative to other lenders. The baseline effect is for White, Non-Hispanic/Latino borrowers, which reflects the combined race and ethnicity categories. Total effects for other groups are then obtained by adding the interaction terms that show the additional increment (or decrement) for each group relative to this baseline.

For example, the regression analysis including all years indicates an 11 basis point ZHL overcharge for White Non-Hispanic/Latino ZHL borrowers.[53] To illustrate the incremental effects for other groups, the coefficient on the interaction term between the Zillow dummy variable and, for example, the Black race indicator, captures the difference between White, Non-Hispanic/Latino ZHL borrowers and Black, Non-Hispanic/Latino ZHL borrowers. That coefficient shows that the rate spread for Black, Non-Hispanic/Latino ZHL borrowers is an additional 10 basis points higher than the rate spread for White, Non-Hispanic/Latino ZHL borrowers, resulting in a total overcharge of 21 basis points (i.e., $10 + 11 = 21$) on a ZHL loan relative to other lender's loans for Black, Non-Hispanic/Latino ZHL borrowers.

The coefficient on the interaction term between the Zillow dummy variable and the Hispanic/Latino ethnicity indicator similarly flags a difference between White, Non-Hispanic/Latino ZHL borrowers and White, Hispanic/Latino ZHL borrowers of -12 basis points, indicating that White, Hispanic/Latino ZHL borrowers actually receive better pricing than White, Non-Hispanic/Latino Zillow borrowers, resulting in a 1 basis point (i.e., $12 - 11 = 1$) undercharge relative to other lenders' loans for White, Hispanic/Latino Zillow borrowers.

The coefficient on the interaction term between the Zillow dummy variable and the Asian race indicator is statistically insignificant, indicating no difference in percentage points of overcharge between White, Non-Hispanic/Latino ZHL borrowers and Asian, non-Hispanic/Latino ZHL borrowers, as shown on Appendix Table 1-1. That is also the case for Race Other borrowers for the 3-year period, as shown on this Table. However, the difference is significant for Race Other borrowers in 2024, as shown on Appendix Table 1-2.

---

[53] The basis points are equal to the 10,000 times the coefficient. That is, a coefficient of 0.10% is 10 basis points.

31

**Appendix Table 1-1. Regression results including interaction terms for Zillow borrower race and ethnicity (2022-2024)**

| Dependent Variable: Rate Spread | Zillow Home Loans | | | Adj. R-Sq. | N |
| --- | --- | --- | --- | --- | --- |
| | Coefficient | Standard Error | Avg. Loan Size | | |
| **Interaction of indicator of Zillow borrower with indicator of borrower race/ethnicity, where race/ethnitity is:** | | | | | |
| **White, non-Hispanic/Latino** | 0.1063%*** | 0.0002 | $320,666 | 0.0753 | 4.46M |
| **Asian** | 0.0312% | 0.0002 | $413,330 | 0.0753 | 4.46M |
| **Black** | 0.1022%*** | 0.0003 | $282,832 | 0.0753 | 4.46M |
| **Race other** | 0.0179% | 0.0002 | $305,000 | 0.0753 | 4.46M |
| **Race missing** | 0.0438%*** | 0.0001 | $334,040 | 0.0753 | 4.46M |
| **Hispanic/Latino** | -0.1158%** | 0.0005 | $320,100 | 0.0753 | 4.46M |
| **Ethnicity missing** | -0.0656%*** | 0.0001 | $335,771 | 0.0753 | 4.46M |

*Notes:* *** p<0.01, **p<0.05, *p<0.10. The baseline effect is for White, Non-Hispanic/Latino borrowers. Additional effects are interaction terms showing the additional increment (or decrement) for each group relative to the baseline. The analyzed sample includes 10,969 Zillow loans. See Table 5 for sources and other specification details.

**Appendix Table 1-2. Regression results including interaction terms for Zillow borrower race and ethnicity (2024 only)**

| Dependent Variable: Rate Spread | Zillow Home Loans | | | Adj. R-Sq. | N |
| --- | --- | --- | --- | --- | --- |
| | Coefficient | Standard Error | Avg. Loan Size | | |
| **Interaction of indicator of Zillow borrower with indicator of borrower race/ethnicity, where race/ethnitity is:** | | | | | |
| **White, non-Hispanic/Latino** | 0.1613%*** | 0.0003 | $337,075 | 0.0974 | 1.38M |
| **Asian** | -0.0279% | 0.0002 | $437,574 | 0.0974 | 1.38M |
| **Black** | 0.1559%*** | 0.0003 | $285,192 | 0.0974 | 1.38M |
| **Race other** | 0.0958%*** | 0.0003 | $309,250 | 0.0974 | 1.38M |
| **Race missing** | 0.0708%*** | 0.0002 | $353,815 | 0.0974 | 1.38M |
| **Hispanic/Latino** | -0.1330%*** | 0.0005 | $330,815 | 0.0974 | 1.38M |
| **Ethnicity missing** | -0.0977%*** | 0.0002 | $356,557 | 0.0974 | 1.38M |

*Notes:* *** p<0.01, **p<0.05, *p<0.10. The baseline effect is for White, Non-Hispanic/Latino borrowers. Additional effects are interaction terms showing the additional increment (or decrement) for each group relative to the baseline. The analyzed sample includes 5.972 Zillow loans. See Table 5 for sources and other specification details.

32

# Appendix 2:
# Full Regression Results and Summary Statistics

**Appendix Table 2-1. Descriptive statistics for 30-year conventional loans**

| Variable | Zillow | | | | | All Lenders | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Mean | SD | P25 | Median | P75 | Mean | SD | P25 | Median | P75 |
| Rate Spread | 0.382% | 0.550% | -0.004% | 0.329% | 0.713% | 0.257% | 2.067% | -0.111% | 0.247% | 0.613% |
| Loan Amount | $320,666 | $180,896 | $195,000 | $285,000 | $405,000 | $371,888 | $222,234 | $225,000 | $325,000 | $465,000 |
| Income | $120,362 | $83,995 | $67,000 | $99,000 | $150,000 | $144,099 | $274,367 | $75,000 | $113,000 | $170,000 |
| Combined Loan to Value Ratio | 84% | 14% | 80% | 90% | 95% | 81% | 16% | 76% | 83% | 95% |
| *Categorical Variables* | | | | | | | | | | |
| *Debt-to-Income Ratio* | | | | | | | | | | |
| Under 30 | 18% | | | | | 21% | | | | |
| 30-35 | 17% | | | | | 17% | | | | |
| 36-42 | 27% | | | | | 28% | | | | |
| 43-49 | 37% | | | | | 33% | | | | |
| 50 Plus | 1% | | | | | 1% | | | | |
| Missing | 0% | | | | | 0% | | | | |
| *Race* | | | | | | | | | | |
| Asian | 8% | | | | | 10% | | | | |
| Black | 5% | | | | | 6% | | | | |
| White | 56% | | | | | 70% | | | | |
| Other | 1% | | | | | 1% | | | | |
| Missing | 30% | | | | | 14% | | | | |
| *Ethnicity* | | | | | | | | | | |
| Hispanic | 10% | | | | | 12% | | | | |
| Non-Hispanic | 64% | | | | | 75% | | | | |
| Missing | 27% | | | | | 12% | | | | |
| *Age* | | | | | | | | | | |
| Under 35 | 41% | | | | | 39% | | | | |
| 35-54 | 38% | | | | | 42% | | | | |
| 55 Plus | 21% | | | | | 19% | | | | |
| Missing | 0% | | | | | 0% | | | | |

