**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| ZILLOW GROUP, INC. and ZILLOW, INC., <br><br> *Plaintiffs*, <br><br> v. <br><br> MIDWEST REAL ESTATE DATA LLC, COMPASS, INC., and COMPASS ILLINOIS, INC., <br><br> *Defendants*. | Case No. 1:26-cv-05451 <br><br> Judge: Hon. John J. Tharp, Jr. |

**PLAINTIFFS' OPPOSITION TO MIDWEST REAL ESTATE DATA LLC'S
<u>MOTION TO COMPEL ARBITRATION AND STAY ACTION</u>**

**TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................. 2

LEGAL STANDARDS ........................................................................................ 6

ARGUMENT ...................................................................................................... 7

I. ZILLOW'S SOLE AGREEMENT WITH MRED REQUIRES THE PARTIES' DISPUTES TO BE ADJUDICATED IN THIS FORUM ................................................. 7

II. ZILLOW'S AGREEMENT WITH NON-PARTY MLS GRID DOES NOT PROVIDE A BASIS TO ARBITRATE AGAINST MRED HERE.................................. 8

    A. MRED Fails to Establish Formation of *Any* Agreement to Arbitrate This Dispute ......................................................................................... 8

        1. MRED Fails to Establish a Direct Agreement ........................................... 8

        2. MRED's Third-Party Beneficiary Argument Is Unavailing ...................... 9

    B. Zillow's Claims Do Not Arise Under the MLS GRID Agreement ..................... 12

III. THE COURT SHOULD NOT STAY THE ACTION ................................................. 13

IV. ZILLOW IS ENTITLED TO PURSUE INJUNCTIVE RELIEF IN ANY EVENT........ 14

CONCLUSION.................................................................................................... 15

# TABLE OF AUTHORITIES

**Page**

## CASES

*Adtile Techs. Inc. v. Perion Network Ltd.*,
192 F. Supp. 3d 515 (D. Del. 2016)........................................................................9

*AlliedSignal, Inc. v. B.F. Goodrich Co.*,
183 F.3d 568 (7th Cir. 1999) ...............................................................................12

*Am. Express Co. v. Italian Colors Rest.*,
570 U.S. 228 (2013).............................................................................................13

*APAC Customer Servs., Inc. v. Marrow*,
2012 WL 1443091 (N.D. Ill. Apr. 26, 2012) .......................................................14

*AT&T Techs., Inc. v. Commc'ns Workers of Am.*,
475 U.S. 643 (1986)...............................................................................................6

*Baxter Int'l, Inc. v. Abbott Lab'ys*,
315 F.3d 829 (7th Cir. 2003) ...............................................................................13

*Blair v. Scott Specialty Gases*,
283 F.3d 595 (3d Cir. 2002)...................................................................................9

*Bradford-Scott Data Corp. v. Physician Computer Network, Inc.*,
128 F.3d 504 (7th Cir. 1997) ...........................................................................1, 14

*Carder v. Carl M. Freeman Communities, LLC*,
2009 WL 106510 (Del. Ch. Jan. 5, 2009)............................................................11

*Cindy's Candle Co., Inc. V. WNS, Inc.*,
714 F. Supp. 973 (N.D. Ill. 1989) ........................................................................13

*Coinbase, Inc. v. Suski*,
602 U.S. 143 (2024)..........................................................................................6, 12

*E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*,
269 F.3d 187 (3d Cir. 2001)..................................................................................10

*Falcon Tankers, Inc. v. Litton Sys., Inc.*,
300 A.2d 231 (Del. Super. Ct. 1972) ...................................................................10

*Finlay v. Moseley, Hallgarten, Estabrook & Weeden, Inc.*,
1987 WL 5237 (N.D. Ill. Jan. 5, 1987).............................................................10, 11

*First Options of Chi., Inc. v. Kaplan*,
    514 U.S. 938 (1995)............................................................................................6, 8, 9

*Gateway E. Ry. Co. v. Terminal R.R Ass'n of St. Louis*,
    35 F.3d 1134 (7th Cir. 1994) ............................................................................1, 14

*GNH Group, Inc. v. Guggenheim Holdings*,
    2020 WL 4287358 (D. Del. July 27, 2020) ......................................................9, 11

*Harris v. W6LS, Inc.*,
    171 F.4th 957 (7th Cir. 2026) ..............................................................................6

*Hogan v. SPAR Grp., Inc.*,
    914 F.3d 34 (1st Cir. 2019)..................................................................................10

*In re Evanston Nw. Corp. Antitrust Litig.*,
    2015 WL 13735423 (N.D. Ill. Sept. 4, 2015) .............................................12, 13

*In re Paragon Offshore PLC*,
    588 B.R. 735 (Bankr. D. Del. 2018) ...................................................................11

*In re Remicade (Direct Purchaser) Antitrust Litig.*,
    938 F.3d 515 (3d Cir. 2019)................................................................................13

