# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| ZILLOW GROUP, INC. and ZILLOW, INC., | Case No. 1:26-cv-05451 |
| *Plaintiffs*, | |
| v. | Judge: Hon. John J. Tharp, Jr. |
| MIDWEST REAL ESTATE DATA LLC, COMPASS, INC., and COMPASS ILLINOIS, INC., | |
| *Defendants*. | |

## PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

**Page**

INTRODUCTION .................................................................................................................... 1

STATEMENT OF FACTS ....................................................................................................... 3

      A.      Zillow Builds an Innovative Platform and Consumer Experience ......................... 3

      B.      Access to Residential Real Property Listings Is Foundational to Zillow's
            Success ..................................................................................................................... 3

      C.      Harmful Private Listing Networks Undermine Transparency ................................. 4

      D.      Zillow Responds to the Rise of PLNs by Developing Its Listing Access
            Standards, Which Promote Access and Transparency .............................................. 5

      E.      MLSs Change Their Rules and Zillow Responds with Zillow Preview,
            Further Increasing Transparency ............................................................................. 6

      F.      MRED Is the Monopolist MLS in Chicagoland ...................................................... 7

      G.      Compass Is the Dominant Brokerage in Chicagoland ............................................. 9

      H.      MRED and Compass Operate PLNs and Compete with Zillow ............................. 9

      I.      MRED and Compass Conspire to Block Zillow's Standards and Cut
            Zillow's Feeds .......................................................................................................... 10

            1.      MRED and Compass Revise MRED's Rules to Target Zillow's
                     Standards ....................................................................................................... 11

            2.      MRED and Compass Block Zillow's Access to Direct Broker
                     Feeds ............................................................................................................. 13

            3.      MRED and Compass Launch an Alliance to Launder Suppressed
                     Compass Listings and Block Zillow's Standards Nationwide.................. 14

      J.      Zillow Will Be Irreparably Harmed Absent an Injunction ................................... 16

LEGAL STANDARD............................................................................................................. 17

ARGUMENT .......................................................................................................................... 17

      A.      Zillow Has a Strong Likelihood of Success on the Merits ................................... 17

            1.      Zillow Is Likely to Succeed on Its Section 1 Claim ................................. 17

          i.       Expedited Discovery Amply Demonstrates an Unlawful Agreement ................................................................................... 18

          ii.      Defendants' Agreement Is an Unreasonable Restraint ................. 23

          iii.     Defendants' Conduct Has Caused Antitrust Injury ...................... 29

    2.      Zillow Is Likely to Succeed on Its Section 2 Claim ................................ 30

          i.       MRED Is a Monopolist .................................................................. 30

          ii.      MRED Maintains Its Monopoly Through Coercive Conduct ....... 32

  B.     Zillow Will Suffer Irreparable Harm Absent an Injunction ................................. 33

    1.      Losing Access to the MRED Listing Feeds Would Irreparably Harm Zillow ............................................................................................... 33

    2.      Acceding to Defendants' Unlawful Scheme Would Irreparably Harm Zillow ............................................................................................... 36

  C.     The Balance of Harms and Public Interest Support Granting the Injunction ....... 38

  D.     The Court Should Enjoin Defendants from Acts in Furtherance of the Conspiracy ............................................................................................................. 40

CONCLUSION ............................................................................................................................. 40

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Acquaire v. Can. Dry Bottling Co. of N.Y., Inc.*,
24 F.3d 401 (2d Cir. 1994) ...................................................................................................38

*Agnew v. Nat'l Collegiate Athletic Ass'n*,
683 F.3d 328 (7th Cir. 2012) ...............................................................................................23

*Applied Sys., Inc. v. PBC Consulting Inc.*,
2026 WL 381866 (N.D. Ill. Feb. 11, 2026) .........................................................................34

*Austin Bd. of Realtors v. E-Realty, Inc.*,
2000 WL 34239114 (W.D. Tex. Mar. 30, 2000) ..................................................................35

*Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*,
784 F.2d 1325 (7th Cir. 1986) .............................................................................................32

*BrightStar Franchising, LLC v. Foreside Mgmt. Co.*,
808 F. Supp. 3d 870 (N.D. Ill. 2025) ..............................................................................33, 37

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962) .............................................................................................................26

*Chancey v. Ill. State Bd. of Elecs.*,
635 F. Supp. 3d 627 (N.D. Ill. 2022) ...................................................................................38

*Compass, Inc. v. Zillow, Inc.*,
No. 25-cv-05201-JAV (S.D.N.Y.) .....................................................................................10, 21

*Corbitt v. Nat'l Broad. Corp.*,
1992 WL 350670 (N.D. Ill. Nov. 23, 1992) .........................................................................39

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
504 U.S. 451 (1992) .............................................................................................................32

*Eli Lilly & Co. v. Zenith Goldline Pharms., Inc.*,
172 F. Supp. 2d 1060 (S.D. Ind. 2001) ................................................................................27

*Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*,
744 F.2d 588 (7th Cir. 1984) ...............................................................................................38

*Gov't Emps. Med. Plan v. Regence Blue Shield of Idaho*,
2005 WL 8165289 (D. Idaho Mar. 15, 2005) .......................................................................40

*Health o meter, Inc. v. Terraillon Corp.*,
  873 F. Supp. 1160 (N.D. Ill. 1995) ........................................................................38

*Hess Newmark Owens Wolf, Inc. v. Owens*,
  415 F.3d 630 (7th Cir. 2005) ...............................................................................34

*In re Dealer Mgmt. Sys. Antitrust Litig.*,
  680 F. Supp. 3d 919 (N.D. Ill. 2023) .....................................................17, 18, 29

*In re Text Messaging Antitrust Litig.*,
  630 F.3d 622 (7th Cir. 2010) ........................................................................18, 21

*In re Uranium Antitrust Litig.*,
  617 F.2d 1248 (7th Cir. 1980) ..............................................................................39

*Int'l Outsourcing Servs., LLC v. Blistex, Inc.*,
  420 F. Supp. 2d 860 (N.D. Ill. 2006) ....................................................................29

*Kleen Prods. LLC v. Int'l Paper*,
  306 F.R.D. 585 (N.D. Ill. 2015)............................................................................21

*Laidlaw Acquisition Corp. v. Mayflower Grp., Inc.*,
  636 F. Supp. 1513 (S.D. Ind. 1986) ......................................................................39

*Life Spine, Inc. v. Aegis Spine, Inc.*,
  8 F.4th 531 (7th Cir. 2021) ....................................................................17, 33, 34

*Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*,
  29 F.4th 337 (7th Cir. 2022) .................................................................................17

*MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*,
  708 F.2d 1081 (7th Cir. 1983) ..............................................................................30

*Moehrl v. Nat'l Ass'n of Realtors*,
  492 F. Supp. 3d 768 (N.D. Ill. 2020) .............................................................18, 25

*Nw. Real Est. Bd., Inc. v. Multiple Listing Serv. of N. Ill., Inc.*,
  1991 WL 640147 (N.D. Ill. Aug. 22, 1991) .......................................................23, 24, 27

*Ohio v. Am. Express Co.*,
  585 U.S. 529 (2018)........................................................................25, 26, 27

*Ploss v. Kraft Foods Grp., Inc.*,
  197 F. Supp. 3d 1037 (N.D. Ill. 2016) ..................................................................30

*Realcomp II, Ltd. v. F.T.C.*,
  635 F.3d 815 (6th Cir. 2011) ..........................................................................26, 31

*Reifert v. S. Cent. Wis. MLS Corp.*,
450 F.3d 312 (7th Cir. 2006) ..................................................................................26

*Roland Mach. Co. v. Dresser Indus., Inc.*,
749 F.2d 380 (7th Cir. 1984) .............................................................................35, 36

*Stuller, Inc. v. Steak N Shake Enters., Inc.*,
695 F.3d 676 (7th Cir. 2012) .............................................................................36, 37

*Tichy v. Hyatt Hotels Corp.*,
376 F. Supp. 3d 821 (N.D. Ill. 2019) .................................................................18, 19

*Tiz, Inc. v. S. Glazer's Wine & Spirits, LLC*,
2024 WL 2785142 (N.D. Ill. May 30, 2024) ......................................................19, 30

*Toys "R" Us, Inc. v. FTC*,
221 F.3d 928 (7th Cir. 2000) .......................................................................23, 25, 30

*Tri-Gen v. Int'l Union of Operating Eng'rs, Loc. 150, AFL-CIO*,
433 F.3d 1024 (7th Cir. 2006) ...........................................................................23, 29

*trueEX, LLC v. MarkitSERV Ltd.*,
266 F. Supp. 3d 705 (S.D.N.Y. 2017).....................................................................39

*United States v. Aluminum Co. of Am.*,
148 F.2d 416 (2d Cir. 1945).....................................................................................30

*United States v. Dentsply Int'l, Inc.*,
399 F.3d 181 (3d Cir. 2005).....................................................................................32

*United States v. Grinnell Corp.*,
384 U.S. 563 (1966)..................................................................................................30

*United States v. Microsoft Corp.*,
253 F.3d 34 (D.C. Cir. 2001) .............................................................................30, 31

*United States v. Realty Multi-List, Inc.*,
629 F.2d 1351 (5th Cir. 1980) ...........................................................................26, 39

*VanDerStok v. BlackHawk Mfg. Grp. Inc.*,
639 F. Supp. 3d 722 (N.D. Tex. 2022) ....................................................................38

*Viamedia, Inc. v. Comcast Corp.*,
951 F.3d 429 (7th Cir. 2020) .......................................................................27, 30, 32, 33

*Walter Kidde Portable Equip., Inc. v. Universal Sec. Instruments, Inc.*,
669 F. Supp. 2d 895 (N.D. Ill. 2009) .......................................................................30

*Wilk v. Am. Med. Ass'n*,
895 F.2d 352 (7th Cir. 1990) ...................................................................................39

*Yong Ki Hong v. KBS Am., Inc.*,
2005 WL 1712236 (E.D.N.Y. July 22, 2005)...........................................................40

**MISCELLANEOUS**

Areeda & Hovenkamp, *Antitrust Law* (5th ed. 2024) ....................................................32

**INTRODUCTION**

Weeks of expedited discovery and a multi-day evidentiary hearing have confirmed that Defendants Midwest Real Estate Data, LLC ("MRED") and Compass, Inc. (together with Compass Illinois, Inc., "Compass") entered into an unlawful conspiracy to terminate Zillow's access to an essential input for competition: MRED's residential real estate listing data feeds. Defendants worked in lockstep towards their mutual goal to block Zillow's nationwide enforcement of its pro-transparency Listing Access Standards ("Standards"), which discourage harmful private listings. Zillow's competitive threat became more acute when it launched Zillow Preview, an innovative product to create and distribute premarket listings, in direct competition with Defendants' private listing networks ("PLNs"). Despite bare denials of conspiracy, overwhelming evidence—in contemporaneous text messages, emails, and business documents—shows that Defendants conspired, under an obviously pretextual national expansion plan, to launder Compass's Florida, Georgia, and California listings through MRED in order to force Zillow to abandon its Standards nationally or risk losing MRED's critical listing data for tens of thousands of Chicagoland homes. The antitrust laws do not permit competitors to conspire to force their mutual competitor to choose between decimating its business or abandoning a key competitive strategy.

Zillow meets every requirement for a preliminary injunction. First, Zillow has amply demonstrated likelihood of success on the merits of its claims. Under Section 1, Zillow has shown that MRED and Compass worked together to coerce Zillow to abandon the Standards by threatening—and then terminating—Zillow's access to MRED's listing feeds. Indeed, Defendants co-drafted a press release announcing their very goal: to "protect" agents from feed recipients like Zillow. Any doubt about Defendants' coordination is resolved by the trail of evidence in the weeks and months before termination, showing Defendants often discussed their joint desire to halt Zillow's Standards. Under Section 2, Zillow has shown that MRED is a monopolist in the

Chicagoland market for Listing Creation and Distribution. Facing no genuine competitors, it controls and exploits an undisputed market share of over 98%. Wielding that monopoly, MRED revised and selectively enforced its listing display rules to block Zillow's Standards, choosing to immediately terminate access to its listing feeds for the first time in MRED's history. MRED's rules advance no legitimate procompetitive benefits and serve only to block its competitor.

