**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ZILLOW GROUP, INC. and ZILLOW, INC., <br><br> *Plaintiffs*, <br><br> v. <br><br> MIDWEST REAL ESTATE DATA LLC, COMPASS, INC., and COMPASS ILLINOIS, INC., <br><br> *Defendants*. | Case No. 1:26-cv-05451 <br><br> Judge John J. Tharp, Jr. |

**DEFENDANTS' JOINT OPENING POST-HEARING BRIEF**
**ON ZILLOW'S HORIZONTAL GROUP BOYCOTT CLAIM**

**TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................. 1

STATEMENT OF FACTS ............................................................................................... 3

    I.      The Current Residential Real Estate Market ................................................. 3

    II.     Compass, MRED, and Zillow ........................................................................ 6

    III.    Zillow's Listing Access Standards and this Dispute .................................... 10

ARGUMENT .................................................................................................................. 16

    I.      Preliminary Injunction Standard ................................................................. 16

    II.     Zillow Has Not Shown Likelihood of Success on Its Section 1 Claim ............... 17

         A.    Zillow Has Shown No Anticompetitive Agreement ................................ 18

         B.    Defendants' Conduct Is Not *Per Se* Unlawful ........................................ 20

         C.    Zillow Cannot Prevail Under the Rule of Reason ................................... 23

             1.    Zillow Failed To Establish Market Power ................................... 23

             2.    Private Listings Are Not Anticompetitive ................................... 24

             3.    MRED's Neutral Data Protection Rules Do Not Harm Competition ............................................................................... 25

             4.    Zillow's Other Justifications for Its Listing Ban Are Illusory ...... 27

    III.    Zillow Cannot Show Irreparable Harm ......................................................... 28

         A.    Zillow's Alleged Harm Is Self-Inflicted .................................................. 29

         B.    Zillow's Claim of Irreparable Injury Is Illusory ..................................... 29

         C.    Damages Are an Adequate Remedy .......................................................... 30

         D.    Zillow's Delay in Seeking Injunctive Relief Precludes Irreparable Harm ....................................................................................................... 31

    IV.    Zillow's Requested Injunction Will Injure Defendants and Homesellers ............ 31

    V.     Public Interest Weighs Against A Preliminary Injunction ................................. 32

    VI.    The Proposed Injunction Against Compass Violates Fed. R. Civ. P. 65(d) ......... 32

i

**TABLE OF AUTHORITIES**

**Cases**

*Abrasic 90 Inc. v. Weldcote Metals, Inc.*,
364 F. Supp. 3d 888 (N.D. Ill. 2019) ................................................................... 30

*Ball Mem'l Hosp., Inc. v. Mutual Hosp. Ins., Inc.*,
784 F.2d 1325 (7th Cir. 1986) ........................................................... 17, 23, 32

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ............................................................................... 18

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*,
441 U.S. 1 (1979) .................................................................................. 20

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
429 U.S. 477 (1977) ............................................................................... 25

*Bus. Elecs. Corp. v. Sharp Elecs. Corp.*,
485 U.S. 717 (1988) ............................................................................... 18

*Capgemini Fin. Servs. USA Inc. v. Infosys Ltd.*,
2014 WL 340206 (N.D. Ill. Jan. 30, 2014) ............................................... 31

*Chi. Pro. Sports Ltd. P'ship v. NBA*,
961 F.2d 667 (7th Cir. 1992) ................................................................... 24

*Chi. Pro. Sports Ltd. P'ship v. NBA*,
95 F.3d 593 (7th Cir. 1996) ..................................................................... 24

*Chicago Studio Rental, Inc. v. Illinois Dep't of Commerce*,
940 F.3d 971 (7th Cir. 2019) ................................................................... 27

*City of Mishawaka, Ind. v. Am. Elec. Power Co.*,
616 F.2d 976 (7th Cir. 1980) ................................................................... 32

*Duthie v. Matria Healthcare, Inc.*,
543 F. Supp. 2d 958 (N.D. Ill. 2008) ....................................................... 30

*EEOC v. AutoZone, Inc.*,
707 F.3d 824 (7th Cir. 2013) ................................................................... 32

*Fourqurean v. NCAA*,
143 F.4th 859 (7th Cir. 2025) ................................................................. 23

*FTC v. Ind. Fed'n of Dentists*,
476 U.S. 447 (1986) ............................................................................... 24

ii

*Girl Scouts of Manitou, Inc. v. Girl Scouts of U.S. of Am., Inc.*,
  549 F.3d 1079 (7th Cir. 2008) .................................................................. 28, 29, 31

*Ill. Repub. Party v. Pritzker*,
  973 F.3d 760 (7th Cir. 2020) ................................................................................ 17

*In re Text Messaging Antitrust Litig.*,
  782 F.3d 867 (7th Cir. 2015) .................................................................... 18, 19, 20

*Int'l Test & Balance, Inc. v. Associated Air & Balance Council*,
  14 F. Supp. 2d 1033 (N.D. Ill. 1998) ................................................................... 16

*Isaksen v. Vt. Castings, Inc.*,
  825 F.2d 1158 (7th Cir. 1987) .............................................................................. 19

*Ixmation, Inc. v. Switch Bulb Co.*,
  2014 WL 5420273 (N.D. Ill. Oct. 23, 2014) ....................................................... 31

*James Cape & Sons Co. v. PCC Constr. Co.*,
  453 F.3d 396 (7th Cir. 2006) ................................................................................ 25

*MacDermid Printing Sols. LLC v. Cotron Corp.*,
  833 F.3d 172 (2d Cir. 2016) ................................................................................. 28

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
  475 U.S. 574 (1986).............................................................................................. 20

*Miles Distribs., Inc. v. Specialty Constr. Brands, Inc.*,
  476 F.3d 442 (7th Cir. 2007) ........................................................................... 18, 20

*Minocqua Brewing Co. v. Hess*,
  160 F.4th 849 (7th Cir. 2025) ............................................................................... 16

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
  465 U.S. 752 (1984)..................................................................................... 18, 19, 20

*Motor Werks Partners, L.P. v. BMW of N. Am., Inc.*,
  2001 WL 1136145 (N.D. Ill. Sept. 24, 2001) ..................................................... 31

*Murphy v. Alpha Realty, Inc.*,
  1978 WL 1451 (N.D. Ill. Dec. 7, 1978).............................................................. 20

*Nat'l Ass'n of Realtors v. United States*,
  97 F.4th 951 (D.C. Cir. 2024)................................................................................. 5

*NCAA v. Alston*,
  594 U.S. 69 (2021)................................................................................................ 23

iii

*NCAA v. Bd. of Regents of Univ. of Okla.,*
   468 U.S. 85 (1984)..................................................................................24, 25, 27

*Nken v. Holder*,
   556 U.S. 418 (2009)............................................................................... 17, 29

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.,*
   472 U.S. 284 (1985)....................................................................................... 21

*NYNEX Corp. v. Discon, Inc.,*
   525 U.S. 128 (1998)....................................................................................... 21

*Omnicare, Inc. v. UnitedHealth Grp., Inc.,*
   629 F.3d 697 (7th Cir. 2011) ........................................................................ 18

*Packaging Corp. of Am., Inc. v. Croner,*
   419 F. Supp. 3d 1059 (N.D. Ill. 2020)........................................................... 31

*Phila. Taxi Ass'n, Inc. v. Uber Techs., Inc.,*
   886 F.3d 332 (3d Cir. 2018) .......................................................................... 25

*Realcomp II, Ltd. v. FTC,*
   635 F.3d 815 (6th Cir. 2011) .................................................................... 5, 20

*Reifert v. S. Cent. Wisc. MLS Corp.,*
   450 F.3d 312 (7th Cir. 2006) ......................................................... 20, 21, 22, 24

*Republic Tobacco v. N. Atl. Trading Co.,*
   381 F.3d 717 (7th Cir. 2004) ........................................................................ 21

*Right Field Rooftops, LLC v. Chicago Baseball Holdings, LLC,*
   80 F. Supp. 3d 829 (N.D. Ill. 2015)............................................................... 30

*Robertson v. Sea Pines Real Estate Cos.,*
   679 F.3d 279 (4th Cir. 2012) ........................................................................ 20

*Roland Mach. Co. v. Dresser Indus., Inc.,*
   749 F.2d 380 (7th Cir. 1984) ........................................................................ 30

*Second City Music, Inc. v. City of Chi.,*
   333 F.3d 846 (7th Cir. 2003) ........................................................................ 29

*St. Luke's Hosp. v. ProMedica Health Sys., Inc.,*
   8 F.4th 479 (6th Cir. 2021) ..................................................................... 30, 31

*Starbucks Corp. v. McKinney,*
   602 U.S. 339 (2024)....................................................................................... 16

iv

*Thompson v. Metro. Multi-List, Inc.*,
    934 F.2d 1566 (11th Cir. 1991) ............................................................................... 20

*United States v. Nat'l Ass'n of Realtors*,
    2006 WL 3434263 (N.D. Ill. Nov. 27, 2006) ............................................................ 5

*United States v. Realty Multi-List, Inc.*,
    629 F.2d 1351 (5th Cir. 1980) ............................................................................ 5, 21

*Valley Liquors, Inc. v. Renfield Imps., Ltd.*,
    822 F.2d 656 (7th Cir. 1987) ................................................................................. 19

*Walker Process Equip. v. Food Mach. & Chem. Corp.*,
    382 U.S. 172 (1965)................................................................................................ 23

*Winter v. NRDC, Inc.*,
    555 U.S. 7 (2008)............................................................................................... 16, 17

*Wis. Music Network, Inc. v. Muzak Ltd. P'ship*,
    5 F.3d 218 (7th Cir. 1993) ..................................................................................... 25

**Statutes**

225 ILCS 454/15-15 ......................................................................................................... 3

**Rules**

Fed. R. Civ. P. 65(d) ...................................................................................................... 32

**INTRODUCTION**

Zillow is not entitled to the extraordinary relief it seeks because any harm, if it exists at all, is self-inflicted. If Zillow wants MRED's feed, the "lifeblood" of its business that it receives virtually for free, all Zillow has to do is not subjectively ban listings. It is as simple as that. The Court here is confronted with two sets of rules at war with each other. One is Zillow's Listing Access Standards (the Zillow "ban"), which bans listings formerly marketed outside of the Multiple Listing Service ("MLS"), and thus off Zillow, to stifle competition. The other set is MRED's listing display rules, which expand consumer options and bar unfair and misleading use of MRED's listing data. Zillow asks the Court to side with its ban, which Zillow hopes will entirely quash a method of competition that consumers value.

