# DX496

April 18, 2024

# Zillow White Paper for the Department of Justice: Competition Issues Involving MLS Rules

Confidential & not for distribution. Sensitive information shared subject to confidentiality protections.



HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER

ZG-MC-00049492

DX496 - page 1 of 27



Zillow Group, Inc. ("Zillow") appreciates the opportunity to present this submission to the United States Department of Justice ("DOJ" or the "Agency") in connection with the DOJ's investigation into the No-Commingling Rule. This submission is submitted pursuant to the attached letter of confidentiality. Zillow requests that this submission and all information contained therein be afforded all confidentiality protections as set forth in the attached letter and all applicable statutes, regulations, and customary confidentiality policies.

# Introduction

Before the internet, homeowners and prospective buyers had limited access to information during the home buying and selling process. The real estate market was a "walled garden," accessible only by working with a real estate agent. In recent years, the proliferation of digital consumer-facing platforms like Zillow, Redfin, Realtor.com, and Homes.com has significantly reduced the barriers consumers historically faced when searching for and selling residential properties. Transparency and access to data, which can be facilitated by Multiple Listing Services ("MLSs") and online platforms that display listings data, are critical to ensuring an open, fair, and competitive real estate market. With access to a greater number of listings and insights into information about available properties, prospective buyers can find and negotiate for the homes that best fit their needs. Sellers also benefit from this transparency, as it allows them to determine an optimal listing price based on recent transactions in the surrounding area and market their properties to a wider range of prospective buyers and negotiate for the best possible prices and terms. Further, transparency and access to data promotes competition by reducing barriers to entry in the brokerage market, thus allowing small and nascent firms with different business models to compete against the large national brokerages.

Despite these advancements, there remain significant barriers to achieving an open and competitive market, largely due to several National Association of Realtors ("NAR") rules. Specifically, NAR's implementation and MLSs' adoption and enforcement of two rules—the "Office Exclusive" exception to the Clear Cooperation Policy and the No-Commingling Rule—harm competition by eliminating the transparency and access to data required to achieve an open, equitable, and competitive residential real estate industry.

NAR's mandatory Clear Cooperation Policy was implemented to increase transparency and protect potential buyers from the discriminatory effects of pocket listings, but the Office Exclusive exception created a loophole that allows agents to withhold listings from the

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER

ZG-MC-00049493

**DX496 - page 2 of 27**

general public and competing brokerages. Agents have increasingly abused this loophole to the detriment of both buyers and sellers.

Home buyers are enticed into paying elevated buy-side commissions for access to exclusive listings only accessible through their brokerage. In addition, NAR's No-Commingling Rule reduces transparency by preventing listings from non-MLS sources to appear alongside MLS listings. Listings from non-MLS sources include, but are not limited to, for sale by owner ("FSBO"), new construction, and auction properties. The reduced visibility of these types of available properties means that prospective buyers do not have a complete view into the choices available to them and must rely upon their agent to provide them with listings, who might have an incentive to highlight certain listings over others for a variety of reasons (e.g., opportunity for dual agency, higher commission offers, etc.).

Moreover, the No-Commingling Rule can create a competitive disadvantage for certain home sellers (e.g., sellers of FSBO, new construction, or auction properties) by limiting exposure of their properties. As a result, these sellers can feel like they have no choice but to list their property with an MLS-affiliated agent. These are also the types of properties that often provide an alternative compensation model compared to traditional agent listings, yet consumers may have less visibility into these homes due to the separate online search experience required by the No-Commingling Rule.

Equitable access to accurate and reliable listing information is imperative, as it increases the visibility of non-MLS listings, lowers transaction costs, and increases price competition in the residential real estate market. The purchase of a home is one of the most important and expensive events in a person's life, and it is critical that consumers have the options, information, and resources needed to navigate the home buying and selling process. Accordingly, Zillow urges the DOJ to pursue elimination of the Office Exclusive exception to the Clear Cooperation Policy and the No-Commingling Rule.



MLS listings book from 2001

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER

ZG-MC-00049494

**DX496 - page 3 of 27**

Zillow

# Private Listing Networks

## *Clear Cooperation Policy*

In January 2020, NAR enacted the Clear Cooperation Policy, a mandatory rule requiring brokers to submit listings to the MLS within one business day of marketing the property to the public.[1] Under the rule, marketing to the public includes any medium through which a property is publicly marketed beyond the agent, including erecting a 'for sale' sign in the front yard, placing an ad in a local newspaper, or posting the property on a real estate website like Zillow. The rule did, however, stipulate that one-to-one marketing, between the listing brokerage and an individual client did not constitute "public marketing."

In the years leading up to NAR's enactment of the Clear Cooperation Policy, concerns emerged over the use of "pocket listings" to discriminate against people of color. With a pocket listing, the home seller's agent effectively keeps the listing for themselves and markets the property privately to select buyers or agents, giving real estate agents the power to dictate the universe of potential buyers of the property. By shielding available homes from most buyers, pocket listings may facilitate disparate treatment or disparate impact, hiding properties from people based on legally protected demographics like race, national origin, or religion. Indeed, as the National Fair Housing Alliance ("NFHA") has explained, "sellers and real estate agents who want to engage in discrimination can use [pocket listings] easily to hide properties from borrowers of color," in violation of the Fair Housing Act and Civil Rights Act of 1866.[2]

NAR enacted the Clear Cooperation Policy to combat widespread concerns about housing discrimination facilitated by pocket listings. According to NAR, the Clear Cooperation Policy was an effort to "foster broker cooperation and address the problems surrounding off-market listings" that was enacted in response to a NAR working group study finding that "listings

_____

[1] The Clear Cooperation Policy provides that "[w]ithin one (1) business day of marketing a property to the public, the listing broker must submit the listing to the MLS for cooperation with other MLS participants. Public marketing includes, but is not limited to, flyers displayed in windows, yard signs, digital marketing on public facing websites, brokerage website displays (including IDX and VOW), digital communications marketing (email blasts), multi-brokerage listing sharing networks, and applications available to the general public." National Association of Realtors, Clear Cooperation Policy, https://www.nar.realtor/about-nar/policies/mls-clear-cooperation-policy.
[2] National Fair Housing Alliance, Fair Housing Solutions: Overcoming Real Estate Sales Discrimination (2019) at 12, https://nationalfairhousing.org/wp-content/uploads/2019/12/Fair-Housing-Solutions-Overcoming-Real-Estate-Sales-Discrimination-2.pdf

Zillow White Paper for the Department of Justice: Competition Issues Involving MLS Rules   |   4

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER

ZG-MC-00049495

**DX496 - page 4 of 27**



outside of the broader marketplaces excludes consumers, undermining REALTORS®' commitment to provide equal opportunity to all."[3]

The Office Exclusive exception circumvents these goals to the detriment of consumers.

