**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

ZILLOW GROUP, INC. and
ZILLOW, INC.,

*Plaintiffs*,

v.

MIDWEST REAL ESTATE DATA LLC,
COMPASS, INC., and
COMPASS ILLINOIS, INC.,

*Defendants*.

Case No. 1:26-cv-05451

Judge John J. Tharp, Jr.

**DEFENDANT MIDWEST REAL ESTATE DATA LLC'S OPENING**
**POST-HEARING BRIEF ON ZILLOW'S MONOPOLIZATION CLAIM**

**TABLE OF CONTENTS**


I. Zillow Cannot Show Likelihood of Success on its Section 2 Claim. ................................ 1

- A. Zillow Fails To Adequately Define a Relevant Market Under Section 2. ............. 1
- B. MRED Has No Monopoly Power Even In Zillow's Defined Market. .................. 5
- C. Alternatively, To The Extent Zillow Claims MRED Is A Competitor, MRED Had No Obligation to Deal With Zillow. .................................................. 6
- D. MRED's Procompetitive Reasons for Enforcing Its Objective Criteria Rule Rebut Any Prima Facie Case of Anticompetitive Conduct. .......................... 7

## TABLE OF AUTHORITIES

### CASES

*Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*,
836 F.3d 1171 (9th Cir. 2016) ....................6

*Blue Cross & Blue Shield United v. Marshfield Clinic*,
65 F.3d 1406 (7th Cir. 1995) ....................5

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962)....................2, 3

*ChampionsWorld, LLC v. U.S. Soccer Fed'n, Inc.*,
890 F. Supp. 2d 912 (N.D. Ill. 2012) ....................2

*Collins v. Associated Pathologists, Ltd.*,
844 F.2d 473 (7th Cir. 1988) ....................4

*Compass, Inc. v. Zillow, Inc.*,
No. 1:25-cv-05201-JAV (S.D.N.Y. Dec. 5, 2025) ....................6

*Ducere LLC v. Enbridge (U.S.) Inc.*,
2025 WL 81373 (N.D. Ill. Jan. 13, 2025) ....................6

*Goldwasser v. Ameritech Corp.*,
222 F.3d 390 (7th Cir. 2000) ....................6

*House of Brides, Inc. v. Alfred Angelo, Inc.*,
No. 11 C 07834, 2014 WL 64657 (N.D. Ill. Jan. 8, 2014) (Tharp, J.)....................4

*In re Harley Davidson Aftermarket Parts Mktg., Sales Practices and Antitrust Litig.*,
151 F.4th 922 (7th Cir. 2025) ....................4

*Ind. Grocery, Inc. v. Super Valu Stores, Inc.*,
864 F.2d 1409 (7th Cir. 1989) ....................1

*NCAA v. Alston*,
594 U.S. 69 (2021)....................7

*Nucap Indus., Inc. v. Robert Bosch LLC*,
273 F. Supp. 3d 986 (N.D. Ill. 2017) ....................1

*Olympia Equip. Leasing Co. v. W. Union Tel. Co.*,
797 F.2d 370 (7th Cir. 1986) ....................6

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
555 U.S. 438 (2009)....................1, 6

*Pope v. Mississippi Real Estate Comm'n*,
872 F.2d 127 (5th Cir. 1989) ....................7

*Reifert v. South Central Wisconsin MLS Corp.*,
450 F.3d 312 (7th Cir. 2006) ....................2, 7

*Republic Tobacco v. N. Atl. Trading Co*,
381 F.3d 717 (7th Cir. 2004) ....................2, 4

*Sargent-Welch Scientific Co. v. Ventron Corp.*,
567 F.2d 701 (7th Cir. 1977) ....................................................................................3

*Schorr v. Abbott Labs.*,
457 F.3d 608 (7th Cir. 2006) ....................................................................................7

*State of Ill. ex rel. Burris v. Panhandle E. Pipe Line Co.*,
935 F.2d 1469 (7th Cir. 1991) ................................................................................7, 8

*United States v. Nat'l Ass'n of Realtors*,
No. 05-c-5140, 2008 WL 5411637 (N.D. Ill. Nov. 18, 2008) ..........................................8

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004)...............................................................................................1, 6

**TREATISES**

AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 565a (May 2026) ...............................................3

Defendant Midwest Real Estate Data LLC (MRED) submits this Opening Post-Hearing Brief on Zillow's Monopolization Claim under Section 2 of the Sherman Act, and otherwise incorporates in full Defendants' Joint Opening Post-Hearing Brief On Zillow's Horizontal Group Boycott Claim.

