**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| ZILLOW GROUP, INC. and ZILLOW, INC., <br><br> *Plaintiffs*, <br><br> v. <br><br> MIDWEST REAL ESTATE DATA LLC, COMPASS, INC., and COMPASS ILLINOIS, INC., <br><br> *Defendants*. | Case No. 1:26-cv-05451 <br><br> Judge: Hon. John J. Tharp, Jr. |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' JOINT
POST-HEARING BRIEF ON HORIZONTAL GROUP BOYCOTT AND
<u>MRED'S POST-HEARING BRIEF ON MONOPOLIZATION</u>**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

ARGUMENT ..................................................................................................................... 2

I.      Zillow Is Likely to Establish MRED and Compass Conspired to Deprive Zillow of Its Core Listings Input ......................................................................................... 2

       A.      Defendants Fail to Refute the Ample Evidence of an Unlawful Group Boycott ........................................................................................................... 2

       B.      Defendants' Horizontal Conspiracy Is Per Se Unlawful ..................................... 5

       C.      Zillow's Conspiracy Claim Is Likely to Succeed Under the Rule of Reason ..................................................................................................... 7

             1.      Zillow Has Sufficiently Shown the Relevant Market .............................. 7

             2.      The Evidence Shows Anticompetitive Effects in the Relevant Market ..................................................................................................... 8

             3.      Defendants Do Not—And Cannot—Show the Boycott Is Procompetitive ........................................................................................ 10

       D.      Defendants' Conduct Has Caused Antitrust Injury ........................................... 13

II.      Zillow Is Likely to Succeed on Its Section 2 Claim .......................................... 14

       A.      MRED Fails to Counter Market Definition or its Monopoly Power ................. 14

       B.      The Refusal to Deal Framework Is No Bar to Zillow's Section 2 Claim ........... 15

III.      Zillow Has Demonstrated Irreparable Harm ...................................................... 17

IV.      The Balance of Harms and Public Interest Favor Zillow .................................... 19

CONCLUSION ................................................................................................................... 20

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962)..................................................................................................................7

*Compass, Inc. v. Nw. Multiple Listing Serv.*,
2026 WL 776138 (W.D. Wash. Mar. 19, 2026) ..............................................................16

*Continental Distr. Co., Inc. v. Somerset Importers, Ltd.*,
411 F. Supp. 754 (N.D. Ill. 1976) ......................................................................................4

*Cumulus Media New Holdings v. The Nielsen Co.*,
No. 26-88 (2d Cir. July 13, 2026)......................................................................................19

*Deslandes v. McDonald's USA, LLC*,
81 F.4th 699 (7th Cir. 2023) ................................................................................................5

*Doe v. Univ. of S. Ind.*,
43 F.4th 784 (7th Cir. 2022) ..........................................................................................7, 14

*FTC v. Meta Platforms, Inc.*,
775 F. Supp. 3d 16 (D.D.C. 2024)....................................................................................10

*Goldwasser v. Ameritech Corp.*,
222 F.3d 390 (7th Cir. 2000) ............................................................................................16

*Hess Newmark Owens Wolf, Inc. v. Owens*,
415 F.3d 630 (7th Cir. 2005) ............................................................................................18

*In re Deere & Co. Repair Serv. Antitrust Litig.*,
703 F. Supp. 3d 862 (N.D. Ill. 2023) ................................................................................2

*In re Text Messaging Antitrust Litig.*,
782 F.3d 867 (7th Cir. 2015) ..............................................................................................4

*Medco Rsch., Inc. v. Fujisawa USA, Inc.*,
1994 WL 719220 (N.D. Ill. Dec. 21, 1994)....................................................................19

*Moehrl v. Nat'l Ass'n of Realtors*,
492 F. Supp. 3d 768 (N.D. Ill. 2020) .............................................................................2, 3

*Monsanto v. Spray-Rite Serv. Corp.*,
465 U.S. 752 (1984)..............................................................................................................5

*New York ex rel. Schneiderman v. Actavis PLC*,
  787 F.3d 638 (2d Cir. 2015)......................................................................................10

*Ohio v. Am. Express Co.*,
  585 U.S. 529 (2018)..........................................................................................7, 10, 15

*Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.*,
  585 F.2d 821 (7th Cir. 1978) .......................................................................................2

*Omnicare, Inc. v. UnitedHealth Grp., Inc.*,
  629 F.3d 697 (7th Cir. 2011) .......................................................................................2

*PLS.Com, LLC v. Nat'l Ass'n of Realtors*,
  32 F.4th 824 (9th Cir. 2022) ........................................................................................6

*Reifert v. S. Cent. Wis. MLS Corp.*,
  450 F.3d 312 (7th Cir. 2006) ...................................................................................6, 13

*Second City Music, Inc. v. City of Chicago*,
  333 F.3d 846 (7th Cir. 2003) .....................................................................................17

*Sprint Nextel Corp. v. AT&T Inc.*,
  821 F. Supp. 2d 308 (D.D.C. 2011).............................................................................5

*Stuller, Inc. v. Steak N Shake Enters., Inc.*,
  695 F.3d 676 (7th Cir. 2012) ...............................................................................17, 18

*Tiz, Inc. v. S. Glazer's Wine & Spirits, LLC*,
  2024 WL 2785142 (N.D. Ill. May 30, 2024)..............................................................13

*Toys "R" Us, Inc. v. FTC*,
  221 F.3d 928 (7th Cir. 2000) ...................................................................................5, 15

*United States v. Apple, Inc.*,
  2025 WL 1829127 (D.N.J. June 30, 2025)..................................................................16

*United States v. Paramount Pictures*,
  334 U.S. 131 (1948)......................................................................................................3

*United States v. Realty Multi-List, Inc.*,
  629 F.2d 1351 (5th Cir. 1980) .....................................................................................6

*United States v. Town of Thornapple*,
  143 F.4th 793 (7th Cir. 2025) ....................................................................................18

*Viamedia, Inc. v. Comcast Corp.*,
  951 F.3d 429 (7th Cir. 2020) .............................................................................5, 15, 16

-iii-

**RULES**

Fed. R. Civ. P. 65(d) .................................................................................................................20

**MISCELLANEOUS**

11 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* (5th ed. 2024)................................5, 8

