**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ZILLOW GROUP, INC. and ZILLOW, INC., <br><br> *Plaintiffs*, <br><br> v. <br><br> MIDWEST REAL ESTATE DATA LLC, COMPASS, INC., and COMPASS ILLINOIS, INC., <br><br> *Defendants*. | Case No. 1:26-cv-05451 <br><br> Judge John J. Tharp, Jr. |

**DEFENDANTS' JOINT RESPONSE POST-HEARING BRIEF
ON ZILLOW'S HORIZONTAL GROUP BOYCOTT CLAIM**

**TABLE OF CONTENTS**

RESPONDING STATEMENT OF FACTS ........................................................................... 1

    I.      The Factual Timeline Does Not Fit Zillow's Conspiracy Claim .......................... 2

    II.    Many of Zillow's "Facts" Are Unsupported or Contradict the Evidence ............... 4

        A.     Zillow, MRED, and Compass Are Not Competitors ................................ 4

        B.     Zillow Does Not Apply Its Ban Objectively ............................................. 4

        C.     Zillow Preview Was Not a Response to MLS Rule Changes ..................... 5

        D.     Zillow Preview Is Not "More Transparent" ............................................... 5

        E.     Zillow Did Not Begin to Use Direct Feed Agreements in Response to MRED's Feed Suspension Threat ............................................................... 6

        F.     MRED's PLN Listings Are Not Exclusive to MRED .............................. 7

        G.    Compass Private Exclusives Are Available to Anyone ............................. 7

        H.    Phase 3 Compass Listings Did Not "Fail" and Are Not "Stale" ................ 7

        I.     Zillow Incorrectly Attributes Compass Franchisees to Compass ............... 8

        J.     Compass Did Not Instruct Its Agents to Stop Putting Listings Into MRED ........................................................................................................ 8

        K.    Compass Will Not Benefit from an Injunction ......................................... 9

ARGUMENT ...................................................................................................................... 9

    I.      Zillow Has Not Shown a Likelihood of Success on Its Section 1 Claim .............. 9

        A.     Zillow Has Shown No Anticompetitive Agreement .................................. 9

        B.     Zillow Failed to Show an Unreasonable Restraint .................................. 13

    II.    Zillow Failed to Show Irreparable Harm .......................................................... 16

    III.   The Proposed Injunction Against Compass Violates Fed. R. Civ. P. 65(d) ......... 18

i

# TABLE OF AUTHORITIES

**Cases**

*Agnew v. NCAA,*
   683 F.3d 328 (7th Cir. 2012) ............................................................................................. 13

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
   429 U.S. 477 (1977) ............................................................................................................ 16

*Chi. Pro. Sports Ltd. P'ship v. NBA,*
   961 F.2d 667 (7th Cir. 1992) ............................................................................................. 16

*Gov't Emps. Med. Plan v. Regence Blue Shield of Idaho,*
   2005 WL 8165289 (D. Idaho Mar. 15, 2005) ................................................................... 18

*In re Text Messaging Antitrust Litigation,*
   630 F.3d 622 (7th Cir. 2010) ............................................................................................. 12

*In re Text Messaging Antitrust Litig.,*
   782 F.3d 867 (7th Cir. 2015) ........................................................................................ 12, 13

*LSP Transmission Holdings II, LLC v. Huston,*
   131 F.4th 566 (7th Cir. 2025) ........................................................................................... 18

*Matsushita Elec. Indus. Co. v. Zenith Radio Co.,*
   475 U.S. 574 (1986) ..................................................................................................... 11, 12

*Mazurek v. Armstrong,*
   520 U.S. 968 (1997) ..................................................................................................... 13, 18

*MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.,*
   708 F.2d 1081 (7th Cir. 1983) ........................................................................................... 17

*Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.,*
   948 F. Supp. 2d 538 (D. Md. 2013) .................................................................................. 14

*Miles Distribs., Inc. v. Specialty Constr. Brands, Inc.,*
   476 F.3d 442 (7th Cir. 2007) ............................................................................................. 13

*Monsanto Co. v. Spray-Rite Serv. Corp.,*
   465 U.S. 752 (1984) ..................................................................................................... 11, 13

*Nw. Real Est. Bd., Inc. v. Multiple Listing Serv. of N. Ill., Inc.,*
   1991 WL 640147 (N.D. Ill. Aug. 22, 1991) ..................................................................... 15

*NYNEX Corp. v. Discon, Inc.,*
   525 U.S. 128 (1998) ........................................................................................................... 13

*Petruzzi's IGA Supermarkets v. Darling-Del. Co.*,
  998 F.2d 1224 (3d Cir. 1993) ............................................................................................ 11

*Reifert v. S. Cent. Wis. MLS Corp.*,
  450 F.3d 312 (7th Cir. 2006) ............................................................................................ 13

*Robertson v. Sea Pines Real Est. Cos.*,
  679 F.3d 278 (4th Cir. 2012) ............................................................................................ 15

*St. Luke's Hosp. v. ProMedica Health Sys., Inc.*,
  8 F.4th 479 (6th Cir. 2021) ............................................................................................... 18

*Steel Co. v. Citizens for a Better Env't*,
  523 U.S. 83 (1998) ............................................................................................................ 18

*Stuller, Inc. v. Steak N Shake Enters., Inc.*,
  695 F.3d 676 (7th Cir. 2012) ............................................................................................ 17

*U.S. v. Realty Multi-List, Inc.*,
  629 F.2d 1351 (5th Cir. 1980) ..................................................................................... 15, 16

*United States v. Nat'l Ass'n of Realtors*,
  2006 WL 3434263 (N.D. Ill. Nov. 27, 2006) ................................................................... 15

*Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004) .......................................................................................................... 17

