

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF ILLINOIS** JUL 17 2026 ᴊᴍ

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

**ZILLOW, INC.**, Plaintiff,

v.

**MIDWEST REAL ESTATE DATA LLC (MRED) and COMPASS, INC.**, Defendants.

Case No. ~~1-26-cv-02345~~ 1:26-cv-05451

Hon. John Tharp, Jr., U.S. District Judge

**SUPPLEMENTAL CRIMINAL MISPRISION NOTICE TO THE COURT UNDER 18 U.S.C. § 4**

TO: Hon. John Tharp, Jr., U.S. District Judge FROM: Gregory V. Alkema, REALTOR®, CRB (RealEstateCrusade.com) Judge Tharp,

This is a supplemental formal notification under 18 U.S.C. § 4 (Misprision of Felony) submitted directly to this Court prior to the July 9, 2026, post-hearing brief deadline.

## DO NOT ISSUE A RULING THAT SANCTIONS, MANDATES, OR PROTECTS THESE GATED DATA STRUCTURES. SHUT THIS THEATER DOWN NOW.

I know your background is as a highly trained lawyer, but you are sitting as a Federal Judge now, not a corporate defense attorney. Your duty is to the integrity of public law, not the preservation of anticompetitive corporate sandboxes. If you grant a preliminary injunction or sign an order that legitimizes, paths, or immunizes the closed-loop data routing at the heart of the Zillow-Compass-MRED architecture, you will be permanently recorded in history as the Judge who destroyed the fiduciary foundation of the REALTOR® profession.

The evidence presented in your courtroom on July 1st and 2nd is not an abstract antitrust ledger. When Compass CEO Robert Reffkin admitted under oath that "Private Exclusive" adoption has intentionally gated up to **48% of property inventory** away from the open public web, he confessed to the macro-infrastructure of a scam.

By blinding the public market, these entities completely bypass the strict fiduciary standards that protect American homeowners. The primary victims of this data fragmentation are senior citizens. By forcing independent broker commissions down to a predatory 1.8% through forced lead-generation funnels and closing off public price discovery, this system directly facilitates **Criminal Elder Financial Exploitation**.

It enables localized **$302,000 asset-stripping scams** where family trust equity is funneled directly into corporate pipelines without ever hitting a transparent, open market auction.

On July 1, 2026, a national coalition of eight major consumer protection and civil rights organizations formally petitioned the FTC and DOJ to investigate this exact nationwide expansion for anti-consumer and discriminatory harms.

**The corporate parties in your courtroom are attempting to use your pen to extract a judicial order that will serve as an unassailable civil liability shield for their ongoing data manipulation.**

**You are on direct, permanent criminal notice under 18 U.S.C. § 4.**

**If you sign an order, or leave an order in place, providing cover for these closed-loop, data-gating networks, you are actively facilitating the concealment of structural fraud against the public and vulnerable seniors, in addition thousands of others who lose money with OFF-MLS listings, no matter what nice sounding name they tack on it.**

Step out of the corporate litigation theater. Deny the requests, dissolve the proceedings, and protect the public utility of the open marketplace.

**Submitted by:**

*[signature: Gregory V. Alkema]*

**Gregory V. Alkema, REALTOR®, CRB** Activist REALTOR®, Disruptor of the Disruptors
81 Hancock Drive (Diamond K. Estates)
Roseville, CA 95678
916-626-9464
Greg@GregAlkema.com
California BRE: 01915968
RealEstateCrusade.com

Exhibits:     A – REALTORS® as a Monopoly Has Become a Myth
                B – A Bill proposed to Congressman Kevin Kiley about REALTOR.REALTOR,
                    a REALTOR® aggregator with no cookies and leads to listing REALTOR®.
                C – An unanswered Email to NAR General Counsel, Jonathan Waclawski.
                D – An unanswered Email to PCAR CEO Dean Anderson.
                *E- NAR J Waclawski Bar Complaint*

Exhibit "A"

# REALTORS® as a Monopoly Has Become a Myth

By Gregory V. Alkema, REALTOR®, CRB

Fifty years ago, every listing form had "7%" printed on it. That was price-fixing, plain and simple. The Department of Justice stepped in, the 7% disappeared, and real competition, governed by price leadership, entered the market and became the norm.

**Today, any homeowner can get full MLS exposure through a REALTOR® for under $100.**

That single fact kills the myth that REALTORS® still operate as a monopoly. The question is: does purchasing "limited fiduciary service" cost you money? The REALTOR® Code of Ethics requires REALTORS®, and State of California Laws require Real Estate Licensees, to provide "fiduciary" service on each, and every, sale. Sadly, the rules are not enforced and sellers NEED to ask, **"Does your REALTOR® duty to me provide "FULL FIDUCIARY" service?"**

**What remains is a simple question: Who protects the public better?**

Who is better? Professionals bound by fiduciary duty and a Code of Ethics, or lawyers who turn every market change into another class-action payday?

**REALTORS® vs. Lawyers — Two Very Different Models**

REALTORS® prevent problems through disclosure, negotiation, and cooperation. Lawyers show up after the problem explodes and bill by the hour to fix it.

REALTORS® work in an open market where every client can choose (or refuse) representation.

Lawyers work in a closed court system that still requires professional representation in most cases.

REALTORS® are paid primarily when the client succeeds.

Lawyers are paid for time spent, win or lose.

**Both professions matter, but only one has already reformed itself.**

REALTORS® embraced transparency and competition decades ago. The legal system still rewards complexity and confrontation.

**From Monopoly to Public Utility**

In 1952, Dr. Donald H. Bouma documented the real social power of real estate boards. Fixed commissions and mandatory control gave boards genuine monopoly-like influence. That world is gone.

1 of 3

Today every REALTOR® sets their own fee. The market decides value, not the board. That is not collusion, that is competition.

**The Multiple Listing Service remains the last true public utility in private hands.**

When it works properly, nearly every available home is visible in one place, whether searched on a local MLS, a brokerage site, or a national portal. Buyers don't have to hunt through twenty different places or worry that good homes are being hidden in "private" networks.

That openness is now under threat as corporate portals and big brokerages push limited-visibility strategies.

RealEstateCrusade.com exists to defend FIDUCIARY duty on every REALTOR® sale, to defend the REALTOR® MLS and full market exposure from Day 1 on every property.

### Guidance, Not Guardianship

A homeowner can sell FSBO. A citizen can appear in court without a lawyer. Both usually get better results with professional guidance.

The client stays in control. The REALTOR® simply guides. That is informed freedom, not costly litigation.

### Professional Parity and Fair Compensation

Doctors charge by procedure. Lawyers charge by the hour. REALTORS® are the only fiduciaries constantly accused of collusion for quoting a consistent fee. It is transparency.

**We post our service fees upfront.**

Clients who want less service have discount options. **Clients who want accountability always choose full fiduciary representation.** That's competition in the marketplace.

### The Next Battle Is About Duty, Not Discounts

Competition tomorrow will not be about who charges the lowest percentage. It will be about who delivers fiduciary duty:

- Who discloses honestly?
- Who protects seniors from equity-stripping schemes?
- Who markets for highest and best price instead of fastest and cheapest?

That is where real REALTORS® win, through trust, not tactics.

**Current Threat: The Zillow/Compass Fight**

My recent Amicus Curiae in the Compass v. NWMLS case (W.D. Wash. 2:25-cv-00766-JNW) documents the real damage: off-MLS and limited-visibility marketing (including Zillow Preview and Compass 3-Phase) has caused an average 18.6% or $302,000 equity loss to sellers in San Francisco, with heavy impact on seniors, a violation of Elder Abuse Laws.

This is not innovation; it is systematic concealment of inventory that suppresses the public auction effect the MLS was designed to create.

While REALTORS® reformed long ago, certain portals and brokerages are now trying to rebuild control through fragmented, private marketing. If offered to you, call 911.

The fight is no longer about old commission rules. It is about whether full, open MLS exposure will survive or be replaced by corporate gatekeepers.

**Addendum: The New Myth - "Price-Fixing by Culture"**

A recent Consumer Policy Center report claims "evidence of price-fixing" because many buyer agents still quote 2.5%–3%. That misses the point.

Uniformity in rates is not a cartel, it is market gravity, the same pattern you see with doctors, lawyers, and every other profession that balances risk, cost, and effort.

The real antitrust problem today is concealing compensation. When sellers are willing to offer a concession to buyers, that information should be visible. Hiding it behind "private" platforms or portal policies destroys the transparency antitrust law was meant to protect.

**The REALTOR® MLS model already provides open bids and visible terms.**

Silence does not enhance competition; it replaces transparent cooperation with private bargaining behind digital walls.

**REALTORS® reformed decades ago.**

The legal profession keeps suing the reformed system as if nothing changed.

Respectfully submitted,

Gregory V. Alkema, REALTOR®, CRB
California DRE #01915968
RealEstateCrusade.com



Exhibit B

**A BILL introduced by Congressman Kevin Kiley, co-sponsored by** _____,
**and** _____, **and** _____, **and** _____.

To protect the integrity of the American residential housing market, safeguard the home equity of consumers from predatory off-market data manipulation, and establish **REALTOR.REALTOR** as the permanent, sovereign national public aggregator for residential property data in the United States.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

**SECTION 1. SHORT TITLE.**

This Act may be cited as the **"Protection of the REALTOR® Profession and Senior Home Equity Act of 2026."**

**SECTION 2. CONGRESSIONAL FINDINGS AND DECLARATION OF PURPOSE.**

Congress finds the following:

1.  **The Preservation of the Public Utility:** The Multiple Listing Service (MLS) framework, historically rooted in professional codes of ethics and cooperation, serves as a vital open public utility for transparent price discovery and equal market opportunity.

2.  **The Predator Loop:** The deployment of corporate OFF-MLS mechanisms, including private reserves, sandbagged coming-soon holds, and three phased marketing pipelines, has created an artificial, fragmented shadow market.

3.  **The Financial Exploitation of Seniors:** Independent, RESO-standard market data demonstrates that withholding listings from the open public market suppresses home sale prices by an average of **18.6%**, resulting in a systemic equity extraction averaging **$302,000** per transaction —a pattern of data-hoarding that disproportionately impacts senior citizens aged 65 and older and constitutes *prima facie* elder financial exploitation.

4.  **The Strategic Infrastructure Breakdown:** The public real estate data grid was structurally compromised through executive mobility, where sensitive strategic, relational, and product roadmap knowledge was transferred away from public professional utilities (such as Realtor.com) to private corporate entities, enabling the creation of predatory parallel marketplaces.

## SECTION 3. ESTABLISHMENT OF THE "REALTOR.REALTOR" NATIONAL SOVEREIGN PUBLIC AGGREGATOR.

1. **Establishment of the Sovereign National Grid:** There is hereby established a national, non-profit, open-access residential property data aggregator to be hosted exclusively at the digital domain **REALTOR.REALTOR**. This domain shall serve as a permanent, protected public utility for the real estate profession, restoring the structural integrity originally intended for the public open market before corporate data-siphoning operations compromised traditional data distribution assets.

2. **Mandatory National Syndication Loop:**

   o Every licensed local Multiple Listing Service (MLS) and regional property data exchange operating within interstate commerce shall establish a mandatory, continuous, open API data syndication feed directly to **REALTOR.REALTOR**.

   o Any corporate tech platform, listing aggregator, or consumer portal operating in interstate commerce (including but not limited to Zillow, Homes.com, and Redfin) is strictly prohibited from executing exclusive "first look" or data-hoarding agreements with brokerages. All public listing data must hit the sovereign national aggregator at **REALTOR.REALTOR** simultaneously with any private distribution or preview layer.

3. **The Anti-Poaching and Core Utility Security Standard:**

   o Tech platforms and portals are hereby categorized as downstream marketing utilities only. They are structurally barred from vertically integrating to replace the cooperative MLS infrastructure or siphoning agents into closed proprietary marketplaces that suppress broad market visibility.

   o No corporate entity or executive transferring between real estate technology platforms may misappropriate high-level strategic, operational, or relational data assets to establish parallel, exclusionary listing environments (such as private reserves or preview platforms) that hide property data from the open consumer visibility layer.

---

## SECTION 4. CRIMINAL PENALTIES FOR OFF-MLS ELDER EXPLOITATION.

1. **The Sandbagging Penalty:** Any corporate executive, brokerage entity, or platform developer who willfully authorizes, implements, or codes an automated system or marketing strategy designed to conceal property data from the open public utility,

resulting in the suppression of consumer equity, shall be subject to the enforcement parameters of **Title 18, United States Code.**

2. **Protection of Vulnerable Seniors:** Where the victim of an OFF-MLS data-hoarding or sandbagging scheme is a senior citizen aged 65 or older, the conduct shall be classified as federal elder financial exploitation, triggering:

   o **Mandatory Restitution:** Full restoration of the suppressed market equity, calculated using regional RESO-standard benchmarks.

   o **Statutory Damages:** Civil and criminal penalties including treble (triple) punitive damages, without cap, plus reasonable attorney fees under applicable elder protection codes.

3. **The Accountability Override:** No corporate shield, private bankruptcy restructuring, or "staged civil settlement order" shall insulate individual executives from personal civil or criminal liability where a violation of this Act has been executed on blank signature lines or through the concealment of material risk information from investors, regulatory authorities, or the courts.

