**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ZILLOW GROUP, INC. and ZILLOW, INC., Plaintiff, v. MIDWEST REAL ESTATE DATA LLC, COMPASS, INC., and COMPASS ILLINOIS, INC., Defendants. | ) | No. 1:26-cv-5451<br>Judge John J. Tharp, Jr. |

**MEMORANDUM OPINION AND ORDER**

Midwest Real Estate Data LLC ("MRED") moves to compel arbitration and stay this action pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1-16. R. 30.[1] For the reasons explained below, MRED's motion to compel arbitration and stay the action is granted.

**BACKGROUND**

Plaintiff Zillow operates an online real estate platform that displays residential for-sale property listings to consumers. R. 92 at 7. Defendant MRED is a multiple listing service ("MLS") based in Lisle, Illinois. R. 30-1 ¶ 4. Defendants Compass, Inc. and Compass Illinois, Inc. (collectively, "Compass") operate a residential real estate brokerage. R. 1 at 4.

Multiple listing services ("MLSs") are organizations through which real estate brokers share property listings with one another. R. 1 ¶ 40. MLSs aggregate listings submitted by participating brokers into a centralized database and distribute those listings among their members.

[1] Citations to the docket are indicated by "R." followed by docket number, and, where necessary, a page or paragraph citation from the ECF document heading.

*Id*. Typically, MLSs operate within geographic regions, but there is no requirement that they confine their coverage to a defined area.

MLSs commonly distribute listing data through Internet Data Exchange ("IDX") and Virtual Office Website ("VOW") feeds. *Id.* ¶ 44. IDX feeds permit participating brokers to display MLS listings publicly on the Internet, while VOW feeds provide more detailed listing information to registered clients through password-protected websites. *Id.* Online platforms such as Zillow obtain listing data through these feeds. *Id.*

MRED distributes its listing data to its participating brokers and online platforms like Zillow through MLS Grid, a centralized licensing and distribution platform created by a consortium of MLSs. R. 30-1 ¶ 5. Rather than licensing listing data directly to each recipient, participating MLSs—including MRED—use MLS Grid to administer standardized data license agreements governing access to and use of IDX and VOW listing data. *Id.* ¶ 6.

This dispute arose after Zillow declined to display certain residential listings submitted to MRED by Compass because those properties had first been marketed through Compass's private listing network ("PLN") before being entered into MRED's MLS. R. 1 ¶ 6. A PLN is a system through which listings are marketed to a limited group of agents or consumers before being made available through the MLS. *Id.* ¶ 1. Compass offers sellers a multi-phase marketing strategy, under which listings may first appear on its PLN before later being entered into the MLS. *Id.* ¶ 5.

Zillow determined that listings marketed in this manner violated its Listing Access Standards ("Standards"). Adopted in April 2025, the Standards provide that Zillow will not display listings that have previously been marketed through a brokerage's private listing network or other off-market inventory (unless the seller changed agents). *Id.* ¶ 6. Consistent with those standards,

Zillow declined to display certain Compass listings after they were entered into MRED's MLS. *Id.*

MRED, in turn, concluded that Zillow's refusal to display those listings violated MLS Grid's licensing rules, which prohibit MRED from excluding listings based on certain objective criteria, including the identity of the listing brokerage firm. R. 30, Ex. C ¶¶ 9, 21; R. 30, Ex. D ¶ 13. After determining that Zillow's exclusion was based on prohibited criteria—specifically, that Compass had marketed the properties through its PLN before submitting them to the MRED MLS, MRED terminated Zillow's access to its IDX and VOW listing feeds. R. 1 ¶ 102. Zillow disputes that its exclusion of the Compass listings violated the licensing rules. R. 1 ¶ 99.

Zillow filed this action against MRED and Compass on May 12, 2026, alleging that the defendants conspired to boycott Zillow by denying its access to Chicagoland listings. R. 1 ¶ 15. Zillow then moved for a preliminary injunction on May 18, 2026, arguing that the termination of its access to the listing feeds would cause irreparable harm. R. 21 at 11-12. On May 19, 2026, MRED moved to compel arbitration and stay this action pending arbitration.[2] R. 30.

On May 21, 2026, MRED terminated Zillow's access to its IDX and VOW feeds. R. 41 at 2. The following day, Zillow filed a motion for temporary restraining order asking the Court to restore the status quo by reinstating Zillow's access to MRED's listing feeds. *Id.* Following a hearing on May 22, 2026, the Court entered a temporary restraining order based on an agreement reached by Zillow and MRED that restored Zillow's access to the listing feeds pending further proceedings while requiring Zillow to include on its platform listings that had previously been

[2] The Court notes that MRED's motion to compel asks the Court to compel arbitration only between MRED and Zillow. R. 30. No party asserts the existence of an arbitration provision binding Compass and Zillow to arbitrate disputes between them. Accordingly, the Court must address Zillow's motion for preliminary injunction as to Compass regardless of its ruling on MRED's arbitration motion.

included in MRED Listing Feeds or was located in a zip code in which MRED had at least one listing during the prior year. R. 52. On June 4, 2026, and by agreement, the Court ordered that the TRO would remain in effect until the earlier of (1) the Court's ruling on Zillow's motion for a preliminary injunction, or (2) if the Court granted MRED's motion to compel arbitration, a duly appointed arbitrator determined whether emergency relief should remain in effect pursuant to the AAA Rules for Emergency Measures of Protection. R. 74. After an expedited discovery process, the Court conducted a two-day hearing on Zillow's motion for a preliminary injunction on July 1 and 2, 2026. Briefing on the pending motions concluded on July 13, 2026.

