**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ZILLOW GROUP, INC. and ZILLOW, INC.,<br><br>Plaintiff,<br><br>v.<br><br>MIDWEST REAL ESTATE DATA LLC, COMPASS, INC., and COMPASS ILLINOIS, INC.,<br><br>Defendant. | ) | No. 1:26-cv-5451<br><br>Judge John J. Tharp, Jr. |

**MEMORANDUM OPINION AND ORDER**

For the reasons set forth in the Opinion below, the plaintiff's motion for preliminary injunction is denied. R. 21. Pursuant to the Court's June 4, 2026, order, the temporary restraining order is dissolved. R. 74.

## I. BACKGROUND

### 1. The Parties

Plaintiffs Zillow Group, Inc. and Zillow, Inc. (collectively, "Zillow") operate an online real estate platform that displays residential property listings to consumers. Defendant Midwest Real Estate Data LLC ("MRED") is a multiple listing service ("MLS") headquartered in Lisle, Illinois. R. 1 ¶ 18.[1] Defendants Compass, Inc. and Compass Illinois, Inc. (collectively, "Compass") operate a residential real estate brokerage with a strong presence in the Chicagoland area. *Id.* ¶ 25, 26.

---

[1] Citations to the docket are indicated by "R." followed by the docket number and, where necessary, a page or paragraph citation from the ECF header.

### 2. Industry Background

#### *a) Multiple Listing Services*

MLSs are organizations through which real estate brokers contribute residential property listings to a centralized database and share those listings with other participating brokers. R. 1 ¶ 40. MLSs also establish rules governing the submission, distribution, and display of listing information. *Id.* ¶ 43. MLSs commonly distribute listing data through Internet Data Exchange ("IDX") and Virtual Office Website ("VOW") feeds. *Id.* ¶ 44. IDX feeds permit participating brokers to display MLS listings publicly on the Internet, while VOW feeds provide more detailed listing information to registered clients through password-protected websites. *Id.* Online platforms, including Zillow, obtain listing data through such feeds. *Id.* MRED distributes its listing data through MLS Grid, a centralized licensing and distribution platform created by a consortium of MLSs. R. 118 at 14. MRED provides brokers, agents and platforms—including Zillow—access to its listing data through MLS Grid subject to MRED's rules governing each feed. *Id.* Zillow receives both MRED IDX and VOW data through agreements with MLS Grid. *Id.* Zillow also has entered into "direct feed" agreements with a number of brokers, by which it receives listings of those brokers directly from the brokers rather than, or in addition to, listings obtained through the MLS Grid data feeds from the MRED database of listings. *See infra* at 10.

To prevent discrimination against innovative methods of competition in the residential real estate market, MLSs have rules governing data use, based on standards promulgated by the National Association of Realtors ("NAR"). As relevant here, NAR standards have long conditioned use of listing data by MLS members on "objective criteria" such as list price, location, property type (among others). DX534 (NAR Policy Statement 8.5). MRED has incorporated that requirement into its rules. See DX004 (MRED IDX Rule 9); DX034 (MLS Grid IDX Rules at 3).

The "objective criteria" requirement was implemented following a consent judgment secured by the Department of Justice against NAR in 2008. DX427, at 18 (¶ II.5.h).

From 2019 to March of 2025, NAR had in place a "Clear Cooperation Policy" ("CCP") that required MLSs to ensure that participating brokers posted listings to the MLS within one day of being "publicly marketed." PI Tr. 124:11-125:5 (Samuelson); DX532, at 2; DX533. Based on concern that the CCP "restrict[ed] home-seller choices and preclude[d] competition from new listing services," *Nat'l Ass'n of Realtors v. United States,* 97 F.4th 951, 954 (D.C. Cir. 2024), the DOJ challenged the CCP and prompted NAR to amend the CCP to permit brokers (with the consent of the seller) to delay MLS active listing distribution—thereby effectively allowing "private listings."

***b) Listing Marketing Practices***

The dispute in this case concerns, generally, the different ways in which residential property listings may be marketed to potential home buyers, and specifically, the propriety of "private listings." The practices relevant here are best understood according to the breadth of their distribution, from listings shared only with a limited audience to listings broadly distributed through an MLS.

**1) <u>Office Exclusives</u>**

At the narrowest end are "office exclusives," also called "private listings," "pocket listings," and "secret listings," which are listings that are never marketed to the general public. R. 1 ¶ 49; R. 118 at 17; PX113 at 3. An "office exclusive" requires a seller to certify that they do not want the listing to be entered into the MLS or publicly marketed. R. 1 ¶ 49. Such listings are generally shared only within the listing brokerage and through one-to-one communications with potential buyers. *Id.*

**2) Private Listing Networks**

A private listing network ("PLN") is a system through which listings are distributed to a restricted network of agents or potential buyers rather than made broadly available to the public. R. 112 at 11. A PLN may be operated by a brokerage or by another organization, including an MLS. *Id.* at 16.

Compass operates a PLN as the first step of its "3-Phased Marketing" strategy, or "3PM." *Id.* at 12. During Phase 1 of its strategy, Compass (with the express approval of the Seller) enters an agent's listing into its PLN, called Compass "Private Exclusives," which distributes the listing among Compass agents but does not put the listing on the MLS. MRED likewise operates a PLN for its participants. R. 112 at 16. Listings placed in MRED's PLN are entered into MRED's system and are visible to MRED participants but are not distributed through MRED's active feeds for public display on brokerage websites and platforms such as Zillow until a seller directs the agent to enter the listing into the MLS. R. 1 ¶ 55.

**3) "Coming Soon" Listings**

A listing may also be "pre-marketed" publicly before it is entered into the MLS for broad distribution. R. 118 at 9. These "coming soon" products make information about an individual property publicly available while withholding the listing from distribution through the MLS for a given time, allowing the buyer to test price or generate buyer interest. PX502 at 6.

Zillow Preview is one such product. Zillow Preview is a PLN, PI Tr. 398:5-16 (Wu), which permits participating brokerages to display "coming soon" listings publicly on Zillow before active MLS distribution. R. 1 ¶ 80. Compass similarly offers "coming soon" listings during Phase 2 of its 3PM. R. 118 at 9. Dubbed "Compass Coming Soons," these listings are publicly displayed on Compass's website and on Redfin, an online portal competitor of Zillow. In Chicagoland, they are

also entered into MRED's PLN, where MRED participants can view them even though they are withheld from MRED's syndicated feeds.

**4) <u>Active MLS Distribution</u>**

At the broadest end of listing dissemination is ordinary active MLS distribution. Once a listing is made active for distribution through an MLS, such as MRED, participating brokers may receive the listing and the MLS may transmit it through IDX and VOW feeds to authorized recipients, including consumer-facing platforms such as Zillow. R. 1 ¶ 44.

**5) <u>Phased Marketing Strategies</u>**

A seller need not use only one of these methods. At the seller's request, an agent may move a listing from narrower to broader distribution over time.

Compass's 3PM process formalizes that approach. In Phase 1, Compass markets the property through its PLN as a "Private Exclusive"; in Phase 2; it publicly pre-markets the property as "Coming Soon"; and in Phase 3, it submits the listing for active MLS distribution. R. 1 ¶ 54. Similarly, an agent can first enter a listing onto MRED's PLN to share it with other MRED agents and then later publish it onto MRED's MLS for broader syndication at the client's request. *Id.* ¶ 55.

Zillow considers the type of phased marketing practice exemplified by Compass 3PM to be "selective or gated marketing" in violation of their Listing Access Standards. R. 112 at 12. Thus, this type of phased marketing strategy is at the heart of the dispute in this case.

***c) Zillow's Listing Access Standards***

Shortly after NAR amended the CCP to permit private listings, Zillow announced its Listing Access Standards ("Standards") in April 2025. R. 1 ¶ 6. The Standards govern whether Zillow will display a particular listing on its own platform. *Id.* Zillow adopted the Standards in

response to what it viewed as the increasing and alarming use of private listing networks, which Zillow contends restrict public access to listing information. *Id.* ¶ 7.

Under the Standards, a listing must be "broadly accessible to the general public in a manner that provides open access" to be eligible for display on Zillow. R. 1 ¶ 72; PX477 at 57. A listing may satisfy that requirement by, among other things, appearing on a public-facing website or being placed in an MLS for distribution and display through MLS feeds. PX477 at 57. The Standards provide that listings subject to "selective or gated marketing practices that require a consumer to work with the listing brokerage to get access" are not broadly accessible and therefore are ineligible for display. *Id.*

The Standards do not prohibit all private listings, however. The Standards make an exception for "truly private listings" for sellers who "do not want their home to be publicly marketed at all." DX558 at 2. To qualify for the exception, a private listing must meet all of the following requirements: 1) it must be shared only among agents within the brokerage and with their clients through one-to-one communications; 2) the seller must sign a waiver directing that the listing not be publicly marketed; 3) the listing cannot have been included in a brokerage's private listing network or any other inventory of private listings that is actively marketed to consumers, including on a public-facing website; and 4) access cannot be conditioned on a consumer working with the listing brokerage. PX477 at 57-58.

Zillow considers listings that have gone through Compass's 3PM to fall outside that exception because Phase 1 provides for the listings to be marketed as Compass "Private Exclusives" PLN. R. 1 ¶ 5. Moreover, although Compass does not publicly display the individual Phase 1 listings, it advertises the existence of its Private Exclusive inventory on its public website prompting consumers to obtain access by registering online, contacting Compass, or working

through an agent. R. 118 at 12-3, 17. Zillow considers advertising sufficient evidence that Compass's PLN is "actively marketed to consumers…on a public-facing website" in violation of its Standards. *Id.*, PX477 at 57. Thus, Zillow therefore treats Compass' 3PM listings as "selective or gated marketing practices" rather than type of genuinely private listings exempted by the Standards. R. 112 at 12.

The Standards do not, however, prohibit all marketing before active MLS distribution. Zillow revised the Standards to permit publicly accessible "Coming Soon" marketing, after determining that some listings offered through Zillow Preview would otherwise have violated the original policy. "Compass Coming Soons" likewise are publicly displayed on Compass and Redfin. R. 118 at 21.

MRED took the position that Zillow's Standards could violate the revised rules because Zillow might suppress listing based, directly or indirectly, on the brokerage or agent associated with the listings. *Id.* Zillow disagreed, maintaining that the Standards filtered listings based on how a property was marketed rather than on the identity of the brokerage or agent. *Id.* at 19-20. As the defendants point out, however, how a property was marketed only matters if the original agent remains the same; if the agent or brokerage changes, Zillow forgives the prior off-MLS marketing of the property. Zillow also maintains that it applies its Standards objectively "to all brokerage, all agents, all listings regardless of who they are, but of the 1,390 listings Zillow has banned, all but 8 were Compass listings. DX201.

If a listing does not comply with the Standards, Zillow will not display it while it remains with the same listing agent or brokerage, even if the listing is later entered into the MLS and distributed to Zillow through an MLS feed. PX477 at 57; R. 118 at 17; PI Tr. 57:6–25 (Samuelson). However, if the seller fires the agent who marketed the listing on a PLN, and the new agent enters

the listing directly onto the MLS, Zillow will permit the listing to be displayed on Zillow. *Id.*; PI Tr. 57:17–19 (Samuelson) ("[W]e don't think it's fair to penalize the new agent who had nothing to do with convincing the seller to put the listing in the [PLN].").