**Appendix Table 2-2. Regression results for conventional loans**

| VARIABLES | Base Regression | Year 2022 | Year 2023 | Year 2024 | Income <= $60K | Income <= $100K | Income <= $60K & Year 2024 | Income <= $100K & Year 2024 |
|---|---|---|---|---|---|---|---|---|
| zillow | 0.000988*** | -0.000371 | 0.001191*** | 0.001494*** | 0.002295*** | 0.001428*** | 0.003120*** | 0.002072*** |
| | (0.000284) | (0.000227) | (0.000286) | (0.000353) | (0.000229) | (0.000259) | (0.000311) | (0.000335) |
| income_mil | 0.003924*** | 0.003973*** | 0.005957*** | 0.003691*** | -0.218470** | 0.019724 | -0.309479*** | -0.005259 |
| | (0.000327) | (0.000426) | (0.000410) | (0.000381) | (0.086698) | (0.042616) | (0.081021) | (0.059945) |
| income_sq_mil | -0.000022*** | -0.000041*** | -0.000065*** | -0.000017*** | 3.125020*** | 0.365400 | 4.140037*** | 0.633669* |
| | (0.000005) | (0.000005) | (0.000010) | (0.000002) | (0.797609) | (0.256720) | (0.692273) | (0.359784) |
| loan_amount_mil | -0.008380*** | -0.012860*** | -0.007649*** | -0.004764*** | -0.040791*** | -0.039685*** | -0.039997*** | -0.040298*** |
| | (0.000660) | (0.000572) | (0.000848) | (0.000867) | (0.005615) | (0.002976) | (0.006672) | (0.004156) |
| loan_amount_sq_mil | 0.002802*** | 0.003700*** | 0.002187** | 0.002586*** | 0.032288*** | 0.030473*** | 0.030656*** | 0.031101*** |
| | (0.000720) | (0.000533) | (0.000983) | (0.000615) | (0.004895) | (0.001822) | (0.004730) | (0.002449) |
| combined_loan_to_value_ratio | 0.000104*** | 0.000105*** | 0.000104*** | 0.000102*** | 0.000090*** | 0.000104*** | 0.000094*** | 0.000106*** |
| | (0.000004) | (0.000004) | (0.000004) | (0.000004) | (0.000006) | (0.000005) | (0.000008) | (0.000007) |
| age_35_54 | 0.000467*** | 0.000373*** | 0.000499*** | 0.000547*** | 0.000103 | 0.000212** | 0.000129 | 0.000309*** |
| | (0.000078) | (0.000072) | (0.000096) | (0.000078) | (0.000105) | (0.000099) | (0.000103) | (0.000101) |
| age_55_plus | 0.000459*** | 0.000261*** | 0.000529*** | 0.000605*** | -0.000173*** | -0.000016 | -0.000057 | 0.000098 |
| | (0.000053) | (0.000063) | (0.000060) | (0.000047) | (0.000064) | (0.000066) | (0.000071) | (0.000068) |
| age_missing | 0.003709 | -0.002514 | 0.008722** | 0.002868 | -0.000238 | -0.002459 | | -0.008748*** |
| | (0.003387) | (0.002494) | (0.003934) | (0.002503) | (0.002692) | (0.002911) | | (0.000482) |
| dti_30_35 | 0.000357*** | 0.000471*** | 0.000464*** | 0.000171*** | 0.000656*** | 0.001082*** | 0.000531** | 0.001115*** |
| | (0.000047) | (0.000042) | (0.000050) | (0.000059) | (0.000157) | (0.000113) | (0.000232) | (0.000168) |
| dti_36_42 | 0.000756*** | 0.000863*** | 0.000882*** | 0.000572*** | 0.001383*** | 0.001959*** | 0.001346*** | 0.002184*** |
| | (0.000064) | (0.000061) | (0.000072) | (0.000075) | (0.000253) | (0.000181) | (0.000354) | (0.000270) |
| dti_43_49 | 0.001092*** | 0.001161*** | 0.001298*** | 0.000851*** | 0.002064*** | 0.002739*** | 0.002189*** | 0.003176*** |
| | (0.000111) | (0.000129) | (0.000124) | (0.000107) | (0.000384) | (0.000277) | (0.000531) | (0.000398) |
| dti_50_plus | 0.001554** | 0.001177* | 0.001754*** | 0.002456* | 0.003072*** | 0.003674*** | 0.004754** | 0.005875*** |
| | (0.000708) | (0.000674) | (0.000616) | (0.001409) | (0.001050) | (0.000973) | (0.001976) | (0.001926) |
| dti_missing | 0.005063*** | 0.002526*** | 0.005720*** | 0.006201** | 0.003288*** | 0.005118*** | 0.004757** | 0.007777*** |
| | (0.001682) | (0.000836) | (0.001319) | (0.002705) | (0.001081) | (0.001331) | (0.002125) | (0.002652) |
| race_black | -0.000380 | 0.000151 | -0.000679** | -0.000786** | -0.001105*** | -0.000927** | -0.001268*** | -0.001214*** |
| | (0.000297) | (0.000314) | (0.000301) | (0.000320) | (0.000394) | (0.000369) | (0.000400) | (0.000387) |
| race_asian | -0.001249*** | -0.001029*** | -0.001560*** | -0.001228*** | -0.000316* | -0.000689*** | -0.000294 | -0.000663*** |
| | (0.000196) | (0.000145) | (0.000270) | (0.000223) | (0.000177) | (0.000185) | (0.000211) | (0.000224) |
| race_other | -0.000397* | -0.000022 | -0.000613** | -0.000615** | -0.000384** | -0.000576*** | -0.000509* | -0.000702** |
| | (0.000204) | (0.000109) | (0.000268) | (0.000305) | (0.000154) | (0.000196) | (0.000285) | (0.000302) |
| race_missing | -0.000612*** | -0.000492*** | -0.000747*** | -0.000747*** | -0.000366*** | -0.000514*** | -0.000187 | -0.000516*** |
| | (0.000129) | (0.000108) | (0.000136) | (0.000201) | (0.000103) | (0.000114) | (0.000134) | (0.000143) |
| hispanic | 0.001319*** | 0.001269*** | 0.001261** | 0.001454*** | 0.001127*** | 0.001319*** | 0.001228*** | 0.001436*** |
| | (0.000479) | (0.000416) | (0.000560) | (0.000487) | (0.000406) | (0.000478) | (0.000369) | (0.000443) |
| hispanic_missing | 0.000600*** | 0.000446*** | 0.000596*** | 0.000771*** | 0.000532*** | 0.000570*** | 0.000517*** | 0.000713*** |
| | (0.000156) | (0.000143) | (0.000181) | (0.000196) | (0.000129) | (0.000138) | (0.000137) | (0.000146) |
| 2023.activity_year | -0.001285*** | | | | -0.002687*** | -0.002519*** | | |
| | (0.000270) | | | | (0.000252) | (0.000274) | | |
| 2024.activity_year | -0.001067*** | | | | -0.002961*** | -0.002663*** | | |
| | (0.000339) | | | | (0.000361) | (0.000365) | | |
| Constant | -0.004095*** | -0.002772*** | -0.005921*** | -0.006185*** | 0.004665** | -0.002067 | 0.003141* | -0.004786** |
| | (0.000394) | (0.000421) | (0.000425) | (0.000382) | (0.001838) | (0.001380) | (0.001880) | (0.002001) |
| | | | | | | | | |
| Observations | 4,464,612 | 1,735,655 | 1,350,104 | 1,378,853 | 671,370 | 1,907,858 | 175,440 | 537,380 |
| R-squared | 0.075971 | 0.136182 | 0.049457 | 0.099407 | 0.177379 | 0.125213 | 0.200401 | 0.186876 |
| Mean dependent var | 0.00255 | 0.00330 | 0.00199 | 0.00214 | 0.00304 | 0.00288 | 0.00173 | 0.00185 |
| SD dependent var | 0.00882 | 0.00700 | 0.0116 | 0.00757 | 0.00683 | 0.00798 | 0.00690 | 0.00676 |
| Adj R-sq | 0.0753 | 0.135 | 0.0473 | 0.0974 | 0.174 | 0.124 | 0.187 | 0.182 |
| Zillow Obs | 10969 | 1714 | 3283 | 5972 | 2174 | 5622 | 1100 | 2937 |
| Zillow Avg Loan Size | 320666 | 309294 | 296755 | 337075 | 159618 | 217090 | 157118 | 219440 |

SE clustered by LEI

\*\*\* p<0.01, \*\* p<0.05, \* p<0.1

**Appendix Table 2-3. Regression results for all years and for 2024, including interaction terms for Zillow and race, and Zillow and ethnicity**

| VARIABLES | All Years | Year 2024 |
|---|---|---|
| zillow | 0.001063*** | 0.001613*** |
| | (0.000238) | (0.000288) |
| income_mil | 0.003924*** | 0.003691*** |
| | (0.000327) | (0.000381) |
| income_sq_mil | -0.000022*** | -0.000017*** |
| | (0.000005) | (0.000002) |
| loan_amount_mil | -0.008379*** | -0.004763*** |
| | (0.000660) | (0.000867) |
| loan_amount_sq_mil | 0.002802*** | 0.002586*** |
| | (0.000720) | (0.000615) |
| combined_loan_to_value_ratio | 0.000104*** | 0.000102*** |
| | (0.000004) | (0.000004) |
| age_35_54 | 0.000467*** | 0.000547*** |
| | (0.000078) | (0.000078) |
| age_55_plus | 0.000459*** | 0.000605*** |
| | (0.000053) | (0.000047) |
| age_missing | 0.003709 | 0.002867 |
| | (0.003387) | (0.002504) |
| dti_30_35 | 0.000357*** | 0.000172*** |
| | (0.000047) | (0.000059) |
| dti_36_42 | 0.000756*** | 0.000572*** |
| | (0.000064) | (0.000075) |
| dti_43_49 | 0.001092*** | 0.000851*** |
| | (0.000111) | (0.000107) |
| dti_50_plus | 0.001554** | 0.002457* |
| | (0.000708) | (0.001409) |
| dti_missing | 0.005063*** | 0.006200** |
| | (0.001682) | (0.002704) |
| race_black | -0.000383 | -0.000792** |
| | (0.000298) | (0.000322) |
| race_asian | -0.001250*** | -0.001227*** |
| | (0.000196) | (0.000224) |
| race_other | -0.000397* | -0.000621** |
| | (0.000205) | (0.000307) |
| race_missing | -0.000613*** | -0.000749*** |
| | (0.000129) | (0.000202) |
| hispanic | 0.001322*** | 0.001459*** |
| | (0.000480) | (0.000489) |
| hispanic_missing | 0.000602*** | 0.000775*** |
| | (0.000156) | (0.000197) |
| 2023.activity_year | -0.001285*** | |
| | (0.000270) | |
| 2024.activity_year | -0.001067*** | |
| | (0.000339) | |
| zillow_x_black | 0.001022*** | 0.001559*** |
| | (0.000315) | (0.000342) |
| zillow_x_asian | 0.000312 | -0.000279 |
| | (0.000201) | (0.000197) |
| zillow_x_race_other | 0.000179 | 0.000958*** |
| | (0.000214) | (0.000326) |
| zillow_x_race_missing | 0.000438*** | 0.000708*** |
| | (0.000113) | (0.000203) |
| zillow_x_hispanic | -0.001158** | -0.001330*** |
| | (0.000472) | (0.000486) |
| zillow_x_hispanic_miss | -0.000656*** | -0.000977*** |
| | (0.000143) | (0.000178) |
| Constant | -0.004095*** | -0.006185*** |
| | (0.000394) | (0.000382) |
| | | |
| Observations | 4,464,612 | 1,378,853 |
| R-squared | 0.075976 | 0.09943 |
| Mean dependent var | 0.00255 | 0.00214 |
| SD dependent var | 0.00882 | 0.00757 |
| Adj R-sq | 0.0753 | 0.0974 |
| Zillow Obs | 10969 | 5972 |
| Zillow Avg Loan Size | 320666 | 337075 |