*In re Rotavirus Vaccines Antitrust Litig.*,
    30 F.4th 148 (3d Cir. 2022) ................................................................................13

*Matthews v. Rollins Hudig Hall Co.*,
    72 F.3d 50 (7th Cir. 1995) ..................................................................................12

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*,
    473 U.S. 614 (1985)............................................................................................13

*Morales-Posada v. Cultural Care, Inc.*,
    141 F.4th 301 (1st Cir. 2025)..............................................................................10

*Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.*,
    636 F.2d 51 (3d Cir. 1980).....................................................................................7

*Peters v. Kaleyra, Inc.*,
    2024 WL 4333143 (D. Del. Sept. 27, 2024).......................................................11

*Pryner v. Tractor Supply Co.*,
    109 F.3d 354 (7th Cir. 1997) ..............................................................................14

*Rent-A-Center, West, Inc. v. Jackson*,
    561 U.S. 63 (2010)..............................................................................................12

iii

*Sanato v. Sears, Roebuck and Co.*,
    259 F. Supp. 3d 873 (N.D. Ill. 2016) ................................................................6, 7

*Shaffer v. Stratton Oakmont, Inc.*,
    756 F. Supp. 365 (N.D. Ill. 1991) ...................................................................11

*Sierra Rutile Ltd. v. Katz*,
    937 F.2d 743 (2d Cir. 1991)..............................................................................14

*Smash v. Dover Downs, Inc.*,
    2022 WL 2966431 (D. Del. July 27, 2022) ....................................................8, 9

*Varnes v. Chrysler Fin. Corp.*,
    2007 WL 4125830 (N.D. Ind. Nov. 15, 2007)..................................................14

*Volkswagen Of Am., Inc. v. Sud's Of Peoria, Inc.*,
    474 F.3d 966 (7th Cir. 2007) ...........................................................................14

*Zurich Am. Ins. Co. v. Watts Indus., Inc.*,
    417 F.3d 682 (7th Cir. 2005) ..............................................................................6

**STATUTES**

Clayton Act § 7 ......................................................................................................12

Sherman Act............................................................................................................15

iv

## INTRODUCTION

Zillow's antitrust claims seek to restore competition, maintain transparency in real estate, and protect consumers, agents, and Zillow from harm. Zillow's claims arise out of MRED's wrongful conspiracy with Compass to boycott Zillow and hide private real estate listings. Further undermining transparency, MRED seeks to force Zillow into arbitration rather than proceeding in open court. But MRED's Motion fails at the outset: the parties never formed an agreement to arbitrate. MRED fails to disclose to the Court that MRED's agreement with Zillow designates Illinois federal or state court as the venue to resolve their disputes.

There is no basis to arbitrate this case. MRED misleadingly suggests that a different agreement, the MLS GRID Agreement, manifests what MRED claims is the "parties'" intent to arbitrate (Motion at 8, 9)—but the only "parties" to that agreement are Zillow and third-party MLS GRID, not Zillow and MRED. MRED cites no authority compelling a plaintiff to arbitration based on a contract with a third-party when the parties to the relevant dispute have a direct written agreement to resolve such disputes in plaintiff's selected forum. Because Zillow has never agreed to arbitrate its claims against MRED, the Court should deny MRED's Motion.

Nor should this case be stayed. Even if Zillow is ultimately required to arbitrate against MRED (which would be contrary to the parties' express intent), the Court should first grant Zillow's request for a preliminary injunction against both Defendants, *Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134, 1141 (7th Cir. 1994) (holding that district court may grant preliminary injunctive relief in the face of arbitration), and the matter should proceed in this Court against Compass, which has no basis to compel arbitration of Zillow's claims. *See Bradford-Scott Data Corp. v. Physician Computer Network, Inc.*, 128 F.3d 504, 506 (7th Cir. 1997) (holding that case could proceed in federal court against non-arbitrating defendants).

For these reasons, the Court should deny MRED's Motion in its entirety.

1

## BACKGROUND

### *Industry Background*

Zillow is a real estate company whose business is based on making real estate listings "broadly available and easily accessible." Compl. ¶ 2. Zillow's pro-transparency business model enables sellers to attract the widest possible pool of home buyers and allows buyers access to the widest possible inventory of homes for sale. *Id*. Zillow sources listing data from local multiple listing services ("MLSs"), each of which maintain a common database of real estate listings within a particular area. *Id*. ¶ 40. Access to MLS listing data is critical to Zillow's pro-transparency listing platform and related products and services. *Id*. ¶¶ 12, 45. MLSs set rules to govern how listings are added to MLS databases, distributed to MLS participants, and displayed. *Id*. ¶ 43. They primarily distribute their local listings to participants through Internet Data Exchange ("IDX") or Virtual Office Website ("VOW") feeds. *Id*. ¶ 44. Accordingly, to obtain IDX and VOW data feeds, MLS participants, including platforms like Zillow, are subject to each MLS's policies. *Id*.