Second, Zillow will be irreparably harmed absent an injunction. Defendants do not seriously dispute that Zillow's business in Chicagoland and Zillow Preview will be immediately and irreversibly harmed if MRED again terminates Zillow's access to MRED's listing feeds, causing an immediate loss of customers and ensuing downward spiral that will affect each part of Zillow's multifaceted platform. Instead, Defendants assert that Zillow could simply abandon its Standards, but that too would harm Zillow's business in Chicagoland and nationwide, by allowing Defendants to promote their harmful PLNs and offload their failed listings onto Zillow, and by allowing PLNs to proliferate, fragment the market, and harm the quality and quantity of Zillow's listings supply. In either case, the harms to Zillow are incalculable; it would be impossible to quantify the loss of customers, business and goodwill to Zillow, particularly as to Zillow Preview.

Third, the balance of the equities and public interest both weigh decidedly in favor of an injunction. MRED concedes the only harm it might suffer is negative media attention, which is not unwarranted in light of MRED's naked conspiratorial efforts. And Compass stands to benefit from the injunction, as its own CEO concedes that Compass wants its listings to be displayed on Zillow. Moreover, the public interest is promoted by enforcing the antitrust laws and permitting Zillow to compete vigorously by promoting its pro-transparency policies, without the Damoclean threat of losing a key competitive input in Chicagoland.

Accordingly, the Court should grant Zillow's motion and enter a preliminary injunction.

**STATEMENT OF FACTS**

**A.      Zillow Builds an Innovative Platform and Consumer Experience**

Founded in 2004 with the goal of "help[ing] more consumers [] find the right home . . . by providing transparen[t] information on real estate," Tr. 36:19-22 (Samuelson), Zillow has revolutionized online home search. Before Zillow, in the pre-internet world, "listings were primarily only accessible to real estate agents. . . . and [consumers] would typically only see the listings that [their] agent had recommended to [them]." Tr. 37:10-16 (Samuelson). Zillow combines comprehensive listings with innovative tools like the Zestimate and BuyAbility to "empower[] consumers [to] . . . do research for themselves, be better educated, and also see all of their housing options," not just the ones selected by agents. Tr. 36:24-37:6, 37:19-24 (Samuelson).

Zillow has invested in "building a really good consumer experience that drives those consumers to [its] sites and apps." Tr. 218:20-24 (Hofmann). Zillow's efforts have paid off, amassing "the largest audience of buyers on the internet, over 200 million users a month." Tr. 39:6-8 (Samuelson). Zillow monetizes that audience primarily as an advertising site where agents pay to access Zillow's audience. Tr. 40:9-11 (Samuelson), 208:7-8 (Hofmann). Zillow also makes money originating mortgages, selling software to agents and industry professionals, and via display advertising to Zillow's user base. Tr. 208:13-20 (Hofmann).

**B.      Access to Residential Real Property Listings Is Foundational to Zillow's Success**

Zillow's success is dependent on access to listings—the "lifeblood" of its business. Tr. 40:14-15 (Samuelson), 209:4-6 (Hofmann). Consumers think of Zillow "for having a comprehensive set of real estate listings, whether it's existing homes for sale, new homes, or rentals." Tr. 208:22-209:1 (Hofmann). Zillow has "buil[t] [its] brand, [its] audience, [and its] engagement over the last 20 years on the back of having those types of listings." Tr. 209:6-10 (Hofmann). "[T]he most important listings are new listings," because consumers are most likely

to look at new listings. Tr. 40:21-22, 41:12-20 (Samuelson); PX442 at 17, Fig. 1.

Historically, Zillow has received listings from more than 500 Multiple Listing Services ("MLSs") throughout the United States. Tr. 62:15 (Samuelson). Each MLS maintains a database and distributes that listing information to its members via "listing feeds." Internet Data Exchange ("IDX") and Virtual Office Website ("VOW") feeds transmit listing information to MLS members to then display listings on their websites. Tr. 38:18-39:1 (Samuelson).

## C. Harmful Private Listing Networks Undermine Transparency

While Zillow seeks to "turn on the lights" and display residential real property information freely to all, Tr. 49:15-16 (Samuelson), others seek to hide or gate that information in PLNs.[1] PLNs increase barriers to access and search costs for buyers. Tr. 50:22-23 (Samuelson), 391:1-12 (Wu). PLNs also harm sellers. On average, in the United States, properties sold via PLN sell for almost $5,000 less than properties sold publicly via MLS. Tr. 49:3-9 (Samuelson); PX417; PX418. The same holds true in Chicagoland. Tr. 392:6-17 (Wu); PX418. PLNs also harm small, independent brokerages' ability to compete with larger brokerages for both agents and consumers and to aggregate listings into a competing PLN. Tr. 50:2-8 (Samuelson).

Ultimately, PLNs benefit only the large brokerages, which hoard listings to increase their own profits at the expense of buyers, sellers, and competitors. PLNs are "a recruiting tool . . . [to] attract agents from other smaller brokerages. . . . [and to] recruit buyers" away from other agents. Tr. 51:15-22 (Samuelson). This allows brokerages to profit by "double end[ing] the deal"—to earn "commission both on the buy side and the sell side." Tr. 51:23-25 (Samuelson).

---

[1] PLN "listings are typically not available to the public, on public-facing websites. And oftentimes, in order for a buyer to get access to those listings, the buyer needs to work with the listing brokerage." Tr. 46:7-12 (Samuelson). PLNs are neither new nor innovative; brokerages have used PLNs since at least the 1970s. Tr. 47:11-21 (Samuelson).

**D.      Zillow Responds to the Rise of PLNs by Developing Its Listing Access Standards, Which Promote Access and Transparency**

In April 2025, in response to the rise in PLNs, Zillow created its Listing Access Standards. Tr. 52:19-20 (Samuelson); PX506. The Standards solely apply to Zillow websites; they do not govern what other platforms may show on their websites. Tr. 53:5-8 (Samuelson); PX506 ¶2. Zillow's Standards promote "fair and transparent access to all real estate information," PX506 ¶1, by requiring that the listing be "broadly accessible to the general public in a manner that provides open access." PX506 ¶3(a); Tr. 53:15-25 (Samuelson). The seller remains free to choose to engage in "selective or gated marketing practices that require a consumer to work with the listing brokerage to get access to the [l]isting," but, in that instance, the listing is "not [] eligible for display on the Zillow Sites." PX506 ¶3(b); *accord* Tr. 54:1-7 (Samuelson). The Standards represent a key competitive strategy that helps Zillow maintain the quality and quantity of its listing supply by incentivizing broad public distribution of listings early in the listing process. PX110 ¶¶6, 139.

Zillow "built technology that looks across the internet, looks across websites [] to find listings that are being selectively marketed." Tr. 58:3-5 (Samuelson). If Zillow detects listings that violate its Standards, Zillow provides the listing agent with two warnings so as "to not catch agents off guard," but does not suppress either listing. Tr. 56:15-23 (Samuelson). The third time that agent has a different listing that violates the Standards, "for that third listing and subsequent violating listings," Zillow "choose[s] not to display the listing on Zillow." Tr. 56:25-57:5 (Samuelson). A listing remains suppressed only for the life of the listing agreement because, if the seller switches agents, Zillow "do[es]n't think it's fair to penalize the new agent" and wants to "protect sellers" from the "poor outcomes" of originally listing in a PLN. Tr. 57:8-25 (Samuelson).

Since Zillow started enforcing the Standards at the end of June of 2025, Tr. 56:4-9 (Samuelson), Zillow has warned agents and suppressed listings from multiple brokerages,

including Compass, Howard Hanna, Real, Side Brokerage, and Vanguard Properties. Tr. 58:9-16 (Samuelson). The Standards "apply to all brokerages, all agents, all listings regardless of who they are" and are objectively applied "on a listing-by-listing basis." Tr. 53:12-14, 58:11-13, 59:3-61:25 (Samuelson); *compare* PX155, PX156, *with* PX157.

Zillow's Standards have been effective: since implementing the Standards, Zillow is "not seeing a bunch of large brokers now launching new [PLNs]." Tr. 62:2-7 (Samuelson); *see also* Tr. 218:4-9 (Hofmann); Tr. 527:10-13 (Aron). "[B]y suppressing a small number of listings, [Zillow] ha[s] seen more formerly private listings come onto the market. The net effect is actually more listings; not fewer." Tr. 110:2-4 (Samuelson); *see also* Tr. 64:24-65:4 (Samuelson).

**E.      MLSs Change Their Rules and Zillow Responds with Zillow Preview, Further Increasing Transparency**

Around the same time Zillow announced its Standards, MLSs around the country began relaxing their rules to "allow[] for longer premarketing periods" and Zillow created Zillow Preview in response to these changes. Tr. 115:18-23, 155:8-17 (Samuelson). Zillow Preview is a premarket product that is more public and more transparent than PLNs. Tr. 209:19-25 (Hofmann).

Zillow Preview allows "an agent [to] enter the information about the Preview listing" using Zillow's add/edit module. Tr. 67:17-22 (Samuelson). Zillow also has "a distribution mechanism" for Preview listings,[2] including to the websites of the listing broker, any related national franchise, and Realtor.com. Tr. 66:21-67:6, 67:23-25 (Samuelson); PX470. Zillow Preview thus directly competes with MRED's PLN and Compass's Phase 1 PLN to be the platform where agents first enter and premarket their listings. PX110 ¶¶51, 71; Tr. 345:4-346:1 (Reffkin); PX044 at 1.

---

[2] Zillow has "had this distribution technology for a number of years," which Zillow provides to more than 150 MLSs around the country to use to distribute their IDX and VOW feeds, and which Zillow licenses to some large MLS software vendors for their databases. Tr. 68:3-9 (Samuelson).

Once a Zillow Preview listing is live, "a buyer consumer can do one of two actions. They can contact the listing agent. In that scenario, the listing agent meets that consumer for free. So [Zillow] do[es]n't get paid for that. To the extent a buyer consumer looks to preschedule a tour, they get connected with one of [Zillow's] premier agents. And to the extent the buyer consumer then transacts with that real estate agent, [Zillow] take[s] a percentage of the commission" and pays a portion of that back to the original Preview listing agent. Tr. 210:16-211:3 (Hofmann). Over time, Zillow Preview will impact revenues in other parts of Zillow's business. For example, demand from Preview will likely increase the number of loans that Zillow originates and increase sales of Zillow Showcase, an innovative product which enhances listings with "rich media, 3D scans, [and] an integrated floor plan." Tr. 213:5-20 (Hofmann).

Zillow Preview complements the Standards by "incentivizing sellers and agents on the listing platform to choose transparency . . . by offering enhanced visibility, agent compensation, and broader exposure." PX110 ¶139; *see also* PX163 ¶49. The Standards thus "encourage broad dissemination of listings, and Zillow Preview rewards new-to-market listings that buyers choose to broadly disseminate," PX110 ¶139, posing a direct threat to Defendants' competing PLNs.

Although Zillow Preview is "only about a hundred days old[,]" it is an early success. Tr. 70:24 (Samuelson). Zillow has had "over a thousand brokerages who have already signed up for it, and thousands of listings have been entered into Zillow Preview." Tr. 70:24-71:2 (Samuelson); *accord* Tr. 211:4-9 (Hofmann). Ultimately, as Zillow Preview's success grows, listings "become[] more transparent . . . to the broader market." Tr. 211:17-22 (Hofmann).