Zillow pretends it favors "transparency," but in truth its ban achieves the opposite: Zillow only bans listings that were *publicly* marketed off-MLS and, as such, it encourages listings to be truly secret; it knowingly and deliberately withholds the fact that a home is for sale from its users (when Zillow knows it is for sale); and it affirmatively lies to those users by describing the home as not for sale. Moreover, Zillow will put a listing back on its website if the homeowner fires her agent and broker, even if that home was not initially marketed through the MLS. Transparency is not Zillow's motive. As its own documents show, Zillow adopted its ban to threaten and coerce real estate agents and homesellers to abandon off-MLS marketing. Zillow's only goal was to limit consumer choice and maximize its own profits. The ban is working: Zillow confirmed at the hearing that use of private listings plummeted in the areas where Zillow implemented the ban, throttling competition or, as Zillow calls it, "contagion."

The only area where Zillow did not implement its ban, and the only area where homesellers are still free to privately market homes without incurring Zillow's "punishment," is MRED's

1

primary service area. Zillow never implemented its ban here because immediately after Zillow announced the ban, MRED independently told Zillow the ban would violate MRED's procompetitive display rules. Zillow then threatened MRED with costly litigation and a public spectacle if it tried to protect consumer choice. Compass separately sought enforcement of procompetitive MLS rules against the Zillow ban from every MLS in the country. All but MRED surrendered to Zillow. Seeing MRED providing a service consumers wanted, marketing options without punishment, Compass supported MRED's expansion to compete with other MLSs that did less to defend consumer choice. Zillow, fearing competition would result in "contagion" across the country, chose to violate MRED's rules and ban Compass listings submitted to MRED's MLS.

Antitrust law presumes consumer choice is the heart of competition. Private listings promote competition in residential real estate marketing. Indeed, the long history of antitrust enforcement in real estate has been designed to *increase* the number of business models available to homesellers. Because Zillow's position is so fundamentally at odds with antitrust theory, it cannot show likelihood of success on the merits of its claims. The evidence shows that *neither* Defendant wanted Zillow's data feeds permanently suspended. Defendants simply wanted Zillow to stop banning and misrepresenting listings. Instead, Zillow directly threatened each of them, and Defendants each acted in their own independent self-interest defending against those threats. That is not an unlawful conspiracy. Defending against Zillow's ruthless promotion of its own business model simply does not give rise to an antitrust claim. Nor has Zillow, as a practical matter, established irreparable harm or harm to competition to support a preliminary injunction. Any harm is self-inflicted and would be fully compensable if it existed.

2

**STATEMENT OF FACTS**

Facially, the parties agree that sellers should determine the way homes are marketed. *See, e.g.*, DX582, at 1 ("Consumers have the right to choose how to sell their home."); PI Tr. 105:10–17 (Samuelson) ("If a seller says I'm willing to keep my listing private . . . that's okay."). Yet Zillow asks this Court to use antitrust law to foreclose seller choice unless it benefits Zillow. The facts dictate the opposite result.

## I. THE CURRENT RESIDENTIAL REAL ESTATE MARKET

Home listings are created by real estate agents, who sign listing agreements with homeowners, write listings, and hire vendors needed to create the listing (*e.g.*, photographers). *See* PI Tr. 38:8–11 (Samuelson). Agents owe fiduciary duties to sellers, which require agents to "[p]romote the best interest of the client" and "[o]bey[] specific directions of the client." 225 ILCS 454/15-15. Sellers decide marketing strategy in consultation with agents. PI Tr. 488:23–489:8 (Aron). Many sellers choose not to send their listings to an MLS for general distribution right away, preferring to privately market for a time. PI Tr. 306:8–11 (Reffkin). "[M]arketing outside of the MLS . . . [is] a widespread practice." PI Tr. 306:9–12 (Reffkin); *see also* PX177, at 3–4 (Zillow advertising its Opendoor offering); DX580, at 3 (suggesting sellers "[s]kip the hassle of listing" by using Opendoor). Private listings can be shared entirely offline, displayed on a brokerage website, input into a Private Listing Network ("PLN") like MRED's, or posted as "coming soon" on a public website. PI Tr. 46:7–10 (Samuelson). Almost all other listings are input directly to an MLS. PI Tr. 368:7–22 (Wu). "The MLS combines its members' listings information into a database, usually in electronic form. The MLS then makes these data available to all brokers who are members of the MLS." DX530, at 15. Some listings sell during private marketing, but the vast majority are ultimately submitted to an MLS. PI Tr. 198:1–5 (Haran) (about 95% of listings

3

on MRED's PLN go to "active status"), 303:5–8 (Reffkin) (about 94% of Compass listings that begin as private listings proceed to the MLS).

Brokers that receive active, non-PLN feeds from an MLS can display listings that originate within that brokerage as well as those from other brokerages. *See* PI Tr. 368:13–19 (Wu); DX137, at 20–21 ¶ 47 (Aron Decl.). Other sites that aggregate and distribute listings (like Zillow.com, Realtor.com, Redfin.com, and Homes.com) also receive MLS active feeds. PI Tr. 494:20–25 (Aron). These sites also receive listing data directly from brokers, agents, home builders and developers, homesellers' submissions, and other sources. PI Tr. 36:23–37:7 (Samuelson).

MLSs have rules on data use. The National Association of Realtors ("NAR") established industry standards governing MLS operation. PI Tr. 85:19–86:1 (Samuelson). Although brokers and others receiving the listings need not publish all the listings, NAR standards and related MLS rules that follow them, like MRED's, require recipients to filter listings using "objective criteria." NAR Policy Statement 8.5 (DX534); MRED IDX Rule 9 (DX004); MLS Grid IDX Rules (DX034, at 3).[1] A broker may, for example, specialize in lakefront properties and publish only lakefront listings. PI Tr. 166:3–15 (Haran). To avoid recipients unfairly discriminating among agents, however, MLS rules generally forbid recipients from selecting listings based on the identity of the submitting agent. PI Tr. 132:23–133:1 (Samuelson); DX534, at 2 ("Policy Statement 8.5 states a participant cannot filter out . . . MLS listings based on . . . [the] brokerage and/or agent.").

That is because for decades, antitrust authorities monitored and intervened in the residential real estate market. "[T]he Agencies recently have challenged, as antitrust violations, MLS rules that unreasonably restrict competition by brokers who use alternative business models." DX530, at 68. For example, the DOJ and FTC have brought cases ensuring that discount brokers and fee-

---

[1] MRED's display rules also forbid altering listings so as to misrepresent their content. DX034 § 31 (prohibiting manipulation of "listing content that in any way that produces a deceptive or misleading result").

for-service brokers were not denied MLS access. *Id*. at 68 (describing and citing cases).[2] In this District, the DOJ also secured a consent judgment against NAR, which had adopted rules allowing brokers to limit early forms of internet marketing using MLS feeds. DX427. Those rules allowed brokers to selectively deny MLS distribution to discount brokerages. *See United States v. Nat'l Ass'n of Realtors*, 2006 WL 3434263, at *2–4 (N.D. Ill. Nov. 27, 2006) (describing allegations). The District Court found the DOJ sufficiently alleged the policies "were developed and utilized with anti-competitive animus . . . [and] would harm American consumers." *Id.* at *12. The parties then settled. In the Competitive Impact Statement, DOJ explained that "[t]he proposed Final Judgment embodies the fundamental principle that an association of competing brokers, operating an MLS, cannot use the aggregated power of the MLS to discriminate against a particular method of competition." DX425, at 16. The Final Judgment provided that excluding listings from display may be "based only on objective criteria, including but not limited to, factors such as geography, list price, type of property, cooperative compensation offered by listing broker, or whether the listing broker is a Realtor[]." DX427, at 18 (¶ II.5.h). Importantly, brokers could not weaponize MLS data against other brokers. PI Tr. 441:10–15, 442:8–11 (Jensen).

More recently, the DOJ supported challenges to NAR's "Clear Cooperation Policy" ("CCP"). The CCP, in effect from 2019 to 2025, required all affiliated MLSs to ensure members posted listings to the MLS within one day of being "publicly marketed." PI Tr. 124:11–125:5 (Samuelson); DX532, at 2; DX533. The "DOJ believe[d] that the [CCP] restrict[ed] home-seller choices and preclude[d] competition from new listing services." *Nat'l Ass'n of Realtors v. United States*, 97 F.4th 951, 954 (D.C. Cir. 2024) (discussing DOJ investigations). DOJ's opposition to

---

[2] *See also United States v. Realty Multi-List, Inc.*, 629 F.2d 1351 (5th Cir. 1980); *Realcomp II, Ltd. v. FTC*, 635 F.3d 815 (6th Cir. 2011).