### *The Office Exclusive Loophole*

The Clear Cooperation Policy contains a significant exception to the requirement that listings must be posted to the MLS within one business day of being marketed to the public. Under the Office Exclusive exception, listing agents can share listings with other agents within their same brokerage firm without having to post them on the MLS.[4] This exception was intended to provide a narrow carve out to protect the privacy of high-profile sellers, such as celebrities, wishing to maintain anonymity when selling a property. The language of the Clear Cooperation Policy indicates that this was designed to be a narrow exception, providing that MLS members are excused from disseminating listing information to the MLS "if the seller *refuses* to permit the listing" to appear on the MLS.[5]

Far from serving as a narrow exception just for cases requiring privacy, brokerages and agents have used the office exclusive exception as a loophole to engage in the exact type of conduct the rule sought to prevent. Indeed, brokers and agents have expanded the exception beyond the intended scope of the rule by keeping listings within a brokerage even when homeowners do not "refuse" to include the listing on the MLS but rather are persuaded by an agent that there is some benefit to limiting the marketing of the listing to agents within one brokerage. As a result, the most powerful brokerages in the country have begun compiling their listings in internal private data networks, often referred to as Private Listing Networks ("PLNs"), composed of these exclusive listings.

While a fraction of home sellers choose not to publicly market their homes for privacy reasons, the expanded use of these "exclusive" networks harms consumers by reducing housing access for buyers, which may lead to potential fair housing problems. In a recent study of homes sold between 2020 and July 2023 in the Bright MLS service area, Bright MLS found that office exclusive or pocket listings were more common "in white neighborhoods with higher shares of white residents" and "were also more common in higher-income

---

[3] National Association of Realtors, *Backstory Behind the Clear Cooperation Policy Proposal* (Oct. 30, 2019), https://www.nar.realtor/backstory-behind-the-clear-cooperation-policy-proposal.

[4] Clear Cooperation Rule Section 1.3 provides that "If the seller refuses to permit the listing to be disseminated by the service, the participant may then take the listing (office exclusive) and such listing shall be filed with the service but not disseminated to the participants. Filing of the listing should be accompanied by certification signed by the seller that he does not desire the listing to be disseminated by the service." https://www.nar.realtor/about-nar/policies/mls-clear-cooperation-policy.

[5] *Id.*

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER

ZG-MC-00049496

**DX496 - page 5 of 27**



neighborhoods."[6] Based on this study, Bright MLS concluded that "the practice of pocket listings increases housing inequalities, reinforces residential segregation patterns, and raises fair housing concerns."[7]

Furthermore, the decreased marketing exposure harms sellers and allows agents to maintain artificially high commissions.

### PLNs Harm Consumers

The Office Exclusive loophole has enabled powerful brokerages to engage in anticompetitive conduct that harms home buyers and sellers as well as small and nascent brokerages. Brokerages establish PLNs by persuading homeowners to enter into exclusive agreements that limit dissemination of the seller's listing to within the listing agent's brokerage. Under these agreements, a seller's property cannot appear on the MLS. As with pocket listings, PLNs may appeal to certain sellers because they offer more privacy in the sales process. However, PLNs harm more typical homeowners by limiting the number of prospective buyers that can see a seller's listing. Although listings on PLNs may reach more prospective buyers than a traditional pocket listing held by a single agent, they reach only a fraction of the number of prospective buyers MLS listings reach. This reduced exposure may make it difficult for a seller to quickly find a competitive buyer for their home, as studies have shown that MLS listings often sell faster and for a higher sales price than "office exclusives."[8] By limiting the potential market of buyers, PLNs typically do not/cannot generate bidding wars among prospective buyers to maximize their sale price. As a result, sellers that list their homes on PLNs may receive less for their home than they would on the MLS.

In addition, the Office Exclusive exception inhibits competition and raises prices for home buyers by enabling PLNs to set artificially high buyer broker commissions. Before a prospective buyer can gain access to the listings on a PLN, they must enter into a contract that requires them to agree upfront to pay the buyer broker a set commission, allowing the

---

[6] *See* "Dispelling Myths about Real Estate Commissions and the MLS," https://downloads.ctfassets.net/1g8q1frp4lix/ynrVPObvikFxrD1PgSiD8/7195c0aa59011747b55e538a46d4910a/Dispelling-Myths.pdf

[7] *Id.*

[8] A Bright MLS study found that "[c]omparable homes marketed on the MLS sold for a median sales price of 16.84% higher price than those sold as an off MLS with office exclusive arrangements" and that "[l]istings promoted on-MLS from the start went under contract in an average of 11 days compared to Office-Exclusive listings that eventually ended up being promoted through the MLS, which took a combined average time of 31 days to get a contract." Bright MLS, On/Off MLS Study (2021), https://assets.ctfassets.net/1g8q1frp4lix/69PEVCSSUVfYRCqrSpKKEd/35da1493a4976e721947ccbbbe4c44d8/Bright_MLS_On-Off_MLS_Study.pdf; *see also* Bright MLS MLS, On MLS Study (2023), https://go.brightmls.com/rs/253-TBC-658/images/On-MLS%20Study%202023.pdf

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY -
SUBJECT TO PROTECTIVE ORDER

ZG-MC-00049497

**DX496 - page 6 of 27**

brokerage to hold the line on discounting commissions. If the buyer won't pay the "cover charge," they can't get past the velvet rope to access the exclusive listings in the PLN. Under these contracts, buyers are required to pay the agent this commission regardless of whether the home they ultimately purchase is one of the exclusive listings available only through the PLN. As noted above, PLNs contain a small number of listings compared to MLSs. These networks are narrow by design, allowing brokers to draw in potential buyers under the guise that they will benefit from access to a subset of listings held behind a velvet rope (even if none of those listings line up with the buyer's requirements). PLNs are particularly enticing to buyers searching for a home in low-inventory markets, which have been prevalent since 2020.