## I. Zillow Cannot Show Likelihood of Success on its Section 2 Claim.

Zillow's Section 2 claim fails for numerous reasons, most notably because MRED has no duty to assist Zillow by providing listings according to Zillow's preferred terms, rather than pursuant to MRED's procompetitive rules. *See Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 409–10 (2004) (firms have no duty to deal under the "terms and conditions" preferred by rivals). "As a general rule, businesses are free to choose the parties with whom they will deal, as well as the prices, terms, and conditions of that dealing." *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555 U.S. 438, 448 (2009). This is particularly the case when MRED stands ready to allow Zillow access to MRED's listing data under the rules in force for nearly 20 years and followed by Zillow and all other MRED participants for years.

Zillow also has not met its "stiff burden" of proving a Section 2 claim because: (1) Zillow has not proven its alleged relevant market; (2) MRED does not possess monopoly power in that market; (3) MRED's enforcement of its license agreement is not anticompetitive (as explained in Defendants' Joint Opening Brief); and (4) MRED has a valid business justification for enforcing its rules. *See Ind. Grocery, Inc. v. Super Valu Stores, Inc.*, 864 F.2d 1409, 1413 (7th Cir. 1989).

### A. Zillow Fails To Adequately Define a Relevant Market Under Section 2.

"Although market definition is a deeply fact-intensive inquiry, failure to offer a plausible relevant market is [fatal to] an antitrust claim." *Nucap Indus., Inc. v. Robert Bosch LLC*, 273 F. Supp. 3d 986, 1011 (N.D. Ill. 2017). "The outer boundaries of a product market are determined by

the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Reifert v. South Central Wis. MLS Corp.,* 450 F.3d 312, 320 (7th Cir. 2006) (citation omitted). "Identifying a geographic market requires both, careful selection of the market area in which the seller operates, and to which the purchaser can practicably turn for supplies." *Republic Tobacco v. N. Atl. Trading Co*, 381 F.3d 717, 738 (7th Cir. 2004) (quotations omitted); *see* PI Tr. 496:6–10 (Aron) ("There are two standard methods that economists use in antitrust analysis for defining a market, and those are the hypothetical monopolist test and/or what is referred to as the practical indicia of markets from the *Brown Shoe* case.") (quotation modified). Zillow has not offered a plausible product or geographic market.

First, Zillow defines the allegedly monopolized market as "listing[] platforms for the creation and distribution of listings in the Chicagoland region." PI Tr. 364:12–19 (Wu). But Zillow's economist did not do any substantive economic analysis of diversion, using the hypothetical monopolist test or any other test, to measure cross-elasticity or whether his market was a valid antitrust market; he relied only on his "thought process." PI Tr. 382–2:14. (Wu); PI Tr. 495:22–496:15 (Aron). Thought experiments do not replace actual evidence-based analysis. *See ChampionsWorld, LLC v. U.S. Soccer Fed'n, Inc.*, 890 F. Supp. 2d 912, 948 (N.D. Ill. 2012) (expert opinion not helpful on market definition where he failed to perform hypothetical monopolist test or any "study at all on consumer sensitivity" to prices).

As to the *Brown Shoe* test for whether MRED's MLS is an economic substitute for listing platforms owned by Compass or Zillow, Zillow's economist also did no substantive analysis of practical indicia, including "industry or public recognition" of listing platforms for the creation and distribution of listings "as a separate economic entity, the product's peculiar characteristics

and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962).

In fact, the "realities of competitive practice" demonstrate MRED is *not* a competitor to Zillow or Compass. *See Sargent-Welch Scientific Co. v. Ventron Corp.*, 567 F.2d 701, 710 (7th Cir. 1977). Brokerages and their agents, who represent buyers and sellers in purchasing and selling homes, create listings. DX137 ¶¶ 120–21, 123 (Aron). MLSs like MRED then act as data aggregators by using listings as "an input" to create listing compilations (or "feeds") to distribute to their participants, like Zillow and Compass, under usage rules. PI Tr. 177:14–17; 191–21–24 (Haran) (Zillow is a participant, IDX feed recipient, vendor, and data consumer); DX137 ¶¶ 117, 120–21, 123 (Aron). Finally, MRED's participants use MRED's listing feeds for a variety of commercial purposes. *See* DX550, at 18 ("Many of our competitors and other real estate websites have similar access to MLSs and listing data and may be able to source certain real estate information faster or more efficiently than we can."); PI Tr. 437:10–11 (Jensen) (Zillow is "an owner and a customer and a vendor" to MRED). In this case, MRED's MLS is a complement to Zillow's and Compass's products, not a substitute. *See* PI Tr. 493:13–494:17; 497:19–498:2 (Aron); 463:25–464:4 (Jensen) (MRED's PLN enables brokerages to compete with "coming-soon" products like Compass Phase 2 and Zillow Preview listings). According to the leading antitrust treatise, "[g]rouping complementary goods into the same market" is "economic nonsense" and would "undermine[] the rationale for the policy against monopolization or collusion in the first place." AREEDA & HOVENKAMP, ANTITRUST LAW ¶ 565a (May 2026).