## INDEX OF CITED EXHIBITS

| Exhibit / Citation | Location |
|---|---|
| Deposition Excerpts of Debra Aron ("Aron Dep. Tr.") | Dkt. 113-1, Ex. A |
| Deposition Excerpts of Rebecca Jensen ("Jensen Dep. Tr.") | Dkt. 113-1, Ex. E |
| Deposition Excerpts of Robert Reffkin ("Reffkin Dep. Tr.") | Declaration of Bonnie Lau in Support of Plaintiffs' Response to Defendants' Post-Hearing Briefs, Ex. I |
| Deposition Excerpts of Ronald McColly ("McColly Dep. Tr.") | Declaration of Bonnie Lau in Support of Plaintiffs' Response to Defendants' Post-Hearing Briefs, Ex. J |
| PX006 | Dkt. 113-2 |
| PX016 | Dkt. 113-2 |
| PX019 | Dkt. 113-2 |
| PX023 | Dkt. 113-2 |
| PX024 | Dkt. 113-2 |
| PX025 | Dkt. 113-2 |
| PX040 | Dkt. 113-2 |
| PX044 | Dkt. 113-4 |
| PX053 | Dkt. 113-4 |
| PX058 | Dkt. 113-4 |
| PX059 | Dkt. 113-4 |
| PX064 | Dkt. 113-5 |
| PX065 | Dkt. 113-5 |
| PX070 | Dkt. 113-5 |
| PX071 | Dkt. 113-5 |
| PX078 | Dkt. 113-5 |
| PX080 | Dkt. 113-5 |
| PX084 | Dkt. 113-5 |
| PX101 | Dkt. 113-5 |
| PX102 | Dkt. 113-5 |
| PX107 | Dkt. 113-5 |
| PX109 | Dkt. 113-5 |
| PX110 | Dkt. 113-7 |
| PX113 | Dkt. 113-8 |
| PX155 | Dkt. 113-8 |
| PX156 | Dkt. 113-8 |
| PX157 | Dkt. 113-8 |
| PX163 | Dkt. 113-8 |
| PX164 | Dkt. 113-9 |
| PX165 | Dkt. 113-9 |
| PX166 | Dkt. 113-9 |
| PX190 | Dkt. 113-9 |

| Exhibit / Citation | Location |
|---|---|
| PX220 | Dkt. 113-10 |
| PX235 | Dkt. 113-10 |
| PX331 | Dkt. 113-10 |
| PX404 | Dkt. 113-10 |
| PX408 | Dkt. 113-11 |
| PX434 | Dkt. 113-11 |
| PX442 | Dkt. 113-11 |
| PX483 | Dkt. 113-12 |
| PX485 | Dkt. 113-12 |
| PX490 | Dkt. 113-12 |
| PX496 | Dkt. 113-12 |
| PX497 | Dkt. 113-12 |
| PX499 | Dkt. 113-13 |
| PX506 | Dkt. 113-13 |
| DX137 | Dkt. 119-13 |
| DX138 | Dkt. 119-14 |
| DX534 | Dkt. 119-45 |

**INTRODUCTION**

Rather than confront the record showing that MRED and Compass agreed to deprive Zillow of its core listings input, Defendants recast Zillow's arguments, attempt to minimize isolated parts of their conspiracy, and offer self-serving denials flatly contradicted by their own testimony and contemporaneous documents. Thus, nothing in Defendants' briefs rebuts Zillow's showing that it is likely to prevail on the merits. Defendants' agreement is a horizontal group boycott between competitors—as Defendants' own documents acknowledge—and is per se unlawful. Even under the rule of reason, Zillow prevails: it has defined a relevant market and shown substantial anticompetitive effects flowing from the boycott. In contrast, Defendants make no effort to articulate any cognizable procompetitive justification for their agreement to cut off a rival, instead eliding the question by focusing on claimed benefits of PLNs, which Defendants' own documents confirm are risky and not in the best interests of many consumers. Zillow is likewise likely to succeed on its Section 2 claim against MRED, whose termination of a longstanding relationship to entrench its undisputed monopoly bears every hallmark of an unlawful refusal to deal.

The equities confirm that an injunction should issue. Absent relief, Zillow faces irreparable harm from the false choice that Defendants have engineered, the erosion of Zillow's brand, goodwill and competitive position, and the injury to nascent platform product Zillow Preview. Defendants do not even attempt to show how money damages would suffice to remedy those harms. Defendants, by contrast, identify no harm from an order that does no more than preserve the status quo that has prevailed for over a year. The public interest favors the transparency, competition and open real estate access that Zillow's Standards and Zillow Preview protect.

The Court should grant Zillow's motion for a preliminary injunction.

-1-

## ARGUMENT

**I.    Zillow Is Likely to Establish MRED and Compass Conspired to Deprive Zillow of Its Core Listings Input**

Rather than respond to the overwhelming evidence of a group boycott, Defendants attempt to recast Zillow's antitrust claim and misconstrue the record to argue that Zillow is not likely to succeed under either a per se or rule of reason analysis. Their failure to address the substance of Zillow's claim is fatal, and thus Zillow is likely to succeed on its Section 1 claim.

**A.    Defendants Fail to Refute the Ample Evidence of an Unlawful Group Boycott**

Defendants claim that Zillow has not shown an agreement "that MRED would cut Zillow's feed" or "an agreement for MRED to enforce its rules," Defs. Br. 18, 20, but Defendants misconstrue the conspiracy. The abundant evidence—both direct and circumstantial—shows that MRED and Compass had a "conscious commitment to a common scheme" to deprive Zillow of listings, the lifeblood of Zillow's business. *Moehrl v. Nat'l Ass'n of Realtors*, 492 F. Supp. 3d 768, 780 (N.D. Ill. 2020) (quoting *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 706 (7th Cir. 2011)). *See* Plf. Br. 18-23. Defendants cannot evade liability by splintering their conspiracy into discrete parts and then arguing that neither MRED nor Compass participated in every part. *In re Deere & Co. Repair Serv. Antitrust Litig.*, 703 F. Supp. 3d 862, 903 (N.D. Ill. 2023) ("[B]ecause courts must look at the course of conduct of the alleged conspiracy as a whole, the character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts."); *see also Ohio-Sealy Mattress Mfg. Co. v. Sealy, Inc.*, 585 F.2d 821, 828 (7th Cir. 1978) (same).