*Yong Ki Hong v. KBS Am., Inc.*,
  2005 WL 1712236 (E.D.N.Y. July 22, 2005) ................................................................... 18

**Rules**

Fed. R. Civ. P. 65(d) ............................................................................................................. 18

Zillow is trying to use this Court to shield itself from the consequences of its own anticompetitive tactics—not to stop a purported group boycott. Zillow manufactured a listing ban to thwart consumer choice by punishing homesellers and agents who privately market homes—blacklisting them until sellers fire their agents and hire new ones. The ban violates MRED's procompetitive display rules, which prohibit *all* feed recipients from filtering listings using non-objective criteria, such as agent identity, and misrepresenting listings. Zillow's ban specifically targeted Compass and its agents, whose listings received more than 99% of Zillow's bans. Zillow also directly threatened MRED if it enforced its display rules and Compass if it did not abandon private listings. MRED's and Compass's responses to Zillow's threats were not a conspiracy; they were unilateral defenses against Zillow's anticompetitive attacks.

In its post-hearing brief, Zillow paints itself as an innocent transparency advocate, too weak to protect itself from the "dominant" Defendants. The facts show exactly the opposite. Zillow is trying to wield its power, using the "largest audience of buyers on the internet" (Zillow Opening Br. ("Pl. Br.") at 3) to force homesellers and agents into immediate public marketing. But as Zillow feared, many homesellers prefer, for their own reasons, a more limited initial distribution of their listing information—and Zillow's ban gives them a stark ultimatum: include Zillow in any public marketing or lose access to Zillow altogether. That is coercion, not competition.

### RESPONDING STATEMENT OF FACTS

In their Joint Opening Brief ("Defs. Br."), Defendants detailed the factual backdrop of this dispute developed in discovery and at the hearing. Defendants explained the residential real estate market, including the long history of antitrust regulator intervention intended to ensure that MLSs operate neutrally to protect "brokers who use alternative business models." *See* Defs. Br. 3–6. And Defendants established that both MRED's "objective criteria" rule and Compass's 3PM are

1

procompetitive. Zillow's post-hearing brief constructs an alternate reality divorced from the record and the market. It conflates facts, misrepresents others, and ignores some altogether.

## I. THE FACTUAL TIMELINE DOES NOT FIT ZILLOW'S CONSPIRACY CLAIM

Zillow contends Compass and MRED "entered into an unlawful conspiracy to terminate Zillow's access to . . . MRED's . . . feeds." Pl. Br. 1. But MRED CEO Rebecca Jensen's testimony belies Zillow's theory that MRED's rule enforcement was the product of an agreement with Compass. She testified that MRED's rule long prohibited non-objective filtering of MRED's data. PI Tr. 438:1–2 (Jensen). She also testified that she first learned the details of Zillow's ban from Zillow executives on April 15, 2025, at a RESO conference in Tucson. PI Tr. 443:20–444:2 (Jensen). Her reaction was immediate and independent, and the same day—*before* she communicated with anyone at Compass—she told Zillow executives that the ban was "clearly based on having the listing switch agents" and was "not using objective criteria." *Id.* at 444:3–13. She further explained that the ban violated the principles underlying the 2008 DOJ consent decree. *Id.* at 444:5–6. The next day, again without any Compass prompting, she repeated the same assessment publicly in San Diego, at a Zillow-sponsored ARELLO conference for state regulators. *Id*. at 444:25–445:25. An objection that predates the conspiracy's alleged formation, that MRED voiced consistently for months, *id.* at 443:10–448:12; DX094, at 2; DX460, at 1; DX461; DX512; DX517, is not evidence of a conspiracy—it is evidence that MRED's position was independently held, promptly communicated, and never dependent on anything Compass said or did.

In its Complaint, Zillow alleges a conspiracy "[b]eginning in or around October 2025." Compl. ¶ 176. But that is impossible to reconcile with the evidence. Ms. Jensen's consistent objections to Zillow regarding its ban started *six months* earlier. So, in its post-hearing brief, Zillow tries to quietly shift the start date for the purported conspiracy to April 15, 2025, carefully conflating two *different* conferences to make it appear that MRED's CEO and Compass's CEO

spoke about Zillow's ban on the same day Ms. Jensen first discussed it with Zillow. Pl. Br. 11 ("MRED and Compass began discussing how to block [the Zillow ban] . . . [d]uring a panel at an April 15, 2025 industry conference."). That is false and deliberately misleading. The *only* evidence Zillow cites in support is the declaration of a Zillow employee, who says: "[o]n April 15, 2025, I attended a conference hosted by [ARELLO]. At the conference, MRED CEO Rebecca Jensen and Compass CEO Robert Reffkin participated in a . . . presentation . . . [discussing] Zillow's standards." PX166 ¶ 8. That benign testimony, however, and Zillow's mischaracterization of it, obscures crucial timing facts. The ARELLO conference was a multi-day conference in San Diego, and Ms. Jensen's panel discussion with Mr. Reffkin occurred on **April 16**. PI Tr. 444:23–445:1 (Jensen).[1] On **April 15**, however, Ms. Jensen was in Tucson at a RESO conference with Zillow executives. PI Tr. 443:20–444:13 (Jensen). Ms. Jensen testified she first learned the details of Zillow's ban directly from Zillow executives on April 15, while at that RESO conference, and immediately raised concerns with Zillow about it. *Id.* Ms. Jensen's uncontroverted testimony is that she began consistently objecting to Zillow's ban from the moment she learned of it without any influence from or communications with Compass. *Id.*