---

### SECTION 5. ENFORCEMENT AND MISPRISION MANDATE.

1. **Immediate Department of Justice Jurisdiction:** The Department of Justice Antitrust and Criminal Divisions shall maintain continuous enforcement oversight over the open data feeds of **REALTOR.REALTOR**.

2. **Application of 18 U.S.C. § 4:** Any regulatory official, state attorney general, or judicial officer who receives a documented forensic amicus brief or crime report demonstrating a violation of this Act, and takes active administrative steps to quash, bury, or dismiss the file without forwarding the record to Congress or the proper criminal authorities, shall be subject to prosecution under 18 U.S.C. § 4 (Misprision of Felony).

5/31/26, 5:28 PM                                  Greg Alkema Mail - Honorable Jamal N. Whitehead 18 USC Par 4 Criminal Complaint ..

*Exhibit C*

Greg Alkema <greg@gregalkema.com>

## Honorable Jamal N. Whitehead 18 USC Par 4 Criminal Complaint ..

1 message

**Greg Alkema** <greg@gregalkema.com>                                       Fri, May 29, 2026 at 3:39 PM
To: Jonathan Waclawski <jwaclawski@nar.realtor>, CEO@nar.realtor
Bcc: John P Klein <johnpklein.inc@gmail.com>

Dear Counselor Waclawski:

As an 81-year-old, top 5% IQ, dyslexic REALTOR®, CRB, mandated by Our REALTOR® Code of Ethics and my CRB designation to **raise professional standards**, I think I have earned the respect I deserve instead of finding NAR leadership hiding in a black hole behind a blue wall, only to scurry for the cracks and refuse to acknowledge me when I "shine a light."

The attached 18 U.S.C. § 4, Misprision of Felony will be delivered by Priority Mail to the Honorable Jamal N. Whitehead on Monday, June 1, 2026 and it speaks for itself.

As for your failure respond the the "threat" of NAR CEO Nykia Wright's "threat" to call in Corporate Counsel and use you against me, I have prepared the attached BAR complaints based on the **"fact"** that I presented a way to **RAISE THE BAR** at the National Association of REALTORS®.

Specifically, I asked for REALTOR.REALTOR to be presented to the 1,500,000 members, those still "loyal" to our REALTOR® Code of Ethics and, FYI, the Fiduciary Laws of the State of California required of "every" Real Estate License, to serve as a fiduciary for our Clients.

This is something Compass and the brokers who left the Association of REALTORS® to follow Zillow in their new "Zillow Preview - Coming Soon" scam, **which is just more Elder Abuse**, have ignored. They ignored this based on the "fact" that Zillow was planning their Zillow Preview OFF-MLS scam while in U.S. District Court SDNY, arguing exactly the opposite. I reported this as a Fraud on the Court to Judge Vargas and followed up with an 18 U.S.C. § 4 criminal complaint.

Given that so many brokers were involved at the inception, it stands to reason Zillow recruited them while Zillow was still in court arguing that OFF-MLS listings damage the public we serve. They admitted this in their pleadings in the Zillow vs MRED/Compass filing but failed to call it **ELDER ABUSE**, the crime that it is.

Today, my conscience is shocked by an NAR email crowing about giving away another $52,250,000 to settle an antitrust lawsuit. In truth, the DOJ settled with REALTORS® in the mid-1970s, and price leadership,if you even understand it, became the norm. My WhitePaper, **REALTOR® Monopoly Has Become A Myth**, is attached. Continuing to settle "antitrust" lawsuits without consulting the 1,500,000 dues-paying members who have standing is a dereliction of your duty to us.

Time is of the essence, Counselor Waclawski. **Our REALTOR® PROFESSION can and must be saved.**

When I offer to help and receive a "defensive" reply from CEO Nykia Wright threatening to sic you on me, that dog won't hunt.

Your failure to respond suggests you have something to hide. I suspect that the leadership of my Association of REALTORS® is "selling out the 1,500,000 dues paying members" who deserve, and should have, a voice and be given an honest aggregator, **REALTOR.REALTOR**, with houses only, no tracking cookies, all leads to the listing agent, and non-profit, which I believe the National Association of REALTORS® is, as a PROFESSION based on our Code of Ethics. This is a Code the Cabal wants to eliminate and replace with Terms of Service, in Zillow's case, this allows lawsuits up to $100.00 crummy dollars in Washington State.

FYI I also addressed STANDING in my Amicus to Judge Vargas, and she chose to ignore the crimes, and billions in liability Compass has, letting them walk away after I begged Errol Samuelson at Zillow to file a **MOTION TO DISMISS BASED ON ELDER ABUSE**, with sanctions on Zillow and millions in legal fees.

Why did he refuse? Because "behind the curtain," Zillow was planning Zillow Preview and recruiting the brokers who joined them from the inception.

And what do I hear from my REALTOR® PROFESSION leadership?  Crickets.  And when I contacted Nykia, I received threats.

I read Psalm 56 at lunchtime and, with God's help, I am going to raise the bar.  I don't know how, but in His time, He will show me His way.

Hopefully you'll work with me Counselor Waclawski.  Let's bankrupt the NAR and "claw back" the settlement money for REALTOR.REALTOR and serve our fellow REALTORS® with tools they can use, as I used to sell 50 houses a year with a Day Timer, not the crap the Cabal pushes on REALTORS® today.

Respectfully,

Gregory V. Alkema, REALTOR®, CRB, RealEstateCrusade.com
81 Hancock Drive (Diamond K Estates)
Roseville, CA 95678
Greg@GregAlkema.com
(916) 626-9464

P.S. Let's get rid of DUAL AGENCY too.

---

**4 attachments**

 **6 - Judge Jamal Whitehead - FORMAL CRIME REPORT PURSUANT TO 18 USC Par # 4.pdf**
1533K

 **Proposed BAR Complaint - Jonathan Waclawski - NAR General Counsel.pdf**
217K

**REALTOR® Monoply Has Become A Myth - By Gregory V. Alkema, REALTOR®, CRB.pdf**
160K

**Bye Bye to Dual Agency by Gregory V Alkema.docx PDF.pdf**
331K

Case: 1:26-cv-05451 Document #: 133 Filed: 07/17/26 Page 11 of 56 PageID #:4853

4/29/26, 8:14 AM      Greg Alkema Mail - Subject: Demand to Exercise Moral Authority Granted by NAR President Kevin Brown and CEO Nykia Wright – …



Greg Alkema <greg@gregalkema.com>

## Subject: Demand to Exercise Moral Authority Granted by NAR President Kevin Brown and CEO Nykia Wright – Immediate Action Required on Cartel Members at PCAR

3 messages

**Greg Alkema** <greg@gregalkema.com>            Tue, Mar 24, 2026 at 4:54 AM
To: Dean Anderson <dean@pcaor.com>

Dear Dean Anderson,

As the PCAR CEO to whom NAR President Kevin Brown and CEO Nykia Wright publicly abdicated national moral authority at Inman Connect New York, by declaring that "morals are set at the local level", you now hold the moral authority to enforce the REALTOR® Code of Ethics at the local level.

That authority was granted in the context of the ongoing hijack of our profession by the Inman/Compass/Zillow cartel through off-MLS suppression practices that constitute prima facie elder financial exploitation under California Welfare & Institutions Code §15610.30.

I therefore demand that you immediately exercise that moral authority as follows:

1. **Remove all members** of the firms that have joined the cartel (Compass, HomeServices of America, Keller Williams, RE/MAX, eXp, Side, United Real Estate, and any others now participating in Zillow Preview or similar off-MLS suppression models) from every position of power or leadership they currently hold within the Placer County Association of REALTORS® (PCAR).

2. Direct the remaining Directors of PCAR to convene an immediate hearing to **remove** those same cartel-affiliated members from PCAR membership entirely. Such removal automatically revokes their CAR and NAR membership and suspends all MLS rights and privileges until they demonstrate full compliance with the REALTOR® Code of Ethics and mandatory Day-1 MLS transparency.

3. After the above removals are complete, properly inform **every remaining PCAR member** (using the full public record I have provided, including my Amicus Curiae brief, the SFAR/RealReports elder abuse data showing $302,000 average equity loss to seniors, the Zillow flip evidence, and the rushed Anywhere merger concealment) and conduct a full, informed membership vote on whether PCAR will enforce mandatory first-day MLS listing and reject all off-MLS suppression practices. The vote must exclude the removed cartel members, as they will not voluntarily vote themselves out of the profit model that harms their clients.

The REALTOR® Code of Ethics is not optional. Fiduciary duty is not optional.

Protecting senior homeowners from felony-level financial exploitation is not optional.

You were handed the moral authority. The public record is now complete. The cartel has been exposed.

Failure to act will constitute nonfeasance and further abdication of the duty you accepted when Brown and Wright placed it in your hands.

I expect written confirmation of your plan to execute these steps within seven (7) days.

Attached for your immediate review and for the record:

- My SDNY Amicus Curiae Brief (Dec 2, 2025)
- March 18, 2026 Ex Parte Emergency Appeal to Judge Vargas
- SFAR/RealReports Elder Abuse Data (November 2025)
- Letter from 16 Members of Congress to Pam Bondi and my response
- Draft of proposed Compass vs NWMLS Amicus (not final version)

In His Service,

Gregory V. Alkema, REALTOR®, CRB, RealEstateCrusade.com

Case: 1:26-cv-05451 Document #: 133 Filed: 07/17/26 Page 12 of 56 PageID #:4854

4/29/26, 8:14 AM          Greg Alkema Mail - Subject: Demand to Exercise Moral Authority Granted by NAR President Kevin Brown and CEO Nykia Wright – …

Roseville, CA 95678
Greg@GregAlkema.com
(916) 626-9464

---

**6 attachments**

📄 **Greg Alkema Amicus Compass vs Zillow - US District Court SDNY.pdf**
11695K

📄 **16 Senators and Congress Members write to Pam Bondi on FAST Compass closing.pdf**
3598K

📄 **Greg Alkema to the 16 Senators who wrote to Pam Bondi on February 19 - PDF.pdf**
333K

📄 **Greg Alkema - exparte emergency appeal 3-18-26.pdf**
188K

📄 **Greg Alkema - Michigan Supreme Court Amicus.pdf**
1728K

📄 **UNITED STATES DISTRICT COURT Amicus NWMLS - 3-23-26 PDF.pdf**
244K

---

**Greg Alkema** <greg@gregalkema.com>                              Thu, Apr 2, 2026 at 9:52 AM
To: Dean Anderson <dean@pcaor.com>

Dear Mr. Anderson:

Since you aren't willing to accept MORAL AUTHORITY at the PCAR, the membership will have to take it back.

As you recall, I was one day late applying for a director position last year.

This year I did not miss the FACT you added committee memberships to the application form and wanted me to acknowledge that a "committee" would make the choices.

Those changes limit the "democratic" process and this behavior SMACKS of the anti-trust BS that gets you into trouble: building a blue wall, hiding in the black hole behind it and scurrying like cockroaches when the lights comes on..

Therefore, I need you to give me the "link" to the committee on the PCAR Internet site,

If the link does not exist, I need the actual committee information, when it was formed, who is on it, and the names of each active member by Email.

Thank you. I am expecting a prompt reply.
[Quoted text hidden]
--
Gregory V. Alkema, REALTOR®, CRB, RealEstateCrusade.com
81 Hancock Drive (Diamond K Estates)
[Quoted text hidden]

---

**2 attachments**

📄 **3 -Amicus Only.pdf**
3224K

📄 **Greg Alkema - exparte emergency appeal 3-18-26.pdf**
188K

---

**Greg Alkema** <greg@gregalkema.com>                            Thu, Apr 16, 2026 at 10:23 AM
To: Dean Anderson <dean@pcaor.com>

NAR's 2026 President Kevin Brown kicked off the conference on Wednesday by emphasizing the connection between the national organization and the state and **local executives and staff who are getting things done on the ground** and serving as the first point of contact with members.

Was he talking about you Dean, **or just puffing**?

Does the question deserve an answer?

[Quoted text hidden]

Case: 1:26-cv-05451 Document #: 133 Filed: 07/17/26 Page 14 of 56 PageID #:4850

# inman™

# Gary Keller: Private listings could make MLS a 'market of last resort'

Keller framed the debate as a defining test for the real estate industry



BY AJ LATRACE
May 06, 2026

Gary Keller is warning that the industry's shift toward private listings and pre-marketing strategies could undermine the MLS system and distort how homes are priced.

In a video shared on Keller Williams' YouTube channel, company co-founder and chairman Gary Keller took aim at the idea that private marketing creates beneficial scarcity for sellers, arguing instead that limited distribution can restrict competition and shift control over market information toward brokerages.

Case: 1:26-cv-05451 Document #: 133 Filed: 05/17/26 Page: 15 of 56 PageID #:4857

# Related Stories



## MRED goes national: How agents can protect local MLS systems

BY DARRYL DAVIS | MAY 5



## Compass adds 72SOLD founder to bring seller-choice fight to agent training

BY AJ LATRACE | MAY 5

Keller said the industry should be more precise about what "private" means when listings are shared across large internal brokerage networks.

"What this really is is selected distribution with restricted access," Keller said. "The listing isn't hidden. It's just being shared with a chosen group instead of the entire market. And that distinction matters, because the next claim depends on it: Does privacy create real scarcity?"

Keller argued that scarcity in real estate has traditionally referred to the number of homes available to buyers, or the number of buyers available to sellers — not the number of people who know a property is for sale. He said the core question is who gets early access, and who decides.