## ANALYSIS

### I. Legal Standard

The Federal Arbitration Act ("FAA") mandates that courts enforce valid written arbitration agreements. *Tinder v. Pinkerton Sec.*, 305 F.3d 728, 733 (7th Cir. 2002) (citing 9 U.S.C. § 2). This mandate reflects a federal policy placing arbitration agreements "on equal footing with all other contracts." *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006). But arbitration remains a matter of contract, and "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT&T Techs. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986). Accordingly, the Court must determine whether an enforceable agreement to arbitrate exists before compelling arbitration. *Janiga v. Questar Cap. Corp.*, 615 F.3d 735, 740 (7th Cir. 2010).

Whether the parties agreed to arbitrate a particular dispute is ordinarily a question for a Court. Unless the parties have "clearly and unmistakably" agreed otherwise, questions of arbitrability are decided by the court rather than the arbitrator. *AT&T Techs.*, 475 U.S. at 649; *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). Parties may delegate questions of

arbitrability to the arbitrator, but such an agreement must be established by clear and unmistakable evidence. *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 69-70 (2010); *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002).

Under the FAA, arbitration may be compelled if the Court finds that: (1) a written arbitration agreement exists between the parties; (2) the dispute falls within the scope of that agreement; and (3) one party has refused to arbitrate. *Zurich Am. Ins. Co. v. Watts Indus., Inc.,* 417 F.3d 682, 690 (7th Cir. 2005). The party seeking to compel arbitration bears the initial burden of establishing the existence of an agreement to arbitrate. *A.D. v. Credit One Bank, N.A.*, 885 F.3d 1054, 1063 (7th Cir. 2018). Once that burden is met, the burden shifts to the opposing party to demonstrate that the agreement is unenforceable or that the claims fall outside its scope. *PD Logistics, LLC v. BMO Bank N.A.*, No. 1:25-cv-06559, 2026 WL 608544, at *3 (N.D. Ill. Mar. 4, 2026); *Mecum v. Weilert Custom Homes, LLC*, 239 F. Supp. 3d 1093, 1095 (N.D. Ill. 2017). In determining whether a valid arbitration agreement exists, courts apply the law governing contract formation in the relevant state. *First Options*, 514 U.S. at 944.

Because the FAA does not prescribe an evidentiary standard for motions to compel arbitration, courts apply a standard analogous to summary judgment. *Tinder*, 305 F.3d at 735. Thus, a district court may conclude as a matter of law that an arbitration agreement exists only if there is no genuine dispute of material fact concerning its formation or enforceability; otherwise, the FAA requires a trial on such issues. *Id*. In making that determination, the Court views the evidence in the light most favorable to the non-movant, but the party opposing arbitration must present specific evidence creating a genuine dispute of material fact. *Id.*; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## II. Threshold Questions

Before applying the Seventh Circuit's framework for compelling arbitration, the Court must first answer several threshold questions.

### *1. Whether the Court May Decide the Motion*

The Court first addresses whether the Court or an arbitrator should decide MRED's motion to compel arbitration. As discussed above, questions of arbitrability are presumptively for judicial interpretation unless the parties have "clearly and unmistakably" agreed to delegate those questions to an arbitrator. *First Options*, 514 U.S. at 944.

MRED contends that the arbitration clause in this case delegates questions of arbitrability because it requires arbitration "administered by the American Arbitration Association under its Commercial Arbitration Rules," because those rules authorize an arbitrator to rule on objections concerning the existence, scope, or validity of an arbitration agreement and the arbitrability of a claim. R. 30 n. 3. According to MRED, incorporation of those rules constitutes "a clear and unmistakable intent to submit arbitrability to an arbitrator." *Id*. The Court disagrees.

MRED is correct that because the FAA "reflects the principle that arbitration is a matter of contract," parties may agree not only to arbitrate the merits of a dispute, but also to "arbitrate gateway questions of arbitrability, such as whether the parties have agreed to arbitrate or whether their agreement covers a particular issue." *Rent-A-Ctr., W., Inc.*, 561 U.S. at 69-70 (cleaned up). This is known as a "delegation provision." *Id.* at 68.

However, MRED's argument that the arbitration clause here implies the existence of a delegation provision presumes that it is already clear that a valid arbitration clause exists between the parties. Not so. Here, the parties fundamentally disagree over which of two contracts governs their dispute. R. 30 at 8; R. 92 at 7-8. Only one of the contracts in question contains an arbitration

clause at all. Therefore, the Court must decide which contract governs in order to determine whether an arbitration clause exists in the first place and whether the parties are bound by it, before any questions of delegation can be considered. In *Coinbase*, the Supreme Court made clear that where "the parties agreed to *two* contracts," the question of whether they agreed to arbitrate can be answered "only by determining which contract applies." *Coinbase, Inc. v. Suski*, 602 U.S. 143, 148 (2024) (emphasis in original). *Coinbase* held that " a court must decide which contract governs," not the arbitrator. *Id.* at 152. To hold otherwise would impermissibly "elevate" the contract containing the arbitration provision over the other. *Id.*

Even assuming the Court does find that the contract containing the arbitration clause is the relevant contract in this case and that the arbitration clause is valid, this Court does not agree that the mere reference to the AAA rules within an arbitration clause constitutes the "clear and convincing evidence" required by the Supreme Court to defer "gateway questions" of arbitrability to the arbitrator. *Rent-A-Ctr., W., Inc.*, 561 U.S. at 69-70.