### 3. MRED and Compass Oppose Zillow's Standards

After Zillow announced its Listing Access Standards in April 2025, MRED and Compass each immediately expressed its opposition. MRED CEO Rebecca Jensen testified that she first learned the details of the Standards from a Zillow representative at an industry conference on April 15, 2025. R. 129 at 6-7. She immediately expressed concern that the Standards were inconstant with MRED's rules governing the criteria by which recipients of its listing feeds could exclude listings. *Id.*; Tr. 443:20-444:13 (Jensen). Jensen credibly testified that she reached that conclusion before discussing the Standards with anyone at Compass. *Id.*

The following day, and as previously scheduled, Jensen and Compass CEO Robert Reffkin appeared together on a panel at another industry conference. R. 129 at 7. During the panel, Reffkin stated that Zillow's Standards would "make [the] MRED [PLN] impossible" and Jensen expressed her view that the Standards conflicted with principles reflected in the 2008 settlement between the Department of Justice and the National Association of Realtors.[2] *Id.*; PX166 ¶ 8; Tr. 465:22-466:8 (Jensen). On April 17, Jensen sent Reffkin a copy of that settlement. R. 129 at 7-8; PX058; PX059.

Compass challenged the Standards in federal court, filing an antitrust action against Zillow, alleging that it had conspired with Redfin in adopting the Standards and seeking to enjoin their enforcement nationwide. R. 1 ¶ 87; 25-CV-05201 (SDNY). The court denied Compass's motion

[2] Ms. Jensen understood the 2008 settlement to reflect the principle that MLS listing data should not be used to discriminate among brokerages or to pressure agents or sellers to switch brokerages. PI Tr. 444:3-13. Because Zillow's Standards could suppress a listing based on how the listing brokerage had previously marketed it, while permitting the listing to appear if the seller switched to a different agent, Ms. Jensen viewed the Standards as inconsistent with that principle and with the requirement that listing exclusions be based on objective criteria. 446:24-447:2.

for a preliminary injunction on February 6, 2026, and Compass later dismissed the action. *Id.* MRED was not a party to that suit.

**4. MRED Clarifies Its Listing-Feed Rules**

Communications between Compass and MRED concerning Zillow continued later in 2025. In September, a Compass executive introduced MRED Chief Technology Officer Chris Haran to another Compass executive, Ryan Jensen. R. 112 at 18. Ryan Jensen then asked Haran for additional information about MRED's "objective criteria" rules and, specifically, how MRED determined what listings a recipient could exclude from its IDX feeds. *Id.*, PX084 at 1-4.

On October 1, 2025, Reffkin sent an email to representatives of several MLSs asserting that Zillow's Standards violated MLS rules. Reffkin urged each MLS to "discipline Zillow" and stated that, if Zillow did not "immediately repeal[]" the Standards, the MLSs should "block Zillow from IDX and VOW feeds." PX068 at 1. The email was forwarded to Haran on October 9, 2025. R. 112 at 18.

On October 15, 2025, MRED informed Zillow that it was clarifying the MLS Grid licensing rules governing recipients of its IDX and VOW feeds. According to MRED, the revisions did not create a new prohibition directed at Zillow but clarified restrictions already contained in the governing rules after Zillow sought clarification concerning MRED's position. R. 122 at 10. ("MRED merely clarified its nearly 20-year-old rule at Zillow's request."). DX094 at 2 ("Importantly, the updated provisions expressly prohibit excluding or filtering listings based directly or indirectly on the identity of any Participant, brokerage, or firm. A policy or display approach that limits or suppresses listings from certain brokerages would be inconsistent with the revised MRED rules with MLS Grid."). The existing rules permitted recipients to exclude listings according to "objective criteria," including criteria based on geography, price, property type, or type of listing. *Id.* at 19. The revised rules added an MRED-specific restriction providing that

"[e]xclusion criteria may not include, directly or indirectly, the identity of any Participant, brokerage firm, subscriber, licensee, or representative." *Id.*; PX070 at 3. The revised MRED rules became effective on October 29, 2025.

**5. Zillow Seeks Direct Listing Feeds**

Apart from the MLS Grid feeds it receives, Zillow has also obtained some listing information directly from individual brokerages. *Id.* at 20. As the dispute with MRED continued, Zillow sought additional direct feeds from Chicagoland brokerages. *Id.* MRED emailed its members about Zillow's efforts to obtain those feeds, stating that MRED had warned Zillow that "excluding listings may violate MRED's rules" and asking members to notify MRED if Zillow reached out to them with such a request. *Id.*; R. 1 ¶ 144; PX399; PX400; PX401; Tr. 77:16-78:19, 79:13-80:21 (Samuelson).

Compass, meanwhile, terminated several existing direct-feed arrangements with Zillow. R. 112 at 20. On February 17, 2026, Compass terminated its preexisting authorization for Zillow to receive direct feeds of Compass listings in Chicagoland. R. 1 ¶ 116. On May 8, Compass terminated direct-feed authorizations with Zillow nationwide on behalf of Compass brokerage entities and subsidiaries. R. 112 at 20.; PX073. Zillow contends these terminations were intended to deprive it of an alternative source of listing data if MRED terminated its MLS feeds. R. 1 ¶ 110. Compass disputes that characterization and maintains that its decisions concerning direct feeds were made independently. R. 118 at 26.

**6. MRED's National Expansion**

Meanwhile, MRED and Compass began discussing a broader relationship concerning MRED's PLN. Those discussions, internally referred to as "Project Derby," contemplated expanding MRED membership to Compass agents outside MRED's traditional Chicagoland territory. R. 112 at 21. Zillow maintains that MRED's announced expansion was a pretext, and

that its real objective was to force Zillow to abandon its Standards in lieu of having its data feeds from MRED cut off.

On April 24, 2026, MRED issued a press release announcing its national expansion initiative. PX075. In the press release, MRED stated that it would "protect and safeguard agents who participated in its PLN from being banned or penalized by third party portal and IDX feed recipients." *Id.* at 1. The press release also announced that Compass had committed to make its nationwide inventory, including Private Exclusive and Coming Soon listings, available to MRED participants, and quoted Reffkin as saying that Compass wanted "to support MLSs, like MRED, that value, support, and protect their customers, who are real estate agents, from retaliation by other MLSs and portals." *Id.* Compass also agreed to subsidize MRED membership for as many as 100,000 Compass agents. R. 112 at 21; PX052 at 3.

**7. MRED Suspends Zillow's Listing Feeds**

Following the announcement of MRED's national expansion, Compass agents outside Chicagoland began entering listings into MRED. R. 112 at 22. On May 5, 2026, MRED contacted Zillow concerning six Compass listings located in Florida, Georgia, and California that appeared in MRED's feeds but were not displayed on Zillow. *Id.* The following day, MLS Grid contacted Zillow concerning nine Compass listings, including the six identified by MRED. R. 1 ¶ 128-131; R. 113-11 at 119. MLS Grid advised Zillow that continued noncompliance could result in fines or suspension of Zillow's access to MLS data. *Id.* Zillow maintained that the listings had been suppressed because they previously had been marketed in violation of its Listing Access Standards. R. 1 ¶ 11. MRED maintained that Zillow's refusal to display listings contained in its feeds violated MRED's rules governing use of those feeds. *Id.*

The disagreement ultimately resulted in MRED suspending Zillow's access to its IDX and VOW feeds. R. 112 at 23. The suspensions removed more than 30,000 MRED listings from

Zillow's platform, although Zillow was able to restore a portion of those listings (about half) through other sources, including direct brokerage feeds. *Id.*

### 8. Procedural History

Zillow filed this action against MRED and Compass on May 12, 2026, alleging violations of §§ 1 and 2 of the Sherman Act. R. 1 ¶ 15. Zillow then moved for a preliminary injunction on May 18, 2026. R. 21. On May 19, 2026, MRED moved to compel arbitration and stay Zillow's claims against it pending arbitration. R. 30.

On May 21, 2026, MRED terminated Zillow's access to its IDX and VOW feeds. R. 41 at 2. The following day, Zillow filed a motion for temporary restraining order seeking restoration of those feeds. *Id.* Following a hearing on May 22, 2026, the Court entered a temporary restraining order based on an agreement reached by the parties that restored Zillow's access to the listing feeds but substantially limited its enforcement of its Standards against MRED listings that had been marketed through its PLN, pending further proceedings. R. 52.

On June 4, 2026, the Court ordered that the TRO would remain in effect until the earlier of (1) the Court's ruling on Zillow's motion for a preliminary injunction, or (2) if the Court granted MRED's motion to compel arbitration, a duly appointed arbitrator determine whether emergency relief should remain in effect pursuant to the AAA Rules for Emergency Measures of Protection. R. 74. The Court conducted a two-day hearing on Zillow's motion for a preliminary injunction on July 1 and 2, 2026. R. 102. The parties then filed post-hearing briefs and responses. R. 112; R. 118; R. 122; R. 127; R. 129; R. 131.

## II. DISCUSSION

### 1. Zillow's Antitrust Theories

Zillow asserts two antitrust claims arising from the above events. First, under § 1 of the Sherman Act, Zillow contends that MRED and Compass "conspired to implement a boycott of the

residential for-sale listings supply to Zillow." R. 1 ¶ 93. Zillow alleges that the defendants "implemented this conspiracy to coerce Zillow to abandon its competitive response to private listings, to weaken Zillow's pro-consumer and pro-transparency business model, and to protect Compass's and MRED's own private listings from legitimate competition from Zillow and others." *Id.* Zillow characterizes the alleged agreement as a per se unlawful group boycott and, alternatively, as an unreasonable restraint of trade under the rule of reason.

Second, Zillow asserts a monopolization claim against MRED under § 2 of the Sherman Act. Zillow alleges that MRED possesses monopoly power in a market for "Residential Real Estate Listing Creation and Distribution" in Chicagoland and that it used its "monopoly power over Chicagoland listings as leverage to force competitors like Zillow to abandon their pro-transparency business models nationwide." R. 1 ¶ 10.

Defendants contest both theories.[3] They deny that MRED and Compass entered into any agreement concerning Zillow's access to listings and maintain that their respective conduct resulted from independent business decisions. R. 118 at 24-25. MRED and Compass contend that they each made independent decisions to terminate Zillow's feeds in response to Zillow's failure to comply with MRED's rules. *Id.* Defendants argue that Zillow's alleged agreement is not per se unlawful because the defendants are not horizontal competitors, nor is it an unreasonable restraint of trade under the rule of reason, and that Zillow cannot establish antitrust injury. R. 118 at 23. Relatedly, MRED argues that Zillow's inability to establish a relevant market defeats its § 2 claim of monopoly power and its failure to establish an antitrust claim in § 1 defeats the § 2 claim as well. R. 122 at 5-9.

[3] Compass is not named in the § 2 monopolization claim.

**2. Preliminary Injunction Standards**

"The granting of a preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 389 (7th Cir. 1984). This "extraordinary and drastic remedy" is available only when the movant carries its burden of persuasion by a "clear showing." *Goodman v. Illinois Dep't of Fin. & Pro. Regul.*, 430 F.3d 432, 437 (7th Cir. 2005) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)); *see also Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1068 (7th Cir. 2018).