SE clustered by LEI

*** p<0.01, ** p<0.05, * p<0.1

35

**Appendix Table 2-4. Descriptive statistics for 30-year VA loans**

| Variable | Zillow | | | | | All Lenders | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Mean | SD | P25 | Median | P75 | Mean | SD | P25 | Median | P75 |
| Rate Spread | -0.266% | 0.498% | -0.645% | -0.245% | 0.083% | -0.206% | 0.671% | -0.595% | -0.187% | 0.230% |
| Loan Amount | $397,352 | $170,007 | $275,000 | $365,000 | $485,000 | $382,050 | $187,373 | $255,000 | $345,000 | $455,000 |
| Income | $117,043 | $56,167 | $76,000 | $105,000 | $142,500 | $115,488 | $64,318 | $74,000 | $101,000 | $140,000 |
| Combined Loan to Value Ratio | 97% | 9% | 100% | 100% | 100% | 95% | 11% | 98% | 100% | 100% |
| *Categorical Variables* | | | | | | | | | | |
| *Debt-to-Income Ratio* | | | | | | | | | | |
| Under 30 | 7% | | | | | 10% | | | | |
| 30-35 | 11% | | | | | 12% | | | | |
| 36-42 | 21% | | | | | 21% | | | | |
| 43-49 | 29% | | | | | 27% | | | | |
| 50 Plus | 32% | | | | | 30% | | | | |
| Missing | 0% | | | | | 0% | | | | |
| *Race* | | | | | | | | | | |
| Asian | 3% | | | | | 3% | | | | |
| Black | 11% | | | | | 14% | | | | |
| White | 49% | | | | | 64% | | | | |
| Other | 2% | | | | | 2% | | | | |
| Missing | 34% | | | | | 17% | | | | |
| *Ethnicity* | | | | | | | | | | |
| Hispanic | 13% | | | | | 13% | | | | |
| Non-Hispanic | 56% | | | | | 72% | | | | |
| Missing | 32% | | | | | 16% | | | | |
| *Age* | | | | | | | | | | |
| Under 35 | 40% | | | | | 38% | | | | |
| 35-54 | 37% | | | | | 41% | | | | |
| 55 Plus | 23% | | | | | 20% | | | | |
| Missing | 0% | | | | | 0% | | | | |

36

**Appendix Table 2-5. Regression results for VA loans**

| VARIABLES | Base Regression | Year 2022 | Year 2023 | Year 2024 | Income <= $60K | Income <= $100K | Income <= $60K & Year 2024 | Income <= $100K & Year 2024 |
|---|---|---|---|---|---|---|---|---|
| zillow | 0.001146** | -0.000696* | 0.000389 | 0.001963*** | 0.002000*** | 0.001264** | 0.002548*** | 0.001957*** |
| | (0.000565) | (0.000410) | (0.000487) | (0.000656) | (0.000605) | (0.000601) | (0.000706) | (0.000643) |
| income_mil | 0.012071*** | 0.005638*** | 0.014413*** | 0.016392*** | 0.051745 | 0.087780*** | -0.016922 | 0.111511*** |
| | (0.001427) | (0.000982) | (0.001284) | (0.002409) | (0.043306) | (0.010612) | (0.082783) | (0.014901) |
| income_sq_mil | -0.002155*** | -0.000911*** | -0.002391*** | -0.005312*** | 0.304732 | -0.315154*** | 1.617251* | -0.289033*** |
| | (0.000375) | (0.000184) | (0.000461) | (0.001234) | (0.439084) | (0.064705) | (0.925843) | (0.080541) |
| loan_amount_mil | -0.015035*** | -0.014699*** | -0.017027*** | -0.014428*** | -0.047658*** | -0.038766*** | -0.066399*** | -0.051808*** |
| | (0.001392) | (0.001156) | (0.001463) | (0.001828) | (0.005141) | (0.005075) | (0.009929) | (0.009493) |
| loan_amount_sq_mil | 0.006791*** | 0.006643*** | 0.007622*** | 0.006590*** | 0.034519*** | 0.028154*** | 0.035005*** | 0.038600*** |
| | (0.000780) | (0.000856) | (0.000870) | (0.000867) | (0.004607) | (0.005447) | (0.010696) | (0.011018) |
| combined_loan_to_value_ratio | 0.000071*** | 0.000088*** | 0.000074*** | 0.000056*** | 0.000091*** | 0.000086*** | 0.000101*** | 0.000081*** |
| | (0.000006) | (0.000005) | (0.000006) | (0.000008) | (0.000008) | (0.000006) | (0.000014) | (0.000008) |
| age_35_54 | 0.000309*** | 0.000141* | 0.000401*** | 0.000435*** | 0.000334 | 0.000303** | 0.000664** | 0.000416** |
| | (0.000095) | (0.000082) | (0.000107) | (0.000116) | (0.000205) | (0.000138) | (0.000270) | (0.000180) |
| age_55_plus | 0.000633*** | 0.000201* | 0.000852*** | 0.000920*** | 0.000544** | 0.000612*** | 0.000879*** | 0.000904*** |
| | (0.000140) | (0.000109) | (0.000169) | (0.000180) | (0.000220) | (0.000175) | (0.000235) | (0.000217) |
| age_missing | 0.004488*** | 0.005225** | 0.004692*** | | 0.003991 | 0.003696 | | |
| | (0.001520) | (0.002531) | (0.000845) | | (0.005075) | (0.003657) | | |
| dti_30_35 | 0.000853*** | 0.000695*** | 0.001056*** | 0.000792*** | 0.001126*** | 0.001107*** | 0.001421*** | 0.001331*** |
| | (0.000062) | (0.000084) | (0.000077) | (0.000064) | (0.000154) | (0.000094) | (0.000388) | (0.000146) |
| dti_36_42 | 0.001507*** | 0.001246*** | 0.001772*** | 0.001462*** | 0.001832*** | 0.001981*** | 0.002191*** | 0.002401*** |
| | (0.000094) | (0.000120) | (0.000120) | (0.000100) | (0.000232) | (0.000151) | (0.000437) | (0.000206) |
| dti_43_49 | 0.001987*** | 0.001561*** | 0.002369*** | 0.002015*** | 0.002551*** | 0.002649*** | 0.003440*** | 0.003236*** |
| | (0.000121) | (0.000159) | (0.000162) | (0.000137) | (0.000290) | (0.000188) | (0.000570) | (0.000253) |
| dti_50_plus | 0.002185*** | 0.001565*** | 0.002667*** | 0.002308*** | 0.003038*** | 0.003017*** | 0.004779*** | 0.003961*** |
| | (0.000231) | (0.000224) | (0.000272) | (0.000291) | (0.000461) | (0.000334) | (0.000812) | (0.000504) |
| dti_missing | 0.003996*** | 0.002663** | 0.005790** | 0.002847*** | 0.003892* | 0.004774*** | -0.000445 | 0.002964** |
| | (0.001422) | (0.001221) | (0.002272) | (0.001084) | (0.002358) | (0.001705) | (0.005003) | (0.001451) |
| race_black | -0.000436* | -0.000034 | -0.000586*** | -0.000745** | -0.000376 | -0.000416 | -0.000790* | -0.000862** |
| | (0.000236) | (0.000186) | (0.000221) | (0.000331) | (0.000254) | (0.000265) | (0.000445) | (0.000377) |
| race_asian | -0.001208*** | -0.000986*** | -0.001345*** | -0.001345*** | -0.001105*** | -0.001123*** | -0.000921*** | -0.001173*** |
| | (0.000128) | (0.000101) | (0.000209) | (0.000139) | (0.000166) | (0.000120) | (0.000299) | (0.000136) |
| race_other | -0.000538*** | -0.000335** | -0.000510** | -0.000733*** | -0.000423** | -0.000589*** | -0.000459 | -0.000638** |
| | (0.000176) | (0.000170) | (0.000219) | (0.000218) | (0.000164) | (0.000185) | (0.000386) | (0.000257) |
| race_missing | -0.000284*** | -0.000275** | -0.000201 | -0.000399*** | -0.000148 | -0.000189 | -0.000143 | -0.000347** |
| | (0.000100) | (0.000121) | (0.000150) | (0.000111) | (0.000189) | (0.000131) | (0.000310) | (0.000165) |
| hispanic | -0.000630*** | -0.000293*** | -0.000715*** | -0.000847*** | -0.000433*** | -0.000550*** | -0.000881*** | -0.000760*** |
| | (0.000142) | (0.000087) | (0.000158) | (0.000202) | (0.000161) | (0.000143) | (0.000305) | (0.000189) |
| hispanic_missing | 0.000010 | -0.000015 | -0.000122 | 0.000160 | 0.000004 | 0.000058 | 0.000157 | 0.000230 |
| | (0.000118) | (0.000147) | (0.000185) | (0.000108) | (0.000171) | (0.000135) | (0.000308) | (0.000150) |
| 2023.activity_year | -0.002412*** | | | | -0.002862*** | -0.002851*** | | |
| | (0.000440) | | | | (0.000449) | (0.000503) | | |
| 2024.activity_year | -0.003407*** | | | | -0.004226*** | -0.004119*** | | |
| | (0.000636) | | | | (0.000737) | (0.000756) | | |
| Constant | -0.006163*** | -0.006777*** | -0.008923*** | -0.008930*** | -0.005103*** | -0.006692*** | -0.007418*** | -0.010111*** |
| | (0.000430) | (0.000505) | (0.000569) | (0.000559) | (0.001260) | (0.000997) | (0.001675) | (0.000931) |
| | | | | | | | | |
| Observations | 701,699 | 260,655 | 219,231 | 221,813 | 74,576 | 327,635 | 16,882 | 89,700 |
| R-squared | 0.147785 | 0.089884 | 0.143680 | 0.166125 | 0.245587 | 0.178390 | 0.400002 | 0.260692 |
| Mean dependent var | -0.00284 | -0.00107 | -0.00337 | -0.00441 | -0.00109 | -0.00212 | -0.00350 | -0.00416 |
| SD dependent var | 0.00680 | 0.00650 | 0.00668 | 0.00679 | 0.00691 | 0.00736 | 0.00781 | 0.00747 |
| Adj R-sq | 0.144 | 0.0797 | 0.133 | 0.155 | 0.217 | 0.171 | 0.316 | 0.238 |
| Zillow Obs | 812 | 114 | 177 | 521 | 88 | 364 | 49 | 218 |
| Zillow Avg Loan Size | 397352 | 362719 | 388729 | 407860 | 223636 | 292967 | 220918 | 291973 |