### *The MRED Participant Agreement*

MRED is one of the largest MLSs in the country and serves Chicagoland with over 43,000 members. *Id.* ¶ 18. Zillow displays listings from Chicagoland and signed an agreement to participate in MRED. *See* Declaration of Matt Hendricks ("Hendricks Decl.") ¶ 5, Ex. E ("MRED Participant Agreement"). MRED's Participant Agreement with Zillow establishes the parties' mutual obligations and enables Zillow to access MRED's IDX and VOW data feeds. *Id.* Access to MRED and its data is critical to Zillow's ability to compete in Chicagoland. Compl. ¶ 45.

The MRED Participant Agreement states that MRED will provide participants "access to all data and functions in the MRED Service" to which participants "are entitled under the MRED Policies." Hendricks Decl., Ex. E § 3. The "MRED Service" includes "any access or license to the MRED Software, the MRED Database, and the MRED System." *Id*. § 1. The "MRED Policies"

2

are defined to include MRED's "rules and regulations." *Id*. In turn, MRED's Rules and Regulations require Zillow to follow the IDX and VOW display rules posted by MRED's listing distribution provider, MLS GRID. *See* Hendricks Decl. ¶ 8, Ex. F, MRED Rules and Regulations §§ 31, 33.[1] Those display rules include the MRED-specific Revised Rules at issue here. Declaration of Chris Haran ("Haran Decl."), Ex. C, IDX Rules; Ex. D, VOW Rules; Compl. ¶¶ 101-05 (describing how MRED incorporated the anti-Zillow provision in the "revised MRED rules with MLS Grid").

Critically, the MRED Participant Agreement includes a dispute resolution and forum selection clause, under which Zillow and MRED agreed to resolve any disputes under the agreement (including Zillow's access to the "MRED Service" and MRED's enforcement of the IDX and VOW display rules), in court. Hendricks Decl., Ex. E § 43. That clause provides "[a]ny dispute, claim, or proceeding under this Agreement shall have jurisdiction and venue of the state and federal courts sitting in DuPage County, Illinois . . ." *Id*.; *see also* Hendricks Decl. ¶ 5.[2]

### The MLS GRID Agreement

Contrary to the express terms of Zillow and MRED's controlling Participant Agreement, which are conspicuously absent from MRED's Motion, MRED attempts to invoke a separate agreement between Zillow and MLS GRID, a third-party listing distribution provider. Compl. ¶ 11. Non-party MLS GRID offers a platform and technology through which MRED participants like Zillow access MLS listings data. *Id*.; *see also* Hendricks Decl. ¶ 9. Like all MRED participants,

---

[1] Although the MRED Participant Agreement contemplates that Zillow and MRED would enter into a specific agreement governing access to the IDX and VOW feeds, (*see* MRED Participant Agreement § 12), no such agreement was ever entered, leaving the Participant Agreement as the only relevant agreement laying out Zillow and MRED's mutual obligations to each other. Hendricks Decl. ¶¶ 6-7.

[2] Prior to Zillow becoming a Participant in the MRED MLS, its access to MRED data was governed by direct license that also directed disputes to state or federal courts in Dupage County, Illinois. Hendricks Decl. ¶ 4.

3

Zillow maintains a separate Data License Agreement with MLS GRID (the "MLS GRID Agreement"). *See* Haran Decl., Ex. A, MLS GRID Agreement. MRED is not a party to the MLS GRID Agreement. *See id*. at 1 (defining the "Parties" as Zillow, MLS GRID, and the individual realtor Participant); *see also* Hendricks Decl. ¶ 9. The MLS GRID Agreement contains an arbitration provision under which *Zillow and MLS GRID* (the only "Parties") agreed to arbitrate disputes that "arise out of" the MLS GRID Agreement. *See* Haran Decl., Ex. A § XII(c).

> Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be settled by binding arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules, including its Optional Rules for Emergency Measures of Protection (collectively, the "Arbitration Rules"), and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof. In the event of a dispute arising from or related to this Agreement, ***each Party*** shall bear all costs incurred by it, including, without limitation, its court costs, attorney's fees and other related costs and expenses. Without limiting the foregoing, ***the Parties agree*** to act in good faith with respect to this Agreement and efforts to resolve any dispute. The location of the arbitration shall be selected by ***MLS GRID in its sole discretion***.

*Id*. (emphasis added). Though MRED's Motion obfuscates the relevant text in the second half of the arbitration provision, that text clearly provides that only the "Parties" to the MLS GRID Agreement can invoke arbitration. *Id*. Further, although the MLS GRID Agreement, like the MRED Participant Agreement, incorporates the IDX and VOW display rules (including the Revised Rules), those rules do not themselves contain an arbitration or forum-selection clause. Rather, the display rules defer to individual MLSs (*e.g.*, MRED) and their "Governing Documents" to resolve disputes over who may obtain access. *See* Haran Decl., Ex. C, IDX Rules § 3 ("Participation [] is available to all Member Participants who are authorized by their applicable MLS's Governing Documents and who consent to the display of their listings by other Member Participants."); Haran Decl., Ex. D, VOW Rules § 2 ("The right of a Participant's VOW to display MLS GRID Data is limited to that supplied by the MLS(s) in which the Participant has participatory rights.").