## F.    MRED Is the Monopolist MLS in Chicagoland

MRED is the sole MLS in Chicagoland. Tr. 43:13-24 (Samuelson), 336:18-19 (Reffkin), 383:22-24 (Wu); PX110 ¶4. MRED's core function is to aggregate and distribute real estate listings created by agents and brokers to other market participants through IDX and VOW feeds ("MRED

Listing Feeds"). Tr. 194:4-8 (Haran); PX110 ¶¶43-44. MRED primarily serves Chicagoland and the surrounding region, including northern Illinois, southern Wisconsin, northwest Indiana, and a portion of Iowa. Tr. 43:6-10 (Samuelson); PX442 ¶¶7, 10-13. Although MRED has, throughout its history, accepted outlier listings located across the United States, the vast majority of MRED's active listings (99.98%) are within its primary service area. PX442 ¶¶7, 11; Tr. 165:10-14 (Haran); *see also* PX043 at 3. MRED is one of the largest MLSs in the country with more than 40,000 members. Tr. 42:23-43:5, 44:2-5 (Samuelson), 307:6-10 (Reffkin); PX163 ¶12.

MRED holds monopoly power in the market for Chicagoland Residential Real Estate Listing Creation and Distribution. "Almost all" residential real property listings in Chicagoland— over 98%—are "created and distributed through MRED." Tr. 43:15-18 (Samuelson); PX110 ¶¶104, 121. Any entity that wishes to compete effectively in Chicagoland cannot do so without access to MRED's Listing Feeds. PX110 ¶122.

MRED generates revenue largely through monthly subscription fees that participants pay to real estate associations in exchange for access to MRED Listing Feeds. Jensen Dep. Tr. 48:8-14, 49:8-50:15. MRED distributes its Listing Feeds to participants through its third-party data delivery partner MLS Grid, subject to "a series of [] rules" maintained by MLS Grid that govern the display of listings. Tr. 44:8-18 (Samuelson). MRED was a founding member of MLS Grid and MRED's CEO Rebecca Jensen chairs its Board of Managers. Tr. 44:19-45:1 (Samuelson). Together, MRED and MLS Grid enforce the rules governing MRED's Listing Feeds. Tr. 194:18-24 (Haran). Rule violations can result in sanctions up to and including fines or Listing Feeds suspension or termination. Haran Dep. Tr. 127:1-14; *see also* PX043 at 31 (MRED issued six fines in 2025). Until this year, MRED had never before suspended any participant's Listing Feeds access as a penalty for violating MLS Grid rules. Tr. 196:4-10 (Haran).

### G.      Compass Is the Dominant Brokerage in Chicagoland

Compass is the largest real estate brokerage and franchisor in the country. Tr. 45:12-14 (Samuelson); PX477 ¶32. Compass has grown significantly in recent years, fueled in large part by acquisitions including its acquisition of Anywhere Real Estate in early 2026.[3] Tr. 45:4-21 (Samuelson); Reffkin Dep. Tr. 9:1-12, 112:19-25; PX110 ¶5. Compass dominates Chicagoland Brokerage Services, holding a 27.48% market share by transaction count and 35.75% by sales volume. PX478 ¶13(a); PX110 ¶5. Three Compass-affiliated brokers serve on MRED's Board of Managers. PX043 at 13; Tr. 249:9-11, 249:21-250:12 (Broude).

### H.      MRED and Compass Operate PLNs and Compete with Zillow

Both MRED and Compass are vocal proponents of PLNs. MRED operates a PLN in Chicagoland, where over 96% of PLN listings are exclusive to it. PX163 ¶34; PX478 ¶9. In MRED's PLN, private listings are placed in the MLS system such that "[o]ther agents within MRED can see th[e] listing, but typically that listing is not available for display on other brokers' websites" or to the public, including on Zillow. Tr. 47:25-48:4 (Samuelson), 197:4-10 (Haran).

Compass operates its own PLN for creating and distributing listings as part of its "3-Phased Marketing" strategy. Tr. 344:24-346:1 (Reffkin), 46:18-47:2 (Samuelson); PX502 at 2-4. Compass's PLN contains Phase 1 "Private Exclusive" listings, which are hidden behind a registration wall and available only to Compass agents and registered users. PX163 ¶33; Tr. 70:9-14 (Samuelson), 327:24-328:15 (Reffkin). In Phase 2, Compass "Coming Soon" listings "are available without any registration" on the Compass and Redfin websites. Tr. 47:4-7, 96:22-97:1

---

[3] Compass's acquisition of Anywhere Real Estate is currently under investigation by the antitrust bureau of the New York attorney general's office. Nicole Friedman & Corinne Ramey, *Real-Estate Giant Compass Under Antitrust Investigation in New York*, WALL ST. J. (June 3, 2026), https://www.wsj.com/real-estate/real-estate-giant-compass-under-antitrust-investigation-in-new-york-29bd0e74?mod=Searchresults&pos=1&page=1.

(Samuelson); PX499 at 2-3. If the property fails to sell in Phase 1 or Phase 2—as is the case with 94% of Compass listings, Tr. 330:13-15 (Reffkin)—then Compass places the property in Phase 3, meaning "the listing is [available] in the MLS and also available through [] listing feeds. . . and, therefore, appears on other websites" including Zillow's. Tr. 47:8-10 (Samuelson).

Defendants view Zillow's Standards as a threat to their PLNs and have resisted Zillow's enforcement of the Standards from the outset. In early 2025, MRED asked Zillow not to implement the Standards in MRED's territory, Tr. 448:2-18 (Jensen), and soon thereafter, Compass filed a federal antitrust lawsuit seeking to block the Standards nationwide. *Compass, Inc. v. Zillow, Inc.*, No. 25-cv-05201-JAV (S.D.N.Y.), Dkts. 1, 23. The court denied Compass's preliminary injunction motion on February 6, 2026, leading Compass to dismiss its meritless lawsuit. *Id.*, Dkts. 184, 191.

Zillow Preview, too, is a direct competitive threat to Defendants' PLNs. Tr. 375:20-376:4 (Wu), 70:7-14 (Samuelson). Premarketing products such as Zillow Preview and Defendants' PLNs all fight for "new listings as soon as they hit the market or even before they hit the market." Tr. 70:9-10 (Samuelson), 211:15-212:24 (Hofmann). Zillow Preview also makes premarketing more transparent. PX110 ¶¶64-67; Tr. 212:18-24 (Hofmann). Thus, Zillow Preview "is the antidote" to Defendants' exclusivity strategies because it makes premarket listings broadly available to anyone on the internet. Tr. 211:21-24 (Hofmann); *see also* PX453; PX468.

## I.     MRED and Compass Conspire to Block Zillow's Standards and Cut Zillow's Feeds

To insulate themselves from Zillow's competitive threat, Defendants worked hand-in-hand to force Zillow to display unwanted private listings and abandon its pro-consumer Standards. Defendants' scheme involved three steps. First, MRED, working alongside Compass, revised its MLS Grid IDX and VOW display rules ("Revised Rules") to target Zillow's Standards and establish a pretext for terminating Zillow's access to MRED Listing Feeds. Second, Defendants terminated or discouraged Zillow's direct broker feeds, neutering Zillow's only alternative source

of Chicagoland listings. Third, Defendants formed an alliance through which Compass laundered its failed Private Exclusive listings through MRED, triggering an ostensible violation of MRED's Revised Rules to justify MRED's termination of Zillow's MRED Listing Feeds.

### 1. MRED and Compass Revise MRED's Rules to Target Zillow's Standards

Soon after Zillow announced its Standards, MRED and Compass began discussing how to block them. During a panel at an April 15, 2025 industry conference, Reffkin commented that the Standards "make [the] MRED [PLN] impossible," PX166 ¶8, and Ms. Jensen responded that she believed a 2008 settlement between the Department of Justice (DOJ) and the National Association of Realtors (NAR) prohibited Zillow from enforcing them. Tr. 465:22-466:8 (Jensen). Two days later, Ms. Jensen emailed Mr. Reffkin a copy of the NAR settlement. PX058; PX059.

MRED and Compass's efforts to block Zillow's Standards accelerated in late 2025. On September 9, Compass Regional Vice President Fran Broude introduced MRED Chief Technology Officer Chris Haran to Compass's Ryan Jensen. PX005 at 4; Tr. 168:19-22 (Haran). Haran and Mr. Jensen then had a call, after which Mr. Jensen asked if Haran "could share more information around objective criteria and how MRED defines what can [and] cannot be excluded from IDX feeds." PX084 at 1-4. By "objective criteria," Mr. Jensen was referencing MLS Grid's IDX and VOW rules governing filtering of MRED's Listing Feeds. *See* PX040, PX404; *see also* Tr. 438:6-17 (Ms. Jensen claiming MRED's "objective criteria" rules derive from the NAR settlement).

Shortly thereafter, on October 1, 2025, Reffkin sent an email to multiple MLSs urging them to "discipline" Zillow by leveraging their objective criteria rules to terminate Zillow's IDX and VOW access if the Standards were not "immediately repealed." PX068 at 1. Reffkin's email was forwarded to Haran on October 9, 2025, *id.*, and the same day Mr. Jensen requested a call with Haran to discuss a "time sensitive" matter, PX085 at 2. According to Reffkin, it was Mr. Jensen who drafted the October 1 email, Tr. 346:5-14 (Reffkin), underscoring Mr. Jensen's central role

in coordinating with MRED and other MLSs to discipline Zillow for enforcing its Standards. On October 15, Haran told Mr. Jensen that MRED "will be covering [its Revised Rules] with our board tomorrow and releasing via MLS Grid in the next two weeks." PX088 at 1. The same day, Haran notified Zillow of forthcoming "revisions" to its IDX and VOW rules and suggested that Zillow's Standards were noncompliant. PX090 at 2; *see also* Tr. 72:2-20 (Samuelson). The Revised Rules became effective on October 29, 2025, and remain in effect today. PX041; Tr. 73:24-25 (Samuelson).

Prior to the revision, MRED's rules permitted Zillow and other feed recipients to filter listings based on "objective criteria, including but not limited to, factors such as geography or location [], list price, type of property, or type of listing." PX070 at 3; Tr. 254:7-11 (Broude); *see also* PX040; PX404; PX083 ("As long as [Zillow] disclose[s], I believe they are within our rules"); Haran Dep. Tr. 39:5-19. Now, the Revised Rules include a new MRED-specific provision that states: "Exclusion criteria may not include, directly or indirectly, the identity of any Participant, brokerage firm, subscriber, licensee, or representative." PX070 at 3; *see also* Tr. 168:3-8 (Haran); PX164; PX165. This language says nothing about whether feed recipients may exclude listings based on the way the property was marketed. *See* Tr. 166:21-167:5 (Haran). Nevertheless, MRED has maintained that Zillow's Standards violate the Revised Rules because the Standards supposedly discriminate based on brokerage. *See* Haran Dep. Tr. 23:17-24:7; *see also* PX163 ¶60.

After MRED informed Zillow of the Revised Rules, Zillow made clear its belief that the Standards comply because Zillow filters listings based on a permissible objective criterion: how the property was marketed. PX090 at 1; Tr. 74:1-10 (Samuelson). Zillow does not exclude listings based on prohibited criteria such as brokerage identity, and instead applies the Standards uniformly across all brokerages and agents. Tr. 53:12-14 (Samuelson). Zillow voiced its concerns in multiple

-12-

conversations with MRED CEO Rebecca Jensen, only to be repeatedly rebuffed. PX166 ¶¶9-10. Although Zillow tried to find a middle ground where it could implement the Standards in MRED's territory without offending MRED's interpretation of the Revised Rules, Ms. Jensen rejected Zillow's proposals and threatened to cut Zillow's Listing Feeds access if it took steps to enforce the Standards. Tr. 74:11-24 (Samuelson); PX166 ¶¶9-10; PX163 ¶63. In light of the Revised Rules and MRED's threats to terminate Zillow's Listing Feeds access, Zillow began taking steps to obtain Chicagoland listings from an alternate source: directly from brokers. PX163 ¶¶61-66.