CCP echoed the conclusions of a 1983 FTC Staff Report that concluded, "[o]n its face, requiring that MLS members submit all of their listings of a designated type restricts the competitive freedom of the broker-members. Alternative methods of selling houses are effectively foreclosed." DX531, at 150. In March 2025, NAR amended the CCP to allow private listings–by permitting brokers to delay MLS active listing distribution. DX533.

## II.   COMPASS, MRED, AND ZILLOW

Compass is a brokerage, whose agents enter listing agreements with sellers and represent buyers searching for homes.[3] PI Tr. 292:21–24 (Reffkin). Compass offers sellers a variety of marketing services, including its 3-Phased Marketing Strategy ("3PM"), in which listings are not immediately posted to the active MLS (and therefore cannot be syndicated to Zillow or other websites). PI Tr. 491:25–492:7 (Aron). Compass also offers sellers listing services in which the listing goes directly to the MLS and immediately to Zillow and other sites. PI Tr. 493:19–25 (Aron). Compass agents discuss the advantages and disadvantages of these options with sellers. Sellers are provided with extensive disclosures, and sellers that choose 3PM explicitly acknowledge and instruct that their listing will not initially be published to the active MLS feed. PI Tr. 303:13–305:8 (Reffkin); DX578. Sellers also acknowledge, among other things, that using 3PM may affect the number of potential buyers who see the property and the ultimate price paid for the property. PI Tr. 304:20–25 (Reffkin); DX578. By March 2025, approximately 48% of Compass homesellers chose 3PM, and that number was growing until the implementation of Zillow's ban. PI Tr. 308:8–309:1 (Reffkin).

In Phase 1 of 3PM, listings are distributed among Compass agents. Compass does not post those listings online but prominently discloses their existence on its website. PI Tr. 97:20–98:4

---

[3] Compass also franchises independently operated real estate brands. PI Tr. 293:2–8 (Reffkin).

(Samuelson); 295:22–296:4 (Reffkin) (discussing "black box"). Buyers may access those listings in several ways: registering for free online, having their non-Compass agent contact Compass, contacting a Compass office themselves, or working with a Compass agent. *See* PI Tr. 98:2–18 (Samuelson); 296:5–297:6 (Reffkin); DX137, at 39 Ex. 4 (Aron Decl.) ("All buyers & agents can access [Phase 1 listings] in our offices or by contacting Compass."). In the second phase of 3PM, Compass posts certain information about the listing to its website as a "Coming Soon" listing. PI Tr. 300:13–21 (Reffkin). Compass's "Coming Soon" listings are also posted to MRED's PLN and displayed on Redfin.com. PI Tr. 492:21–493:5 (Aron). MRED makes "Coming Soon" listings visible to all MRED participants (including Zillow), but they are not distributed in the active MRED feeds and cannot be publicly displayed by other brokers or websites without Compass's permission. *See* PI Tr. 463:25–464:4 (Jensen); 492:21–493:5 (Aron). In the third phase, Compass provides the listing to the MLS active feed. PI Tr. 493:19–25 (Aron).

Sellers choose 3PM for many reasons. Marketing outside the MLS[4] means the number of days on market and price history are not tracked. PI Tr. 300:16–18 (Reffkin). This allows sellers to market properties as long as they wish without negative information attaching. The private phases of 3PM thus give sellers the opportunity to test price, even at an "aspirational" level, without the risk that any resulting price drop is publicly tracked. PI Tr. 302:11–19 (Reffkin). Some sellers simply do not want property details to be made public. PI Tr. 101:17–22 (Samuelson); 228:1–8 (Hofmann); 302:20–303:4 (Reffkin); 464:23–465:3 (Jensen). Properties also may sell faster. Compass found that properties using 3PM sell 20% more quickly than those that go straight

---

[4] Zillow itself touts the advantages of selling homes off the MLS through its Opendoor offering. DX539 ("A recent Zillow survey found nearly a third of Americans were surprised by the emotional toll of selling their home . . . . An Opendoor sale means no home showings, no home prep or making repairs and none of the hassle that can come with a traditional listing. With this new Opendoor experience on Zillow, consumers can explore their selling options and choose one that meets their needs.") (internal quotation marks omitted).

to MLS standard distribution. PI Tr. 308:13–21 (Reffkin). Compass also found that properties marketed using 3PM sell for a 2.9% higher price and have 30% fewer price drops than those sent directly to the MLS active feed. *Id*.

MRED is the leading MLS in Illinois and several counties in adjoining states and provides its services in many other locations. DX045, at 3; PI Tr. 43:6–10 (Samuelson). Over its 20-year history, MRED accepted and distributed listing information in all 50 states as part of its long-standing expansion plans. PI Tr. 165:10–14 (Haran); 467:7–9 (Jensen). MRED is an aggregator and distributor of home listings submitted by its participating brokers. PI Tr. 407:3–10 (Wu). MRED's active feed is distributed to all of its members, subject to compliance with MRED's display rules, including the "objective criteria" rule. *See* PI Tr. 317:20–24 (Reffkin); 489:23–490:9 (Aron). As a cooperative of brokers distributing information, MRED operates on a break-even basis. PI Tr. 437:12–14 (Jensen). Distribution of MRED aggregated data is handled by MLS Grid. PI Tr. 44:15–22 (Samuelson); DX175 ¶ 5. MRED also provides various services to brokers, agents, and others in the real estate industry, such as property appraisers. PI Tr. 306:20–25 (Reffkin). MRED distributes historic sales data, and MRED facilitates so-called "direct" broker feeds. PI Tr. 478:3–9 (Jensen); PI Tr. 38:16–39:1 (Samuelson). Brokers who put their listings into MRED may designate individual recipients for their listings, as a substitute for or in addition to distributing it widely through the active feed. PI Tr. 75:14–19 (Samuelson); 469:7–20 (Jensen). Because it hosts that data, MRED, through MLS Grid, facilitates direct distribution. PI Tr. 193:23–194:5 (Haran).

On April 24, 2026, MRED announced a national expansion of its MLS service. DX078, at 1. National expansion will allow MRED to compete against other MLSs for listings and members by differentiating itself from other MLSs, including through rule enforcement. PI Tr. 324:10–17 (Reffkin) ("The more MLSs are competing with each other, the better it is for agents and sellers

. . . . MRED expanding national[ly] is a signal that MLSs will have to compete by giving more options to agents and sellers, which is only a good thing."); 470:18–19 (Jensen) ("Agents and sellers and buyers" benefit from competition among MLSs). MRED differentiates itself in part through its willingness to enforce its rules, as other "MLSs are terrified of being sued" by Zillow. PI Tr. 326:19–20 (Reffkin); 455:6–14 (Jensen).

Zillow is the most used real estate website, seeing well more than the number of visits and unique visitors of its three largest competitors combined (Realtor.com, Homes.com, Redfin.com). DX137, at 17 Ex. 1 (Aron Decl.); PI Tr. 500:8–501:6 (Aron). Zillow is registered as a real estate broker and a member of MLSs, though it performs no brokerage services. *See* PI Tr. 42:23–24 (Samuelson), 326:2–8 (Reffkin). Portals like Zillow do not create listings; they do not pay for vendor support, like photographers; they do not compete to represent homeowners; and they are not bound by fiduciary duties. Instead, Zillow is an internet site displaying for-sale and rental listings created by others. PI Tr. 326:2–8 (Reffkin) (Zillow "does not contribute a single listing to the MLS system"). Zillow receives almost all its inventory for almost no cost by being an MLS participant and paying a nominal participation fee. PI Tr. 325:24–326:1 (Reffkin) ("Zillow then spends $360 to get access to all of that content. All of that hard work . . . . They get all of it."); PI Tr. 208:7–12 (Hofmann) (Zillow is "built on the back" of content created by agents that it receives from the MLS).

When a Zillow user clicks "Contact Agent" or requests a home tour, Zillow matches that user with a Zillow-promoted buyer's agent (which consumers claim tricks them into using Zillow-promoted agents, inflating commissions and steering them to high-fee Zillow home loans). PI Tr. 39:22–40:2 (Samuelson); *see* DX423 ¶¶ 7, 54. If the promoted agent succeeds in selling the user a property, Zillow receives a large portion of the agent's commission. *See* PI Tr. 39:22–40:2

(Samuelson). Some agents also pay Zillow for leads received. DX029, at 106:10–19 (Hofmann Dep.).