In addition to the negative effects PLNs have on buyers and sellers, PLNs restrain competition among brokerages. Only the largest brokerages have the ability to aggregate a large enough number of exclusive listings to draw in prospective buyers. As a result, smaller brokerages are disadvantaged when recruiting agents, as well as attracting buy-side clients, because they cannot offer access to a large database of exclusive listings. Over time, large brokerages will be able to leverage their PLNs to divert agents and consumers away from smaller brokerages, ultimately resulting in those smaller brokerages being pushed out of the market.

## The Office Exclusive Exception Must be Eliminated

At first blush, PLNs may appear to compete with MLSs by providing an alternative listing mechanism for sellers and an alternative listings source for prospective buyers. Indeed, some argue that PLNs help erode MLS monopolies over for-sale listings in the areas in which they operate. However, PLNs are not a substitute for MLSs. Several features of PLNs—and specifically of PLNs established under the Office Exclusive loophole—distinguish these exclusive networks from MLSs. Notably, listing agents in these networks utilize PLNs as an *addition* to, not a substitute for, the MLS. In fact, if a listing fails to sell in a PLN, agents will often, later, enter the listing in the MLS. Moreover, as noted above, PLNs offer only a small fraction of the number of listings compared to the MLS but agents convince buyers that it is beneficial to them to pay for access to these additional listings as a supplement to the MLS listings those buyers may also be interested in.

Elimination of the Office Exclusive exception is even more important today to protect competition and ensure industry transparency in light of emerging changes to industry rules for agent compensation. Rulings and settlements resulting from industry litigation will begin to put downward pressure on buyer broker commissions. Brokers and agents will now be even more motivated to steer buyers and sellers to PLNs as a way to maintain higher buy-side commissions and to maximize double-dipping of commissions via dual agency. As

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER

ZG-MC-00049498

**DX496 - page 7 of 27**



a result, an increasing number of buyers will find themselves obligated to commit to paying the 2.5% or 3% commission required to gain access to PLN listings.

The Hamptons in New York provides an illuminating example of a market with a fragmented and decentralized listing system without the rules that promote a fair and transparent marketplace. Although NAR-affiliated One Key MLS operates in the Hamptons, the Hamptons has historically been one of the few markets in the country where most listings are not placed in a centralized, traditional MLS. Instead, brokers in this market primarily use a listing database (HamptonsRE), operated by four large brokerages, which does not restrict "pocket listings" and generally operates with very few rules. As a result, brokers can freely maintain private listing networks or "office exclusives," but listing agents can also share those listings with any other agent outside of their firm without a requirement to also publicly market the property. The effect is a fragmented consumer experience where all brokers' listings aren't made available for display on all brokerage websites (no IDX) and often, buyers must work with multiple large brokerages (commonly without any written buyer representation agreement) in order to obtain access to the full real estate marketplace.

There is already a growing trend toward the expansion of private listing networks (facilitated by the office exclusive loophole) amongst some of the nation's largest real estate brokerages, despite not being in consumers' best interests.[9] Redfin, which has been vocally opposed to private networks in the past, is seemingly feeling pressured to create its own network, reluctantly, as Joe Rath of Redfin stated in an August 2023 Linkedin post: "Unfortunately, it's been three years since Clear Cooperation passed and it does not seem likely that NAR and MLSs will eliminate office exclusives, so Redfin will have to use them too."[10] In October 2023, eXp Realty® announced eXp Exclusives, a new nationwide private listing network.[11] To prevent the office exclusive exemption to the Clear Cooperation Policy from further evolving from a loophole used by large brokers to a prevalent avenue to avoid declining commission rates as a result of compensation rule changes, the DOJ should consider pursuing elimination of the exemption altogether.

---

[9] *Compass Private Exclusives*, https://www.compass.com/private-exclusives/.
[10] Joe Rath, LinkedIn, https://www.linkedin.com/posts/joerath_clear-cooperation-is-failing-brokerage-leaders-activity-709579216732284 5184-ussr/?utm_source=share&utm_medium=member_ios (last visited March 23, 2024).
[11] eXp World Holdings, Inc., *eXp Realty Unlocks Nationwide Listing Network With the Power of 'eXp Exclusives'* (Oct. 3, 2023), https://expworldholdings.com/press-releases/exp-realty-unlocks-nationwide-listing-network-with-the-power-of-e xp-exclusives/.

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER

ZG-MC-00049499

DX496 - page 8 of 27

**Zillow**

## Data Analysis of Private Listings

**Overview:** Zillow analyzed data in five markets to infer the number and percentage of listings sold in a private listing network or as an "office exclusive" in 2023. While the data indicates that these listings currently represent a relatively small percentage of the total listings in each market, if the average was applied nationwide, approximately 120,000 homes would not have been seen by most prospective home buyers, and approximately 120,000 home sellers would not have been able to take advantage of a full and open marketplace. Zillow plans to use these findings as a baseline to continue to track how industry changes affect the prevalence of private listings.