Zillow also ignores direct feeds provided directly from brokerages to online portals like Zillow in its product market definition. By its own admission, Zillow can use direct feeds to "replicate" more than 50 percent of the listings available through MRED's MLS. *See* DX137 ¶ 129

(Aron). That selective exclusion from the relevant product market of the supply of more than 50 percent of Chicagoland listings (directly from brokerages) renders Zillow's product market improperly narrow. *See In re Harley Davidson Aftermarket Parts Mktg., Sales Practices & Antitrust Litig.*, 151 F.4th 922, 933–37 (7th Cir. 2025) (affirming dismissal of antitrust claim based on overly narrow product market where plaintiff failed to include reasonably interchangeable substitutes); *House of Brides, Inc. v. Alfred Angelo, Inc*., No. 11 C 07834, 2014 WL 64657, at *6 (N.D. Ill. Jan. 8, 2014) (ignoring substitutes "fall[s] short of plausibly drawing the boundaries of the relevant product market") (Tharp, J.). "It is impossible to monopolize a market that does not exist." *Collins v. Associated Pathologists, Ltd*., 844 F.2d 473, 480 (7th Cir. 1988).

Second, Zillow fails to adequately define the relevant geographic market. "Identifying a geographic market requires both, careful selection of the market area in which the seller operates, and to which the purchaser can practicably turn for supplies." *Republic Tobacco*, 381 F.3d at 738 (quotation omitted). Zillow seeks to define the relevant geographic market as the Chicago area despite claiming nationwide harm and seeking nationwide relief because MRED has accepted listings from *outside* Chicago. *See, e.g.*, Compl., ¶¶ 10 (alleging harm from abandoning "business models nationwide"), 138 (alleging harm "if Zillow . . . does not heed Defendants' demands to withdraw their . . . listing policies nationwide"). Zillow fails to explain the mismatch between its proposed geographic market and MRED's actions as a nationwide MLS in accepting listings from Florida, Georgia, and California. Given the hundreds of MLSs nationwide, *see* PI Tr. 52:16–17 (Samuelson); DX137 ¶¶ 132–34 (Aron), MRED does not possess monopoly power in a national market, rendering Zillow's proposed geographic market artificially narrow. *See Republic Tobacco*, 381 F.3d at 739 (dismissing Section 2 claims where no claim that defendant was "a monopoly or has attempted to monopolize in the national market").

### B. MRED Has No Monopoly Power Even In Zillow's Defined Market.

"Fifty percent is below any accepted benchmark for inferring monopoly power from market share." *Blue Cross & Blue Shield United of Wis. v. Marshfield Clinic*, 65 F.3d 1406, 1411 (7th Cir. 1995). Here, Zillow admits it can replace over half of MRED's feed with a direct brokerage feed alternative. As a result, Zillow cannot succeed on its claim that MRED has monopoly power even in its inadequately pleaded market.

Zillow says MRED controls 98% of listings in Chicagoland. DX174 ¶¶ 104–06 (Wu). But MRED does not *exclusively* control any listings; brokerages do. *See* PI Tr. 530:9–12 (Aron). Zillow admits "direct feeds" from brokers can "replicate" MRED's feed. PI Tr. 75:9–77:17 (Samuelson); 198:6–15 (Haran) ("Zillow would still have had access to more than 400 [direct] feeds from MRED."). Thus, direct feeds act as "a substitute for the aggregation and distribution functions of MRED's MLS listing service." DX137 ¶¶ 59, 129, 135 (Aron); *see* PI Tr. 75:9–19, 76:2–20 (Samuelson); 192:5–193:6, 198:14–199:3 (Haran). Indeed, Zillow already has direct feeds for up to 55% of the listings on MRED's feed. DX137 ¶ 129 (Aron); *see* PI Tr. 193:1–6, 198:4–13 (Haran). It could well obtain more if it demanded *reasonable* terms from direct feed providers[1] and did not misrepresent their listings, like Compass's.[2] If Zillow can already access over 50% of all listings and potentially far more than that, MRED has "control" over less than 50% of listings in Chicagoland. While it may be inconvenient for Zillow to obtain listings from sources other than MRED, Zillow cannot prove MRED has monopoly power when Zillow has available substitutes