Expedited discovery proves that MRED and Compass formed an agreement in which Compass would launder its failed Private Exclusive listings from far-flung locations outside MRED's territory through MRED, exploiting MRED's Revised Rules to force Zillow to choose between suffering a termination of all MRED listings in Chicagoland or abandoning its Standards

nationwide. Plf. Br. 18-23; PX490 at 1-3 (MRED explaining that non-compliance with MRED objective criteria rule could result in "suspen[sion of] data feed access"); PX019; PX408; PX053; PX078; PX220. Even if, as Compass argues, Compass merely stood by while MRED terminated Zillow's Listing Feeds, "acquiescence in an illegal scheme is as much a violation of the Sherman Act as the creation and promotion of one." *Moehrl*, 492 F. Supp. 3d at 780 (quoting *United States v. Paramount Pictures*, 334 U.S. 131, 161 (1948)).[1] Regardless, a mountain of contrary evidence proves that Compass was anything but an innocent bystander.

Reffkin's assertion that the Alliance was a unilateral decision to expand the reach of Compass's listings and "endorse MRED's commitment to data protection," Defs. Br. 20, is undermined by myriad contemporaneous documents showing that the goal of the Alliance was to leverage MRED's Revised Rules to force Zillow to jettison the Standards under pain of Listing Feeds termination. PX019; PX408; PX016; PX190; PX434; PX496. As just one example, Defendants' claim that "Compass did not promise anything in return or make any threats" if an MLS did not enforce its rules to block Zillow's listings access, Defs. Br. 13, is flatly contradicted by Compass emails threatening to withhold Compass listings from MLSs if they did not "rigorously enforce" against Zillow. *E.g.*, PX071. And Defendants' contention that "neither Defendant wanted Zillow's data feeds *permanently* suspended," Defs. Br. 2 (emphasis added), is semantic sleight-of-hand. Ms. Jensen and MRED repeatedly threatened to terminate Zillow's access to MRED Listing Feeds, PX166 ¶¶9-10; PX163 ¶¶63, and Reffkin and Compass repeatedly

---

[1] *Moehrl* is directly on point. There, plaintiffs alleged a horizontal conspiracy among NAR and real estate brokers to adopt and enforce a rule requiring a set offer of compensation for buyer-brokers. 492 F. Supp. 3d at 774-75. The court rejected the brokers' argument that they could not have joined the conspiracy because they played no role in the initial issuance of the rule, as "it is sufficient that [p]laintiffs have shown that the [defendant brokers] played a role in the conspiracy" by requiring their franchisees to join NAR and abide by its rules. *Id*. at 780.

pressured MRED and other MLSs to do the same. PX070 at 4 ("Update your language to be like Mred" . . . [or] "[t]ell Zillow they will lose their idx access . . ."); PX006; PX071; PX235.

Defendants also rely on Ms. Jensen's claim that MRED acted unilaterally in cutting Zillow's feed, but her self-serving testimony is not credible. Ms. Jensen admitted that she discussed the possibility of terminating Zillow's Listing Feeds with Reffkin, Tr. 482:13-21 (Jensen), and the timing of the CEOs' calls and Compass's internal planning meetings strongly indicates that Defendants coordinated the feed cut—of a fellow participant in MRED—weeks in advance and days before Zillow even received its first notice to cure, PX080; PX023; PX024; PX025.

Beyond reciting Reffkin's and Ms. Jensen's denials, Defendants fail entirely to grapple with the circumstantial evidence of conspiracy. Defendants contend that "communications or other opportunities to agree are not sufficient to show agreement," Defs. Br. 19, but ignore the multiple plus factors—*i.e.*, actions against Defendants' self-interest, concentrated market structure, common motives to conspire, and high volume of communications—amply shown by Zillow's evidence here. *See In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 879 (7th Cir. 2015); Plf. Br. 19-23. In any event, at the preliminary injunction stage, courts permit a "common purpose and plan" to be inferred from "a development and a collocation of circumstances." *Continental Distr. Co., Inc. v. Somerset Importers, Ltd.*, 411 F. Supp. 754, 757 (N.D. Ill. 1976).

Here, Defendants concede they acted in parallel by threatening Zillow's Listing Feeds. Defs. Br. 2 ("MRED . . . told Zillow the ban would violate MRED's procompetitive display rules . . . [and] Compass separately sought enforcement of procompetitive MLS rules against the Zillow ban in every MLS in the country."). Yet, Defendants neither dispute nor contextualize the damning voluminous texts, emails, and phone calls between MRED and Compass at key points throughout the conspiracy. Defendants were in constant contact about: MRED's revision of its objective

criteria rule, PX058, PX059, PX084, PX101, PX102; Compass's meritless lawsuit to block the Standards, PX061, PX062, PX063; Zillow Preview, PX064, PX065; and their plan to launder Private Exclusives through MRED and terminate Zillow's Listing Feeds, PX080, PX331. This is a far cry from *Monsanto v. Spray-Rite Service Corp.*, where legitimate communications between a manufacturer and its distributors "about the prices and the reception of their products in the market" were held insufficient to prove a conspiracy. 465 U.S. 752, 762 (1984). Nor do Defendants dispute at all that they acted in tandem to cancel or discourage direct broker feeds with Zillow.

## B. Defendants' Horizontal Conspiracy Is Per Se Unlawful

MRED and Compass—direct competitors in the Listing Creation and Distribution market—agreed to deprive Zillow of its core listings input. This is a classic horizontal group boycott subject to per se analysis. *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 936 (7th Cir. 2000).

Defendants baldly assert that "Compass and MRED are not competitors" because some aspects of Compass's and MRED's businesses are in a vertical relationship. Defs. Br. 21-22. But two entities may be in a predominantly vertical relationship and yet enter a horizontal agreement for the sake of the per se analysis. *Deslandes v. McDonald's USA, LLC*, 81 F.4th 699, 703 (7th Cir. 2023); *see also Sprint Nextel Corp. v. AT&T Inc.*, 821 F. Supp. 2d 308, 317-18 (D.D.C. 2011) (businesses that participate in multiple markets may have both horizontal and vertical relationships); 11 Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶1901c (5th ed. 2024) ("An arrangement is said to be 'horizontal' when its participants are (1) either *actual or potential rivals* at the time the agreement is made; and (2) the agreement eliminates some avenue of rivalry among them." (emphasis added)). That Compass and MRED may "provid[e] complementary products" in some markets does not disprove the fact that MRED's PLN and Compass's Private Exclusives are in direct competition in the relevant market here. *See Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 452, 464 (7th Cir. 2020) ("[a]ntitrust analysis must always be attuned to the

-5-

particular structure and circumstances of the industry at issue").