Separately, Zillow cites absolutely nothing about the April 16 ARELLO presentation that provides even a hint that MRED and Compass began some conspiracy on that date. Zillow simply notes that during his public remarks at the conference, Mr. Reffkin said Zillow's ban would "make [the] MRED [PLN] impossible," and "Ms. Jensen responded that she believed a 2008 settlement between the [DOJ and NAR] prohibited Zillow from enforcing" the ban. Pl. Br. 11. Ms. Jensen then emailed a copy of the 2008 settlement to Mr. Reffkin on April 17, directing him to the page

---

[1] *See also* ARELLO Schedule, *available at* https://www.arello.org/events/viewEvent.cfm?e=185#schedule (confirming Mr. Reffkin and Ms. Jensen's panel discussion occurred on April 16).

of the settlement that she referenced during the panel discussion a day earlier. PX058; PX059. The next step in Zillow's timeline does not occur until "late 2025," Pl. Br. 11, ignoring the many interim MRED communications taking issue with the Zillow ban. *E.g.*, DX461 (May 2025 email stating Zillow ban "does not comply with [MRED's] existing data delivery policies.").

## II. MANY OF ZILLOW'S "FACTS" ARE UNSUPPORTED OR CONTRADICT THE EVIDENCE

Many of the "factual" statements in Zillow's brief are not supported by the record. Zillow also mischaracterizes facts to create false impressions, some of which are worth correcting.

### A. Zillow, MRED, and Compass Are Not Competitors

Zillow asserts that "Compass, MRED, and Zillow are horizontal competitors in the Listing Creation and Distribution market," that are in "a race to who can get the listing first." Pl. Br. 24. But neither MRED nor Zillow "create" listings or race to get them. Only real estate agents—like Compass's—compete for listings, through hard work and investment, and they race only against other agents to find sellers and obtain listing agreements to generate their listings. Zillow and MRED distribute listing information, through *different* means to *different* audiences, generating revenue from *different* sources for doing so. MRED is a cooperative of brokers that aggregates and distributes member-broker-generated listing data to its non-consumer participants on a breakeven basis. By contrast, Zillow is a consumer-facing portal that takes MLS data—obtained for next to nothing—and monetizes it into billions of dollars in revenue. In any event, the only relationship that matters for antitrust purposes is Compass's relationship with MRED. And Compass and MRED are not competitors generally or with respect to "Coming Soon" listings.

### B. Zillow Does Not Apply Its Ban Objectively

Zillow claims it applies its ban "objectively" to "all brokerages, all agents, all listings regardless of who they are," Pl. Br. 6, but that is false. Zillow's discovery responses show all but 8 of Zillow's 1,390 banned listings were Compass listings. DX201. That is not objective. Zillow's

4

warning and enforcement mechanism (the so-called three-strike rule) confirms Zillow actively pursues and blacklists *individual* agents. *See* Pl. Br. 5 ("The third time that *agent* has a different listing that violates the Standards, 'for that third listing and subsequent violating listings,'" Zillow will not display those listings.) (emphasis added); DX455, at 2 (listings will not appear on Zillow "for the life of the listing agreement between *that specific listing broker and seller*") (emphasis added). Zillow also insists its ban is "based on a permissible objective criterion: how the property was marketed," Pl. Br. 12, but that is wrong. How a property was marketed becomes completely irrelevant to Zillow as soon as the agent or brokerage changes.

## C. Zillow Preview Was Not a Response to MLS Rule Changes

Zillow also mischaracterizes the impetus for launching Zillow Preview, a marketing tool Zillow now offers that is almost identical to Compass's Phase 2. Though MLS rules changed over time, Zillow did not "create[] Zillow Preview in response to" those changes. Pl. Br. 6. It did so in response to consumer demand and as a direct response to the Compass/Redfin "coming soon" partnership. PI Tr. 118:13–119:18 (Samuelson) (Redfin "certainly" motivated Zillow Preview); DX029, at 170:19–171:2 (Hofmann Dep.) ("Zillow Preview was launched . . . as a competitive response to Compass and Redfin's partnership"); DX490, at 8 (Compass/Redfin "deal massively disrupts the status quo"), 9 (emphasizing need to "execute swiftly" a response with Zillow Preview). Zillow Preview, which Zillow itself would have prohibited under its original listing ban, also is a clear admission that off-MLS marketing has procompetitive benefits. It also shows Zillow has no problem banning procompetitive strategies until forced to do otherwise.

## D. Zillow Preview Is Not "More Transparent"

Zillow Preview is not "more public and transparent than PLNs." Pl. Br. 6. Zillow's own expert describes Zillow Preview, which advertises "coming soon" listings, as a PLN. PI Tr. 398:5–16 (Wu). Zillow Preview operates in the same way as Compass Phase 2 listings, which also are

marketed as "coming soon." *See* PI Tr. 514:19–515:12 (Aron) (both are "coming-soon" products). Zillow Preview displays brokerages' "coming soon" listings on its website to the public. PX163 ¶ 43 (Samuelson Decl.). Compass's Phase 2 listings are shared with other brokerages via MRED's PLN and also are publicly displayed on Compass's website and Redfin.com. PI Tr. 463:25–464:4 (Jensen), 330:4–10 (Reffkin). There is no basis to say Zillow Preview is "more public."