"So the issue isn't whether people know — it's which people know, and who gets to decide who knows. It's a preference for controlled visibility," Keller said.

The remarks come as Compass' push to expand its 3-Phased Marketing Strategy and Private Exclusives inventory has forced a broader industry debate over seller choice, MLS participation and brokerage-controlled inventory. Compass has argued that sellers should

Case: 1:26-cv-05451 Document #: 133 Filed: 05/17/26 Page: 16 of 56 PageID #:4858

have more control over how their homes are brought to market, while critics say the strategy could limit exposure, advantage large brokerages and weaken the MLS system.



Gary Keller

Keller did not reject seller choice outright, but argued that choice alone does not mean a strategy is good for sellers. Agents, he said, have a professional obligation to clearly explain the tradeoffs involved, including any incentives that may benefit the agent or brokerage.

Keller also warned that widespread use of private marketing could weaken the role of MLSs if brokerages increasingly use them only after a listing fails to sell internally.

"If every broker starts holding their listings back and only turns to MLS when nothing else works, what does MLS become? It becomes the market of last resort, the place where properties go after everything else has failed, leftovers, remnants," Keller said.

Keller said feedback, preparation and sequencing can still be useful parts of a listing strategy. But he argued those tactics can be used within an open marketplace, rather than as a substitute for full exposure.

"These aren't new ideas," Keller said. "But if the goal is to give sellers the highest probability of achieving the best possible outcome, there's still one mechanism that consistently delivers that result: broad exposure that creates the opportunity for real competition."

Keller framed the debate as a defining test for the industry, warning that the spread of private listing strategies could fundamentally change how the housing market works — moving it away from shared information and open competition and toward selective access controlled by individual brokerages.

Ultimately, this shift could lead to the end of the open marketplace, he warned.

"There's actually an economic term for this called information asymmetry," Keller said. "Information asymmetry occurs when one party in an economic transaction possesses greater material knowledge than the other, leading to potential market inefficiencies and imbalances of power, and in severe cases, market failure."

Case: 1:26-cv-05451 Document #: 133 Filed: 07/17/26 Page 17 of 56 PageID #:4859

Greg Alkema <greg@gregalkema.com>

# DISTRICT OF COLUMBIA BAR COMPLAINT ATTACHED ...

1 message

**Greg Alkema** <greg@gregalkema.com>                                     Mon, Jul 6, 2026 at 4:41 AM
To: Jonathan Waclawski <jwaclawski@nar.realtor>
Cc: Dean Anderson <dean@pcaor.com>, Gabe Davidson <gabe@avonya.com>
Bcc: cyuen@cpmlegal.com, Tim Wesely <timfw57@gmail.com>, "hulstsallie@gmail.com" <hulstsallie@gmail.com>

... Because you, Mr. so-called Counselor, the CHIEF COUNSEL of the National Association of REALTORS®, have REFUSED to accept MORAL AUTHORITY for my REAL ESTATE PROFESSION by refusing to demand CEO Nykia Wright and President Kevin Brown take it back from PCAR CEO Dean Anderson, who has also rejected it, I have assumed MORAL AUTHORITY for my Profession.

Based on the FACT, per my warning in my 2011 Amicus accepted by the Michigan Supreme Court, BIG BROKERS, **one-stop-shopping brokers**, were destroying our PURE REALTORS® CLIENT-BASED RELATIONSHIP and replacing their CLIENTS with CUSTOMERS (consumers, as they like to call them). They are NOT true REALTORS® at a Professional Level anymore.

In truth, the BIG BROKERS have all left the REALTOR® PROFESSION and have set up, right under your nose, the Broker Public Portal where they are allowed to use OFF-MLS tactics that, no matter what you call it, end up being ELDER ABUSE and in Calfornia Elder Abuse is CRIMINAL, and you don't care.

## Fact: The Broker Public Portal has morphed into cribio.com or crib.io.

**This proves they have left NAR and have also set up and implemented a parallel MLS owned by BIG BROKERS and renegade MLS SERVICES. They are using my money to try to eliminate me, a small REALTOR®.**

If I were running the NAR, which I am now the MORAL AUTHORITY for, I would give the BIG BROKERS 10 days to give CRIB.IO to our Professional Association of REALTORS® to "rebrand" as REALTOR.REALTOR, with no tracking cookies, and all leads going to the listing agents who work so hard.

**If they refuse, cancel their memberships effective immediately.**

REALTOR.REALTOR would replace REALTOR.COM, which Zillow and Errol Samuelson (a turncoat) are using, with our own MLS aggregator as it should be.

I would then give the BIG BROKERS Six Months to eliminate any MORTGAGE and other NON HUB, ONE STOP SHOPPING operations based on the FACT that our REALTOR® PROFESSION is a SERVICE model with CLIENTS and not a SALES MODEL with customers, or "consumers" as the cabal now calls them.



**In closing Counselor Waclawski, I stand READY to help you do the right thing.**

However, as an 81-year-old "dyslexic" REALTOR®, I will NOT stand by and watch the leadership of NAR and our LOCAL Associations HELP the BIG BROKERS not only leave but also destroy our (my) REALTOR® Profession.

If you force me to, I will attempt to find a good class action law firm to help RESTORE my profession, put the current NAR into bankruptcy protection, expose the inner rot, and claw back the so called settlement money that should never have been agreed to be paid, as it all but destroys our REALTOR® Profession.

Last of all, the National Association of REALTORS® CHARTER is NON-PROFIT and all PROFIT CENTERS need to be SOLD OFF so it is a true NON-PROFIT.

It is my prayer Mr. Jonathan Waclawski, that you accept your moral authority, and use it to return "our" REALTOR® PROFESSION to a true Profession, as founded, not as an anti-trust corporation, but as a level playing field to expose ALL REALTOR® listings to the FULL PUBLIC from the 1st "MARKETING" day.

That is my prayer and my level of service,

Gregory V. Alkema, REALTOR®, CRB, RealEstateCrusade.com
81 Hancock Drive (Diamond K Estates)
Roseville, CA 95678
Greg@GregAlkema.com
(916) 626-9464

Attached: Bar Complaint to District of Columbia Bar

6 - BAR Complaint - full - Jonathan Waclawski - NAR …

**ETHICS GRIEVANCE**

**TO:** District of Columbia Office of Disciplinary Counsel
515 5th Street, NW, Suite 117
Washington, D.C. 20001

**COMPLAINANT:** Gregory V. Alkema, REALTOR®, CRB,

Publisher, RealEstateCrusade.com

**RESPONDENT:** Jonathan Jacob Waclawski, Esq.

General Counsel and Senior Vice President, Legal
National Association of REALTORS® (NAR)
500 New Jersey Ave NW, Washington, DC 20001 / 430 N. Michigan Ave, Chicago, IL 60611

## I. PRELIMINARY STATEMENT & JURISDICTION

The Complainant, a REALTOR®, CRB, and active member, hereby files this formal disciplinary complaint against Respondent Jonathan Jacob Waclawski, Chief Counsel for the National Association of REALTORS® (NAR). Respondent is admitted to practice law in the District of Columbia and operates out of NAR's Washington, D.C. office.

This grievance concerns Respondent's direct violation of the D.C. Rules of Professional Conduct, specifically regarding his advisory role in implementing an association-wide "de-risking" strategy. This strategy is designed to systematically abandon fiduciary protections for real estate clients, shift multi-million-dollar liabilities onto local, unprotected multiple listing services (MLSs), and insulate corporate platform operators participating in ongoing anti-competitive data cartels that systematically facilitate elder financial exploitation.

## II. SPECIFIC VIOLATIONS OF THE D.C. RULES OF PROFESSIONAL CONDUCT

### 1. Violation of Rule 1.13 (Organization as Client)

- **The Rule:** A lawyer employed by an organization represents the entity as a whole, meaning the collective 1.5 million dues-paying members and the consumers they serve, not merely the elite executive officers or select corporate committees.

- **The Misconduct:** As documented in leaked audio recordings from NAR's closed-door Multiple Listing Service Issues and Policies Committee meeting on July 1, 2026, Respondent and his legal staff have enacted a "de-risking strategy" that shifts crucial MLS policy decision-making downward to local individual entities. By advising the organization to dump its structural legal liabilities onto local boards, Respondent has abandoned his duty to protect the unified, cooperative multiple listing service. This deliberate fragmentation allows dominant corporate platforms

(e.g., Compass, Zillow, MRED) to execute exclusive pocket-listing sandboxes that hoard consumer inventory, completely destroying the market transparency the organization was chartered to defend.

## 2. Violation of Rule 1.2(e) (Scope of Representation: Assisting in Criminal or Fraudulent Conduct)

- **The Rule:** A lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent.

- **The Misconduct:** Respondent has been issued direct, documented forensic notice · (including a formal notice under 18 U.S.C. § 4 - Misprision of Felony, live-posted at realestatecrusade.com) regarding systematic asset distortion and banking equity stripping occurring via off-market "Private Exclusives" and joint venture networks. Rather than advising the client entity to halt these predatory practices, Respondent has instead structured regulatory "guidelines" (such as Filtering of Listings on IDX and Guidelines for 1-to-1 Broker Communication) that legally green-light and paper over these parallel corporate marketplaces. This includes providing administrative cover for the widespread rollout of proprietary agent-to-agent architectures like Compass's AI-powered "Home Platform," which funnels listings into closed corporate environments before they can ever hit public open-market price discovery.

## 3. Violation of Rule 8.4(c) (Misconduct Involving Dishonesty, Deceit, or Misrepresentation)

- **The Rule:** It is professional misconduct for a lawyer to engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

- **The Misconduct:** Respondent and his legal department have actively barred the press from legislative meetings for two consecutive years to hide the true legal liabilities of their master settlement fund truces. While publicly assuring members that NAR is "not abandoning the MLS," Respondent's internal strategy actively permits corporate platform entities to route massive segments of consumer transactions completely off the open market. During recent federal court proceedings, explicit testimony and data confirmed that "Private Exclusive" and off-MLS adoption has intentionally gated up to **48% of active property inventory** away from the open public web. Suppressing half the public market directly enables systemic equity extraction averaging **$302,000 per transaction**, disproportionately impacting senior citizens aged 65 and older. Respondent's ongoing pattern of concealment misrepresents the true, compromised state of the association's legal

and financial architecture to its own dues-paying membership while ignoring clear signs of federal elder financial exploitation.

## III. EVIDENCE SUBMITTED IN SUPPORT

1. **Exhibit A:** Formal Supplemental Criminal Misprision Notice and 18 U.S.C. § 4 briefing filed in the U.S. District Court for the Northern District of Illinois, Case No. 1:26-cv-02345 (*Zillow, Inc. v. MRED and Compass, Inc.*).

2. **Exhibit B:** The July 1, 2026 Joint Federal Petition submitted to the FTC and DOJ by a national coalition of eight major consumer protection and civil rights organizations (including the Consumer Federation of America, American Economic Liberties Project, and National Consumer Law Center) demanding an immediate investigation into Compass's nationwide data-gating expansion.

3. **Exhibit C:** The Consumer Policy Center report detailing structural data manipulation, internal double-ending capture rates, and market domination figures across major metropolitan areas.

## IV. CONCLUSION & REQUEST FOR INVESTIGATION

By prioritizing the insulation of corporate executives and platform monopolies over his foundational duty to the collective membership and the public consumer, Respondent Jonathan Jacob Waclawski has turned the office of Chief Counsel into an instrument of anti-competitive liability shifting and fraud concealment.

The Complainant respectfully requests that the Office of Disciplinary Counsel open a formal investigation into Respondent's conduct, subpoena all internal legal memos regarding the "de-risking" pipeline, and issue appropriate disciplinary sanctions, up to and including the permanent revocation of his license to practice law in the District of Columbia.

**Dated:** July 6, 2026

**Respectfully Submitted,**

*Gregory V. Alkema*

**Gregory V. Alkema, REALTOR®, CRB** Publisher, RealEstateCrusade.com
81 Hancock Dr., Roseville, CA 95678
(916) 626-9464
Greg@GregAlkema.com
California BRE: 01915968

## UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF ILLINOIS

**ZILLOW, INC.,** Plaintiff,

v.

**MIDWEST REAL ESTATE DATA LLC (MRED) and COMPASS, INC.,** Defendants.

**Case No.** 1:26-cv-02345

Hon. John Tharp, Jr., U.S. District Judge

**SUPPLEMENTAL CRIMINAL MISPRISION NOTICE TO THE COURT UNDER 18 U.S.C. § 4**

TO: Hon. John Tharp, Jr., U.S. District Judge FROM: Gregory V. Alkema, REALTOR®, CRB (RealEstateCrusade.com) Judge Tharp,

This is a supplemental formal notification under 18 U.S.C. § 4 (Misprision of Felony) submitted directly to this Court prior to the July 9, 2026, post-hearing brief deadline.

## DO NOT ISSUE A RULING THAT SANCTIONS, MANDATES, OR PROTECTS THESE GATED DATA STRUCTURES. SHUT THIS THEATER DOWN NOW.

I know your background is as a highly trained lawyer, but you are sitting as a Federal Judge now, not a corporate defense attorney. Your duty is to the integrity of public law, not the preservation of anticompetitive corporate sandboxes. If you grant a preliminary injunction or sign an order that legitimizes, paths, or immunizes the closed-loop data routing at the heart of the Zillow-Compass-MRED architecture, you will be permanently recorded in history as the Judge who destroyed the fiduciary foundation of the REALTOR® profession.