"[N]either the Supreme Court nor the Seventh Circuit have resolved whether incorporation of the AAA Rules constitutes 'clear and unmistakable' evidence that the parties intended the question of arbitrability to be decided by an arbitrator." *Wal-Mart Stores, Inc. v. Helferich Pat. Licensing, LLC*, 51 F. Supp. 3d 713, 720 (N.D. Ill. 2014). To the contrary, the Seventh Circuit has at least twice explicitly declined to infer delegation from arbitration provisions that incorporated the AAA rules. In *Oblix Inc. v. Winiecki,* the agreement required disputes to be resolved "exclusively by binding arbitration…in accordance with the rules then in effect of the American Arbitration Association." 374 F.3d 488, 490 (7th Cir. 2004). The Court nevertheless concluded that the agreement was "not broad enough to compel the conclusion that arbitrability is itself an arbitrable issue." *Id.* And in *Reliance Insurance Co. v. Raybestos Products Co.,* the arbitration

provisions likewise required arbitration in accordance with AAA rules, but the Seventh Circuit rejected the contention that "even the question of arbitrability should be submitted to the arbitrators," finding no clear and unmistakable evidence of a such an agreement. 382 F.3d 676, 678 (7th Cir. 2004).

The Court recognizes that a number of other courts have reached a different conclusion. District courts in this Circuit have described the contrary positions as the "consensus view" and have held that incorporation of AAA rules supplies clear and unmistakable evidence of delegation. *See, e.g., Imperial Crane Sales, Inc. v. Sany Am., Inc.*, No. 15 C 859, 2015 WL 4325483 at *4 (N.D. Ill. July 15, 2015); *Grabowski v. PlatePass, L.L.C.*, No. 20 C 7003, 2021 WL 1962379 at *3 (N.D. Ill. May 17, 2021); *Sha-Poppin Gourmet Popcorn LLC v. JPMorgan Chase Bank, N.A.*, 553 F. Supp. 3d 452, 458 (N.D. Ill. 2021); *Nandorf, Inc. v. Applied Underwriters Captive Risk Assurance Co., Inc.*, 410 F. Supp. 3d 882, 888 (N.D. Ill. 2019), appeal dismissed, 2020 WL 6257027 (7th Cir. Oct. 15, 2020) (collecting cases in this district). In *Sha-Poppin*, for example, observed that "every federal court of appeals to consider the question had adopted that view" and that the Seventh Circuit "appears to be the only circuit that has not ruled on this question." 553 F. Supp. 3d at 458. Those decisions are not persuasive authority, however, and do not displace the rule stated by the Seventh Circuit in *Oblix* and *Reliance* or, more fundamentally, *First Options'* requirement that delegation be established by clear and unmistakable evidence. *First Options*, 514 U.S. at 944. This Court does not agree that a mere reference to a set of rules can constitute the "heightened standards" requiring the parties' "clear and unmistakable" "manifestation of intent" to delegate questions of arbitrability to the arbitrator.

Thus, the Court does not find clear and unmistakable evidence that the parties agreed to remove questions of arbitrability from judicial determination. Accordingly, the presumption of judicial determination applies, and the Court will decide MRED's motion to compel arbitration.

### *2. Which Contract Governs the Dispute?*

Arbitration is a matter of contract. *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010); *Harris v. W6LS, Inc.*, 177 F.4th 777, 780 (7th Cir. 2026). Accordingly, "the first question in any arbitration dispute must be: What have these parties agreed to?" *Coinbase, Inc. v. Suski*, 602 U.S. 143, 148 (2024).

That inquiry is ordinarily straightforward because courts need only determine whether the relevant contract requires arbitration. Here, however, the parties disagree over which of two contracts governs their dispute. R. 30 at 8; R. 92 at 7-8. As *Coinbase* makes clear, where "the parties agreed to *two* contracts," the question of whether they agreed to arbitrate can be answered "only by determining which contract applies." *Id.* (emphasis in original).

That determination is dispositive. If the governing contract does not contain an arbitration provision, the Court must deny MRED's motion because there is no arbitration agreement to enforce. If the governing contract does contain an arbitration provision, the Court may then determine whether that provision is enforceable and encompasses this dispute. The Court therefore begins by determining which contract governs, which requires first identifying the nature of the parties' dispute.

#### a. *Defining the Dispute*

To determine which agreement governs this dispute, the Court must first identify the conduct Zillow alleges violated the antitrust laws.