"To determine whether a situation warrants such a remedy, a district court engages in an analysis that proceeds in two distinct phases: a threshold phase and a balancing phase." *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the U.S. of Am., Inc.*, 549 F.3d 1079, 1085-86 (7th Cir. 2008); *see also Life Spine, Inc. v. Aegis Spine, Inc.,* 8 F.4th 531, 539 (7th Cir. 2021). To survive the threshold phase, the movant must show that: (1) it is likely to succeed on the merits; (2) traditional legal remedies would be inadequate; and (3) it will suffer irreparable harm without preliminary relief. *Girl Scouts*, 549 F.3d at 1086. If the movant fails to establish any one of those requirements, the Court "must deny the injunction." *Id.*

If the movant clears the threshold phase, the Court proceeds to the balancing phase. *Girl Scouts*, 549 F.3d at 1086. There, the Court weighs the irreparable harm against the harm the government would suffer if relief were granted, applying a sliding scale. *Id.* "The more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor." *Roland Mach.*, 749 F.2d at 387; *see also GEFT Outdoors, LLC v. City of Westfield*, 922 F.3d 357, 364 (7th Cir. 2019). The Court must also consider whether the injunction is in the public interest, including effects on non-parties. *Courthouse News Serv.*, 908 F.3d at 1068.

### 3. Analysis of Preliminary Injunction Factors

#### *a) Likelihood of Success on the Merits*

To establish a likelihood of success on the merits, Zillow must make a "strong showing" that it is likely to succeed on at least one of its claims. *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 762-63 (7th Cir. 2020). A mere "possibility of success" or "better than negligible chance" is insufficient. *Id.* (citing *Winter v. Natural Resources Defense Council*, 555 U.S. 7, 22 (2008)). At the same time, Zillow need not establish that it will "definitely win the case," nor does a "strong showing" require proof by a preponderance of the evidence. *Id.* at 763. Rather, it "normally includes a demonstration of how the applicant proposes to prove the key elements of its case." *Id.*

The Sherman Act protects consumers from injury resulting from diminished competition. *Agnew v. Nat'l Collegiate Athletic Ass'n*, 683 F.3d 328, 335 (7th Cir. 2012); *Banks v. NCAA*, 977 F.2d 1081, 1087 (7th Cir. 1992). Accordingly, an antitrust plaintiff must demonstrate "not only an injury to himself, but an injury to the market as well." *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1107 (7th Cir. 1984). Section 1 and 2 of the Sherman Act address different threats to competition: § 1 governs concerted restraints of trade, while § 2 prohibits monopolization. 15 U.S.C. §§ 1-2; *Vakharia v. Swedish Covenant Hosp.*, 190 F.3d 799, 810 (7th Cir. 1999); *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 210 (1959).

Zillow asserts claims under both provisions as to MRED; it presents only a § 1 claim against Compass. The Court begins with the Section 1 claim.

**1) <u>Section 1 Claim</u>**

Section 1 of the Sherman Act "forbids contracts, combinations, and conspiracies in restraint of trade." *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 654 (7th Cir. 2002) (citing 15 U.S.C. § 1). To establish a § 1 claim, a plaintiff must show that the defendants

"(1) entered into an agreement[4] that (2) unreasonably restrained trade in the relevant market and (3) caused the plaintiff an antitrust injury." *Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*, 15 F.4th 831, 833 (7th Cir. 2021); *Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*, 29 F.4th 337, 349 (7th Cir. 2022). The Seventh Circuit has described a three-step framework for evaluating evidence of an anticompetitive agreement. The Court first reviews the plaintiff's evidence of agreement; next, whether the defendants have shown that the challenged conduct is as compatible with legitimate business activity as with illegal conspiracy; and, if the evidence remains ambiguous, whether the plaintiff has identified evidence tending to exclude the possibility that the defendants were pursuing legitimate independent interests. *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 599 (7th Cir. 1995) (citing *Market Force, Inc. v. Wauwatosa Realty Co.*, 906 F.2d 1167 at 1171-72 (7th Cir. 1990)). "[C]onduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Omnicare,* 629 F.3d at 707 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986)).

Zillow contends that MRED and Compass (1) entered into an agreement to cut off Zillow's access to residential real estate listings; (2) that agreement constituted a horizontal group boycott

[4] A note on terminology. Courts in the Seventh Circuit use different formulations of the first element of a § 1 claim. One common formulation tracks the statutory language and requires proof of a "contract, combination or conspiracy." *See, e.g.*, *Denny's Marina, Inc. v. Renfro Prods.*, Inc., 8 F.3d 1217, 1220 (7th Cir. 1993). But the Seventh Circuit has explained that, for purposes of § 1, "the distinction among these terms is unimportant." *United States v. Nunez*, 673 F.3d 661, 664 (7th Cir. 2012). Zillow characterizes the alleged arrangement here as a "conspiracy." R. 1 ¶ 1. Yet, as *Nunez* explains, "'conspiracy' in section 1 is simply a pejorative term for a contract… signifying an agreement, a meeting of minds." 673 F.3d at 664. Accordingly, more recent Seventh Circuit formulations speak of the first element in terms of whether the defendants' "entered into an agreement." *Ass'n of Am. Physicians & Surgeons, Inc. v. Am. Bd. of Med. Specialties*, 15 F.4th 831, 833 (7th Cir. 2021); *Marion Diagnostic Ctr., LLC v. Becton Dickinson & Co.*, 29 F.4th 337, 349 (7th Cir. 2022). Because that formulation most directly captures the threshold inquiry, the Court uses "agreement," rather than "conspiracy," throughout this Opinion.

and therefore unreasonably restrained trade in the market for "Chicagoland Residential Real Estate Listing Creation and Distribution"; and (3) the resulting reduction in competition caused Zillow antitrust injury. R. 1 ¶ 176-186. The Court considers each element of the claim in turn.

***(a) Agreement***

The first element requires Zillow to establish an agreement between MRED and Compass. That requirement reflects § 1's threshold distinction between concerted and independent action. Section 1 "does not reach conduct that is wholly unilateral" and "[i]ndependent action is not proscribed." *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984); *Monsanto Co. v. Spray-Rite Serv. Corp.,* 465 U.S. 752, 761 (1984). "It is well settled that no liability can be predicated on Section 1 in the absence of some type of concerted action." *Quality Auto Body, Inc. v. Allstate Ins. Co.*, 660 F.2d 1195, 1200 (7th Cir. 1981). Thus, the "crucial question is whether respondents' conduct toward petitioner stemmed from independent decision or from an agreement, tacit or express." *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 541 (1954).

An agreement exists where the defendants have reached "a meeting of minds" or "a unity of purpose or a common design and understanding." *American Tobacco Co. v. United States*, 328 U.S. 781, 810 (1946). The defendants therefore must have consciously agreed to act together; there can be no "unwitting conspirator." *United States v. Standard Oil Co.*, 316 F.2d 884, 890 (7th Cir. 1963).

The existence of an agreement is analytically distinct from whether the agreement unreasonably restrains trade. *See Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 186 (2010); *see also*, Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1400b (5th ed. 2025) ("In the antitrust universe, the existence of an agreement must always be considered separately from the question of legality."); *Always Towing & Recovery, Inc. v. City of Milwaukee*, 2 F.4th 695, 704 (7th Cir. 2021) (holding that the existence of a contract established agreement but not a

resulting unreasonable restraint of trade). Whether the agreed-upon conduct unreasonably restrained trade is therefore addressed separately under the second element of Zillow's § 1 claim.

Relatedly, a civil § 1 claim does not require proof that the defendants specifically intended to restrain trade or otherwise achieve an anticompetitive purpose. *In re Surescripts Antitrust Litig.*, No. 19-CV-06627, 2022 WL 22872026, at *2 (N.D. Ill. Aug. 29, 2022) ("Specific intent to restrain trade…is not a necessary element of a section 1 violation."); *United States v. U.S. Gypsum* Co., 438 U.S. 422, 436 n.13 (1978); *McLain v. Real Est. Bd. of New Orleans, Inc.*, 444 U.S. 232, 243 (1980). Accordingly, the first element asks whether the defendants knowingly agreed to jointly undertake the challenged conduct; Zillow need not show that they entered that agreement with the specific purpose of producing an anticompetitive result. Evidence of motive or purpose may nevertheless bear on whether an agreement existed.

That distinction matters here because Zillow describes the alleged arrangement in several ways. It refers, for example, to an "agreement to harm Zillow," R. 112 at 25, an "agreement to cut off a rival," R. 127 at 8, an agreement to "force Zillow to abandon its Standards," R. 112 at 8, and an agreement to "protect their PLN listings from Zillow's competitive threat," R. 1 ¶ 9. Those formulations describe asserted purposes, motives, or anticompetitive characteristics of the alleged agreement. For the purposes of the first element, however, the Court must identify the conduct Zillow contends MRED and Compass actually agreed to undertake.

Zillow repeatedly identifies that specific conduct as cutting off Zillow's access to residential real estate listings. *See, e.g.*, R. 1 ¶ 1 (alleging defendants agreed to "cut off Zillow's access to *all* of the real estate listings controlled by MRED and Compass in Chicagoland"); R. 1 ¶ 177 (alleging an agreement "to deprive Zillow of for-sale residential property listings data in Chicagoland"); R. 1 ¶ 93 (defendants agreed to "implement a boycott of the residential for-sale

listings supply to Zillow"); R. 21 at 16 (alleging that defendants agreed "to cut off Zillow's access to listing feeds"). The relevant question under the first element is therefore whether the defendants consciously agreed to act together to undertake that conduct. If MRED and Compass intentionally acted together to cut off Zillow's access to residential real estate listings, Zillow has established an agreement. If each defendant decided independently to pursue that objective, and not pursuant to a conscious agreement between them, then Zillow has not established an agreement under § 1.

"No formal agreement is necessary to constitute an unlawful conspiracy." *American* Tobacco, 328 U.S. at 809. An agreement may be established through direct or circumstantial evidence. *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 629 (7th Cir. 2010). Direct evidence is "explicit and requires no inferences to establish the proposition or conclusion being asserted." *Tichy v. Hyatt Hotels Corp.*, 376 F. Supp. 3d 821, 834 (N.D. Ill. 2019). Circumstantial evidence, by contrast, relies on inferences drawn from parallel conduct and additional factual circumstances, known as plus factors.  Zillow contends that the record contains both direct and circumstantial evidence of an anticompetitive agreement between MRED and Compass.

#### ***(b) MRED's National Expansion***

Zillow identifies what it characterizes as the pretextual "Alliance" between MRED and Compass as direct evidence of such an agreement. PX220 (describing email to Compass agents advising that MRED suspended its listing feed to Zillow as "the most damning evidence" of agreement between MRED and Compass."). To support that contention, Zillow relies on MRED's April 24, 2026, press release announcing the MRED initiative, as well as several contemporaneous

communications concerning the initiative. PX220.[5] This evidence fails, however, to establish a strong likelihood that MRED and Compass agreed to work in concert to deprive Zillow of listings.

The April 24, 2026 press release states that Compass would enter listings from across the country into MRED as part of MRED's national expansion. R. 113-5 at 45 (PX075). It further states that MRED would "protect and safeguard agents who participate in its PLN from being banned or penalized by third party portals and IDX feed recipients." *Id.* Zillow argues that this language plainly refers to Zillow and demonstrates that the initiative was intended to target Zillow's Standards. R. 21 at 12; R. 112 at 18.