SE clustered by LEI

*** p<0.01, ** p<0.05, * p<0.1

37

**Appendix Table 2-6. Descriptive statistics for 30-year FHA loans**

| Variable | Zillow | | | | | All Lenders | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Mean | SD | P25 | Median | P75 | Mean | SD | P25 | Median | P75 |
| Rate Spread | 0.548% | 0.513% | 0.193% | 0.547% | 0.876% | 0.686% | 0.811% | 0.234% | 0.749% | 1.229% |
| Loan Amount | $303,338 | $126,694 | $215,000 | $285,000 | $375,000 | $304,109 | $129,868 | $215,000 | $295,000 | $375,000 |
| Income | $101,909 | $50,961 | $69,000 | $93,000 | $123,000 | $96,782 | $74,536 | $65,000 | $88,000 | $117,000 |
| Combined Loan to Value Ratio | 95% | 5% | 97% | 97% | 97% | 95% | 10% | 97% | 97% | 97% |
| *Categorical Variables* | | | | | | | | | | |
| *Debt-to-Income Ratio* | | | | | | | | | | |
| Under 30 | 6% | | | | | 5% | | | | |
| 30-35 | 9% | | | | | 9% | | | | |
| 36-42 | 21% | | | | | 21% | | | | |
| 43-49 | 30% | | | | | 33% | | | | |
| 50 Plus | 34% | | | | | 32% | | | | |
| Missing | 0% | | | | | 0% | | | | |
| *Race* | | | | | | | | | | |
| Asian | 4% | | | | | 3% | | | | |
| Black | 13% | | | | | 18% | | | | |
| White | 50% | | | | | 63% | | | | |
| Other | 2% | | | | | 2% | | | | |
| Missing | 31% | | | | | 14% | | | | |
| *Ethnicity* | | | | | | | | | | |
| Hispanic | 14% | | | | | 25% | | | | |
| Non-Hispanic | 60% | | | | | 63% | | | | |
| Missing | 26% | | | | | 12% | | | | |
| *Age* | | | | | | | | | | |
| Under 35 | 42% | | | | | 46% | | | | |
| 35-54 | 45% | | | | | 44% | | | | |
| 55 Plus | 13% | | | | | 10% | | | | |
| Missing | 0% | | | | | 0% | | | | |

38

**Appendix Table 2-7. Regression results for FHA loans**

| VARIABLES | Base Regression | Year 2022 | Year 2023 | Year 2024 | Income <= $60K | Income <= $100K | Income <= $60K & Year 2024 | Income <= $100K & Year 2024 |
|---|---|---|---|---|---|---|---|---|
| zillow | -0.000191 | -0.002233*** | -0.001563*** | 0.001114* | 0.001253*** | 0.000207 | 0.002657*** | 0.001594*** |
| | (0.000544) | (0.000407) | (0.000428) | (0.000619) | (0.000343) | (0.000487) | (0.000321) | (0.000531) |
| income_mil | 0.023880*** | 0.011823*** | 0.027707*** | 0.029631*** | 0.100770*** | 0.099338*** | -0.098076** | 0.096608*** |
| | (0.001648) | (0.001282) | (0.001733) | (0.002395) | (0.019861) | (0.012808) | (0.039421) | (0.020018) |
| income_sq_mil | -0.003028*** | -0.001498*** | -0.003519*** | -0.003876*** | 0.018202 | -0.049705 | 2.553874*** | 0.222042* |
| | (0.000256) | (0.000197) | (0.000352) | (0.000528) | (0.244064) | (0.069844) | (0.424686) | (0.125483) |
| loan_amount_mil | -0.030326*** | -0.022787*** | -0.033704*** | -0.039011*** | -0.052401*** | -0.040305*** | -0.083342*** | -0.064254*** |
| | (0.004089) | (0.003084) | (0.004419) | (0.005447) | (0.005859) | (0.005829) | (0.006761) | (0.009692) |
| loan_amount_sq_mil | 0.019598*** | 0.015965*** | 0.021338*** | 0.025510*** | 0.037376** | 0.009341 | 0.059317*** | 0.027445*** |
| | (0.003713) | (0.002923) | (0.004053) | (0.004863) | (0.015013) | (0.006971) | (0.018840) | (0.010107) |
| combined_loan_to_value_ratio | 0.000063 | 0.000030 | 0.000148*** | 0.000167*** | 0.000018 | 0.000046 | 0.000090*** | 0.000148*** |
| | (0.000040) | (0.000026) | (0.000010) | (0.000015) | (0.000016) | (0.000033) | (0.000017) | (0.000016) |
| age_35_54 | 0.000486*** | 0.000139** | 0.000640*** | 0.000801*** | 0.000025 | 0.000214*** | 0.000208*** | 0.000451*** |
| | (0.000073) | (0.000055) | (0.000075) | (0.000069) | (0.000052) | (0.000063) | (0.000057) | (0.000057) |
| age_55_plus | 0.000243** | -0.000276*** | 0.000568*** | 0.000835*** | -0.000388*** | -0.000013 | 0.000104 | 0.000584*** |
| | (0.000121) | (0.000095) | (0.000070) | (0.000096) | (0.000091) | (0.000109) | (0.000093) | (0.000074) |
| age_missing | 0.002840** | 0.002209** | 0.003619** | 0.002747** | 0.005691*** | 0.001449 | | 0.001465 |
| | (0.001106) | (0.001061) | (0.001662) | (0.001065) | (0.000915) | (0.001320) | | (0.001317) |
| dti_30_35 | 0.000994*** | 0.000657*** | 0.000934*** | 0.001169*** | 0.000654*** | 0.000897*** | 0.000502*** | 0.001015*** |
| | (0.000071) | (0.000071) | (0.000079) | (0.000098) | (0.000085) | (0.000084) | (0.000151) | (0.000141) |
| dti_36_42 | 0.001697*** | 0.000950*** | 0.001695*** | 0.002082*** | 0.001170*** | 0.001755*** | 0.001424*** | 0.002320*** |
| | (0.000125) | (0.000101) | (0.000143) | (0.000151) | (0.000124) | (0.000157) | (0.000214) | (0.000250) |
| dti_43_49 | 0.001971*** | 0.000887*** | 0.002002*** | 0.002577*** | 0.001221*** | 0.002264*** | 0.001902*** | 0.003268*** |
| | (0.000167) | (0.000099) | (0.000180) | (0.000214) | (0.000138) | (0.000221) | (0.000263) | (0.000347) |
| dti_50_plus | 0.001371*** | 0.000114 | 0.001642*** | 0.002069*** | 0.000723*** | 0.001838*** | 0.001574*** | 0.003049*** |
| | (0.000131) | (0.000107) | (0.000150) | (0.000182) | (0.000140) | (0.000190) | (0.000254) | (0.000308) |
| dti_missing | 0.006411*** | 0.002179*** | 0.006190*** | 0.007735*** | 0.003680*** | 0.005776*** | 0.004657*** | 0.007748*** |
| | (0.001024) | (0.000631) | (0.001197) | (0.001456) | (0.000928) | (0.000977) | (0.000831) | (0.001317) |
| race_black | -0.000359 | 0.000170 | -0.000725*** | -0.000809*** | -0.000099 | -0.000222 | -0.000796*** | -0.000710*** |
| | (0.000223) | (0.000153) | (0.000228) | (0.000288) | (0.000115) | (0.000193) | (0.000206) | (0.000256) |
| race_asian | -0.001943*** | -0.001110*** | -0.002090*** | -0.002149*** | -0.001152*** | -0.001593*** | -0.001225*** | -0.001699*** |
| | (0.000282) | (0.000130) | (0.000339) | (0.000296) | (0.000207) | (0.000239) | (0.000327) | (0.000236) |
| race_other | -0.001020*** | -0.000425** | -0.001171*** | -0.001329*** | -0.000862*** | -0.001134*** | -0.001355*** | -0.001504*** |
| | (0.000306) | (0.000205) | (0.000376) | (0.000363) | (0.000239) | (0.000295) | (0.000310) | (0.000355) |
| race_missing | -0.000712*** | -0.000277* | -0.000912*** | -0.000929*** | -0.000333*** | -0.000577*** | -0.000542*** | -0.000806*** |
| | (0.000188) | (0.000147) | (0.000210) | (0.000217) | (0.000117) | (0.000146) | (0.000159) | (0.000162) |
| hispanic | 0.000083 | 0.000188* | -0.000036 | -0.000026 | 0.000248*** | 0.000235* | 0.000192 | 0.000215 |
| | (0.000151) | (0.000113) | (0.000153) | (0.000200) | (0.000087) | (0.000125) | (0.000119) | (0.000179) |
| hispanic_missing | 0.000481** | 0.000077 | 0.000550** | 0.000749*** | 0.000089 | 0.000356* | 0.000387*** | 0.000648*** |
| | (0.000221) | (0.000187) | (0.000256) | (0.000248) | (0.000154) | (0.000189) | (0.000150) | (0.000195) |
| 2023.activity_year | -0.005129*** | | | | -0.005539*** | -0.005649*** | | |
| | (0.000405) | | | | (0.000291) | (0.000417) | | |
| 2024.activity_year | -0.006956*** | | | | -0.007168*** | -0.007462*** | | |
| | (0.000684) | | | | (0.000510) | (0.000695) | | |
| Constant | 0.008085** | 0.011628*** | -0.004742*** | -0.007992*** | 0.012421*** | 0.007866*** | 0.005963*** | -0.006890*** |
| | (0.003749) | (0.002574) | (0.000976) | (0.001303) | (0.001664) | (0.002972) | (0.001510) | (0.001268) |
| | | | | | | | | |
| Observations | 1,454,519 | 478,418 | 475,662 | 500,439 | 292,735 | 910,527 | 72,715 | 279,441 |
| R-squared | 0.274993 | 0.085977 | 0.171731 | 0.224947 | 0.338848 | 0.322043 | 0.393226 | 0.309812 |
| Mean dependent var | 0.00683 | 0.0113 | 0.00574 | 0.00364 | 0.00854 | 0.00735 | 0.00446 | 0.00370 |
| SD dependent var | 0.00811 | 0.00640 | 0.00757 | 0.00824 | 0.00758 | 0.00816 | 0.00781 | 0.00839 |
| Adj R-sq | 0.273 | 0.0802 | 0.167 | 0.220 | 0.332 | 0.320 | 0.370 | 0.302 |
| Zillow Obs | 3911 | 533 | 1312 | 2066 | 651 | 2280 | 291 | 1105 |
| Zillow Avg Loan Size | 303338 | 268415 | 292622 | 319153 | 175461 | 243719 | 173969 | 249579 |