4

*The Anticompetitive Scheme*

MRED would have the Court believe that this dispute arises merely from a disagreement about Zillow's contractual rights to the MRED data. Not so. This case is about an overarching conspiracy between Compass and MRED—a classic group boycott—to coerce Zillow into abandoning its pro-transparency Listing Access Standards nationwide. Compl. ¶¶ 9-10, 93, 176-78. After Compass failed to enjoin Zillow's Standards nationwide in New York federal court, Compass pivoted to a different approach and co-opted MRED as its cat's paw. *Id*. ¶¶ 9-10. Within weeks of Compass CEO Robert Reffkin's October 2025 demand that MLSs "discipline" Zillow, MRED—on whose board three Compass-affiliated brokers sit—adopted Revised Rules specifically to target Zillow, with MRED CEO Rebecca Jensen vowing to act as "referee" and rewrite those Rules "as needed" to block Zillow's Standards. *Id*. ¶¶ 86-88, 91, 94, 97-103, 108. She then made good on her promise, contorting the Chicagoland MRED service to list Compass's far-flung private listings in Florida, Georgia, and California—where they were already subject to Zillow's Standards—and providing MRED with a pretextual basis to terminate Zillow's entire Chicagoland listing feed. *Id*. ¶¶ 11, 127-33. Contrary to MRED's announcement about this "national expansion" with Compass, the primary purpose was not to serve MRED's members but to "protect" Defendants' private listing networks from Zillow's Standards nationally and foreclose competition from Zillow and its nascent Zillow Preview product. *Id*. ¶¶ 10, 120-23, 138, 169. Defendants bolstered their anticompetitive plan by severing Zillow's ability to access alternative listings data: Compass terminated its direct feeds to Zillow and worked with MRED to ensure other brokers did the same. *Id*. ¶¶ 110-19, 139.

Zillow's claims against MRED are thus rooted in a broad nationwide conspiracy utilizing many tools at Compass and MRED's disposal. MRED's unilateral ability to change its rules and enforce compliance under the MRED Participant Agreement is just one such tool. At Compass's

5

insistence, MRED created a new MRED-specific addendum for MLS GRID to add to its IDX and VOW rules. *Id*. ¶¶ 101-05. Once added, the Revised Rules were the basis for a Rules and Regulations violation that MRED could unilaterally enforce. Though MRED had the discretion under the relevant contractual provisions to modify the MLS Grid IDX and VOW rules applicable to MRED listings, the evidence will show that the modification was part of a broader scheme which made those rule changes illegal. In short, MRED and its competitor Compass illegally conspired to use their monopoly power over Chicagoland listings as a cudgel to prevent Zillow from competing.

## LEGAL STANDARDS

"Arbitration is a matter of contracts and consent." *Coinbase, Inc. v. Suski*, 602 U.S. 143, 145 (2024). Therefore, while federal policy may favor arbitration, arbitrators still "derive their authority to resolve disputes only because *the parties have agreed in advance* to submit such grievances to arbitration." *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648-49 (1986) (emphasis added); *see also First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995) (arbitration is "a way to resolve those disputes—but only those disputes—that *the parties have agreed* to submit to arbitration") (emphasis added).

Courts apply "ordinary state-law principles that govern the formation of contracts" to determine "whether the parties agreed to arbitrate a certain matter (including arbitrability)." *Harris v. W6LS, Inc.*, 171 F.4th 957, 962 (7th Cir. 2026) (citing *First Options of Chi.*, 514 U.S. at 944). Arbitration may only be compelled "if the following three elements are shown: a written agreement to arbitrate, a dispute within the scope of the arbitration agreement, and a refusal to arbitrate." *Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682, 687 (7th Cir. 2005). "The applicable standard is akin to a Rule 56 summary judgment standard, and the district court must accept the non-movant's evidence as true, drawing all reasonable inferences in his favor." *Sanato v. Sears,*

6

*Roebuck and Co.*, 259 F. Supp. 3d 873, 875 (N.D. Ill. 2016). Accordingly, "when considering a motion to compel arbitration which is opposed on the ground that no agreement to arbitrate had been made between the parties, [a district court] should give to the opposing party the benefit of all reasonable doubts and inferences that may arise." *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co.*, 636 F.2d 51, 54 (3d Cir. 1980).