### 2. MRED and Compass Block Zillow's Access to Direct Broker Feeds

MRED and Compass both recognized that the conspiracy to boycott Zillow's access to the Listing Feeds would not work if Zillow had an alternate source of Chicagoland listings. PX250 at 4; PX514 at 2 (without Compass's direct feeds, Zillow is "no longer a credible search option in Chicagoland"). MRED recognized Zillow's access to direct broker feeds as a "threat." PX250 at 4; *see also* PX051 at 3; PX483 at 2. To neutralize that threat, Compass and MRED acted in parallel to eliminate or discourage brokerages from providing direct feeds to Zillow. PX163 ¶¶61-73.

In late 2025, MRED repeatedly warned its members of Zillow's efforts to obtain direct broker feeds and falsely implied that MRED did not know why Zillow needed such feeds despite MRED's repeated threats to terminate Zillow's Listing Feeds. PX399; PX400; PX401; Tr. 77:16-78:19, 79:13-80:21 (Samuelson). Compass also directed termination of several Compass and affiliates' direct broker feed agreements with Zillow. PX007 (Compass Illinois); PX406 (Coldwell Banker); PX407 (Jameson Sotheby's); PX072 at 1 ("[O]ur understanding is that Robert requested we stop the automated feed"); PX008 at 3 ("Robert/Ashton has directed us to cancel our direct broker feed to Zillow."); Tr. 245:9-246:11 (Broude). And on May 8, 2026, Compass cancelled all broker feed authorization agreements nationwide with Zillow, for all Compass affiliates. PX068; PX073; Tr. 346:5-348:5, 349:16-350:8, 356:10-357:2 (Reffkin). Facing complaints from agents

-13-

concerned that their listings would not appear on Zillow, Compass doubled down, reiterating that "Compass will **not** provide Zillow with a direct listing feed" and mandating that "Compass agents **cannot** directly submit for-sale listings to Zillow." PX216 at 1; Tr. 248:8-249:1 (Broude).

> ### 3. MRED and Compass Launch an Alliance to Launder Suppressed Compass Listings and Block Zillow's Standards Nationwide

In February 2026, Reffkin and Ms. Jensen began discussing "Project Derby"—an alliance through which Compass would add its failed Private Exclusive listings from far flung states into MRED ("Alliance"). PX047; PX074; PX014. Although billed as a "nationwide expansion" of MRED, the keystone of this Alliance was MRED's promise to leverage its Revised Rules to "protect" Compass listings from being suppressed under Zillow's Standards. PX075 at 1; *see also* Reffkin Dep. Tr. 178:18-21 ("[M]y hope was . . . that agents that were being banned, if they joined MRED, that they wouldn't be banned anymore."); PX016 at 1 ("Will this protect active [Private Exclusives] that aren't in MLS yet? That's what we hope and that is the intent."); PX019 at 1, 3; PX190. Compass chose to partner with MRED because its Revised Rules could prevent Zillow from filtering Private Exclusives across the country under threat of Listing Feeds termination in Chicagoland. PX016 at 1 ("[I]f Zillow bans anything, they could lose their feed to Chicagoland"); PX408 at 1. Ms. Jensen similarly acknowledged days after announcing the Alliance that "listing with MRED should keep [Compass agents'] listings from being banned on Zillow." PX496 at 2.

Defendants' chaotic implementation of Project Derby confirms the expansion was a pretext. In their April 24 press release, Defendants touted that Compass would "[g]ive[] a data feed of [a]ll of its [l]istings to MRED," and "subsidiz[e] some of the cost of MRED access to the first 100,000 [Compass] agents to join"—but none of those promises have come true. PX052 at 3, 5; Tr. 178:18-179:5 (Haran), 353:14-25 (Reffkin); Jensen Dep. Tr. 114:2-4; PX013 at 1. Instead, April 24 was "an all day firedrill," as Defendants had left brokers and realtor associations in the dark on how

-14-

new subscribers in faraway states could join MRED. PX245 at 2; *see also* PX269.

Early on April 24, Compass rushed to inject "banned" listings (*i.e.*, Private Exclusives that had been filtered under Zillow's Standards) into MRED. PX053 at 3; Tr. 480:19-482:5 (Jensen); *see also* PX020 at 1 (Compass "push[ed]" to onboard "agents who have 2 warnings" from Zillow); PX192 at 2. Compass and MRED senior executives closely coordinated to make that happen, and Reffkin, Ms. Jensen, and Haran were each directly involved. *See* PX053 (Reffkin to Ms. Jensen: "Rebecca – I'm connecting you to Neda [Nevab] who is the president of Compass. She is going to help a few dozen compass agents that a [sic] have been banned to sign up today."); PX345 (Ms. Jensen coordinating with Nevab); PX490 at 1-3 (Haran explaining to Compass that non-compliance with MRED objective criteria rule could result in "suspen[sion of] data feed access").

Within two weeks, Compass entered at least nine formerly Private Exclusive out-of-area listings—located in Florida, Georgia, and California—into MRED, all of which had been filtered by Zillow for violating the Standards. PX163 ¶¶76-78; PX093 at 4-7; PX094 at 2-6. Documents confirm Defendants' intent to use these listings to induce a violation of the Revised Rules and then "test" Zillow's response. PX078 at 3; PX021 at 1 ("We've uploaded about 6 previously banned listings from FL and GA and they are not feeding in to Zillow at this time so we are waiting to see what Zillow does."). Then at Compass's urging, MRED and MLS Grid reported the purported violations to Zillow, issued notice to cure, PX163 ¶¶76-78; PX093 at 5; PX094 at 2-3; PX402 at 2; PX403 at 2-3, and warned of suspension of Zillow's Listing Feeds access, PX402 at 3.

Meanwhile, Compass began preparing for MRED's termination of the Listing Feeds. Six days before Zillow first received notice to cure (PX402 at 2), Compass began scheduling a series of planning meetings on April 30, May 5 and May 8 for MRED to terminate Zillow's Listing Feeds. PX023; PX024; PX025. Compass prepared talking points and marketing materials to capitalize on

Zillow's loss of listings. *See* PX212; PX513; PX205; PX206; Tr. 274:3-9, 274:19-23 (Broude).

The conspiracy culminated on May 20, when MRED terminated Zillow's longstanding access to MRED's Listing Feeds. Tr. 88:20-22 (Samuelson). MRED admitted that it never even considered the option of issuing Zillow a fine and proceeded straight to Listing Feeds suspension. Haran Dep. Tr. 196:11-15. As a result, Zillow instantly lost over 30,000 listings in Chicagoland, only 45% of which it was able to recover through direct broker feeds. PX480 ¶¶8-9; Tr. 88:20-89:6 (Samuelson). Compass immediately deployed its pre-prepared marketing materials, attempting to claim its spoils and divert consumers from Zillow to Compass. PX434; Tr. 275:2-16 (Broude). The same day, Compass instructed its agents to stop inputting their listings into MRED because "we don't believe that entering your listings into MRED will offer additional protection for your listings that start as a Private Exclusive." PX220.

## J. Zillow Will Be Irreparably Harmed Absent an Injunction

Zillow will suffer irreparable harm without a preliminary injunction because Zillow will be faced with the impossible choice between enforcing its Standards outside MRED's traditional territory and thus losing access to MRED's Listing Feeds, or abandoning its Standards nationwide. Absent an injunction, Zillow likely "w[ould] los[e] access to the listings in Chicago." Tr. 214:5 (Hofmann), 90:2-6 (Samuelson). Although Zillow could recover some of those listings through direct broker feeds, it is "limited in how many . . . [it] can end up recovering, . . . because Compass's share in Chicago is around 30 percent, and they've been quite clear that they are not going to give [Zillow] a feed of those listings." Tr. 214:5-9 (Hofmann). Because Zillow could not get back to even 80% coverage via direct broker feeds, Zillow "would very rapidly lose [its] Chicago audience. Th[is] would have . . . lasting impact on [Zillow's] brand," Tr. 77:3-11, 90:2-6 (Samuelson), that starts a "downward spiral." Tr. 216:11-13 (Hofmann); Tr. 527:10-528:7 (Aron); PX450 ¶¶171-72. Without listings, Zillow's "audience collapses," Tr. 91:17-18 (Samuelson),

-16-

harming Zillow's products across the board, Tr. 91:1-21 (Samuelson), 214:25-216:24 (Hofmann). Ultimately, that harm to Zillow cannot be calculated because of ongoing feedback effects that reinforce the harm and break the foundation for investment in new products. Tr. 399:10-22 (Wu).

Even if Zillow does not lose Listing Feeds access, Zillow would still suffer irreparable harm if it cannot enforce its Standards nationwide. In that scenario, Zillow "would see an increase in private listings" because "other brokers who don't have PLNs today would go establish PLNs resulting in more and more listings being taken off the market . . . [and] not appearing on Zillow." Tr. 91:22-92:5 (Samuelson), 217:24-218:19 (Hofmann). Consumers would no longer "see [Zillow as having] a comprehensive set of listings." Tr. 218:18-19 (Hofmann). It would be "impossible" to attach a specific dollar value to that harm to Zillow. Tr. 92:8 (Samuelson), 219:15-25 (Hofmann).

## LEGAL STANDARD

To obtain a preliminary injunction, Zillow "must show that it is likely to succeed on the merits, and that traditional legal remedies would be inadequate, such that it would suffer irreparable harm without the injunction." *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 539 (7th Cir. 2021). The Court then weighs the harm of denying the injunction against any harm to the Defendants of granting it, using a sliding scale, and also considers the public interest. *Id.*

## ARGUMENT

### A. Zillow Has a Strong Likelihood of Success on the Merits

#### 1. Zillow Is Likely to Succeed on Its Section 1 Claim

To succeed on its Section 1 group boycott claim, Zillow must show that MRED and Compass "(1) entered into an agreement that (2) unreasonably restrains trade in the relevant market and (3) caused the plaintiff an antitrust injury." *Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*, 29 F.4th 337, 349 (7th Cir. 2022). "[T]he ultimate question is whether the evidence considered as a whole and in combination with the economic evidence is sufficient" to find an

-17-

unlawful agreement. *In re Dealer Mgmt. Sys. Antitrust Litig.*, 680 F. Supp. 3d 919, 963 (N.D. Ill. 2023) (quotation omitted). Zillow need not show "[p]articipation by each conspirator in every detail in the execution of the conspiracy . . . for each conspirator may be performing different tasks to bring about the desired result." *Moehrl v. Nat'l Ass'n of Realtors*, 492 F. Supp. 3d 768, 780 (N.D. Ill. 2020) (quotation omitted).

### i. Expedited Discovery Amply Demonstrates an Unlawful Agreement

Zillow may show the agreement through either direct or circumstantial evidence. *See In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 629 (7th Cir. 2010). Direct evidence is "explicit and requires no inferences to establish the proposition or conclusion being asserted." *Tichy v. Hyatt Hotels Corp.*, 376 F. Supp. 3d 821, 834 (N.D. Ill. 2019). Circumstantial evidence requires "alleg[ing] (1) parallel conduct and (2) additional factual circumstances, or 'plus factors,' indicating an agreement." *Id*.

***Direct evidence***. The MRED-Compass Alliance is direct evidence of an agreement to harm Zillow. Indeed, the jointly written Alliance press release admits that Defendants' goal was to block Zillow's enforcement of the Standards. *See* PX075 at 1 (promising to "protect and safeguard agents who participate in [MRED's] PLN from being banned or penalized"); PX092 at 2; Tr. 177:2-178:3 (Haran); PX488; Tr. 479:3-480:18 (Jensen); Reffkin Dep. Tr. 151:19-152:16. The conspiracy's anticompetitive goals were no secret within Defendants' organizations. Compass employees understood that the primary purpose of the Alliance was to leverage MRED's Revised Rules to coerce Zillow to abandon the Standards nationwide under pain of Listing Feeds termination. *See* PX019 at 4 ("If an agent opts into [MRED], MRED will extend their coverage and enforcement against these bans to that agent, regardless of where in the country they are."); PX408 at 1. With Zillow unable to enforce the Standards anywhere, it would be forced to display failed Compass Private Exclusive listings, contrary to Zillow's pro-transparency mission. *See* PX016 at 1 ("Will

this protect active [Private Exclusives] that aren't in the MLS yet? That's what we hope and that is the intent."); PX190. MRED's CEO also shared this understanding. PX496 at 2.