### III.    ZILLOW'S LISTING ACCESS STANDARDS AND THIS DISPUTE

From 2019 to 2025, NAR rules governing MLSs (the Clear Cooperation Policy) required MLS members to publish listings to the MLS within one business day of any "[p]ublic marketing." DX532, at 2. In March 2025, following DOJ pressure, NAR revised its policy to allow private listings so long as the seller instructed the agent not to list on an MLS. PI Tr. 309:11–310:7 (Reffkin); DX533. In anticipation of that change, Zillow strategized ways to protect its dominance.[5] DX263. Zillow worried the change would cause PLNs to proliferate, decreasing the number of listings immediately published to Zillow. PI Tr. 126:7–128:1 (Samuelson); DX263. Zillow recognized that as a threat to its business, which requires a large volume of listings to attract the "audience" Zillow monetizes. PI Tr. 40:13–19 (Samuelson) (listings are "lifeblood" of Zillow's business); 144:24–145:9 (Samuelson) (private listings are a "contagion"). Zillow considered several "hardline" tactics to apply pressure to agents to try to recreate the CCP's effect, forcing listings immediately into an MLS. DX263, at 30 (Zillow deliberating, "What does 'or else' look like?" and contemplating use of a "hammer" to keep listings flowing to its platform). Zillow described each strategy as "punishing" brokers or agents for engaging in private marketing, by banning some or all of their listings from Zillow. *Id.*; PI Tr. 135:1–136:1 (Samuelson). Although Zillow did not adopt the most extreme tactics (*e.g.*, banning entire brokerages), the "hardline" strategy prevailed, and Zillow targeted individual agents with the desired outcome of getting "sellers to switch agents [and] put [their] listing on Zillow." DX263, at 12, 27.

---

[5] Zillow has a 66 percent share of portal viewers. PI Tr. 317:9–14 (Reffkin) ("Zillow Group's real estate audience market share [is] . . . 66 percent market share.").

The result was the Zillow ban, announced April 10, 2025,[6] through which it tried to recreate the original CCP effect. DX465; PI Tr. 314:4–5 (Reffkin). The ban blocked listings from Zillow's website if those listings were previously marketed outside the MLS. DX465 ¶ 5; PI Tr. 53:15–55:20 (Samuelson). However, Zillow does *not* ban those listings if the seller fires the agent that initially listed the property privately and hires a new agent at a different brokerage that immediately submits the property to the MLS. PI Tr. 57:6–25 (Samuelson). This exception proves the ban is intended to "penalize" agents that market outside the MLS so they do not do so in the future. PI Tr. 57:17–19 (Samuelson) ("[W]e don't think it's fair to penalize the new agent who had nothing to do with convincing the seller to put the listing in the [PLN].").

Tellingly, Zillow's ban also does not apply to "secret" office exclusives, *i.e.*, private listings that are never publicly marketed. It only applies to the public use of a "black box" that Compass displays on its website to alert the public to the existence of the private listings. DX465 ¶ 4(b); DX151 ¶ 3(c); PI Tr. 104:11–105:17 (Samuelson); PX503. This exception again proves transparency was never Zillow's goal. PI Tr. 105:8–11 (Samuelson) ("A. Truly private -- what are known as office exclusive listings in the industry are fine. Q. And that's the least transparent kind of listing, right? A. It is, but some sellers choose that."); *id.* at 108:11 (acknowledging "[f]ewer people would know about" true private exclusives than about Compass's Phase 1 listings). Zillow has enforced its ban since June 2025, but not in MRED's primary service area. Outside that area, the ban significantly chilled private listing use. PI Tr. 150:5–7 (Samuelson) (noting private listings are "declining because of our listing access standards"); *see also* PI Tr. 62:1–11 (Samuelson) (praising the ban for eliminating "competitive pressure" to invest in

---

[6] Zillow began a campaign to ban PLNs in 2024, asking the DOJ for the same relief it seeks here. *See* DX496 (April 2024 Zillow white paper to DOJ). Zillow continued this effort before the DOJ, State Attorneys General, and State legislatures until the end of 2025. *See* DX489 at 14–21; DX498 at 1; DX509.

the development of PLNs); *id.* at 156:23–157:2 ("[F]or agents who received one or two warning notices, 90 percent of them [n]ever had a violative listing afterwards.").

Rebecca Jensen, MRED's CEO, testified she first heard of Zillow's ban on April 15, 2025, while at a conference. PI Tr. 443:20–444:2 (Jensen). She was "flabbergasted" and, *before* she communicated with anyone at Compass about the ban, immediately told Zillow representatives that the ban was "clearly based on having the listing switch agents" and was "not using objective criteria." *Id.* at 444:3–13. She said the ban violated the principles of the 2008 DOJ/NAR settlement. *Id*. at 444:5–6. The next day, Ms. Jensen spoke at a Zillow-sponsored conference for state regulators where she recounted her experience with Zillow and publicly expressed her view that Zillow's ban decisions were based on brokerage and inconsistent with the DOJ settlement. *See id.* at 444:25–446:6. At an April 2025 meeting with Zillow, Ms. Jensen reiterated that "the whole point of the DOJ settlement, was to make sure that MLS data is not used . . . as a weapon to get agents to switch brokerages or to get sellers to switch brokerages." *Id.* at 446:24–447:2.

Over the ensuing months, Ms. Jensen and other MRED representatives repeatedly advised Zillow that the ban violated MRED's rules. *Id*. at 446:10–447:14, 448:8–12; *see also id.* at 201:10–202:10 (Haran); DX094, at 3; DX460; DX512; DX517. In May 2025, MRED sent a message to its Board that "[MRED has] asked [Zillow] to not implement [the Zillow ban] in Illinois, as we feel it does not comply with our existing data delivery policies." DX461; PI Tr. 448:13–24 (Jensen). In Fall 2025, MRED's CTO met with Zillow at a conference. There he reiterated MRED's position and advised Zillow that MRED would be clarifying its rules to address Zillow's questions. PI Tr. at 201:8–202:10, 206:23–207:1 (Haran); DX094, at 3. On October 15, 2025, MRED responded to Zillow's requests for clarification, PI Tr. 447:5–14 (Jensen), by providing a redlined objective criteria rule and stating that "[a] policy or display approach that limits or

12

suppresses listings from certain brokerages would be inconsistent with the revised MRED rules with MLS Grid." DX094, at 2; PI Tr. 450:20–452:3 (Jensen); *see also id.* at 202:11–23 (Haran).

Zillow apparently agreed its ban was undeniably impermissible, as it did not impose it in MRED's primary service area. PI Tr. 431:8–10 (Wu). But Zillow began an aggressive campaign, threatening to sue MRED if it did not change its position. PI Tr. 452:14–455:3 (Jensen) (Zillow told Ms. Jensen: "You can expect your phone to be dumped and all of your text messages to get out and have millions of dollars spent on litigation, and [] you are going to have a public spectacle . . . ."); DX189, at 3 (document preservation letter). Despite Zillow's threats, MRED maintained its position that the ban was "not grounded in any objective fields or data element." DX190, at 4; PI Tr. 457:6–458:8 (Jensen).

For its part, Compass responded to Zillow's ban by complaining loudly to MLSs, including MRED, that the listing standards violated rules against selecting listings on a "nonobjective" basis. PI Tr. 317:15–318:1 (Reffkin).[7] Although Compass asked MRED and other MLSs to enforce their rules, Compass did not promise anything in return or make any threats if an MLS did not. PI Tr. 319:5–17, 325:4–9 (Reffkin). Compass's strong preference was that feed suspension would not be necessary, as Compass wants its Phase 3 listings displayed on Zillow given the breadth of Zillow distribution. PI Tr. 280:24–281:2 (Broude); 319:9–12 (Reffkin). But Compass also firmly believes in seller choice and that Zillow should not dictate that choice. PI Tr. 326:25–327:8 (Reffkin). Zillow, however, believes the opposite, and demonstrated it will go to any lengths to prevent it.

So Zillow approached Compass first with carrots (and now a big litigation stick) to induce Compass to abandon 3PM. PI Tr. 311:1–2 (Reffkin) ("[Compass] should be worried. Zillow has

---

[7] Compass correctly perceived that Zillow's ban targeted Compass specifically. Only 8 of 1,390 suppressed listings were generated by non-Compass agents, despite the large number of agents that market properties outside the MLS. DX201; PI Tr. 152:1–21 (Samuelson); 314:14–21 (Reffkin).

carrots [and] sticks."); 312:6–13 (Reffkin) (Zillow "will not allow" Compass to market outside of Zillow). The substantial carrots were Zillow's offer of "$1.3 to $1.6 billion of annual [revenue] uplift" to Compass with a goal of "doubl[ing] Compass's market share" if Compass stopped using 3PM. PI Tr. 313:8–10 (Reffkin).[8] Zillow also promised to route buyers to Compass so Compass could "double end" transactions (earning a seller and a buyer commission) (*id.* at 313:10–15). Zillow *now* complains here that private exclusives improperly increase double-ended transactions, which is even more ironic because Zillow now routes Zillow Preview inquiries to the listing agent to "double end" deals, for a cut of the commission of course. Compl. ¶¶ 68–69, ECF 1.

Compass firmly rejected Zillow's offer in order to protect seller choice. PI Tr. 313:16–17 (Reffkin) ("Q. Did you accept that offer? A. No."). Then, in addition to lobbying MLSs to enforce their rules, Compass entered into an agreement in March 2026 with Redfin.com in which Compass would provide Redfin access to all of Compass's Phase 2 "Coming Soon" listings, which at the time were subject to the Zillow ban. PI Tr. 330:4–10 (Reffkin). This successful expansion of the reach of Phase 2 of 3PM forced Zillow to respond competitively in two ways. First, Zillow launched "Zillow Preview," which Zillow admits was a direct response to the Compass/Redfin transaction. PI Tr. 118:13–119:18 (Samuelson) (Redfin transaction "certainly" motivated Zillow Preview launch); DX029, at 170:19–171:2 (Hofmann Dep.) ("Zillow Preview was launched . . . as a competitive response to Compass and Redfin's partnership . . . ."); DX490, at 8 (Compass/Redfin "deal massively disrupts the status quo"), 9 (emphasizing need to "execute swiftly" a response through Zillow Preview). Zillow Preview is a pre-MLS marketing strategy very similar to

---

[8] The FTC also is suing Zillow over agreeing with Redfin not to compete for apartment listings in exchange for $100 million. *See FTC v. Zillow Grp., Inc.*, No. 1:25-cv-01638-AJT-WBP (E.D. Va. Sept. 30, 2025).