Going forward, Zillow also intends to use this data to investigate the impact of private listings on fair housing. Specifically, there is an opportunity to learn exactly what these exclusive listing networks "look like." While it would be impossible to know the actual demographic characteristics of those who participate in these fragmented markets, Zillow can use census data to overlay racial and ethnic demographic data based on property location.[12] From there, we may be able to measure whether private listings disproportionately deny home buyers of color the equal opportunity to access these listings,[13] and whether these networks have a segregative effect in the communities where these transactions are prevalent.[14]

**Methodology**: Private, or "off MLS sales" are extremely hard to identify. With that in mind, and our history of dealing with agents for almost two decades, we know the majority of agents enter their listings in the MLS, even if marketed and sold off MLS. Reasons being—to receive credit for the transaction, assist with valuations and comparables, and due to local requirements.[15] We made assumptions based on agent behavior and timing of the transaction. Zillow then analyzed 2023 MLS data for five markets with complete, clean data sets[16] and varied demographic and geographic footprints. After that, we targeted the following four "Data Sets"[17] in each market:

_____

[12] For example, we can calculate an Adverse Impact Ratio (AIR) to measure practical significance, which compares the likelihood that minority homebuyers are able to access PLNs at the same rate as non-Hispanic white buyers.

[13] *See* Complaint, *United States v. Meta Platforms, Inc., f/k/a Facebook, Inc.* (S.D.N.Y. 2022) (No. 1:22-cv-05187). While the Meta complaint and consent decree are about ad-delivery algorithms, at its core, it is about effectively making housing opportunities unavailable on the basis of legally-protected demographics. Here, it must be determined whether PLNs have a similar effect.

[14] *See* Robert G. Schwemm, SEGREGATIVE-EFFECT CLAIMS UNDER THE FAIR HOUSING ACT, 20 N.Y.U. Journal of Legislation & Public Policy 709, 715 (2017) for a discussion on segregative effect cases and "perpetuation of segregation" as a method of disparate impact analysis.

[15] Many MLSs have a rule that if you are a member, you are required to put the sale in the MLS regardless of whether you marketed it or sold it off MLS.

[16] "Clean" data means that the data doesn't contain duplicates, missing fields, etc.

[17] These are closed transaction data sets in calendar year 2023.

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER

ZG-MC-00049500

**DX496 - page 9 of 27**

**⌂ Zillow**

1. Listing arrives in the MLS data feed as PENDING[18] status (PENDING has multiple different values, all of which were accounted for). This means an accepted offer was received for the listing prior to it being entered into the MLS.
2. Listing arrives in the MLS data feed and is changed to PENDING status within 24 hours
3. Listing arrives in the MLS data feed as CLOSED status[19]
4. Listing arrives in the MLS data feed and is changed to CLOSED status within 24 hours

For each Data Set, Zillow then bucketed all of the transactions in the market into one of the following three categories:

1. Both sides of the transaction were represented by the same AGENT ID ("Dual Agency – Single Agent")
2. Both sides of the transaction were represented by the same OFFICE ID and a different AGENT ID ("Dual Agency – Interoffice")
3. Both sides of the transaction were represented by a different AGENT ID and a different OFFICE ID ("Independent Representation")

Within the four Data Sets, Zillow inferred that the "Dual Agency – Single Agent" transactions and the "Dual Agency – Interoffice" transactions each represent private listings or "office exclusives" (based on the combination of being sold-on-arrival and being represented by the same brokerage). Zillow compiled these transactions into a set labeled "High Confidence Private Listings." This set represents the transactions Zillow believes to have the highest likelihood of being private listings. Zillow used the "Independent Representation" transactions as the control to provide a higher confidence in this methodology, understanding that there are other ways that a property could be quick to move to pending or closed status.

**Results:** The results for each individual market are included in Appendix A and a summary of all researched markets is captured in the following chart:

| Summary | |
|---|---|
| **Total listings all researched markets 2023** | **376,058** |
| High Confidence Private Listings | 9,379 |
| High Confidence Private Listing Rate AVG | 2.92% |
| Dual Agency Listings All Transactions | 44,787 |

---

[18] "PENDING" is the compilation of different statuses that are not ACTIVE or CLOSED as MLSs may define "pending" with different terms, e.g., Contingent, Under Contract, etc.
[19] Not all MLSs allow the agent to initially enter a listing as CLOSED. It may need to be entered as an ACTIVE or PENDING status type and then changed to CLOSED.

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY -
SUBJECT TO PROTECTIVE ORDER

ZG-MC-00049501

**DX496 - page 10 of 27**

**Zillow**

| | |
|---|---|
| Dual Agency Rate All Transactions AVG | 12.73% |
| % of private Dual Agency to Dual Agency as a whole | 20.94% |
| NAR Existing Home Sales 2023 | 4,090,000 |
| National High Confidence Private Listing @ 2.92% AVG | 119,468 |

**Findings:** Based on our analysis of 376,058 listings in these five markets, High Confidence Private Listings represented 9,379 listings and between 2% to 5% of each market, with an average of 2.92%. Additionally, our study found that 9% to 18% of all transactions were dual agency, with an average of 12.73%. But those identified as private listings were over 20% of **all** dual agency transactions, meaning the incidence rate of dual agency was more heavily focused toward private networks.

We expect to see a rise in private listings and office exclusives as the MLSs and their policies and procedures are under scrutiny. Alternative, publicly available avenues to list and sell homes have always been available and will continue to be. But putting properties behind a wall for only a select few to have access to could lead to increased dual agency, discrimination based on price and demographics, and an overall poor and non-transparent consumer experience in one of the most important financial decisions of their life.

# The "No-Commingling Rule"

In the early 2000s, NAR adopted a series of rules aimed at eliminating the nascent competitive threats seeking to provide online residential real estate services to home buyers and sellers. These rules, referred to as the Internet Data Exchange Rules ("IDX Rules"), govern the distribution and public display of listings data on MLS participants' websites. Among other things, the IDX Rules provide that:

> Listings obtained through IDX feeds from REALTOR® Association MLSs where the MLS participant holds participatory rights must be displayed separately from listings obtained from other sources.  Listings obtained from other sources (e.g., from other MLSs, non-participating brokers, etc.) must display the source from which each such listing was obtained.[20]

_____

[20] *See* Section 18.3.11 of the NAR Model MLS Rules and Regulations, https://www.nar.realtor/handbook-on-multiple-listing-policy.