---

[1] DX001, at 91:8–92:16 (Broude Dep.) (Zillow's broker feed agreement for rental properties was "broad and widespread" to an "egregious" extent by including "all listing data that the brokerage may have"); DX122, at 172:15–22, 173:23–174:12 (McColly Dep.) (McColly Real Estate declined to sign Zillow direct feed agreement because "the contract was so onerous you can never get out of it," then Zillow went "behind the back of our corporate office" to ask individual managers to sign the agreement); *see id.* at 173:1–2 ("I thought what Zillow was doing is wrong.").

[2] *Compare, e.g.*, DX589 (Compass "Active" listing), *with* DX591 (same home on Zillow "Off market").

for MRED's listing feeds. *See Ducere LLC v. Enbridge (U.S.) Inc.*, No 1:24-cv-01217, 2025 WL 81373, at *5 (N.D. Ill. Jan. 13, 2025) (dismissing claim where plaintiff alleged monopoly power "solely from [defendant's] control of Chicago-area pipelines" but "fail[ed] to account for [available] substitutes").

**C. Alternatively, To The Extent Zillow Claims MRED Is A Competitor, MRED Had No Obligation to Deal With Zillow.**

At its core, Zillow's monopolization claim turns on MRED's refusal to deal on Zillow's preferred terms. Compl., ECF 1 ¶¶ 100–02, 127, 163–64, 190–91. MRED's declining to do so, and not "engage in a lovefest" with Zillow, is not anticompetitive. *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1184 (9th Cir. 2016). Nor is declining to extend "terms and conditions preferred" by Zillow even assuming Zillow is correct, which it is not, that the two companies are competitors. *Trinko*, 540 U.S. at 409–10. The "Supreme Court has repeatedly emphasized" that point, *Aerotec Int'l,* 836 F.3d at 1184, as has Zillow itself, *see, e.g.*, Defs.' Proposed Findings of Fact, ECF 150, at 44–46, *Compass, Inc. v. Zillow, Inc.*, No. 1:25-cv-05201-JAV (S.D.N.Y. Dec. 5, 2025). And with good reason, as "[p]art of competing . . . is the ability to make decisions about with whom and on what terms one will deal." *Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 397 (7th Cir. 2000). That is true regardless of the competitor's intent. Indeed, it is "an antitrust commonplace, that if conduct is not objectively anticompetitive the fact that it was motivated by hostility to competitors . . . is irrelevant." *Olympia Equip. Leasing Co. v. W. Union Tel. Co.*, 797 F.2d 370, 379 (7th Cir. 1986).

Zillow characterizes MRED's refusal to deal on Zillow's preferred terms as MRED changing the rules. But MRED merely clarified its nearly 20-year-old rule at Zillow's request. *See* PI Tr. 447:5-14, 450:14-19, 451:13–17 (Jensen); *see also* DX094, at 2 (attaching redline of IDX clarification to Zillow). MRED's refusal to accept Zillow's demands for preferred terms does not

violate Section 2 of the Sherman Act. *See, e.g.*, *linkLine*, 555 U.S. at 457–58; *Trinko*, 540 U.S. at 409–10; *Schorr v. Abbott Labs.,* 457 F.3d 608, 610 (7th Cir. 2006). MRED is under no obligation to abandon its own procompetitive display listing rules simply because Zillow is "no longer happy with [its] bargain." *State of Ill. ex rel. Burris v. Panhandle E. Pipe Line Co*., 935 F.2d 1469, 1484 (7th Cir. 1991). MRED is and has always been ready to deal with Zillow on the same terms Zillow agreed to and has been operating under for years.[3]

### D. MRED's Procompetitive Reasons for Enforcing Its Objective Criteria Rule Rebut Any Prima Facie Case of Anticompetitive Conduct.