Moreover, Defendants fail to substantively wrestle with their own contemporaneous documents and testimony showing direct competition between MRED and Compass in the relevant Listing Creation and Distribution market, such as: (1) MRED's internal business documents identifying "broker-to-portal deals," including those involving Zillow and Compass, as a risk to the MRED PLN's position "as the distribution layer for private listings," PX485 at 3-4, *see also* PX044 at 1, PX483 at 2, 6; (2) Reffkin's admission that Compass Private Exclusives are "just a different version of MRED's private listing network," Tr. 344:18-19 (Reffkin); (3) Compass's position in other litigation that Compass office exclusives are a "competitive threat" to MLSs, PX109 ¶¶55-56, PX107 at 1; and (4) Dr. Wu's extensive analysis of the competitive conditions among MRED, Compass, and Zillow in the Listing Creation and Distribution market, Tr. 369:4-370:19, 374:2-13, 374:18-375:1, 375:10-376:11, 377:7-15, 378:24-380:6, 381:15-22 (Wu).

Defendants' reliance on cases evaluating MLS rules under the rule of reason is misplaced. *See Reifert v. S. Cent. Wis. MLS Corp.*, 450 F.3d 312, 317 (7th Cir. 2006); *United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1367-68 (5th Cir. 1980). Those cases addressed challenges to the MLS's own rules, membership requirements, or operational practices and were evaluated under the rule of reason because they were part of the operation of a cooperative venture that plausibly generated procompetitive benefits. None of those cases involved, as here, an MLS joining with a different market participant in a group boycott to deny their mutual competitor a critical input. Nor can Defendants credibly argue their conspiracy increases market efficiencies. *See PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 835-36 (9th Cir. 2022) (group boycott involving NAR and MLSs to hamper upstart service that would compete with MLSs subject to per se analysis). Defendants' cases thus provide no basis to avoid the per se rule here.

**C.** **Zillow's Conspiracy Claim Is Likely to Succeed Under the Rule of Reason**

Even if the rule of reason applies, Zillow is likely to succeed on its Section 1 claim. Zillow has shown substantial anticompetitive effects in the relevant market, Plf. Br. 25-29; *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018), and antitrust injury to Zillow and competition generally, Plf. Br. 25-27. None of Defendants' contrary arguments survive examination.

**1.** **Zillow Has Sufficiently Shown the Relevant Market**

Defendants' critique that there are "fact-intensive" economic analyses Dr. Wu could have performed with more discovery, MRED Br. 1-2, is misplaced at this stage when the Court must "assess[] the merits as [it] think[s] they are likely to be decided after more complete discovery and litigation." *Doe v. Univ. of S. Ind.*, 43 F.4th 784, 792 (7th Cir. 2022). Indeed, Defendants' argument that the Listing Creation and Distribution market lacks "evidence-based analysis," Defs. Br. 23-24 (quoting Tr. 495:5-496:15 (Aron)), is belied by Dr. Aron herself, *see* Tr. 523:13-25 (Aron) (agreeing that quantitative Hypothetical Monopolist Test is unnecessary). Nonetheless, Dr. Wu extensively evaluated substitutability in his report, determining that certain products—including Zillow Preview, Compass's Phase 1 PLN, and MRED's PLN—are substitutable and thus within the relevant market, PX110 ¶92, while others—including "non-digital platforms" and "[o]ther digital alternatives like online home search portals or public websites of individual brokerages"— were outside the market, PX110 ¶¶86, 90-91. *See* Tr. 375:2-376:11, 381:4-382:17 (Wu). Dr. Wu also considered the *Brown Shoe* factors, finding that the "available evidence" showed "the creation and distribution of residential real estate listings [to be] recognized by the industry as a distinct market." PX110 ¶93, Tr. 382:18-22 (Wu). *See Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962) (identifying industry recognition as one "practical indicia" of relevant product market). He explained the peculiar characteristics and uses of listings platforms, including an "add/edit" tool to create listings and then distribute them. Tr. 370:20-373:9 (Wu explaining creation and

distribution for Zillow, MRED, and Compass listings platforms). And the "distinct customers" are the agents who (at the direction of their sellers) decide where to create and distribute the listing. Tr. 402:23-403:3 (Wu). This more than suffices to define a relevant market at this early PI stage.

Further, Zillow is likely to show that Compass's PLN and MRED's PLN are substitutes and not complements. *Contra* Defs. Br. 23-24, MRED Br. 3. "Substitutes are goods that can replace one another and thus 'compete' for the user's purchase." Areeda & Hovenkamp, *Antitrust Law* ¶565. Reffkin concedes that "MRED doesn't get and has never received private exclusive data from Compass," Reffkin Dep. Tr. 97:22-24, and that MRED's PLN is a "different version" of Compass Private Exclusives, Tr. 344:15-23 (Reffkin); *see also* Tr. 375:2-376:11 (Wu). Defendants rely on testimony that Compass Coming Soon "listings are accommodated and facilitated by MRED" to argue Compass's listings platform is not a substitute for MRED's. Tr. 493:6-18 (Aron). But that mistakes the input to the service (listing information) with the service itself (listing platforms). It only shows that MRED has won the competition to be the listings platform for Compass Coming Soons in Chicagoland; indeed, in other regions, Coming Soons are shared via the Compass listings platform and not the MLS. PX499 at 2 (instructing agents to enter Phase 2s in "Compass Listing Editor Entry Only" or "into the MLS Only"). Zillow Preview listings, too, need not be entered into the MLS. PX497 at 2-3. Defendants do not address these fatal facts. Again, their own documents and testimony demonstrate that Compass, MRED, and Zillow are horizontal competitors in the relevant market. *See supra* at I.B.

### 2. The Evidence Shows Anticompetitive Effects in the Relevant Market

Zillow establishes anticompetitive effects from Defendants' group boycott: the termination of an essential input, the degradation of Zillow's platform and ability to compete, and the proliferation of PLNs, all of which result in consumer and marketwide harms. Plf. Br. 26-27. MRED and Compass do not meaningfully engage with that evidence and instead respond that

"[p]rivate [l]istings [a]re [n]ot [a]nticompetitive" because sellers choose their PLNs and thereby purportedly increase output. Defs. Br. 24-25. But Defendants' argument ignores the relevant question and is contradicted by the record.