> **E.** **Zillow Did Not Begin to Use Direct Feed Agreements in Response to MRED's Feed Suspension Threat**

Zillow claims that "[i]n light of . . . MRED's threats to terminate Zillow's Listing Feeds access, Zillow *began* taking steps to obtain Chicagoland listings from an alternate source: directly from brokers." Pl. Br. 13 (emphasis added). But the record plainly shows Zillow obtained hundreds of direct feed agreements over the years, PI Tr. 193:3–8 (Haran), including from Compass Illinois back in December 2021, years before Zillow announced its ban and MRED told Zillow the ban violated MRED's display rules. PX007, at 3. That was not part of any attempt to replicate MRED's feeds in the event MRED suspended them; it was Zillow's supposed effort to obtain only *rental* listings directly from Compass after Zillow rejected MRED's terms for a rental feed. DX001, at 90:12–21, 109:4–9 (Broude Dep.). But the Zillow-drafted direct feed contract did not cover only rental listings, it covered every single Compass listing, including for-sale properties. When Compass's management discovered this overreach, Compass terminated the direct feed agreement, which Compass viewed as "egregious." DX001, at 91:8–92:16 (Broude Dep.) (Zillow's broker feed agreement for rental properties was "broad and widespread" to an "egregious" degree). That egregious overreach apparently is a page out of Zillow's standard playbook. *See* DX122, at 172:15–22, 173:23–174:12 (McColly Dep.) (McColly Real Estate declined to sign Zillow direct

6

feed agreement because "the contract was so onerous you can never get out of it," then Zillow went "behind the back of our corporate office" to ask individual managers to sign it).[2]

### F.     MRED's PLN Listings Are Not Exclusive to MRED

Zillow falsely states that "96% of PLN listings are exclusive to" MRED. Pl. Br. 9. But MRED does not *exclusively* control any listings; brokerages do. *See* PI Tr. 530:9–12 (Aron). Every listing in MRED's PLN is available to all MRED participants through MRED's feed and *also* directly available from the brokerage that created the listing, should that brokerage choose to share it directly. *See* MRED Br. 5.

### G.     Compass Private Exclusives Are Available to Anyone

Zillow misrepresents access to Compass Phase 1 listings. *See* Pl. Br. 9 (claiming they "are hidden behind a registration wall and available only to Compass agents and registered users."). Potential buyers may access Phase 1 listings by registering for free online, working with a Compass agent, having a non-Compass agent contact Compass, or contacting a Compass office themselves. *See* PI Tr. 296:5–297:6 (Reffkin); DX137, at 39 Ex. 4 (Aron Decl.) ("black box" noting that "[a]ll buyers & agents can access [Phase 1 listings] in our offices or by contacting Compass."). There is no obligation to work with a Compass agent to see a Phase 1 listing. PI Tr. 296:5–9 (Reffkin).

### H.     Phase 3 Compass Listings Did Not "Fail" and Are Not "Stale"

Zillow incorrectly complains that unless it can enforce its ban, it will "be forced to display failed Compass Private Exclusive listings" distributed to Zillow via MRED's active feed once the listing reaches Phase 3. Pl. Br. 18. But as Mr. Reffkin testified, Compass's 3PM strategy *intends* for each listing to pass through all three phases, hence the name, and 94% do. PI Tr. 303:5–12

---

[2] Zillow also is incorrect that "terminating its direct feed to Zillow would increase costs for [Compass] agents by forcing them to manually enter their rental listings into Zillow." Pl. Br. 25. At the time of Compass Illinois's direct feed agreement termination, it put a support program in place to assist its agents with getting rental listings onto Zillow. DX001, at 113:5–8 (Broude Dep.).

(Reffkin). Listings that reach Phase 3 did not "fail." They passed through two other marketing phases designed to generate buzz and provide useful information to the seller to better prepare the home for public marketing. And they are not "stale," because Zillow does not care about how long it has been since a listing was created, only whether it was placed in the MLS by the agent that pre-marketed. PI Tr. 226:25–227:8 (Hofmann). In any event, Zillow provided no evidence that it charges agents any less for "stale" leads.

## I.     Zillow Incorrectly Attributes Compass Franchisees to Compass

Zillow deliberately bundles Compass with independently owned and operated franchisees to artificially inflate Compass's market share and influence over MRED. Trying to paint Compass as "the [d]ominant [b]rokerage in Chicagoland," Pl. Br. 9, Zillow claims Compass holds a "27.48% market share by transaction count," but that improperly includes independent franchisees, over which Compass has no control. PX478 ¶ 7(c) (admitting inclusion of "franchise brands" in share calculation). That is critical because Compass cannot prevent independent franchisees from sending listings to Zillow. Zillow also claims "[t]hree Compass-affiliated brokers serve on MRED's Board of Managers," Pl. Br. 9, to inflate Compass's influence over MRED's 17-member board, DX001, at 22:22–24 (Broude Dep.). But two of those seats are held by independently owned and operated franchisees that Compass does not control. PI Tr. 323:2–7 (Reffkin), 249:21–250:13 (Broude).

## J.     Compass Did Not Instruct Its Agents to Stop Putting Listings Into MRED

Zillow claims that on the same day MRED suspended Zillow's feeds, "Compass instructed its agents to stop inputting their listings into MRED." Pl. Br. 16. But the document Zillow cites does not support that. *See* PX220. There is no "instruction" to stop putting listings into MRED. The document simply explains that MRED suspended Zillow's feed after Zillow "continued banning certain active listings from appearing on its website based on the broker or agent name"

8

and the likely implications that had for listings entered into MRED. *Id.* Because Zillow decided to violate MRED's display rules by banning listings, and MRED decided to suspend Zillow's listing feeds, Compass simply did not at that time "believe that entering . . . listings into MRED" would "offer additional protection for . . . listings that start as a Private Exclusive." *Id.* Zillow's characterization of this document is thus highly misleading.

### K. Compass Will Not Benefit from an Injunction

Zillow's claim that Compass will "benefit from the injunction" could not be more wrong. Pl. Br. 2. As explained in Defendants' brief, Compass agents and homesellers will continue to suffer harm from any injunction. Defs. Br. 31–32. While Compass prefers its Phase 3 listings to be displayed on Zillow's website, it does not want that at the expense of sellers' choice. PI Tr. 323:17–23 (Reffkin). Zillow's requested injunction will permit Zillow to ban Compass Phase 1 listings from Zillow once they reach Phase 3. For Compass agents and homesellers, that means they will be forced to forego private marketing or suffer Zillow's ban.