The evidence presented in your courtroom on July 1st and 2nd is not an abstract antitrust ledger. When Compass CEO Robert Reffkin admitted under oath that "Private Exclusive" adoption has intentionally gated up to **48% of property inventory** away from the open public web, he confessed to the macro-infrastructure of a scam.

By blinding the public market, these entities completely bypass the strict fiduciary standards that protect American homeowners. The primary victims of this data fragmentation are senior citizens. By forcing independent broker commissions down to a predatory 1.8% through forced lead-generation funnels and closing off public price discovery, this system directly facilitates **Criminal Elder Financial Exploitation**.

It enables localized **$302,000 asset-stripping scams** where family trust equity is funneled directly into corporate pipelines without ever hitting a transparent, open market auction.

On July 1, 2026, a national coalition of eight major consumer protection and civil rights organizations formally petitioned the FTC and DOJ to investigate this exact nationwide expansion for anti-consumer and discriminatory harms.

**The corporate parties in your courtroom are attempting to use your pen to extract a judicial order that will serve as an unassailable civil liability shield for their ongoing data manipulation.**

**You are on direct, permanent criminal notice under 18 U.S.C. § 4.**

**If you sign an order, or leave an order in place, providing cover for these closed-loop, data-gating networks, you are actively facilitating the concealment of structural fraud against the public and vulnerable seniors, in addition thousands of others who lose money with OFF-MLS listings, no matter what nice sounding name they tack on it.**

Step out of the corporate litigation theater. Deny the requests, dissolve the proceedings, and protect the public utility of the open marketplace.

**Submitted by:**

*Gregory V. Alkema*

**Gregory V. Alkema, REALTOR®, CRB** Activist REALTOR®, Disruptor of the Disruptors
81 Hancock Drive (Diamond K. Estates)
Roseville, CA 95678
916-626-9464
Greg@GregAlkema.com
California BRE: 01915968
RealEstateCrusade.com

Exhibits:     A – REALTORS® as a Monopoly Has Become a Myth
              B – A Bill proposed to Congressman Kevin Kiley about REALTOR.REALTOR,
                    a REALTOR® aggregator with no cookies and leads to listing REALTOR®.
              C – An unanswered Email to NAR General Counsel, Jonathan Waclawski.
              D – An unanswered Email to PCAR CEO Dean Anderson.

Exhibit "A"

# REALTORS® as a Monopoly Has Become a Myth

By Gregory V. Alkema, REALTOR®, CRB

Fifty years ago, every listing form had "7%" printed on it. That was price-fixing, plain and simple. The Department of Justice stepped in, the 7% disappeared, and real competition, governed by price leadership, entered the market and became the norm.

**Today, any homeowner can get full MLS exposure through a REALTOR® for under $100.**

That single fact kills the myth that REALTORS® still operate as a monopoly. The question is: does purchasing "limited fiduciary service" cost you money? The REALTOR® Code of Ethics requires REALTORS®, and State of California Laws require Real Estate Licensees, to provide "fiduciary" service on each, and every, sale. Sadly, the rules are not enforced and sellers NEED to ask, **"Does your REALTOR® duty to me provide "FULL FIDUCIARY" service?"**

**What remains is a simple question: Who protects the public better?**

Who is better? Professionals bound by fiduciary duty and a Code of Ethics, or lawyers who turn every market change into another class-action payday?

**REALTORS® vs. Lawyers — Two Very Different Models**

REALTORS® prevent problems through disclosure, negotiation, and cooperation. Lawyers show up after the problem explodes and bill by the hour to fix it.

REALTORS® work in an open market where every client can choose (or refuse) representation.

Lawyers work in a closed court system that still requires professional representation in most cases.

REALTORS® are paid primarily when the client succeeds.

Lawyers are paid for time spent, win or lose.

**Both professions matter, but only one has already reformed itself.**

REALTORS® embraced transparency and competition decades ago. The legal system still rewards complexity and confrontation.

**From Monopoly to Public Utility**

In 1952, Dr. Donald H. Bouma documented the real social power of real estate boards. Fixed commissions and mandatory control gave boards genuine monopoly-like influence. That world is gone.

Today every REALTOR® sets their own fee. The market decides value, not the board. That is not collusion, that is competition.

**The Multiple Listing Service remains the last true public utility in private hands.**

When it works properly, nearly every available home is visible in one place, whether searched on a local MLS, a brokerage site, or a national portal. Buyers don't have to hunt through twenty different places or worry that good homes are being hidden in "private" networks.

That openness is now under threat as corporate portals and big brokerages push limited-visibility strategies.

RealEstateCrusade.com exists to defend FIDUCIARY duty on every REALTOR® sale, to defend the REALTOR® MLS and full market exposure from Day 1 on every property.

### Guidance, Not Guardianship

A homeowner can sell FSBO. A citizen can appear in court without a lawyer. Both usually get better results with professional guidance.

The client stays in control. The REALTOR® simply guides. That is informed freedom, not costly litigation.

### Professional Parity and Fair Compensation

Doctors charge by procedure. Lawyers charge by the hour. REALTORS® are the only fiduciaries constantly accused of collusion for quoting a consistent fee. It is transparency.

**We post our service fees upfront.**

Clients who want less service have discount options. **Clients who want accountability always choose full fiduciary representation.** That's competition in the marketplace.

### The Next Battle Is About Duty, Not Discounts

Competition tomorrow will not be about who charges the lowest percentage. It will be about who delivers fiduciary duty:

- Who discloses honestly?
- Who protects seniors from equity-stripping schemes?
- Who markets for highest and best price instead of fastest and cheapest?

That is where real REALTORS® win, through trust, not tactics.

**Current Threat: The Zillow/Compass Fight**

My recent Amicus Curiae in the Compass v. NWMLS case (W.D. Wash. 2:25-cv-00766-JNW) documents the real damage: off-MLS and limited-visibility marketing (including Zillow Preview and Compass 3-Phase) has caused an average 18.6% or $302,000 equity loss to sellers in San Francisco, with heavy impact on seniors, a violation of Elder Abuse Laws.

This is not innovation; it is systematic concealment of inventory that suppresses the public auction effect the MLS was designed to create.

While REALTORS® reformed long ago, certain portals and brokerages are now trying to rebuild control through fragmented, private marketing. If offered to you, call 911.

The fight is no longer about old commission rules. It is about whether full, open MLS exposure will survive or be replaced by corporate gatekeepers.

**Addendum: The New Myth - "Price-Fixing by Culture"**

A recent Consumer Policy Center report claims "evidence of price-fixing" because many buyer agents still quote 2.5%–3%. That misses the point.

Uniformity in rates is not a cartel, it is market gravity, the same pattern you see with doctors, lawyers, and every other profession that balances risk, cost, and effort.

The real antitrust problem today is concealing compensation. When sellers are willing to offer a concession to buyers, that information should be visible. Hiding it behind "private" platforms or portal policies destroys the transparency antitrust law was meant to protect.

**The REALTOR® MLS model already provides open bids and visible terms.**

Silence does not enhance competition; it replaces transparent cooperation with private bargaining behind digital walls.

**REALTORS® reformed decades ago.**

The legal profession keeps suing the reformed system as if nothing changed.

Respectfully submitted,

Gregory V. Alkema, REALTOR®, CRB
California DRE #01915968
RealEstateCrusade.com

Exhibit B

**A BILL introduced by Congressman Kevin Kiley, co-sponsored by _____,
and _____, and _____, and _____.**

To protect the integrity of the American residential housing market, safeguard the home equity of consumers from predatory off-market data manipulation, and establish **REALTOR.REALTOR** as the permanent, sovereign national public aggregator for residential property data in the United States.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

### SECTION 1. SHORT TITLE.

This Act may be cited as the **"Protection of the REALTOR® Profession and Senior Home Equity Act of 2026."**

### SECTION 2. CONGRESSIONAL FINDINGS AND DECLARATION OF PURPOSE.

Congress finds the following:

1. **The Preservation of the Public Utility:** The Multiple Listing Service (MLS) framework, historically rooted in professional codes of ethics and cooperation, serves as a vital open public utility for transparent price discovery and equal market opportunity.

2. **The Predator Loop:** The deployment of corporate OFF-MLS mechanisms, including private reserves, sandbagged coming-soon holds, and three phased marketing pipelines, has created an artificial, fragmented shadow market.

3. **The Financial Exploitation of Seniors:** Independent, RESO-standard market data demonstrates that withholding listings from the open public market suppresses home sale prices by an average of **18.6%**, resulting in a systemic equity extraction averaging **$302,000** per transaction —a pattern of data-hoarding that disproportionately impacts senior citizens aged 65 and older and constitutes *prima facie* elder financial exploitation.

4. **The Strategic Infrastructure Breakdown:** The public real estate data grid was structurally compromised through executive mobility, where sensitive strategic, relational, and product roadmap knowledge was transferred away from public professional utilities (such as Realtor.com) to private corporate entities, enabling the creation of predatory parallel marketplaces.

## SECTION 3. ESTABLISHMENT OF THE "REALTOR.REALTOR" NATIONAL SOVEREIGN PUBLIC AGGREGATOR.

1.  **Establishment of the Sovereign National Grid:** There is hereby established a national, non-profit, open-access residential property data aggregator to be hosted exclusively at the digital domain **REALTOR.REALTOR.** This domain shall serve as a permanent, protected public utility for the real estate profession, restoring the structural integrity originally intended for the public open market before corporate data-siphoning operations compromised traditional data distribution assets.

2.  **Mandatory National Syndication Loop:**

    o   Every licensed local Multiple Listing Service (MLS) and regional property data exchange operating within interstate commerce shall establish a mandatory, continuous, open API data syndication feed directly to **REALTOR.REALTOR.**

    o   Any corporate tech platform, listing aggregator, or consumer portal operating in interstate commerce (including but not limited to Zillow, Homes.com, and Redfin) is strictly prohibited from executing exclusive "first look" or data-hoarding agreements with brokerages. All public listing data must hit the sovereign national aggregator at **REALTOR.REALTOR** simultaneously with any private distribution or preview layer.

3.  **The Anti-Poaching and Core Utility Security Standard:**

    o   Tech platforms and portals are hereby categorized as downstream marketing utilities only. They are structurally barred from vertically integrating to replace the cooperative MLS infrastructure or siphoning agents into closed proprietary marketplaces that suppress broad market visibility.

    o   No corporate entity or executive transferring between real estate technology platforms may misappropriate high-level strategic, operational, or relational data assets to establish parallel, exclusionary listing environments (such as private reserves or preview platforms) that hide property data from the open consumer visibility layer.

---

## SECTION 4. CRIMINAL PENALTIES FOR OFF-MLS ELDER EXPLOITATION.

1.  **The Sandbagging Penalty:** Any corporate executive, brokerage entity, or platform developer who willfully authorizes, implements, or codes an automated system or marketing strategy designed to conceal property data from the open public utility,

resulting in the suppression of consumer equity, shall be subject to the enforcement parameters of **Title 18, United States Code.**

2. **Protection of Vulnerable Seniors:** Where the victim of an OFF-MLS data-hoarding or sandbagging scheme is a senior citizen aged 65 or older, the conduct shall be classified as federal elder financial exploitation, triggering:

   o **Mandatory Restitution:** Full restoration of the suppressed market equity, calculated using regional RESO-standard benchmarks.

   o **Statutory Damages:** Civil and criminal penalties including treble (triple) punitive damages, without cap, plus reasonable attorney fees under applicable elder protection codes.

3. **The Accountability Override:** No corporate shield, private bankruptcy restructuring, or "staged civil settlement order" shall insulate individual executives from personal civil or criminal liability where a violation of this Act has been executed on blank signature lines or through the concealment of material risk information from investors, regulatory authorities, or the courts.

---

## SECTION 5. ENFORCEMENT AND MISPRISION MANDATE.

1. **Immediate Department of Justice Jurisdiction:** The Department of Justice Antitrust and Criminal Divisions shall maintain continuous enforcement oversight over the open data feeds of **REALTOR.REALTOR.**

2. **Application of 18 U.S.C. § 4:** Any regulatory official, state attorney general, or judicial officer who receives a documented forensic amicus brief or crime report demonstrating a violation of this Act, and takes active administrative steps to quash, bury, or dismiss the file without forwarding the record to Congress or the proper criminal authorities, shall be subject to prosecution under 18 U.S.C. § 4 (Misprision of Felony).

*Exhibit C*

Greg Alkema <greg@gregalkema.com>

## Honorable Jamal N. Whitehead 18 USC Par 4 Criminal Complaint ..

1 message

---

**Greg Alkema** <greg@gregalkema.com>          Fri, May 29, 2026 at 3:39 PM
To: Jonathan Waclawski <jwaclawski@nar.realtor>, CEO@nar.realtor
Bcc: John P Klein <johnpklein.inc@gmail.com>

Dear Counselor Waclawski:

As an 81-year-old, top 5% IQ, dyslexic REALTOR®, CRB, mandated by Our REALTOR® Code of Ethics and my CRB designation to **raise professional standards**, I think I have earned the respect I deserve instead of finding NAR leadership hiding in a black hole behind a blue wall, only to scurry for the cracks and refuse to acknowledge me when I "shine a light."