The parties disagree over the nature of that conduct. Zillow argues that the antitrust violation arises from MRED's rulemaking and enforcement process. R. 92 at 17. According to Zillow, its "dispute arises from MRED's process for passing rules and enforcing them against MRED participants." *Id*. MRED, by contrast, contends that the case is fundamentally a contract dispute over the agreement governing Zillow's access to IDX and VOW listing feeds. R. 30 at 6. In MRED's view, the case is "nothing more than a straightforward dispute over license agreements." *Id.*

The Court agrees with neither characterization in full. Zillow is correct that this is an antitrust action, not merely a contract dispute, as MRED suggests. R. 92 at 10; R. 30 at 6. Whether Zillow has plausibly alleged an antitrust violation, or whether its allegations are better understood as sounding in contract, is not a question the Court may consider on a motion to compel arbitration. A court deciding arbitrability may not evaluate the merits of the underlying claims. *AT&T Techs.*, 475 U.S. at 649; *United Nat. Foods, Inc. v. Teamsters Loc. 414*, 58 F.4th 927, 934 (7th Cir. 2023) ("We must resist any temptation to assess the strength or weakness of the claim for any reason, even if it is only to satisfy ourselves that the claim is not frivolous."). Accordingly, for the purposes of this motion, the Court accepts Zillow's claims for what they are pleaded to be: antitrust claims. *See* R. 1 at 1.

At the same time, the Court agrees with MRED that the conduct giving rise to Zillow's antitrust claims cannot be understood apart from Zillow's access to IDX and VOW listing feeds. R. 30 at 6-7. While Zillow asserts that this case is broadly about MRED's "rule-making and rule-enforcement processes," the text of the challenged rule demonstrates that the issue is more specific. R. 92 at 17.

Zillow challenges a single provision that appears in the MLS Grid Rules.[3] R. 30, Ex. A ¶¶ 9, 21; R. 30, Ex. B ¶ 13. That provision prohibits MRED participants from excluding any IDX or VOW listing from display based on "the identity of any Participant, brokerage firm, subscriber, licensee or representative." *Id.* The Court henceforth refers to this requirement as the "Listing Exclusion Rule."

The rule itself confirms that Zillow's characterization is incomplete. The challenged conduct is not rulemaking in the abstract. It is the adoption and enforcement of the Listing Exclusion Rule, which established a condition Zillow had to satisfy to continue receiving IDX and VOW feeds. The rulemaking process and Zillow's access to the data feeds are therefore intertwined aspects of the same alleged anticompetitive conduct.

Zillow's complaint confirms that understanding. Zillow alleges that the Listing Exclusion Rule was "designed to provide MRED with a pretextual basis for retaliating against Zillow's implementation of its Standards by terminating Zillow's access to MRED's Listing Feed." R. 1 ¶ 102. By describing the rule as a "pretext" for terminating Zillow's access to MRED's listing feeds, Zillow acknowledges that the alleged anticompetitive conduct is not rulemaking generally but the adoption and enforcement of a specific rule that threatened its continued access to IDX and VOW feeds. Zillow's requests for injunctive relief reflect the same understanding. R. 21 at 21 (seeking to enjoin defendants from "taking any steps to terminate Zillow's access to MRED Listing Feeds"); R. 41 at 3 ("Zillow seeks a TRO to reinstate Zillow's longstanding access to MRED Listing Feeds

[3] The parties use different terminology to describe these rules. Zillow refers to them as "MRED's Revised Rules," while MRED refers to them as the "MLS Grid Rules." R. 1 ¶¶ 103; R. 20 at 8-9. To avoid confusion, the Court clarifies that both parties are referring to the same documents, entitled the "MLS GRID IDX and VOW Rules" and the "MLS GRID VOW Rules." R. 30, Ex. C; R. 30, Ex. D. Although these documents contain some provisions specific to MRED, the Court refers to the rules by the titles of the documents in which they appear and therefore uses the collective term "MLS Grid Rules."

until Zillow's PI Motion can be decided."). After MRED enforced the Listing Exclusion Rule, Zillow asked the Court "to reinstate Zillow's longstanding access to MRED's Listing Feeds"; it did not seek an injunction prohibiting MRED from engaging in rulemaking generally. R. 41 at 3.

In sum, the Court concludes that Zillow's antitrust claims arise from MRED's adoption and enforcement of the Listing Exclusion Rule, which threatened Zillow's access to IDX and VOW feeds.

*b. Selecting the Governing Contract*

Having identified the dispute, the Court next determines which agreement governs it. The governing agreement must be the one that establishes the conditions under which Zillow may access IDX and VOW listing feeds, including the Listing Exclusion Rule that Zillow alleges is anticompetitive. The parties disagree over which agreement that is. R. 30 at 8; R. 92 at 7-8.

Zillow contends that the MRED Participant Agreement governs because it "establishes the parties' mutual obligations and enables Zillow's access to IDX and VOW Feeds." R. 92 at 7. The Court agrees with the first proposition but not the second.