Even accepting Zillow's interpretation of that language, the announcement does not establish the agreement alleged—that MRED and Compass agreed to cut off Zillow's access to residential listings. On its face, the announcement establishes that Compass would participate in MRED's expansion. The statement identified by Zillow within the press release establishes that MRED intended to protect PLN participants from penalties imposed by third-party portals and IDX recipients. It does not state that MRED and Compass agreed to terminate Zillow's MRED listing feeds, terminate Compass' direct feeds to Zillow, prevent other brokers from supplying Zillow with listings, or otherwise foreclose Zillow's access to residential listing data.

Zillow also relies on contemporaneous communications that more explicitly connect the initiative to Zillow's Standards. Compass materials state that MRED's expansion would protect agents against actions by platforms such as Zillow and extend that protection to agents using MRED outside Chicagoland. PX019. Other communications similarly express the hope or expectation that listings entered into MRED would be protected from Zillow's Standards. PX016;

[5] Zillow maintains that the press release announcing MRED's national expansion was a joint press release. R. 112 at 25. MRED contests that characterization, and Reffkin testified at the hearing that "[t]his is not my press—our press release." PI Tr. 354:6-9.

PX408; PX496. But none expressly stated that MRED and Compass agreed to cut off Zillow's access to residential listings.

Zillow points to notes by Compass taken during a call with MRED discussing MRED's expansion as evidence of agreement because the notes expressly mention the potential loss of Zillow's Chicagoland feed. PX016. The notes expressly state, however, that "This is an MRED program with no contract or agreement between Compass and MRED." *Id.* Zillow focuses, however, on comments in the notes stating that "MRED is protecting all listings and agents from Zillow bans" and that MRED had indicated that, if Zillow banned listings, Zillow "could lose their feed in Chicagoland." *Id.* The notes also state, in bold text, "[t]hat's what we hope and that is the intent," in reference to whether MRED's expansion would protect Compass private listings. *Id.* But "the hope and intent" referenced in the notes is clearly that listing Private Exclusives with MRED will protect them from application of Zillow's Standards because MRED had "constructed a policy that prohibits Zillow from filtering listings." *Id*. The notes thus evince an expectation (albeit an erroneous one) that MRED would not shut down Zillow's listing feed because Zillow would comply with MRED's objective criteria rule. Compass's objective, then, was not to work with MRED to cut off Zillow's listing feed; Compass sought to capitalize on the rules that MRED had implemented to preserve that feed.

Zillow also points to a May 20, 2026, Compass communication that it characterizes as directing Compass agents to stop entering listings into MRED after MRED suspended Zillow's feeds. PX220. Zillow characterizes the email as its "most damning evidence" of agreement for two reasons. R. 112 at 35. First, it emphasizes the timing as evidence that Compass and MRED were acting pursuant to a common plan. *Id.* Second, Zillow contends that the email exposes MRED's asserted expansion as "pretextual." *Id.* In Zillow's view, if Compass' agents were genuinely

entering listings into MRED in order to help MRED expand nationally, there would have been no reason for Compass to discourage further submissions into MRED immediately after Zillow's feeds were suspended. *Id.* Zillow therefore asks the Court to infer that "since the sole goal of the Alliance was to protect and restore Compass failed Private Exclusive listings to Zillow's website, entering those listings into MRED became unnecessary once Zillow's Listing Feeds had been cut." *Id.*

But Zillow's characterization of the communication overstates what the document itself says. PX220. The email does not instruct Compass agents to stop submitting listings to MRED. Rather, it states that, in light of MRED's suspension of Zillow's feeds, "we do not believe that entering your listings into MRED will offer additional protection for your listings that start as a Private Exclusive." PX220 at 1. Zillow characterizes this as an "about-face" on Compass's alliance with MRED, but it reads more like a status update ("I'm reaching out to let you know") advising Compass agents that, for the moment, listings sent to MRED were not likely to make it to Zillow. That is information that any Compass broker would want, whether Compass had a national alliance with MRED or not. That communication may indicate that Compass reassessed the utility of submitting private listings to MRED once Zillow no longer received MRED's feeds. But it does not follow that MRED's expansion was a pretext for an agreement to terminate Zillow's feeds.

The record also provides legitimate, procompetitive reasons for MRED's expansion. MRED's contemplation of expansion beyond Chicagoland predated Zillow's Standards, PI Tr. 467:4-9, and has had listings from every state. *Id.* at 466:24-25. Both Jensen and Reffkin testified that expanding MRED's reach would increase competition among MLSs by giving brokers and agents additional choices for listing distribution. R. 129 at 13; PI Tr. 324:2–17 (Reffkin), 470:5–19 (Jensen). That evidence undercuts Zillow's contention that the expansion was merely a pretext

for coordinated action against Zillow. There is also evidence that MRED and Compass were pursuing their opposition to Zillow independently. According to the defendants, MRED's CEO Jensen formed and communicated her objection to the Standards before consulting Compass, and although Compass separately sued Zillow in the Southern District of New York seeking to enjoin the Standards nationwide, MRED was not a party to that action. R. 129 at 7; R. 113-11 at 27.

The materials concerning MRED's expansion therefore may show that both MRED and Compass had serious concerns about the effects of Zillow's Standards on PLN listings and that each believed that MRED's expansion could help protect PLN listings. But that proposition is not evidence of an agreement. The materials concerning the April 2026 initiative do not establish, without inference, that MRED and Compass agreed to cut off Zillow's access to residential real estate listings. To reach that conclusion, the Court must infer an agreement from the parties' communications, their asserted motives, and their subsequent conduct. Evidence requiring inference is not direct evidence. *In re High Fructose Corn Syrup,* 295 F.3d at 661. MRED's national expansion is no "smoking gun." *Omnicare*, 629 F.3d at 706.

***(c) Parallel Conduct***

Circumstantial evidence of an anticompetitive agreement generally requires parallel conduct and plus factors. Parallel conduct is conduct that "would probably not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties." *In re Text Messaging Antitrust Litig.*, 630 F.3d at 628 (quoting *Bell Atlantic Corp. v Twombly*, 550 U.S. 544, 557 n. 4 (2007)). Evidence of parallel conduct generally requires additional factual circumstances—or "plus factors"—to support an inference of agreement. *Id.*; *Tichy*, 378 F. Supp. 3d at 834. Relevant plus factors may include conduct against apparent economic self-interest, market concentration, opportunities to collude, a high level of interfirm communications, changes in conduct, and a common motive to conspire.

*See In re Loc. TV Advert. Antitrust Litig.*, No. 18 C 6785, 2020 WL 6557665 at *9 (N.D. Ill. Nov. 6, 2020); *Tiz*, 2024 WL 2785142 at *17; *Tichy*, 376 F. Supp. 3d at 834. The Court considers the alleged parallel conduct alongside the plus factors, rather than in isolation. *See, e.g.*, *Tiz, Inc. v. S. Glazer's Wine & Spirits, LLC*, No. 22 CV 1648, 2024 WL 2785142, at *17 (N.D. Ill. May 30, 2024); *In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 790 (N.D. Ill. 2017).

Zillow identifies two principal strands of parallel conduct that it contends support an inference of the alleged agreement. First, Zillow points to evidence that Compass urged MLSs, including MRED, to terminate Zillow's listing feeds if Zillow enforced the Standards. R. 21 at 13-14. Zillow then points to MRED's subsequent revision of its rules, its threats to terminate Zillow's MRED feed if Zillow continued applying the Standards to MRED-supplied listings, and its eventual suspension of those feeds. *Id.* According to Zillow, the sequence of those events supports an inference that Compass and MRED were acting pursuant to an advance understanding concerning Zillow's access to listing data. *Id.*

Second, Zillow points to the defendants' respective actions affecting alternative sources of listing data. Compass terminated direct broker feeds that separately supplied Compass listings to Zillow. *Id.* at 14. Zillow further contends that MRED warned its members against providing Zillow with substitute direct feeds, thereby impeding Zillow's ability to replace listing data it could no longer obtain through MRED. *Id.* Zillow argues that those actions complemented MRED's suspension of its own feeds and support an inference that MRED and Compass had agreed to cut off Zillow's access to residential real estate listings.

These circumstances provide some support for Zillow's inference, but they do not distinguish agreement from independent action. Compass had an independent reason to oppose the Standards because their application to private listings rendered Compass's three-phase marketing

strategy "impossible." R. 118 at 25-26. Under the Standards, a Compass listing marketed privately before being entered into the MLS would later be excluded from Zillow, requiring Compass to choose between aspects of its preferred marketing strategy and distribution of the listing on Zillow. *Id.*

MRED offers its own independent explanation for its conduct. MRED maintains that Zillow's refusal to display certain listings supplied through MRED violated the rules governing recipients' use of MRED data. *Id.* at 25. According to MRED, its subsequent revisions did not create a new prohibition directed at Zillow but clarified restrictions already contained in the governing rules after Zillow sought clarification concerning MRED's position. R. 122 at 10-11. MRED further contends that, as the MLS responsible for administering those rules, it acted independently when it threatened and ultimately suspended Zillow's feed after Zillow continued to engage in conduct MRED regarded as a violation. R. 118 at 25.

That explanation also bears on Compass's communications with MRED. Compass was an MRED member affected by MRED's rules and therefore had reason to respond by "complaining loudly" to MRED, the entity responsible for rule-enforcement, about conduct it believed violated those rules. R. 188 at 19. The Supreme Court has cautioned against inferring agreement merely from complaints followed by responsive action, observing that complaints may be "natural" and "unavoidable" in an ongoing distribution relationship. *Monsanto Co.*, 465 U.S. at 763-64. As the Supreme Court in *Monsanto* stated, "permitting an agreement to be inferred merely from the existence of complaints, or even from the fact that termination came about in response to complaints, could deter or penalize perfectly legitimate conduct." *Id.* (cleaned up). Thus, Compass's advocacy that MRED enforce its rules, followed by MRED's enforcement action, is consistent with Zillow's theory of agreement, but it is also consistent with Compass complaining

to the entity responsible for administering the rules and MRED independently deciding how to enforce them.

The same competing explanations apply to the defendants' conduct concerning substitute feeds. MRED contends that discouraging members from supplying Zillow with substitute feeds was part of its effort to make the suspension of Zillow's MRED feeds effective as an enforcement mechanism. And Compass contends that its decision to terminate its own direct feeds reflected its independent interests and its response to the Standards.

Thus, the parallel conducted asserted does not in and of itself exclude independent action. The Court now considers these allegations of parallel conduct alongside Zillow's asserted plus factors.

***(d) Plus Factors***

Zillow relies on several plus factors to distinguish its inference of agreement from the competing explanations supplied by MRED and Compass. It argues that the defendants acted against their economic self-interest, operated in a highly concentrated market, had repeated opportunities to coordinate, engaged in extensive communication concerning Zillow and the Standards, and shared a motive to protect PLN listings from the effects of Zillow's Standards. R. 21 at 14-15; R. 112 at 27-30.