SE clustered by LEI

*** p<0.01, ** p<0.05, * p<0.1

39

\\\\\\\\\\\\\\\\\\\\\\\\\\\\

# Exhibit 12

≡  **NATIONAL MORTGAGE PROFESSIONAL**

✉ NEWSLETTERS     SUBSCRIBE     🔍

LATEST     EVENTS     DIRECTORIES     ANALYSIS & DATA     TECH     NON-QM     TOPICS ▾     WEBINARS     PODCASTS     VI



**HELOC DSCR CASH-OUT**
☑ Great for Working Capital
☑ Ideal for Real Estate Investors
☑ No Prepayment Penalties

SunWest Mortgage Company, Inc. NMLS 3277
For licensed mortgage professionals only.

`ANALYSIS AND DATA`    `INDUSTRY NEWS`

# Study: Zillow Loans Found To Be More Expensive

DEC 29, 2025





By **Lew Sichelman**
*Staff Writer*

**COMING UP** ────────

| JUN **04** | **Anatomy Of An A**  **Mortgage Compa**  📹 Webinar 12:00p |

| JUN **09** | **Texas Mortgage R**  **— San Antonio**  📍 San Antonio, TX |

| JUN **17** | **Qualify More Bor**  **with Kind's Non-**  **Depletion Advant**  📹 Webinar  1:00 p  10:00 |

──── *Get the NMP Dai*

| Your email address |

ADVERTISEMENT

NATIONAL MORTGAGE PROFESSIONAL   NEWSLETTERS   SUBSCRIBE

LATEST   EVENTS   DIRECTORIES   ANALYSIS & DATA   TECH   NON-QM   WEBINARS   PODCASTS   VI

# significant lifetime cost "overcharges" on 30-year loans

A new report by Georgetown University Professor Steven C. Salop adds fuel to two lawsuits charging Zillow with deceptive practices by requiring or incentivizing "affiliated" real estate agents to steer their clients to the popular listing site's mortgage lending affiliate, Zillow Home Loans.

The 40-page report says Zillow Home Loans "charges significantly higher mortgage costs than they would pay to other lenders." The rate is higher on all types of loans, conventional and government-backed, as well as those offered to Black home buyers, the study found.

Zillow has yet to respond to a request for comment from NMP made over the holidays, but it has reportedly objected to the study, calling it flawed. The study "draws inaccurate and misleading conclusions," it has said.

The study, conducted by Salop, a professor of economics and law emeritus, was funded by Co-Star, the owner of Homes.com, which is locked in a bitter battle with Zillow to become the country's top listing portal. But Salop said the financial support was not contingent on the results of his analysis.



## NATIONAL MORTGAGE PROFESSIONAL

✉ NEWSLETTERS    SUBSCRIBE    🔍

LATEST    EVENTS    DIRECTORIES    ANALYSIS & DATA    TECH    NON-QM    WEBINARS    PODCASTS    VI

### Get the NMP Daily

*Essential stories, every weekday.*

Your email address    ➤ Sign Up

Based on HMDA data for loans originated between 2022 and 2024, and controlling for borrower demographics, loan characteristics and geographic and "temporal" factors, Salop concluded that Zillow borrowers paid about a 10% annual percentage rate on a 30-year conventional loan than they did with other lenders.

The higher APR amounts to a net present value (NPV) "overcharge" of some $2,900 on an average $321,000 loan held to term, the professor's analysis found. For 2024 alone, the APR on such a loan originated by Zillow Home Loans was about 15 points for the year, amounting to an "overcharge" of about $4,600 on an average loan of approximately $337,000.

"The NPV dollar overcharge is higher in the earlier years both because of an increase in the incremental basis points and because the average loan size is increasing," the report explained.

Further analysis of 30-year conventional mortgages also found that the differences between Zillow and other lenders' APRs for a comparable loan is larger "in percentage terms" for lower-income borrowers for each kind of loan, conventional, VA, or FHA.

Black borrowers paid "substantially" higher overcharges than the charges paid by White borrowers, the study found. Hispanics paid less than other borrowers in 2022 and 2023 but not in 2024.

The analysis shows that Zillow's mortgages have become more expensive over the course of the 2022-2024 study period relative to other lenders.

"While Zillow's loans were relatively cheaper in 2022," the study found, "they became relatively more expensive in 2023 and even more expensive in 2024.

In 2022, the NPV of lifetime incremental cost of a Zillow mortgage held to maturity — and discounted at 6.5% per year approximately equal to the APR — would be $1,043 lower than those of other lenders, according to the study. In 2023, they became $3,213 more expensive, and in 2024, they were $4,579 more expensive on an average loan size of about $337,000 held to maturity

million in present-value terms, he found.

# Zillow Home Loans    # New Home Sales

## ABOUT THE AUTHOR



**Lew Sichelman**
*Staff Writer*

Lew Sichelman has been covering the housing and mortgage sectors for 52 years. His syndicated column appears in major newspapers throughout the country.

      PUBLISHED DEC 29, 2025

≡   **NATIONAL MORTGAGE PROFESSIONAL**

✉ NEWSLETTERS    SUBSCRIBE    🔍

LATEST     EVENTS     DIRECTORIES     ANALYSIS & DATA     TECH     NON-QM          WEBINARS     PODCASTS     VI

**LOG IN WITH**

**OR SIGN UP WITH DISQUS** ⑦

> Name

♡          Share                              Best    Newest    Oldest

Be the first to comment.