## ARGUMENT

### I. ZILLOW'S SOLE AGREEMENT WITH MRED REQUIRES THE PARTIES' DISPUTES TO BE ADJUDICATED IN THIS FORUM

MRED concedes that this Court should look for the parties' "intent to be bound" on dispute resolution, as "manifested by their signatures." Motion at 8. Contrary to MRED's conclusion, however, this inquiry points to the MRED Participant Agreement, not Zillow's agreement with MLS GRID. The MRED Participant Agreement is the *only* relevant agreement between Zillow and MRED that speaks to dispute resolution. Hendricks Decl. ¶¶ 6-7. And because it is the only agreement that obligates MRED to provide Zillow with MLS privileges (including the feed access that is part of Zillow's requested relief, Compl. § XII), it is the only agreement under which Zillow's antitrust claims against MRED could potentially arise. It is clear, then, that the only forum-selection clause that manifests the parties' "intent to be bound" is the MRED Participant Agreement's "Dispute resolution" clause directing the parties to bring suit in this Court. Hendricks Decl., Ex. E § 43 ("Any dispute, claim, or proceeding under this Agreement shall have jurisdiction and venue of the state and federal court sitting in DuPage County, Illinois . . . .").

MRED urges the Court to begin its search for the parties' intent by looking not at the MRED Participant Agreement (the only relevant agreement between Zillow and MRED), but instead at the MLS GRID IDX and VOW display rules. However, even under those rules it is still clear that the MRED "Dispute resolution" clause is applicable. The IDX display rules state, in relevant part:

7

"Participation in IDX is available to all Member Participants who are authorized by their applicable MLS's Governing Documents and who consent to the display of their listings by other Member Participants." Haran Decl., Ex. C § 3; *see also* Haran Decl., Ex. D § 2 (similar). Thus, to the extent that this dispute arises out of the (anticompetitive) Revised Rules, that document points back to the MRED Participant Agreement, under which Zillow and MRED submitted to the jurisdiction of this forum.

MRED cites no precedent where a court compelled arbitration based on plaintiff's agreement with a third party when there was an applicable agreement directly between the parties commanding the plaintiff's selected forum. Zillow is aware of none. Thus, the Court should give effect to the parties' plain intent in the MRED Participant Agreement and allow this dispute to proceed as filed.

## II. ZILLOW'S AGREEMENT WITH NON-PARTY MLS GRID DOES NOT PROVIDE A BASIS TO ARBITRATE AGAINST MRED HERE

### A. MRED Fails to Establish Formation of *Any* Agreement to Arbitrate This Dispute

#### 1. MRED Fails to Establish a Direct Agreement

Under Delaware law,[3] the MLS GRID Agreement is not evidence of a valid contract to arbitrate this dispute. Nothing in the MLS GRID Agreement suggests that Zillow intended to be bound to arbitrate its claims against MRED, or that Zillow and MRED exchanged consideration. *See* Motion at 8 (citing *Smash v. Dover Downs, Inc.*, 2022 WL 2966431, at *2 (D. Del. July 27, 2022)). MRED points only to facts that demonstrate Zillow's contract formation with MLS GRID, but they are not evidence of intent to arbitrate *this dispute*. *See First Options of Chi.*, 514 U.S. at

---

[3] Zillow does not dispute that Delaware law applies to determine the obligations under the MLS GRID Agreement. *See* Motion at 8.

943 (arbitration is "a way to resolve those disputes—but only those disputes—that *the parties have agreed* to submit to arbitration.") (emphasis added). Moreover, there was no consideration offered in exchange for Zillow's supposed offer to arbitrate against MRED. The only form of consideration that MRED invokes is "mutual assent to the Arbitration [Provisions]," Motion at 9, but again this applies to MLS GRID only. MRED did not sign the MLS GRID Agreement and nothing else therein suggests that MRED took on the obligation to arbitrate against Zillow.

MRED's cases are readily distinguishable—they all involve written agreements to arbitrate between the plaintiff and the defendant and, thus, do not support contract formation where, as here, there is no written arbitration agreement between the parties. *See Smash*, 2022 WL 2966431, at *2 (arbitration agreement "stat[ed] that both Smash and Dover Downs agree to forego the right to sue each other in court"); *Blair v. Scott Specialty Gases*, 283 F.3d 595, 603-04 (3d Cir. 2002) (Blair and Scott both signed); *Adtile Techs. Inc. v. Perion Network Ltd.*, 192 F. Supp. 3d 515 (D. Del. 2016) (Adtile signed and Perion was the successor-in-interest to company that signed). *GNH Group, Inc. v. Guggenheim Holdings, LLC* is particularly instructive: it involved two groups of defendants – one signatories to a contract containing an arbitration clause, and the other not. 2020 WL 4287358, at *4 (D. Del. July 27, 2020). As to the non-signatories, the court's reasoning supports Zillow's position, not MRED's. *Id.* at *5. It held there was no evidence of plaintiff's intent to form an agreement to arbitrate with non-signatory defendants. *Id.* ("How could there be such evidence when Plaintiff and the Non-Signatory Defendants have not signed an agreement with each other containing an arbitration provision with respect to any such claims?"). It also collected cases rejecting contract formation and denying arbitration under similar circumstances. *Id*.