***Circumstantial evidence***. Zillow also has overwhelming circumstantial evidence of an agreement—*i.e.*, parallel conduct and plus factors. *Tichy*, 376 F. Supp. 3d at 834. "Relevant plus factors . . . include whether the parallel acts were against the economic self-interest of the parties, the market structure of the relevant markets, and . . . opportunities to collude." *Tiz, Inc. v. S. Glazer's Wine & Spirits, LLC*, 2024 WL 2785142, at *17 (N.D. Ill. May 30, 2024).

Parallel Conduct. MRED and Compass engaged in at least two distinct strands of parallel conduct to harm Zillow and competition in the Listing Creation and Distribution market.

First, MRED and Compass waged a campaign to terminate Zillow's Listing Feeds in retaliation for the Standards. In October 2025, Reffkin emailed multiple MLSs urging them to terminate Zillow's listing feeds. PX006. The same day that Reffkin's email was forwarded to MRED, Haran and Mr. Jensen met to discuss a "time sensitive" matter. PX085 at 2. Days later, Haran sent Mr. Jensen a redline of the Revised Rules, PX088, that would create the pretext for terminating Zillow's Listing Feeds access. With the Revised Rules in place, MRED continued to threaten Zillow with termination of the MRED Listing Feeds. Tr. 464:5-466:8 (Jensen). Compass has since urged other MLSs to follow MRED's model and retaliate against Zillow's Standards, PX070 (Bright MLS); PX071 (Hive MLS); PX235 (Doorify); PX237 (MLS PIN).

Second, Defendants worked in tandem to eliminate Zillow's access to direct broker feeds, Zillow's only alternate source of Chicagoland listings. MRED recognized that Zillow's ability to obtain direct broker feeds was a "[t]hreat[]" to MRED's dominance, PX250 at 4, PX051 at 3, and warned its members against providing Zillow with direct broker feeds, PX399, PX400, PX401. In parallel, Compass and its affiliates canceled their pre-existing direct feed agreements with Zillow

nationwide, which Compass viewed as a fatal blow against Zillow. PX514 at 2 ("Even if Zillow obtains some direct feeds, the fact that it will not have listings from Compass . . . effectively means it is no longer a credible search option in Chicagoland."); *see also* PX007; PX406; PX407; PX068.

Actions Against Economic Self-Interest. The termination of Zillow's MRED Listing Feeds was contrary to each Defendant's economic self-interest. As to MRED, "MLSs generally benefit from Zillow's platform" to expand the reach of its members' listings because Zillow "is the most visited real estate portal." PX110 ¶¶75-76. Following the feed cut, MRED's members complained that "Zillow is a huge tool" for selling their clients' properties, PX258 at 2, and were "extremely upset and concerned" about MRED cutting off Zillow's Listing Feeds, PX288 at 2. MRED's conduct thus makes sense only if "[it] believed that such a strategy would or could prevent Zillow from becoming a rival platform." PX110 ¶76.

As to Compass, many of its agents are Zillow Flex and Zillow Premier partners, and some such agents depend on Zillow for "about 40-50% of their business." PX027 at 2. Compass recognized those agents would be harmed by a feed cut. PX027 at 1-3; PX193; PX208 at 2 ("It's very possible that we'll lose some agents" from feed termination). Similarly, Compass canceling its direct broker feed agreements with Zillow was against its economic self-interest. Compass agents use Zillow to advertise both for-sale and rental listings, but unlike for-sale listings, rental listings are not distributed through MRED's IDX and VOW feeds. PX184 at 1. By terminating its direct feeds with Zillow, Compass eliminated the only data feed distributing its rental listings to Zillow and forced its own agents to manually enter rental listings into Zillow. *Id.* Sales managers requested that Compass "turn the feed back on," PX183 at 1, but Compass rejected their pleas, PX215. In all, its conduct makes sense only if "Compass believed that such a strategy would or could prevent Zillow from developing a strong listing platform that could compete strongly against

-20-

its PLN." PX110 ¶76.

Highly Concentrated Market. A high collective market share "facilitates collusion" and "constitutes supporting evidence of collusion." *In re Text Messaging Antitrust Litig.*, 630 F.3d at 627-28. Here, the Chicagoland Listing Creation and Distribution market is highly concentrated. As of May 7, 2026, 98.2% of all Chicagoland listings were created and distributed via MRED's platform. PX110 ¶¶105-06. Reffkin admits MRED's dominance. Tr. 335:19-336:19 (Reffkin).

High Volume of Communications. Compass and MRED were in "constant communication" about Zillow throughout the conspiracy, further evidencing an unlawful agreement. *Kleen Prods. LLC v. Int'l Paper*, 306 F.R.D. 585, 597 (N.D. Ill. 2015), *aff'd*, 831 F.3d 919 (7th Cir. 2016).

- In April 2025, following their appearances on a panel at a conference in which Ms. Jensen claimed that Zillow's Standards violated the 2008 DOJ/NAR VOW settlement, Ms. Jensen emailed a copy of the settlement to Reffkin. PX058; PX059.

- In September 2025, Broude introduced Haran to Mr. Jensen, who later discussed MRED's objective criteria rule. PX084. Following that call, Mr. Jensen asked Haran if he "could share more information around objective criteria and how MRED defines what can / cannot be excluded from IDX feeds." *Id.* at 1. Haran and Mr. Jensen communicated multiple times in later months regarding "time sensitive," PX085 at 2, PX101 at 2, and "[u]rgent," PX102 at 1, matters, but now Haran conveniently cannot recall what they discussed, Tr. 170:22-171:13, 174:4-175:16 (Haran).

- Compass sued Zillow and sought a preliminary injunction to block Zillow from enforcing the Standards nationwide. *Compass, Inc. v. Zillow, Inc.*, No. 25-cv-05201-JAV, (S.D.N.Y.), Dkts. 1, 24. During the hearing on Compass's motion, Reffkin sent Ms. Jensen Zillow documents produced in that litigation. PX061 at 2. The next day, Ms. Jensen asked for permission to forward a document to the Illinois Attorney General and to reporters. PX062 at 2. Reffkin agreed and separately asked another employee to send Jensen "all the documents" related to MRED, MLSs, lobbying, or Illinois. PX063 at 2.

- On March 17, 2026, Reffkin texted Ms. Jensen about the launch of Zillow Preview—a mutual competitive threat. PX064 at 2. A day later, Reffkin and Ms. Jensen texted about Zillow's continued enforcement of its Standards. PX065 at 2. "MRED doesn't have plans to comply," Jensen assured Reffkin. *Id.*

- In February and April 2026, Reffkin and Ms. Jensen texted about lobbying the Illinois legislature to defeat a bill that would have restricted PLNs, celebrating that "the bill in IL legislature is dead for the year." PX067 at 2; PX328. Reffkin and Ms. Jensen also jointly commissioned anti-Zillow editorials. PX046 at 7.

-21-

- MRED and Compass were in constant contact in the weeks preceding MRED's termination of Zillow's Listing Feeds. Reffkin requested an early morning phone call on April 30, PX080 at 2. Reffkin and Ms. Jensen set up another call on May 14. PX331 at 2. Although Ms. Jensen offered vivid recollections of her conversations with Zillow over a year ago, Tr. 443:20-447:14, 449:1-8, 452:4-466:8 (Jensen), she has no recollection of the subject matter of her May 2026 calls with Reffkin, Tr. 483:1-484:7, 485:3-14 (Jensen). Nor, for that matter, does Reffkin. Tr. 331:3-339:5 (Reffkin).

- Hours after Reffkin and Ms. Jensen spoke on April 30, PX080, Compass began a series of meetings to prepare for Zillow's future loss of the MRED Listing Feeds. PX023; PX024; PX025; *see also* PX204 at 2 (reserving time "the week of 5/14 (post board meeting) . . . for the 'emergency'").

Motive to Conspire. Defendants had a clear common motive to conspire: to protect their

PLNs from Zillow's pro-transparency Standards and the recent direct competitive threat posed by

Zillow Preview's listing creation and distribution capabilities. For Compass's PLN, Compass

agents and their sellers rely heavily on Zillow's platform and audience to market their properties,

since 94% of listings in Compass's 3-Phase Marketing program fail to sell in Phases 1 or 2. Tr.

330:13-15 (Reffkin). With Zillow continuing to enforce the Standards outside Chicagoland,

Compass became increasingly desperate to circumvent them and push its failed Private Exclusive

listings onto Zillow. For example, Reffkin advised Compass agents to falsely list their properties

as for-sale-by-owner or through agents at other brokerages. PX079 at 1. Reffkin persisted even

after Compass agents warned that these methods of skirting the Standards were "misleading to the

public" and "against MLS rules." PX239 at 1. Compass's unilateral methods of circumventing the

Standards were largely ineffective, however. PX239. In MRED, Compass saw an opportunity to

block Zillow's enforcement of the Standards nationwide that it had failed to achieve on its own.

MRED was similarly motivated by the desire to insulate its PLN from competition. MRED

correctly understood that its PLN directly competes with "broker-to-portal" offerings like Zillow

Preview and the Compass-Redfin deal, PX044 at 1, offerings which risk undermining its market

dominance. PX485 at 4. By conspiring with Compass on a purported national expansion and

injecting banned listings into MRED, MRED was able to kneecap a nascent and promising competitor, Zillow Preview, that threatened its monopoly. PX110 ¶80.

Opportunities to Collude. MRED and Compass had numerous opportunities to collude, including through the MRED Board of Managers, which include three Compass-affiliated representatives. *See* PX043 at 13; Tr. 249:9-250:13 (Broude).

### ii. Defendants' Agreement Is an Unreasonable Restraint

Defendants' scheme to coerce Zillow to abandon its Standards nationwide is an unreasonable restraint of trade, regardless of whether the per se or rule of reason framework applies.

***Per Se***. "Horizontal agreements among competitors, including group boycotts, [are] illegal *per se*." *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 936 (7th Cir. 2000). A group boycott is per se unlawful if "(1) the boycotting firm has cut off access to a supply, facility[,] or market necessary for the boycotted firm . . . to compete; (2) the boycotting firm possesses a 'dominant' position in the market . . . and (3) the boycott . . . cannot be justified by plausible arguments that it was designed to enhance overall efficiency." *Id.*

Importantly, plaintiffs do not have to prove a per se violation caused injury to competition—the injury is presumed. *Tri-Gen v. Int'l Union of Operating Eng'rs, Loc. 150, AFL-CIO*, 433 F.3d 1024, 1032 (7th Cir. 2006). While a per se violation still must affect a relevant market, the burden to provide a "specific definition of the relevant market" and "detailed market analysis" is reduced in the per se context. *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 337 (7th Cir. 2012); *id.* at 345 (requiring only the "rough contours of the relevant commercial market in which anticompetitive effects may be felt"); *Toys "R" Us*, 221 F.3d at 937 (foregoing "elaborate market analysis" once horizontal per se agreement was established). And "[o]f particular significance is the fact that concerted denials of access to a real estate multiple listing service, where members have agreed to pool and share their listings, have been held to constitute

-23-

a group boycott of the nonmember." *Nw. Real Est. Bd., Inc. v. Multiple Listing Serv. of N. Ill., Inc.*, 1991 WL 640147, at * 2 (N.D. Ill. Aug. 22, 1991).

Compass, MRED, and Zillow are horizontal competitors in the Listing Creation and Distribution market. PX110 ¶¶70-71. All three are in "a race to who can get the listing first, and that's why [Zillow] compete[s] directly with private listing networks." Tr. 70:9-14 (Samuelson). As Dr. Wu put it, "the threat facing an MLS is that because there's competition for new listings . . . agents may now choose not to put their newest listings on the MLS." Tr. 375:10-13. MRED's own documents confirm it. After the launch of Compass-Redfin deal and Zillow Preview, which each allow brokerages to send their premarket listings directly to portals, MRED twice identified "broker-to-portal" deals as competing with its PLN. PX485 at 3-4, PX044 at 1; PX483 at 2, 6. Such broker-to-portal deals threaten MRED's position "as the distribution layer for private listings." PX485 at 3-4. While Ms. Jensen denied competing with Zillow, Tr. 437:10-11, she offered no explanation for MRED's contemporaneous documents. Nor could Ms. Jensen explain what Zillow Preview specifically buys from or sells to MRED, as Zillow Preview is a separate platform from MRED to create and distribute listings. *See* Tr. 370:20-371:9 (Wu) (describing how Preview separately provides for creation and distribution of a new listing); PX497 at 2-3; PX447 at 1-3.