Compass "Coming Soon" listings that appear on Redfin.com and are entered into MRED's PLN. PI Tr. 65:15–70: 14 (Samuelson); *see also* PI Tr. 322:13–14 (Reffkin).

Second, it forced Zillow to revise its ban to accommodate pre-MLS marketing that the ban previously forbade. DX151. Under the original ban, any "pre-MLS marketing" resulted in a Zillow ban, *see* DX465 ¶ 5, and Zillow Preview is "pre-MLS marketing," PI Tr. 117:11–12 (Samuelson). So Zillow was forced to revise its own ban to permit "coming soon" listings. PI Tr. 117:25–118:5 (Samuelson) ("[W]e modified our listing access standards" because "some Zillow Preview listings would have violated the original listings access standards."). However, it continues to ban private marketing like Compass's Phase 1 of 3PM–where Compass has "Private Exclusives" but informs any home buyer that comes to Compass's website or office that they may access those listings. *See* DX151 ¶ 3(a). The Zillow ban incongruously permits private listings but only if the brokerage does not make the existence of those listings transparent to the searching public. PI Tr. 104:19–105:17 (Samuelson) (affirming this "least transparent kind of listing" is permissible under Zillow's ban). And the ban continues to permit listings that were previously privately marketed if the homeseller fires the original agent and hires a new agent who did not engage in pre-MLS marketing. PI Tr. 57:8–19 (Samuelson).

Compass's efforts to protect seller choice also included taking advantage of MRED's desire to expand nationally and placing its active listings on MRED including those Zillow previously banned. PI Tr. 269:6–10 (Broude); DX022, at 1; PI Tr. 324:2–17 (Reffkin). Because Zillow declined to enforce the ban in MRED's primary service area, Compass hoped all MRED-distributed listings would be displayed by Zillow. *See* DX022, at 1; PI Tr. 323:19–23, 339:6–17 (Reffkin). That hope was swiftly shattered. Zillow not only banned those listings, but also falsely informed Zillow users that the properties were not for sale even though they were. *See, e.g.,* DX591

15

(erroneous Zillow listing); DX589 (Compass listing submitted to the IDX feed); *see also* PI Tr. 315:7–316:14 (Reffkin) (explaining Zillow "get[s] the IDX feed like everyone else" and intentionally "changed it to manipulate the page and punish the seller").

After learning Zillow selectively banned listings from MRED's feed, MLS Grid sent Zillow a notice that it was violating the "objective criteria" rule, giving Zillow 13 days to cure. DX169, at 3. Zillow chose not to cure its violations, and MRED accordingly suspended Zillow's listing feed access on May 20, 2026. PI Tr. 221:6–8 (Hofmann). As a result of this Court's Temporary Restraining Order, the suspension lasted just two days. ECF 50. Zillow insists that preventing Zillow from enforcing its listing ban will "undermine Zillow's ability to protect the quality and quantity of its listings, lead[ing] to a negative spiral of declining traffic and platform liquidity." PI Tr. 21:13–16 (Lau). But its own witnesses confirm Zillow suffered no harm and no "downward spiral" from not enforcing its ban. PI Tr. 143:2–20 (Samuelson); *see* PI Tr. 431:8–16 (Wu) ("Zillow has not been in a downward spiral in Chicagoland" even though "Zillow has never enforced its standards in Chicago").

## ARGUMENT

### I.  PRELIMINARY INJUNCTION STANDARD

"A preliminary injunction is an extraordinary and drastic remedy." *Int'l Test & Balance, Inc. v. Associated Air & Balance Council*, 14 F. Supp. 2d 1033, 1038 (N.D. Ill. 1998) (citation omitted). "[A] plaintiff seeking a preliminary injunction must make a clear showing that 'he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *Starbucks Corp. v. McKinney,* 602 U.S. 339, 346 (2024) (quoting *Winter v. NRDC, Inc.*, 555 U.S. 7, 20, 22 (2008)); *see Minocqua Brewing Co. v. Hess*, 160 F.4th 849, 855 (7th Cir. 2025). Making "a strong showing" of a likelihood of success on the merits is "a significant

16

burden." *Ill. Repub. Party v. Pritzker*, 973 F.3d 760, 762–63 (7th Cir. 2020). "[A] possibility of success is not enough." *Id*. at 762. Nor is "a 'better than negligible' chance." *Id.* (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)). A clear showing that "irreparable injury is likely" is a similar threshold requirement. *Id*. at 763 (quoting *Winter*, 555 U.S. at 22).

## II.      ZILLOW HAS NOT SHOWN LIKELIHOOD OF SUCCESS ON ITS SECTION 1 CLAIM

Zillow cannot show–much less "clearly" or "strongly"–that it is likely to succeed on its Section 1 claim. Most fundamentally, Zillow cannot prove an unlawful "agreement." Compass and MRED may have moved in similar directions, but the evidence amply demonstrates these were unilateral moves in each company's respective interest in response to Zillow's overt threats. Moreover, the Seventh Circuit and other courts recognize that only the rule of reason applies to MLS-conduct rules like those at issue here. Thus, Zillow's attempt to characterize Compass's and MRED's conduct as a *per se* illegal group boycott fails, for Compass and MRED are not horizontal competitors, and an MLS like MRED is a productive joint venture.

Zillow's rule of reason case–which requires full consideration of the anticompetitive and procompetitive effect of any alleged restraint–has no likelihood of success. Zillow's conduct– punishing agents to eliminate off-MLS marketing–is facially anticompetitive, denies consumer choice, and reduces product diversity in the market. Compass's 3PM and MRED's PLN are procompetitive and satisfy consumer demand. Even Zillow's witnesses concede that sellers have multiple reasons to choose private listings. The Seventh Circuit has warned, in words particularly applicable here, "that business rivals may seek to use antitrust to stifle rather than promote competition, [and therefore] the pro- or anti-competitive effects on the market at large should be an important factor in the district court's analysis" of a preliminary injunction request. *Ball Mem'l Hosp., Inc. v. Mutual Hosp. Ins., Inc.*, 784 F.2d 1325, 1334 (7th Cir. 1986).

17

### A. Zillow Has Shown No Anticompetitive Agreement

"To prevail under § 1 under any theory, plaintiffs generally must prove . . . defendants had a contract, combination, or conspiracy ('an agreement')" in restraint of trade. *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 705 (7th Cir. 2011). "[I]ndependent parallel behavior" does not violate Section 1, *In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 879 (7th Cir. 2015), and to show likelihood of success, Zillow must show evidence that "tends to exclude the possibility of independent action." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 554 (2007). Zillow has not done so.

Zillow contends Compass and MRED *agreed* that MRED would cut Zillow's listing feed. But at the hearing, Zillow admitted the only evidence it can provide is communications between the parties, including Compass's complaints that the Zillow ban violated MRED's rules. *See* PI Tr. 18:17–20:22 (Lau). Compass, though, is both a contributor of listings to and a recipient of listings from MRED. The Supreme Court's seminal *Monsanto* decision thus rejects the sufficiency of Zillow's case. There, a dealer complained to a manufacturer about other dealers' noncompliance with a retail price policy, followed by the manufacturer's termination of the disobedient dealers. The Court rejected the idea that these two facts were sufficient to show an agreement, saying specifically that "something more than evidence of complaints is needed." 465 U.S. at 764. It is both "natural" and "unavoidable" that dealers will complain about others' failure to follow policy, therefore "[p]ermitting an agreement to be inferred merely from the existence of complaints, or even from the fact that termination came about 'in response to' complaints could deter or penalize perfectly legitimate conduct." *Id*. at 763; *see also Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 726–30 (1988). The Seventh Circuit reaffirmed this principle in myriad cases. *See, e.g., Miles Distribs., Inc. v. Specialty Constr. Brands, Inc.*, 476 F.3d 442, 451–52 (7th Cir. 2007);

18

*Isaksen v. Vt. Castings, Inc.*, 825 F.2d 1158, 1162 (7th Cir. 1987); *Valley Liquors, Inc. v. Renfield Imps., Ltd.*, 822 F.2d 656, 661 (7th Cir. 1987).

Zillow points to Compass's contact with MRED, including texts, discussions, and emails and the fact that Compass has one seat on MRED's board.[9] But standing alone, communications or other opportunities to agree are not sufficient to show agreement. Again, *Monsanto*: "[T]he fact that a manufacturer and its distributors are in constant communication about prices and marketing strategy does not alone show that the distributors are not making independent pricing decisions." 465 U.S. at 752. Similarly, in *Text Messaging*, the Seventh Circuit held that communications even among competitors, without their content demonstrating an agreement, was not sufficient. 782 F.3d at 870, 879. As Dr. Aron explained, MRED had strong, independent incentives to enforce its display rules "to maintain the integrity of the data" and ensure participants' "ability to cooperate in the use of that data for creating real estate transactions [that] isn't competitively biased against any particular parties." PI Tr. 498:12–16 (Aron); 442:8–443:2 (Jensen); 194:6–195:25 (Haran). "[T]hat's a central economic function of the MLS entity." PI Tr. at 498:17–18 (Aron). And it "maintain[s] the confidence of its constituent members so that that valuable economic function of compiling and distributing data for the benefit of the functioning of the real estate market is preserved." *Id*. at 498:18–22; DX086, at 4–5 ("Our data is trustworthy, accurate, timely, and usable, all in an environment that prioritizes user choice"); DX138 ¶¶ 14–15.