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER

ZG-MC-00049502

**DX496 - page 11 of 27**



This rule, referred to as the "No-Commingling Rule," prohibits consumer-facing platforms like Zillow from displaying listings from non-MLS sources alongside MLS listings. As a result, consumers are prevented from viewing all available listings in one online search experience. While NAR does not categorize this as a mandatory rule,[21] Zillow's research indicates that over 80% of the 521 MLSs enforce the No-Commingling Rule or a similar policy.[22] As a result, consumers in these regions have reduced visibility of certain types of listings, such as auction, FSBO, new construction, and rental listings, as compared to MLS-listed properties.

## *The No-Commingling Rule Harms Consumers*

In the face of emerging changes to rules governing agent commissions, the No-Commingling Rule could potentially be weaponized by agents to maintain higher commissions. In general, non-MLS listings, such as FSBO and new construction, tend to have different compensation models. Discount brokerages have suggested that by requiring listings from non-MLS sources to be displayed separately, the No-Commingling Rule ensures that these lower-commission properties are obscured from prospective buyers' view, stifling innovation and new entry from alternative fee model brokerages. Buyers therefore lose out on an opportunity to work with agents who might charge a lower commission.

In addition, the No-Commingling Rule harms sellers of non-MLS listed properties by significantly reducing the market of potential buyers that will view the listing. Limiting the exposure of non-MLS listings puts sellers of those listings at a disadvantage when looking for potential buyers. As a result, to obtain greater visibility, sellers may have no option but to list their property with an MLS-affiliated agent (and pay a higher commission) to achieve an equal playing field.

## *The No-Commingling Rule Must be Eliminated*

The No-Commingling Rule must be eliminated to reduce friction for buyers, ensure maximum exposure for sellers, and further spur competition for different commission compensation models in the real estate market. Despite the many emerging changes in the industry as a result of litigation and corresponding settlement agreements, Zillow is not aware of any developments to date that would alleviate concerns related to the No-Commingling Rule.

---

[21] NAR's Handbook on Multiple Listing Policy establishes "optional" rules, such as the No-Commingling Rule, and "mandatory" rules, such as the Clear Cooperation Policy, which NAR-affiliated MLSs are required to adopt. Many unaffiliated MLSs have also enacted or otherwise agreed to abide by many of NAR's policies. For example, the Northwest Multiple Listing service implemented the No-Commingling rule even though it is not affiliated with NAR.
[22] This figure is based on Zillow's annual review of MLSs' rules and regulations identifying a no-commingling rule for 442 out of 521 total MLSs. The total number of MLSs is based on the most recent study by T350, available here: https://www.realestatealmanac.com/organized-real-estate/multiple-listing-services/11/

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER

ZG-MC-00049503

**DX496 - page 12 of 27**

**Zillow**

While the recently announced NAR Settlement Agreement contains a provision aimed at prohibiting MLSs and agents from steering consumers to listings based on the stated offer of buyer agent compensation, this is not sufficient to address the consumer harm resulting from steering that remains permissible under the No-Commingling Rule.[23] The No-Commingling Rule remains another mechanism for agents to limit consumers' access to real estate listings and insulate traditional brokerages from new entrants and innovative business models.

To resolve the transparency issues created by the No-Commingling Rule and further promote competition, NAR should be required to both (i) eliminate the No-Commingling Rule and (ii) establish a new mandatory policy that *requires* MLSs to allow MLS participants, at their option, to commingle all listings data from any source, as outlined in Zillow's recent proposal to NAR, a copy of which is provided in Appendix B.[24]

Absent elimination of no-commingling rules, listings portals will remain hamstrung from promoting transparency and complete access to listings data *nationwide*.

## Data Analysis of Zillow's "Two-Tab" Search Experience

**Overview:** In the fall of 2020, Zillow announced that it would join MLSs and begin using MLS IDX data feeds to populate its platforms.[25] As a result, Zillow would be required to comply with each MLS's IDX rules governing the access to and display of the IDX data, including the No-Commingling Rule (adopted in over 80% of MLSs) requiring the separation of MLS-sourced agent listings and listings obtained from other sources. Zillow was unable to offer a viable user interface that displays non-MLS listings alongside MLS listings in markets where MLSs do not have the rule and segregates the listings in markets where MLSs do have the rule. It is also not feasible for Zillow or any listings portal to lobby or negotiate with over 400 MLSs individually about eliminating the rule.

---

[23] See Section H, Paragraph 58(ii) of the NAR Settlement Agreement, in which NAR agrees to "[r]equire that REALTORS® and REALTOR® MLS Participants and subscribers must not filter out or restrict MLS listings communicated to their customers or clients based on the existence or level of compensation offered to the buyer broker or other buyer representative assisting the buyer."

[24] Zillow has petitioned NAR five times over the last three years to eliminate the No-Commingling Rule. Zillow first approached NAR in 2021 when NAR was considering changes to IDX policies. Zillow further petitioned NAR in March 2022, February 2023, September 2023, and most recently in March 2024.

[25] Zillow's decision to transition from obtaining listings data from individual syndication agreements with MLSs and brokers to obtaining listings data from MLS IDX feeds was due to the significant problems syndication agreements created for Zillow, including but not limited to the inferior quality and timeliness of data. Additionally, the agreements left Zillow and its consumers vulnerable to having Zillow's access to critical data disrupted at any time because the syndication agreements were terminable at will.

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER

ZG-MC-00049504

**DX496 - page 13 of 27**

**≜ Zillow**

To meet these requirements, Zillow ultimately decided to implement a two-tab display for consumers to search for-sale listings, with listings sourced from the MLSs in the first tab labeled as "Agent Listings" and listings from non-MLS sources (including FSBO, new construction, and auction listings) in the second tab labeled as "Other Listings."

In the days immediately following Zillow's transition to the two-tab display experience, Zillow found that consumer activity declined significantly on our FSBO and auction listings, evidencing consumers' reduced access to information on non-MLS listings to the detriment of both home buyers and sellers.

**Methodology:** In the days following the transition to the two-tab display experience, Zillow analyzed page views and email submissions for FSBO listings and page views and website traffic on the external auction listing hosts' websites for auction listings.