Even if Zillow could make out a *prima facie* case of anticompetitive conduct, MRED has easily rebutted it. As courts have held, properly managed MLS rules "serve pro-competitive purposes," *Pope v. Mississippi Real Estate Comm'n*, 872 F.2d 127, 130 (5th Cir. 1989), and "provid[e] a more transparent marketplace," *Reifert*, 450 F.3d at 321; *see also United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1369 (5th Cir. 1980) (without reasonable rules, "it is possible that neither brokers nor the public will utilize the service, thus forfeiting the benefits it may yield to all."). The same goes for any joint venture requiring cooperation. *See, e.g.*, *NCAA v. Alston*, 594 U.S. 69, 88 (2021).

MRED's objective criteria rule, prohibiting discrimination based on, among other things, marketing practices, serves pro-competitive purposes by ensuring sellers are not "reluctant to post their listings," in any lawful manner they choose, which would make the market "less transparent and less efficient." *Reifert*, 450 F.3d at 321; *see* DX137 ¶ 180 (Aron); PI Tr. 57:6–25 (Samuelson), 199:15–21, 201:20–202:4 (Haran). The 2008 DOJ consent decree, on which MRED's rule is based, recognized that purpose by barring rules that "unreasonably discriminate against" certain

[3] Zillow's monopolization claim is as hollow as its specious new claim that it did not understand that MRED was an MLS "when Zillow signed the MLS Grid Agreements" to get access to MRED listing data. ECF Dkt. 107 at 4.

brokerages. *United States v. Nat'l Ass'n of Realtors*, No. 05-c-5140, 2008 WL 5411637, at *3 (N.D. Ill. Nov. 18, 2008); *see* PI Tr. 199:15–21, 201:20–202:4 (Haran). Here, the rule's application to Zillow illustrates its value. Zillow's listing ban rejects prior PLN listings unless sellers fire their agents. *See* DX151 ¶ 4. That policy discourages sellers, agents, and brokerages who prefer to post on PLNs from exercising that preference. And since MRED's PLN was created to bring "pocket listings" into the light of day and into MLSs in the first place, *see* DX120, at 4–6, 19, discouraging PLNs will suppress the overall number of MLS listings. MRED's objective criteria rule prevents those harmful and unwanted outcomes. *See* PI Tr. 438:6–442:7 (Jensen describing history of rule); *id.* at 463:9–15 ("MRED's objective criteria rules are meant to treat . . . all agents that subscribe to an MLS equally."). And while Zillow may prefer a regime where it can punish sellers, agents, and brokerages it disfavors because of their marketing choices, it cannot show MRED's rule lacks pro-competitive justifications or that any harms outweigh those justifications.

Finally, "consumers would be worse off if a firm had a duty under the antitrust laws to release customers from their contractual obligations; it is anything but efficient for a firm to abandon its contractual rights at the behest of customers who are no longer happy with their bargain." *Burris*, 935 F.2d at 1484. MRED's objective criteria rule has existed over its entire ten-plus year relationship with Zillow. Both as historically written and clarified at Zillow's request, it bars discrimination against agents for their marketing practices. That is clear from the 2008 consent decree upon which the rule is based. *See* PI Tr. 441:16–442:4 (Jensen). By signing MRED's licensing agreements, Zillow agreed to follow the objective criteria rule, which it has followed for over 10 years. Holding Zillow to its contractual obligations is a valid reason for MRED to enforce its rules. *See* PI Tr. 472:4–11 (Jensen) (Q: "Could all of this have been avoided?" A: "It could have been." Q: "How?" A: "If Zillow would have just followed our IDX agreement.").

Dated: July 9, 2026

*/s/ Stephen D. Libowsky*
Stephen D. Libowsky
MANATT, PHELPS & PHILLIPS, LLP
151 N. Franklin St. (Suite 2600)
Chicago, IL 60606
Telephone: (312) 477-4798
slibowski@manatt.com
Attorney No. 6187081

Dylan M. Carson (*pro hac vice*)
Joshua N. Drian (*pro hac vice*)
MANATT, PHELPS & PHILLIPS, LLP
1050 Connecticut Ave. NW (Suite 600)
Washington, D.C. 20036
Telephone: (202) 585-6500
dcarson@manatt.com
jdrian@manatt.com

Zachary J. Howe (*pro hac vice*)
MANATT, PHELPS & PHILLIPS, LLP
12730 High Bluff Dr. (Suite 300)
San Diego, CA 92130
Telephone: (619) 205-8500
zhowe@manatt.com

*Counsel for Defendant*
*Midwest Real Estate Data LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that, on July 9, 2026, I electronically filed a copy of the foregoing through the Court's CM/ECF system, which will send notifications of the filing to all counsel of record.

Dated: July 9, 2026 *</s/ Stephen D. Libowsky>*