*First*, Defendants wrongly attempt to justify their conduct and the resulting Chicagoland Listing Feeds termination by pointing to the claimed benefits of PLNs. *Id.* Terminating Zillow's Listing Feeds in Chicagoland did nothing to change Zillow's implementation of its Standards or to promote PLN adoption in the relevant geographic market because Zillow had already withheld implementation of its Standards in Chicagoland for the better part of a year. Instead, the feed cut served only to punish Zillow in Chicagoland by neutering it as a viable competitor who was offering a new pro-transparency alternative—Zillow Preview—to Defendants' PLNs, and force tens of thousands of MRED Chicagoland listings displayed on Zillow to go dark without warning.

*Second*, it is Defendants' conspiracy that reduces output, not Zillow's Standards or Zillow Preview. As Dr. Aron recognized, if a firm's quantity of inputs is significantly reduced, that would reduce the firm's output. Tr. 527:21-25 (Aron). Applying that principle here is straightforward: "Zillow's output will fall if it cannot enforce its standards because the standards really are aimed at incentivizing home sellers to choose Zillow and to put their new listings on Zillow," and "[t]hat is what creates an increase in the inputs of listings to Zillow, which is what creates the additional traffic and audiences that Zillow wants, which creates output—output increase." Tr. 399:23-400:6 (Wu); *see also* Tr. 62:1-11, 110:2-4 (Samuelson). Then there is the market-wide reduction in output that Defendants' conspiracy has inflicted, and may again inflict, on Chicagoland. If Zillow is forced to abandon the Standards nationwide in exchange for MRED's Listing Feeds, there will be a "proliferation of PLNs in a fragmented marketplace and more hidden inventory which is not good for buyers, sellers, or agents." Tr. 400:10-12 (Wu); *see also* PX110 ¶¶24, 134, 142

(explaining the Chicagoland brokerage services output reduction resulting from Defendants' conspiracy). Defendants' ability to reduce output directly establishes their market power. *See Am. Express Co.*, 585 U.S. at 541.

### 3. Defendants Do Not—And Cannot—Show the Boycott Is Procompetitive

Because Zillow establishes substantial anticompetitive effects in a relevant market, the burden shifts to Defendants, as they concede, to proffer a "procompetitive rationale *for the restraint.*" *See Am. Express Co.*, 585 U.S. at 541 (emphasis added); Defs. Br. 17. "[S]uch justifications cannot be pretextual." *FTC v. Meta Platforms, Inc.*, 775 F. Supp. 3d 16, 68 (D.D.C. 2024) (collecting cases). If the Court "determine[s] that Defendants' procompetitive justifications are pretextual, [it] need not weigh them against the anticompetitive harms." *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 658 (2d Cir. 2015).

Here, the restraint is the group boycott: Defendants' conspiracy to deprive Zillow of access to listings. *See* Compl. ¶¶176-86; PI Mot. 10-11. But Defendants simply ignore their group boycott—perhaps because it is indefensible—and instead advance purported procompetitive rationales for MRED's display rules and PLNs generally. *See* Defs. Br. 17, 24-27.[2] Defendants contend that MRED's display rules are procompetitive because they permit filtering based solely on objective criteria and thus protect the ability to list via PLN, thereby increasing the overall options available to sellers. *See id.* But the underlying premise of Defendants' argument—that the method of marketing a listing is not "objective" criteria—is flawed for at least two reasons.

*First*, Defendants admit that MRED's objective criteria rule is modeled after NAR Policy Statement 8.5, which itself stems from a 2008 settlement between DOJ and NAR. *See* Tr.

---

[2] Because Defendants fail to establish a procompetitive rationale for the boycott restraint, Zillow need not show that Defendants' procompetitive efficiencies could be reasonably achieved through less anticompetitive means. *See Am. Express Co.*, 585 U.S. at 542.

438:15-17 (Jensen). Not only is that 2008 settlement no longer in effect today, *see* Tr. 473:12-18 (Jensen), but the NAR guidance does not bar filtering based on marketing practices. It provides only that "objective criteria should: [b]e applied equally to all participants' listings; [b]e based on measurable or verifiable facts; [and n]ot explicitly and/or directly target any particular brokerage and/or agent by name." DX534 at 1. "[I]llustrative, not exhaustive" examples of such criteria include "[g]eography or location, [l]ist price range, [p]roperty type, [t]ype of listing agreement (e.g., exclusive right to sell or exclusive agency)" as well as "listing status, property attributes . . . or other neutral considerations." *Id.*[3]

Zillow's Standards meet all three NAR requirements for objective criteria:

- Zillow's Standards apply equally to all participants' listings. *See* Tr. 53:11-14, 58:9-16 (Samuelson) (Zillow's Standards "apply to all brokerages, all agents, all listings regardless of who they are," so Zillow has suppressed listings from multiple brokerages, such as Compass, Howard Hanna, Real, Side Brokerage, and Vanguard Properties, including "a couple of [its] partners . . . who are good customers"); PX506 ¶2.

- Zillow's Standards do not target any particular brokerage or agent, by name or otherwise. Tr. 59:3-61:25 (Samuelson) (the Standards are objectively applied "on a listing-by-listing basis . . . so an agent might have one or two listings suppressed but all of the rest of their listings, because they're not violat[ing the Standards], still appear on [Zillow's] site"); *compare* PX155, PX156, *with* PX157 (displaying listing while suppressing another from same agent that violates Zillow's Standards).

- Zillow's Standards are based on verifiable facts about a listing, including "how that listing is marketed." Tr. 74:7-8 (Samuelson); *see also* PX163 ¶53.

---

[3] In response to Compass urging MLSs to enforce their IDX rules against Zillow, NAR recently issued guidance emphasizing that Policy Statement 8.5 was intended to prevent filtering based on "the existence or level of cooperative compensation." Press Release, NAR, *NAR Publishes Guidance on the Use of Listing Filters, Clear Cooperation* (May 29, 2026) (emphasis added), https://www.nar.realtor/news/real-estate-news/nar-publishes-guidance-on-the-use-of-listing-filters-clear-cooperation. NAR further clarified that the intent of the reference to prohibiting filtering "based on the name of broker or agent" was originally adopted "to prevent discriminating against brokers or agents who may be known to either not offer or offer certain levels of compensation." DX534 at 2.

In the face of the 2008 DOJ/NAR settlement and NAR Policy Statement 8.5, the majority of the roughly 500 MLSs throughout the country who have the same or similar "objective criteria" rule have reached the same conclusion: Zillow's Standards are objective. *See* PX163 ¶53; PX070. Defendants' arguments to the contrary are plainly pretextual; the Revised Rules were specifically contrived as a means to an end—cutting Zillow's access to the Listing Feeds.