## ARGUMENT

### I. ZILLOW HAS NOT SHOWN A LIKELIHOOD OF SUCCESS ON ITS SECTION 1 CLAIM

Zillow has not met the preliminary injunction requirement of a "strong" showing of likelihood of success on the merits. Defs. Br. 16–17. Instead, Zillow offers the Court a series of impermissible inferences, outright speculation, and self-serving testimony.

### A. Zillow Has Shown No Anticompetitive Agreement

Again, Zillow completely ignores the evidence. MRED's CEO concluded immediately upon hearing the details of Zillow's ban—without talking to Compass—that it violates MRED's longstanding "objective criteria" rule and so informed Zillow that day. PI Tr. 443:14–444:13 (Jensen). MRED's decision was unilateral, based on its own rules and consistent conviction that they were supported by the guiding principles of the DOJ's 2008 settlement. *Id.* MRED's early

9

decision also disproves Zillow's assertion that MRED's October 2025 rule clarification was a *new* rule adopted through an agreement with Compass, *id*. at 444:5–6 (Jensen), particularly in light of the fact that it was *Zillow* that asked MRED to clarify its rule, *id.* at 447:5–14 (Jensen).

The rest of Zillow's purported evidence mischaracterizes the parties' actions. Zillow's only claimed direct evidence of agreement, an MRED press release announcing a purported "Alliance" to support MRED's national expansion,[3] actually shows the parties behaved in their own interests. As Zillow concedes, MRED has long had operations in every state, PI Tr. 165:10–14 (Haran), and MRED CEO Jensen testified of MRED's long-standing plans for expansion, PI Tr. 467:7–9 (Jensen). Zillow attacked PLNs, and Compass in particular, using "hardline" techniques to "punish" agents and brokers. *See, e.g.*, DX263, at 28 ("We want to punish the agent for choosing to put their listings on alternate networks."), 30 ("Everything about the hardline plan assumes we can be successful at using a hammer to keep sellers and agents on our site."). In response to those attacks, Compass decided to expand its use of MRED. PI Tr. 324:2–325:3 (Reffkin).

MRED's expansion is pro-competitive because it generates competition among MLSs. PI Tr. 324:2–17 (Reffkin), 470:5–19 (Jensen). Yet Zillow calls it "pretext," which is odd because Zillow claims injury from it. Pl. Br. 28. In any event, MRED issued its press release on April 24, and days later, Zillow launched this case—generating uncertainty about MRED's rules and potentially undermining Compass's reasons to provide its listings to MRED. That uncertainty also underlies the May 20, 2026, email, PX220, which Zillow calls its "[m]ost damning" evidence. Pl. Br. 28. In that email, Compass was not committing any "about face," *id.*; it was explaining to

---

[3] Zillow's repeated claims that MRED and Compass issued a "joint" press release are exaggerations. MRED issued a press release to note Compass's important decision, and Compass naturally reviewed it because it described Compass's actions. PX075; PI Tr. 353:12 (Reffkin) ("This is not my press – our press release."); *id*. at 354:6–9 (Reffkin) (Compass's suggestions "[d]idn't mean [MRED had] to accept the changes").

10

agents that, because of Zillow's actions against MRED and MRED's responding feed suspension, they would not, at that time, receive the protection that Compass thought they would (and should).

Zillow's so-called circumstantial case is similarly inadequate because it flies in the face of clear precedent: "[A]ntitrust law limits the range of permissible inferences from ambiguous evidence . . . ." *Matsushita Elec. Indus. Co. v. Zenith Radio Co.*, 475 U.S. 574, 588 (1986). Compass's complaints to MRED about Zillow's ban were not "parallel conduct," which typically involves companies raising prices at the same time or otherwise "act[ing] similarly by refraining from competing." *Petruzzi's IGA Supermarkets v. Darling-Del. Co.*, 998 F.2d 1224, 1243 (3d Cir. 1993). Compass's "conduct" was to complain to MRED and other MLSs, and complaints are not evidence of agreement. *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 763 (1984); *see* Defs. Br. 18–19. Nor did MRED and Compass "work[] in tandem to eliminate Zillow's access to direct broker feeds." Pl. Br. 19. MRED actually *enabled* Zillow's direct feed access. PI Tr. 459:22–24 (Jensen). And MRED's communications to brokers were made independently and simply explained that MRED did not understand Zillow's hurry. *See, e.g.*, PX400, at 3 ("MRED does not understand the basis for this January timeline, as MRED has not provided Zillow with any notices of violations as of this date that would require a disconnection of their listing data feed."). Compass's independent decisions to terminate its direct feed agreements were (1) in February 2026 (PX007), a correction of overreaching contracts that were supposed to be limited to rental feeds (DX001, at 94:2–4 (Broude Dep.)); and (2) later in May 2026 (PX073), a separate response to Zillow's attack on its 3PM. Compass does not have an antitrust duty to sit back and let Zillow abuse egregious contractual terms or dictate the methods sellers use to market their homes.