The attached 18 U.S.C. § 4, Misprision of Felony will be delivered by Priority Mail to the Honorable Jamal N. Whitehead on Monday, June 1, 2026 and it speaks for itself.

As for your failure respond the the "threat" of NAR CEO Nykia Wright's "threat" to call in Corporate Counsel and use you against me, I have prepared the attached BAR complaints based on the **"fact"** that I presented a way to **RAISE THE BAR** at the National Association of REALTORS®.

Specifically, I asked for REALTOR.REALTOR to be presented to the 1,500,000 members, those still "loyal" to our REALTOR® Code of Ethics and, FYI, the Fiduciary Laws of the State of California required of "every" Real Estate License, to serve as a fiduciary for our Clients.

This is something Compass and the brokers who left the Association of REALTORS® to follow Zillow in their new "Zillow Preview - Coming Soon" scam, **which is just more Elder Abuse**, have ignored. They ignored this based on the "fact" that Zillow was planning their Zillow Preview OFF-MLS scam while in U.S. District Court SDNY, arguing exactly the opposite. I reported this as a Fraud on the Court to Judge Vargas and followed up with an 18 U.S.C. § 4 criminal complaint.

Given that so many brokers were involved at the inception, it stands to reason Zillow recruited them while Zillow was still in court arguing that OFF-MLS listings damage the public we serve. They admitted this in their pleadings in the Zillow vs MRED/Compass filing but failed to call it **ELDER ABUSE**, the crime that it is.

Today, my conscience is shocked by an NAR email crowing about giving away another $52,250,000 to settle an antitrust lawsuit. In truth, the DOJ settled with REALTORS® in the mid-1970s, and price leadership,if you even understand it, became the norm. My WhitePaper, **REALTOR® Monopoly Has Become A Myth**, is attached. Continuing to settle "antitrust" lawsuits without consulting the 1,500,000 dues-paying members who have standing is a dereliction of your duty to us.

Time is of the essence, Counselor Waclawski. **Our REALTOR® PROFESSION can and must be saved.**

When I offer to help and receive a "defensive" reply from CEO Nykia Wright threatening to sic you on me, that dog won't hunt.

Your failure to respond suggests you have something to hide. I suspect that the leadership of my Association of REALTORS® is "selling out the 1,500,000 dues paying members" who deserve, and should have, a voice and be given an honest aggregator, **REALTOR.REALTOR**, with houses only, no tracking cookies, all leads to the listing agent, and non-profit, which I believe the National Association of REALTORS® is, as a PROFESSION based on our Code of Ethics. This is a Code the Cabal wants to eliminate and replace with Terms of Service, in Zillow's case, this allows lawsuits up to $100.00 crummy dollars in Washington State.

FYI I also addressed STANDING in my Amicus to Judge Vargas, and she chose to ignore the crimes, and billions in liability Compass has, letting them walk away after I begged Errol Samuelson at Zillow to file a **MOTION TO DISMISS BASED ON ELDER ABUSE**, with sanctions on Zillow and millions in legal fees.

Why did he refuse? Because "behind the curtain," Zillow was planning Zillow Preview and recruiting the brokers who joined them from the inception.

And what do I hear from my REALTOR® PROFESSION leadership? Crickets. And when I contacted Nykia, I received threats.

I read Psalm 56 at lunchtime and, with God's help, I am going to raise the bar. I don't know how, but in His time, He will show me His way.

Hopefully you'll work with me Counselor Waclawski. Let's bankrupt the NAR and "claw back" the settlement money for REALTOR.REALTOR and serve our fellow REALTORS® with tools they can use, as I used to sell 50 houses a year with a Day Timer, not the crap the Cabal pushes on REALTORS® today.

Respectfully,

Gregory V. Alkema, REALTOR®, CRB, RealEstateCrusade.com
81 Hancock Drive (Diamond K Estates)
Roseville, CA 95678
Greg@GregAlkema.com
(916) 626-9464

P.S. Let's get rid of DUAL AGENCY too.

---

**4 attachments**

 **6 - Judge Jamal Whitehead - FORMAL CRIME REPORT PURSUANT TO 18 USC Par # 4.pdf**
1533K

 **Proposed BAR Complaint - Jonathan Waclawski - NAR General Counsel.pdf**
217K

 **REALTOR® Monoply Has Become A Myth - By Gregory V. Alkema, REALTOR®, CRB.pdf**
160K

 **Bye Bye to Dual Agency by Gregory V Alkema.docx PDF.pdf**
331K

*Exhibit D*

Greg Alkema <greg@gregalkema.com>

## Subject: Demand to Exercise Moral Authority Granted by NAR President Kevin Brown and CEO Nykia Wright – Immediate Action Required on Cartel Members at PCAR

3 messages

---

**Greg Alkema** <greg@gregalkema.com>                    Tue, Mar 24, 2026 at 4:54 AM
To: Dean Anderson <dean@pcaor.com>

Dear Dean Anderson,

As the PCAR CEO to whom NAR President Kevin Brown and CEO Nykia Wright publicly abdicated national moral authority at Inman Connect New York, by declaring that "morals are set at the local level", you now hold the moral authority to enforce the REALTOR® Code of Ethics at the local level.

That authority was granted in the context of the ongoing hijack of our profession by the Inman/Compass/Zillow cartel through off-MLS suppression practices that constitute prima facie elder financial exploitation under California Welfare & Institutions Code §15610.30.

I therefore demand that you immediately exercise that moral authority as follows:

1. **Remove all members** of the firms that have joined the cartel (Compass, HomeServices of America, Keller Williams, RE/MAX, eXp, Side, United Real Estate, and any others now participating in Zillow Preview or similar off-MLS suppression models) from every position of power or leadership they currently hold within the Placer County Association of REALTORS® (PCAR).

2. Direct the remaining Directors of PCAR to convene an immediate hearing to **remove** those same cartel-affiliated members from PCAR membership entirely. Such removal automatically revokes their CAR and NAR membership and suspends all MLS rights and privileges until they demonstrate full compliance with the REALTOR® Code of Ethics and mandatory Day-1 MLS transparency.

3. After the above removals are complete, properly inform **every remaining PCAR member** (using the full public record I have provided, including my Amicus Curiae brief, the SFAR/RealReports elder abuse data showing $302,000 average equity loss to seniors, the Zillow flip evidence, and the rushed Anywhere merger concealment) and conduct a full, informed membership vote on whether PCAR will enforce mandatory first-day MLS listing and reject all off-MLS suppression practices. The vote must exclude the removed cartel members, as they will not voluntarily vote themselves out of the profit model that harms their clients.

The REALTOR® Code of Ethics is not optional. Fiduciary duty is not optional.

Protecting senior homeowners from felony-level financial exploitation is not optional.

You were handed the moral authority. The public record is now complete. The cartel has been exposed.

Failure to act will constitute nonfeasance and further abdication of the duty you accepted when Brown and Wright placed it in your hands.

I expect written confirmation of your plan to execute these steps within seven (7) days.

Attached for your immediate review and for the record:

- My SDNY Amicus Curiae Brief (Dec 2, 2025)
- March 18, 2026 Ex Parte Emergency Appeal to Judge Vargas
- SFAR/RealReports Elder Abuse Data (November 2025)
- Letter from 16 Members of Congress to Pam Bondi and my response
- Draft of proposed Compass vs NWMLS Amicus (not final version)

In His Service,

Gregory V. Alkema, REALTOR®, CRB, RealEstateCrusade.com

Case: 1:26-cv-05451 Document #: 133 Filed: 07/17/26 Page 33 of 56 PageID #:4875

4/29/26, 8:14 AM        Greg Alkema Mail - Subject: Demand to Exercise Moral Authority Granted by NAR President Kevin Brown and CEO Nykia Wright – …

Roseville, CA 95678
Greg@GregAlkema.com
(916) 626-9464

---

**6 attachments**

Greg Alkema Amicus Compass vs Zillow - US District Court SDNY.pdf
11695K

16 Senators and Congress Members write to Pam Bondi on FAST Compass closing.pdf
3598K

Greg Alkema to the 16 Senators who wrote to Pam Bondi on February 19 - PDF.pdf
333K

Greg Alkema - exparte emergency appeal 3-18-26.pdf
188K

Greg Alkema - Michigan Supreme Court Amicus.pdf
1728K

UNITED STATES DISTRICT COURT Amicus NWMLS - 3-23-26 PDF.pdf
244K

---

**Greg Alkema** <greg@gregalkema.com>                          Thu, Apr 2, 2026 at 9:52 AM
To: Dean Anderson <dean@pcaor.com>

Dear Mr. Anderson:

Since you aren't willing to accept MORAL AUTHORITY at the PCAR, the membership will have to take it back.

As you recall, I was one day late applying for a director position last year.

This year I did not miss the FACT you added committee memberships to the application form and wanted me to acknowledge that a "committee" would make the choices.

Those changes limit the "democratic" process and this behavior SMACKS of the anti-trust BS that gets you into trouble: building a blue wall, hiding in the black hole behind it and scurrying like cockroaches when the lights comes on..

Therefore, I need you to give me the "link" to the committee on the PCAR Internet site,

If the link does not exist, I need the actual committee information, when it was formed, who is on it, and the names of each active member by Email.

Thank you. I am expecting a prompt reply.
[Quoted text hidden]
--
Gregory V. Alkema, REALTOR®, CRB, RealEstateCrusade.com
81 Hancock Drive (Diamond K Estates)
[Quoted text hidden]

---

**2 attachments**

 3 -Amicus Only.pdf
3224K

 Greg Alkema - exparte emergency appeal 3-18-26.pdf
188K

---

**Greg Alkema** <greg@gregalkema.com>                          Thu, Apr 16, 2026 at 10:23 AM
To: Dean Anderson <dean@pcaor.com>

Case: 1:26-cv-05451 Document #: 133 Filed: 07/17/26 Page 34 of 56 PageID #:4876

4/29/26, 8:14 AM　　　Greg Alkema Mail - Subject: Demand to Exercise Moral Authority Granted by NAR President Kevin Brown and CEO Nykia Wright – …

NAR's 2026 President Kevin Brown kicked off the conference on Wednesday by emphasizing the connection between the national organization and the state and **local executives and staff who are getting things done on the ground** and serving as the first point of contact with members.

Was he talking about you Dean, **or just puffing**?

Does the question deserve an answer?

[Quoted text hidden]

July 1, 2026

Chairman Andrew Ferguson
Federal Trade Commission
600 Pennsylvania Avenue NW
Washington, D.C. 20580

The Honorable Todd Blanche
U.S. Department of Justice
950 Pennsylvania Avenue NW
Washington, D.C. 20530

**Re: Request for Investigation into Compass–MRED Agreement and Related Anti-Consumer and Civil Rights Harms**

Dear Acting Attorney General Blanche and Chairman Ferguson:

We write on behalf of undersigned consumer protection, housing, civil rights, and fair competition advocacy organizations to urge the Federal Trade Commission and the Department of Justice to investigate the recently announced agreements between Compass Inc. and several Multiple Listing Services (MLSs) nationwide. These arrangements raise serious consumer protection, competition, and fair housing concerns, particularly when viewed in the context of Compass's considerable and growing power in the real estate market.[1] We urge you to investigate whether the agreement constitutes an unlawful effort to reduce transparency and fair competition for homebuyers and sellers.

In April, Compass struck a deal with Midwest Real Estate Data (MRED) to expand MRED's Private Listing Network nationwide.[2] Public reporting suggests that the Compass–MRED initiative is specifically intended to protect and expand off-market listing networks that bypass traditional public listing distribution.[3] Since then, Compass has made similar deals with Bright MLS, Realtracs, and MLS/CLAW.[4] Such arrangements reduce consumer choice, impede price competition, and increase steering incentives by encouraging transactions within affiliated

---

[1] Brobeck, Stephen. "Compass Expansion: New Data on Market Share and Double-Ending." The Consumer Policy Center, April 14, 2026.
https://consumerpolicy.org/compass-threatens-to-dominate-residential-real-estate-market/
[2] Velt, Tracy. "MRED Opens Private Listing Network to Agents Nationwide with Compass Data Deal." *HousingWire*, April 24, 2026. https://www.housingwire.com/articles/mred-compass-private-listing-network/
[3] Dickerson, Lillian and Amie Fisher. "MRED Opens Access to All Agents – with Compass the First to Join." *Real Estate News,* April 24, 2026.
https://www.realestatenews.com/2026/04/24/mred-opens-access-to-all-agents-with-compass-the-first-to-join; McCullough, Caleb. "Backed by Compass, Chicago's MLS Takes Private Listing Network National." *The Real Deal,* April 26, 2026.
https://therealdeal.com/chicago/2026/04/24/backed-by-compass-chicagos-mls-takes-private-listing-network-national/
[4] Fisher, Amie. "Compass Amplifies Reach in Deal with Nation's Largest MLS." *Real Estate News*, May 13, 2026.
https://www.realestatenews.com/2026/05/13/compass-amplifies-reach-in-deal-with-nations-largest-mls

1

broker networks. These arrangements also eliminate market competition between brokerages and harm small, independent brokerages.