As its name suggests, the MRED Participant Agreement governs Zillow's status as an MRED Participant. R. 92, Ex. E. It establishes the rights and obligations attendant to Zillow's participation in MRED. *Id.* But the agreement itself expressly distinguishes participation in MRED from access to IDX and VOW feeds. *Id.* ¶ 12. Section 12 provides that "access to MRED's IDX or VOW database and data feeds can only occur subject to a separate written agreement." *Id*. By its own terms, therefore, the MRED Participant Agreement does not govern the conditions under which Zillow may receive IDX and VOW listing feeds; it expressly states that those rights are governed by a "separate written agreement." *Id.*

Zillow argues that no such "separate written agreement" exists because Section 12 contemplates an agreement between "MRED, Firm Participant, and Subscriber," and no agreement among those parties was ever executed. R. 92 at n.1. The Court is unpersuaded. It is undisputed that Zillow obtained access to MRED's IDX and VOW feeds through MLS Grid. R. 30 at 8; R. 92 at 8. Those feeds were necessarily provided pursuant to a written contractual arrangement. That arrangement cannot be the MRED Participant Agreement because Section 12 expressly states access to IDX and VOW data occurs only through a separate agreement. Nor can it be no agreement at all, as Zillow claims, because that conclusion would contradict Section 12's express terms that an agreement must be in place before a member can access the feeds. R. 92, Ex. E ¶ 12.

The Court finds that the "separate written agreement" governing Zillow's access to IDX and VOW data feeds is the MLS Grid Agreement.[4] R. 30, Ex. A; R. 30; Ex. B. It governs Zillow's license to receive and use IDX and VOW listing data and therefore satisfies the "separate written agreement" requirement set forth in the MRED Participant Agreement. R. 92, Ex. E § 12. That conclusion is also consistent with MLS Grid's role in the parties' relationship. As explained above, listing data flows from brokers to MRED, from MRED to MLS Grid, and from MLS Grid to licensed platforms such as Zillow. R. 30-1 ¶ 6. The contractual structure mirrors that arrangement: the MRED Participant Agreement governs participation in MRED generally, while the MLS Grid Agreement governs Zillow's license to receive IDX and VOW listing data. Indeed, Zillow acknowledges that it receives the MRED listing data through a separate agreement with MLS Grid: "Like all MRED participants, Zillow maintains a separate Data License Agreement with MLS GRID." R. 92 at 8-9.

[4] The MLS Grid Agreement consists of two data licensing agreements: one governing IDX uses and one governing both IDX and VOW uses. R. 30, Ex. A; R. 30, Ex. B. The Court refers them collectively as the "MLS Grid Agreement."

Zillow separately argues that the MLS Grid Agreement cannot govern because it is too narrow to encompass Zillow's claims. Zillow explains that its "dispute arises from MRED's process for passing rules and enforcing them against MRED Participants in general, not the MLS GRID Agreement in particular." R. 92 at 17-18. But, as explained above, the challenged conduct is not rulemaking in the abstract. Rather, it is MRED's adoption and enforcement of the Listing Exclusion Rule governing Zillow's continued access to IDX and VOW feeds. That rule appears in the MLS Grid Rules and is incorporated into the MLS Grid Agreement. R. 30, Ex. A § I; R. 30, Ex. B § I. Accordingly, even accepting Zillow's premise that this dispute concerns MRED's rulemaking, the only rule challenged in this litigation arises under the MLS Grid contractual framework rather than the MRED Participant Agreement.

Accordingly, the Court concludes that the MLS Grid Agreement governs the rights and obligations implicated by Zillow's claims. The Court therefore evaluates MRED's motion under that Agreement.

## III. <u>The MLS Grid Agreement Satisfies the FAA</u>

Having concluded that Zillow's claims arise under the MLS Grid Agreement, the Court next considers whether that Agreement satisfies the FAA's requirements for compelling arbitration. Under the Seventh Circuit's framework, arbitration may be compelled only if the Court finds: (1) a written agreement to arbitrate exists between the parties; (2) that there is a dispute among the parties within the scope of the arbitration agreement, and (3) that one party has refused to arbitrate. *Zurich*, 417 F.3d at 690.

### 1. *A Written Agreement to Arbitrate Exists*

The MLS Grid Agreement contains a mandatory arbitration provision. R. 30, Ex. A § XII(c); R. 30, Ex. B § XII(c). Neither party disputes the existence of that provision. R. 30 at 7; R.

92 at 9. Zillow instead advances two arguments against enforcement of the provision. First, Zillow argues that MRED and Zillow did not intend to arbitrate disputes between one another. R. 92 at 12. Second, Zillow argues that MRED, as a third-party beneficiary rather than a party to the MLS Grid Agreement, cannot enforce the arbitration provision. *Id.* at 9.

*a. Intent to Arbitrate*

Zillow argues that neither it nor MRED intended to arbitrate disputes between them. R. 92 at 12. According to Zillow, the MRED Participant Agreement is the only agreement executed directly by Zillow and MRED, and its forum-selection clause therefore reflects the parties' mutual intent to resolve disputes between them in federal or state court rather than through arbitration. R. 92, Ex. E ¶ 43.

The argument is unpersuasive. As explained above, Zillow's claims arise under the MLS Grid Agreement, not the MRED Participant Agreement. Arbitration is a matter of contract, and the parties' intent must be determined from the agreement governing the dispute before the Court. *Coinbase,* 602 U.S. at 148. The existence of a forum-selection clause in a separate agreement governing a different contractual relationship does not negate the mandatory arbitration provision contained in the MLS Grid Agreement.