***(i) Communications***

As Zillow observes, MRED and Compass communicated frequently concerning Zillow's Standards, MRED's rules, private listings, and MRED's April 2026 expansion. *Id.*; *see e.g.*, PX058; PX059; PX084; PX085; PX101; PX102; PX061; PX062; PX063. The record therefore establishes ample opportunity for MRED and Compass to reach an agreement. *Id.* That said, the probative force of the defendants' communications and opportunities to coordinate provide is negligible. Compass was an MRED member and, even before the present contretemps, actively

participated in MRED governance, so it is hardly surprising to learn that they communicated frequently: they would have done so even in the absence of the dispute over listing standards. Nor is it particularly revealing that they discussed Zillow's adoption of its Standards. Evidence that MRED and Compass rarely communicated until this controversy arose would be more telling, but that evidence is lacking.

Further, the evidence is uncontradicted that Rebecca Jensen, MRED's CEO, learned of Zillow's adoption of its Standards on April 15, 2025, and immediately concluded that the Standards violated MRED's objective criteria rule and were inconsistent with the 2008 settlement between the DOJ and Nar, and so notified Zillow that day.

***(ii) Economic Self-Interest***

Zillow's economic self-interest argument adds little to the stew. Zillow argues that both defendants benefited from having listings displayed on Zillow and therefore acted contrary to their interest by taking steps that reduced that exposure. R. 112 at 27. But exposure on Zillow was only one interest relevant to the defendants' decisions. Compass also had an asserted interest in preserving the Private Exclusive component of its three-phase marketing strategy. R. 118 at 23. Compass has a better gage on what is in its economic self-interest that does Zillow; rightly or wrongly, it believes 3PM produces now, or will in the future, more profit. The fact that Compass may have sacrificed some short-term benefit derived from having its listings carried on Zillow to preserve its 3PM marketing strategy is entirely consistent with legitimate conduct.

The inference of acting contrary to economic self-interest is particularly strained as to MRED. MRED is a cooperative MLS whose functions include collecting and distributing listing information and providing services, including its PLN, to its members. R. 118 at 14; R. 129 at 11. MRED does not make any significant profit from listings being displayed on Zillow—MRED receives just $360 a year from Zillow as membership dues, and in exchange provides Zillow access

to all of MRED's listing data, according to defendants' testimony. R. 118 at 15; PI Tr. 325:24–326:1. Zillow has not shown that continued distribution of MRED data to Zillow provided an economic benefit of such significance that suspending Zillow's feed would have been economically irrational absent an agreement with Compass. Even assuming MRED sacrificed some benefit by suspending Zillow's feed, that does not establish that its conduct was contrary to its overall interests when considered alongside its asserted interests in enforcing its rules and serving its members.

***(iii) Other Plus Factors***

Zillow's reliance on market concentration does not materially alter the analysis. That factor depends on the viability of Zillow's proposed definition of the relevant market, which it describes as the market for "Chicagoland Residential Real Estate Listing Creation and Distribution." The defendants dispute that market definition. The Court will examine Zillow's asserted relevant market later in this Opinion, in its analysis of Zillow's claim of unreasonable restraint of trade.

Zillow also asserts that the defendants had a common motive to protect PLN listings from the effects of the Standards. The record contains evidence that both MRED and Compass were concerned about the effects of Zillow's Standards on PLN listings. R. 118 at 25-26. But a common interest in resisting the same policy does not itself establish an agreement concerning how to resist it. Compass had an independent reason to oppose a policy affecting its Private Exclusive listings and three phase marketing strategy. *Id.* MRED likewise asserts independent reasons grounded in the administration of its rules and services it provides to its members. *Id.* MRED's also offers a PLN as a service to its members and therefore had its own reason to oppose a policy that could make that service less attractive to agents by jeopardizing subsequent distribution of those listings on Zillow. *Id.* The existence of overlapping interests therefore makes similar or complementary action less probative of an agreement than it otherwise might be.

Considered together, Zillow's' alleged parallel conduct and asserted plus factors lend some plausibility to Zillow's argument that MRED and Compass acted pursuant to an agreement. But the evidence does not sufficiently distinguish that inference from the competing inference that MRED and Compass independently pursued aligned interests. The record shows extensive communications, opportunities to coordinate, overlapping opposition to Zillow's Standards, and actions that reduced Zillow's access to listing data. R. 21 at 14-15; R. 112 at 27-30. Those communications are consistent with Zillow's theory, but they are also compatible with Compass independently acting to preserve its preferred marketing strategy and MRED's independent interest in enforcing its rules and pursuing the interests of its members. Zillow has not, therefore, identified evidence that "tends to exclude" the possibility of independent action. *Monsanto*, 465 U.S. at 764*; Serfecz*, 67 F.3d at 599.

Accordingly, Zillow has not made the required strong showing that MRED and Compass agreed to cut off Zillow's access to residential real estate listings. Its direct evidence does not establish that agreement, and its circumstantial evidence does not sufficiently distinguish the inference of agreement from the competing inference of independent conduct. Zillow therefore has not made the required showing of an agreement under § 1.

That conclusion is sufficient to defeat Zillow's § 1 claim at the preliminary injunction stage. *Quality Auto Body, Inc.*, 660 F.2d at 1200 ("It is well settled that no liability can be predicated on Section 1 in the absence of some type of concerted action."). Nevertheless, for the sake of completeness, the Court considers the remaining Section 1 elements.

***(e) Unreasonable Restraint***

The second element requires Zillow to show that the alleged agreement unreasonably restrained trade. Although § 1 refers broadly to agreements "in restraint of trade," the Supreme Court has long interpreted the statute to prohibit only *unreasonable* restraints. *Ohio v. Am. Express*

*Co.*, 585 U.S. 529, 540 (2018); *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 885 (2007).

Courts generally determine whether a restraint is unreasonable under the rule of reason, which requires an assessment of the restraint's actual effect on competition in a relevant market. *Am. Express*, 585 U.S. at 541; *Leegin*, 551 U.S. at 885-86. A narrow class of restraints, however, is unlawful per se because experience has shown that they "always or almost always tend to restrict competition and decrease output" and possess little or no redeeming competitive value. *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 289 (1985). Because per se rules dispense with an inquiry into market circumstances and competitive effects, courts apply them only to restraints whose "nature and necessary effect are so plainly anticompetitive that no elaborate study of their industry is needed to establish their illegality." *Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679, 692 (1978).

Zillow contends that the alleged agreement constitutes a horizontal group boycott and is therefore unlawful per se. R. 127 at 8. Defendants contend that per se treatment is inappropriate and that the alleged restraint must instead be evaluated under the rule of reason. R. 118 at 23. The Court therefore first considers the appropriate mode of analysis.

#### *(i) Per Se Analysis*

Zillow argues that the alleged agreement is a horizontal group boycott and therefore constitutes a per se unreasonable restraint of trade. R. 127 at 8. The Court disagrees.

The Supreme Court has long treated certain group boycotts as unlawful per se. *See, e.g., Fashion Originators' Guild of America, Inc. v. FTC*, 312 U.S. 457 (1941); *Klor's Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207 (1959). "The common attribute of per se illegal boycott is a concerted attempt by a group of competitors at one level to protect themselves from competition

from non-group members who seek to compete at that level." *U.S. Trotting Ass'n v. Chicago Downs Ass'n, Inc.*, 665 F.2d 781, 788 (7th Cir. 1981) (internal quotation marks omitted).

"Not all group boycotts, however, are per se unlawful." *Spray-Rite Serv. Corp. v. Monsanto Co.*, 684 F.2d 1226, 1236 (7th Cir. 1982), aff'd, 465 U.S. 752 (1984). Accordingly, "pinning a label on conduct, such as 'tying' or 'boycott,' is not enough if the conduct does not necessarily have the pernicious effect the label suggests." *BCB Anesthesia Care, Ltd. v. Werries*, 36 F.3d 664, 666 (7th Cir. 1994). Indeed, the Seventh Circuit has cautioned that "[t]he danger of rote application of the per se rule to all conduct that can be called a "group boycott" is that the sound teachings of experience will be extended into new and unfamiliar areas, where they have no proper application." *U.S. Trotting Ass'n*, 665 F.2d at 788. Per se treatment is therefore appropriate only where the restraint is "manifestly anticompetitive" and experience permits the Court to condemn it without a detailed examination of its anticompetitive effects. *Id.* at 789.

The Seventh Circuit has distilled that paradigm into two essential elements of a per se group boycott: "(1) at least some of the boycotters are competitors of each other and the target and (2) the boycott is designed to protect the boycotters from competition with the target." *Spray-Rite Serv. Corp.*, 684 F.2d at 1236. Zillow has not sufficiently demonstrated either element.

First, the alleged boycott is not an agreement among horizontal competitors directed at another horizontal competitor. *Id.* In antitrust parlance, a horizontal restraint is an agreement among firms competing at the same level of the market, while a vertical restraint involves firms at different levels of production and distribution. *Valley Liquors, Inc. v. Renfield Importers, Ltd.,* 822 F.2d 656, 650 n. 5 (7th Cir. 1987). MRED and Compass are not horizontal competitors; their relationship is vertical: "Compass receives data feeds of listings from MRED. And so it is what

we refer to in economics as a vertical relationship of a supplier to recipient of inputs, and also it is a customer of the output of MRED. So it is vertical in both senses." PI Tr. 490:15-19 (Aron).

The Supreme Court and the Seventh Circuit have made clear that "antitrust law does not permit the application of the per se rule in the boycott context in the absence of a horizontal agreement." *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 138 (1998); *Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928, 936 (7th Cir. 2000) (stating that "horizontal agreements among competitors, including group boycotts, [are] illegal *per se*"). (*Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911, 916 (7th Cir. 2020) ("Sharif has not alleged a horizontal agreement (i.e., among competitors) … so the case is not subject to the rule of per se illegality under Section 1.").

Here, Zillow asserts that "Compass, MRED and Zillow are horizontal competitors in the Listing Creation and Distribution market." R. 112 at 31. That relationship is not self-evident, nor is Zillow's proposed market one that courts have acknowledged or recognized. MRED does not create listings; it operates an MLS that collects and distributes listing information among its members—including both Zillow and Compass. Compass is a brokerage whose agents market and sell real estate—that is, it creates listings. Zillow operates a platform that neither creates nor distributes listings but rather receives and displays them. R. 1 ¶ 18, 25. Whether those three entities compete at the same level in a single antitrust market is sharply disputed. *Compare* R. 112 at 31 ("Compass, MRED, and Zillow are horizontal competitors in the Listing Creation and Distribution market"), with R. 118 at 23 ("Compass and MRED are not horizontal competitors"). Resolving that question requires the relevant market analyses provided by a rule of reason approach. The Court therefore cannot simply assume the horizontal competitive relationship necessary to place the alleged restraint within the per se boycott paradigm.

Second, Zillow has not demonstrated that "the boycott is designed to protect the boycotters from competition with the target." *Spray-Rite Serv. Corp.*, 684 F.2d at 1236. In other words, the anticompetitive character of the conduct alleged is not sufficiently obvious to justify condemnation without further analysis. The Seventh Circuit has cautioned that the per se rule should not be applied to conduct that may be designed "to achieve some other goal" than excluding competition. *U.S. Trotting Ass'n*, 665 F.2d at 788.