ADVERTISEMENT



PEOPLE ON THE MOVE

# FICO Names Eric Lapin VP, Head Of Strategy And Market Intelligence For Scores Business

Mortgage, title, and fintech veteran brings more than 25

## Renew your NMLS License — for free.

Enjoy access to a free NMLS renewal class when you attend an in-person event.

Find an event ⧉

FICO has appointed Eric Lapin as vice president and head of strategy and market intelligence for its Scores business, adding a longtime mortgage and fintech executive to a leadership role at the company behind the credit scores used throughout the mortgage industry.Lapin ann...

Continue reading ›

|     | **Texas Mortgage Roundup – Dallas** |
| --- | --- |
| **SEP** **01** | ⊙ Dallas, TX |

TECH

# Finastra Launches Analytics Platform To Help Lenders Reduce Mortgage Application Fallout

New benchmarking tool helps lenders identify where

Mortgage lenders spend significant resources attracting borrowers, but many applications never make it to the closing table. Finastra is betting that better visibility into where borrowers drop out of the process can help lenders improve pull-through rates and fund more loan...

Continue reading  ›

## These stories, your inbox.

Subscribe to the NMP Daily newsletter.

Your email address          ➤ Sign Up

More from Analysis and Data  ›

### Property Taxes Rise Across Every Major Metro, Adding To Borrower Affordability Pressure

Median tax bills increased 5.1% in 2024, with borrowers

### Purchase Mortgage Payments Moved Higher In April

Higher loan amounts and modest rate increases continued squeezing borrower qualification margins, particularly for FHA

### Luxury Housing Market Surges While Middle-Market Buyers Stay Sidelined

Redfin reports high-end home sales and prices are rising as affluent borrowers

☰ **NATIONAL MORTGAGE PROFESSIONAL**

✉ NEWSLETTERS    SUBSCRIBE    🔍

LATEST        EVENTS        DIRECTORIES        ANALYSIS & DATA        TECH        NON-QM                        WEBINARS        PODCASTS        VI

## Serious Mortgage Delinquencies Remain Elevated Despite Stable Overall Performance

ICE data shows overall mortgage performance remained stable in April, but late-stage delinquencies and foreclosure inventory continued rising above year-ago levels

ANALYSIS AND DATA

MAY 26, 2026

## Gearing Up During Downtimes

Why slower market cycles are the ideal time for mortgage lenders to modernize data, strengthen governance, and prepare for the next wave of AI-driven efficiency

ANALYSIS AND DATA

MAY 26, 2026

## Rising Household Bills Add New Pressure To Mortgage Affordability

New doxo report finds rising mortgage, utility, insurance, and other recurring household costs are widening affordability gaps across the U.S.

ANALYSIS AND DATA

MAY 26, 2026

POPULAR







**NATIONAL MORTGAGE PROFESSIONAL**

NEWSLETTERS

SUBSCRIBE

LATEST     EVENTS     DIRECTORIES     ANALYSIS & DATA     TECH     NON-QM          WEBINARS     PODCASTS     VI

## Encompass Integration

OPERATIONS

JUN 01, 2026

## Billion Bet On Housing

C-SUITE STRATEGIES

JUN 01, 2026

REGULATION AND COMPLIANCE

MAY 29, 2026

---

**NATIONAL MORTGAGE PROFESSIONAL**

    



## NMP, Mortgage Banker, & Mortgage Women

Subscribe

**NEWS**

HOME

LATEST

PRODUCT ▾

CHANNEL ▾

TECH

ANALYSIS & DATA

**EVENTS**

MAGAZINES

VIDEO

PODCASTS

WEBINARS

DIRECTORIES

GUIDE TO NON-QM

**ABOUT**

ORIGINATOR CONNECT NETWORK EVENTS ⧉

Your email address

Get the Daily Newsletter



SALES & MARKETING

CAREER

OPINION

OPERATIONS

COURTS

DIVERSITY & INCLUSION

PEOPLE ON THE MOVE

2026 American Business Media, LLC

Advertise With Us     About Us     Contact     Privacy Policy

# Exhibit 13

Sign In     Subscribe

News ⌄     Intelligence NEW     Events ⌄     Video     Altos     Rankings ⌄     HW Data     More +

Podcasts
Brokerage | MLS/Associations | Real Estate
🕐 4 minute read

# Zillow Preview expands as more brokerages seek pre-market exposure

Zillow says nearly 60 firms now use Preview, adding 28 more, letting coming soon listings appear on Zillow and Trulia before MLS

April 10, 2026, 10:01am *by* _Brooklee Han_ *and* _HousingWire Automation_



News > Real Estate

## Article Summary

Zillow added 28 brokerages and franchisors to Zillow Preview, bringing participants to nearly 60. The program lets coming soon listings appear publicly on Zillow and Trulia before going active in the MLS.  *AI Summary*

Nearly 60 brokerages and franchisors have now joined **Zillow Preview**, giving agents and sellers a way to publicly market pre-MLS listings on **Zillow** and **Trulia**. Zillow announced Friday


About **Brooklee Han**

Brooklee Han is a real estate reporter focused on the real estate agent experience and the title insurance industry. Before joining HousingWire, Han was an international figure skater representing Australia at the 2014 Winter Olympics.
see full bio

### About **HousingWire Automation**

This article was generated using HousingWire Automation and reviewed by a HousingWire editor before publication. The system helps convert company announcements and industry data into HousingWire-style news coverage.

that 28 additional firms have signed on to offer Zillow Preview to their agents, signaling growing broker adoption of pre-marketing coming soon listings.

The latest participants include **The Keyes Family of Companies**, **8z Real Estate**, **Russell Real Estate Services**, **Seven Gables Real Estate**, **NorthGroup Real Estate**, **Homes of Idaho**, **DeLex Realty**, **Home Grown Group Realty**, **JohnHart Real Estate**, **Nest Realty**, **Realty Masters**, **Beverly & Company**, **Newport & Company**, **W Real Estate**, **Thrive Real Estate Group**, **KOMAR**, **Bella Realty Group**, **ICON Realty Experts**, **Queenston Realty**, **Libertas Real Estate**, **The Advantage Group**, **ROI Real Estate**, **Lamica Realty**, **Intege Realty**, **Arizona Proper Real Estate**, **Grace Hagerty Real Estate Inc**, **Real Estate Fixed** and **iad Real Estate**.

These firms join <u>over two dozen other brokerages and franchisors</u>, including **Side, United Real Estate, REMAX, HomeServices of America, Keller Williams** and **SERHANT.**, whose coming soon listings are already live on Zillow Preview.

Under the Zillow Preview program, listings can appear publicly on Zillow and Trulia before going active in the MLS, with visibility to any consumer with a phone or computer. The company has said that listing agents and sellers can use the pre-market period to test pricing, gauge interest and build a pipeline of showings before the official go-live date. Buyers can discover, save and share upcoming listings, connect directly with the listing agent or schedule tours with an agent of their choice.

see full bio

## HousingWire Daily Newsletter

enter email address to subscribe

Submit

## Featured Events



Hosted By **JazzX AI**

**Rewiring Mortgage for the AI Era : Why AI Is Now a Leadership Imperative**



Hosted By **Accurate Group LLC**

**The state of home equity: A strategic indicator for risk, growth, and performance in today's mortgage market**



Hosted By **HousingWire**

**AI Summit 2026**

HousingWire Partners

"Pre-market listings belong in the daylight — giving sellers the broadest possible exposure and giving all buyers access without the requirement to get past a registration wall or work with one particular brokerage," Errol Samuelson, chief industry development officer at Zillow, said in a statement. "Our research is clear: the best outcomes for sellers come from the broadest competition among buyers."

Unlike many private networks, Zillow Preview does not require consumers to work with a specific brokerage to see or inquire about a home. Zillow says buyers are never locked into any one firm to access the inventory, a key distinction as regulators and plaintiffs in ongoing commission litigation have questioned practices that may limit consumer choice.

"For 100 years, The Keyes Company has thrived by asking one question: What do consumers need right now, and how do we deliver it?" Mike Pappas, the CEO of T**he Keyes Family of Companies**, said in a statement. "Zillow Preview gives sellers and their agents a new choice: the ability to start marketing early while still reaching the broadest possible audience."

Other brokerage leaders share a similar view, with Ryan Carter, the president and CEO of 8z Real Estate, stating that he and his firm appreciate that Zillow Preview aligns with their beleif that "buyers and sellers are best served by an open, transparent market."

"By making pre-market listings publicly visible to everyone, not just a select network, we are giving our sellers the broad exposure they deserve and giving buyers access to more homes," Carter said in a statement.

According to the company, Zillow Preview is designed to operate within local MLS rules while giving brokerages more flexibility in how they time and stage the marketing of listings. Participation is at the brokerage level; individual agents can then choose, with their sellers, whether to use it as part of their listing strategy.

Zillow first announced Zillow Preview in mid-March, just weeks after **Compass**, which now owns **Anywhere** and **@properties Christie's International Real Estate**, announced an exclusive deal with **Rocket Companies** and **Redfin** to showcase its coming soon listings during its Q4 2025 earnings call.

In late March, **eXp Realty** announced non-exclusive pre-marketing deals with Realtor.com, Homes.com and ComeHome.com, which is **HouseCanary**'s real estate portal that has partnered with **Google** to showcase listings in Google search results in select markets, to syndicate its coming soon listings.