### 2. MRED's Third-Party Beneficiary Argument Is Unavailing

MRED tries to invoke an exception to normal principles of contract formation—the third-party beneficiary doctrine, Motion at 10-12—but that doctrine does not side-step the central

question: whether Zillow agreed to arbitrate *with MRED*.

Even where a non-signatory is a third-party beneficiary of a contract overall, a court must look to the specific terms of the arbitration provision to determine whether the signatory agreed to arbitrate against non-signatories. *See E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 196 (3d Cir. 2001); *Morales-Posada v. Cultural Care, Inc.*, 141 F.4th 301, 315 (1st Cir. 2025) ("the language of the arbitration clause [is] dispositive as to [non-signatory's] authority to enforce that provision"). In *Nemours*, the Third Circuit (applying Delaware law) held that no agreement to arbitrate had been formed. 269 F.3d at 196. Rather than analyze the language of the contract as a whole, the court looked to "[t]he arbitration clause itself [which] anticipated only three beneficiaries . . . all of them parties." *Id*.

Courts routinely reject attempts by third-party beneficiaries to compel arbitration against signatories to a contract containing an arbitration provision when, as here, the arbitration provision refers only to the parties to the contract. *See Cultural Care*, 141 F.4th at 312 (affirming denial of purported third-party beneficiary's motion to compel where language of "the arbitration agreement 'does not even make an ambiguous reference'" to third-party beneficiary); *Hogan v. SPAR Grp., Inc.*, 914 F.3d 34, 40 (1st Cir. 2019) (affirming denial of motion to compel on third-party beneficiary theory where "the arbitration clause limits its applicability to the signatories by only covering disputes 'between the Parties'"); *Falcon Tankers, Inc. v. Litton Sys., Inc.*, 300 A.2d 231, 237, 240 (Del. Super. Ct. 1972) (purported third-party beneficiary had "no standing to invoke the agreement to arbitrate" where "[t]he arbitration clause in the contract is by its very terms, made applicable only to 'any dispute, difference or disagreement between'" signatories); *Finlay v. Moseley, Hallgarten, Estabrook & Weeden, Inc.*, 1987 WL 5237, at *1 (N.D. Ill. Jan. 5, 1987) (purported third-party beneficiary "lack[ed] standing to assert [agreement's] arbitration clause"

10

where "the language of the arbitration clause refers only to disputes between plaintiff and [signatory]"); *Shaffer v. Stratton Oakmont, Inc.*, 756 F. Supp. 365, 367 (N.D. Ill. 1991) (purported third-party beneficiary had "no standing to benefit from [agreement's] arbitration provision" where it was not mentioned in the arbitration provision).

Here, likewise, the MLS GRID Agreement's arbitration provision expressly excludes non-signatories or third-party beneficiaries (such as MRED here) by referring only to the "Parties" (*i.e.*, the signatories to the contract). Haran Decl., Ex. A § XII(c)*; see, e.g.*, *In re Paragon Offshore PLC*, 588 B.R. 735, 756 (Bankr. D. Del. 2018) ("[a]pplying the traditional contractual review tool of *expressio unius*" and finding that "non-signatories have been *expressly excluded* from the Arbitration Provision" which only stated that "Each Party agrees" to arbitration) (emphasis added). Accordingly, the Court should reject MRED's attempt to invoke the MLS GRID Agreement's separate provision that makes unnamed MLSs third-party beneficiaries of the contract as a general matter, but does not mention dispute resolution specifically. Motion at 10-11 (citing Haran Decl., Ex. A § XII (j)). In sum, Zillow did not agree to arbitrate against MRED.[4]

MRED briefly suggests, in a footnote, that an arbitrator should decide the very question of arbitrability. That contention is contrary to the great weight of authority interpreting the requirement that "clear and unmistakable evidence" of intent is necessary before delegating the question of arbitrability to an arbitrator. *See Guggenheim Holdings*, 2020 WL 4287358, at *5 (collecting cases). MRED cannot point to anything like an express delegation clause here. Further,

---

[4] Here, the Court does not have to wonder what Zillow intended with respect to disputes it expected to arise with MRED—there is a direct agreement with MRED on the topic. Indeed, this fact pattern sets MRED apart from its cited cases. *See* Motion at 10-11. In *Peters v. Kaleyra, Inc.*, 2024 WL 4333143 (D. Del. Sept. 27, 2024) and *Carder v. Carl M. Freeman Communities, LLC*, 2009 WL 106510 (Del. Ch. Jan. 5, 2009), the courts determined that a third-party beneficiary could benefit from the signatory's promise to arbitrate, but in neither case had the third-party beneficiary signed a separate agreement with the signatory to litigate in state or federal court.

11

where two contracts may be applicable and only one contains an arbitration clause, a federal court is the proper forum for resolving which of the two applies. *Coinbase*, 602 U.S. at 145. The Court must also resolve collateral "challenges [to] the validity . . . of the precise agreement to arbitrate at issue." *Id.* at 151 (citing *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 71 (2010)).