That new off-MLS listings platforms present competition to MLSs is well understood by both Compass and MRED. Indeed, Compass has challenged another MLS's rules as stifling competition from Compass against the MLS itself. PX109 ¶¶55-56 (identifying Compass's office exclusives as a "competitive threat" to another MLS because it reduces the number of listings on the MLS). Reffkin testified Compass Private Exclusives are "just a different version of MRED's [PLN]" and that Compass Phase 2 Coming Soons compete with Zillow. Tr. 344:18-19, 301:12-22 (Reffkin). He has also called Zillow a threat to MLSs like MRED. PX107 at 1. And MRED's PLN

-24-

was founded as a competitive response to off-MLS listings after agents were "questioning the value of the [MLS]" because they did not have the "entire inventory of homes." PX113 at 3.

Defendants used their dominance to cut off Zillow's listings, the essential input Zillow needs to compete. PX110 ¶¶126-28; Tr. 40:13-15 (Samuelson). Defendants have a stranglehold on the market for Listing Creation and Distribution: over 98% of all listings in Chicagoland are created and distributed only through MRED, PX110 ¶¶105-06, and 99.98% of private listings are controlled by MRED and Compass together, *id.* ¶¶108-09. "[T]he Seventh Circuit and several other courts have recognized that MLSs have market power" standing alone, *Moehrl*, 492 F. Supp. 3d at 782, and Compass only compounds that power.

MRED and Compass have no credible argument that their conspiracy enhances overall efficiency. Compass's documents demonstrate that it was on notice that terminating its direct feed to Zillow would increase costs for its agents by forcing them to manually enter their rental listings into Zillow. PX184. The same is true for MRED members forced to manually enter their listings into Zillow post-feed cut. The agreement between the two dominant competitors in a market to boycott a horizontal competitor is per se unlawful, *Toys "R" Us*, 221 F.3d at 936, particularly where, as here, they control the listing feed inputs necessary for Zillow to compete in the market.

***Rule of Reason***. Zillow is also highly likely to succeed under the rule of reason. Zillow must first show a substantial anticompetitive effect in a relevant market, Defendants must then offer a procompetitive rationale for the restraint, and, if they do, Zillow must demonstrate that Defendants' procompetitive efficiencies could be reasonably achieved through less anticompetitive means. *Ohio v. Am. Express Co.*, 585 U.S. 529, 541-42 (2018).

Zillow has adequately defined two relevant markets where Defendants have market power and anticompetitive effects occur—the Chicagoland markets for Listing Creation and Distribution

and Brokerage Services. Tr. 381:4-9 (Wu). Product markets are defined by "reasonable interchangeability of use." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962). Dr. Wu defined this market according to substitution by recognizing that "agents have a choice on where they can put their newest listing" between the competing Compass, Zillow, and MRED platforms. Tr. 402:23-403:3 (Wu). Dr. Wu also laid out a plan for a full economic analysis with the benefit of full discovery. Tr. 381:23-382:17 (Wu). Courts also look to "practical indicia" along with the "economic evidence." *Reifert v. S. Cent. Wis. MLS Corp.*, 450 F.3d 312, 320 (7th Cir. 2006). As discussed above, Defendants' documents show "industry or public recognition" of competition between MRED, Compass, and Zillow for listings. *Id.*; *see also* PX114 at 2. The "peculiar characteristics and uses," *Reifert*, 450 F.3d at 320, of such listing platforms are to create and distribute listings. Tr. 370:2-374:6 (Wu). With respect to the geographic market, the local nature of real estate and the Brokerage Services market are widely recognized, including by Compass itself. PX109 ¶¶77, 79; *Realcomp II, Ltd. v. F.T.C.*, 635 F.3d 815, 828 (6th Cir. 2011).

Defendants' scheme has clear anticompetitive effects. Anticompetitive effects include "reduced output, increased prices, or decreased quality in the relevant market." *Amex*, 585 U.S. at 542. Courts have recognized "significant competitive harms" when "a trade group like a multiple listing service . . . assumes the power to exclude other competitors from access to its pooled resources." *United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1370 (5th Cir. 1980). "[C]utting Zillow's listing feed would eliminate effective competition with MRED's and Compass's listing platforms and deter other participants from offering services, like Zillow's, based on increasing transparency and access." PX110 ¶131. "[W]ithout access to sufficient aggregated, up-to-date, and accurate listings information in the Chicagoland area, Zillow would become markedly less useful and trustworthy to prospective home buyers searching for homes on Zillow's sites." *Id.* ¶130. In

other words, MRED and Compass have unlawfully "exclude[d] a competitor of [theirs] so as to prevent the victim from competing against [them]." *Nw. Real Est. Bd.*, 1991 WL 640147, at * 1.

Defendants' boycott also blocks a critical input, degrades the quality of Zillow's platform, and exacerbates the proliferation of PLNs. *See Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 476 (7th Cir. 2020) (diminishing quality is an anticompetitive effect). Because the boycott cuts off Zillow's Chicagoland listings, including the newest and most valuable for-sale listings, agents and consumers will "no longer have the robust consumer-facing platform that has provided so many positive benefits to the real estate market generally." PX110 ¶¶21-22. "Zillow is a particularly important competitive constraint in this market" because Zillow Preview "is a new entrant with innovative services and is currently the only viable challenger to MRED and Compass in Chicagoland." *Id.* ¶132. MRED and Compass "cannot stifle nascent competition by entering into an agreement restraining trade." *Eli Lilly & Co. v. Zenith Goldline Pharms., Inc.*, 172 F. Supp. 2d 1060, 1075 (S.D. Ind. 2001).

The coerced end to Zillow's Standards nationwide would likewise cause anticompetitive effects in Chicagoland and nationwide. Dr. Wu explained that, because the Standards "are aimed at incentivizing home sellers to choose Zillow and to put their new listings on Zillow," Zillow's own "output will fall if it cannot enforce" them. Tr. 399:23-400:6 (Wu). *See Amex*, 585 U.S. at 542. Critically, output would also fall market-wide because of the "proliferation of PLNs," a "fragmented marketplace," and "more hidden inventory." Tr. 400:7-12 (Wu). Because some large brokerages have likely withheld launching a PLN based on Zillow's nationwide enforcement, Chicagoland would likely experience a greater proliferation than it has to date. Tr. 145:19-146:2 (Samuelson). PLN proliferation "raises search costs," Tr. 391:12 (Wu), a form of "increased prices" imposed on homebuyers that is an anticompetitive effect. *Amex*, 585 U.S. at 542.

There are no non-pretextual justifications for Defendants' conduct. Indeed, Defendants' documents show that Compass terminating Zillow's direct feeds increases costs by forcing agents (a) to market without access to Zillow's platform and audience, PX183; PX215; and (b) to enter their rental listings into Zillow manually, PX184. The same goes for MRED members whose listings went dark and then had to be manually entered back into Zillow. Defendants' conduct, in other words, raises their own costs and creates inefficiency. Nor is the conduct justified by any legitimate interest in expanding MRED nationally. Compass prioritized enrolling agents with suppressed listings into MRED. *See* PX053 at 3; PX245 at 2. And Compass applauded agents who had previously violated the Standards for submitting listings to MRED. *See* PX078 at 2. Most damning is Compass's about-face on the Alliance following Zillow's Listing Feeds termination. Compass agents were told on May 20 that because MRED "has suspended its listings feed from Zillow.com . . . we don't believe that entering your listings into MRED will offer additional protection for your listings that start as a Private Exclusive." PX220. Since the sole goal of the Alliance was to protect and restore Compass failed Private Exclusive listings to Zillow's website, entering those listings into MRED became unnecessary once Zillow's Listing Feeds had been cut.

Compass's promises in the April 24 press release to justify the Alliance each proved to be fabrications. Both Compass and MRED acknowledge that Compass has not given MRED a data feed of its listings, nor is there any "set timeline" for doing so. Tr. 178:22-179:8 (Haran); Tr. 350:11-351:11 (Reffkin). Although Compass promised to enroll 100,000 agents into MRED, there is no plan or goal to ensure agents continue to join, Tr. 350:9-12, 351:19-352:25 (Reffkin), and MRED's membership has remained stable throughout the year. Tr. 176:8-177:1 (Haran). Compass's promise to subsidize some of the cost of its agents joining MRED was also a fantasy. PX013 at 1; PX490 at 1-2; Tr. 262:8-264:25 (Broude). Indeed, Reffkin is not aware of any agent

-28-

having been subsidized to join MRED. Tr. 352:23-25 (Reffkin).

Nor are MRED's Revised Rules justified by any legitimate effort to increase the display of listings or protect competition. The Revised Rules do not require Zillow to display *any* listings, and feed recipients may exclude listings for myriad idiosyncratic reasons. Tr. 165:15-168:8 (Haran). Moreover, MRED's claim that the Revised Rules derive from a 2008 DOJ / NAR consent decree relating to VOW feeds is plainly pretextual. While Ms. Jensen purports to be an expert as to some portions of the consent decree, but not others, *compare* Tr. 438:3-442:22, 445:15-447:14, 454:11-455:14, 456:13-18, 461:2-462:12, *with* Tr. 473:12-477:6 (Jensen), that decree has long expired and is no longer in effect, Tr. 473:12-18 (Jensen). Nevertheless, the consent decree authorized VOW feed recipients to filter listings based on the form of compensation offered to the buyer's agent and an agent's membership in NAR, DX427 at 18 (subsection 5(h)); both features are completely inconsistent with MRED's complaints that Zillow's Standards exclude listings based on "business model" or brokerage or agent identity, Tr. 442:8-14, 463:16-21 (Jensen).

### iii. Defendants' Conduct Has Caused Antitrust Injury

"To state an antitrust injury, a plaintiff must allege an anticompetitive injury that flows from defendant's actions and that the antitrust laws were intended to prevent." *In re Dealer Mgmt. Sys. Antitrust Litig.*, 680 F. Supp. 3d at 972 (quotation omitted). *See Int'l Outsourcing Servs., LLC v. Blistex, Inc.*, 420 F. Supp. 2d 860, 865-66 (N.D. Ill. 2006) (threatened injury sufficient for injunction). Should the Court find a per se Section 1 violation, plaintiffs need not prove injury to competition—**the injury is presumed**. *Tri-Gen*, 433 F.3d at 1032.

Zillow has shown that MRED and Compass caused Zillow antitrust injury by conspiring to exclude it from the Listing Platforms and Brokerage Services markets in Chicagoland. Rendering a competitor unable to compete as effectively as it did prior to a boycott is cognizable antitrust injury. *In re Dealer Mgmt. Sys. Antitrust Litig.*, 680 F. Supp. 3d at 1009 (finding antitrust

injury where plaintiff delayed its entrance into two markets and lost business that it would have earned but for the boycott). Defendants' boycott has deprived Zillow of the ability to compete as effectively by denying it access to the "lifeblood" of its business—listings—under threat of eliminating the Standards nationwide or Zillow losing Chicagoland Listing Feeds. Tr. 40:13-15 (Samuelson); PX110 ¶20. Further, the boycott harms competition marketwide by "threatening to exclude and restricting the competitive constraints that Zillow and other pro-transparency platforms place on [Defendants]." PX110 ¶127. *See Viamedia*, 951 F.3d at 481-83 (antitrust injury found where Comcast's exclusionary conduct forced Viamedia from ad rep services market, harming competition). This is paradigmatic antitrust injury. *Tiz*, 2024 WL 2785142, at \*25.