As MRED CEO Rebecca Jensen testified, "when we suspended Zillow's feed, we acted completely on our own," after a *year* of explaining to Zillow that its ban violated MRED rules. PI Tr. 436:8–12 (Jensen). And Compass had strong, independent reasons to support MRED's rule enforcement. "Compass has an interest in ensuring that the rules that are intended to protect against

---

[9] PI Tr. 322:25–323:7 (Reffkin) (confirming Compass has just one seat on MRED's Board of Managers).

19

discrimination against . . . Compass's own marketing program, that it views as novel and beneficial to its customers, is enabled and preserved." PI Tr. 499:7–11 (Aron). Where each company makes an "independent judgment" to take an action, that is not sufficient evidence of unlawful agreement. *Text Messaging*, 782 F.3d at 875; *accord Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986) (plaintiff "must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently") (quoting *Monsanto*, 465 U.S. at 764).

Zillow argues that Compass's eventual decision to place all of its listings into MRED's portal was part of an agreement for MRED to enforce its rules. But MRED's CEO testified that MRED has long had expansion plans. PI Tr. 470:7–471:2 (Jensen). And Compass's CEO testified that Compass's support was a unilateral decision by Compass, to expand the reach of its own listings and endorse MRED's commitment to data protection. PI Tr. 324:2–21 (Reffkin). In fact, MRED's expansion to other areas is procompetitive, as it offers a different business model by protecting PLNs and seller choice. PI Tr. 467:7–15, 470:5–22 (Jensen). To be sure, Zillow opposes MRED's expansion because it does not like MRED's rules. But Zillow cannot show Compass and MRED did anything but independently pursue their own interests. *Miles Distribs.*, 476 F.3d at 450 ("ambiguous evidence" is insufficient to support "an inference of" a Section 1 claim).

## B. Defendants' Conduct Is Not *Per Se* Unlawful

Antitrust cases involving MLS rules of conduct, including from this Circuit, apply the rule of reason, not the *per se* rule.[10] For example, in *Reifert v. S. Cent. Wisc. MLS Corp.*, 450 F.3d 312

---

[10] *See, e.g.*, *Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 279, 290 (4th Cir. 2012) ("[T]he cooperative actions of MLS members are not per se unreasonable"); *Realcomp II, Ltd.*, 635 F.3d at 825–27; *Thompson v. Metro. Multi-List, Inc.*, 934 F.2d 1566, 1579 (11th Cir. 1991) (discussing "pro-competitive effects inherent in" MLSs); *Murphy v. Alpha Realty, Inc.*, 1978 WL 1451, at *9 (N.D. Ill. Dec. 7, 1978) (MLS requirements "must be tested under the 'rule of reason'"). A *per se* violation, on the other hand, requires agreement to a specific kind of activity that "always or almost always tend[s] to restrict competition and decrease output." *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 19–20 (1979).

(7th Cir. 2006), a buyer's agent challenged an NAR "non-solicitation rule" that "prohibit[ed] members from inducing sellers to breach listing contracts . . . and using 'information received through a Multiple Listing Service . . . to target clients of other Realtors.'" *Id*. at 315. The court said, "[w]e must review a challenge to [the rule] under the rule of reason to determine whether the agreement contributes to competition and productivity." *Id*. at 321. Similarly, in *United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1367–68 (5th Cir. 1980), the court held that MLS distribution can help overcome market inefficiencies, rejecting the government's attempt to apply a *per se* rule. *Id*. (detailing the "enormously procompetitive objectives" of MLSs). The court further observed, "it may well be necessary to the success of a multiple listing service to establish some standards of competence, professionalism, and mode of operation for admission to membership." *Id*. at 1369.

In any event, modern group boycott law applies a *per se* rule only when two conditions are met: (1) the parties to the agreement are horizontal competitors, *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998) ("[P]recedent limits the *per se* rule in the boycott context to cases involving horizontal agreements among direct competitors."), *and* (2) the agreement is not part of (or appropriate to) a productive venture but instead simply forecloses competition, *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 294 (1985). Neither is true here.

First, Compass and MRED are not competitors,[11] and courts should be "cautious about importing relaxed standards of proof from horizontal agreement cases into vertical agreement cases [because doing] so might harm competition and frustrate the very goals that antitrust law seeks to achieve." *Republic Tobacco v. N. Atl. Trading Co.*, 381 F.3d 717, 737 (7th Cir. 2004).

---

[11] Although Zillow and its expert spent significant time describing Zillow as a competitor to MRED and Compass, those claims are irrelevant. A group boycott arises from an agreement between competitors, and in this case, Zillow alleges the relevant agreement was between Compass and MRED. Compl. ¶ 1, ECF 1.

21

Compass and MRED have a vertical relationship. As Zillow's Chief Industry Development Officer Errol Samuelson agreed, an MLS is "a database, a cooperative of agents and brokers who share their listings." PI Tr. 38:2–5 (Samuelson); *see also* DX145 ¶ 13 (Decl. of E. Samuelson). ("MRED aggregates and distributes local for-sale listings to its members, agents, brokerages, including online platforms like Zillow."). Unlike Compass, MRED does not create listings and has no role in the marketing or sale of properties. Plaintiff's expert Dr. Wu argued that, because Compass and MRED both provide *means* through which listing agents might reach potential buyers, Compass and MRED are direct competitors. PI Tr. 401:25–402:4 (Wu).[12] But that is analytically wrong. As Dr. Aron explained, entities are competitors if they provide competing products or services, not because they use similar tools. PI Tr. 495:5–496:6; 497:17–498:2 (Aron); *see also id.* at 488:9–10 ("Compass and MRED do not compete with each other."); *see also Reifert*, 450 F.3d at 318 ("Products and services are in the same market when they are good substitutes."). Compass and MRED provide complementary products, not competing substitutes. PI Tr. 493:13–494:17 (Aron).

Second, any alleged agreement here (and again there is none) would not *foreclose* competition, it would *promote* it. Zillow is the party that, through its ban, seeks to abolish an entire marketing strategy for residential real estate, depriving consumers of the ability to choose that strategy out of fear of Zillow's punishment. Compass and MRED each took independent steps to counter Zillow's anticompetitive threat and preserve consumer choice. Antitrust law does not deem such conduct to be an anticompetitive group boycott.

---

[12] Of course, this is fundamentally inconsistent with Zillow and Dr. Wu's other claim that MRED is a monopolist *and* the relevant market has significant barriers to entry. PI Tr. 385:1–9; 403:4–12 (Wu); DX174, at 41–42 (discussion of barriers to entry); *cf.* PDX 2.9, *with* PDX 2.33.

### C.      Zillow Cannot Prevail Under the Rule of Reason

Evaluating Zillow's case under the rule of reason does not change the outcome, because in addition to failing to show any anticompetitive agreement, Zillow has not shown (1) Compass has market power in any well-defined market; (2) private listings are anticompetitive; or (3) MRED's rules protecting its listing data are anticompetitive. "To prevail under the rule of reason, a plaintiff must offer evidence of anticompetitive effects." *Fourqurean v. NCAA*, 143 F.4th 859, 867 (7th Cir. 2025). But that is only the threshold burden, because the rule of reason is "'a fact-specific assessment of market power and market structure' aimed at assessing the challenged restraint's 'actual effect on competition'–especially its capacity to reduce output and increase price." *NCAA v. Alston*, 594 U.S. 69, 88 (2021) (quotation omitted); *see also Fourqurean*, 143 F.4th at 869.

### 1.      Zillow Failed To Establish Market Power

"Market power is a necessary ingredient in every case under the Rule of Reason." *Ball Mem'l Hosp.*, 784 F.2d at 1334. "Firms without market power bear no burden of justification." *Id*. at 1335. Evidence of market power may be direct–a showing that the defendant can "reduce output and increase price" in a relevant market. Or it may be indirect, through showing that the defendant has a high enough market share of a relevant market that the court might presume market power. In either method, a "relevant market" is a market that closely defines a product and geographic market that, through appropriate economic testimony, bounds a competitive domain for sellers and buyers. "Without a definition of that market, there is no way to measure [a defendant's] ability to lessen or destroy competition." *Walker Process Equip. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965).

Zillow's assertions of market power do not correspond to any well-defined market. As Dr. Aron explained, Zillow and Dr. Wu's purported "listing creation and distribution market" lacks "evidence-based analysis" of the substitutability of products or services by consumers.

23

PI Tr. 495:5–496:15 (Aron). Again, Compass's services to sellers (creating listings and marketing properties) are complements to MRED's services (aggregating and distributing listings to brokers). *Id*. at 493:13–494:14. They are not substitutes. *Id*. Dr. Wu wrongly focuses on "the tools that platforms use to enter listings. And tools are not the foundation of an economic market." *Id*. at 495:11–18. *See Reifert*, 450 F.3d at 318 ("Products and services are in the same market when they are good substitutes for one another.").

### 2. Private Listings Are Not Anticompetitive

One thing Zillow is transparent about is that its attack on Compass and MRED, through its listing ban and otherwise, is an attempt to stop the "proliferation of private listing networks"–or at least to severely restrict their scope. PI Tr. 218:6–9 (Hofmann). Zillow touts the listing ban's success in suppressing PLN use. PI Tr. 62:2–11 (Samuelson); 218:6–14 (Hofmann); 314:20–315:6 (Reffkin). But PLN marketing is chosen by *homesellers*, and for myriad reasons. Moreover, once Compass private listings move to the third phase of 3PM, they are entered into the MLS and distributed to Zillow, which Compass and its sellers want as an option as well.