**Findings**: For FSBO listings, over the 14-day period following Zillow's transition to the two-tab experience, there was a 66% reduction in page views and a 42% reduction in email submissions. For auction listings, over a 10-day period following Zillow's transition to the two-tab experience, there was a 56% reduction in page views and a 38% reduction in visits to the external auction listing hosts' websites.

 

**Over the 14-day period following the transition to a two-tab experience**

**~66%** 👁
Reduction in total "For sale by owner" page views on Zillow

**~42%** ✉
Reduction in total "For sale by owner" email submits on Zillow

**Over the 10-day period following the transition to a two-tab experience**

**~56%** 👁
Reduction in page views for auction listings

**~38%** 🖑
Reduction in traffic to auction listings website

The two-tab experience for "Agent Listings" and "Other" listings, a forced change in the consumer experience due to "no commingling" rules

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER

ZG-MC-00049505

**DX496 - page 14 of 27**

**Zillow**

# Conclusion

The Office Exclusive exception to the Clear Cooperation Policy and the No-Commingling Rule reduce transparency and limit consumers' access to data in the residential real estate market. The country's most powerful brokerages and their agents have used these policies to engage in conduct that harms home buyers and sellers as well as small and nascent brokerages. Under the Office Exclusive exception to the Clear Cooperation Policy, brokerages have compiled private networks of pocket listings that enable agents to maintain artificially high commissions and engage in anticompetitive steering and potentially, discrimination. Similarly, the No-Commingling Rule results in reduced consumer access to information on non-MLS listings to the detriment of both home buyers and sellers. NAR's proposed settlement agreement does not adequately address the problematic outcomes of these rules discussed above. Accordingly, the DOJ should pursue elimination of the Office Exclusive exception to the Clear Cooperation Policy and the No-Commingling Rule.

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER

ZG-MC-00049506

**DX496 - page 15 of 27**

**Zillow**

# Appendix A:

## Sample 1 - Chicago (MRED)

| MRED / Chicago | |
|---|---|
| **Total Listings 2023** | **127,768** |
| High Confidence Private Listings | **2,592** |
| High Confidence Private Listing Rate | **2.03%** |
| Dual Agency Listings All Transactions | **12,728** |
| Dual Agency Rate All Transactions | **9.96%** |

| | Transactions | | | | |
|---|---|---|---|---|---|
| | **Standard Transaction** | **Came Pending** | **Came Closed** | **1 Day Pending (ODP)** | **1 Day Closed (ODC)** |
| | 117,438 | 5,400 | 305 | 4,592 | 33 |
| **Individual Representation** | 103,989 | 3,563 | 182 | 3,645 | 17 |
| **Dual Agency** | 5,566 | *1,215* | *93* | *474* | *10* |
| **Interoffice** | 4,570 | *448* | *25* | *324* | *3* |
| **Intercompany** | 3,313 | 174 | 5 | 149 | 3 |

| | Share of All Transactions | | | | |
|---|---|---|---|---|---|
| **Individual Representation** | 81.39% | 2.79% | 0.14% | 2.85% | 0.01% |
| **Dual Agency** | 4.36% | *0.95%* | *0.07%* | *0.37%* | *0.01%* |
| **Interoffice** | 3.58% | *0.35%* | *0.02%* | *0.25%* | *0.00%* |
| **Intercompany** | 2.59% | 0.14% | 0.00% | 0.12% | 0.00% |

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER

ZG-MC-00049507

**DX496 - page 16 of 27**

| Share of Category | | | | | |
|---|---|---|---|---|---|
| Individual Representation | 88.55% | 65.98% | 59.67% | 79.38% | 51.52% |
| Dual Agency | 4.74% | 22.50% | 30.49% | 10.32% | 30.30% |
| Interoffice | 3.89% | 8.30% | 8.20% | 7.06% | 9.09% |
| Intercompany | 2.82% | 3.22% | 1.64% | 3.24% | 9.09% |



Belvidere – BBOR
Bloomington-Normal – BNAR
Champaign County – CCAR
Chicago – CAR
Fox Valley – RAPV
Heartland – HRO
Home Town – HAR
Illini – IVAR
Kankakee-Iroquois-Ford – KIFAR
Livingston County – LCBR
Mainstreet – MORe
Northern Illinois Commercial – NICAR
North Shore-Barrington – NSBAR
Oak Park – OAK
Three Rivers – TRAR

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER

ZG-MC-00049508

**DX496 - page 17 of 27**

**≜ Zillow**

## Sample 2 - Southern California (CRMLS)

| CRMLS | |
|---|---|
| **Total Listings 2023** | **134,122** |
| High Confidence Private Listings | **2,712** |
| High Confidence Private Listing Rate | **2.02%** |
| Dual Agency Listings All Transactions | **17,223** |
| Dual Agency Rate All Transactions | **12.84%** |

| | Transactions | | | | |
|---|---|---|---|---|---|
| | **Standard Transaction** | **Came Pending** | **Came Closed** | **1 Day Pending (ODP)** | **1 Day Closed (ODC)** |
| | 127,016 | 3,407 | 1,726 | 1,949 | 24 |
| **Individual Representation** | 109,864 | 1,842 | 755 | 1,514 | 15 |
| **Dual Agency** | 7,432 | *788* | *546* | *220* | *4* |
| **Interoffice** | 7,079 | *638* | *343* | *170* | *3* |
| **Intercompany** | 2,641 | 139 | 82 | 45 | 2 |

| | Share of All Transactions | | | | |
|---|---|---|---|---|---|
| **Individual Representation** | 81.91% | 1.37% | 0.56% | 1.13% | 0.01% |
| **Dual Agency** | 5.54% | *0.59%* | *0.41%* | *0.16%* | *0.00%* |
| **Interoffice** | 5.28% | *0.48%* | *0.26%* | *0.13%* | *0.00%* |
| **Intercompany** | 1.97% | 0.10% | 0.06% | 0.03% | 0.00% |

| | Share of Category | | | | |
|---|---|---|---|---|---|
| **Individual Representation** | 86.50% | 54.07% | 43.74% | 77.68% | 62.50% |
| **Dual Agency** | 5.85% | 23.13% | 31.63% | 11.29% | 16.67% |
| **Interoffice** | 5.57% | 18.73% | 19.87% | 8.72% | 12.50% |
| **Intercompany** | 2.08% | 4.08% | 4.75% | 2.31% | 8.33% |