*Second*, Defendants attempt to defend a rule that does not exist as neither the current rules nor their predecessors facially address marketing practices. Pre-revision, MRED's rules plainly permitted Zillow and other feed recipients to filter listings based on "objective criteria, including but not limited to factors such as geography or location, list price, type of property, or type of listing." PX070 at 3; Tr. 254:7-11 (Broude); *see also* PX040; PX404. They made no mention of marketing practices as a prohibited criterion. Now, the Revised Rules include a new MRED-specific provision that states: "Exclusion criteria may not include, directly or indirectly, the identity of any Participant, brokerage firm, subscriber, licensee, or representative." PX070 at 3; *see also* Tr. 168:3-8 (Haran); PX164, PX165. But as Haran admits, this still says nothing about whether a feed recipient such as Zillow may exclude listings that were marketed in a PLN. *See* Tr. 166:21-167:5 (Haran).

Defendants also attempt to justify their conduct by advancing claimed benefits of PLNs. But the types of gated, selectively marketed listings discouraged by Zillow's Standards are not and have never been put on MRED's PLN. Reffkin Dep. Tr. 97:22-24. MRED itself recognized Compass Private Exclusives are "risky" and may not be in the "client's best interest," PX483 at 2, and that such listings harm buyer's agents by making it hard to "track down information about the property" and seller's agents by "[l]imiting the exposure of a listing to a subset of the market," PX113 at 7-8. Compass's listings undermine the "near-perfect market information" that MLSs

-12-

previously facilitated by requiring "that members place all listings in the MLS" within a certain number of days. *See Reifert*, 450 F.3d at 317. Dr. Wu detailed why a proliferation of such listings would be an anticompetitive outcome, and why it would add nothing innovative.[4] Tr. 390:1-391:20 (Wu) (addressing harms from PLNs and concluding, "[i]t's not like there's more homes out there in the marketplace. . . . [a]ll you've done is put some inventory in a room behind a door.").

Thus, even under the rule of reason, Zillow is still likely to succeed on the merits. Zillow has established Defendants' group boycott creates a substantial anticompetitive effect in the relevant market, but not once do Defendants even give lip service to any alleged procompetitive rationale for agreeing to boycott Zillow. Nor can they. *See* Plf. Br. 28-29.

### D. Defendants' Conduct Has Caused Antitrust Injury

Defendants' baseless contention that Zillow's injury results from "the increased competition that MRED's rules facilitate," Defs. Br. 25, again ignores that the challenged conduct is not the neutral application of MRED's rules, but rather Defendants' conspiracy to deprive Zillow of critical listings. *See* Tr. 40:13-15 (Samuelson); PX110 ¶20. *See supra* at I.C.2; *infra* at III. That exclusion causes market-wide harm. Plf. Br. 30-32. "The Seventh Circuit has held that a competitor's exclusion from the market constitutes an antitrust injury." *Tiz, Inc. v. S. Glazer's Wine & Spirits, LLC*, 2024 WL 2785142, at *25 (N.D. Ill. May 30, 2024) (collecting cases). Defendants are wrong to say the loss of the Standards harms only Zillow. The proliferation of PLNs that Zillow's Standards seek to prevent would harm not just Zillow, but buyers, sellers, and their agents through reduced market output, quality, and innovation; the loss of the value and pro-

---

[4] Defendants attack Dr. Wu's regression analysis, Defs. Br. 26, but misapprehend the proper nature of the inquiry. As Dr. Wu testified, control for property quality, the qualifier with which MRED and Compass take issue, is "very important because the proportion of homes on the Compass PLN tend to be more luxury homes." Tr. 534:12-13 (Wu). "If [one] do[es] [not] control for the quality of the home," as Dr. Aron omits here, then one "get[s] the wrong answer." Tr. 534:13-15 (Wu).

transparency options that Zillow offers; market fragmentation; and worse outcomes for buyers and sellers. Tr. 390:1-394:3 (Wu); PX110 ¶¶23, 27, 111, 134, 141-42, 146, 153.

## II.     Zillow Is Likely to Succeed on Its Section 2 Claim

MRED's arguments against Zillow's Section 2 claim are unavailing. MRED attempts to identify fact-intensive analyses that Zillow did not do, but in the context of a PI motion, Zillow need only demonstrate it is likely to succeed with the benefit of "complete discovery and litigation," not prove its entire case. *Doe*, 43 F.4th at 792.

### A.      MRED Fails to Counter Market Definition or Its Monopoly Power

MRED's criticism of Zillow's market definition misses the mark for the reasons identified above. *See supra* at I.C.1. MRED also says that "Zillow fails to adequately define the relevant geographic market," MRED Br. 4, but does not actually challenge Zillow's position that the relevant markets are inherently local. Instead, MRED argues that there is a disconnect between Zillow's geographic market and its complaint of MRED's national expansion. There is no inconsistency: to show it is likely to succeed, Zillow must show anticompetitive effects in Chicagoland, and it has done so. Plf. Br. 26-27.

MRED's market power criticisms are flawed. MRED argues that Zillow excluded direct broker feeds from the relevant market and that any direct broker feeds Zillow obtains must be subtracted from MRED's market share. MRED Br. 5.[5] MRED is wrong for three main reasons.

*First*, direct broker feeds are still created and distributed through MRED's platform, so they are analytically within MRED's control in the Listing Creation and Distribution market. Tr. 192:18-22 (Haran) ("[O]ur fourth feed would be broker direct feeds . . . once they input listing data

---

[5] If MRED's feeds and Compass's direct feeds were in the same market, that would be all the more reason to find that Defendants are competing suppliers of listing feeds to Zillow and have entered a horizontal conspiracy to block Zillow's access. *See supra* at I.B; Tr. 536:20-537:4 (Wu).

into the MRED database, [they] can then receive all the information they inputted back in a feed."). Those feeds are within MRED's control to offer or not. Tr. 198:18-19 (Haran) ("broker direct feeds is a policy that . . . we're very proud of").

*Second*, direct broker feeds are not a substitute in the Listing Creation and Distribution market. In terms of where a listing starts, a direct broker feed is entirely derivative of the MRED feed, as it is a feed of listings that the brokerage has already put on MRED's listing platform. Tr. 192:18-22 (Haran). The direct broker feeds are just another way to access (a portion of) listings created and distributed on that platform. In other words, agents do not substitute between placing a listing on a direct broker feed or on the MRED feed, unlike the various listing platforms that present real options for where to create and distribute (particularly premarket) listings. Plf. Br. 24. The inclusion of direct broker feeds would therefore amount to the inclusion of complementary (or even duplicative) products that Defendants argue must be avoided. MRED Br. 3.