Zillow's view that MRED and Compass are acting against their own economic interest is contrived. MRED enforces its "objective criteria" rule to maintain overall broker confidence in

11

MRED's neutrality. PI Tr. 466:4–5 (Jensen) ("The whole point of a good referee is to make it equal for everybody."). MRED can only convince brokers to contribute to its active MLS feed if it can assure them that the feed will not be weaponized by some users against others. PI Tr. 498:12–16 (Aron); 442:8–443:2 (Jensen); 194:6–195:25 (Haran); DX138 ¶¶ 14–15 (McColly Decl.); Defs. Br. 19. That is exactly what Zillow is doing. MRED does in fact want Zillow to display listings from MRED's MLS feeds (and is "generally benefit[ed]," Pl. Br. 20) so long as Zillow does not corrupt the feed. Compass also acknowledges that sellers and agents want to have Zillow as an option—and that it is an integral part of the last phase of 3PM. PI Tr. 280:24–281:2 (Broude); 319:9–12, 326:25–327:8 (Reffkin). But Compass acts in its overall economic interest, and in the interests of its agents and their clients, by fighting the Zillow ban. Almost half of Compass sellers adopt 3PM, and Compass believes in seller choice (and the procompetitive nature of PLNs). PI Tr. 308:8–309:1 (Reffkin).

The rest of Zillow's circumstantial evidence relies on "[im]permissible inferences." *Matsushita*, 475 U.S. at 588. Zillow relies (Pl. Br. 18, 21) on the Seventh Circuit's first decision in *In re Text Messaging Antitrust Litigation*, 630 F.3d 622 (7th Cir. 2010), in which the complaint survived a motion to dismiss. But Zillow *ignores* the Seventh Circuit's second decision affirming summary judgment for defendants. *In re Text Messaging Antitrust Litig.*, 782 F.3d 867 (7th Cir. 2015). There, the Seventh Circuit said that the "complaint passed the [motion to dismiss] test [because] the complaint 'alleges a mixture of parallel behaviors, details of industry structure, and industry practices, that [may] facilitate collusion." *Id*. at 870 (quoting 630 F.3d at 627). These allegations also included, as do Zillow's, a "small number of firms" and "alleged exchanges" of information. *Id*. at 871. After that decision, "[t]he challenge to the plaintiffs . . . was thus to find evidence that the defendants had colluded expressly." *Id*. at 872. Plaintiffs did not. And the court

12

held that plaintiffs could not survive summary judgment with the same mixture of allegations that were sufficient to survive a motion to dismiss, because they did not provide material evidence that could exclude "independent parallel behavior." *Id*. at 879; *see id*. at 876–79.

Under *Monsanto*, complaints about others' conduct are not enough to survive summary judgment. *Miles Distribs., Inc. v. Specialty Constr. Brands, Inc.*, 476 F.3d 442, 451 (7th Cir. 2007). Zillow has complaints, but no actual evidence of conspiracy. And the burden for a preliminary injunction is "***much higher***" than what a plaintiff needs to show to avoid summary judgment. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis added). Otherwise, preliminary injunctions would be granted in every case, and it would no longer be "an extraordinary and drastic remedy." *Id.* (quotations omitted).

### B.      Zillow Failed to Show an Unreasonable Restraint

In its brief, Zillow ignores the Seventh Circuit's holding in *Reifert v. S. Cent. Wis. MLS Corp.*, 450 F.3d 312, 315, 321 (7th Cir. 2006), that MLS rules are judged under the rule of reason, and myriad other cases holding the same. *See* Defs. Br. 20–21. Instead, Zillow pins its *per se* claim on the argument that Compass and MRED are horizontal competitors, which their own fact witnesses admit is wrong—an error compounded by Zillow's erroneous market definition. *See* PI Tr. 38:2–5 (Samuelson) (an MLS is "a database, a cooperative of agents and brokers who share their listings"). And even a *per se* case "does not eliminate the need for a relevant commercial market." *Agnew v. NCAA*, 683 F.3d 328, 345 (7th Cir. 2012).

A threshold requirement for a *per se* rule is that the defendants are "direct competitors," which requires that they be in the same market. *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998). For one, it is hard to describe MRED as a "competitor" in any market because, by agreement among its members, MRED does no more than break even. PI Tr. 437:12–14 (Jensen). And MRED is certainly not a competitor with Compass, which markets to consumers while MRED

13

sells wholesale access to its MLS members and subscribers (like Compass) through 15 Realtor associations. As a result, Zillow's "Listing Creation and Distribution Market" is not just imprecise, it is fundamentally wrong. Zillow tries to bridge its logic gap by saying "'agents have a choice on where they can put their newest listing'" among the "Compass, Zillow, and MRED platforms." Pl. Br. 26 (quoting PI Tr. 402:23–403:3 (Wu)). But agents put listings into all three depending on the intended audience. A brokerage website and Zillow are avenues to reach consumers, and MRED is a vehicle to reach other brokerages. They are thus complementary tools that provide exposure for agent listings. Entities are competitors only if they provide competing products or services. PI Tr. 495:5–496:6, 497:17–498:2 (Aron); *see also id*. at 488:9–10 ("Compass and MRED do not compete with each other.").

Zillow's claim (Pl. Br. 24–25) that Compass conceded that off-MLS listings compete with MLSs is a startling misrepresentation. First, Compass's case against Northwest MLS alleges that *broker members* of that MLS conspired to create an MLS rule that excludes competition from Compass. The relevant horizontal competitors there are the *broker members*. PX109, ¶¶ 55–56. Second, Compass's 3PM is similar to MRED's PLN only in the sense that MRED's PLN receives Compass Phase 2 listings and other brokers' private listings for distribution to participating members. Even if Compass Phase 2 "Coming Soons" now compete with Zillow Preview since its March 2026 launch, that does not place Compass in the same market as *MRED*.[4]

Caselaw confirms that real estate brokerages do not compete with MLSs (as opposed to the other broker-members that comprise the MLS, with whom they do compete). *See, e.g.*, *Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*, 948 F. Supp. 2d 538, 567 (D. Md. 2013)

---

[4] Zillow also points to PX107 as saying Compass viewed Zillow as a threat to MLSs, but there, Mr. Reffkin was primarily addressing Zillow's highly unfavorable terms of use and the dangers of providing data to Zillow without the protection of MLS data protection rules.