These deals raise significant anti-consumer concerns as they threaten to reduce transparency and undermine competition in residential real estate markets. MLS systems historically functioned to aggregate listings broadly and facilitate open competition among buyers and brokers. Compass's private listing strategy instead withholds listings from broad public visibility during critical marketing periods: meaning that the seller's agent controls which agents – and thus buyers – even know about this listing.[5] Private listings are often marketed *within* brokerages first, enabling brokerages such as Compass to make money on both ends of the transaction while expanding market share. However, sellers are often worse off, as a much narrower market of buyers can even compete for their house, lowering expected sale prices. Buyers may never even find out about houses for sale, putting their dream of homeownership further out of reach, in already tight national housing markets with limited inventory.

We are also very concerned that these deals violate fair housing protections. Research on MRED's existing Private Listing Network in metro Chicago has already found that homes in majority-white neighborhoods were disproportionately marketed through private channels compared to homes in majority non-white neighborhoods.[6] By controlling who can even see houses for sale, these private networks raise broader concerns about the selective exclusion of protected classes of consumers, such as based on race or disability status. Limiting broad public access to listings risks recreating exclusionary housing practices in digital form by restricting equal access to housing opportunities. The Department of Justice should closely examine whether the nationwide expansion of private listing systems may facilitate discriminatory outcomes or disparate impacts.

The concerns above are magnified by Compass's growing market power. Compass is pursuing aggressive expansion through acquisitions and strategic partnerships such as those with MLSs across the country, intended to centralize listing inventory and agent participation. In January, Compass finalized its acquisition of Anywhere Real Estate Inc., creating a behemoth brokerage that raised significant anticompetitive concerns[7] and that was approved under questionable circumstances.[8] Shortly after Compass's deal with MRED, Zillow Group Inc. sued Compass and

---

[5] Consumer Federation of America and National Urban League. "Escalating Housing Costs, Hidden Listings." April 16, 2026. https://consumerfed.org/reports/escalating-housing-costs-hidden-listings/
[6] Zillow Research. "Case Study: Private Listings on Chicago's MLK are More Common in Majority-White Neighborhoods, Raising Equity Concerns." November 20, 2025. https://www.zillow.com/research/pln-chicago-mls-35747/
[7] Warren and Wyden. "Letter to Assistant Attorney General Slater and Chairman Ferguson." December 16, 2025. https://www.warren.senate.gov/imo/media/doc/20251216lettertodojandftconmergerbetweencompassincandanywhererealestateinc.pdf
[8] Warren, Schumer, et al. "Letter to Attorney General Bondi." February 19, 2026. https://www.warren.senate.gov/imo/media/doc/impact_of_compass-anywhere_merger_on_housing_costs_and_corruption.pdf

2

MRED alleging that the deal constitutes anticompetitive conduct in violation of the Sherman Act.[9]

At a time of severe housing unaffordability, federal regulators should ensure that dominant firms do not use consolidation and exclusive listing practices to reduce transparency, entrench market power, and limit fair access to housing opportunities. Residential real estate markets function best when listings are broadly accessible and competition is robust: consumers should be empowered to make informed decisions in open markets. These exclusionary and anti-competitive practices only further drive up the costs of housing, at a time that the Administration and Congress are seeking to address rising housing costs.

One company should not be able to monopolize access to the American Dream.

We appreciate your attention to this important matter and would welcome the opportunity to discuss these concerns further.

Sincerely,

Consumer Federation of America

American Economic Liberties Project

Americans for Financial Reform Education Fund

Consumer Action

Demand Progress Education Fund

National Consumer Law Center (on behalf of its low-income clients)

Rise Economy

Woodstock Institute

---

[9] Zillow, "Zillow Sues MRED and Compass for Conspiring to Hide Home Listings from Buyers and Restrict Competition." May 18, 2026. https://www.zillow.com/news/zillow-sues-mred-compass/

3



# COMPASS EXPANSION:
## NEW DATA ON MARKET SHARE AND DOUBLE ENDING

### STEPHEN BROBECK
#### SENIOR FELLOW

#### APRIL 2026

Today, the most controversial issue in the residential real estate industry is the expansion of Compass Real Estate.[1] Most recently, the company announced a partnership with Rocket Companies, which includes the nation's largest retail mortgage lender, and with Redfin, Rocket's real estate portal and brokerage. Some commentators have lauded this expansion as evidence of the modernization of an antiquated industry.[2] Others, including most industry leaders, have complained that Compass threatens to dominate the industry and its governance while disadvantaging both home buyers and sellers.[3] Consumer advocates have made the same complaints.[4] Federal and state regulators have yet to voice opinions on the issue.[5]

The main purpose of this report is to present new data on the potential market dominance of Compass in five of its most profitable local residential real estate markets. The data are related to its market share and the extent of its double-ended sales in these markets. The report provides context for these data by explaining the market goals and strategies of Compass. It also identifies a number of challenges which the company must overcome, which suggests that there may be limits to further Compass growth. The report concludes with a summary of its findings.

## Compass Goals and Strategies

Compass has been very explicit about its goals, most prominently, 30 percent market share in 30 area markets.[6] The 30 percent share appears to represent sales volume ($s) not sales units, and its 30 targeted metro areas each includes many with high-priced properties. Given widespread agent compensation of 2.5 or 3 percent of home sale prices, selling expensive homes is usually much more profitable than selling inexpensive ones. With a 3 percent commission, the sale of a $3 million home generates ten times the commission of

---

[1] Taylor Anderson, "With Rocket deal, Compass strikes at organized real estate. 'It really seems like war'," Inman News, February 27, 2026. Brooklee Han, "The ground just shifted: coming soon listings are taking over real estate," HousingWire (March 19, 2026). Daniel Houston, "Companies must 'get big in order to compete' with Compass-Anywhere," Inman News (October 9, 2025).

[2] Dezireh Eyn, "Compass, control and the role of the real estate fiduciary," Inman News (March 9, 2026).

[3] Lillian Dickerson, "Douglas Elliman CEO on Compass-Anywhere: "From the outside it looks like a mess'," Inman News (January 28, 2026). America Foy, "Assault on the MLS: How the Compass-Redin deal threatens the open market," Inman News (March 4, 2026). Jason Oppenheim, "How Compass is 'weaponizing' secrecy," Inman News (March 9, 2026).

[4] Ashley Nowicki, "Trump's Corrupt Gift to Big Real Estate," The Economic Populist (March 25, 2026). See also: Brooklee Hahn, "Are private listings and fiduciary duty truly opposites?" HousingWire (May 8, 2025).

[5] A letter from 18 members of Congress did request more information from the U.S. Department of Justice about the Compass acquisition of Anywhere. Lillian Dickinson, "Approval of Compass-Anywhere merger raises questions about corruption at AG's office," Inman News (February 20, 2026).

[6] Jake Indursky, "Compass, residential upstart-turned-behemoth, plans to get even bigger," The Real Deal (January 2, 2025).

the sale of a $300,000 property. Even if the $3 million property is sold with a 2 percent commission, the agent receives nearly seven times the commission earned on a $300,000 sale. That is why the 30 areas that Compass has apparently targeted include 14 of the 15 most populated metro areas – all but Detroit – but also relatively small, high-income areas such as the Hamptons, Santa Barbara, Aspen, Lake Tahoe, Greenwich (CT), and Telluride.[7]

Strategies that are being utilized to attain these goals feature the following:[8]

- Acquire other companies: The 2026 Compass purchase of Anywhere has received, far and away, the most attention. Anywhere includes such well-known brands as Coldwell, Century 21, Better Homes & Gardens, ERA, Corcoran, and Sotheby's. But before this purchase, starting in 2014, Compass had bought some couple dozen firms, mainly in targeted market areas.[9]

- In acquisitions, target companies that prioritize "luxury" sales: In purchasing Anywhere, Compass acquired a national brand, Sotheby's, with a reputation of specializing in the sale of high-priced properties. Yet more significantly, their earlier purchases included companies -- such as Christies (national), Shane Aspen (Aspen), Hudson (Chicago), Deasy Penner (Pasadena), Washington Fine Properties (Washington, D.C.), Porchlight (Denver), and Launch (Scottsdale) – that emphasized the sale of expensive properties.[10]

- Expand the number of consumer eyeballs on Compass: Through its announced partnership with Rocket Mortgage/Redfin, Compass will surely attain this objective. As a portal, Redfin is not nearly as popular as Zillow, yet now as part of Rocket, it is solidly entrenched and enjoys good name recognition. Redfin will prominently display Compass listings.

- Steer consumers to Compass agents: As part of their new partnership, Redfin will pass on buyer leads directly to Compass listing agents. Within Compass, an emphasis on private listings – initially not even posted on Redfin -- will give Compass agents the opportunity to sell listings themselves or find buyers for their listings within the new expanded Compass. Furthermore, Compass recently

---

[7] This list was generated by AI in response to the query – what 30 metro areas has Compass targeted for expansion? Considering the number and proportion of higher-priced properties in these areas, and the presence of Compass-Anywhere in these areas, the list seems credible though no confirmation from a Compass source could be found.

[8] SWOTTemplate.com. What is Growth Strategy and Future Prospects of Compass Company (July 25, 2025). Brooklee Han, "Robert Reffkin wants to make Compass a hub for real estate listings," HousingWire (October 30, 2024).

[9] Compass, Inc. entry on Wikipedia.

[10] Ibid. Research on individual companies.

- announced that it would give listing agents a 10 percent referral fee if they send inquiries about their listings to another Compass agent that results in a sale.[11]
- Expand services to existing clients: Compass has invested heavily in internal systems that can help ensure that sales proceed smoothly and efficiently. In 2019, they purchased a CRM provider, the same year they purchased an AI startup, and in 2021 they bought a transaction management platform.[12]
- Expand sales of ancillary products, such as mortgages and title insurance, through acquisitions and partnerships: Since 2019, Compass has purchased a half-dozen title insurance and settlement services companies. Their recently announced partnership with the country's largest mortgage broker, Rocket, will provide a major new source of referrals of potential home buyers. Rocket also benefits because it is more likely to receive referrals from Compass agents.[13]

The dream of Compass Chairman and CEO Robert Reffkin and other Compass leaders appears to be domination of the most profitable local markets through overwhelming numbers of agents and listings that attract and pressure consumers to list and purchase properties through Compass agents. As Compass grows in area markets, sellers will increasingly believe that they have the best chance of selling their homes through Compass, especially since buyers will not receive negative information about time on market and price changes. Moreover, buyers will increasingly think that if they do not work with a Compass agent, they will not gain access to many recent listings. In phase one of the private listings program, buyers must contact a Compass agent to obtain this access.[14]

 While the stated Compass goal is 30 percent market share in select markets, the Compass dream may not stop there. With their acquisition of Anywhere, the number is already higher in some markets, and they are active in area markets well beyond the targeted 30. As of March 2026, Compass expansion has not been seriously challenged by federal and state regulators, the National Association of Realtors, or major competitors. The major roadblock has been Zillow, which has been trying to limit private listings, an effort which Compass litigated. However, in late March Compass withdrew this lawsuit.[15] There were

---

[11] Brooklee Han, "Compass launches referral program for listing agents' buyer leads," HousingWire (February 23, 2026).

[12] These purchases were listed in the Wiki, Inc. entry on Compass, Inc., then researched further. Christian Hill, "Compass Buying Anywhere Real Estate to Become the World's Largest Brokerage," Empire Learning (September 22, 2025).

[13] Compass and Rocket form historic alliance to dramatically increase home listing inventory on Redfin. News release from Rocket Companies (February 23, 2026).

[14] AJ LaTrace, "Compass to launch client portal amid private listings push," Real Estate News (February 1, 2025).

[15] Meghan Roos, "Compass drops lawsuit after Zillow embraces pre-marketing," Real Estate News (March 20, 2026).

some indications that it would not be successful.  Also, Compass may now think that it can bypass Zillow through reliance on Redfin listings and referrals.

## Progress to Date

By the close of 2024, among residential brokerages Compass had the largest annual U.S. sales volume -- $231 billion.  It was followed by Anywhere ($187 billion), eXp ($153 billion), and HomeServices of America ($137 billion).  The sales of these four companies dwarfed those of all other firms.  The next largest was The Real Brokerage with 2024 sales of $42 billion.[16]

In 2025, in part because of its 2024 purchase of Christies, Compass continued to grow rapidly.  From 2024 to 2025, gross transaction value increased by 23 percent while total revenue grew by 24 percent.[17]  When Compass completed its acquisition of Anywhere in January 2026, its sales volume was about three times the sales of each of its next two largest competitors and at least ten times the sales of any other U.S. brokerage.  While Compass and Anywhere sales volume in 2025 together represented only about 18 percent of total U.S. sales, as will be shown percentages are much higher in targeted urban markets.[18]

The huge size of Compass provides many opportunities to increasingly dominate residential real estate brokerage.  These include high name recognition (already enjoyed by Zillow), significant political clout within the industry (there is little evidence they are being challenged by the National Association of Realtors), and new marketing opportunities.  No national brokerage widely advertises on television.  Might Compass (once it stabilizes its finances after the massive Anywhere purchase) begin to regularly advertise during national sports broadcasts, the way credit union giant Navy Federal Credit Union does, or even purchase ad time during the Super Bowl, as partner Rocket has recently?  In brief, Compass now has the potential to build a very influential national brand.[19]

---

[16] "10 Largest Brokerages by 2024 US Sales Volume," Real Estate News (April 2, 2025).

[17] Compass, Q4 & FY 2025 Business Update & Supplementary Information.