Moreover, Zillow places more weight on the MRED Participant Agreement's forum selection clause than the provision can bear. The clause is permissive rather than mandatory. R. 92, Ex. E ¶ 43. It identifies courts in which litigation under the Participant Agreement may proceed, but it does not require the parties to litigate to the exclusion of other agreed-upon dispute resolution mechanisms. *Id.* By its terms, the forum selection clause in the participant agreement states only that state and federal courts in DuPage County Illinois have jurisdiction and venue over disputes; Zillow reads it as providing such jurisdiction and venue are exclusive, but the provision says

nothing of the sort. R. 94 at 15; R. 92, Ex. E at 5. A forum selection clause "is mandatory only if it contains clear language specifying that litigation must occur in the specified forum—and language merely indicating that the courts of a particular place 'shall have jurisdiction' (or similar) is insufficient." *Weber v. PACT XPP Techs.*, AG, 811 F.3d 758, 768 (5th Cir. 2016); *see, e.g.*, *Hunt Wesson Foods, Inc. v. Supreme Oil Co*., 817 F.2d 75, 77 (9th Cir. 1987) (clause's "shall have jurisdiction" language was permissive); cf. *Yellow Freight Sys., Inc. v. Donnelly*, 494 U.S. 820, 823 (1990) (language that federal courts "shall have jurisdiction" did not "oust[] state courts" of jurisdiction). Because the arbitration clauses are mandatory and the forum selection clause is not, the former prevails over the latter. See, e.g., *Quicken Loans Inc. v. RE/MAX, LLC*, 216 F. Supp. 3d 828, 834 (E.D. Mich. 2016).

Accordingly, even if the Participant Agreement governed this dispute, its forum selection clause would not foreclose arbitration. It therefore does not displace the MLS Grid Agreement's mandatory arbitration provision.

*b. MRED May Enforce the Arbitration Provision as a Third-Party Beneficiary*

Zillow next argues that, even if the MLS Grid Agreement governs this dispute, MRED cannot compel arbitration because it is not a signatory to that Agreement. R. 92 at 14-17. Whether a non-signatory may enforce an arbitration agreement is determined by applicable state contract law. *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009). The MLS Grid Agreement selects Delaware law, and the parties do not dispute that Delaware law governs the Agreement. R. 30, Ex. A § XII(a); R. 30, Ex. B § XII(a); R. 30 at 8; R. 92 at n.3.

Under Delaware law, only parties to a contract and intended third-party beneficiaries may enforce a contract's terms, including an arbitration provision. *NAMA Holdings, LLC v. Related World Mkt. Ctr., LLC*, 922 A.2d 417, 434 (Del. Ch. 2007); *CTF Dev., Inc. v. BML Props. Ltd.*, No.

CV 2021-0459-KSJM, 2022 WL 42041, at *8 (Del. Ch. Jan. 5, 2022). To establish intended third-party beneficiary status, the beneficiary must show that: (1) the contracting parties intended the third-party to benefit from the contract; (2) the benefit was intended as a gift or in satisfaction of a preexisting obligation; and (3) conferring that benefit was a material part of the parties' purpose in entering the contract. *Bako Pathology LP v. Bakotic*, 288 A.3d 252, 271 (Del. 2022).

MRED satisfies each requirement. First, the parties intended for MRED to benefit from the contract. The MLS Grid Agreement's "Third Party Beneficiaries" clause expressly states that "[e]ach MLS is a third-party beneficiary of MLS Grid's delivery of the MLS's MLS Data to third parties." R. 30, Ex. A § XII(j); R. 30, Ex. B § XII(j). The Agreement further provides that "each MLS is entitled to enforce the terms of this Agreement." *Id.* That language plainly demonstrates that the contracting parties intended participating MLSs, including MRED, to benefit from the Agreement. Second, the Agreement confers upon participating MLSs the contractual benefit of enforcing the restrictions governing the licensing and use of their listing data without requiring each MLS to become a signatory to every MLS Grid license agreement. R. 30 at 15-16. Finally, conferring that benefit was material to the Agreement's purpose. The Agreement exists to facilitate MLS Grid's licensing of participating MLSs' data while preserving each MLS's ability to protect its own proprietary listing data through enforcement of the Agreement's terms. *Id.* The express grant of enforcement authority reflects that purpose. Accordingly, MRED is an intended third-party beneficiary under Delaware law.

Nevertheless, Zillow argues that MRED cannot enforce the arbitration provision because it refers only to the "Parties." R. 92 at 15. The Court disagrees. That argument reads the arbitration provision in isolation. The arbitration provision defines the disputes that must be resolved through arbitration. R. 30, Ex. A § XII(c); R. 30, Ex. B § XII(c). The third-party beneficiary provision, by

contrast, provides that each participating MLS "is entitled to enforce the terms of this Agreement." R. 30, Ex. A § XII(j); R. 30, Ex. B § XII(j). Reading the Agreement as a whole, those provisions are complementary rather than conflicting. The arbitration provision establishes arbitration as the required forum for covered disputes, while the third-party beneficiary clause extends to participating MLSs the contractual right to enforce that obligation. *Id.* Nothing in Section XII(j) excludes the arbitration provision from the terms an MLS may enforce. *Id.* The Court therefore concludes that MRED's contractual right to enforce the Agreement includes the right to invoke its arbitration provision.