Here, the alleged anticompetitive conduct—cutting off Zillow's access to residential real estate listing feeds—is not itself price fixing, market allocation, bid rigging, or other restraint whose anticompetitive character courts have long treated as self-evident. *See Agnew*, 683 F.3d at 336 ("[h]orizontal price fixing and output limitation are classic examples of behavior that is considered anticompetitive per se"). And the record presents plausible explanations for the conduct other than an effort by MRED and Compass to protect themselves from competition with Zillow. MRED contends that its actions reflect enforcement of rules governing the distribution and use of listing data, while Compass contends that its conduct reflected its own listing and marketing strategy. R. 118 at 23; R. 129 at 11. The existence of these plausible alternative explanations is relevant because it prevents the Court, on the present record, from characterizing the alleged agreement as a "naked restraint of trade with no purpose except stifling of competition." *U.S. Trotting Ass'n*, 665 F.2d at 789.

Courts have found that similar potential explanations to those presented by the defendants have foreclosed per se analysis. For example, in *Trotting,* the court rejected per se treatment where a membership organization enforced its own rules and the record did not show that the rules were intended solely to suppress competition. *Id.* Moreover, the Seventh Circuit has evaluated restrictions associated with multiple listing services under the rule of reason. *See Reifert v. S. Cent.*

*Wis. MLS Corp.*, 450 F.3d 312, 321-22 (7th Cir. 2006) (applying the rule of reason to an MLS-related restraint).

Accordingly, Zillow has not made the strong showing necessary to establish a per se unlawful group boycott. It has not shown, without market analysis that per se treatment is intended to avoid, that MRED, Compass and Zillow occupy the horizontal competitive relationship required for per se treatment of group boycott restraints. Nor is the alleged agreement so manifestly anticompetitive that its anticompetitive significance can be determined without considering the market circumstances and the explanations for the challenged conduct. The Court therefore analyzes the alleged restraint under the rule of reason.

***(ii) Rule of Reason Analysis***

Having concluded that the alleged restraint is not unlawful per se, the Court analyzes it under the rule of reason. For group boycotts, "the usual anti-trust concern is that the parties to the agreement are trying to create, protect, or enhance a dominant position in the market." *Fourqurean v. Nat'l Collegiate Athletic Ass'n*, 143 F.4th 859, 869 (7th Cir. 2025). Therefore, to decide whether such an agreement unreasonably restrains trade, "we consider its potential to deprive the public of the benefits of competition, especially competitive prices, taking into account market power and market structure." *Id.*

To do this, the rule of reason employs a three-step, burden-shifting framework. At the first step, the plaintiff bears the burden of showing that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market. *Am. Express Co.*, 585 U.S. at 541. That inquiry requires the plaintiff to provide a "precise market definition in order to demonstrate that a defendant wields market power, which, by definition, means that the defendant can produce anticompetitive effects." *Agnew*, 683 F.3d at 335. In other words, the first step requires the plaintiff to establish (1) a market definition, (2) market power, and (3) anticompetitive effects.

*Id.* If the plaintiff carries that burden, the burden shifts to the defendant to demonstrate a procompetitive rationale for the restraint. *Am. Express Co.*, 585 U.S. at 541. If the defendant does so, the burden shifts back to the defendant to show that procompetitive efficiencies could reasonably be achieved through less anticompetitive means. *Id.* at 542.

Zillow has not made the required showing at the first step. Most fundamentally, it has not sufficiently established the relevant market in which the alleged restraint purportedly harms competition. Because it has not established a relevant market, it inevitably follows that Zillow has not made a sufficiently strong showing of market power in a properly defined market. And even assuming both a cognizable market and sufficient market power, the present record does not sufficiently show a substantial anticompetitive effect in that market.

a) Market Definition

Under the rule of reason, the plaintiff bears the burden of showing that the challenged agreement has an anticompetitive effect "on a given market within a given geographic area." *Agnew*, 683 F.3d at 335. To do this, the plaintiff must provide a "precise market definition." *Id.* The plaintiff must define both a product market and a geographic market. *Id.*

"A relevant market under the Sherman Act is comprised of the commodities reasonably interchangeable by consumers for the same purposes." *Sharif Pharmacy, Inc.*, 950 F.3d at 916 (cleaned up). "A properly defined market excludes other potential suppliers (1) whose product is too different (product dimension) or too far away (geographic dimension) and (2) who are not likely to shift promptly to offer defendant's customers a suitably proximate (in both product and geographic terms) alternative." *Id.* (citing Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 530a (4th ed. 2019)). The market also must "correspond to the commercial realities of the industry." *Sharif Pharmacy, Inc.*, 950 F.3d at 918 (quoting *Brown Shoe Co. v. U.S.*, 370 U.S. 294, 336 (1962)).

Zillow posits a product market for "Residential Real Estate Listing Creation and Distribution." R. 1 ¶ 141. According to Zillow's expert, Dr. Lawrence Wu, that market consists of platforms that listing agents can use to create residential listings and distribute them to buyers and their agents. PX110 at 9. Zillow therefore places, within a single market, listings distributed broadly through an MLS, listings marketed through private listing networks such as those operated by MRED and Compass, and listings pre-marketed through Zillow Preview. *Id*. Its theory is that these platforms compete for listing agents deciding where and how to market their listings. The proposed geographic market is Chicagoland. *Id.* at 32-33.

The Court is not persuaded that Zillow has made a sufficiently strong showing that those services comprise a single antitrust product market. The difficulty is not simply that MRED, Compass and Zillow are different kinds of entities; different products or services may belong to the same market if consumers regard them as substitutes. *Sharif Pharmacy, Inc.*, 950 F.3d at 918. ("A cluster of products can comprise a relevant product market if the cluster is itself an object of consumer demand.") (internal quotation omitted); *United States v. Grinnell Corp.*, 384 U.S. 563, 572–73 (1966) ("We see no barrier to combining a single market a number of different products or services where that combination reflects commercial realities.").

Rather, the problem is that Zillow has not sufficiently demonstrated that the different functions performed here are substitutes in that sense. MRED operates an MLS through which its members submit and distribute listing information and also offers a PLN as a service to its members. R. 1 ¶ 55. Compass is a brokerage whose agents represent sellers and market properties, including through Compass' three-stage marketing program, which includes its private listing network. *Id.* ¶ 5. Zillow operates a consumer-facing real estate platform and, through Zillow Preview, permits certain properties to be marketed before broader distribution. *Id.* ¶ 80. Zillow

places these functions together because each can play some role in the creation or distribution of listing information. PX110 at 9. But participation in a common process does not itself establish interchangeability. The plaintiff must show "commodities reasonably interchangeable by consumers for the same purposes." *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956).

The record suggests substantial complementarity among at least some of these services. Compass agents submit listings to MRED, and Compass listings marketed privately may later enter MRED's MLS. Zillow, in turn, receives listing information originating with brokers and distributed through MRED and displays it on its online platform. But complementarity does not make MRED and Compass substitutes for one another; sellers foreclosed from using Compass's services to create listings and market properties cannot turn to MRED for those services instead. MRED and Compass both have PLNs, but they serve different functions—Compass uses its PLN as the first stage of its 3PM listing marketing strategy, MRED uses its PLN as service to its users for sharing listings with members and getting them ready for entry into MRED's MLS. Zillow has not adequately shown that a listing agent confronted with a change in the price, quality, or availability of one of those services would respond by substituting another in its place. It is difficult to imagine that an agent seeking to market a listing using Compass' 3PM marketing service, which begins with entry into Compass' PLN, would be content to simply use MRED's PLN instead, which is not a marketing service at all but rather an internal database. The Court therefore cannot find that these products are "reasonably interchangeable by consumers for the same purposes." *E. I. du Pont de Nemours & Co.*, 351 U.S. at 395. Nor can the court conclude that products and services are in the same market when they are not good substitutes for one another. *Reifert*, 450 F.3d at 318.

Zillow's market theory also does not clearly correspond to the "commercial realities" reflected in the record. Zillow's theory treats listing agents as the relevant consumers choosing among MRED, Compass, and Zillow to distribute their listings, yet its asserted competitive harms focus principally on buyers' and sellers' access to listing information and on transparency in the downstream housing market. *See, e.g.* R. 1 ¶ 46. For example, Zillow states that if defendants' terminated Zillow's listing feeds, "consumers [sic] welfare would be harmed because consumers who previously relied on Zillow's transparent and innovative technology to find local homes for sale would be blocked from using their preferred platform." R. 1 ¶ 12. That is an asserted harm to the ability of buyers to find homes, not of listing agents to choose between platforms to enter listings.

Those propositions are not necessarily inconsistent, but Zillow has not sufficiently connected them through a coherent market definition. The record instead indicates that MRED, Compass, and Zillow perform distinct and sometimes complementary functions in the process by which listings are created, marketed, distributed, and displayed.

The Court therefore concludes that Zillow has not made a strong showing that its proposed market for Residential Real Estate Listing Creation and Distribution corresponds to the commercial realities of the industry or encompasses services that are reasonably interchangeable.

The Court need not separately reject Zillow's proposed Chicagoland geographic market. A relevant geographic market must be defined through a "pragmatic" and "factual" inquiry and must correspond to the commercial realities facing buyers and sellers. *Sharif Pharmacy Inc.*, 950 F.3d at 918. Even assuming Chicagland constitutes an appropriate geographic market, Zillow has not adequately established the product market to which that geographic boundary would apply.

b) Market Power

Zillow has not sufficiently defined a relevant market, but even if it had, it would also be required to show that MRED and Compass possess sufficient market power for the challenged restraint to produce substantial anticompetitive effects. *Agnew,* 683 F.3d at 346. Under Seventh Circuit law, market power is the ability to raise prices above competitive levels by restricting output. *Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1331 (7th Cir. 1986). Market power is a threshold requirement of a rule of reason claim. *Id.*

Market power may be inferred from a sufficiently substantial share of a properly defined relevant market, but market share is only a proxy for the ultimate inquiry: whether the defendant actually has the ability to restrict market output or otherwise exercise power over competitive conditions. *Id.* at 1335-37.

Zillow principally relies on MRED's control over Chicagoland listing data. R. 1 ¶ 155. It asserts that more than 98 percent of residential listings in Chicagoland are distributed through MRED and accordingly assigns MRED approximately 98 percent of the proposed Listing Creation and Distribution market. *Id.* ¶ 153. Zillow further argues that MRED's ability to threaten termination of Zillow's listing feed demonstrates its power to coerce compliance with MRED's rules. R. 127 at 17. Zillow likewise asserts that MRED is the only source of aggregated, timely for-sale listing data in Chicagoland and that a competing platform cannot offer a viable service without access to such data. R. 1 ¶ 154.

The difficulty with Zillow's market share evidence follows from the market-definition problem discussed above. As *Agnew* explains, a precise market definition is ordinarily necessary to demonstrate that the defendant possesses market power capable of producing anticompetitive effects. 683 F.3d at 346. Zillow derives MRED's asserted 98 percent share from the same proposed

Listing Creation and Distribution market that the Court has concluded Zillow has not adequately established. The Court therefore cannot infer market power from that percentage alone.

Nor does MRED's ability to terminate Zillow's access to its listing feed independently establish market power in Zillow's proposed antitrust market. That evidence demonstrates that MRED controls an important input for Zillow and possesses substantial leverage in its relationship with Zillow. But the relevant inquiry is power over competitive price or output in a market, not simply leverage over an individual trading partner. *Ball Mem'l Hosp., Inc.* 784 F.2d at 1331.