*This article was written by Brooklee Han and generated with the assistance of HousingWire Automation. It was reviewed by a HousingWire editor before publication. The system helps convert company announcements and industry data into HousingWire-style news coverage.*

More: | Clear Cooperation | | Zillow |

**Become a member** to comment on this article.

Most Popular Ar        Latest Articles



### Realtor.com adds Agoyu AI to generate quotes for movers

Realtor.com has integrated Agoyu AI on select listings, letting users film items for real-time moving quotes from licensed movers.

---

### Berkshire's big housing bet: What agents should pay attention to

---

### Berkshire Taylor Morrison deal focuses on scale and ecosystems

---

### NAR publishes new resources on MLS, listings

---

### Mutual of Omaha remains No. 1 as HECM endorsements fall 4.7% in May

**Quiet 2026 hurricane season forecast, risk remains for builders**

## HW Media

Altos Research

HousingWire

HousingWire Intelligence

RealTrends

Reverse Mortgage Daily

## Community

Events

The Gathering

## Advertise With HW

Advertising Solutions

## Company

About HousingWire

Newsletters

Enterprise Subscription

Contact Us

Licensing & Reprints

Jobs

Press

  

© 2006-2026 HW Media, LLC. All rights reserved.

Powered by WordPress VIP

Privacy Policy

# Exhibit 14

New lawsuit accuses Zillow of deceiving home buyers | Reuters

Learn more about **LSEG**



Subscribe

# New lawsuit accuses Zillow of deceiving home buyers

By **Mike Scarcella**

September 22, 2025 8:51 AM PDT · Updated September 22, 2025

  



A "sold" sign is seen outside of a recently purchased home in Washington, U.S., July 7, 2022. REUTERS/Sarah Silbiger/File Photo
Purchase Licensing Rights ⬈

## Companies



**Cohen Milstein Sellers & Toll**

> Follow

**Compass Inc**

> Follow

**Zillow Group Inc**

> Follow

Sept 22 (Reuters) - Zillow (ZG.O) ⤢ , the largest U.S. online real estate portal, is facing a new proposed class action accusing the company of deceptively using property listings to steer home buyers to its network of affiliated agents.

The lawsuit ⤢ , filed on Friday in Seattle, claims Zillow is misleading prospective buyers into contacting agents working with Zillow and not the agent who listed the home for sale.

> Jumpstart your morning with the latest legal news delivered straight to your inbox from The Daily Docket newsletter. Sign up here.

The plaintiff, an Oregon resident, alleged Zillow's practices violate a Washington state consumer protection law and a federal real estate law.

"Zillow is well aware of the potential for ill-gotten gains in this space and has sought to play fast and loose when real people's basic need of housing is on the table," said Steve Berman, a lead attorney on the lawsuit.

Seattle-based Zillow in a statement said it will defend against the claims and called the lawsuit a fundamental misrepresentation of how the company operates. The company said it stands by its "long held belief that buyers and sellers deserve to have the choice to work with an agent who is committed to their best interests and only represents them."

Zillow has disclosed it receives about 227 million unique visitors a month, and received 2.4 billion visits between January and March.

The plaintiff seeks to represent at least tens of thousands of home buyers who used Zillow-affiliated agents since 2021.

According to the lawsuit, Zillow takes 40% of the commission from some of its agents, a cut that is hidden from the buyer and seller. The complaint said the alleged arrangement incentivizes agents to prioritize their commissions at all costs.

"Zillow's scheme has the intent and the effect of unlawfully maintaining high and inflexible commissions that drive up the prices that buyers must pay," the lawsuit said.

Zillow is facing other lawsuits over its business practices.

In June, brokerage Compass (COMP.N) ↗ sued Zillow in federal court in Manhattan, seeking an order that would allow Compass to market some homes more exclusively. Zillow has denied the allegations in the case, saying that hidden listings limit consumer choice.

The case is Alucard Taylor v. Zillow Inc, U.S. District Court, Western District of Washington, No. 2:25-cv-01818.

For plaintiff: Steve Berman and Jerrod Patterson of Hagens Berman Sobol Shapiro, and Douglas McNamara and Theodore Leopold of Cohen Milstein Sellers & Toll

For defendant: No appearances yet

Read more:

Zillow sued by Homes.com owner CoStar for 'massive' copyright violations

Compass sues Zillow for allegedly stifling competition for home listings

Zillow settles lawsuit against home listing services over tour scheduling

Reporting by Mike Scarcella

Our Standards: **The Thomson Reuters Trust Principles.** ↗

Suggested Topics:

Government   Consumer Protection   Antitrust   Class Actions & Multi-district Litigation

Purchase Licensing Rights

## Read Next / Editor's Picks

World

**New Jersey governor blames out-of-state agitators for inflaming Newark ICE detention protests**

5 hours ago

---

Government

**Court clears way for Texas to enforce migrant arrest law**

5 hours ago

---

World

**New Jersey state police assert control outside migrant detention center**

5 hours ago

---

World

**Trump says he will 'transfer' Kennedy Center to Congress after court setback**

May 30, 2026

---

## Latest

**Home**

**Authors**

**Topic Sitemap**

**Archive**

**Article Sitemap**

## Media

📹 **Videos**

📷 **Pictures**

## Browse

**World**

**Business**

**Markets**

**Sustainability**

**Legal**

**Breakingviews**

**Technology**

**Investigations**

**Graphics**

**Podcasts**

**Sports**

**Science**

**Lifestyle**

## About Reuters

**About Reuters** ⌐

**Media Center** ⌐

**Advertise with Us** ⌐

**Careers** ⌐

**Reuters News Agency** ⌐

**Brand Attribution Guidelines** ⌐

**Reuters and AI** ⌐

**Reuters Leadership** ⌐

**Reuters Fact Check**

**Reuters Diversity Report** ⌐

**Commercial Disclosure (Japan)** ⌐

## Stay Informed

**Download the App (iOS)** ⌐

**Download the App (Android)** ⌐

**Newsletters**

**Subscribe**

---

Information you can trust

Reuters, the news and media division of Thomson Reuters, is the world's largest multimedia news provider, reaching billions of people worldwide every day. Reuters provides business, financial, national and international news to professionals via desktop terminals, the world's media organizations, industry events and directly to consumers.

Follow Us

     

LSEG Products

## Workspace ⎋

Access unmatched financial data, news and content in a highly-customised workflow experience on desktop, web and mobile.

## Data Catalogue ⎋

Browse an unrivalled portfolio of real-time and historical market data and insights from worldwide sources and experts.

## World-Check ⎋

Screen for heightened risk individual and entities globally to help uncover hidden risks in business relationships and human networks.

**Advertise With Us** ⎋    **Advertising Guidelines**    **Purchase Licensing Rights** ⎋

All quotes delayed a minimum of 15 minutes. See here for a list of exchanges and delays.

**Cookies** ⎋    **Terms & Conditions**    **Privacy** ⎋    **Copyright** ⎋    **Digital Accessibility** ⎋    **Corrections**
**Data Disclosure and Sources** ⎋    **Site Feedback** ⎋    **Manage Cookies**

© 2026 Reuters. All rights reserved

New lawsuit accuses Zillow of deceiving home buyers | Reuters

# Exhibit 15

# What Zillow's Economist Doesn't Want You To Know

**inman.com**/2026/06/05/what-zillows-economist-doesnt-want-you-to-know



Greg Hague pushes back on Mischa Fisher's opinion piece, outlining the ways he sees Zillow undermining transparency and affordability.

Let me ask you, America's real estate professionals, one question. Do you want Zillow to be the defining marketplace for homes in this country?

That's the real question buried inside the response Zillow economist Mischa Fisher wrote to my recent Inman op-ed. Understand what he's quietly asking you to accept.

Throughout his article, Fisher effectively labels any home not posted on Zillow a "private listing." A home marketed through social media, email, a brokerage's own website, a coming-soon campaign, or a dozen other proven channels becomes, in Zillow's view, "private." Hidden. Kept from the public.

In a nutshell, his position is this: If your listing is not on Zillow, it's hidden. It's private. That is categorically false. And it is the foundation his entire argument rests on.

That is a bold presumption none of us voted for: that Zillow is the defining public marketplace and that a home counts as "public" only if it lands there within 24 hours of

being marketed anywhere else, under a Zillow policy that can ban a listing from the site for good.

Who decided that? Not homesellers. Not homebuyers. They don't hire Zillow. They hire us. They want the judgment of a [real estate professional](), not a portal. Zillow is a vendor. A tool. It's not the government, and it's not our trade association.

The moment we accept that off-Zillow means hidden, we have handed a third-party vendor the power to dictate how every home in America gets marketed and how every homebuyer in America gets monetized.

## The word 'private'

I have said this for years in my training, my writing and from every stage I've stood on. The word "private" is being weaponized. It is being used as a synonym for "hidden from buyers," and that is simply not what marketing a home away from the portals means.

So here is my advice to every brokerage and agent reading this. Strike the word "private" from your marketing vocabulary.

I understand how it crept in. It sounds exclusive. Buyers want to feel like insiders, first through the door, seeing something the crowd can't. That instinct is real, and it sells. But that same word is now being turned against us, used by Zillow and those aligned with it to paint a professional marketing choice as something sneaky.