### B.     Zillow's Claims Do Not Arise Under the MLS GRID Agreement

An independent basis to deny MRED's Motion and decline to compel arbitration is that Zillow asserts antitrust claims that do not rely upon the MLS GRID Agreement. Courts conduct a fact-specific inquiry to determine whether antitrust claims "arise out of" a contract. *Matthews v. Rollins Hudig Hall Co.*, 72 F.3d 50, 53 (7th Cir. 1995) (courts must review contract language and determine whether an arbitration provision is "not susceptible of an interpretation that covers the asserted dispute"); *In re Evanston Nw. Corp. Antitrust Litig.*, 2015 WL 13735423, at *6 (N.D. Ill. Sept. 4, 2015) (reviewing arbitration provisions to determine whether "each clause readily appears to encompass the antitrust claims"). Further, the Seventh Circuit holds that antitrust claims do not "arise out of" a contract where a party's compliance with that contract would not remedy the alleged antitrust injury. *AlliedSignal, Inc. v. B.F. Goodrich Co.*, 183 F.3d 568, 572-73, 577 (7th Cir. 1999) (agreement "which provide[d] for arbitration of 'any claim or controversy arising out of or relating to [the] Agreement'" did not apply to case under Section 7 of the Clayton Act because "[defendant] could fully comply with the [agreement] and still cause [plaintiff] antitrust injury").

Here, Zillow's Complaint is not merely about contract performance, it is about the overarching conspiracy hatched by Compass and MRED to coerce Zillow into abandoning its pro-transparency Listing Access Standards nationwide. Defendants' plan to hijack MRED's rule-making and rule-enforcement processes was but one tool in an overarching scheme to impede Zillow as a competitor. Compl. ¶ 106. Accordingly, Zillow's dispute arises from MRED's process for passing rules and enforcing them against MRED Participants in general, not the MLS GRID

12

Agreement in particular.

MRED cites cases where antitrust claims were arbitrable because they arose from contracts containing arbitration clauses, *see* Motion at 13, but those cases are distinguishable from this one because they involved non-compliance with the contract at issue;[5] overcharges mandated by the contract;[6] or anticompetitive effects that would not have been achieved but for the binding nature of the contract.[7] Contrary to MRED's assertions, Zillow's antitrust claims *do not* take issue with specific terms in the MLS GRID Agreement—they focus instead on the rules MRED supplied to MLS GRID as part of a broader scheme. Nor does Zillow dispute whether any parties to the MLS GRID Agreement complied with their respective obligations. Accordingly, MRED's attempt to invoke the MLS GRID Agreement to compel Zillow's claims to arbitration is of no avail.

## III. THE COURT SHOULD NOT STAY THE ACTION

Even if the Court compels Zillow to arbitrate its claims against MRED, it should proceed now with Zillow's antitrust claim against Compass. It is within the Court's discretion "whether to

---

[5] *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc*., 473 U.S. 614, 617 (1985) (anticompetitive harm arose from defendant's non-compliance with distribution agreement which had trade restraining effects).

[6] *In re Remicade (Direct Purchaser) Antitrust Litig*., 938 F.3d 515, 518 (3d Cir. 2019) (anticompetitive harm arose from distribution contract which caused distributor to pay artificially inflated prices under the contract); *In re Evanston Nw. Corp. Antitrust Litig*., 2015 WL 13735423, at *6 (antitrust claims were "in essence—claims to recover alleged overpayments made pursuant to the contracts containing the [arbitration] clauses").

[7] *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 233 (2013) (anticompetitive harm arose from provision in card acceptance agreements which required merchants to accept "all" of defendant card issuer's cards, despite anticompetitive fees for certain cards); *In re Rotavirus Vaccines Antitrust Litig.*, 30 F.4th 148, 158-59 (3d Cir. 2022) (anticompetitive harm arose from loyalty contracts which had exclusionary effects); *Baxter Int'l, Inc. v. Abbott Lab'ys*, 315 F.3d 829, 831 (7th Cir. 2003) (concerned whether a license agreement between the parties "forb[ade] Baxter from competing . . . [and] violate[d] U.S. antitrust law"). One of MRED's cases, *Cindy's Candle Co., Inc. V. WNS, Inc.*, contradicts its argument. 714 F. Supp. 973 (N.D. Ill. 1989). The court there "request[ed] further briefing on whether" the arbitration provision covered plaintiff's antitrust claims and subsequently held that it did not. *Id.* at 979.