### 2. Zillow Is Likely to Succeed on Its Section 2 Claim

A Section 2 claim has "two elements: (1) possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power." *Ploss v. Kraft Foods Grp., Inc.*, 197 F. Supp. 3d 1037, 1069 (N.D. Ill. 2016). A private plaintiff must also show antitrust injury. *Walter Kidde Portable Equip., Inc. v. Universal Sec. Instruments, Inc.*, 669 F. Supp. 2d 895, 899 (N.D. Ill. 2009); *see supra* § A.1.iii. Zillow is likely to succeed as to each element.

### i. MRED Is a Monopolist

A plaintiff may "prov[e] market power . . . by proving relevant . . . markets and by showing that the defendant's share exceeds whatever threshold is important for the practice in the case." *Toys "R" Us*, 221 F.3d at 937. The Supreme Court holds that a share of 87% of the relevant market "leaves no doubt" as to monopoly power. *United States v. Grinnell Corp.*, 384 U.S. 563, 571 (1966); *see MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1107 (7th Cir. 1983) (shares over 70-80% sufficient for monopoly power); *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 424 (2d Cir. 1945) (90% share "is enough to constitute a monopoly"). A high share is especially strong evidence of monopoly power when "possession of a dominant share . . . is

protected by entry barriers." *United States v. Microsoft Corp.*, 253 F.3d 34, 51, 55 (D.C. Cir. 2001).

The evidence of MRED's monopoly power is overwhelming and undisputed. Dr. Wu calculated that MRED has "98 percent of the listings in Chicagoland," and Dr. Aron did not offer any competing market share calculation. Tr. 383:23-24, 533:12-15 (Wu). Moreover, Dr. Wu found that it is "really hard" for a new entrant to "overcome the scale and the network effects [it] really need[s] . . . to compete against the incumbent MLS," and that these high barriers to entry are why "we mostly see only one MLS in an area." Tr. 384:6-7, 395:21-24 (Wu); *Realcomp II*, 635 F.3d at 829 (recognizing network effects for MLSs). As a result, Dr. Wu found that "MRED is a monopolist." Tr. 403:4-6. Compass has come to the same conclusion. Tr. 336:18-19 (Reffkin). In fact, Reffkin recently testified that "the MLSs are listing monopolies. They're digital listing monopolies." PX437 at 73:22-24; *see also id.* at 52:22-53:12; PX109 ¶¶80-84, 86.

The availability of direct broker feeds does not undermine MRED's monopoly power. There are barriers to entry to assembling a feed of active listings to replace MRED's. Tr. 384:17-385:12 (Wu). Zillow would need to negotiate with thousands of Chicagoland brokerages, which is costly because it "takes a lot of time to work out an agreement" and "some brokerages may not even agree," *id.*, such as Compass which controls 28% of listings in the Chicagoland market, Tr. 534:17-535:1 (Wu); PX478 ¶14(d). Dr. Aron agrees that "[e]ach broker has control over its own listings feed and can supply that feed to Zillow or whomever it wants." Tr. 531:8-13 (Aron). She acknowledges that Zillow "may face higher costs in terms of having to go to a bunch of brokerages and negotiate deals and it may have to pay for those feeds." Tr. 531:2-6 (Aron).

As to direct evidence, "MRED was able, and it showed that it could cut its feed to Zillow. That is an exercise of its control over listings." Tr. 384:14-16 (Wu). That feed cut reduced the quality of MRED's platform and the broad exposure for its members' listings. Aron Dep. Tr.

-31-

69:9-12. *See Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1335 (7th Cir. 1986) ("Market power comes from the ability to cut back the market's total output.").

### ii.    MRED Maintains Its Monopoly Through Coercive Conduct

Exclusionary conduct is conduct that "impair[s] rivals' opportunity to compete in a way that is inconsistent with 'competition on the merits.'" *Viamedia*, 951 F.3d at 452-53. Thus, the "second element of a § 2 claim is the use of monopoly power 'to foreclose competition, to gain a competitive advantage, or to destroy a competitor.'" *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 482-83 (1992). "[T]he 'means of illicit exclusion, like the means of legitimate competition, are myriad.'" *Viamedia*, 951 F.3d at 453. The key inquiry is whether the conduct "harm[s] the competitive *process* and thereby harm[s] consumers." *Id.* "Behavior that otherwise might comply with antitrust law may be impermissibly exclusionary when practiced by a monopolist." *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 187 (3d Cir. 2005). For example, barring others from "trad[ing] with a competitor . . . may well be deemed exclusionary for a monopolist on a minimum showing that they imposed some impediment on rivals' access to the market." Areeda & Hovenkamp, *Antitrust Law* ¶806 (5th ed. 2024).

Here, MRED maintains its monopoly by coercing Zillow to drop its Standards to receive the MRED Listing Feeds. *See supra* at 10-11; Tr. 472:4-12 (Jensen) (testifying "all of this [could] have been avoided" if Zillow abandoned the Standards). But the Standards are a key competitive strategy to increase the quantity and quality of Zillow Preview's listings. Tr. 387:5-25 (Wu). MRED's conduct therefore has anticompetitive effects as explained above. *See supra* at 25-27.

MRED's justifications are pretextual. Where there are anticompetitive effects, Section 2 "[l]iability turns . . . on whether 'valid business reasons' can explain [the monopolist's] actions." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 483 (1992). MRED's purported national expansion has served only to inject banned listings from Compass into MRED. *See supra*

-32-

at 14-15; Tr. 395:7-15 (Wu). And MRED's claim that it must block Zillow's Standards due to the terms of the DOJ / NAR VOW settlement is undermined by the settlement itself, Tr. 473:16-18, 474:2-475:1 (Jensen), and by MRED's refusal to consider ways Zillow might modify the Standards to comply with MRED's interpretation of its Revised Rules, Tr. 131:14-22 (Samuelson).

MRED's conduct is not a mere refusal to deal. "A 'simple refusal to deal' is conduct where one firm 'refuses to deal no matter what,' whereas '[t]ying and exclusive dealing are two common examples' of 'conditional refusals to deal'—i.e., one firm will refuse to deal with another firm unless 'some condition is met.'" *Viamedia*, 951 F.3d at 453. MRED's conduct falls into the latter category and so the anticompetitive effects of the condition itself—requiring Zillow to abandon the Standards nationwide—must still be assessed.

## B. Zillow Will Suffer Irreparable Harm Absent an Injunction

"Harm is irreparable if legal remedies are inadequate to cure it," meaning "the remedy must be seriously deficient as compared to the harm suffered." *Life Spine*, 8 F.4th at 545 (quotation omitted). "[T]here must be more than a mere possibility that the harm will come to pass," but "[t]he alleged harm need not be occurring or be certain to occur before a court may grant relief." *BrightStar Franchising, LLC v. Foreside Mgmt. Co.*, 808 F. Supp. 3d 870, 888 (N.D. Ill. 2025). Here, Defendants' conspiracy forces an impossible choice: lose access to the MRED Listing Feeds and go dark in Chicagoland, or abandon Zillow's Standards nationwide. Either outcome would irreparably harm Zillow unless Defendants are enjoined.

### 1. Losing Access to the MRED Listing Feeds Would Irreparably Harm Zillow

If Zillow refuses to yield to Defendants' conspiracy, MRED would promptly strip Zillow of its Listing Feeds access (again) and inflict immediate, irreparable and extraordinary harm, as MRED already inflicted on Zillow at the outset of this case.

When MRED cut Zillow's access on May 20, 2026, Zillow lost over 30,000 residential real

estate listings, causing an immediate degradation in the quantity and quality of its listings. PX480 ¶8; PX110 ¶158. Even after restoring direct broker feeds, Zillow was left with less than half of MRED's total listings in Chicagoland. PX480 ¶9; Tr. 88:20-89:6 (Samuelson). Agents inundated Zillow's phone lines with concerns over reduced listing exposure and disruptions to lead distribution. PX480 ¶¶12-13; Tr. 89:7-17 (Samuelson). These agents emphasized that "consumers will shift to other platforms like Realtor.com," PX480 ¶12, reflecting the real and imminent threat of Zillow permanently losing large swaths of its Chicagoland audience but for the TRO restoring Zillow's Listing Feeds access. Tr. 89:18-90:11, 157:19-158:5 (Samuelson). Worse, competitors like Compass immediately seized upon Zillow's loss of listings to advertise the competitive advantage it had unfairly gained with respect to its own listing platform and to lure consumers away from Zillow. PX433; PX434; PX435; PX515. If Zillow were to face another feed cut, it would be impossible to identify all of the customers who would abandon Zillow in favor of other platforms with superior listing access. PX110 ¶158; PX163 ¶87; Tr. 365:7-11, 396:12-397:2, 398:17-399:22 (Wu). *Life Spine*, 8 F.4th at 546 (evidence of lost customers that "were not fully identifiable" demonstrated irreparable harm). Defendants' expert also confirmed that a loss of listings could "drain the moat around Zillow" by destroying its historic first-mover advantage. Tr. 525:17-526:8 (Aron). Such "loss of competitive position" is exceedingly "difficult to quantify." *Applied Sys., Inc. v. PBC Consulting Inc.*, 2026 WL 381866, at *6 (N.D. Ill. Feb. 11, 2026).

Losing the MRED Listing Feeds would be only the beginning, as a renewed cut would have numerous downstream effects that irreparably harm Zillow. The Seventh Circuit has explained that "it is precisely the difficulty of pinning down what business has been or will be lost that makes an injury 'irreparable.'" *Hess Newmark Owens Wolf, Inc. v. Owens*, 415 F.3d 630, 632 (7th Cir. 2005). That is exactly what Zillow faces here. Zillow's brand promise is to deliver the

-34-

most accurate, up-to-date, and comprehensive set of listings available to consumers. Tr. 36:18-37:7 (Samuelson), 208:22-209:10 (Hofmann). Critically, Zillow does not monetize on a per-listing basis; instead, Zillow relies on listings to drive traffic and build an audience for a broad array of products and services, all of which enables Zillow to generate revenue through lead generation, advertising, and product sales. Tr. 40:8-19 (Samuelson); *see also* Tr. 225:11-226:4 (Hofmann). If Zillow's listing supply is reduced to less than 50% in Chicagoland, that would directly undermine Zillow's brand promise and audience-driven business model in ways that are difficult, if not impossible, to quantify. Tr. 89:25-92:8 (Samuelson). The result would be a negative spiral of reduced viewership and broken consumer trust, which would drive away agents and home buyers and sellers, further eroding Zillow's audience, with cascading but indeterminate ripple effects across Zillow's entire product line. PX110 ¶¶158-59; Tr. 145:14-15, 147:3-148:5 (Samuelson), 208:22-209:10, 216:11-22 (Hofmann). *See Austin Bd. of Realtors v. E-Realty, Inc.*, 2000 WL 34239114, at *5 (W.D. Tex. Mar. 30, 2000) (where online brokerage was shut out of local MLS, "it would be extraordinarily difficult to place a monetary value on the potential sales [plaintiff] may have lost, the potential customers they may lose, and the potential damage to their reputation").

The harm to Zillow Preview, a nascent product that competes with Defendants' PLNs, is particularly acute. Tr. 91:13, 70:7-14 (Samuelson), 375:20-376:4 (Wu). Although Zillow Preview has existed for only about 100 days, it has experienced early momentum with "over a thousand brokerages who have already signed up" and "thousands of listings" entered. Tr. 70:24-71:2 (Samuelson). Still, the need to attract customers is critical to Zillow Preview's survival and long-term success, and loss of the Listing Feeds would shutter Zillow Preview in its infancy in Chicagoland and cause immeasurable loss of customers and business. Tr. 91:12-92:8 (Samuelson), 215:5-216:12 (Hofmann), 398:5-16 (Wu); PX110 ¶159; PX163 ¶¶81-84. *Roland Mach. Co. v.*

*Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984) (irreparable harm found where business losses are "very difficult to calculate").