Compass's 3PM strategy and MRED's PLN therefore *increase* output–by increasing the combination of options available to sellers. "A 'restraint' that in the end expands output serves the interests of consumers and should be applauded rather than condemned." *Chi. Pro. Sports Ltd. P'ship v. NBA*, 961 F.2d 667, 673 (7th Cir. 1992); *Chi. Pro. Sports Ltd. P'ship v. NBA*, 95 F.3d 593, 597 (7th Cir. 1996) ("Unless a contract reduces output in some market, to the detriment of consumers, there is no antitrust problem."). On the other hand, Zillow's ban seeks to *deprive* sellers of the option to first privately market and then actively list on the MLS (and Zillow) using a single agent. *See FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 459 (1986) ("limiting consumer choice by impeding the ordinary give and take of the marketplace cannot be sustained under the Rule of Reason") (internal quotations and citation omitted); *NCAA v. Bd. of Regents of Univ. of Okla.*,

24

468 U.S. 85, 102 (1984) ("[A]ctions [that] widen consumer choice . . . can be viewed as procompetitive"); *Wis. Music Network, Inc. v. Muzak Ltd. P'ship*, 5 F.3d 218, 223 (7th Cir. 1993) (rejecting antitrust claim at preliminary injunction stage because "[t]he effect of the program increases consumer choice"). As explained, the history of antitrust agency interventions in real estate markets has been to ensure that multiple and alternative business models operate together with the benefits of the MLS and broker trade associations. PI Tr. 440:6–442:14 (Jensen). And the DOJ successfully pressured the NAR to revise the Clear Cooperation Policy specifically to allow off-MLS marketing, all in service of competition. *See supra* at 5, 9–10.

### 3. MRED's Neutral Data Protection Rules Do Not Harm Competition

MRED's data protection rules, which apply equally to all MRED participants, facilitate and protect the increase in output described above. Zillow baselessly claims the purported injury to its business model matches injury to sellers, who allegedly sell homes for less money, and to buyers, who have access to fewer properties. But any injury to Zillow though, standing alone, does not count. "The antitrust laws . . . were enacted for 'the protection of *competition,* not *competitors*.'" *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) (quotation omitted). Plaintiffs lack antitrust standing where their injuries are from *increased* competition. *See James Cape & Sons Co. v. PCC Constr. Co.*, 453 F.3d 396, 399 (7th Cir. 2006) (no antitrust injury even though defendant's bid rigging may have injured plaintiff because those "activities actually *increased*, rather than restricted, competition, albeit in an illegal manner"); *Phila. Taxi Ass'n, Inc. v. Uber Techs., Inc.*, 886 F.3d 332, 344 (3d Cir. 2018) (no antitrust injury for taxi drivers because "Uber's entry into the Philadelphia market, regardless of its legality, *increased* . . . competition"). Zillow's alleged injury here, if it exists at all, is just that—an injury from the *increased* competition that MRED's rules facilitate.

25

To be sure, Zillow cannot show that MRED's display rules injure consumers. That is because fully informed consumers choose private listing networks if there are no adverse consequences, and MRED's procompetitive display rules protect consumers from such consequences. Zillow claims homesellers suffer lower sale prices when homes are privately marketed, but the studies on which Zillow relies are poorly executed and contradicted. First, Dr. Wu's model improperly included an endogenous variable–that is, he sought to identify a price effect, but in creating his purported control group, he weighted properties in part using a *price* characteristic. That invalidates his result. PI Tr. 509:11–510:3 (Aron). When Dr. Aron used Dr. Wu's model without that error, the results actually showed privately marketed sale prices were *higher*. *Id*. at 510:4–23. Second, Zillow's other studies "are really more like press releases [than] a peer-reviewed study," *id.* at 511:3–10, and the only study in peer-reviewed literature showed higher prices from private marketing. *Id*. at 512:2–10.

Most importantly, even if MLS sale prices were slightly higher, that does not establish consumer injury. Consumer welfare is, of course, determined by consumers, who consider price, quality, and a variety of other factors. Dr. Aron explained that one cannot conclude consumers are hurt simply because prices may be higher, as consumers may value nonprice considerations. PI Tr. 507:9–508:18 (Aron). Zillow's own testimony admits that sellers may value privacy or convenience (among a long list of things) over price when deciding to sell their homes. PI Tr. 104:19–105:6 (Samuelson) ("[P]rivate listings are fine, right, because there are some sellers who prioritize privacy."), 112:14–16 (Samuelson) ("[T]he seller may be taking a lower price, but they're taking it in exchange for convenience"). The Supreme Court has emphasized that consumer choice drives consumer welfare. "A restraint that has the effect of reducing the importance of

26

consumer preference in setting price and output is not consistent with this fundamental goal of antitrust law." *Bd. of Regents*, 468 U.S. at 107.

Even if Zillow's worst-case scenario–its "downward spiral" resulting from MRED's rule enforcement–occurred, consumers would not likely be injured. As Dr. Aron testified, Zillow's largest competitors—Homes.com, Redfin, and Realtor.com–are sophisticated, well-funded companies. PI Tr. 513:2–19 (Aron). These companies would expand, and "[c]onsumers would not be worse off." *Id*. at 514:8. Dr. Wu conceded that "most people" are already using multiple platforms in their home searches. PI Tr. 429:4–6 (Wu). "And there's no reason to expect that these platforms not only couldn't absorb the traffic that would arguably be diverted from Zillow, but that they wouldn't make even more investments in meeting the opportunity." PI Tr. 514:15–18 (Aron). In *Chicago Studio Rental, Inc. v. Illinois Dep't of Commerce*, 940 F.3d 971 (7th Cir. 2019), the Seventh Circuit rejected the plaintiff's claim that injury to its business constituted consumer injury for just the same reason. "'Transfer of business from one company to another, however, without an accompanying effect on competition, cannot be an antitrust violation' because antitrust laws protect competition, not competitors." *Id*. at 979 (quotation omitted).

### 4. Zillow's Other Justifications for Its Listing Ban Are Illusory

Zillow makes three other related arguments that consumers would benefit from its listing ban. Each is illusory. First, Zillow argues privately marketed listings are "stale" when they reach the MLS and Zillow. But Zillow has no evidence of this. The whole point of private listings is to permit a homeseller to pre-market a home *without* the MLS tracking the number of days on market. But as the Court also noted, Dr. Wu's Figure 1, showing a declining number of views for Zillow-displayed listings, makes no distinction between listings that were previously privately marketed and those that were not. PI Tr. 388:20–389:6 (colloquy between the Court and Dr. Wu). Further undermining Zillow's "stale" listing story is that Zillow permits a privately marketed listing to be

27

displayed if the seller hires a new agent to list the property. DX151, at 3, ¶ 3(c)(iii). Zillow's CFO Jeremy Hofmann tellingly testified that "stale" does not (to Zillow) have its usual meaning of "too old." A listing to Zillow is "stale" *only* if it was privately marketed before hitting the MLS and Zillow and the same agent represents the seller at the time it does. PI Tr. 226:8–24 (Hofmann).

Second, Zillow complains that buyers should have access to "all listings," relying on a "more information is better" rationale. This is deeply ironic, as Zillow suppresses available for-sale homes by manipulating listings to deliberately deny users information about properties for sale. *See supra* at 15–16. Even more ironically, Zillow is now hosting its own PLN–Zillow Preview–that it previously would have banned under its own listing ban. In all events, Zillow does not show any concrete consumer harm, *supra* at 25–27, which is the highest concern of antitrust.

Last, Zillow frequently suggests that consumers who choose Compass's 3PM strategy are being misled. But there is no evidence to support that assertion, and it flies in the face of Compass's comprehensive disclosures, which are signed by every seller. PI Tr. 303:17–305:24 (Reffkin); DX578. It also flies in the face of the fiduciary duties of agents. *See supra* at 3. Even if this allegation were true, and it is demonstrably false, the issue would be a matter of consumer protection or tort, not antitrust. "[A]ctions that 'merely interfere with the consumer's freedom of choice in deciding' whether to buy a product are insufficient to support an antitrust claim, absent any further showing of 'demonstrable, anti-competitive impact.'" *MacDermid Printing Sols. LLC v. Cotron Corp.*, 833 F.3d 172, 187 (2d Cir. 2016) (quotation omitted).

## III.   ZILLOW CANNOT SHOW IRREPARABLE HARM

Even if Zillow could show any likelihood of success (which it cannot), it falls far short of the required "clear showing" of irreparable harm in the absence of a preliminary injunction. "A harm is 'irreparable' if it 'cannot be prevented or fully rectified by the final judgment after trial.'" *Girl Scouts of Manitou, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1089 (7th Cir.

28

2008), *abrogated on other grounds by Nken*, 556 U.S. 418 (quotation omitted). Zillow admits it was not and is not enforcing its ban in MRED's primary territory and that in that territory it is not "downward spiraling" or suffering immeasurable injury. At every step, Zillow's injury story is speculative. But even if Zillow was injured to some degree during a trial on the merits, antitrust law's treble damages would make it whole. *See* PI Tr. 519:20–22, 520:17–20 (Aron).