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER

ZG-MC-00049509

**DX496 - page 18 of 27**



## Sample 3 – Seattle (NWMLS)

| NWMLS | |
|---|---|
| *Total Listings 2023* | *42,320* |
| High Confidence Private Listings | 1,115 |
| High Confidence Private Listing Rate | 2.63% |
| Dual Agency Listings All Transactions | 3,882 |
| Dual Agency Rate All Transactions | 9.17% |

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER

ZG-MC-00049510

**DX496 - page 19 of 27**

**Zillow**

| Transactions | | | | | |
|---|---|---|---|---|---|
| | Standard Transaction | Came Pending | Came Closed | 1 Day Pending (ODP) | 1 Day Closed (ODC) |
| | 36,375 | 936 | 3,171 | 1,826 | 12 |
| Individual Representation | 33,023 | 741 | 2,347 | 1,648 | 8 |
| Dual Agency | 1,056 | 110 | 519 | 57 | 3 |
| Interoffice | 1,711 | 72 | 266 | 87 | 1 |
| Intercompany | 585 | 13 | 39 | 34 | 0 |

| Share of All Transactions | | | | | |
|---|---|---|---|---|---|
| Individual Representation | 78.03% | 1.75% | 5.55% | 3.89% | 0.02% |
| Dual Agency | 2.50% | 0.26% | 1.23% | 0.13% | 0.01% |
| Interoffice | 4.04% | 0.17% | 0.63% | 0.21% | 0.00% |
| Intercompany | 1.38% | 0.03% | 0.09% | 0.08% | 0.00% |

| Share of Category | | | | | |
|---|---|---|---|---|---|
| Individual Representation | 90.78% | 79.17% | 74.01% | 90.25% | 66.67% |
| Dual Agency | 2.90% | 11.75% | 16.37% | 3.12% | 25.00% |
| Interoffice | 4.70% | 7.69% | 8.39% | 4.76% | 8.33% |
| Intercompany | 1.61% | 1.39% | 1.23% | 1.86% | 0.00% |

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER

ZG-MC-00049511

**DX496 - page 20 of 27**

Zillow



## Sample 4 - Oklahoma City (MLSOK)

| MLSOK | |
|---|---|
| *Total Listings 2023* | *26,462* |
| High Confidence Private Listings | 887 |
| High Confidence Private Listing Rate | 3.35% |
| Dual Agency Listings All Transactions | 4,796 |
| Dual Agency Rate All Transactions | 18.12% |

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY -
SUBJECT TO PROTECTIVE ORDER

ZG-MC-00049512

**DX496 - page 21 of 27**

**⌂ Zillow**

| Transactions | | | | |
|---|---|---|---|---|
| Standard Transaction | Came Pending | Came Closed | 1 Day Pending (ODP) | 1 Day Closed (ODC) |
| 23,669 | 1,044 | 282 | 1,428 | 39 |

| | Standard Transaction | Came Pending | Came Closed | 1 Day Pending (ODP) | 1 Day Closed (ODC) |
|---|---|---|---|---|---|
| Individual Representation | 19,702 | 583 | 129 | 1,177 | 9 |
| Dual Agency | 2,277 | *288* | *103* | *136* | *22* |
| Interoffice | 1,632 | *171* | *49* | *111* | *7* |
| Intercompany | 58 | 2 | 1 | 4 | 1 |

| Share of All Transactions | | | | |
|---|---|---|---|---|
| Individual Representation | 74.45% | 2.20% | 0.49% | 4.45% | 0.03% |
| Dual Agency | 8.60% | *1.09%* | *0.39%* | *0.51%* | *0.08%* |
| Interoffice | 6.17% | *0.65%* | *0.19%* | *0.42%* | *0.03%* |
| Intercompany | 0.22% | 0.01% | 0.00% | 0.02% | 0.00% |

| Share of Category | | | | |
|---|---|---|---|---|
| Individual Representation | 83.24% | 55.84% | 45.74% | 82.42% | 23.08% |
| Dual Agency | 9.62% | 27.59% | 36.52% | 9.52% | 56.41% |
| Interoffice | 6.90% | 16.38% | 17.38% | 7.77% | 17.95% |
| Intercompany | 0.25% | 0.19% | 0.35% | 0.28% | 2.56% |

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER

ZG-MC-00049513

**DX496 - page 22 of 27**



## Sample 5 - Nashville (Realtracs)

| Realtracs | |
|---|---|
| **Total Listings 2023** | **45,386** |
| High Confidence Private Listings | 2,073 |
| High Confidence Private Listing Rate | 4.57% |
| Dual Agency Listings All Transactions | 6,158 |
| Dual Agency Rate All Transactions | 13.57% |

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY -
SUBJECT TO PROTECTIVE ORDER

ZG-MC-00049514

**DX496 - page 23 of 27**

**Zillow**

| Transactions | | | | | |
|---|---|---|---|---|---|
| | Standard Transaction | Came Pending | Came Closed | 1 Day Pending (ODP) | 1 Day Closed (ODC) |
| | 36,583 | 5,899 | 636 | 2,252 | 16 |
| Individual Representation | 31,923 | 4,323 | 307 | 1,942 | 3 |
| Dual Agency | 2,651 | *1,076* | *288* | *148* | *11* |
| Interoffice | 1,434 | *394* | *39* | *115* | *2* |
| Intercompany | 575 | 106 | 2 | 47 | 0 |

| Share of All Transactions | | | | | |
|---|---|---|---|---|---|
| Individual Representation | 70.34% | 9.52% | 0.68% | 4.28% | 0.01% |
| Dual Agency | 5.84% | *2.37%* | *0.63%* | *0.33%* | *0.02%* |
| Interoffice | 3.16% | *0.87%* | *0.09%* | *0.25%* | *0.00%* |
| Intercompany | 1.27% | 0.23% | 0.00% | 0.10% | 0.00% |

| Share of Category | | | | | |
|---|---|---|---|---|---|
| Individual Representation | 87.26% | 73.28% | 48.27% | 86.23% | 18.75% |
| Dual Agency | 7.25% | 18.24% | 45.28% | 6.57% | 68.75% |
| Interoffice | 3.92% | 6.68% | 6.13% | 5.11% | 12.50% |
| Intercompany | 1.57% | 1.80% | 0.31% | 2.09% | 0.00% |