*Third*, MRED's termination of Zillow's Listing Feeds, as "an exercise of its control over listings," is direct evidence of MRED's market power. Tr. 384:13-16 (Wu); *see Am. Express Co.*, 585 U.S. at 541; *Toys "R" Us*, 221 F.3d at 937 (reduction in output is direct evidence of market power). MRED has no response.

## B. The Refusal to Deal Framework Is No Bar to Zillow's Section 2 Claim

To the extent this Court agrees that MRED's conduct must be analyzed as a refusal to deal, the requirements to find an unlawful refusal to deal are met, assuming Zillow is a competitor of MRED's. *Viamedia*, 951 F.3d at 459 (identifying requirements). MRED's feed termination meets every requirement from *Viamedia*, as MRED: (1) threatened termination and then terminated a long-term voluntary preexisting relationship with Zillow, MRED Br. 7 (acknowledging long-term relationship); (2) imposed a sudden change to MRED's enforcement, expanding from Chicagoland to nationwide, Plf. Br. 14-16; (3) demonstrated a willingness to sacrifice participant fees from

-15-

Zillow, Tr. 325:24-25 (Reffkin); (4) made MRED's own customers unhappy and reduced the value of the service it provides by eliminating free distribution for its members' listings, Plf. Br. 20, Aron Dep. Tr. 69:9-12; and (5) had never before imposed a feed termination on any customer, much less without first considering a less drastic fine, Tr. 191:8-16, 196:1-12 (Haran). *Viamedia*, 951 F.3d at 459. Most importantly, MRED's feed cut damages Zillow Preview as a competitor in the Listing Creation and Distribution market. The right to choose with whom a business will deal has always been qualified by the absence of evidence that such "decisions are part of a broader effort to maintain [the business's] monopoly power." *Goldwasser v. Ameritech Corp.*, 222 F.3d 390, 398 (7th Cir. 2000).

On the other hand, if this Court finds that Zillow is a mere customer and not a competitor of MRED, as Defendants insist, then the restrictions MRED seeks to impose on its customers to access the feed must be analyzed under the rule of reason. *United States v. Apple, Inc.*, 2025 WL 1829127, at *12 (D.N.J. June 30, 2025) (collecting cases) ("The Court finds the refusal to deal doctrine does not apply to Apple's alleged conduct in this case because Plaintiffs do not allege Apple is failing to deal with its smartphone rivals, but rather that Apple's conduct is imposing restrictions on developers and smartphone users."); *Compass, Inc. v. Nw. Multiple Listing Serv.*, 2026 WL 776138, at *8 (W.D. Wash. Mar. 19, 2026) (same). MRED's conduct fails the rule of reason. Zillow has shown that MRED's termination of Listing Feeds access would stifle nascent Zillow Preview, remove a competitive constraint, preserve MRED's monopoly, and dull incentives for MRED to innovate and improve quality. Moreover, the coerced end to Zillow's Standards nationwide would allow PLNs to proliferate and withdraw more listing inventory, lowering market efficiency and output, with worse outcomes for buyers and sellers. Plf. Br. 26-27.

MRED's claim that its conduct is procompetitive because it will encourage more sellers to

post listings on its PLN, MRED Br. 8, is belied by the facts and thus cannot constitute a legitimate business justification. As discussed above, MRED's conduct does nothing to increase overall output of listings and only serves to gate or hide more listings away in PLNs that would otherwise be broadly accessible to the public. *See supra* at I.C.3.

## III. Zillow Has Demonstrated Irreparable Harm

Defendants' conduct coerces two possible outcomes: that Zillow lose access to the MRED Listing Feeds or abandon its Standards nationwide. Zillow has introduced substantial evidence that either outcome irreparably harms Zillow. Plf. Br. 33-38. Defendants fail to change the calculus.

*First*, Zillow's harm is not self-inflicted; it is a false choice among two irreparably harmful alternatives imposed by Defendants. Defendants rely on *Second City Music, Inc. v. City of Chicago*, 333 F.3d 846 (7th Cir. 2003), Defs. Br. 29, but as the Seventh Circuit has recognized, *Second City Music* "does not give a categorical legal rule" that a so-called "self-inflicted wound[]" can never constitute irreparable harm. *Stuller, Inc. v. Steak N Shake Enters., Inc.*, 695 F.3d 676, 679 (7th Cir. 2012). Rather, "the particular circumstances of the case" dictate whether an injury is "truly self-inflicted" or is instead the product of a false choice. *Id.* The latter is irreparable harm, which encompasses circumstances where acceding to the defendant's terms forces "a significant change to [plaintiff's] business model" and "negatively affect[s] its revenue, even to a considerable extent." *Id.* at 680. That is precisely the false choice that Defendants have imposed on Zillow here.

*Second*, that a downward spiral has not yet begun does not make Zillow's harm "illusory." Defs. Br. 29. Initially, the downward spiral has not yet begun because MRED terminated Zillow's access to the Listing Feeds for only two days, until the Court issued a temporary restraining order, and Zillow has been able to enforce the Standards everywhere but MRED's territory. Plf. Br. 5-6; 16-17. Without the preliminary injunction, Zillow will either lose the feed or not be able to enforce the Standards nationwide, a false choice between two irreparable harms to Zillow, competition and

-17-

consumers. *Id.*, *see supra* I.C-D. And Zillow has already suffered significant harm in Chicagoland: Zillow's inability to enforce the Standards in MRED's territory has driven more listings into Defendants' PLNs, which undermines Zillow's brand promise, audience and revenue, Tr. 63:21-64:7, 157:19-158:5 (Samuelson)—harms that have been exacerbated by Compass's rapid growth and market dominance within just the last year, Tr. 227:9-18 (Hofmann). The broader risk of PLN "contagion" also remains. Tr. 144:24-145:9 (Samuelson).

In any event, Zillow need not show the harm is "certain to occur," only that it is "likely." *United States v. Town of Thornapple*, 143 F.4th 793, 799-800 (7th Cir. 2025). Zillow readily meets that standard. Plf. Br. 33-38. Defendants may dispute "the validity and strength" of Zillow's evidence of irreparable harm, "but that argument goes to the 'sliding scale analysis'" and not to the "threshold requirements" of a preliminary injunction. *Stuller*, 695 F.3d at 680. Zillow has presented compelling evidence of actual and imminent irreparable harm, which is more than sufficient, particularly when coupled with Zillow's strong showing that it is likely to succeed on the merits. Plf. Br. 17-33; *supra* at I-II.