(MLS does not compete with an entity that "does not offer multiple listing services"); *United States v. Nat'l Ass'n of Realtors*, 2006 WL 3434263, at *1 (N.D. Ill. Nov. 27, 2006) ("NAR's member brokers compete with one another in local brokerage services markets to represent consumers in connection with real estate transactions."); *Robertson v. Sea Pines Real Est. Cos.*, 679 F.3d 278, 285 (4th Cir. 2012).

Zillow relies on just one case to support its *per se* argument (Pl. Br. 23–24), *Nw. Real Est. Bd., Inc. v. Multiple Listing Serv. of N. Ill., Inc.*, 1991 WL 640147 (N.D. Ill. Aug. 22, 1991), but that case does not apply for two reasons. First, the case involved an alleged conspiracy among the broker-owners of the MLS to exclude competing brokers. *Id.* at *1–2. Here, Zillow alleges a conspiracy between one broker-owner and the MLS itself. Second, the court there relied on *U.S. v. Realty Multi-List, Inc.*, 629 F.2d 1351 (5th Cir. 1980), which "concluded that multiple listing services themselves were not *per se* illegal," and applied a rule of reason analysis. *Nw. Real Est. Bd.*, 1991 WL 640147 at *2. Zillow's own cited case does not support a *per se* standard.

Zillow also has no likelihood of success under the rule of reason. For reasons discussed (above and Defs. Br. 23–24), Zillow failed to establish a relevant market. Zillow's assertion that MRED's "objective criteria" rule is anticompetitive is also flawed. Ms. Jensen testified the rule is based on NAR industry standards and the DOJ's position in the 2008 litigation. PI Tr. 440:6–442:14 (Jensen). Zillow's brief does not even acknowledge that antitrust agencies consistently—in the 1983 FTC Report, in many litigated cases, in the 2008 settlement, and in opposing NAR's Clear Cooperation Policy—take the position that private listings increase competition over an "MLS only" market. *See* Defs. Br. 4–6 (collecting cites). Zillow, however, acknowledged in its *internal* strategy document that it was DOJ pressure on NAR that led to the change in the Clear Cooperation Policy, which Zillow seeks to recreate through its ban. DX263, at 2. It is Zillow's ban

that "exclude[s] other competitors," not MRED's display rules. Pl. Br. 26 (quoting *Realty Multi-List*, 629 F.2d at 1370). More importantly, MRED's display rules (and Compass's 3PM strategy) do not forbid or even discourage sellers and their agents from choosing to place properties in MRED's active feed immediately for distribution to Zillow. PI Tr. 326:25–327:8 (Reffkin).

Zillow also fails to show consumer injury. First, Zillow is wrong that injury to itself is injury to the market. Pl. Br. 27, 29–30. *But see Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977); Defs. Br. 25. Even if Zillow's own output falls, MRED's display rules and Compass's 3PM increase output by increasing seller choice. "A 'restraint' that in the end expands output serves the interests of consumers and should be applauded rather than condemned." *Chi. Pro. Sports Ltd. P'ship v. NBA*, 961 F.2d 667, 673 (7th Cir. 1992); *see* Defs. Br. 24–25. Second, Zillow's purported evidence of lower prices for homes selling while in a PLN is wrong and irrelevant. Defs. Br. 26–27. Consumers reveal their preferences by choosing PLNs or Compass's 3PM, and those preferences legitimately include nonprice considerations such as privacy and convenience. PI Tr. 507:9–508:18 (Aron), 104:19–105:6, 112:14–16 (Samuelson). Moreover, the speculative harm to Zillow from PLN proliferation is not harm to the market, given Dr. Wu's concession that buyers already use multiple websites (at no additional cost). PI Tr. 429:4–6 (Wu), 102:19–20 (Samuelson). Compass Phase 2 "Coming Soons" are publicly available on Compass's website and Redfin.com (exactly as Zillow Preview "coming soons" are available on Zillow's and listing brokerages' websites), and Compass consistently informs consumers searching for properties when it has "Private Exclusives" in the relevant area, which can be accessed without registering or hiring a Compass agent. PI Tr. 303:17–305:24, 295:22–296:4 (Reffkin); DX578.

## II.   ZILLOW FAILED TO SHOW IRREPARABLE HARM

Zillow says it would face "an impossible choice" absent preliminary relief: lose MRED's feeds or abandon the Zillow ban. Pl. Br. 33. There is no evidence Zillow would suffer harm in

16

either case. Again, the obviously true statement that buyers search multiple websites means consumers do not think of Zillow as "comprehensive." PI Tr. 427:23–428:18 (Wu). Whatever statements Zillow makes about its so-called "brand promise" thus must be aspirational, Pl. Br. 34–35, because they are not the reality. And Zillow's repeated invocations of "transparency" and "choice" are inconsistent with the Zillow ban's operation and effects. Defs. Br. 11, 27–28.

Similarly, no objective evidence supports the importance of "new listings" that Zillow pushes; Dr. Wu's Figure 1 shows only that listings new *to Zillow* get more engagement than listings old *to Zillow*. PI Tr. 388:20–389:6 (colloquy between the Court and Dr. Wu). And Zillow's admission that it has not yet "spiral[ed]" in Chicago, combined with the fact that 95% of PLN listings ultimately flow to Zillow, makes that story even more doubtful. Defs. Br. 29–30. That is particularly true because Zillow can obtain about 50% of listings, and perhaps close to 70%, through direct feeds.[5] PI Tr. 89:5 (Samuelson), 213:23–214:18 (Hofmann).[6]

Zillow is motivated to increase the number of listings on its website so it can earn more money from selling leads, sharing buyer agents' commissions, and providing mortgage services, among other services. PI Tr. 208:7–21, 210:14–211:3 (Hofmann). Zillow is promoting its interests, not the public's. Zillow's internet competitors—Homes.com, Realtor.com, and Redfin.com—do not impose the same anticompetitive ban on listings that Zillow does, and they are not failing companies. Nor will Zillow be even if it respects sellers' choices. Zillow also does not directly

---

[5] Zillow says MLS listings are an "essential input," Pl. Br. 25, though it did not plead an essential-facilities claim. Even if the law recognized such a claim, *see Verizon Commc'ns Inc. v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 410–11 (2004) (expressing doubt), it would fail on Zillow's ability to duplicate much of the feed. *See MCI Commc'ns Corp. v. Am. Tel. & Tel. Co.*, 708 F.2d 1081, 1132–33 (7th Cir. 1983).