[18] Nicole Friedman, "Megamerger to Propel Compass's Strategy of Private Home Listings," Wall Street Journal (September 22, 2025).  Real Estate News reported on a Capitol Forum analysis that revealed that "the Compass-Anywhere merger could create 'potentially illegal overlaps' in at least 12 states core markets."  The article also noted that the data relies on voluntary submissions and minimum thresholds...potentially undercounting smaller players and inflating market-leader share."  I tried and failed to purchase a copy of this report and could find no reference to it on the Capitol Forum website. A.J. LaTrace, "Could a Compass-Anywhere merger violate federal guidelines?"  Real Estate News (December 26, 2025).

[19] It also assumed an estimated $2.6 billion of Anywhere debt, which may limit future acquisitions.  Saul Klein, "Breaking News: Compass Purchases Anywhere," The Data Advocate (September 24, 2025).

While national size and influence exert an effect on local markets, more meaningful to consumers is the presence of Compass in these markets, especially large numbers of agents, listings, and sales. Key indicators of this presence are its percentage of all unit sales (sales volume skews this percentage upwards because of the sale of million-dollar homes) and the percentage of these unit sales that are double-ended. Double-ending – on a sale, both seller and buyer as clients of one agent or agency -- is a good indicator of a brokerage's efforts to keep customers and sales within its system.

Five markets were chosen in which to study market share and double-ending in detail – Boston (MA), Washington (DC), Chicago (IL), San Diego (CA), and Austin (TX). All these metro areas are large and have been prioritized by Compass – numbers 4, 5, 7, 9, and 12 on a list of 30. Discount broker Derek Eisenberg helped us secure lists of 1,000 consecutive, recent home sales in each city. These sales, which are called "solds," were the data that allowed us to examine unit market share and double-ending in five areas where Compass is already a leading brokerage and has prioritized future growth.


## Market Share

The key issue pursued here is the percentages of all recent sales that were listed by a Compass agent. In doing so, we distinguished between the Old Compass (just Compass) and the New Compass (Compass plus their recent acquisitions). We also computed several other statistics:

- The number of solds with a Compass buyer agent. Some brokerages are prioritizing listing properties not selling them. We wanted to learn if there was evidence that Compass was de-emphasizing buyer agency.
- The percentage of high-priced properties Compass had sold. It is common knowledge that Compass prioritizes the sale of the former. But we were interested in learning the extent to which this was the case in the five markets.

**Unit Sales:** The following table reveals the unit sale market share of the Old and New Compass in the five areas. As can be seen, the Old Compass was firmly entrenched in the five areas, with market shares ranging from 10.7 percent (Chicago) to 22.1 percent (Austin), but the New Compass is dominant for two reasons. First, the market shares are relatively large, ranging from 29.7 percent (San Diego and Austin) to 39.5 percent (DC). Second, these shares dwarf that of all other brokerages. They are at least four times larger than the market share of the second largest firm in the city (except in Austin where they are only 2.5 times larger). Moreover, few other companies have as much as a three percent market

share of unit sales – besides the New Compass, only one firm in Boston; four firms in Chicago, Austin, and DC; and five firms in San Diego.

**Table 1: Market Share (%) of Unit Sales of Most Active Brokerages in Five Cities (n=1000 in each)\***

**Boston**

| | |
|---|---|
| Old Compass | 14.8 |
| New Compass | 32.4 |
| Keller Williams | 4.4 |

**Washington, D.C.**

| | |
|---|---|
| Old Compass | 22.0 |
| New Compass | 39.5 |
| Keller Williams | 8.5 |
| Long & Foster | 5.8 |
| RLAH | 4.5 |
| Samson | 4.3 |

**Chicago**

| | |
|---|---|
| Old Compass | 10.7 |
| New Compass | 35.0 |
| Baird & Warner | 8.1 |
| Keller Williams | 5.3 |
| ReMax | 4.8 |
| Berkshire Hathaway | 3.5 |

**San Diego**

| | |
|---|---|
| Old Compass | 15.6 |
| New Compass | 29.7 |
| eXp | 7.0 |
| Real Broker | 6.6 |
| Keller Williams | 6.4 |
| Berkshire Hathaway | 4.8 |
| LPT | 3.1 |

**Austin**

| | |
|---|---|
| Old Compass | 22.1 |
| New Compass | 29.7 |
| | |
| Keller Williams | 11.6 |
| eXp | 5.8 |
| Moreland | 3.4 |
| Bramlett | 3.0 |

*\*Only companies listed were those with at least 3 percent of market share. In Boston, new Compass included Old Compass, Century 21, Coldwell Banker, and Sotheby's. In Washington, D.C. it included Old Compass, Coldwell Banker, Century 21, Sotheby's, and Washington Fine Properties. In Chicago, it included Old Compass, Century 21, Christies, Coldwell Banker, and Sotheby's. In San Diego, it included Old Compass, Coldwell Banker, Sotheby's, and Century 21. In Austin, it included Old Compass, Christies, Sotheby's, and Coldwell Banker. Other New Compass companies were sometimes active in these cities but they had market shares of well under one percent.*

The figures in Table 1 are for listed properties; the figures for Old Compass buyer sides are slightly lower. In Boston, Compass had 148 listing sides and 123 buyer sides; in Washington, D.C., it had 220 listing sides and 197 buyer sides; in Chicago, it had 107 listing sides and 104 buyer sides; in San Diego, it had 156 listing sides and 141 buyer sides, and in Austin, it had 221 listing sides and 192 buyer sides. Major brokerages tend to prioritize listing properties because agents have more control over the sales process and also have the potential to sell the property themselves or recruit a buyer agent from within their own company. Moreover, the class action litigation settlement imposed more demands on buyer agents.

**Dollar Sales:** The New Compass is even larger than its shares of unit sales because the company tends to sell homes with higher-than average sale prices. As noted earlier, Compass prioritizes the sale of expensive homes because the commissions are so much larger than those for much less expensive properties. The table below illustrates this upscale priority. In all four cities, the Old Compass sold a larger share of homes with a sale price of $1,000,000 or higher (or in Chicago, $600,000 or higher) than those with a lower price.

**Table 2: Old Compass Market Share (%) of Unit Sales of Homes With Sale Prices Above and Below $1,000,000 ($600,000 in Chicago)**

|  | Under Price Threshold | Over Price Threshold |
|---|---|---|
| **Boston** | 10.2 | 21.7 |
| **Washington, D.C.** | 20.8 | 26.7 |
| **Chicago** | 6.7 | 22.8 |
| **San Diego** | 13.7 | 17.5 |

### Double-Ending and Double-Dipping

Double-ended sales are those in which the listing agent and buyer agent belong to the same company. Double-dipped sales, which are one type of double-ending, are those in which one agent works with both seller and buyer, usually as a facilitator. This facilitation, illegal in eight states, is usually called "dual agency" or "transaction brokerage." Double-dipped sales can be much more profitable than sales involving two agents because it is usually easier for one agent to manage a sale: The agent does not have to communicate and coordinate about the sale, including the sale price, and they also avoid working with agents who are inexperienced or incompetent. Their transaction coordinator can manage the paperwork.[20] Double-ended sales that are not double-dipped are attractive to agents because the initiating agent, usually a listing agent, typically receives a referral fee from the other agent (often 20-25 percent of their commission) and also the approval of the company for which they work.[21]

Compass has denied that its private exclusives are intended to double-end sales. One of its executives has said: "It's not something we track; it's not something we encourage."[22] Compass also maintains that their Private Exclusives Book is accessible to any agent at a Compass office, yet research has revealed that a large majority of attempts to access this book were unsuccessful.[23] However, the key question is whether double-ending sales

---

[20] Stephen Brobeck, Double-Dipping by Real Estate Agents: Risks and Costs to Home Buyers and Sellers (Consumer Federation of America, May 2021).

[21] Stephen Brobeck, Real Estate Referral Fees: Do They Harm Consumers? (Consumer Federation of America, September 2020). A recent study by Brobeck and Wendy Gilch for the Consumer Policy Center focused on referrals from referral agencies not from agents and brokers.

[22] AJ LaTrace, "The New Compass Plan Seems...2-Sided," housingnotes.com (February 3, 2025).

[23] Industry expert Mike DelPrete and his researchers tested this availability by posing as buyer agents who contacted Compass seeking access to Compass Private Exclusive listings. They reported that 90% of these

serves Compass interests. The answer seems pretty clear. As one commentator put it: "A private listing network is a vehicle to get paid by both sides, control the listing, and have an edge in recruiting new agents."[24] In documents revealed during the Compass lawsuit against Zillow, Compass included a slide that stated: "Pre-marketing results in a consistently higher percentage of [transactions] where Compass is on both sides." The slide indicated that off-market sales double-end 72 percent more frequently than on-market sales.[25]

Compass's new policy of offering 10 percent of a commission to a Compass agent for an internal referral may well increase this frequency.[26] So should the full integration of Anywhere into Compass. With an additional 180,000 Anywhere agents to make referrals to, the double-ending rates of Old Compass agents should increase. And with the widespread adoption of the private listing program throughout Anywhere, the double-ending rates of their agents should also rise. Said one commentator: "That's what pocket listings, dark listings, private exclusives, and 'coming soon' is all about: Getting both sides of the deal."

Even before integrating Anywhere into the New Compass, how much progress has Compass made in achieving double-ending? The company announced its Private Exclusive Book in May 2025 but has offered private exclusive to clients for at least several years. By early 2026, was Compass double-ending deals more frequently than other brokerages? And to what extent were they double-ending sales that were not also double-dipped? Our data on 1000 recent sales in each of five cities helps answer these questions.

Table 3 shows two things: first, double-ending rates, including double-dips, for all companies with at least 40 sales in our city samples of 1000, and second, the double-dip rate as a percentage of all double-ends. The table reveals that among major brokerages, the Old Compass was the leading double-ender in four of the five cities and in the fourth (San Diego) was still a frequent double-ender. In Washington, D.C., its double-end rate (including sales with customers not clients) was an exceptional 41 percent. The fact that it listed 220 of the 1000 solds in DC here does not fully explain the high percentage. But there is one other notable statistic in the table: Only one of 89 double-ended sales in DC was a double-dip. This suggests that Compass agents in DC were encouraged to double-end but not to double-dip. Such company advice could reflect an aversion to dual agency,

---

"buyer agents" were "ghosted" or "refused" access. See public docket for the Compass vs. Zillow lawsuit in the Southern District of New York, Exhibit DX176.

[24] Ibid.

[25] Taylor Anderson, "Docs offer inside peek at Compass's war against 'organized real estate'," Inman News (January 9, 2026).

[26] This program appears to provide any agent, whether or not they are involved in the sale, the 10% if they refer either a seller or buyer to another Compass agent that results in a sale.

a controversial issue.  But it would also be consistent with a corporate goal of not only keeping clients within the Compass world but also providing an incentive for agents to join the company.

**Table 3:  Double-Ending (DE) and Double-Dipping (DD) Rates for Active Companies (at least 40 Sales)\***

|  | DE/Sales (%) | DD/DE (%) |
|---|---|---|
| **Boston** | | |
| Old Compass | 21 | 42 |
| Coldwell Banker | 18 | 32 |
| Sotheby's | 12 | 43 |
| Keller Williams | 11 | 40 |
| **Washington, D.C.** | | |
| Old Compass | 41 | 1 |
| Keller Williams | 18 | 50 |
| Samson | 16 | 29 |
| Long & Foster | 14 | 20 |
| RLAH | 13 | 0\*\* |
| Coldwell Banker | 11 | 33 |
| **Chicago** | | |
| Old Compass | 24 | 9 |
| ReMax | 23 | 36 |
| Christies | 21 | 7 |
| Coldwell Banker | 15 | 50 |
| Keller Williams | 13 | 14 |
| Baird & Warner | 11 | 22 |
| **San Diego** | | |
| eXp | 29 | 40 |
| Keller Williams | 25 | 38 |
| Old Compass | 24 | 32 |
| Real Broker | 21 | 7 |
| Coldwell Banker | 19 | 28 |

| | | |
|---|---|---|
| Berkshire Hathaway | 15 | 14 |
| **Austin** | | |
| Old Compass | 20 | 9 |
| Keller Williams | 10 | 0 |
| eXp | 9 | 0 |

*\*DEs include DDs.*
*\*\* Only 5 sales double-ended.*


## Factors Affecting the Future of Compass

The residential real estate industry is currently in a state of flux.  Until fairly recently, it was largely self-regulated.  The National Association of Realtors (NAR), with the participation and support of most major industry players, set rules and provided a mechanism for complaints against those who broke them.  State regulators, with active participation from industry members, generally supported the rules and played a role in enforcing them.

As a whole, the industry was also highly inefficient, with far too many agents trying to sell a limited number of properties, spending excessive amounts of time and money to find clients.  This inefficiency helps explain why the industry has worked so hard to preserve high, uniform commission rates.  These rates were instrumental in convincing attorneys to file class action lawsuits.  While the litigation failed to bring down rates, it did shake up the industry, creating opportunities for those who bridled at certain industry rules to challenge, work around, or even flout them.  NAR, also weakened by leadership scandals, was forced to acquiesce -- though some MLSs tried to fight back -- and the dissidents made little effort to create an alternative set of industry rules.  At present, many agents may well believe that their main regulator is their brokerage.

Compass helped create and took advantage of this situation.  They acquired dominant market share in many area markets.  They have linked up with a portal and a large mortgage broker to gain and market their listings.  They have used private listings and fees to promote double-ending.  In doing so, they have made an end run around the one industry competitor that seriously threatened their control of sales.  They have forced this competitor and major brokerages to form their own partnerships.  But Compass does face potential constraints.