The authorities Zillow cites do not support a different result. *See* R. 92 at 13-16. Those decisions do not establish a rule that an intended third-party beneficiary expressly authorized to enforce an agreement may not invoke its arbitration provision merely because it refers to "Parties." Zillow is correct that the arbitration clauses in those cases referred to disputes between the contracting parties. *Id.* But the dispositive issue was not the wording of the arbitration clause itself. Rather, each court first concluded that the non-signatory lacked an independent basis to enforce the agreement because it was not an intended third-party beneficiary or otherwise possessed no contractual enforcement rights. The courts then looked to the arbitration clause's reference to the contracting parties as confirming—not creating—that conclusion.

Thus, in *Falcon Tankers, Inc. v. Litton Sys., Inc.*, the Delaware Superior Court held that the plaintiff could not invoke arbitration because it was not a third-party beneficiary of the contract and the agreement "contain[ed] no specific provision for enforcement" by the plaintiff. 300 A.2d 231, 236 (Del. Super. Ct. 1972). Likewise, in *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, the Third Circuit concluded that the non-signatory "was not a third party beneficiary" and therefore could not enforce the arbitration provision. 269 F.3d 187,

195 (3d Cir. 2001). The First Circuit's decisions in *Hogan v. SPAR Grp., Inc.* and *Morales-Posada v. Cultural Care, Inc.,* applying Massachusetts law, likewise concluded that the non-signatories were not intended third-party beneficiaries because the contracts lacked the "special clarity" required to confer enforceable rights on non-parties. 914 F.3d 34, 39 (1st Cir. 2019); 141 F.4th 301, 318 (1st Cir. 2025). It was that determination—not the arbitration clauses' reference to the "Parties"—that controlled.

Zillow cites no decision in which an intended third-party beneficiary expressly authorized to enforce an agreement was nevertheless precluded from invoking its arbitration provision solely because that provision referred to the "Parties." Nor has the Court found one. To the contrary, the authorities that Zillow relies upon recognize that a non-signatory may enforce an arbitration provision where the governing contract clearly confers that right. *Hogan*, 914 F.3d at 39; *Cultural Care*, 141 F.4th at 318.

The MLS Grid Agreement provides the contractual authority that was absent from Zillow's cited cases. It expressly identifies participating MLSs as intended third-party beneficiaries and expressly provides that "each MLS is entitled to enforce the terms of this Agreement." R. 30, Ex. A § XII(j); R. 30, Ex. B § XII(j). Nothing in the Agreement suggests that this express grant of enforcement authority excludes the arbitration provision. The Court therefore declines to read the arbitration provision's reference to the "Parties" as limiting the express grant of enforcement rights in Section XII(j).

This conclusion is consistent with Delaware law recognizing that intended third-party beneficiaries may enforce contractual provisions, including arbitration provisions. *NAMA Holdings,* 922 A.2d at 434; *CTF Dev.*, 2022 WL 42041, at *8. It is also consistent with Seventh Circuit authority recognizing that intended third-party beneficiaries may enforce contractual rights

notwithstanding their status as non-signatories. *See, e.g., IDS Life Ins. Co. v. SunAmerica, Inc.*, 103 F.3d 524, 529 (7th Cir. 1996); *Brown v. Worldpac, Inc.* No. 17 C 6396, 2018 WL 656082, at *3-4 (N.D. Ill. 2018); *ChampionsWorld, LLC v. U.S. Soccer Fed'n, Inc.*, 487 F. Supp. 2d 980, 987 (N.D. Ill. 2007).

Accordingly, the Court concludes that MRED may enforce the arbitration provision as an intended third-party beneficiary of the MLS Grid Agreement. The first requirement for compelling arbitration is therefore satisfied.

**2. *The Dispute Falls Within the Scope of the Arbitration Agreement***

The Court next considers whether Zillow's claims fall within the scope of the MLS Grid Agreement's arbitration provision. Because the MLS Grid Agreement selects Delaware law, Delaware law governs the interpretation of the arbitration clause. R. 30, Ex. A § XII(a); *First Options*, 514 U.S. at 944.

Under Delaware law, determining whether a dispute falls within an arbitration provision requires a two-step inquiry. *Parfi Holding AB v. Mirror Image Internet, Inc.*, 817 A.2d 149, 155-56 (Del. 2002). First, the Court must determine whether the arbitration provision is "broad or narrow in scope." *Parfi*, 817 A.2d at 155-56; *NAMA Holdings,* 922 A.2d at 430-31. Second, the court must apply that scope to the asserted legal claim to determine whether the claim falls within the contractual provision requiring arbitration. *Id.* If the court is evaluating a narrow arbitration clause, "it will ask if the cause of action pursued in court directly relates to the right in the contract." *Id.* Where an arbitration clause is broad in scope, Delaware courts "will defer to arbitration on any issues that touch on contract rights or contract performance." *Id.*

*a. The Arbitration Clause Is Broad*

The arbitration provision here is conspicuously broad. It requires arbitration of "[a]ny controversy or claim arising out of or relating to this Agreement." R. 30, Ex. A § XII(c); R. 30, Ex. B § XII(c). Delaware courts consistently recognize "arising out of or relating to" language as creating a broad arbitration clause. *See, e.g.*, *E. Hedinger AG v. Brainwave Sci.*, LLC, 363 F.Supp.3d 499, 508 (D. Del. 2019); *Karish v. SI International, Inc.,* No. 19501, 2002 WL 1402303, at *4 (Del. Ch. June 24, 2002)*; Detroit Medical Center v. Provider Healthnet Services, Inc.*, 269 F.Supp.2d 487, 492 (D. Del. 2003). Accordingly, the Court evaluates Zillow's claims under Delaware's broad-scope standard.