Zillow does not define a specific output that has been reduced by the defendants' agreement such that consumers have been harmed by reduced choice. While they argue that the existence of PLNs generally reduces "transparency" for consumers because they cannot see all the listings immediately if some listings are held in a PLN, that does not mean that PLNs truly reduce the "output" of listings; PLNs may affect how listings are accessed, and that may reduce the number of listings available on Zillow, but there is no basis to infer that the overall supply of residential real estate listings will be affected. As far as reducing price goes, while Zillow's expert claimed that PLNs lower sale prices for home sellers, the methodology behind such evidence was highly contested by the defendants. R. 118 at 32; PI Tr. 509:11–510:3 (Aron). Moreover, even a lower sale price that resulted by using a strategy that the seller themselves chose (for privacy or convenience, for example) is not necessarily evidence of consumer harm. *Id.* Thus, without a sufficiently defined market connecting MRED's control over its data to the ability to restrict market-wide output, increase prices, or otherwise diminish competition, the Court cannot equate control of the feed with market power for the purposes of the rule of reason. *Id.*

Accordingly, Zillow has not made a sufficiently strong showing of market power. That conclusion follows principally from its failure to establish the relevant market in which the asserted

power would operate. Even assuming MRED possesses substantial leverage over Zillow by virtue of its control of Chicagoland listing data, that showing does not by itself establish the market power necessary to infer substantial anticompetitive effects under the rule of reason.

***(f) Anticompetitive Effects***

Zillow has also failed to make the required showing that the alleged restraint has caused a substantial anticompetitive effect in that market. *Agnew,* 683 F.3d at 346.

Under *American Express*, anticompetitive effects include such harms as "reduced output, increased prices, or decreased quality in the relevant market." 585 U.S. at 541. The ultimate inquiry remains harm to the competitive process in the relevant market, rather than merely injury to one market participant. *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 135 (1998) (the plaintiff "must allege and prove harm, not just to a single competitor, but to the competitive process, *i.e.*, to competition itself"). Thus, when Zillow describes the harm that would be caused by its inability to enforce the Standards anywhere and would be forced to display failed Compass Private Exclusive listings, contrary to Zillow's pro-transparency mission, that is not a competitive harm; it's a harm to Zillow, but there's no reason that requiring Zillow to include properties that were originally private listings harms competition or reduces the supply of listings.

Zillow contends that the defendants' conduct excludes Zillow Preview as a pro-transparency competitor to the defendants' private listing networks, entrenches MRED's position, and diminishes incentives to compete through greater transparency, quality and lower prices. R.1 ¶ 181-85. Zillow further argues that depriving it of MRED's listing feed and Compass' direct listing feeds weakens Zillow's ability to attract buyers and sellers and ultimately threatens its viability as a competitive listing platform. R. ¶ 183-185.

Zillow repeatedly characterizes the relevant competitive harm in terms of reduced "transparency." R. 1 ¶ 1 (stating that the action seeks to "restore…transparency," "stand up for

listings transparency," and describing defendants' "naked effort to coerce pro-transparency competitor.") Indeed, the Court notes that the word "transparency" is repeated over 300 times in the parties' briefs. But transparency is not, standing alone, a goal of the antitrust laws and opacity is not an anticompetitive effect under the Sherman Act. Transparency is relevant only insofar as Zillow shows that reduced transparency translates into cognizable harm to competition, such as reduced output, increased prices, decreased quality, or diminished consumer choice. Like the other participants in this dispute, Zillow has legitimate commercial interests of its own, including attracting listings and users to its platform. The Court therefore evaluates the competitive consequences of the challenged conduct rather than treating Zillow's stated policy rationale as a proxy for consumer welfare.

The record more clearly demonstrates harm to Zillow than harm to competition generally. The alleged agreement threatens Zillow with the loss of listing data and may make it more difficult for Zillow to implement its Standards or operate Zillow Preview as Zillow prefers. But disadvantage to a particular competitor does not, without more, establish reduced competition in the relevant market. The rule of reason asks whether the challenged conduct produces a substantial anticompetitive effect on the market itself. *NYNEX Corp.*, 525 U.S. at 135.

The challenged conduct occurs against the backdrop of competing approaches to the marketing of residential listings. The defendants contend that private and phased-marketing options expand sellers' choices and that MRED's rules preserve its ability to administer listing data for its members. R. 122 at 12. The relevant question is whether the alleged restraint substantially reduces competition among those alternatives.

On the present record, Zillow has not sufficiently shown that it does. Zillow has not shown a market-wide reduction in the output of listings, an increase in the price consumers pay for

brokerage or listing services attributable to the alleged restraint, or a market-wide reduction in the quality of listings. Its principal evidence instead concerns the listings Zillow itself may lose, the resulting effect on Zillow traffic, and the competitive pressure Zillow says it would otherwise place on the defendants private listing practices, causing a "negative spiral." R. 21 at 20. Those concerns are relevant, but on this record, they do not establish the substantial consumer harm required at the first step of the rule of reason. As Zillow's own expert testified, no "downward spiral" has ensued from Zillow's inability to enforce its Standards. PI Tr. 431:8–16 (Wu) ("Zillow has not been in a downward spiral in Chicagoland" even though "Zillow has never enforced its standards in Chicago"); *see also* PI Tr. 513:2 – 514:18 (Aron: if Zillow were to falter for any reason, consumers would not be worse off given the number and size of competing on-line platforms); R. 118 at 22.

The competitive effects of the defendants' conduct also cannot be assessed in isolation from the policy to which they were responding. Defendants contend that Zillow developed its Standards in response to the growth of private listings and the competitive threat Zillow perceived from private listing networks. R. 118 at 16; DX533. By rendering listings ineligible for display on Zillow if they had previously been marketed through PLNs, the Standards were designed, at least in part, to discourage listing agents from using those PLNs. *Id.* Zillow characterizes that deterrent effect as promoting transparency and broad consumer access. R. 127 at 25.

The Standards, however, promote one form of distribution by discouraging another. Defendants contend that sellers may affirmatively value private or phased marketing and that many privately marketed listings ultimately reach the MLS and broader public platforms in any event. On that view, restrictions on PLNs may reduce, rather than expand, the range of options available to sellers. R. 118 at 30. That possibility matters because the rule of reason is concerned with

market-wide effects such as output, increased prices, or decreased quality. *American Express*, 585 U.S. at 541

The record also identifies plausible procompetitive effects from the challenged conduct. MRED's national expansion could permit it to compete with other MLSs for members and listings, potentially increasing the choices available to brokers, agents, and sellers. R. 118 at 14-15. Reffkin testified that "the more MLSs are competing with each other, the better it is for agents and sellers," and Jensen likewise testified that agents, sellers and buyers benefit from competition among MLSs. *Id.* at 5.

In addition, enforcement of MRED's objective criteria rule is consistent with a broader policy judgment by federal antitrust authorities that NAR's policy requiring listings to be placed immediately into an MLS can themselves restrict competition from alternative brokerage and listing models. R. 118 at 16-17. The DOJ has supported challenges to NAR's Clear Cooperation Policy, which generally required submission to an MLS within one day of public marketing, and the defendants cite that position as supporting greater competition between MLS-based and alternative methods of listing distribution. *Id.* The NAR rule was amended in 2025 to allow for exemptions to the one-day rule in certain circumstances, including delays allowing listing agents to pursue the marketing strategy of their choice for a period of time before the listing is officially syndicated through the MLS.[6] Zillow has resisted amendments to the NAR one-day policy since at least 2024, and has advocated against amending the rule before the DOJ, state attorneys general, and state legislatures. *See* R. 118 n. 6; DX496 (April 2024 Zillow white paper to DOJ); DX489 at 14–21; DX498 at 1; DX509; R. 1 ¶ 51.

[6] *See* "NAR Introduces New Flexibility for Sellers While Retaining Clear Cooperation Policy," https://www.nar.realtor/news/real-estate-news/nar-introduces-new-flexibility-for-sellers-while-retaining-clear-cooperation-policy (last visited Sep. 9, 2026).

Accordingly, Zillow has not carried its initial burden under the rule of reason. It has not sufficiently established a cognizable relevant market, has not made a sufficiently strong showing of market power in a properly defined market. And even assuming both, Zillow has not shown that the alleged restraint substantially harms competition rather than principally Zillow. Because Zillow fails at the first step, the Court need not proceed through the remaining burden-shifting steps concerning the defendants' asserted procompetitive justification and less restrictive alternatives. *See Am Express.*

***(g) Antitrust Injury***

The final element of a Section 1 claim requires a showing that the alleged restraint caused "antitrust injury" to the plaintiff. Antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977). The requirement ensures that a plaintiff's injury resulting from the "competition-reducing aspect or effect" of the challenged conduct, rather than merely from conduct that happens to injure the plaintiff. *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 329 (1990).

The doctrine thus distinguishes injury caused by diminished competition from injury caused by competition itself. As courts in this Circuit have explained, the antitrust laws do not protect firms merely from losing business to rivals or from other competitive pressures. *Ehredt Underground, Inc. v. Commonwealth Edison Co.*, 90 F.3d 238, 240 (7th Cir. 1996). Rather, "a producer's loss is of no concern of the antitrust laws, which protect consumers from suppliers rather than suppliers from each other." *Black Bear Sports Grp., Inc. v. Amateur Hockey Ass'n of Illinois, Inc.*, 962 F.3d 968, 971 (7th Cir. 2020). The relevant question, therefore, is not simply whether Zillow has been injured, but whether its injury flows from a reduction in competition of the kind that the Sherman Act condemns.

Zillow contends that it will lose listing data, site traffic, users, and competitive position if MRED terminates its listing feed and Compass withholds its direct feeds. R. 1 ¶ 165. It further contends that those injuries result from the defendants' effort to exclude Zillow Preview as a competing platform and to prevent Zillow from enforcing its Standards, which Zillow views as an important check on the growth of private listing networks. *Id.* ¶ 169. Zillow alleges, for example, that losing non-Preview listings will reduce Zillow Preview's ability to attract buyers and sellers and thereby weaken it as a competitor, and that preventing Zillow from enforcing its Standards will facilitate further growth of private listing networks. *Id.*

Those alleged injuries could constitute antitrust injury if Zillow showed that they flowed from an unlawful reduction in competition. But it has not done so. As explained above, Zillow has not made a sufficiently strong showing that the alleged restraint substantially harms competition in a cognizable relevant market. The record more clearly shows that termination of the feeds would deprive Zillow of a commercially valuable source of listing data and impair its ability to implement its preferred listing policies. R. 1 ¶ 165. Those harms may be substantial, but injury resulting from the loss of a valuable commercial relationship or from restrictions on a firm's preferred business strategy is not antitrust injury unless it flows from the competition-reducing feature of the challenged restraint. *Brunswick Corp.*, 429 U.S. at 477.

To the extent Zillow's claimed injury stems from the growth of private listing networks or from its diminished ability to constrain their use through its Standards, Zillow has not shown that the resulting competitive pressure itself causes antitrust injury. As discussed above, the record permits competing accounts of whether private and phased-marketing practices reduce consumer access or instead provide sellers with additional options. Antitrust laws protect competition, not a competitor's preferred competitive environment. *Id.* Because Zillow has not sufficiently

established the predicate harm to competition, it likewise has not established the required nexus between that harm and its anticipated loss of listings, traffic, users, or competitive position.

Accordingly, Zillow has not made the strong showing necessary to establish antitrust injury. Because Zillow has not made a strong showing as to any of the three required elements of its § 1 claim—an agreement, an unreasonable restraint of trade, and antitrust injury—it has not demonstrated a likelihood of success on that claim.