This didn't happen overnight. The flexibility agents once had in what we could show in our photos and write in our descriptions has been stripped away to fit others' business models, Zillow's included. They use our listings, for free, for their own profit.

And "rules" have been carefully designed to enhance that profit. For example, Zillow won't allow the listing agent's name, number or brokerage to appear in photos or descriptive copy, so buyers are more likely to assume its "contact agent" button reaches the agent who knows the home.

Most don't realize they're being routed to whoever [paid for the lead](), someone who may have never set foot in the property.

And Fisher, on behalf of Zillow, lectures us about transparency.

## The least transparent model in the industry

One of Fisher's core arguments is transparency. He calls listings kept off the major portals, notably Zillow, "an information asymmetry machine," a setup that supposedly favors the more-informed side, the seller, at the buyer's expense.

I don't disagree that transparency matters. What I can't square is how Zillow gets to crown itself the champion of it.

Look at what Zillow shows buyers:

- Days on market
- Every price cut
- Offer guides that coach buyers to bid below asking and estimate the odds a seller will accept

Every one of those tools arms the buyer against the seller.

Now look at what the seller gets in return. Nothing.

- How long has this buyer been shopping?
- How many offers have they already made?
- How many sellers turned them down for coming in too low?

Zillow shows sellers none of it.

That is not [transparency](). That is a one-way mirror. And the company holding it up is the same one diverting buyers to lead-paying agents instead of the professionals who know the home. If anyone has built an information asymmetry machine, it is Zillow.

## Who's really adding the cost

Fisher also reaches for the affordability crisis, suggesting we make housing "feel more scarce" while families struggle to buy.

The affordability crisis is real. It deserves its own article. But it is not the fault of America's homesellers, and a seller's right to pursue the best possible price does not disappear because buyers face high interest rates, too few new homes and years of rapid price appreciation on the homes that do exist.

Is Zillow's real message that sellers should price lower and market in ways that hand buyers the advantage? It already does plenty of that for them.

So, ask yourself who is really adding cost here. Zillow inserts itself between buyer and seller, then routes that buyer to an agent who paid Zillow for the introduction, an agent who typically charges that buyer thousands in commission to see and purchase the home.

Zillow earns hundreds of millions, by some measures billions, on those referral arrangements. That money comes straight out of the cost of buying a home.

A company that profits by planting a paid toll booth between buyers and sellers is in no position to lecture our industry about affordability.

## What to remember

Fisher closes by telling readers to remember "Who's driving, and who's getting run over." I'd ask America's real estate professionals to take his advice and really think about that. Because Zillow wants to be the one driving, with the power to decide who gets run over.

It's one thing to say you stand for transparency, for affordability, for the consumer. It's another thing to be it.

Zillow says it. Zillow isn't it.

So I'll leave you with the only question that matters: Who do you want at the wheel?

*Greg Hague is an attorney, 50-year real estate veteran, and the founder of 72SOLD (an Inc. 5000 fastest-growing company). Ranked the No. 1 agent in his state and No. 19 nationally by Realtor Magazine, he was recently appointed Director of Home Sales Strategy for Compass International Holdings, helping 100,000+ Century 21 agents grow their market share and better serve America's homesellers.*

# Exhibit 16

**The New York Times**

https://www.nytimes.com/2026/06/06/realestate/zillow-compass-real-estate-consolidation.html

# Real Estate Giants Compass and Zillow Fight Over the Future of the Market

Both companies face lawsuits and antitrust inquiries as they attempt to control the experience of home buying.

▶ Listen · 7:37 min

  **By Elizabeth A. Harris**

June 6, 2026

See more of our coverage in your search results.

**Add The New York Times on Google** ↗

Over the past year, Zillow, the country's largest real estate portal, and Compass, the biggest real estate brokerage in the world, have traded lawsuits and allegations of antitrust violations, all while waving the banner of consumer protection. Both companies have gobbled up competitors and become so dominant that when they shift their rules and practices, they have the power to change how homes in the United States are bought, rented and sold.



Zillow and its subsidiaries attract hundreds of millions of unique visitors each month. Getty Images

Zillow owns listing websites like StreetEasy and Trulia and receives about 220 million unique visitors every month. Its scale means it can dictate practices that agents say are bad for their businesses and confusing for consumers.

Compass was already the largest real estate brokerage in the country when, this year, it bought Anywhere Real Estate for $1.6 billion, making it by far the biggest real estate brokerage in the world with about 340,000 real estate professionals. It controls brands including Christie's International Real Estate, Century 21, Coldwell Banker and Corcoran. It has come under fire for pushing the practice of private listings, which go to a select group of people before they reach the public.

The National Association of Realtors was the longtime gatekeeper of real estate listings, but the organization was found guilty of antitrust violations in 2023, and its grip on the market has loosened. Now, Zillow and Compass are rushing in to fill the vacuum, battling over who gets control of the listings.

"We have two behemoths in the industry," said Jonathan J. Miller, a real estate appraiser and consultant. If the leaders of these companies were to quickly change, shifting their strategy or focus, he continued, the ramifications could be enormous. "The entire market — the biggest asset class in the world — is subject to potentially significant change overnight."

## What is the controversy around Compass's private listings?



Kevin Serna for The New York Times

Private listings have existed for decades, but they were fairly rare. Perhaps a judge or a celebrity wanted to keep their home and address private, so instead of posting the house online, their broker would call other agents and quietly invite them to the property.

Compass, however, has taken the practice wide. It offers its buyers the ability to share online listings only on the Compass website so its own agents and their clients can see them, before bringing the homes to the larger market. Those are

what it calls Private Exclusive listings.

Websites like Zillow list how many days a home has been for sale, and a property that's been on the market for an unusually long time might give a potential buyer pause. Compass's Private Exclusive listings allow sellers to test their price without starting the days-on-market clock.



Smith Collection/Gado, via Getty Images

Compass's critics say the practice disadvantages both buyers and sellers. Buyers won't know if an overpriced home has been sitting at the same price for a year, and sellers won't have the largest pool of potential buyers. Compass, on the other hand, does benefit, its critics say. Brokerages take a cut of their agents' commissions, so by keeping both sides of the deal in-house, the company earns more money.

Critics liken the practice of private listings to putting tape over the odometer before selling a car. Compass disputes this, and says they aren't obscuring any information about the home itself.

"Sellers should have the right to decide how their homes are marketed and where they are marketed," Robert Reffkin, the chief executive of Compass said in a statement.

Some states, including Connecticut and Wisconsin, have passed laws restricting private listings. New York's version is on its way to the governor's desk.

## Why do real estate agents complain about Zillow?



Sipa, via Associated Press Images

When potential buyers look at a home on Zillow, they're presented with the price, photographs and a menu of information including the number of bedrooms and a list of local schools. There are also big, bright buttons to click that will connect them with an agent.

Most buyers assume that when they click those buttons, they are contacting the agent selling the home. But instead they are connected with a buyer's agent, a person who might have nothing to do with the property, but pays Zillow a fee to be

connected with potential clients. Some of those agents share their commissions with Zillow.

Many buyers find this practice confusing. A study by Jerry Wind, a professor of marketing at the Wharton School at the University of Pennsylvania, surveyed more than 850 consumers about Zillow's website and found that less than one percent of them correctly identified who would be contacting them when they expressed interest in a property on Zillow.



Montinique Monroe for The New York Times

Zillow says it's important to connect buyers with their own broker.

"When you go into a negotiation, you want to make sure that each party to the negotiation has somebody on their side who is advocating for them," said Mischa Fisher, chief economist at Zillow. The listing agent's information is available on Zillow for every property.

## Does it matter that these companies are so large?

There has been an enormous amount of consolidation in the real estate industry. Last year, Rocket Companies, which provides mortgages, acquired Redfin, an online real estate brokerage in a deal valued at $1.75 billion. The Real Brokerage announced this spring that it plans to acquire RE/MAX in an $880 million deal.

Many in the industry expected the Compass acquisition of Anywhere Real Estate to face antitrust scrutiny from federal regulators, but it sailed through the regulatory process. The office of New York Attorney General Letitia James, however, is investigating Compass over antitrust concerns, according to a person with knowledge of the investigation who was not authorized to speak publicly.

Ms. James has concerns about Zillow, too. Last year, her office joined a group of states and the Federal Trade Commission in suing Zillow and Redfin, one of the largest players in the rental market, saying they had entered into an agreement to stop competing with each other.



Patrick T. Fallon/Agence France-Presse — Getty Images

Zillow is also facing a class-action lawsuit alleging it incentivizes brokers who use its Flex Agent and Premier Agent programs to steer buyers toward its home loan products.

Both Compass and Zillow have also sued each other on antitrust grounds, accusing one another of using market power to stifle competition. In the latest suit, Zillow accused Compass and Midwest Real Estate Data, a listing service, of hiding listings from buyers to shut out competition.

The companies have all denied the allegations against them.

"There is a huge multibillion dollar strategic power play playing out with these very large publicly traded companies, around the country and in court," said Michael DelPrete, a real estate technology strategist who teaches at the University of Colorado Boulder. "At the end of the day, they're fighting over content — but it's not just content. It's not a Star Wars movie. It's somebody's house."

**Elizabeth A. Harris** covers books and the publishing industry, reporting on industry news and examining the broader cultural impact of books. She is also an author.