13

stay the entire case . . . in cases involving both arbitrable and nonarbitrable issues." *Pryner v. Tractor Supply Co.*, 109 F.3d 354, 361 (7th Cir. 1997). Courts in this Circuit routinely allow parties to pursue claims against non-arbitrating defendants where claims against other defendants are compelled to arbitration. *See Volkswagen Of Am., Inc. v. Sud's Of Peoria, Inc.*, 474 F.3d 966, 971 (7th Cir. 2007) (affirming district court's denial of motion to stay non-arbitrable claims); *Bradford-Scott Data*, 128 F.3d at 506 (holding that case could proceed against non-arbitrating defendants); *see also Varnes v. Chrysler Fin. Corp.*, 2007 WL 4125830, at *3 (N.D. Ind. Nov. 15, 2007) (lifting stay of arbitration "so that Plaintiff may proceed with his case against the remaining [non-arbitrating] Defendants"). In exercising their discretion, courts often examine whether the stay is "expected to conclude within a reasonable time," and whether there will be "undue hardship" imposed on the opposing party. *Sierra Rutile Ltd. v. Katz*, 937 F.2d 743, 750 (2d Cir. 1991) (the party seeking a stay "bears a heavy burden of showing necessity") (quotation and citation omitted). Here, MRED has not demonstrated either factor supports a stay.

## IV. ZILLOW IS ENTITLED TO PURSUE INJUNCTIVE RELIEF IN ANY EVENT

Whether or not the Court compels Zillow to arbitrate its claims against MRED, it should resolve Zillow's Motion for Preliminary Injunction now. The Seventh Circuit follows the majority rule that federal "district courts are not precluded as a general matter from issuing preliminary injunctive relief pending arbitration." *Gateway E. Ry.*, 35 F.3d at 1141 (holding that district court may grant preliminary injunctive relief in the face of arbitration); *APAC Customer Servs., Inc. v. Marrow*, 2012 WL 1443091, at *2 (N.D. Ill. Apr. 26, 2012) (recognizing that "[a] party generally may obtain preliminary injunctive relief in a case, even if the parties have agreed to resolve the dispute in arbitration."). Here, Zillow seeks preliminary injunctive ("PI") relief to preserve the status quo *ante*, and to prevent the real and present danger of Compass expanding the conspiracy to other MLSs and significantly hampering Zillow as a competitor. Contrary to MRED's claim,

14

that result has not been achieved already. *See* Dkt. 56 at 4 (citing cases where courts granted injunctive relief to preserve the efficacy of relief sought through arbitration). Though the Court's TRO restored Zillow's access to the MRED listing feeds on the condition that Zillow not enforce its Standards in the zip codes where MRED had listings during the twelve months prior to the MRED-Compass partnership, Order (Dkt. 52), it stopped short of allowing Zillow to pursue its pro-transparency business model free from the effects of Compass and MRED's harmful conspiracy. The PI hearing should go forward because Zillow still seeks an order preventing MRED from enforcing its Revised Rules and prohibiting Compass and MRED from further conspiring to harm Zillow in retaliation for its Standards.[8]

Accordingly, the Court should proceed to resolve the merits of Zillow's PI motion. Such a result is consistent with Seventh Circuit precedent and the policy goals underlying the Sherman Act to enforce substantive antitrust law and vindicate the public interest. The outcome has the added benefit of efficiency, as this Court has already invested substantial time and resources into this matter, will handle the matter going forward as to Compass even if Zillow must arbitrate against MRED, and will reduce the chances of inconsistent outcomes from a case with identical factual and legal issues proceeding in two separate forums.

## CONCLUSION

For the foregoing reasons, Zillow respectfully requests that the Court deny MRED's Motion to Compel Arbitration and Stay Action in its entirety.

---

[8] *See* Compl. § XII (requesting relief including "[a]n injunction prohibiting MRED and Compass from any further acts effectuating their conspiracy;" "[a]n injunction prohibiting enforcement of MRED's Revised Rules;" and "[a]n injunction prohibiting MRED from terminating Zillow's access to MRED's IDX or VOW feeds on the basis of enforcement of the Standards"); Motion for Preliminary Injunction (Dkt. 21) at 15 ("If the injunction is granted . . . MRED would be restrained from enforcing its Revised Rules . . . .").

Dated: June 25, 2026

Respectfully submitted,

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation


/s/ *Bonnie Lau*
Bonnie Lau (admitted *pro hac vice*)
One Market Plaza, Spear Tower, Suite 3300
San Francisco, California 94105
Telephone: (415) 947-2000
Facsimile: (866) 974-7329
Email: blau@wsgr.com

Brian J. Smith (IL Bar No. 6321543)
1700 K Street NW, Fifth Floor
Washington, DC 20006
Telephone: (202) 973-8800
Facsimile: (866) 974-7329
Email: brian.smith@wsgr.com
*\*Admitted to practice only in Illinois and Maine*

Beau W. Buffier (admitted *pro hac vice*)
31 West 52nd Street, Fifth Floor
New York, New York 10019
Telephone: (212) 999-5800
Facsimile: (866) 974-7329
Email: bbuffier@wsgr.com

Nicholas R. Sidney (admitted *pro hac vice*)
701 Fifth Avenue, Suite 5100
Seattle, Washington 98104
Telephone: (206) 883-2500
Facsimile: (866) 974-7329
Email: nsidney@wsgr.com


*Attorneys for Plaintiffs Zillow Group, Inc. and Zillow, Inc.*

16