To be sure, there is no meaningful substitute for the MRED Listing Feeds. Direct broker feeds, for example, must be negotiated individually across thousands of brokers in Chicagoland, requiring extraordinary time, effort, and resources to aggregate. Tr. 76:2-77:17 (Samuelson); PX514 at 2. For months, Zillow attempted to obtain direct broker feeds as a backup in the event of a feed cutoff, but managed to replicate only 45% of MRED listings—not nearly enough to effectively compete. Tr. 89:2-6 (Samuelson); PX480 ¶9. Zillow's efforts were made all the more difficult by Defendants' conspiracy. Compass and its affiliates terminated Zillow's direct feed access to 28% of Chicagoland listings and barred agents from providing listings directly to Zillow. PX007; PX046; PX407; PX068; PX163 ¶¶61-73; PX480 ¶¶6-9; PX215. MRED also sent multiple messages to its entire membership discouraging brokers from providing Zillow with direct feeds and falsely claiming that MRED did not know why Zillow sought such feeds. PX399; PX400; PX401; Tr. 77:18-78:19, 79:15-80:21 (Samuelson).

In sum, despite its best efforts, Zillow could not come close to replicating the MRED Listing Feeds through alternative direct feeds. PX514 at 2. Absent a preliminary injunction, the vast losses that would cascade from a renewed cutoff are harms the law recognizes as irreparable.

## 2. Acceding to Defendants' Unlawful Scheme Would Irreparably Harm Zillow

If Zillow were to yield to the conspiracy under threat of losing MRED Listing Feeds access, Zillow would be forced to jettison its Standards nationwide. But abandoning the Standards is no "true choice." *Stuller, Inc. v. Steak N Shake Enters., Inc.*, 695 F.3d 676, 679 (7th Cir. 2012). That is because the Standards are a critical component of Zillow's business and mission: they are designed to advance one of Zillow's core values—transparency in real estate—by incentivizing sellers and agents to broadly distribute their listings rather than marketing them selectively in gated

-36-

PLNs. Tr. 387:5-388:5 (Wu); PX511 at 3. The Standards are a key competitive tactic to help Zillow maintain the quality and quantity of its listing supply. Tr. 62:1-11 (Samuelson); PX110 ¶¶6, 139. To abandon the Standards now would upend Zillow's brand positioning and business model. Tr. 157:11-18 (Samuelson), 524:23-525:1, 527:7-9 (Aron); PX110 ¶¶160, 164. That alone shows irreparable harm, *Stuller*, 695 F.3d at 679-80, which will compound absent an injunction.

First, if Zillow were unable to enforce the Standards during the pendency of this litigation, Zillow would be compelled to degrade its own platform by displaying Defendants' unsold listings and by allowing competitors to free-ride on its substantial investments. Tr. 218:6-219:14 (Hofmann); Hofmann Dep. Tr. 37:15-38:23; PX110 ¶¶60, 137, 164. "This would compromise Zillow's value proposition and brand promise to maintain a supply of the listings consumers value most: those that are timely, accurate, and high-quality." PX110 ¶137; *see also id.* ¶¶138, 164.

Second, PLNs would proliferate if Zillow abandoned the Standards. To date, the Standards have been effective in curbing the spread of private listings, but without them, that progress would quickly evaporate to Zillow's severe detriment. Tr. 49:12-24, 52:2-16, 62:1-11, 63:4-64:19 (Samuelson), 393:17-25 (Wu), 527:10-13 (Aron). Absent an injunction, other MLSs would be empowered to engage in selective premarketing and follow MRED's lead in adopting policies that target the Standards; indeed, Compass is actively lobbying other MLSs to revise their rules to "be like Mred," PX070 at 4, and its CEO confirmed that other MLSs are poised to attack the Standards. Tr. 326:9-24 (Reffkin); *see also* Tr. 148:20-149:2 (Samuelson). "This too demands injunctive relief." *BrightStar Franchising*, 808 F. Supp. 3d at 889 (irreparable harm where competitors "may be emboldened" to follow suit if defendant could proceed without consequence).

In short, the Standards are a key procompetitive strategy that helps Zillow maintain access to timely, comprehensive, and valuable new-to-market listings. If more and more listings are

hidden away in PLNs, Zillow would face "increasing losses of the very listings that are the most critical in driving consumer engagement and traffic to Zillow's platform nationwide." PX110 ¶160; *see also* Tr. 218:6-19 (Hofmann). In time, the result would be no different than if Zillow lost the MRED Listing Feeds: a negative feedback loop that would erode Zillow's platform, listing supply, and business, "but with nationwide impacts" throughout "multiple markets across the country." PX110 ¶160. These interconnected harms are virtually "impossible to quantify," and thus irreparable. *Health o meter, Inc. v. Terraillon Corp.*, 873 F. Supp. 1160, 1175 (N.D. Ill. 1995).

Defendants' focus on "self-inflicted" harm is misplaced. This is not a case of self-inflicted harm, but rather a Hobson's choice. The law does not require Zillow to acquiesce to an anticompetitive scheme that would harm Zillow's business, even if not fatally. *Gen. Leaseways, Inc. v. Nat'l Truck Leasing Ass'n*, 744 F.2d 588, 591, 597 (7th Cir. 1984) (affirming injunction against expulsion of "any member who refuses to abide by [] anticompetitive restrictions"); *see also Acquaire v. Can. Dry Bottling Co. of N.Y., Inc.*, 24 F.3d 401, 411-12 (2d Cir. 1994) (no self-inflicted harm where defendant withheld key competitive input in retaliation for refusal to adhere to unfair price policies); *VanDerStok v. BlackHawk Mfg. Grp. Inc.*, 639 F. Supp. 3d 722, 729 (N.D. Tex. 2022) ("It is no answer to say that Plaintiff may avoid the harm by complying with an agency rule that is likely unlawful." (cleaned up)). This false choice is not self-inflicted harm.

## C.     The Balance of Harms and Public Interest Support Granting the Injunction

The final step of the preliminary injunction analysis requires balancing "the irreparable harm the nonmoving party will suffer if preliminary relief is granted," "the irreparable harm to the moving party if relief is denied," and "the public interest, meaning the consequences of granting or denying the injunction to non-parties." *Chancey v. Ill. State Bd. of Elecs.*, 635 F. Supp. 3d 627, 644 (N.D. Ill. 2022) (Tharp, J.). Here, the balance of hardships weighs decidedly in Zillow's favor.

First, Defendants have suffered no harm from the TRO, nor do they stand to lose anything

should the Court grant an injunction. In opposing Zillow's TRO motion, Compass failed to conduct a balancing analysis at all. Dkt. 47. That is unsurprising, as Compass remains free to pursue its PLN in competition with Zillow Preview, and to display its failed Private Exclusive listings on any platform but Zillow's. *See, e.g.*, PX431. Nor would Compass be harmed by a feed cutoff, as Compass *wants* its Chicagoland listings displayed on Zillow. Tr. 323:17-20 (Reffkin). As for MRED, which claims it would "lose the value of its negotiated License Agreement," Dkt. 45 at 18, that interest "must bow to the public's interest in promoting competition." *trueEX, LLC v. MarkitSERV Ltd.*, 266 F. Supp. 3d 705, 726 n.143 (S.D.N.Y. 2017). Beyond purported harm to its freedom of contract, MRED identifies no injury from the TRO other than increased media attention, Jensen Dep. Tr. 185:19-186:4, which is neither concrete nor necessarily harmful, and certainly not irreparable. *See Corbitt v. Nat'l Broad. Corp.*, 1992 WL 350670, at *1-2 (N.D. Ill. Nov. 23, 1992).

Second, a preliminary injunction would serve the public interest. Courts widely recognize an overriding public interest in the "effective and meaningful enforcement of the American anti-trust laws." *In re Uranium Antitrust Litig.*, 617 F.2d 1248, 1261 (7th Cir. 1980); *see also Laidlaw Acquisition Corp. v. Mayflower Grp., Inc.*, 636 F. Supp. 1513, 1521 (S.D. Ind. 1986). Conversely, denying the injunction risks severe harm to the public. Courts have recognized public harm where an MLS leverages its market power to exclude a competitor, thereby reducing price competition and limiting consumer choice. *Realty Multi-List*, 629 F.2d at 1371 (where a broker is unjustifiably excluded from an MLS, "both the broker *and the public* are clearly harmed" (emphasis added)). Here, MRED's Listing Feeds blackout indisputably harmed "consumers' free choice in choosing a product . . . of their liking." *Wilk v. Am. Med. Ass'n*, 895 F.2d 352, 371 (7th Cir. 1990); *see also, e.g.*, PX258 at 2 ("We have a responsibility to our clients to sell their homes, and Zillow is a huge tool for this"); Broude Dep. Tr. 204:20-205:2; McColly Dep. Tr. 136:21-137:5. Furthermore, if

Zillow were forced to abandon its Standards nationwide, PLNs would proliferate and the harms to both consumers and competition would be widespread and substantial. Tr. 48:5-49:9, 49:25-51:13 (Samuelson), 390:1-392:17, 393:17-394:3, 400:13-401:4 (Wu); PX417; PX418; PX419; PX163 ¶¶25-29, 35-36; PX110 ¶¶146-54, PX442 ¶¶27-39.

**D. The Court Should Enjoin Defendants from Acts in Furtherance of the Conspiracy**

Compass is wrong that the Court cannot preliminarily enjoin Compass from acting in furtherance of Defendants' conspiracy. *See* Tr. 35:7-10 (Compass Opening Statement). Regardless of whether the Court orders Zillow to arbitrate this dispute as to MRED, the Court should enjoin Compass from engaging in acts furthering the conspiracy. *See, e.g.*, *Yong Ki Hong v. KBS Am., Inc.*, 2005 WL 1712236, at *4 (E.D.N.Y. July 22, 2005) (preliminarily enjoining defendants from encouraging, requesting, or inducing a defendant to refuse to supply product to plaintiffs); *Gov't Emps. Med. Plan v. Regence Blue Shield of Idaho*, 2005 WL 8165289, at *16 (D. Idaho Mar. 15, 2005) (issuing preliminary injunction to enjoin termination of relationship between defendant and plaintiff's agent where termination would result from group boycott). Here, the conspiracy was furthered by Compass's active laundering of listings known to violate Zillow's Standards outside of MRED's traditional service area. Thus, the Court should preliminarily enjoin Compass from entering into MRED listings outside of MRED's traditional service area that violate Zillow's Standards, and enjoin MRED from terminating Zillow's access to the MRED Listing Feeds based on Zillow's enforcement of the Standards outside MRED's traditional service area.[4]

**CONCLUSION**

For the foregoing reasons, the Court should grant Zillow's preliminary injunction motion.

---

[4] Zip codes in Illinois, Indiana, Iowa, Wisconsin, Michigan, Kentucky, and Missouri where MRED had an active residential real estate for-sale listing in the one year prior to April 23, 2026.

Respectfully submitted,

Dated: July 9, 2026

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

/s/ *Bonnie Lau*
Bonnie Lau (admitted *pro hac vice*)
One Market Plaza, Spear Tower, Suite 3300
San Francisco, California 94105
Telephone: (415) 947-2000
Facsimile: (866) 974-7329
Email: blau@wsgr.com

Brian J. Smith (IL Bar No. 6321543)
1700 K Street NW, Fifth Floor
Washington, DC 20006
Telephone: (202) 973-8800
Facsimile: (866) 974-7329
Email: brian.smith@wsgr.com
*Admitted to practice only in Illinois and Maine*

Beau W. Buffier (admitted *pro hac vice*)
31 West 52nd Street, Fifth Floor
New York, New York 10019
Telephone: (212) 999-5800
Facsimile: (866) 974-7329
Email: bbuffier@wsgr.com

Nicholas R. Sidney (admitted *pro hac vice*)
701 Fifth Avenue, Suite 5100
Seattle, WA 98104
Telephone: (206) 883-2500
Facsimile: (866) 974-7329
Email: nsidney@wsgr.com

*Attorneys for Plaintiffs Zillow Group, Inc. and Zillow, Inc.*

-41-