### A.   Zillow's Alleged Harm Is Self-Inflicted

Zillow's claim of irreparable harm is self-imposed. Zillow can choose to ban listings or choose to lose MRED's feeds. If it chooses to ban listings, any resulting injury is self-inflicted. Per the Seventh Circuit, "self-inflicted wounds are not irreparable injury. Only the injury inflicted by one's adversary counts for this purpose." *Second City Music, Inc. v. City of Chi.*, 333 F.3d 846, 850 (7th Cir. 2003).

### B.   Zillow's Claim of Irreparable Injury Is Illusory

Zillow's claim that its business is mortally threatened is made-for-litigation spin. Zillow's own witnesses admit that, in MRED's primary service area where Zillow *never* enforced its ban, Zillow continues to do well. PI Tr. 143:2–20 (Samuelson); 431:11–24 (Wu). It is not spiraling, and its existence has not been threatened. Moreover, as discussed, Zillow's listing ban does not actually target "stale" listings; it targets *agents* for punishment. PI Tr. 57:17–19 (Samuelson) (admitting Zillow ban "penalize[s]" agents for putting listings in a private listing network).

Moreover, as Dr. Aron testified, Zillow's "spiraling" story is entirely unproven. Although spiraling is theoretically possible, whether it occurs "depends on the circumstances of that market and the rules in place." PI Tr. 517:21–22 (Aron). Here, "we've had this laboratory of Chicago . . . of Listing Access Standards not being enforced, and we have not seen evidence of a downward spiral. That is useful evidence about what the effects would be with respect to a spiral on Zillow going forward." *Id.* at 519:9–14. In the time between now and trial, Zillow is not likely to spiral

29

or otherwise face an existential business crisis if denied a preliminary injunction. Irreparable harm is "real, substantial, and immediate," *Right Field Rooftops, LLC v. Chicago Baseball Holdings, LLC*, 80 F. Supp. 3d 829, 836 (N.D. Ill. 2015) (cleaned up), not "remote, speculative, and contingent." *Duthie v. Matria Healthcare, Inc.*, 543 F. Supp. 2d 958, 961 (N.D. Ill. 2008).

### C. Damages Are an Adequate Remedy

Should Zillow prove its claims at trial, it has an adequate remedy at law–treble damages. "In saying that the plaintiff must show that an award of damages at the end of trial will be inadequate, we do not mean wholly ineffectual; we mean seriously deficient as a remedy for the harm suffered." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984). Zillow attempts to fit within two of *Roland*'s reasons why damages might be inadequate. *See id*. It fails at both. First, as noted above, Zillow has not shown its business will fall into a "downward spiral." Second, Zillow's damages (if any) will be reasonably calculable using standard econometric principles. "Although 'a plaintiff may suffer irreparable harm if the nature of the loss makes monetary damages difficult to calculate,' an adequate remedy at law exists when damages can be quantified 'to a reasonable, which is not to say a high, degree of precision.'" *Abrasic 90 Inc. v. Weldcote Metals, Inc.*, 364 F. Supp. 3d 888, 904 (N.D. Ill. 2019) (quotations omitted).

Dr. Aron testified that, although Zillow has many monetization channels, "these strategies all lead to money . . . . It is in the form of revenues and costs. And those are measurable." PI Tr. 520:7–16 (Aron). By comparing Zillow profits before and after the listing ban and comparing areas of listing ban enforcement with areas of nonenforcement, "well-accepted, well-understood, well-researched, and well-published statistical methods for comparing those things over time and over space and assessing the effect of the Listing Access Standards and isolating them on Zillow's business." *Id*. at 521:15–19. "[E]conomists can and do assess such injuries in monetary terms . . . to compensate any antitrust injuries." *St. Luke's Hosp. v. ProMedica Health Sys., Inc.*, 8 F.4th 479,

489 (6th Cir. 2021). "[I]t should be a relatively straightforward process to estimate, by reference to historical data and trends, the amount of lost profits that would have been earned from sales." *Packaging Corp. of Am., Inc. v. Croner*, 419 F. Supp. 3d 1059, 1078 (N.D. Ill. 2020).

### D. Zillow's Delay in Seeking Injunctive Relief Precludes Irreparable Harm

Failure to seek injunctive relief "immediately upon learning [the relevant facts] raises serious question as to the need for the requested order." *Motor Werks Partners, L.P. v. BMW of N. Am., Inc.*, 2001 WL 1136145, at *2 (N.D. Ill. Sept. 24, 2001). That "delay implies a lack of urgency and irreparable harm." *Ixmation, Inc. v. Switch Bulb Co.*, 2014 WL 5420273, at *7 (N.D. Ill. Oct. 23, 2014) (citation omitted) (collecting cases). Here, Zillow displayed listings from MRED's feed, including those previously in MRED's PLN, for many years before the April 2025 announcement of the Zillow ban. After that announcement, and after MRED explicitly told Zillow its ban violated MRED's display rules, Zillow did not sue to challenge those rules for *thirteen* months, undermining any claim of irreparable harm. *See, e.g.*, *Capgemini Fin. Servs. USA Inc. v. Infosys Ltd.*, 2014 WL 340206, at *4 (N.D. Ill. Jan. 30, 2014) (months-long delay "undermines the assertion that it will suffer irreparable injury if no relief is granted").

## IV. ZILLOW'S REQUESTED INJUNCTION WILL INJURE DEFENDANTS AND HOMESELLERS

In the balancing of the equities phase, "the court weighs the irreparable harm that the moving party would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief." *Girl Scouts*, 549 F.3d at 1086. Zillow asks the Court to bless its ban and prevent MRED from enforcing its rules. Preventing MRED from enforcing its rules will block it from achieving national expansion and competing with other MLSs. Compass and its homesellers also would be significantly injured by such an order, as shown in the short history of Zillow's ban. PI Tr. 218:6–10 (Hofmann) (touting success of ban against "proliferation of private listing[s]"). Compass agents

31

and homesellers significantly reduced 3PM use as a result of Zillow's threatened punishment. Compass's 3PM is an innovative product, and Compass's data show that 3PM home sales occur more quickly and at higher prices, which benefits homesellers and enhances Compass's competitive position. The balance of the equities weighs against a preliminary injunction.

## V.     PUBLIC INTEREST WEIGHS AGAINST A PRELIMINARY INJUNCTION

Finally, a preliminary injunction would disserve the public interest, by harming homesellers who desire pre-marketing. In antitrust cases, this is a particularly important consideration. The Seventh Circuit has cautioned that "the plaintiff's interests [sometimes] do not coincide with those of consumers." *Ball Mem'l Hosp.*, 784 F.2d at 1333. "Given the risk that business rivals may seek to use antitrust to stifle rather than promote competition, district courts should pay particular attention to the public interest in such litigation. Thus, in attempting to weigh the equities of granting or denying a preliminary injunction, in the antitrust setting, the pro or anti-competitive effects on the market at large should be an important factor in the district court's analysis." *Id*. at 1334. Whatever interests Zillow may have, antitrust law is clear that consumers are benefited by greater output, more choice, and vigorous competition among companies and business models. Zillow seeks to end all of these to benefit itself. The public would thus be harmed by the preliminary injunction.

## VI.    THE PROPOSED INJUNCTION AGAINST COMPASS VIOLATES FED. R. CIV. P. 65(D)

The only injunctive relief Zillow seeks as to Compass is to enjoin it from "conspiring." That runs afoul of Rule 65(d)'s specificity requirements and the case law. Fed. R. Civ. P. 65(d); *EEOC v. AutoZone, Inc.*, 707 F.3d 824, 841–42 (7th Cir. 2013) (noting "obey the law" injunctions raise concerns of overbreadth and vagueness); *City of Mishawaka, Ind. v. Am. Elec. Power Co.*, 616 F.2d 976, 991 (7th Cir. 1980) (injunction to comply with the Sherman Act violates Rule 65(d)).

32

Dated:    July 9, 2026

*/s/ Nathan P. Eimer*

Nathan P. Eimer
Vanessa G. Jacobsen
Alec Solotorovsky
Brian Y. Chang
EIMER STAHL LLP
224 S. Michigan Ave., Suite 1100
Chicago, IL 60604
Telephone: (312) 660-7600
Fax: (312) 692-1718
neimer@eimerstahl.com
vjacobsen@eimerstahl.com
asolotorovsky@eimerstahl.com
bchang@eimerstahl.com

*Counsel for Defendants*
*Compass, Inc. and Compass Illinois, Inc.*

*/s/ Stephen D. Libowsky*

Stephen D. Libowsky
MANATT, PHELPS & PHILLIPS, LLP
151 N. Franklin St. (Suite 2600)
Chicago, IL 60606
Telephone: (312) 477-4798
slibowsky@manatt.com
Attorney No. 6187081

Dylan M. Carson (*pro hac vice*)
Joshua N. Drian (*pro hac vice*)
MANATT, PHELPS & PHILLIPS, LLP
1050 Connecticut Ave. NW (Suite 600)
Washington, D.C. 20036
Telephone: (202) 585-6500
dcarson@manatt.com
jdrian@manatt.com

Zachary J. Howe (*pro hac vice*)
MANATT, PHELPS & PHILLIPS, LLP
12730 High Bluff Dr. (Suite 300)
San Diego, CA 92130
Telephone: (619) 205-8500
zhowe@manatt.com

*Counsel for Defendant*
*Midwest Real Estate Data LLC*

33

## **CERTIFICATE OF SERVICE**

I hereby certify that, on July 9, 2026, I electronically filed a copy of the foregoing through

the Court's CM/ECF system, which will send notifications of the filing to all counsel of record.

Dated: July 9, 2026                                    */s/ Nathan P. Eimer*

34