Coverage: *Nashville Area – including, but not limited to, Clarksville, Franklin, Hendersonville, and Murfreesboro*

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER

ZG-MC-00049515

**DX496 - page 24 of 27**

**△ Zillow**

# Appendix B

**NATIONAL ASSOCIATION OF REALTORS®**
500 New Jersey Ave NW
Washington, DC 20001

ATTN: MLS TECHNOLOGY AND EMERGING ISSUES ADVISORY BOARD

Chairman Andy Bencosme - andy@c21village.com
Staff Executive Rodney Gansho – rgansho@nar.realtor

March 29, 2024

*Via E-mail*

Re: **Co-mingling: Section 18.3.11**

Chairman Bencosme,

I am writing to propose modifications to **Section 18.3.11** in reference to co-mingling rules.

**Current Rule:**

> **Section 18.3.11**
>
> Listings obtained through IDX feeds from REALTOR® Association MLSs where the MLS participant holds participatory rights must be displayed separately from listings obtained from other sources. Listings obtained from other sources (e.g., from other MLSs, from non-participating brokers, etc.) must display the source from which each such listing was obtained.* *(Amended 05/17)* ○
>
> **Note:** An MLS participant (or where permitted locally, an MLS subscriber) may co-mingle the listings of other brokers received in an IDX feed with listings available from other MLS IDX feeds, provided all such displays are consistent with the IDX rules, and the MLS participant (or MLS subscriber) holds participatory rights in those MLSs. As used in this policy, "co-mingling" means that consumers are able to execute a single property search of multiple IDX data feeds resulting in the display of IDX information from each of the MLSs on a single search results page; and that participants may display listings from each IDX feed on a single webpage or display. *(Adopted 11/14)*
>
> *\*Displays of minimal information (e.g., "thumbnails", text messages, "tweets", etc., of two hundred [200] characters or less) are exempt from this requirement but only when linked directly to a display that includes all required disclosures. For audio delivery of listing content, all required disclosures must be subsequently delivered electronically to the*

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER

ZG-MC-00049516

**DX496 - page 25 of 27**



*registered consumer performing the property search or linked to through the device's application. (Amended 05/17)*

**Recommendation:** The Advisory Board should recommend to remove restrictions on co-mingling data from MLS and non-MLS sources, and clarify allowed types of co-mingling to include categories of listings consumers frequently search in their home-shopping process. The amended policy should also be made mandatory, instead of optional.

### Section 18.3.11

~~Listings obtained through IDX feeds from REALTOR® Association MLSs where the MLS participant holds participatory rights must be displayed separately from listings obtained from other sources. Listings obtained from other sources (e.g., from other MLSs, from non-participating brokers, etc.) must display the source from which each such listing was obtained.* (Amended 05/17)~~ O

~~Note:~~ An MLS participant (or where permitted locally, an MLS subscriber) may co-mingle the listings of other brokers received in an IDX feed with listings <u>and data</u> available from other ~~MLS IDX feeds~~ <u>sources</u>, provided all such displays are consistent with the IDX rules, and the MLS participant (or MLS subscriber) ~~holds participatory rights in~~ <u>has authorization to display listings or data from</u> ~~those MLSs~~ <u>any source</u>. As used in this policy, "co-mingling" means that consumers are able to execute a single property search of multiple ~~IDX data feeds~~ <u>sources</u> resulting in the display of ~~IDX~~ information from each of the <u>data sources or</u> MLSs on a single search results page; and that participants may display listings <u>and data</u> from each ~~IDX feed~~ <u>source</u> on a single webpage or display.

Listings obtained from other sources (e.g., from other MLSs, from non-participating brokers, etc.) must display the source from which each such listing was obtained.* <u>M</u> ~~(Adopted 11/14)~~

*\*Displays of minimal information (e.g., "thumbnails", text messages, "tweets", etc., of two hundred [200] characters or less) are exempt from this requirement but only when linked directly to a display that includes all required disclosures. For audio delivery of listing content, all required disclosures must be subsequently delivered electronically to the registered consumer performing the property search or linked to through the device's application. (Amended 05/17)*

**Reasoning :**

Now is the time for the National Association of Realtors to take action and cure the outdated and non-transparent rule that blocks home buyers and sellers and agents from being able to see or market every available home for sale or rent, in any location they choose.

It is important to recognize that not all available properties are directly listed in the MLS for various reasons. REALTORS®, the guides and trusted professionals in the home buying and selling process, have both the **ability** and **responsibility** to search, find, display, market and

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY - SUBJECT TO PROTECTIVE ORDER

ZG-MC-00049517

**DX496 - page 26 of 27**

**Zillow**

transact on properties for their clients. These responsibilities and fiduciaries should happen regardless of the listings origin, without facing unnecessary restrictions from their local MLS.

This unnecessary restriction prevents consumers from accessing a comprehensive view of available properties, impeding their ability to make informed decisions, and limiting their housing options. This not only creates friction for buyers and sellers but also impedes the success of REALTORS® in serving their clients best interests.

With every American's housing journey in mind, we strongly urge for this policy change to be promptly addressed and remedied.

We appreciate your consideration of this request. Together, we can ensure a more transparent and user-friendly real estate experience for all.

Sincerely,

Matt Hendricks
*Member #147029347*
*RPAC President's Circle Member*
Senior Director, Industry Affairs
Zillow Group

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL'S EYES ONLY -
SUBJECT TO PROTECTIVE ORDER

ZG-MC-00049518

**DX496 - page 27 of 27**