*Third*, Defendants' vague reference to a possible damages methodology is untested and untethered to the specific harms caused by Defendants' anticompetitive conduct in this case. *See* Defs. Br. 30; DX137 ¶209. Dr. Aron admits that Zillow's platform "exhibits direct and indirect network effects," and that lost listings "reduce[] the value of the platform to sellers, who will be less eager to list," all of which "creat[es] the potential for a negative spiral." Tr. 526:19-527:6 (Aron). She also admits Zillow Preview would "lose an advantage against rivals" in that scenario. Tr. 526:12-14 (Aron). These are not identifiable losses that money damages can adequately remedy, but rather interconnected harms that compound, resulting in an indeterminate amount of lost customers and business. *See Hess Newmark Owens Wolf, Inc. v. Owens*, 415 F.3d 630, 632-33 (7th

Cir. 2005) (irreparable harm where plaintiff would "not be able to identify which contracts slipped from its grasp"). Defendants also overlook the difficulty of calculating lost profits with respect to nascent product Zillow Preview, *see Medco Rsch., Inc. v. Fujisawa USA, Inc.*, 1994 WL 719220, at *14 (N.D. Ill. Dec. 21, 1994), and fail to account for intangible harms to Zillow's brand, competitive position, goodwill and reputation, which are paradigmatic irreparable harms, Plf. Br. 34-35 (citing cases); *Cumulus Media New Holdings v. The Nielsen Co.*, No. 26-88, slip op. at 46-47 (2d Cir. July 13, 2026) (potential loss of "longtime customers" irreparable). Even financial losses can be irreparable if "there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Cumulus*, slip op. at 45.

Finally, Defendants' claims of delay are meritless. Defs. Br. 31. Defendants ignore the events immediately preceding this litigation—the national expansion and rapid escalation of their conspiracy, including the Alliance announced on April 24, 2026 and termination of Zillow's Listing Feeds on May 20. Zillow filed this lawsuit on May 12, just over two weeks after Defendants announced their Alliance, and promptly moved for a preliminary injunction on May 18. Dkts. 1, 21. Zillow then sought a TRO *just one day* after MRED suspended its Listing Feeds. Dkt. 41. Zillow immediately sought relief as soon as Defendants' threatened harms became imminent.

## IV. The Balance of Harms and Public Interest Favor Zillow

Defendants identify no cognizable harm if the Court grants the injunction. Ms. Jensen identified only media attention when asked what harms MRED has suffered since the TRO, Jensen Dep. Tr. 185:19-186:4, which does not tip the scale. Plf. Br. 38-39. MRED's post-hoc theories of harm, Defs. Br. 31, fare no better, as MRED cannot claim harm if enjoined from enforcing its rules outside of its traditional service area, where it has virtually no listings. PX442 ¶15.

Compass claims harm insofar as an injunction would bless Zillow's enforcement of the Standards and thereby "reduce[] 3PM use," Defs. Br. 31-32, but that rings hollow as Zillow has

been enforcing the Standards outside of Chicagoland since June 2025. Tr. 56:4-9 (Samuelson), 301:8-9 (Reffkin). Granting the injunction would therefore maintain the status quo under which Compass already has existed for over a year. And Compass fails to present a scintilla of evidence establishing that an injunction maintaining the status quo will irreparably harm its business; Compass offers only conjecture and uncited, subjective "data." *See* Defs. Br. 31-32.

As for the public interest, Defendants do not seriously dispute that a renewed Listing Feeds suspension would harm consumers, *see id.*, and Defendants fail to otherwise show an injunction would not serve the public. Although Defendants claim an injunction would deprive sellers of the choice to use pre-marketing, that is false. Zillow endorses pre-marketing when done transparently, and created Zillow Preview to do so. *See* Tr. 65:15-67:13 (Samuelson), 211:23-212:1, 212:18-213:1 (Hofmann). Zillow's Standards respect seller choice and allow for truly private listings. Tr. 54:8-15, 109:11-17 (Samuelson); *see also, e.g.*, DX138 ¶12; McColly Dep. Tr. 128:11-129:5. Only *selectively* pre-marketed listings are filtered under the Standards, and even so, the Standards merely restrict brokerages from free-riding on Zillow's platform after a listing fails to sell privately. PX506 ¶3(b); PX163 ¶38; Tr. 218:185-219:14 (Hofmann). As the Standards only govern what is displayed on Zillow, sellers are free to engage in selective pre-marketing—including through Compass's 3PM—and display their listings on all sites other than Zillow's. A preliminary injunction would protect the public interest in consumer choice and competition. Plf. Br. 39-40.[6]

## **CONCLUSION**

For the foregoing reasons and those stated in Zillow's PI motion and post-hearing brief, the Court should grant Zillow's motion and preliminarily enjoin both MRED and Compass.

---

[6] The injunction against Compass would not run afoul of Rule 65(d). Plf. Br. 40.

Respectfully submitted,

Dated: July 13, 2026

WILSON SONSINI GOODRICH & ROSATI
Professional Corporation

/s/ *Bonnie Lau*
Bonnie Lau (admitted *pro hac vice*)
One Market Plaza, Spear Tower, Suite 3300
San Francisco, California 94105
Telephone: (415) 947-2000
Facsimile: (866) 974-7329
Email: blau@wsgr.com

Brian J. Smith (IL Bar No. 6321543)
1700 K Street NW, Fifth Floor
Washington, DC 20006
Telephone: (202) 973-8800
Facsimile: (866) 974-7329
Email: brian.smith@wsgr.com
*Admitted to practice only in Illinois and Maine*

Beau W. Buffier (admitted *pro hac vice*)
31 West 52nd Street, Fifth Floor
New York, New York 10019
Telephone: (212) 999-5800
Facsimile: (866) 974-7329
Email: bbuffier@wsgr.com

Nicholas R. Sidney (admitted *pro hac vice*)
701 Fifth Avenue, Suite 5100
Seattle, WA 98104
Telephone: (206) 883-2500
Facsimile: (866) 974-7329
Email: nsidney@wsgr.com

*Attorneys for Plaintiffs Zillow Group, Inc. and Zillow, Inc.*

-21-