[6] *Stuller, Inc. v. Steak N Shake Enters., Inc.*, 695 F.3d 676, 679 (7th Cir. 2012), does not rebut the self-inflicted nature of Zillow's supposed irreparable harm. There, the franchisor subjected a franchisee to a new policy representing "a significant change to [the franchisee's] business model." *Id.* at 680. Here, it is the opposite. Zillow followed MRED's objective criteria rule for years without issue.

dispute Dr. Aron's testimony that damages would be calculable in this case using standard economic tools. PI Tr. 520:7–521:19 (Aron). "[E]conomists can and do assess such injuries in monetary terms." *St. Luke's Hosp. v. ProMedica Health Sys., Inc.*, 8 F.4th 479, 489 (6th Cir. 2021).

### III. THE PROPOSED INJUNCTION AGAINST COMPASS VIOLATES FED. R. CIV. P. 65(d)

Recognizing its requested injunction as to Compass was improper,[7] Zillow changed it for the first time in its post-hearing brief. *Compare* ECF 21, at 15 (asking to "enjoin Defendants from implementing their conspiracy"), *with* Pl. Br. 40 (asking to "enjoin Compass from entering into MRED listings outside of MRED's traditional service area that violate Zillow's Standards"). A preliminary injunction is an "extraordinary and drastic remedy," *Mazurek*, 520 U.S. at 972 (quotations omitted), and moving the goalposts *after* the preliminary injunction hearing, denying Compass the ability to take discovery and elicit evidence, is grossly unfair. Even if it were timely, Zillow's new request still is improper. If Zillow obtains relief against MRED, which it should not, ordering Compass not to enter listings into MRED would have zero effect. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107, 108–09 (1998) (injunction that would not "remedy [an] alleged harm . . . is insufficient"); *LSP Transmission Holdings II, LLC v. Huston*, 131 F.4th 566, 575, 584 (7th Cir. 2025) (vacating "preliminary injunction [where it] has not and would not redress or prevent plaintiffs' feared injuries"). If MRED must supply feeds to Zillow, and Zillow may ban listings it does not like, Zillow cannot be harmed by including Compass listings in MRED's feed.

---

[7] Zillow cites no in-circuit authority supporting its original request, and the cases it cites are inapposite. *Cf.* Defs. Br. 32 (gathering Seventh Circuit cases). Zillow misrepresents *Yong Ki Hong v. KBS Am., Inc.* as "preliminarily enjoining defendants from encouraging, requesting, or inducing a defendant to refuse to supply product to plaintiffs." Pl. Br. 40. That case involved a TRO, 2005 WL 1712236, at *4 (E.D.N.Y. July 22, 2005), and the court's eventual preliminary injunction contained no such ambiguous language. *Yong*, No. 1:05-cv-01177, ECF 72 (E.D.N.Y. Sept. 28, 2005). Zillow's other case prevented defendants from "terminating their agency relationships," which complies with Rule 65(d). *Gov't Emps. Med. Plan v. Regence Blue Shield of Idaho*, 2005 WL 8165289, at *16 (D. Idaho Mar. 15, 2005).

18

Dated:     July 13, 2026         */s/ Nathan P. Eimer*

Nathan P. Eimer
Vanessa G. Jacobsen
Alec Solotorovsky
Brian Y. Chang
EIMER STAHL LLP
224 S. Michigan Ave., Suite 1100
Chicago, IL 60604
Telephone: (312) 660-7600
Fax: (312) 692-1718
neimer@eimerstahl.com
vjacobsen@eimerstahl.com
asolotorovsky@eimerstahl.com
bchang@eimerstahl.com

*Counsel for Defendants*
*Compass, Inc. and Compass Illinois, Inc.*


*/s/ Stephen D. Libowsky*

Stephen D. Libowsky
MANATT, PHELPS & PHILLIPS, LLP
151 N. Franklin St. (Suite 2600)
Chicago, IL 60606
Telephone: (312) 477-4798
slibowsky@manatt.com
Attorney No. 6187081

Dylan M. Carson (*pro hac vice*)
Joshua N. Drian (*pro hac vice*)
MANATT, PHELPS & PHILLIPS, LLP
1050 Connecticut Ave. NW (Suite 600)
Washington, D.C. 20036
Telephone: (202) 585-6500
dcarson@manatt.com
jdrian@manatt.com

Zachary J. Howe (*pro hac vice*)
MANATT, PHELPS & PHILLIPS, LLP
12730 High Bluff Dr. (Suite 300)
San Diego, CA 92130
Telephone: (619) 205-8500
zhowe@manatt.com

*Counsel for Defendant*
*Midwest Real Estate Data LLC*

19

## CERTIFICATE OF SERVICE

I hereby certify that, on July 13, 2026, I electronically filed a copy of the foregoing through the Court's CM/ECF system, which will send notifications of the filing to all counsel of record.

Dated: July 13, 2026                              */s/ Nathan P. Eimer*

20