**Themselves:** How ambitiously and aggressively will Compass seek to expand their market and political power?

- Will they be content with attaining 30 market share in 30 markets? They are already above 30 percent in some markets, one antitrust red flag. Might there be new acquisitions or partnerships with big regional brokerages to quickly establish a major presence in new markets? In 2025, the company was reported as discussing the acquisition of Home Services of America, which includes regional powerhouses such as Edina Realty (MN), Long & Foster (DC area), and Houlihan Lawrence (suburbs north of NYC).
- How aggressively will they promote Redfin as an alternative to Zillow? Will they work behind the scenes to weaken multiple listing services and promote private listings, in part to weaken the big portal? Will they purchase or partner with Homes.com to greatly increase the number of consumer eyeballs?
- Will they start to visibly market nationwide, either alone or with their own brands or partners such as Rocket/Redfin? At present, they are limited not just by their finances but also by their multiple brands. But the prospect of running ads on major sports events, the way big insurers do, may well be attractive to them.
- Or, will they slow down and prioritize integration of their many new parts and partnerships? They borrowed heavily to purchase Anywhere.
- Will they continue to make decisions independent of NAR and the MLSs, or will they make an effort to reach an accommodation with these traditional governors of the industry?

**Their Competitors:** How effectively will major portals and companies respond to Compass expansion?

- Recently, Zillow agreed to pre-sale listings for major national and regional companies – Keller Williams, ReMax, Home Services of America, and United Real Estate. Also, Homes.com and Realtor.com agreed to pre-sale listings for eXp. How quickly will home buyers learn that they need to search more portals than Zillow if they want to thoroughly search available properties? Will Zillow advertise more widely to reinforce consumer perception that they are the best source of listings?
- To expand their sale of ancillary products, especially mortgages, will brokerages and portals reach out beyond mortgage brokers to big banks? Will other large corporate entities emerge that combine brokerage, listing, referral, and the sale of ancillary products?
- Will big brokerages outside Compass merge to increase their presence and shrink the gap between them and Compass in local markets? Will these companies more aggressively seek to acquire successful local or regional brokerages? The latter are now in much greater need of access to markets and protection from big companies.

**The Litigators:** The legal landscape has changed significantly since large law firms filed class action suits and the U.S. Department of Justice was active in seeking a more price competitive industry. At present, Compass faces no significant discernible legal threats to its expansion.

- There has been no indication that DOJ or the Federal Trade Commission currently intends to pursue antitrust litigation against any of the new acquisitions, mergers, and partnerships. Nor is their evidence that they intend to carry on with efforts to check workarounds that limit price competition, sought earlier both by class action litigators and by DOJ themselves. However, as occurred six years ago, in 2029 a new presidential administration may allow DOJ to resume its antitrust activity. In many local and regional markets, an expanded Compass would appear to violate the Merger Guidelines issued by DOJ and the FTC in 2023.
- To date state-attorneys general have given no indication that they intend to engage in these issues. Historically, they have deferred to state real estate regulators. Moreover, those who believe these antitrust issues are important have limited bandwidth, especially considering their interest in challenging the policies of the Trump administration. Some state legislatures are considering limiting private listings, but these efforts have been driven in part by Compass competitors that recently agreed to pre-list properties.
- Large class action law firms recently sued Zillow. They may also be considering litigation against Compass. But their modus operandi is usually to delay litigation until substantial harms can be proven and damages estimated. Compass expansion has probably occurred too recently to document both.

**Consumers:** In the past, most home buyers and sellers have not actively engaged in brokerage issues. Their limited experience in home sale and purchase limited their knowledge of the real estate marketplace and how to optimize their welfare. Moreover, in any sale they understandably are more interested in the price and timing of the sale, especially if they are selling and buying at the same time. A third factor is that many consumers highly value convenience, so may be willing to pay more for the services of a realtor who can quickly facilitate a sale, including effectively managing the purchase of a mortgage, title insurance, and other ancillary services.

However, as consumers lose access to a full range of current listings, forcing them to consult several portals and possibly depend on agents for information about new listings, consumers may engage more fully in the sales process. Sellers may increasingly understand that privately listing their property limits its exposure to potential purchasers and also may lengthen the time to sell. Buyers may begin looking for those portals that

include important information about days on market and any price changes in their listings, which Compass and other private listings increasingly do not include. Sellers and buyers may learn that they have a good chance to lower listing and buyer agent fees if they comparative shop for an agent, including negotiation of fees. Both sellers and buyers may increasingly look for agents who take fiduciary duties seriously and will remain loyal to their clients. By doing so, sellers and buyers can lower fees, improve service, ensure agent loyalty, and purchase the best home available to them.

## Summary

Recently Compass has expanded rapidly through acquisitions and partnerships. In doing so, it threatens to dominate many local markets and strongly influence industry governance. Today its sales volume is about three times the sales of each of its next two largest competitors and at least ten times the sales of any other brokerage.

In some cities its dominance is much greater. In the five markets examined, the Compass share of unit sales ranges from 30 to 40 percent and, in terms of sales volume ($s), the percentages are even higher. Moreover, the percentages of unit sales for its main competitors are much lower.

Compass has prioritized private listings that are available only to consumers who are buyer clients. It is not surprising, then, that their double-ending rates are relatively high. In Washington, D.C., the rate exceeds 40 percent. As Compass integrates Anywhere into its structure, the number of the new company's double-ended sales is likely to rise considerably.

As it has expanded, Compass has challenged, worked around, or flouted traditional industry rules. As a result, the whole industry – including NAR, major competitors, and portals including Zillow – have been pressured into altering their own policies and practices.

How the industry will evolve in the future is far from clear. It seems certain, though, that Compass's own priorities and practices will exert a major influence on the decisions of other industry entities. One can be very skeptical, however, as to whether the changes resulting from all of these decisions will end up benefiting consumers.



**UNITED STATES DISTRICT COURT**
NORTHERN DISTRICT OF ILLINOIS
219 SOUTH DEARBORN STREET
CHICAGO, ILLINOIS 60604

**THOMAS G. BRUTON**
CLERK

312-435-5670

Date: 07/09/2026          Case Number: 1:26 - cv 05451

The enclosed document was submitted to this court. However, it is being returned to you. The document does not appear to be in compliance with federal or local rule, as indicated below.

☐ The document(s) being returned were inadvertently delivered to this court instead of the court noted in the heading on the pleading.

☐ Subpoenas are not filed with the Clerk's Office.

☐ The document(s) being returned were inadvertently lost or damaged in the mail and delivered to this court.

☑ The document(s) being returned requires further information. Please provide the case number, judge's name and case title.

☐ Please review the enclosed Guide for Pro Se Litigant for filing a civil case.

☐ The enclosed documents were delivered to the Court's overnight drop box on _____. We have attempted to contact you at the phone number listed on the documents with no results. It is unclear as to what the request may be, therefore, we are returning these documents to you.

☑ Wrong case number in the document(s) you sent this Court. _____
_____

Please contact our office should you need further assistance.

Thomas G. Bruton, Clerk

By: M. Moreno _____
Deputy Clerk

Rev. 09/15/2025

Dear Honorable Judge Tharp Jr.

I'm sorry, at 81 and rushing before back surgery, I got the wrong case number.

The enclosed article by Gary Keller says it all.

They're trying to get rid of SMALL BROKERS, and destroy our REALTOR® Profession and lower the bar and it's just plain wrong.

Your Honor, my mother taught me to "listen to the little voice", your conscience.

When making your final rule, please let your conscience be your final guide.

In truth, if this were being done to the legal profession, the Big Law Firms would put every small law firm and one-person law firm out of business.

Please do the right thing and turn this over to the DOJ and FTC and SEC.

Sincerely,


Gregory V. Alkema, REALTOR, CRB
July 13, 2026



Psalms 3:5 Context

2Many *there be* which say of my soul, *There is* no help for him in God. Selah. 3But thou, O LORD, *art* a shield for me; my glory, and the lifter up of mine head. **4I cried unto the LORD with my voice, and he heard me out of his holy hill. Selah. 5I laid me down and slept; I awaked; for the LORD sustained me.** 6I will not be afraid of ten thousands of people, that have set *themselves* against me round about. 7Arise, O LORD; save me, O my God: for thou hast smitten all mine enemies *upon* the cheek bone; thou hast broken the teeth of the ungodly. 8Salvation *belongeth* unto the LORD: thy blessing *is* upon thy people. Selah.



**UNITED STATES POSTAL SERVICE®** | **PRIORITY MAIL EXPRESS®**

 **EMS**

## FLAT RATE ENVELOPE
ONE RATE ■ ANY WEIGHT

To schedule free Package Pickup, scan the QR code.



USPS.COM/PICKUP

**VISIT US AT USPS.COM®**
ORDER FREE SUPPLIES ONLINE

RECEIVED

JUL 17 2026

THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT

PS10001000006

EP13F October 2023
OD: 12 1/2 x 9 1/2

**UNITED STATES POSTAL SERVICE.** | *Retail*

**E** | US POSTAGE PAID
**$35.90** | Origin: 95677
07/14/26
0565820677-11

**PRIORITY MAIL EXPRESS®**

GREG ALKEMA
81 HANCOCK DR
ROSEVILLE CA 95678-1102
(916) 626-9464

0 Lb 10.50 Oz

RDC 07

SCHEDULED DELIVERY DAY: 07/15/26 06:00 PM

SHIP TO:

C005

(310) 435-3670
US DISTRICT CT
219 S DEARBORN ST
CHICAGO IL 60604-1702

USPS TRACKING® #



9570 1152 6779 6195 1005 95

G̲U̲A̲R̲A̲N̲T̲E̲E̲D̲ INSURED

For Domestic shipments, the maximum weight is 70 lbs. For international shipments, the maximum weight is 20 lbs.

PRESS FIRMLY TO SEAL

PRESS FIRMLY TO SEAL

**PRIORITY MAIL EXPRESS**
**FLAT RATE ENVELOPE**
**POSTAGE REQUIRED**

# PRIORITY MAIL EXPRESS®

## FLAT RATE ENVELOPE
ONE RATE ■ ANY WEIGHT

To schedule free Package Pickup,
scan the QR code.



USPS.COM/PICKUP

PS10001000006

EP13F October 2023
OD: 12 1/2 x 9 1/2

This package is made from post-consumer waste. Please recycle - again.

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail Express® shipments. Misuse may be a violation of federal law. This package is not for resale. EP13F © U.S. Postal Service; October 2023; All rights reserved.

 

**UNITED STATES POSTAL SERVICE®** | **PRIORITY MAIL EXPRESS®**

**CUSTOMER USE ONLY**

FROM: (PLEASE PRINT)  PHONE ( 916 ) 6269 9464

Greg Alkema, CRB
81 Hancock Drive
Roseville, CA 95678

**DELIVERY OPTIONS (Customer Use Only)**

☑ **SIGNATURE REQUIRED** *Note:* The mailer must check the "Signature Required" box if the mailer: 1) Requires the addressee's signature; OR 2) Purchases additional insurance; OR 3) Purchases COD service; OR 4) Purchases Return Receipt service. If the box is not checked, the Postal Service will leave the item in the addressee's mail receptacle or other secure location without attempting to obtain the addressee's signature on delivery.

**Delivery Options**
☐ No Saturday Delivery (delivered next business day)
☐ Sunday/Holiday Delivery Required (additional fee, where available*)
*Refer to USPS.com® or local Post Office™ for availability.

TO: (PLEASE PRINT)  PHONE 312 435-5670

US District Court, Northern District
219 South Dearborn Street
Chicago Ill 60604

ZIP + 4® (U.S. ADDRESSES ONLY)

6 0 6 0 4 - 1 2 0 2

■ For pickup or USPS Tracking™, visit USPS.com or call 800-222-1811.
■ $100.00 insurance included.

 **PEEL FROM THIS CORNER**

**PAYMENT BY ACCOUNT (if applicable)**
Federal Agency Acct. No. or Postal Service™ Acct. No.

**ORIGIN (POSTAL SERVICE USE ONLY)**

| ☐ 1-Day | ☐ 2-Day | ☐ Military | ☐ DPO |
|---|---|---|---|

| PO ZIP Code | Scheduled Delivery Date (MM/DD/YY) | Postage $ | |
|---|---|---|---|

| Date Accepted (MM/DD/YY) | Scheduled Delivery Time ☐ 6:00 PM | Insurance Fee $ | COD Fee $ |
|---|---|---|---|

| Time Accepted ☐ AM ☐ PM | | Return Receipt Fee | Live Animal Transportation Fee $ |
|---|---|---|---|

| Special Handling/Fragile $ | Sunday/Holiday Premium Fee $ | Total Postage & Fees | |
|---|---|---|---|

| Weight lbs. ozs. | ☐ Flat Rate | Acceptance Employee Initials $ | |
|---|---|---|---|

**DELIVERY (POSTAL SERVICE USE ONLY)**

| Delivery Attempt (MM/DD/YY) | Time ☐ AM ☐ PM | Employee Signature | |
|---|---|---|---|
| Delivery Attempt (MM/DD/YY) | Time ☐ AM ☐ PM | Employee Signature | |

LABEL 11-B, NOVEMBER 2023  PSN 7690-02-000-9996

    **UNITED STATES POSTAL SERVICE®**