*b. Zillow's Claims Fall Within the Scope of the Arbitration Clause*

As stated above, where an arbitration clause is broad, Delaware courts "will defer to arbitration on any issues that touch on contract rights or contract performance." *Parfi*, 817 A.2d at 155-56.

Under that standard, Zillow's claims plainly fall within the arbitration provision. As explained above, the Court has already concluded that Zillow's claims arise from MRED's adoption and enforcement of the Listing Exclusion Rule governing Zillow's continued access to IDX and VOW listing feeds. The Court has likewise concluded that the rights and obligations implicated by that dispute arise under the MLS Grid Agreement.

Those conclusions largely resolve the inquiry. Because the arbitration provision broadly encompasses disputes "arising out of or relating to" the MLS Grid Agreement, and because Zillow's claims arise from rights and obligations created by that Agreement, the claims necessarily "touch on" contract rights and performance within the meaning of *Parfi*.

Accordingly, the Court concludes that Zillow's claims fall within the scope of the arbitration provision.

### 3. *Zillow Has Refused to Arbitrate*

Finally, the third *Zurich* requirement is satisfied. 417 F.3d at 690. Zillow has declined to submit its claims to arbitration and instead opposes MRED's motion to compel arbitration in this action. *See* R. 92; R. 107. Zillow has therefore refused to arbitrate within the meaning of *Zurich.*

Accordingly, the Court concludes that the MLS Grid Agreement governs the rights and obligations implicated by Zillow's claims against MRED. That Agreement contains a valid and enforceable arbitration provision, Zillow's claims against MRED fall squarely within the scope of that provision, and Zillow has refused to arbitrate those claims. The FAA therefore requires the Court to enforce the parties' agreement to arbitrate. MRED's motion to compel arbitration is granted.

## IV. Stay Pending Arbitration

Having concluded that arbitration of Zillow's claims against MRED must be compelled, the Court must determine whether this action should be stayed pending completion of the arbitration proceedings.

Section 3 of the FAA requires a district court to stay proceedings on claims that are referable to arbitration. 9 U.S.C. § 3; *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 226 (1987); *Volkswagen of Am., Inc. v. Sud's of Peoria, Inc.*, 474 F.3d 966, 971-73 (7th Cir. 2007). Accordingly, Zillow's claims against MRED must be stayed.

The Court must separately determine whether to stay Zillow's claims against Compass, which is not a party to the arbitration agreement. Although the FAA does not require such a stay, the Court has discretion to stay non-arbitrable claims where proceeding simultaneously would risk inconsistent rulings or where arbitration is likely to resolve issues material to the remaining litigation. *Volkswagen*, 474 F.3d at 971-73.

Zillow alleges that MRED and Compass participated in a single anticompetitive conspiracy centered on MRED's adoption and enforcement of the Listing Exclusion Rule. R.1 ¶ 1. To say that the factual and legal issues underlying Zillow's claims against Compass therefore substantially overlap with those that will be resolved in arbitration is an understatement—MRED and Compass are alleged to be coconspirators, and all of the conduct Compass is alleged to have undertaken will unquestionably be at issue in the arbitration of Zillow's claims against MRED. What's more, Zillow has no other claim against Compass that could be resolved without duplicating the work being done in the arbitration hearing. The Court therefore exercises its discretion to stay Zillow's claims against Compass pending completion of the arbitration proceedings. Therefore, this action is stayed entirely pending completion of the arbitration proceedings.

Although the Court compels arbitration and stays this action pending arbitration, that ruling does not moot Zillow's motion for preliminary injunctive relief. According to the Seventh Circuit, a district court may issue provisional equitable relief "in the face of arbitration." *Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134, 1141 (7th Cir. 1994) (holding that the district court did not err in "ordering the parties to arbitration and at the same time issuing a preliminary injunction"); *Sauer–Getriebe KG v. White Hydraulics, Inc.*, 715 F.2d 348, 350 (7th Cir. 1983) (holding that the plaintiff's "right to seek injunctive relief in court and its right to arbitrate are not incompatible"); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Salvano*, 999 F.2d 211, 214 (7th Cir. 1993) ("[T]he weight of federal appellate authority recognizes some equitable power on the part of the district court to issue preliminary injunctive relief in disputes that are ultimately to be resolved by an arbitration panel."). And in *IDS Life Ins. Co. v. SunAmerica, Inc.*, 103 F.3d 524 (7th Cir. 1996), the Court held that a preliminary injunction proceeding may continue even after a stay pending arbitration has been entered. The Court has therefore considered Zillow's preliminary

injunction motion and, in a contemporaneous opinion and order, has denied Zillow's motion for a preliminary injunction.

*   *   *

Dated: September 15, 2026

John J. Tharp, Jr.
United States District Judge