A plaintiff seeking a preliminary injunction need establish a likelihood of success on only one claim. The Court therefore proceeds to Zillow's § 2 claim.

**2) <u>Section 2 Claim</u>**

Zillow also asserts a monopolization claim against MRED under § 2 of the Sherman Act. To prevail on a § 2 monopolization claim, a plaintiff must show "(1) the possession of monopoly power in a relevant market and (2) the willful acquisition or maintenance of that power," as distinguished from growth or development resulting from a superior product, business acumen, or historical accident. *Grinnell Corp*., 384 U.S. at 571. A private plaintiff must also establish antitrust injury. *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 482 (7th Cir. 2020).

***(a) Monopoly Power***

Zillow has not made a sufficiently strong showing that MRED possesses monopoly power in a cognizable relevant market. Monopoly power is the power to control prices or exclude competition in the relevant market. *Grinnell Corp*., 384 U.S. at 571. Although monopoly power may be inferred from a dominant share of a properly defined market, the market must first be identified. *Id.* That requirement is dispositive here. Zillow's § 2 claim relies on the same proposed Chicagoland Residential Real Estate Listing Creation and Distribution market the Court has already concluded Zillow has not sufficiently established. R. 1 ¶ 189. Without a cognizable relevant market, MRED's asserted 98 percent market share cannot establish monopoly power.

The Court does not discount MRED's substantial practical importance in the Chicagoland real-estate ecosystem. The record indicates that MRED serves as the central repository and distributor of residential listings in the area, and Zillow contends that competing platforms cannot offer a viable service without access to comprehensive and timely listing data. R. 1 ¶ 191. But control over an important input is not synonymous with monopoly power absent a showing of the market in which that power is exercised. "Defining the relevant market is an essential prerequisite to a showing of monopoly power." *Depuy Inc. v. Zimmer Holdings, Inc.*, 343 F. Supp. 2d 675, 686 (N.D. Ill. 2004); *Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704, 712 (7th Cir. 1979) ("A definition of the relevant market is essential because without a definition of that market there is no way to measure the defendant's ability to lessen or destroy competition.") (cleaned up).

Because Zillow has not made that predicate showing, it has not established a likelihood of success on the monopoly-power element.

***(b) Willful Maintenance***

Even assuming Zillow had sufficiently established monopoly power, it has not made a strong showing that MRED willfully maintained that power through exclusionary conduct. Possession of monopoly power alone does not violate § 2. The challenged conduct must reflect the willful acquisition or maintenance of monopoly power through exclusionary means, rather than legitimate competition or other lawful business conduct. *Grinnell Corp.*, 384 U.S. at 570-71.

Zillow argues that MRED maintained its monopoly by using control over its listing feed to coerce Zillow into abandoning the Standards, which Zillow contends threatened MRED's private-listing business and competitive position. R. 1 ¶ 189. MRED responds that its actions reflect enforcement of neutral rules, applicable to all MLS members, governing the use and distribution of MRED listing data, not an effort to preserve monopoly power. R. 122 at 9-10.

On the present record, Zillow has not sufficiently shown that MRED's threatened termination of the feed constitutes exclusionary maintenance of monopoly power rather than enforcement of its data distribution rules. As discussed above, the parties sharply dispute the competitive significance of Zillow's Standards and of MRED's response to them. Zillow characterizes the Standards as a pro-transparency challenge to private listing networks; MRED characterizes the dispute as one over Zillow's compliance with rules governing access to MRED data, which benefit all MLS members, including Zillow, by ensuring that MLS members use that data fairly. The same ambiguity that prevents the Court from treating the alleged conduct as manifestly anticompetitive under § 1 likewise prevents a strong showing that MRED used monopoly power for an exclusionary purpose under § 2.

***(c) Antitrust Injury***

Zillow's § 2 claim independently fails for lack of a sufficient showing of antitrust injury. The same antitrust injury requirement discussed with respect to § 1 applies here. Zillow must show that its injury flows from the competition-reducing aspect of MRED's allegedly exclusionary conduct, not merely from the loss of commercially valuable listing data or from competitive pressure arising from rival business models. *Viamedia, Inc.*, 951 F.3d at 481.

For the reasons already explained, Zillow has not made that showing. Its anticipated losses of listing, traffic, users and competitive positions may be substantial, but Zillow has not sufficiently connected those injuries to a reduction in competition in a cognizable relevant market. The Court therefore reaches the same conclusion under § 2 as under § 1.

Accordingly, Zillow has not made a strong showing of likelihood of success on its § 2 claim. It has not sufficiently established monopoly power in a cognizable relevant market, has not sufficiently shown willful maintenance of monopoly power, and has not established antitrust injury.

Accordingly, Zillow has not made the strong showing necessary to a likelihood of success on either claim. A plaintiff seeking a preliminary injunction is required to establish a likelihood of success on at least one of its claims. *Pritzker*, 973 F.3d at 762-63. Therefore, the plaintiffs' preliminary injunction motion fails here, and the Court need not proceed further. However, for the sake of completeness, the Court considers the remaining preliminary injunction factors briefly below.

***b) No Adequate Remedy at Law***

Even if Zillow were able to demonstrate a likelihood of success on one of its claims, it would also have to show that traditional legal remedies would be inadequate to redress the alleged injury. A legal remedy is inadequate when it is "seriously deficient as compared to the harm suffered." *Foodcomm Int'l v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003).

Zillow has not made that showing. If MRED and Compass terminate Zillow's access to listing feeds, Zillow contends that it will lose not merely identifiable revenue from particular transactions, but listing inventory, users, traffic, goodwill, and competitive position. R. 21 at 19. It further contends that those effects would compound because reduced listing inventory makes Zillow less attractive to users, which in turn may make the platform less attractive to sellers and agents, creating a "negative feedback loop." *Id.* at 45.

Those losses can be reasonably estimated. It "should be a relatively straightforward process to estimate, by reference to historical data and trends, the amount of lost profits that would have been earned from sales." *Packaging Corp. of Am. v. Croner*, 419 F. Supp. 3d 1059, 1078 (N.D. IL 2020). As Dr. Aron testified, by comparing Zillow's profits before and after termination of the listing feeds, and comparing areas of listing ban enforcement and non-enforcement, the economic effect of termination of the listing feed can be measured. PI Tr. 520:12-16 ("If the harm is that these monetization strategies will be depressed or will face a downward spiral, the harm to that

isn't . . . abstract. It is in the form of money. It is in the form of revenues and costs. And those are measurable.").

Zillow argues that it is not feasible to identify consumers who would have visited Zillow, listings that would have appeared there, customers who shifted their behavior, or business opportunities lost (*e.g.*, Zillow Preview) because of diminished platform value, but the argument is not persuasive. Zillow's foundational economic model is to generate traffic for its website so that advertisers will pay Zillow to display their ads, and the price paid to Zillow is a function of the traffic generated by its site. Traffic to Zillow's website is thus readily measured and by reference to historical and current market advertising rates changes in Zillow's revenue can be reasonably estimated. As for Zillow Preview, the same sort of "coming soon" service is being offered by other platforms, so there are market data that reflect the value of such services to consumers. It also bears noting that Zillow is a public company (R. 4) and, as such, the effect of material changes to its business are under constant scrutiny and regulatory reporting requirements.

The Court therefore concludes that Zillow has shown that an award of damages after final judgment could adequately remedy the full range of injuries it faces.

***c) Irreparable Harm***

Zillow must separately show that, absent preliminary relief, it is likely to suffer irreparable harm before a final judgment can be entered. *Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 769 (7th Cir. 2011). The threatened injury need not be certain to occur, but it must amount to more than a mere possibility. *Id.* at 788. Zillow's briefing relies on repeated threats by MRED to terminate the feeds if Zillow continues enforcing its Standards, and MRED indeed did make good on those threats, prompting the Court to enter a temporary restraining order preserving the status quo. R. 21 at 19. Thus, the potential injury Zillow alleges is more than "mere possibility," and is

arguably "certain to occur"—in the sense that it already has, and its impact is only being abated by the Court's temporary injunctive measures. *Id.*

Nevertheless, the Court concludes that Zillow has not established that it will experience irreparable harm prior to financial judgment if its IDX and VOX feeds are terminated. While the loss of access to listing feeds would undoubtedly harm Zillow, it will only experience such harm if it attempts to enforce its listing standards that bar listing on Zillow's portal of properties marketed on a PLN before being listed on the MLS. If Zillow doesn't enforce its listing ban, it will not lose access to the listing feeds and it can avoid any harm from MRED's enforcement of the objective criteria rule. Harm resulting from loss of access to the listing feeds is therefore entirely avoidable.

Zillow contends, however, that losing access to the listing feeds would damage its brand because it would compromise Zillow's efforts to promote transparency in the market for residential real estate listings by conditioning access to its portal on having immediate access to any listings on PLNs. Abandoning its listing standards, Zillow asserts, would harm Zillow "by allowing PLNs to promote their harmful PLNs and offload their failed listings onto Zillow and by allowing PLNs to proliferate, fragment the market, and harm the quality and quantity of Zillow's listing supply." R. 112 at 9. Without a comprehensive inventory of listings, including those on PLNs, Zillow contends, it will be unable to compete effectively because listings that have previously been marketed on a PLN are stale and of less interest to buyers.

That makes no sense. Consumers viewing listings on Zillow don't know whether listings have been marketed on a PLN before listing on Zillow. They have no basis to conclude that the listings were previously listed on a PLN—unless, of course, they saw the property on a PLN before it was on Zillow. PI Tr. 427:16-22 (Wu)(Q: "the only way a Zillow user would know that a

particular listing had previously been on some other platform is if they had been on that other platform and saw it there, right? A: Yes, probably.") And if consumers are checking multiple online listing portals, they plainly do not rely on Zillow for its comprehensiveness. PI Tr. 428:6-8 (Wu) ("most users do us multiple platforms, though I don't know that there are many users who only use Zillow"). Only if one defines "irreparable harm" to Zillow as the inability to require PLNs to supply their listings to Zillow can Zillow establish this element.

The proof of the pudding, moreover, is in the eating. Despite the ongoing dispute, Zillow has never enforced its Standard in Chicagoland, PI Tr. 431:6-8 (Wu), and has presented no evidence of any "downward spiral" in Zillow's business. Dr. Wu asserted that "it's too early to tell" whether Zillow's inability to enforce its Standards has or will caused any downward spiral in Zillow's business. If that's the case, then Zillow has necessarily failed to establish that it would suffer irreparable harm if it is unable to enforce its Standards.

Accordingly, Zillow has not shown the inadequacy of legal remedies or a likelihood of irreparable harm.

* * * * *

For the foregoing reasons, Zillow has not made the required strong showing that it is likely to succeed on the merits of either its § 1 or § 2 Sherman Act claim. Accordingly, Zillow's motion for a preliminary injunction is denied.

Pursuant to the Court's June 4, 2026, order, the temporary restraining order is dissolved. R. 74. In accordance with the Court's grant of MRED's motion to compel arbitration, Zillow's claims against MRED in this Court are stayed pending arbitration. R. 30. And for the reasons set forth in the ruling on the arbitration motion, this case is also stayed as to the claim against Compass.

Dated: September 16, 2026

John J. Tharp, Jr.
United States District Judge